### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 06-20758-CR-ALTONAGA/Turnoff

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

CHARLES EMMANUEL,

       Defendant.

_____/

### <u>ORDER ON DEFENDANT'S MOTION TO DISMISS THE INDICTMENT</u>

**THIS CAUSE** is before the Court on Defendant, Charles Emmanuel's Motion to Dismiss the Indictment Based on the Unconstitutionality of 18 U.S.C. § 2340A, Both on Its Face and As Applied to the Allegations of the Indictment [D.E. 38], filed on March 2, 2007. The Court has carefully considered the parties' written submissions, the Brief of *Amici Curiae* [D.E. 56], International Human Rights Organizations Opposing Defendant's Motion to Dismiss the Indictment, filed on April 18, 2007, to which the Defendant had an opportunity to respond,[1] and applicable law.

### I.   <u>BACKGROUND</u>

#### *A.   International and National Prohibitions of Torture*

International prohibition against torture is a *jus cogens* norm of international law. *See Nuru v. Gonzales*, 404 F.3d 1207, 1222-23 (9th Cir. 2005) ("torture is illegal under the law of virtually every country in the world and under the international law of human rights") (internal footnotes

---

[1] Defendant's Reply Memorandum, filed on May 7, 2007 [D.E. 83], addressed both the arguments raised by the Government in opposition [D.E. 58] to the Motion, as well as the arguments of *Amici Curiae*. On June 26, 2007, Defendant also filed a Supplement to Reply to Government's Response to Motion to Dismiss Indictment on Grounds of Unconstitutionality of Statute [D.E. 134].

Case No.  06-20758-Cr-Altonaga/Turnoff

omitted); J. Josephine Vining, <u>Providing Protection From Torture by "Unofficial" Actors, a New</u> <u>Approach to the State Action Requirement of the Convention Against Torture</u>, 70 Brook. L. Rev. 331, n.92 (fall 2004).  The Universal Declaration of Human Rights, adopted by the United Nations in 1948, states that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."  Universal Decl. of Human Rights, Dec. 10, 1948, U.N. Doc. A/810, art. 5.  The International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 7, 999 U.N.T.S. 171, 6 I.L.M. 368, states that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

On December 10, 1984, the United Nations General Assembly unanimously adopted the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture" or "Convention").  G.A. Res. 39/46, U.N. GAOR, 39th Sess., Supp. No. 51 at 197, U.N. Doc. A/RES/39/46, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (Dec. 10, 1984).  *See also* Herbert Morais, <u>Fighting International Crime and its Financing: The Importance of</u> <u>Following a Coherent Global Strategy Based on the Rule of Law</u>, 50 Vill. L. Rev. 583, n.17 (2005). It was adopted "with the stated purpose to 'make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world.'"  *Auguste v. Ridge*, 395 F.3d 123, 130 (3d Cir. 2005) (quoting the Preamble to the Convention, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85)).  The Convention entered into force on June 26, 1987.  *See id.*  It has been described as the "most important U.N. treaty for controlling, regulating, and prohibiting torture and related practices."  Winston Nagan & Lucie Atkins, <u>The International Law of Torture:</u> <u>From Universal Proscription to Effective Application and Enforcement</u>, 14 Harv. Hum. Rts. J. 87, 97 (2001).

2

Case No.  06-20758-Cr-Altonaga/Turnoff

On April 18, 1988, President Ronald Reagan signed the Convention, with the caveat that the United States reserved the right to communicate such reservations, interpretive understandings, or declarations as were deemed necessary.  *See Auguste*, 395 F.3d at 130 (citations omitted).  President Reagan submitted the Convention Against Torture to the Senate for advice and consent to ratification on May 20, 1988, with seventeen proposed conditions (four reservations, nine understandings, and four declarations).  *Id.* at 131(citing S. Exec. Rep. 101-30, at 2, 7 (1990)).

In January 1990, President George H.W. Bush submitted a revised and reduced list of proposed conditions.  *See Auguste*, 395 F.3d at 131.  One of the proposed conditions was that in order to constitute torture, the "act must be specifically intended to inflict severe physical or mental pain or suffering."  *Id.* (quoting S. Exec. Rep. 101-30 at 9, 36).  On January 30, 1990, the Senate Foreign Relations Committee held a hearing and thereafter, on August 30, 1990, issued a report recommending that the Senate give its advice and consent to ratification of the Convention Against Torture, subject to reservations, understandings and declarations.[2]  S. Exec. Rep. 101-30 (1990). The full Senate gave its advice and consent to ratification, again, subject to several reservations, understandings and declarations.  *See* S17, Cong. Rec. 486, S17491-92 (daily ed. 1990).

On October 21, 1994 and pursuant to Article 26 of the Convention, when President William Clinton deposited the instrument for ratification with the United Nations, *see Xuncax v. Gramajo*, 886 F. Supp. 162, 176 n.12  (D. Mass. 1995), the United States became a party to the Convention.

_____

[2] The Senate gave advice and consent subject to the reservation that the term "cruel, inhuman or degrading treatment or punishment" is to have a meaning as prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution, and subject to additional understandings, including that the provisions of the Convention are not self-executing.  For a complete listing of the reservations, understandings and declarations of the United States Senate, *see* http://www.unhchr.ch/html/menu2/6/cat/treaties/convention-reserv.htm.

Case No.  06-20758-Cr-Altonaga/Turnoff

"Notably, the President included the Senate understandings in the instrument of ratification." *Auguste*, 395 F.3d at 132 (citing 1830 U.N.T.S. 320, 321, 322 (1994)); Declarations and Reservations made upon Ratification, accession, or Succession (visited Nov. 24, 2004) (http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14.asp)).

In consenting to ratification of the Convention Against Torture, the Senate acknowledged that existing U.S. federal and state criminal statutes prohibited acts of torture occurring within the United States. *See Summary and Analysis of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment*, S. Treaty Doc. 100-20, 9-10 (1988).  The Senate recognized that in order for the United States to comply with its obligations under the treaty, it would need to enact a criminal statute prohibiting acts of torture by the defendants specified in Article 5 of the Convention, committed outside the United States.  *Id.*

There are 144 parties to the Convention Against Torture, representing approximately 75% of the member states of the United Nations, including the United States and Liberia.  The Convention defines "torture" as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Convention*, Article 1(1).

Article 2(1) of the Convention requires each State Party to "take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction."  Article 4 requires each State Party to "ensure that all acts of torture are offences under

4

Case No.  06-20758-Cr-Altonaga/Turnoff

its criminal law.  The same shall apply to any attempt to commit torture and to any act by any person which constitutes complicity or participation in torture."  Article 5(1) requires each State Party to "take such measures as may be necessary to establish its jurisdiction over the offences . . . (b) When the alleged offender is a national of that State," and "2. . . . where the alleged offender is present in any territory under its jurisdiction and it does not extradite him . . . ."

The Convention, or treaty, was not intended to be self-executing.  *See Reyes-Sanchez v. United States Attorney Gen.*, 369 F.3d 1239, 1240 n.1 (11th Cir. 2004); *Calderon v. Reno*, 39 F. Supp. 2d 943, 956 (N.D. Ill. 1998); *White v. Paulsen*, 997 F. Supp. 1380, 1383 (E.D. Wash. 1998). Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by implementing legislation.  *Auguste*, 395 F.3d at 132 n.7 (citations omitted).  The United States therefore enacted 18 U.S.C. §§ 2340-2340A of the United States Criminal Code pursuant to Articles 4 and 5 of the Convention.  The Torture Convention Implementation Act ("Torture Act"), 18 U.S.C. §§ 2340 and 2340A, contains a definitional section, section 2340, and a section listing proscriptive elements and jurisdictional requirements, section 2340A.

The Torture Act states that "[w]hoever outside the United States commits or attempts to commit torture shall be fined . . . or imprisoned not more than 20 years, or both, and if death results . . . shall be punished by death or imprisoned for any term of years or for life."  Federal courts have jurisdiction if "the alleged offender is a national of the United States; or the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender."  18 U.S.C. § 2340A(b).  A person who conspires to commit an offense under the Act is subject to the same penalties prescribed for the offense under section 2340A(c).

5

Case No.  06-20758-Cr-Altonaga/Turnoff

Under the Torture Act, torture is defined in a slightly different manner from its definition in the Convention.  Torture is defined in the Torture Act as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control."  18 U.S.C. § 2340(1).  "Severe mental pain or suffering" is

the prolonged mental harm caused by or resulting from –

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

18 U.S.C. § 2340(2).

The Torture Act was enacted on April 30, 1994, and amended on September 13, 1994.  It was to become effective on the later of April 30, 1994 or the date on which the United States became a party to the Convention.  *See* Pub. L. No. 103-236, 108 Stat. 463, 464 (1994).  Pursuant to Article 27 of the Convention, the Torture Act entered into force for the United States on November 20, 1994, thirty days after it was deposited for ratification with the United Nations.  *See Xuncax*, 886 F.Supp. at 176 n.12.  The conspiracy offense was added in the 2001 amendments.

Until this case, the Torture Act had never been used in any criminal prosecution.

6

Case No.  06-20758-Cr-Altonaga/Turnoff

### B.        This Prosecution

On December 6, 2006, the Grand Jury returned an Indictment [D.E. 1] against Defendant, Charles Emmanuel, charging Defendant with conspiracy to commit, and the commission of acts of torture upon an unidentified person ("victim") in the country of Liberia.  The Indictment alleges that Defendant was born in Boston, Massachusetts, was present in the United States as a result of his arrival at Miami International Airport, and at relevant times, was present in the country of Liberia, located in West Africa.  Because his father, Charles McArthur Taylor, was president of Liberia, Defendant allegedly had authority to command members of the Liberian Antiterrorist Unit and participated in activities of the Liberian security forces, including the Antiterrorist Unit, a Special Security Service, and the Liberian National Police.  During 2002, Liberia had non-violent groups and armed rebel groups opposed to the presidency of Defendant's father.

Count One of the Indictment charges Defendant with knowingly conspiring with others to commit torture by conspiring with others to commit acts, under the color of law, with the specific intent to inflict severe physical pain and suffering upon a person within their custody and control.  The object of the conspiracy was to obtain information from the alleged victim about actual, perceived, or potential opponents of the Taylor presidency by, *inter alia*, committing torture, in violation of Title 18, United States Code, §§ 2340A and 2340(1).  The interrogation and torture are alleged to have taken place in various locations in Liberia, on or about July 24, 2002.  Among other things, Defendant allegedly made the victim hold scalding water in his hands and repeatedly shocked the victim's genitalia and other body parts, and a co-conspirator poured scalding water on other locations of the victim's body, applied a hot iron to the victim's flesh, and rubbed salt into the victim's open wounds.  All acts are alleged to violate 18 U.S.C. § 2340A(c).

Case No.  06-20758-Cr-Altonaga/Turnoff

Count Two alleges that Defendant and others, while intending to inflict severe physical pain and suffering, committed and attempted to commit torture, while acting under color of law, by committing acts against the victim, including repeatedly burning the victim's flesh with a hot iron, forcing the victim at gunpoint to hold scalding water, burning other parts of the victim's flesh with scalding water, repeatedly shocking the victim's genitalia and other body parts with an electrical device, and rubbing salt into the victim's wounds, while the victim was within the Defendant's custody and physical control, in violation of 18 U.S.C. §§ 2340A and 2340(1), and 18 U.S.C. § 2.

Count Three alleges that Defendant knowingly used and carried a firearm during and in relation to a crime of violence and possessed a firearm in furtherance of a crime of violence, for which the Defendant may be prosecuted in the United States, that is, the crimes alleged in Counts One and Two, all in violation of 18 U.S.C. § 924(c)(1)(A).

Defendant's Motion to Dismiss challenges the Indictment on several constitutional grounds. The "core problem with this case," according to Defendant, is that "the government seeks to oversee, through the open-ended terms of federal criminal law – the internal and wholly domestic actions of a foreign government." (*Def's Mot.* [D.E. 38] at 1).  The essence of the challenge to the prosecution is the constitutional infirmity of 18 U.S.C. § 2340A, a law that has been in place for over a decade, and under which Defendant is the first person to be prosecuted.

Defendant presents the following arguments in support of his Motion, each of which is addressed below in turn:

(A)     Defendant maintains that Congress lacked constitutional authority to enact section 2340A, and disputes that the power to regulate foreign commerce, U.S. Const. art I, § 8, cl. 3; the Piracies and Felonies Clause, U.S. Const., art. I, § 8, cl. 10; and the Necessary and Proper

8

Case No.  06-20758-Cr-Altonaga/Turnoff

Clause, U.S. Const., art. I, § 8, cl. 18, serve as possible sources of Congressional power to legislate.

(B)     Defendant argues that Congress lacks the authority to apply criminal laws extraterritorially, where the locus of the offense is completely foreign.

(C)     Defendant argues that the prosecution violates the doctrine of sovereign immunity, in that the Indictment seeks to charge Defendant, as a foreign official, for acts committed while he was allegedly acting in an official capacity.

(D)     Defendant maintains that section 2340A is unconstitutionally vague on its face and as applied, in violation of the Due Process Clause of the Fifth Amendment.

(E)     Defendant argues that extraterritorial application of the statute violates the Fifth Amendment guarantee of due process.

(F)     Last, Defendant argues that extraterritorial application of the statute violates the Sixth Amendment right to a speedy trial before a jury of one's peers in the place where the crime was committed, the right to compulsory process, and the right to the effective assistance of counsel.

## II.     ANALYSIS

### A.     Congress' Power to Enact the Torture Act[3]

To paraphrase Defendant, he argues that the Torture Act does not implement the Convention Against Torture, but rather, creates a different crime from the act of torture defined in the

---

[3] The Government has implicitly conceded Defendant's argument that the power to regulate commerce with foreign nations, found in U.S. Const. Art. I, § 8, cl. 3, is not a basis for the Congressional exercise of power found in the Torture Act.

Case No.  06-20758-Cr-Altonaga/Turnoff

Convention.  According to Defendant, the Torture Act has an expansive statutory prohibition of torture, where pain and suffering need not be inflicted for purposes of intimidation, coercion, or for obtaining a confession.  That definition is at odds with the limited treaty terms, which define torture as an act by which severe pain or suffering is intentionally inflicted for such purposes as obtaining information or a confession when inflicted by a public official in an official capacity.   Because the definition of torture in the Torture Act, in essence, a definition amounting to aggravated battery, does not track the treaty language, the definition varies sharply from the international understanding of torture as set forth in the Convention, and the statute thus cannot be said to effectuate, or be necessary to or proper for, compliance with the treaty.

Defendant's argument fails to persuade that Congress lacked authorization, under the Necessary and Proper Clause or the Offences Clause of Article I of the Constitution, to enact the Torture Act.

        *1.*     *Necessary and Proper Clause and the Treaty Power*

The undersigned concludes that Congress certainly had the authority to pass the Torture Act under the Necessary and Proper Clause of Article I, as an adjunct to the Executive's authority under Article II to enter into treaties, with the advice and consent of the Senate.  Under Article I, "[t]he Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  Const. art. I, § 8, cl. 18. Under Article II, the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators concur . . . ."  Const. art. II, § 2, cl. 2.  Treaties made pursuant to the power contained in Article II, "can authorize Congress to deal with 'matters'

10

Case No.  06-20758-Cr-Altonaga/Turnoff

with which otherwise 'Congress could not deal.'" *United States v. Lara*, 541 U.S. 193, 201 (2004)

(quoting *Missouri v. Holland*, 252 U.S. 416, 433 (1920)); *see also United States v. Lue*, 134 F.3d

79, 82 (2d Cir. 1998) (noting that because "Congress's authority under the Necessary and proper

Clause extends beyond those powers specifically enumerated in Article I, section 8, . . .  [, it] may

enact laws necessary to effectuate the treaty power, enumerated in Article II . . . .") (quotations and

citations omitted); *United States v. Ferreira*, 275 F.3d 1020, 1027 (11th Cir. 2001) (quoting *Lue*, 134

F.3d at 82).

A treaty is essentially a contract between two nations.  *See Societe Nationale Industrielle

Aerospatiale v. United States Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 533 (1987).  To the

extent treaties are self-executing, or if non self-executing, to the extent Congress implements them

by legislation and conventions, treaties have the force and effect of legislative enactments, and are

the equivalent of acts of Congress.  *See* 16 Am. Jur. 2d *Constitutional Law* § 55.  "Acts of Congress

are the supreme law of the land only when made in pursuance of the Constitution, while treaties are

declared to be so when made under the authority of the United States."  *Holland*, 252 U.S. at 433.

The treaty in question, the Convention Against Torture, has as its goal to make more effective

the struggle against torture and other cruel, inhuman or degrading treatment or punishment

throughout the world.  It requires that State Parties take effective legislative measures to prevent acts

of torture and to make acts of torture offenses under their criminal laws.  The Convention further

requires that each State Party take measures as may be necessary to establish its jurisdiction over

alleged offenders who are either nationals of the State or are present in its jurisdiction.

In determining the intended meaning of the parties, a court should look to a treaty's

negotiating and drafting history, as well as the subsequent practice of the parties in their application

Case No.  06-20758-Cr-Altonaga/Turnoff

of the treaty.  *See Elcock v. United States*, 80 F. Supp. 2d 70, 78-79 (E.D.N.Y. 2000) (citations omitted).  Also, because a treaty implicates questions of foreign policy, the construction given by the Executive Branch, although not binding on the court, is entitled to great weight.  *See Factor v. Laubenheimer*, 290 U.S. 276, 295 (1933).  Furthermore, "if a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."  *Id.* at 293-94.  Lastly, a court is under a duty to interpret a statute in a manner consonant with treaty obligations, because "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." *United States v. PLO*, 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988) (quoting *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)).

When the Convention was ratified by the United States, it was explicitly ratified subject to certain understandings and restrictions.  Those understandings and limitations were subsequently incorporated into the legislative scheme that effectuated it, including the statutory definition of torture.  Defendant cites to no case that compels a finding that where legislation that implements a treaty varies from the language or scope of the treaty, it is constitutionally infirm, or is less necessary and proper to carry out the powers exercised by the Executive under Article II than legislation that mirrors verbatim the language used in the treaty.

Defendant's argument is similar to the arguments raised by the defendants in *Lue*, 134 F.3d 79, and *Ferreira*, 275 F.3d 1020.  In those cases, the defendants maintained that Congress had exceeded its authority to pass laws necessary and proper to the effectuation of the Hostage Taking Convention because the legislation, the Hostage Taking Act, contained language that swept too broadly.  Specifically, in *Lue* the defendant argued that because the Hostage Taking Convention

12

Case No.  06-20758-Cr-Altonaga/Turnoff

targeted a specific aspect of international terrorism – hostage taking – the statute had to deal

narrowly with international terrorism to avoid invalidity under the Necessary and Proper Clause.  134

F.3d at 84.

The court rejected that argument, stating

> If the Hostage Taking Convention is a valid exercise of the Executive's treaty
> power, there is little room to dispute that the legislation passed to effectuate the treaty
> is valid under the Necessary and Proper Clause.  *See Holland*, 252 U.S. at 432, 40
> S.Ct. at 383 (noting that, under normal circumstances, "[i]f the treaty is valid there
> can be no dispute about the validity of [a] statute [passed] under Article I, Section 8,
> as a necessary and proper means to execute the powers of the Government").

> . . . [T]he "plainly adapted" standard [under the Necessary and Proper Clause]
> requires that the effectuating legislation bear a rational relationship to a permissible
> constitutional end.  Were this not the case, any congressional enactment not passed
> pursuant to an expressly enumerated power would be subject to challenge on some
> more rigorous means-ends analysis.  Such thoroughgoing judicial involvement in the
> day-to-day enactments of Congress would undercut . . . the need to preserve a realm
> of flexibility in which Congress can carry out its delegated responsibilities. . . .  The
> Act here plainly bears a rational relationship to the Convention; indeed, it tracks the
> language of the Convention in all material respects.

134 F.3d at 84 (internal citations omitted).  Similarly, in *Ferreira*, the Eleventh Circuit, relying on the

Second Circuit's reasoning in *Lue*, also concluded that the Hostage Taking Act was passed to

implement the International Convention Against the Taking of Hostages, and congressional authority

could be found in the Necessary and Proper Clause.  275 F.3d at 1027.

Here, the definition of torture in the Torture Act admittedly does not "track the language of

the Convention in all material respects."  The statutory definition of torture does, however, parallel

the definition found in the Convention, in that both texts define torture to include the intentional

infliction of severe pain or suffering by a public official or person acting under color of law.  The

element missing from the statutory definition, that is, that the torture be inflicted for the purposes of

Case No.  06-20758-Cr-Altonaga/Turnoff

obtaining a confession, for punishment, or for intimidation or coercion, does not take the Torture Act outside the authorization given Congress in the Necessary and Proper Clause.  Indeed, the more expansive statutory definition, which captures more acts of torture than does the definition contained in the Convention, is consistent with the international community's near universal condemnation of torture and cruel, inhuman or degrading treatment, and is consistent with repeated calls for the international community to be more "effective [in] the struggle against torture."  *Convention Preamble*; *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) ("State-sponsored torture, unlike torture by private actors, likely violates international law. . . .") (citation omitted).

In its Reply and Supplement to Reply, Defendant also argues that the Convention Against Torture was not intended to apply in times of armed conflict and that Liberia was in the midst of armed conflict in 2002 when the crimes alleged in the Indictment occurred.  The materials attached to Defendant's Supplement show that a U.S. government official stated the Convention was not intended to apply in times of armed conflict.  Defendant thus argues that the Necessary and Proper Clause and Congress' treaty power cannot serve as a basis for validating application of the Torture Act here.  The problem with this argument, raised by Defendant in reply, is not only that the Government cannot respond to it, but also that it relies on factual matters outside the face of the Indictment[4] to challenge its sufficiency, facts that the undersigned is not permitted to consider.  *See*

---

[4] While the Indictment references the existence of armed rebel groups opposed to the Charles Taylor presidency, it does not specifically allege the existence of armed conflict in Liberia.  Much of Defendant's argument in this regard is premised upon statements made by the Government at the pretrial detention hearing, but the Indictment itself does not state that the alleged crimes took place during armed conflict.

14

Case No. 06-20758-Cr-Altonaga/Turnoff

*United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("The sufficiency of a criminal indictment is determined from its face).

Notably missing from Defendant's repeated argument that because the statute does not track the treaty, the former could not be legislated pursuant to the Necessary and Proper Clause, is the citation to any case that has required Congress, in implementing the will of the Executive by ratifying international treaties and conventions, to track treaty language verbatim. Mindful of the need to preserve a realm of flexibility in which Congress may carry out its delegated responsibilities, the undersigned concludes that the Torture Act plainly bears a rational relationship to the stated objectives of the Convention, and thus passes constitutional muster under the Necessary and Proper Clause.

2.    <em>Offences Clause</em>

Alternatively, assuming Defendant was correct, and Congress' more expansive definition of torture took the Torture Act outside the realm of the Necessary and Proper Clause, one additional source of constitutional authority for the Torture Act may be found in Article I, § 8, cl.10 of the Constitution, that is the "offences against the Law of Nations" Clause. That clause gives Congress the power "[t]o define and punish Piracies and Felonies on the high Seas, and Offences against the Law of Nations." *Id.* Because of the way the clause is written, and contrary to Defendant's proposed interpretation of it, Congress has the power to define and punish offenses against the law of nations, independent of any piracies or felonies that occur on the high seas.

The law of nations is to be ascertained as follows:

[W]here there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor,

15

Case No.  06-20758-Cr-Altonaga/Turnoff

research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat.

*The Paquete Habana*, 175 U.S. 677, 700 (1900).  In seeking to ascertain what is the law of nations, it is important to clarify the distinction between the law of nations, or customary international law, and the concept of *jus cogens*.

Customary international law, also known as the direct descendant of the law of nations, is the "'general and consistent practice of states followed by them from a sense of legal obligation.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 102(2) (1987)).  Customary international law derives solely from the consent of the states.  *See id.* at 715.  A norm of customary international law may come to attain the status of *jus cogens*, norms that do not depend solely on the consent of the states for their binding force, but rather, transcend such consent.  *See id.*  A *jus cogens* norm is one from which no derogation is permitted; it is one that enjoys the highest status within international law.  *See id.*

The prohibition against official torture has attained the status of a *jus cogens* norm, not merely the status of customary international law.  *See id.* at 717 (collecting authorities).  In reaching the not surprising conclusion that prohibition of official torture was a *jus cogens* norm, the Ninth Circuit explained:

> [W]e conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens*.  The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate.  To subject a person to such horrors is to commit one of the most egregious violations of the personal security and dignity of a human being.  That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens.

16

Case No.  06-20758-Cr-Altonaga/Turnoff

*Id.* at 717 (citations omitted).

It is beyond peradventure that torture and acts that constitute cruel, inhuman or degrading punishment, acts prohibited by *jus cogens*, are similarly abhorred by the law of nations.  *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) ("'[F]or purposes of civil liability, the torturer has become – like the pirate and slave trader before him – *hostis humani generis*, an enemy of all mankind.'") (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980)).  Certainly the numerous international treaties and agreements, and several domestic statutes that contain varying proscriptions against torture, addressing both civil and criminal reparation, demonstrate the law of nations' repudiation of torture.

Over a century ago, the Supreme Court stated that "if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offense against the law of nations."  *United States v. Arjona*, 120 U.S. 479, 488 (1887).  In the present international community, it cannot be said that the Torture Act, legislation that criminalizes acts of torture by U.S. nationals or persons present in the United States, committed outside the United States, does not address an act made punishable by the Government's international obligations under the Convention, and which the Government is required to use due diligence to prevent.  Thus, the Torture Act also finds constitutional protection as a law enacted by Congress to punish offences against the law of nations.

**B.    *Congress' Authority to Apply Criminal Laws Extraterritorially***

Defendant appears to be making two separate arguments regarding the inability of Congress to apply a criminal law extraterritorially where the locus of the offense is completely foreign.  First, Defendant argues that federal courts have allowed for extraterritorial application of U.S. criminal law

Case No.  06-20758-Cr-Altonaga/Turnoff

only where the conduct in question had or would have a deleterious effect within the United States, *see United States v. Bowman*, 260 U.S. 94, 98 (1922) (approving extraterritorial application of criminal statutes "because of the right of government to defend itself against obstruction or fraud wherever perpetrated, especially if committed by its own citizens"), and certainly only where application of the law would be reasonable, *see United States v. Clark*, 315 F. Supp. 2d 1127, 1132 (W.D. Wa. 2004) ("Even if principles of international law serve as bases for extraterritorial application of the law, international law also requires that such application of the law be reasonable.") (citation omitted).  Second, Defendant argues that courts presume Congress legislates against the backdrop of the presumption that laws do not apply extraterritorially, and that presumption may only be overcome by clear expression from Congress of a contrary intent.  *See Nieman v. Dryclean U.S.A. Franchise Co., Inc.*, 178 F.3d 1126, 1129 (11th Cir. 1999) (finding that language in the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*, does not clearly indicate that Congress intended the Act to apply extraterritorially).  Thus, Defendant maintains that all three counts of the Indictment, which address actions committed exclusively in a foreign country, Liberia, by someone now present in the United States, who was born in the United States, should be dismissed.

1. *Extraterritorial Reach of the Torture Act (Counts I and II)*

As to Defendant's first argument on the issue of the constitutionality of the extraterritorial reach of the Torture Act, the Indictment alleges that Defendant was born in the United States, and more recently arrived at Miami International Airport.  Defendant believes that the Government is of the opinion that he was not a United States citizen when he allegedly committed torture on July 24, 2002, because by that time, Defendant had committed acts that had caused him to lose his citizenship. *See* 8 U.S.C. § 1481(a) (listing acts that result in the loss of U.S. citizenship).  Whether or not

Defendant is presently a United States citizen, the Indictment alleges he was born here, and *de jure*, it appears he is a citizen.  *See* U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States . . . .").  And, "[i]t is undisputed that Congress has the power to regulate the extraterritorial acts of U.S. citizens." *Nieman*, 178 F.3d at 1129; *see also United States v. Harvey*, 2 F.3d 1318, 1329 (3d Cir. 1993) ("No tenet of international law prohibits Congress from punishing the wrongful conduct of citizens, even if some of that conduct occurs abroad.") (citations omitted).

As to Defendant's second argument, that the Torture Act is presumed not to reach conduct that occurred extraterritorially, the argument finds no support from the plain words used in the statute, the starting and ending point here for any inquiry into its extraterritorial reach.  Generally, courts are to presume that legislation of Congress is meant to apply only within the territorial jurisdiction of the United States.  *See E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).  That presumption, however, ceases to exist where a contrary intent appears.  *Id.*; *see also Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949) (presumption that "legislation . . . is meant to apply within the territorial jurisdiction of the United States" may be invoked "unless a contrary intent appears").

Here, the Court need not search far for Congress' intent to apply the Torture Act extraterritorially.  The plain words of the statute, section 2340A(a), state "[w]hoever *outside the United States* commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, . . . ."  (emphasis added).  Congressional intent is abundantly clear.

In a case raising a similar argument, *United States v. Clark*, 435 F.3d 1100, 1106 (9th Cir. 2006) (citations omitted), the court stated that "[t]he legal presumption that Congress ordinarily

Case No.  06-20758-Cr-Altonaga/Turnoff

intends federal statutes to have only domestic application . . . is easily overcome . . . because the text of [18 U.S.C.] § 2423 [the PROTECT Act] is explicit as to its application outside the United States." Similarly here, the unambiguous text of the Torture Act expresses Congress' intention to punish acts of torture, or attempted acts of torture, not committed in the United States, but rather, committed "outside the United States." Furthermore, because the substantive provision targets extraterritorial conduct, the conspiracy provision, section 2340A(c) reaches that conduct as well. *See United States v. Layton*, 855 F.2d 1388, 1395 (9th Cir. 1988), *overruled on other grounds*, *Guam v. Ignacio*, 10 F.3d 608, 612 n.2 (9th Cir. 1993).

### 2.   *Extraterritorial Reach of 18 U.S.C. § 924(c)(1)(A) (Count III)*

As to Count Three, Defendant argues that 18 U.S.C. § 924(c), "the Firearm Statute", is devoid of any language sufficient to establish Congressional intent to apply the statute extraterritorially. Defendant, therefore, urges that Count Three fails to counter the presumption against the extraterritorial application of U.S. statutes.

The Government argues, also based on a review of its plain language, that the Firearm Statute was not intended to be limited to domestic application. Under the Firearm Statute,

> any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . [be subjected to additional imprisonment].

18 U.S.C. § 924(c)(1)(A). The Government's position rests on the clause ". . . for which the person may be prosecuted in a court of the United States." The Government urges an interpretation of the Firearm Statute that allows it to be applied extraterritorially because the underlying "crime of

Case No.  06-20758-Cr-Altonaga/Turnoff

violence"[5] alleged under the Torture Act is one for which the person may be prosecuted in the United States.  On this reading, the Firearm Statute's application is defined by the reach of the underlying "crime of violence" to which it attaches.

On at least one occasion the Firearm Statute has been applied to extraterritorial offenses.  In *United States  v. Bin Laden*, 92 F. Supp. 2d 189, 201 (S.D.N.Y. 2000), the court held that because "Congress intended those Subsections [18 U.S.C. §§ 844(f)(1) and (f)(3)] to apply extraterritorially . . . we conclude that this ancillary provision [the Firearm Statute] likewise applies extraterritorially. . . ."[6]  While admittedly *Bin Laden* is a terrorism case involving the destruction of United States embassies in Africa, the distinction is not dispositive in this analysis.  The Firearm Statute is an ancillary statute that attaches to a predicate offense.  This predicate offense may be terrorism or it may be torture.  If the predicate offense is one that "may be prosecuted in a court of the United States," by its plain language, the Firearm Statute may be applied.  There is nothing in the Firearm Statute to suggest that the locale where the predicate offense takes place is an any way material to whether or not the statute applies.

Whether or not the Firearm Statute applies in the context of the instant case is a function of whether or not the extraterritorial application of the Torture Act is proper.  There can be no violation of the Firearm Statute here without an underlying "crime of violence" (given that no drug trafficking

---

[5] The definition of "crime of violence," found in section 924(c)(3), "means an offense that is a felony and (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . . ."  Counts One and Two charge Defendant with felony offenses.  The Torture Act defines an act of torture as an act specifically intended to inflict severe physical pain or suffering.  The allegations contained in Counts One and Two neatly fit into the definition of crime of violence because the counts allege not only felonies, but also have as an element the use of force.

[6] The court in *United States v. Gatlin*, 216 F.3d 207, 212 n.6 (2d Cir. 2000), disagreed with Judge Sand's limitation of the presumption against extraterritoriality to "provisions that define offenses," as explained in *Bin Laden*, 92 F. Supp. 2d at 206 n.32.

Case No.  06-20758-Cr-Altonaga/Turnoff

offense is charged.)[7]  The essence of the Firearm Statute is to enhance the penalty for a violation of some other applicable statute.  Indeed, this characteristic is evidenced by the fact that the penalty imposed under the statute cannot run concurrently, but rather must run subsequent to any other penalty imposed.  *See* 18 U.S.C. § 924(c)(1)(D)(ii).  Based on its plain language, the Firearm Statute applies here because the predicate "crime of violence" is one that "may be prosecuted in a court of the United States."

### C.    *Whether the Prosecution Violates the Doctrine of Sovereign Immunity*

Defendant next argues that the Indictment plainly seeks to charge him as a foreign official for acts committed while he was allegedly acting in an official capacity, and therefore, the charges are prohibited by the doctrine of sovereign immunity.  The argument proceeds in the following fashion. The Indictment charges that Defendant had command of portions of the Antiterrorist Unit, the Liberian armed security force, and that, in Defendant's presence, members of the Antiterrorist Unit seized and took the unnamed victim for questioning concerning opponents of the presidency of Defendant's father, Charles Taylor, and it was during such questioning that "an assault and battery occurred."  (*Def's Mot.* at 15).  Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

---

[7] It is clear, for instance, that Congress intended that the use of firearms during the commission of drug trafficking crimes would expose a defendant to an enhanced penalty.  To accept Defendant's interpretation would necessarily lead to a similar finding that the Firearm Statute applies only to those charged with drug trafficking offenses that occur within the territory of the United States.  Although there is a presumption against extraterritorial application of U.S. statutes, "contemporary U.S. jurisprudence recognizes that 'Congress is presumed to intend extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness.'" Christopher L. Blakesley & Dan E. Stigall, The Myopia of U.S. v. Martinelli: Extraterritorial Jurisdiction in the 21st Century, 39 Geo. Wash. Int'l L. Rev. 1, 4 (2007) (quoting *United States v. Yousef*, 327 F.3d 56, 87 (2d Cir. 2003), and discussing general principles of extraterritoriality).  If the Firearm Statute were read, as Defendant urges, to apply only to offenses that occur within the United States, the statute's effectiveness would be substantially diminished.  There is no indication that Congress intended to penalize offenders less severely where their drug trafficking activities occur outside the United States.

Case No.  06-20758-Cr-Altonaga/Turnoff

§ 1604 *et seq.*, a foreign state (which is defined to include a legal person and a foreign official acting in an official capacity) is immune from the jurisdiction of the United States with certain enumerated exceptions, none of which applies in this criminal prosecution.   Moreover, because sovereign immunity predates the FSIA, and the FSIA does not reference criminal immunity, the statute creates no exceptions to such immunity.  *See id.* at 13 (citing *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 819 (6th Cir. 2002) (FSIA bars RICO prosecution of foreign country and instrumentalities). Thus, argues Defendant, he is subject to the protections afforded by sovereign immunity.

In its Response, the Government seeks to correct Defendant's characterization of the allegations of the Indictment.  First, the Government correctly points out that the Defendant is not charged with acting in his official capacity as a sovereign.  Rather, Defendant is charged with acting under color of law, as is required under the Torture Act.   To act under color of law is not synonymous with sovereignty, as government officials may act under color of law even when violating the law, *see, e.g.,United States v. Picklo*, 190 Fed. Appx. 887, 888-89 (11th Cir. 2006) (citing *United States v. Jones*, 207 F.2d 785, 786-87 (5th Cir. 1953)), and even non-government employees may be considered to be acting under color of law if under the direction of government agents, *see, e.g., United States v. Haimowitz*, 725 F.2d 1561, 1582 (11th Cir. 1984) (citations omitted).  Indeed, "'[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law.'"  *Picklo*, 190 Fed. Appx. at 889 (quoting *Williams v. United States*, 341 U.S. 97, 99 (1951)).

Thus, the allegations of the Indictment, which mirror allegations of misuse of power, made possible because the wrongdoer is clothed with authority of law, are insufficient to constitute allegations of sovereignty.  Even if the allegations were considered sufficient to invoke the protections

Case No.  06-20758-Cr-Altonaga/Turnoff

of sovereignty, however, the Eleventh Circuit has already held that the FSIA does not apply in criminal cases against foreign officials.  In *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997), the court recognized that the FSIA "addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context."  In *Noriega* the court examined the Executive Branch's position on Mr. Noriega's head-of-state immunity claim, under the principles outlined in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), and found that the Executive Branch had manifested a clear sentiment that Mr. Noriega should be denied head-of-state immunity because it had pursued the defendant's capture and prosecution.  *Id.*  The Court is bound by the Eleventh Circuit's interpretation of the FSIA, and therefore need not entertain the Sixth Circuit's contrary interpretation in *Keller*, 277 F.3d 811.

The undersigned concludes that neither the allegations of the Indictment, nor principles of sovereignty, mandate a dismissal of the Indictment.

### D.       *Whether Sections 2340-2340A are Unconstitutionally Vague*

Defendant argues that the Torture Act, 18 U.S.C. §§ 2340-2340A, does not give fair warning of what is outlawed, is void for vagueness, and therefore violates the Due Process Clause of the Fifth Amendment.  Specifically, Defendant maintains that the definitions of "torture" and "severe mental pain or suffering," and the various terms used in those definitions, such as "acting under the color of law," and "incidental to lawful sanction," included in the Torture Act, 18 U.S.C. § 2340, do "not provide the kind of notice that will allow ordinary people to understand what conduct is prohibited." (*Def's Mot.* at 17).  Defendant also argues that because the statute is vague, a prosecutor may use it as a tool of foreign affairs, and it may consequently authorize or encourage arbitrary and discriminatory enforcement.  Defendant challenges the Torture Act as vague on its face and as

24

Case No.  06-20758-Cr-Altonaga/Turnoff

applied, and as additional support for his position regarding vagueness, Defendant submits with his

Reply memorandum two Justice Department memoranda which offer varying interpretations of

torture as defined in the Torture Act.[8]  (*See* [D.E. 83] at App. 4, 5).

The void-for-vagueness challenge to the statute presented here must be considered as applied

to Defendant, rather than upon a review of the text of the statute, or on its face.  This is because the

challenge does not raise a First Amendment issue.  *See United States v. Hasner*, 340 F. 3d 1261,

1269 (11th Cir. 2003) (citing *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995)).

"Vagueness may invalidate a criminal statute if it either (1) fails 'to provide the kind of notice that

will enable ordinary people to understand what conduct it prohibits' or (2) authorizes or encourages

'arbitrary and discriminatory enforcement.'"[9]  *United States v. Eckhardt*, 466 F.3d 938, 944 (11th

Cir. 2006) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted)); *see also*

*Hasner*, 340 F. 3d at 1269 ("A statute is unconstitutionally vague if it fails to 'define the criminal

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited

and in a manner that does not encourage arbitrary and discriminatory enforcement.'") (quoting

*Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  "[T]he presence of culpable intent as a necessary

element of the offense does much to destroy any force in the argument" that a statute is

---

[8] An August 1, 2002 memorandum from Assistant Attorney General Jay S. Bybee to Alberto R. Gonzales, then Counsel to the President, states, for example, that "certain acts may be cruel, inhuman, or degrading, but still not produce pain and suffering of the requisite intensity to fall within Section 2340A's proscription against torture." ([D.E. 83], App. 4 at 1).  The memorandum goes on to examine possible defenses that would negate a claim that interrogation methods violate the statute.  A December 30, 2004 Justice Department memorandum "supercedes" the August 2002 memorandum "in its entirety," because the discussion contained within the latter was "unnecessary." (*Id.*, App. 5 at 1).

[9] Defendant's arguments that the statute is so vague it encourages discriminatory enforcement are not addressed in this order, but rather, will be addressed separately in the order on Defendant's Motion to Dismiss Indictment Based Upon Selective Prosecution in Violation of the Fifth Amendment to the United States Constitution [D.E. 67].

Case No.  06-20758-Cr-Altonaga/Turnoff

unconstitutionally vague.  *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1952).

The Torture Statute contains specific intent as one of its elements, as it defines "torture" to be "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering . . . ."  The Indictment informs Defendant that he and his co-conspirators, acting under color of law and with the specific intent to inflict severe physical pain and suffering, burned the alleged victim's flesh with a hot iron, forced the alleged victim at gunpoint to hold scalding water in his hands, burned parts of the victim's body with scalding water, repeatedly shocked the genitalia and other parts of the body with an electrical device, and rubbed salt into the alleged victim's wounds.  Such allegations, coupled with the statutory language contained in the Torture Statute, certainly advise the ordinary person of prohibited conduct with sufficient definiteness.  The Torture Statute, enacted to fulfill the United States' treaty obligations with most of the countries of the world, certainly put the Defendant, a person born in the United States, on notice of conduct prohibited not only in this country, but in much of the civilized world.

**E.     *Whether Extraterritorial Application of the Torture Statute Violates the Fifth Amendment***

Defendant argues that the prosecution of this case violates his Fifth Amendment Due Process Clause rights.  The crux of Defendant's argument is that there is no nexus between the criminal conduct alleged and his contacts with the United States.[10]  This nexus is required when a federal statute is applied extraterritorially "so that such application would not be arbitrary or fundamentally

---

[10] It appears that Defendant anticipated that the Court would utilize the principle of universal jurisdiction under international law.  (*See, e.g.,* Anthony J. Colangelo, <u>Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law</u>, 48 Harv. Int'l L. J. 121, 130 (2007) (discussing the principle of universal jurisdiction).  Because the Court has not done so, Defendant's "universally condemned" argument ([D.E. 38-1] at 20-1) is not relevant to the Court's analysis, and accordingly is not addressed.

Case No.  06-20758-Cr-Altonaga/Turnoff

unfair." *United States v. Davis*, 905 F.2d 245, 248-9 (9th Cir. 1990) (citations omitted); *see also United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (adopting *Davis* due process analysis). Given the lack of a nexus, Defendant argues that prosecution of the instant case violates his Fifth Amendment due process rights because it is arbitrary or fundamentally unfair.

The Government responds that the nexus requirement of due process is satisfied through Defendant's U.S. citizenship.  As stated, the Indictment alleges that Defendant was born in Boston, Massachusetts.  As a presumptive citizen of the United States, Defendant is subject to the jurisdiction of U.S. courts.[11]  *See* U.S. Const. amend. XIV, § 1.  The Government and Defendant debate whether or not Defendant is actually a citizen of the United States, but this issue is properly reserved for a later stage in the case.  On a Motion to Dismiss the Indictment, given the allegation that Defendant was born in the United States, Defendant is, for purposes of this analysis, a U.S. citizen.

Defendant's citizenship alone[12] is sufficient to satisfy Fifth Amendment due process concerns surrounding extraterritorial application of criminal statutes.  *See United States v. Clark*, 435 F.3d 1100, 1108 (9th Cir. 2006).  The "longstanding principle that citizenship alone is sufficient to satisfy Due Process concerns still has force."  *Id.* (discussing *Blackmer v. United States*, 284 U.S. 421 (1932)).  Furthermore, "'[t]here is no doubt that the United States may exercise jurisdiction over American nationals living abroad, regardless of where the crime is committed.'"  *Id.* (quoting *United States v. Corey*, 232 F.3d 1166, 1179 n.9 (9th Cir. 2000)).  The nexus requirement is, therefore, satisfied by the allegation that Defendant was born in the United States.  *See generally Blackmer*, 284

---

[11] This issue is also addressed in section II. B.1, *supra*.

[12] The Court does not examine the Government's statement that Defendant was apprehended while voluntarily attempting to enter the United States with a fraudulent United States passport.

Case No.  06-20758-Cr-Altonaga/Turnoff

U.S. at 436-8 (due process not offended by exercise of extraterritorial jurisdiction over U.S. citizen residing abroad); *Clark*,  435 F.3d at 1108-09 (same).   Accordingly, Defendant's prosecution for crimes allegedly committed abroad does not violate the Fifth Amendment Due Process Clause.

> ### F.       Whether Extraterritorial Application of the Torture Statute violates the Sixth Amendment

Defendant's final argument is that the extraterritorial application of the Torture Act violates all provisions of the Sixth Amendment.  Defendant first contends that the Government's choice to prosecute the alleged torture of a victim in Liberia that occurred more than four years ago is inherently unconstitutional because it violates Defendant's right to speedy trial, as Defendant will require a long time to prepare for the case.  The Government insists that Defendant's speedy trial claim is premature because the Indictment was only returned several months ago.

The Sixth Amendment provides that,

> [i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S. Const. amend. VI.  "[T]he Speedy Trial Clause by its terms applies only to an 'accused'; the right does not attach before indictment or arrest."  *Doggett v. United States*, 505 U.S. 647, 662 (1992) (O'Connor, J., dissenting) (citations omitted).  The right attaches when the government indicts or arrests the defendant, not when the defendant commits the crime.  *See id.*

Moreover, "[t]he speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused . . . and to shorten the disruption of life caused by arrest and the presence of

Case No.  06-20758-Cr-Altonaga/Turnoff

unresolved criminal charges." *United States v. MacDonald*, 456 U.S. 1, 8 (1982).  Ultimately, "to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay."  *Doggett*, 505 U.S. at 651-652.  (citations omitted).

Defendant's situation does not present a violation of speedy trial rights.  Defendant does not argue that the delay between formal accusation or indictment and trial is prejudicial, but rather merely contends that the criminal charges are stale.  The Speedy Trial Clause, however, does not independently protect against the prosecution of stale criminal charges.  "[T]he applicable statute of limitations is the primary guarantee against [prosecuting] overly stale criminal charges."  *Id.* at 665. Moreover, the Government's choice to prosecute Defendant for four-year-old criminal charges does not offend the spirit and purpose of the Speedy Trial Clause, which is to protect defendants from lengthy incarceration prior to trial.  Because Defendant does not allege that he has been incarcerated for a long time prior to trial, his Speedy Trial claim fails.

The Defendant next contends that Miami, Florida, is not an appropriate venue because the alleged crime occurred in Liberia.  Under 18 U.S.C. § 3238, "[t]he trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested . . . .").  "Congress enacted 18 U.S.C. § 3238 . . . to specify the applicable venue when a crime is committed outside the United States."  *Yousef*, 327 F.3d at 114.  Defendant was arrested in the Southern District of Florida; hence, venue in this District is constitutionally permissible.

It is also not unconstitutional for the Government to prosecute a case where most of the physical evidence and witnesses are located in foreign countries.  *See, e.g., United States v. Greco*,

Case No.  06-20758-Cr-Altonaga/Turnoff

298 F.2d 247, 251 (2d Cir. 1962).  Nevertheless, Defendant argues that the prosecution of these particular criminal charges violates the Sixth Amendment because he has no ability to compel witnesses to come to Miami given that the compulsory process of the Court does not extend to Liberia.  This argument is unavailing.  "[A] defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution." *United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989) (citations omitted); *see also Greco*, 298 F.2d at 251 (holding that "a defendant could not forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as witness in his favor").

"[C]riminal defendants [do] have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56.  In the present Motion, Defendant does not argue that the Government has refused or failed to assist him in mounting his defense.  The Defendant does not argue that the Government has failed to disclose information that may influence the determination of guilt, with the exception of Defendant's repeated requests for the disclosure of the victim's identity, an issue that has been previously addressed by the undersigned (*see Order* [D.E. 66]), and has more recently been addressed by the Magistrate Judge (*see Order* [D.E. 138]).  Consequently, Defendant's request for a dismissal on the basis of a Compulsory Process Clause violation also fails.

## III.  <u>CONCLUSION</u>

Based on the foregoing analysis, it is

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss the Indictment Based on the Unconstitutionality of 18 U.S.C. § 2340A, Both on Its Face and As Applied to the Allegations of the Indictment [D.E. 38], is **DENIED**.

30

Case No.  06-20758-Cr-Altonaga/Turnoff

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of July, 2007.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    Magistrate Judge William Turnoff
       counsel of record