UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case 06-20758-CR-ALTONAGA

THE UNITED STATES OF AMERICA,

        Plaintiff,

                    MIAMI, FLORIDA

vs.

                    OCTOBER 17, 2008

ROY M BELFAST, JR., a/k/a
CHUCKIE TAYLOR, CHARLES
McARTHUR EMANUEL, CHARLES
TAYLOR, JR. and CHARLES
TAYLOR, III,

        Defendant.
_____

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE CECILIA M ALTONAGA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

        KAREN ROCHLIN, A.U.S.A.
        CAROLINE HECK-MILLER, A.U.S.A.
        Office of the U.S. Attorney
        99 N.E. 4th Street
        Miami, FL  33132 - 305.961.9234
        (Fax) 305.536.4675
        Email: karen.rochlin@usdoj.gov
              caroline.miller@usdoj.gov

        CHRISTOPHER GRAVELINE, Trial Attorney
        U.S. Department of Justice
        950 Pennsylvania Avenue, N.W
        Washington, D.C. 20530 - 202.514.3270
        christopher.graveline@usdoj.gov

TOTAL ACCESS COURTROOM REALTIME TRANSCRIPTION

October 17, 2008

1

**FOR THE DEFENDANT:**

2

                        **JOHN WYLIE, A.F.P.D.**

3

                        **MIGUEL CARIDAD, A.F.P.D.**
                        **Federal Public Defender's Office**

4

                        **150 West Flagler Street**
                        **Miami, FL  33130 - 305/536-6900**

5

                             **(Fax) 305/530-7120**
                        **Email:  miguel_caridad@fd.org**

6

                                   **john_wylie@fd.org**

7

**REPORTED BY:**

8

                        **BARBARA MEDINA**
                        **Official United States Court Reporter**

9

                        **400 North Miami Avenue, Ste. 12-2**
                        **Miami, FL  33128 - 305.523.5518**

10

                             **(Fax) 305.523.5519**
                        **Email:  barbmedina@aol.com**

11

                              - - - -

12

**TABLE OF CONTENTS**

13

                                                    **Page**

14

Matthew Baechtle By Ms. Heck-Miller ......................... 5

15

     Direct Examination ...................................... 5

16

     Cross-Examination By Mr. Caridad ...................... 15

17

     Redirect Examination By Ms. Heck-Miller ............... 34

18

Bruce A. Hyma ............................................. 36

19

     Direct Examination By Mr. Rochlin ..................... 36

20

     Voir Dire Examination By Mr. Caridad .................. 94

21

     Voir Dire Examination By Ms. Rochlin ................. 98

22

     Voir Dire Examination By Mr. Caridad ................. 99

23

Reporter's Certificate .................................. 171

24

25

                            **INDEX TO EXHIBITS**

**TOTAL ACCESS COURTROOM REALTIME TRANSCRIPTION**
**October 17, 2008**

| Exhibits | | Marked for<br>Identification | | Received<br>in Evidence | |
|---|---|---|---|---|---|
| Description | | Page | Line | Page | Line |
| Government Exhibit SL 3 .......... 7 | | | 15 | 8 | 12 |
| Government Exhibit SL 6 ......... 12 | | | 23 | 13 | 19 |
| Government Exhibits Hymn ....... 68<br>1-40 | | | 11 | 69 | 11 |
| Government Exhibit Hymn 41 .... 108<br>- 88 | | | 24 | | |
| Government Exhibits Hymn 41-88 .................. 109 | | | | | 24 |
| Government Exhibits  Hymn 89-143 ................ 141 | | | | | 4 |

## CITATION INDEX

Page

## SIDEBAR CONFERENCE INDEX

Descriptions                                                         Page

Sidebar Conference Begins ................................ 135

Proceedings In Open Court Resume ........................ 136

Sidebar Conference Begins ................................ 157

Proceedings In Open Court Resume ........................ 159

## ADMINISTRATIVE CONVENTIONS:

When counsel does not identify themselves each time they

address the Court during a telephone conference, the

industry-standard speaker identification is indicated by

chevrons, i.e., >>>:

**October 17, 2008**

1            THE COURT:    Good morning.

2            MR. CARIDAD:    Good morning, Your Honor.

3            THE COURT:    Did we need to address something before we

4    begin or no.

5            MR. CARIDAD:    The issue about the file on Mr. Dulleh

6    relating to Dr. Hymn.    I think today at some point.    The issue

7    regarding the A-file that Dr. Hymn at least received from the

8    Government before he examined Mr. Dulleh.    I don't know to what

9    extent perhaps we can ask Dr. Hymn to what extent he relied on

10   that report if that's the standards whether I get it or not.    I

11   think he will be testifying today.

12           MS. ROCHLIN:    Your Honor while I don't believe the

13   extent of Dr. Hymn's reliance is the appropriate standard under

14   these circumstances any relevant portions of the A-file have

15   already been provided to counsel with the Jencks material.

16   These include for example some of the statements counsel has

17   already used to cross examine the witness Varmuyan Dulleh such

18   as the statement prepared by Jan Peterson which the witness

19   signed.

20           It is this kind of material from the A-file which

21   Dr. Hymn relied upon.    It is this material that has been

22   provided to the defense.    So as the Government stated in its

23   response the A-file issue we submit is moot in addition to any

24   other legal reasons precluding production of such material.

25           MR. CARIDAD:    Judge I did receive documents that are

**October 17, 2008**

## Baechtle - Direct

1  Jencks regarding Mr. Dulleh but I don't know if that's

2  everything Dr. Hyma relied upon that would be contained in the

3  A-file.

4              THE COURT:  When you examine Dr. Hyma examine him on

5  what it was he relied upon from that A-file.  If he relied on

6  anything else we can take that up at that time.  It may be he

7  did not.

8              MR. CARIDAD:  Very well F. if the Government could

9  just signal to me in the Jencks which part I have in front of

10  me is the A-file.

11              THE COURT:  Let's bring the jury in please.  Your

12  witness.

13              [The jury returns to the courtroom at 9:47 a.m]

14              THE COURT:  Everyone please be seated.

15          MATTHEW BAECHTLE, GOVERNMENT'S WITNESS, RESUMED

16                  DIRECT EXAMINATION (cont'd)

17  [Beginning at 9:48 a.m., 10/17/08.]

18              THE COURT:  Please proceed.

19              MS. HECK-MILLER:  Good morning, Your Honor.  Good

20  morning.

21  BY MS. HECK-MILLER:

22  Q.  Agent Baechtle, do you recall yesterday that you were

23  testifying when we broke off concerning events of February

24  28th, 2008?

25  A.  Yes.

**October 17, 2008**

## Baechtle - Direct

1    Q.   And that at that time you showed on a projector a

2    photograph --

3                MS. HECK-MILLER:   And Agent Naples, if you can,

4    please, put on the screen for publication to the witness and

5    the jury what's already in evidence as CE 8?

6                AGENT NAPLES:   (Complied.)

7    BY MS. HECK-MILLER:

8    Q.   This is the photograph that was shown?

9    A.   That's correct.

10   Q.   Agent Baechtle, do you recall you testified Sulaiman Jusu

11   stated he recognized the person in the photo dressed in white

12   as Charles Taylor and he recognized the person in the photo to

13   the left of President Taylor as you look at the photo as

14   Chuckie Taylor?

15   A.   Yes.

16   Q.   And he recognized the camouflage the person he identified

17   as Chuckie Taylor was wearing as the uniform the Demons used to

18   wear?

19   A.   Yes.

20   Q.   And that's where we were when we broke off yesterday?

21   A.   Yes.

22   Q.   Agent Baechtle, did you ask Mr. Jusu to do anything with

23   regard to any copy of this photograph?

24   A.   Yes, I did.

25   Q.   What did you ask him to do?

**October 17, 2008**

## Baechtle - Direct

1   A.   I asked him to memorialize the observations he had just

2   made on a hard copy of the photograph.

3   Q.   What do you mean by a hard copy?

4   A.   I had a paper copy, a color copy of that image with me and

5   I presented that to him

6   Q.   Did he do anything with regard to that paper copy?

7   A.   He did.   He marked the paper on the individual that he

8   identified as Charles Taylor and he also marked the paper on

9   the individual that he identified as Chuckie Taylor, and he

10  wrote their names next to where he I think he put an X.

11  Q.   Agent, I'd now like to show you what has been marked for

12  identification purposes as SL 3.   If you could put that on the

13  screen.

14     [Government Exhibit SL 3 marked for identification at 9:50

15                              a.m]

16          AGENT NAPLES:   (Complied.)

17  BY MS. HECK-MILLER:

18  Q.   What is SL 3?

19  A.   That's a scanned copy of the photo I presented to him that

20  day.

21  Q.   After the individual, Mr. Sulaiman Jusu, made these marks

22  on the photograph, did you ask him to do anything concerning

23  signing the photograph?

24  A.   I did.

25  Q.   And did he do that?

## October 17, 2008

## Baechtle - Direct

1   A.   Yes.   He signed his name and he dated the paper as well.

2   Q.   Did anybody else sign that photograph?

3   A.   Yes.

4   Q.   And who was that?

5   A.   I signed it and Special Agent Greg Naples signed it as well

6   and dated it.

7         MS. HECK-MILLER:   The Government offers SL 3 in

8   evidence.

9         MR. CARIDAD:   No objection.

10        THE COURT:   Admitted.

11   [Government Exhibit SL 3 received in evidence at 9:51 a.m]

12        MS. HECK-MILLER:   Could we publish that, please?

13        THE COURT:   You may.

14        AGENT NAPLES:   (Complied.)

15   BY MS. HECK-MILLER:

16   Q.   Agent Baechtle, could you, please, explain the marks

17   Sulaiman Jusu put on the photograph, and if you want to circle

18   anything, you can.   You've got that touch-screen there.

19   A.   Sure.

20        The first individual he identified as the gentleman in

21   white who he identified as Charles here, this guy.

22   Q.   Excuse me, agent.   Before you go on, who did he say Charles

23   was?

24   A.   He said Charles was Charles Taylor, the President of

25   Liberia, and he also said that was the same individual --

## Baechtle - Direct

1   Q.   Okay, agent.   We'll leave it at who he said Charles was.

2   A.   Okay.

3   Q.   Would you explain further what Mr. Sulaiman Jusu did in

4   terms of marking that photograph?

5   A.   Yes.   He also marked next to the individual he identified

6   as Chuckie, which was this individual here, and he wrote how he

7   spelled Chuckie next to that individual's head.

8   Q.   Did he say who this person was?

9   A.   Yes.

10   Q.   And who did he say it was?

11   A.   He said that was the individual -- I don't know his exact

12   words, but that was the individual responsible for his arrest

13   and torture.

14   Q.   Would you also show us, please, the signatures?

15   A.   Sure.   The signature on the bottom left here is that of

16   Sulaiman Jusu.   This is my signature and this is Agent Naples's

17   signature.

18         MS. HECK-MILLER:   Thank you.   Agent Naples, you can

19   take down that photograph now.

20         AGENT NAPLES:   (Complied.)

21   BY MS. HECK-MILLER:

22   Q.   What, if anything, did you say to Sulaiman Jusu as to

23   whether he had identified anybody correctly in that photograph?

24   A.   I didn't make any comments of that nature.

25   Q.   And what, if any, assistance was Sulaiman Jusu given with

**October 17, 2008**

## Baechtle - Direct

1  regard to identifying any of the individuals in that

2  photograph?

3  A.   He was not given any assistance.

4  Q.   Now, agent, I'd like to return again to the trip that you

5  made to Sweden in May of 2007.   Was that your first trip to

6  Sweden?

7  A.   Yes.

8  Q.   And at that first trip to Sweden, did you also have a

9  meeting on May 11th, 2007 with any person connected with this

10  case?

11  A.   Yes, I did.

12  Q.   Who was that?

13  A.   I met with Monoh Turay.

14  Q.   Where did you meet with Monoh Turay?

15  A.   I met with Mr. Turay at the same building that I was at the

16  previous day, which was a police building in Stockholm, Sweden.

17  Q.   Who was present at that meeting on May 11th, 2007?

18  A.   The same individuals the day before minus Mr. Jusu.

19  Mr. Turay, his attorney, Harri Vattsjö, the Swedish police

20  officer or investigator, Anders Fogelberg, and myself.

21  Q.   Did you tell Mr. Turay you were going to show him anything?

22  A.   Yes.

23  Q.   What did you tell Mr. Turay?

24  A.   I told him I was going to show him a piece of paper that

25  had six photographs on it.

**October 17, 2008**

## Baechtle - Direct

1  Q.   And did you make any requests or give him any instruction

2  with regard to what you were going to show him?

3  A.   Yes.

4  Q.   What did you tell him?

5  A.   I told him that he should look over the photos and let me

6  know if there was anybody in the photographs that he

7  recognized.

8  Q.   Where were you located physically with regard to Mr. Turay?

9  A.   I was physically located across the table from Mr. Turay.

10 Q.   And did you have with you the blank photospread?

11 A.   Yes.

12         MS. HECK-MILLER:   Agent Naples, if we could put on the

13 screen what has already been admitted in evidence as CE 9 for

14 publication as well.

15         AGENT NAPLES:   (Complied.)

16 BY MS. HECK-MILLER:

17 Q.   Is this a copy of the photospread you placed before

18 Mr. Turay?

19 A.   Yes.

20 Q.   What did Mr. Turay do with regard to this photospread?

21 A.   He looked at it, reviewed it.

22 Q.   And did he say anything?

23 A.   Yes.   He first said that he thought that the individual in

24 number 3 was Chuckie Taylor.

25 Q.   And did he say anything about how he recognized that?

**October 17, 2008**

## Baechtle - Direct

1  A.   Yes.   He stated that he recognized the mustache of the

2  individual and he also indicated that the hair and the eyes

3  were that of Chuckie Taylor.

4          MS. HECK-MILLER:   Thank you, agent.   You can take down

5  CE 9, please.

6          AGENT NAPLES:   (Complied.)

7  BY MS. HECK-MILLER:

8  Q.   Did you give Mr. Turay any instruction?

9  A.   Yes.

10  Q.   What did you instruct him to do?

11  A.   I told him that he should circle the individual who he

12  identified as Chuckie Taylor and sign his name next to that and

13  date it as well.

14  Q.   Did he do that?

15  A.   Yes.

16  Q.   Did you also sign the document?

17  A.   Yes, I did.

18  Q.   Did anybody else sign the document?

19  A.   Yes.   Anders Fogelberg, the police investigator.

20  Q.   Agent, I'd now like to show you what is marked for

21  identification purposes as SL 6.

22      [Government Exhibit SL 6 marked for identification at

23  9:56 a.m]

24  BY MS. HECK-MILLER:

25  Q.   Do you see SL 36?

**October 17, 2008**

## Baechtle - Direct

1          AGENT NAPLES:   (Complied.)

2    A.   SL 6 is a scanned version of the signed photospread that

3    Mr. Turay, on which Mr. Turay circled the number 3, signed his

4    name and dated it.

5    Q.   Have you also seen the paper copy that was scanned to make

6    this image?

7    A.   Yes.

8    Q.   Is that paper copy the original signed document or a

9    duplicate of it?

10   A.   No, it's a duplicate of it.

11   Q.   Why is it a duplicate rather than an original?

12   A.   The original was presented as an exhibit in a prior hearing

13   for this case.

14          MS. HECK-MILLER:   The Government offers SL 6 in

15   evidence.

16          MR. CARIDAD:   No objection.

17          THE COURT:   Admitted.

18     [Government Exhibit SL 6 received in evidence at 9:57 a.m]

19          MS. HECK-MILLER:   If you could publish that, please,

20   to the jury.

21          AGENT NAPLES:   (Complied.)

22   BY MS. HECK-MILLER:

23   Q.   Agent, if you could just show us where Mr. Turay circled

24   the person or the part of the photograph that he identified as

25   Chuckie Taylor.

**October 17, 2008**

## Baechtle - Direct

1   A.   (Complied.)

2   Q.   Agent Baechtle, what, if any, assistance was Mr. Turay

3   given in that making that identification?

4   A.   He was not given any assistance at all.

5   Q.   What, if anything, was Mr. Turay told concerning whether he

6   had picked a right or a wrong photograph?

7   A.   He was not told one way or another whether he picked a

8   right or wrong photograph.

9            MS. HECK-MILLER:   May I have a moment, Your Honor?

10           THE COURT:   You may.

11  BY MS. HECK-MILLER:

12  Q.   Agent Baechtle, do you still have SL 6 on your screen?

13  A.   Yes.

14  Q.   Do you see where Mr. Turay's name is written on the upper

15  right?

16  A.   Where he signed it?

17  Q.   Yes.

18  A.   Yes, I do.

19  Q.   Do you see the numbers underneath that?

20  A.   Yes.

21  Q.   What are those numbers?

22  A.   It's the date.   Do you want me to read it?

23  Q.   If you could read the numbers for us, please.

24  A.   07/05/11.

25  Q.   Now, you told us this occurred on May 11th, 2007.   Is that

## Baechtle - Cross

1  correct?

2  A.   Yes.

3  Q.   Is this style of writing the date different from what you

4  might see in the United States?

5  A.   Yes, it is.

6  Q.   And what style of writing of a date is this?

7  A.   I'm not sure if it's what they do in Sweden or West

8  African, but he put the year first, which was '07, and then the

9  month and then the day.

10  Q.   And, similarly, if you could take a look, please, at SL 3.

11         MS. HECK-MILLER:   If you could put that one back up.

12         AGENT NAPLES:   (Complied.)

13  BY MS. HECK-MILLER:

14  Q.   Do you see where Mr. Jusu has written the date in the lower

15  left?

16  A.   Yes.

17  Q.   Does that also have a different convention of the order the

18  numbers are in than what we would see in the United States?

19  A.   Yes.

20  Q.   Was this, nonetheless, February 28th, 2008?

21  A.   It was February 28th, 2008.

22         MS. HECK-MILLER:   No further questions, Your Honor.

23         We would tender the witness.

24                    CROSS EXAMINATION

25  [Beginning at 10:00 a.m., 10/17/08.]

**October 17, 2008**

## Baechtle - Cross

1  BY MR. CARIDAD:

2  Q.   Good morning, Agent Baechtle.

3  A.   Good morning.

4  Q.   When Mr. Emmanuel was talking to you at the airport on

5  March 30th, 2006, it was your understanding he didn't have to

6  talk to you.  Is that right?

7  A.   That's correct.

8  Q.   You cannot force someone you're interrogating to sit down

9  and answer any of your questions.  Correct?

10 A.   That's correct.

11        MR. CARIDAD:   If we could have the Miranda form,

12 please.  I think it's CE 12, agent.

13        AGENT NAPLES:   (Complied.)

14 BY MR. CARIDAD:

15 Q.   Okay.

16        And CE 12 is on your screen.  That's the card that you

17 carry around with you at all times in case you decide you want

18 to question someone?

19 A.   That's the card that I had on me that day, that I had on me

20 since I started my training.  In a situation in which I'm going

21 to question somebody, I will advise them of their Miranda

22 Rights.

23 Q.   It's also called Miranda warnings.  Is that correct?

24 A.   Miranda warnings.

25 Q.   And the very first warning listed says "You have the right

## Baechtle - Cross

1          to remain silent."  Right?

2   A.   Yes.

3   Q.   Which embodies what you just told us.  Someone being

4   interviewed, at least in the United States, can simply decline

5   to answer any questions?

6   A.   They can.  The defendant didn't.

7   Q.   Correct.  I understand.

8          Despite the fact that he had the right to remain

9   silent and you informed him of his right, he decided,

10  nevertheless, to speak with you.  Correct?

11  A.   That is correct.

12  Q.   Not only did you advise him of his right, but you had him

13  sign a waiver form

14         MR. CARIDAD:  CE 6, if you could put that up on the

15  screen, agent.

16         AGENT NAPLES:  (Complied.)

17  BY MR. CARIDAD:

18  Q.   Is that the waiver form you had my client sign?

19  A.   Yes.

20  Q.   Or you asked him to sign.  You didn't force him

21  A.   Exactly.

22         I asked him to sign it after reading through the

23  information on there, and he voluntarily signed it.

24  Q.   Again, the very first right -- and I guess what this

25  document is all about -- is "You have a right to remain

**October 17, 2008**

## Baechtle - Cross

1       silent."  Correct?

2   A.   That is correct.

3   Q.   The next warning is that "Anything that you say can be used

4       against you in court or other proceedings."  Correct?

5   A.   Yes.

6   Q.   Now, you said that Mr. Emmanuel understood his rights and

7   signed this waiver and spoke to you.   Correct?

8   A.   I said Mr. Emmanuel -- right -- read through his rights.

9   He signed it and spoke to me.

10  Q.   And you spoke to him for about three hours?

11  A.   Yes, it was just about three hours.

12  Q.   And he didn't put any limit on the time that you were

13  asking him questions?

14  A.   No.

15  Q.   So the questioning began around 7:00?

16  A.   It was just after 7:00.

17  Q.   And into the evening until about 10:00?

18  A.   I believe it was either 10:00 or just past 10:00 when we

19  concluded.

20  Q.   And is it correct to say you were the one who concluded the

21  interview?

22  A.   Yes.

23  Q.   Because you didn't have anymore questions?

24  A.   I think there probably could have been more questions I

25  would have asked him   We made a decision, based upon the way

## October 17, 2008

## Baechtle - Cross

1   the interview was going, to stop it at that point.

2   Q.   So you are speaking to him in March, 2006?

3   A.   Yes.

4   Q.   And he's giving you information about events that occurred

5   in 2003 -- correct -- and earlier?

6   A.   We spoke about events since he was born until the day that

7   he arrived.

8   Q.   But the portion of the interview that had to do with

9   Liberia concerned the years from 2003 going back to what

10  period?

11  A.   We spoke about when the defendant first went to Liberia,

12  and that was in 1992.

13  Q.   So he's talking about a period of time that occurred from

14  1992 all the way to 2003 regarding what happened, his presence

15  in Africa?

16  A.   Regarding his presence in Africa?

17  Q.   Yes.

18  A.   I would say yes, that was the primary time period.

19  Q.   He was recalling events that happened at least three years

20  before.   You were talking to him in March, 2006?

21  A.   He left in July, 2003.

22  Q.   Okay.

23        Now, you testified about a few disagreements that

24  Mr. Emmanuel told you that he had with his father.   Correct?

25  A.   Yes.

**October 17, 2008**

## Baechtle - Cross

1  Q.   And one of them was a disagreement over merging the SSS and

2  the EMSSU with the ATU.   Remember that?

3  A.   I do.

4  Q.   The SSS being the Special Security Service.   Correct?

5  A.   Yes.

6  Q.   That, he said, was headed by Benjamin Yeaten?

7  A.   That's what he said.

8  Q.   And the EMSSU which was headed by someone else?

9  A.   At that time the defendant did not make any reference as to

10 who headed that group.

11 Q.   The disagreement you testified about yesterday was over the

12 merging, the coming together of the SSS and the EMSSU with the

13 ATU?

14 A.   Yes.

15 Q.   He told you his father wanted to merge the SSS and the

16 EMSSU into the ATU.   Would that be correct?

17 A.   Yes.

18 Q.   You also talked to him about human rights abuses after 2000

19 by the ATU?

20 A.   We talked about human rights abuses committed by the ATU

21 and the defendant indicated -- we talked about human rights

22 abuses committed by the ATU.

23 Q.   You testified you asked him what he believed those problems

24 resulted from   Right?

25 A.   I don't know if I asked him that specific question, but he

**October 17, 2008**

## Baechtle - Cross

1  gave an answer.   He gave me his opinion on what those human

2  rights abuses resulted from

3  Q.   He said he believed those problems resulted from his

4  father's decision to merge the ATU with other security forces

5  to create a larger force.   Is that correct?

6  A.   I believe that's what he said, yes.

7  Q.   At one point regarding the period from 2000 to 2003, you

8  asked him -- you were asked yesterday if the defendant, my

9  client, continued to have a security detail during that period

10 of time.   Do you remember that?

11 A.   I do.

12 Q.   And he said that during that period of time he still had

13 ATU bodyguards?

14 A.   Yes.   He still -- that during that time, he had ATU

15 bodyguards.

16 Q.   And he told you that he had them because he had requested

17 them   Right?

18 A.   Correct.

19 Q.   But he had to make the request, according to him, to have

20 ATU bodyguards assigned to him   Is that what he said?

21 A.   He said he had them because he requested them

22 Q.   Now, agent, did you tape-record this three-hour long

23 interrogation of my client?

24 A.   No, I did not.

25 Q.   Did you videotape it?

**October 17, 2008**

## Baechtle - Cross

1  A.   No, I did not.

2  Q.   Did you write it out or type it up and ask him to agree

3  that it was a correct statement?

4  A.   No.

5  Q.   Now, why did you not audiotape the statement?

6  A.   The decision that we made was to -- and the practice within

7  my agency -- is to conduct an interview, if we are going to

8  conduct an interview, to conduct an interview and agents that

9  are present will note what is said during the interview and

10 write a report based on the information that is provided by the

11 subject of the interview, and that was the practice that I

12 conducted that day in accordance with what my agency does.

13 Q.   Now, you were taking notes.  Right?

14 A.   At times.

15 Q.   So you weren't taking notes all the time?

16 A.   There were notes being taken at all times.  I was not the

17 one taking notes.

18 Q.   Why was that?

19 A.   Because at times I was the one asking the questions.

20 Q.   So while you're asking questions, it's difficult to do both

21 things at once?  It's difficult to formulate a question, get an

22 answer and write it down?  It's difficult?

23 A.   To write down everything?

24 Q.   Correct.

25 A.   I don't think the process is exclusive.  I know that during

**October 17, 2008**

## Baechtle - Cross

1  the interview there were times where I would ask a question and

2  I would notate what was said.   But the majority of the time if

3  I was asking questions, the other agent present would record

4  the answers and vice-versa.   If the other agent was asking

5  questions, I would primarily make the notations.

6  Q.   And who was the other agent in the room at that time who

7  was taking down notes?

8  A.   It was, for the majority of the interview, it was Special

9  Agent Chris Malone.

10 Q.   Was anyone else besides Agent Malone taking notes?

11 A.   At times, Special Agent Malone stepped out and Special

12 Agent Matthew Couch from my office stepped in for a short

13 period of time.

14 Q.   Do you remember what portion of the interview it was when

15 Agent Malone stepped out of the interview?  By that I mean what

16 topic was being discussed, if you remember?

17 A.   I don't specifically remember at this point exactly.   I can

18 tell you probably a couple of topics.   I think we were

19 discussing maybe the diamond business that the defendant was

20 mentioning.   I think we spoke about the 1996 war, the April 6th

21 war, but I wouldn't be able to tell you exactly what was done

22 without looking at notes.

23 Q.   So you were taking notes and you took your notes and

24 prepared a typed report.   Correct?

25 A.   I took my notes, I took Agent Malone's notes and I took

**October 17, 2008**

## Baechtle - Cross

1  Agent Couch's notes and based upon that and my recollection of

2  what happened during the interview and what was said by the

3  defendant, I produced a report of that interview, a memo of the

4  interview.

5  Q.   Okay.

6      So the memo that ended up being the final memo might

7  contain things that Agent Malone wrote down and things that the

8  other agent wrote down that you might not have heard?

9  A.   I would not agree with that.  I was present throughout the

10 interview.   That's how I was able to write the report, because

11 I was there and I heard what was said and I drafted the report

12 based upon notes from the other individuals who were there.

13 Q.   You said as a backup you had two other agents there taking

14 notes, "and after that, I reviewed their notes and prepared the

15     final report."   Right?

16 A.   I'm not quite sure as a backup.   At all times during the

17 course of the interview, we had two agents present.   I was

18 always there and there was always one other agent.   For a short

19 period of time, the second agent was Agent Couch who was a

20 different agent then who was present when I initially started

21 interviewing the defendant, and both Agent Malone and Agent

22 Couch notated what was being said during the time periods they

23 were present and I also made certain notations at times.

24     I compiled the report based upon those notes and my

25 recollection of what was said by the defendant during the

**October 17, 2008**

## Baechtle - Cross

1  interview.

2  Q.   So it's correct to say that you read the other agents'

3  notes, relied upon them in some way in making your final typed

4  report.  Is that correct?

5  A.   Yes.

6  Q.   Because you thought "Maybe I missed something because I was

7       asking questions and listening.  Maybe I missed something.

8       Let me look at the other agents' notes."  Is that correct?

9  A.   I'm not sure I would agree with that entirely.

10 Q.   Well, what was the purpose of reviewing the other agents'

11 notes?

12 A.   To make sure we had an accurate report of what was taking

13 place during the interview.

14 Q.   Right.  I'm sorry.  Go ahead.

15      In case you missed something.  Right?  That's why they

16 were there?

17 A.   They were there to record at least some of the things that

18 were said during the interview and other things -- notes are

19 not necessarily a complete version.  Not everything that he

20 said is written down word-for-word in notes.

21 Q.   But all of this, having two agents present there and then

22 taking notes, you wouldn't need that if you had recorded the

23 statement --  correct --  with an audio machine, with a tape

24 player?

25 A.   I guess I would agree with that.

**October 17, 2008**

## Baechtle - Cross

1    Q.   So why was not a tape made of the statement?

2    A.   Because that's not the practice of my agency.   That's not

3    how I was trained.   That's not how interviews are conducted

4    within my agency.

5    Q.   Why is it the policy of your agency not to tape-record

6    statements?

7    A.   I didn't say it was policy, practice.   I can't tell you

8    exactly what the policy is, and I don't know.   You'd probably

9    have to ask maybe somebody higher than me within my agency why

10   it is and why I was trained a certain way.

11   Q.   Would you agree with me that it's more accurate to have a

12   tape-recording of a statement than notes of a statement?

13   A.   I can tell you that my practice is what I've described to

14   you.   I have never tape-recorded or video-recorded an

15   interview.

16          I don't know if I could compare the two.   I don't know

17   which one is more accurate than the other, to tell you if there

18   was a tape-recorder there it would record what was said.

19   Q.   You certainly had access to a tape-recorder.

20   A.   At that time I did not have a tape-recorder with me.

21   Q.   You could have brought one with you or had somebody go get

22   one.

23   A.   I guess that's possible, but I did not based upon what I

24   described to you earlier, which is that the practice and the

25   way that I was taught to conduct interviews is to do exactly

**October 17, 2008**

## Baechtle - Cross

1   what I said, have an agent present that notates what's being

2   said and you write up a report of that interview afterwards.

3   Q.   Did you ever question why your agency had a practice of not

4   using audio tapes?

5   A.   No.

6   Q.   Did it ever occur to you to the ask why, "Why don't we just

7        audiotape people"?

8   A.   It has not occurred to me.

9   Q.   You never wondered in all your training "Why don't we just

10       tape somebody?"

11  A.   These decisions are made at a much higher level than me, so

12  I don't know why that would be.  I don't know why the policies

13  or practices are the way they are or why we're trained that

14  way.   I am assuming based on the fact over the years -- I don't

15  want to assume anything.

16  Q.   I'll give you a possible reason.   Maybe people don't want

17  to be audiotaped.   Right?   They might be reluctant.   Right?

18  A.   Who is that?

19  Q.   Maybe that's one reason I'm suggesting why you don't

20  audiotape people.

21  A.   That who would be unconfortable?

22  Q.   The person you are audiotaping.   He might say "No, I don't

23       want to be audiotaped"?

24  A.   That's one thing that could happen.

25  Q.   Did you ask Mr. Emmanuel if he had any objection to being

**October 17, 2008**

1  audiotaped?

2  A.   I did not.

3  Q.   The same thing goes for a videotape.   That's even better.

4  A.   I don't think I'm in a position to make assessments whether

5  a video versus a tape versus notes and a report written

6  afterwards are better than the other.

7         I'm telling you what I did and the practice that I

8  conduct when it comes to interviews and recording what was said

9  in those interviews.

10 Q.   Why don't you think you would be capable of making that

11 assessment?

12 A.   Because I have never done the other ones.   I don't want to

13 make a decision or assessment based on something I've never

14 done.

15 Q.   So the bottom line is we don't have an audiotape.   We don't

16 have a videotape of what was said on March 30th, 2006.

17 A.   That's right, you do not.

18 Q.   And we don't have a statement written out by you shown to

19 my client where he's given a chance to read it, make

20 corrections and sign it.   That didn't happen either?

21 A.   There was no statement that was created at that point.

22 Q.   Do you know why that isn't done?

23 A.   Once again, because the practice and the way I was taught

24 was to do it the way that I did it.   I don't know why we

25 weren't taught any differently.   I'm not sure why that is.   I'm

## Baechtle - Cross

1  telling you the way I did it and the way I've been trained to

2  do it based on what my agency told me.

3  Q.   Now, you talked about some photospreads that you showed

4  Mr. Jusu and Mr. Turay.   Correct?

5  A.   Yes.

6  Q.   And the photospread you showed Mr. Jusu was created out of,

7  from persons that you believed or somebody else must have

8  believed looked similar to Mr. Emmanuel.

9  A.   Yes, physical, similar physical appearance.

10  Q.   And Mr. Jusu was unable to identify Mr. Emmanuel from the

11  photospread.   Correct?

12  A.   He stated people in the top row looked familiar, but he

13  couldn't be sure who anybody was.

14  Q.   So he couldn't identify Mr. Emmanuel in the photospread?

15  A.   Right.

16       MR. CARIDAD:   Could we have the photospread on the

17  screen, please?   I believe it is -- I don't know what it is.

18  Mr. Jusu.

19       AGENT NAPLES:   (Complied.)

20  BY MR. CARIDAD:

21  Q.   This is SL 8, and that's what you showed Mr. Jusu in May of

22  2007?

23  A.   I showed him a blank copy of that.   There weren't any

24  signatures or marks on it.

25  Q.   I understand.   You hadn't signed it.   He hadn't written his

**October 17, 2008**

## Baechtle - Cross

1  name.   It was blank?

2  A.   Yes.

3  Q.   That's the photospread where he couldn't recognize the

4  defendant?

5  A.   As I explained, he couldn't recognize anybody on the bottom

6  row, thought somebody on the top row looked familiar.   I asked

7  him to sign the top row.   He did it.

8  Q.   Sometime later I think you said you showed him another

9  picture, a group picture.   Correct?

10             MR. CARIDAD:   If we could have that up on the screen,

11  agent.   I'm not sure what the number is.   CE 8, I believe.

12             AGENT NAPLES:   (Complied.)

13  BY MR. CARIDAD:

14  Q.   You showed him that picture?

15  A.   I did.

16  Q.   When did you show him that picture?

17  A.   That was in February of 2008.

18  Q.   Now, in this picture he was able to identify someone who he

19  named as Chuckie?

20  A.   That is correct.

21  Q.   Now, you would agree that this, Exhibit CE 8, is not a

22  photospread?

23  A.   CE 8 is not a photospread, in my opinion.

24  Q.   Because one reason -- it's not a photospread is because it

25  doesn't have face pictures of people who look alike.   Correct?

**October 17, 2008**

**Baechtle - Cross**

1   A.   Right.

2   Q.   You have a couple of women.   Right?

3   A.   They look like women to me.

4   Q.   And it has people of different sizes.   Some people look

5   smaller.   Some people look larger?

6   A.   Correct.

7   Q.   And people here are making gestures to one another, it

8   seems.   Correct?

9   A.   It seems like the person identified as Charles Taylor, yes,

10  is making a gesture with his hand.

11  Q.   One person in the photograph is dressed all in white?

12  A.   Right.

13  Q.   And the person next to him at his right is dressed in a

14  camouflage uniform?

15  A.   Yes, he is.

16  Q.   And the person to the right or on the image as you look at

17  the person is dressed in what looks like a black uniform?

18  A.   Correct.

19  Q.   This is not a photospread.

20  A.   If I was making a photospread, putting together a

21  photospread, I would not put together a photospread like this.

22  Q.   Because it's suggestive?

23  A.   I don't know if it's suggestive.   I would say this is not

24  just the way I would do it.

25  Q.   Okay.

**October 17, 2008**

# Baechtle - Cross

1          And the President of Liberia is in the middle dressed

2   in white?

3   A.   Right.

4   Q.   And it has his son to his immediate right?

5   A.   Correct.

6   Q.   Now, on this photospread, Mr. Jusu was able to identify

7   someone he named as --

8          MS. HECK-MILLER:   Objection, Your Honor, to the term

9   "photospread."

10         MR. CARIDAD:   I'm sorry.   I apologize.

11   BY MR. CARIDAD:

12   Q.   On this photograph, CE 8, Mr. Jusu was able to identify

13   someone he named as Chuckie.   Right?

14   A.   Yes, he was.

15   Q.   Now, on CE 8, you see President Taylor is wearing a white

16   cap, it seems like?

17   A.   Yes.

18         MR. CARIDAD:   Right above his head, if we could focus

19   on the wooden structure behind Mr. Taylor's head there.

20         AGENT NAPLES:   (Complied.)

21   BY MR. CARIDAD:

22   Q.   Now, that looks like some sort of wooden structure.   Would

23   you agree?

24   A.   I would agree with that.

25   Q.   It looks like telephone pole size logs.   Would you agree?

**October 17, 2008**

## Baechtle - Cross

1   A.   It could be that, the posts, the four posts that seem to be

2   into the ground.   I can't tell whether or not the other ones

3   would be.

4   Q.   The other ones being the ones that are horizontal?

5   A.   Horizontal, yes.

6   Q.   It looks like some sort of obstacle course part.   Right?

7   A.   I was never in the military.   I'm not quite sure if that

8   could be an obstacle course.   Any answer I could give would be

9   based on what other people might have told me.

10  Q.   Okay.

11          But they look like round telephone poles.   Is that

12  fair?

13  A.   It could be.

14  Q.   Do you know what year this picture was taken?

15  A.   I do not.

16  Q.   This is a picture taken at the base?

17  A.   Based upon what I was told, yes.

18  Q.   Now, did you go to the base when Mr. Kpadeh went to the

19  base?

20  A.   Yes, I did.

21  Q.   So you were there when Mr. Kpadeh pointed out some sort of

22  pole on the ground?

23  A.   Yes.

24  Q.   That pole was a round pole?

25  A.   Are you talking about -- at what point are you talking

## Baechtle - Redirect

1    about?

2    Q.   Well, we saw a picture of Mr. Kpadeh on the base signalling

3    to some sort of telephone pole, some sort of pole?

4    A.   Yes, I was there with him.

5    Q.   That was also a round pole?

6    A.   It was round.

7    Q.   Did it look to you like the pole you just saw in this

8    picture?

9    A.   I would say based on what I saw and what that could be, it

10   could be a similar thing, yes.

11              MR. CARIDAD:   If I could have a moment.

12              Thank you, Your Honor.   I have no further questions.

13              THE COURT:   Redirect.

14                      REDIRECT EXAMINATION

15   [Beginning at 10:28 a.m., 10/17/08.]

16              MS. HECK-MILLER:   Agent Naples, could you put CE 8

17   back on the screen for us.

18              AGENT NAPLES:   (Complied.)

19   BY MS. HECK-MILLER:

20   Q.   Agent Baechtle, this is the photograph that was projected

21   and shown to Mr. Jusu in February of 2008.   Is that correct?

22   A.   Yes, it is.

23   Q.   And that was months after you had shown him a photospread.

24   Is that correct?

25   A.   Correct.

**October 17, 2008**

## Baechtle - Redirect

1  Q.   Now, this photo here, CE 08, when did you ever call it a

2  photospread?

3  A.   I never called it a photospread.

4  Q.   Did you ever say to Mr. Jusu that this was a photospread?

5  A.   No.

6  Q.   Did you ever say to anyone this was a photospread?

7  A.   No.

8  Q.   And during your cross-examination do you recall some

9  testimony concerning why this is not a photospread?

10 A.   Yes.

11 Q.   Are there prominent Liberians shown in this photograph?

12 A.   I would say "Yes."

13 Q.   Does that make it a photospread?

14 A.   No.

15 Q.   Does the presence of prominent Liberians in this photograph

16 establish that this is something that you could use as a

17 photospread?

18 A.   No.

19 Q.   Do you recall in cross-examination that you were asked some

20 questions about human rights abuses and what the defendant said

21 about human rights abuses by the ATU?  Do you recall that

22 cross-examination?

23 A.   I do.

24 Q.   Who was it who put a time frame on when human rights abuses

25 occurred?  Was it yourself or was it the defendant?

**October 17, 2008**

## Hyma - Direct

1   A.   It was the defendant.

2   Q.   And what period did he choose to talk about as one in which

3   there was human rights abuses?

4   A.   It was the period of 2000 to 2003.

5   Q.   What, if any, human rights abuses did he acknowledge having

6   occurred before 2000?

7   A.   I don't believe he acknowledged any.

8           MS. HECK-MILLER:   No further questions, Your Honor.

9           THE COURT:   Thank you.   You may step down.

10          THE WITNESS:   Thank you.

11          THE COURT:   Government's next witness.

12          MS. ROCHLIN:   Your Honor, the United States calls

13   Dr. Bruce Hyma.

14           BRUCE A. HYMA, GOVERNMENT'S WITNESS, SWORN

15                     DIRECT EXAMINATION

16   [Beginning at 10:31 a.m]

17   BY MS. ROCHLIN:

18   Q.   Sir, if you would, please say your name and spell it for

19   the court reporter.

20   A.   My name is Bruce Allen Hyma, B-r-u-c-e.   Middle name is

21   spelled A-l-l-e-n.   My last name is spelled H-y-m-a.

22   Q.   Would you, please, tell us what you do for a living?

23   A.   I am the Miami-Dade County Medical Examiner.

24   Q.   How long have you been the Miami-Dade County Medical

25   Examiner?

**October 17, 2008**

## Hyma - Direct

1    A.    Seven years.

2    Q.    Could you explain a little bit of what it is you do as the

3    Miami-Dade County Medical Examiner?

4    A.    I am charged by Florida Statute 406 to investigate any

5    death that occurs in Miami-Dade County that's a result of

6    criminal violence, any death that's sudden and unexplained, any

7    death that occurs to a person who is otherwise in good health

8    and dies suddenly, any death that occurs in prison, any death

9    that occurs as a result of accident, suicide, homicide, any

10   death that occurs as a result of unusual and mysterious

11   circumstances or any death that may be a threat to public

12   health or is caused by a poison or toxin or job-related.

13            I'm also in charge of approving any body that is going

14   to be dissected, cremated or buried at sea.  All of that, those

15   job duties translate to about 11,000 deaths a year here in

16   Miami-Dade County, and I clearly don't do that by myself.  I

17   have a staff of about seven people that assist me in those

18   duties.

19   Q.    Dr. Hyma, do you have a title?

20   A.    I have several titles.  I am the Department Director of the

21   Medical Examiner Department here at Miami-Dade and also the

22   Chief Medical Examiner, and I also am the District 11 Medical

23   Examiner, which corresponds to the 11th Judicial Circuit here

24   in the State of Florida, and I'm also a Commissioner on the

25   Medical Examiner, State Medical Examining Commission.

**October 17, 2008**

## Hymn - Direct

1    Q.   Now, with respect to your examinations relating to cause of

2    death, do those examinations at times require you to determine

3    cause of injuries to the human body?

4    A.   Yes.   My specialty is forensic pathology and that specialty

5    involves the evaluation of human injury or human disease as it

6    relates to the cause of death.

7    Q.   Dr. Hymn, do all of your cases involve people who have died

8    or do you also address injuries to living people?

9    A.   I address injuries, our department addresses injuries to

10   deceased deceived individuals as charged by statute.   We also

11   address injuries and evaluate injuries of living people.

12   Q.   Can you give some examples of when you address injuries to

13   living people?

14   A.   As a medical examiner here in Miami-Dade County, prior to

15   my duties as the Chief Medical Examiner, I was also the, a

16   physician examiner at the Rape Treatment Center of Jackson

17   Memorial Hospital for 10 years concurrent with my duties as a

18   Medical Examiner.   In that capacity, I evaluated and treated

19   thousands of patients that were brought there who had alleged

20   some form of battery, including sexual battery, but it also

21   included other injuries.

22          Also throughout my career, our department sees on a

23   regular basis individuals that are brought to us for evaluation

24   of injuries to determine what caused the injury and how the

25   injury occurred based on physical evidence that accompanies

**October 17, 2008**

## Hyma - Direct

1  them or on permanent physical damage to their body.

2  Q.   Can you tell us how long you have had your current

3  position?

4  A.   I've been Chief Medical Examiner seven years.

5  Q.   How long prior to that have you been practicing forensic

6  pathology or forensic medicine?

7  A.   Prior to that, Associate Medical Examiner for 14 years in

8  the same department.

9  Q.   Let me ask you to tell us something about your educational

10  background.   Do you have a college degree?

11  A.   Yes.   I received a Bachelor of Science degree in biology in

12  1978 at Calvin College in Grand Rapids, Michigan.

13  Q.   After that, did you continue your education?

14  A.   Yes.   I received a Medical Doctorate from Wayne State

15  University, Detroit, Michigan in 1982.

16  Q.   After you received your medical degree, Dr. Hyma, did you

17  begin a residency?

18  A.   Yes, I did, but prior to that I completed a one-year

19  internship in Medicine And surgery at St. John Hospital in

20  Detroit, Michigan.

21  Q.   Thank you, doctor.   Following your internship, is that when

22  your residency began?

23  A.   Following internship, I completed a four year residency in

24  Anatomic and Clinical Pathology at the Mayo Clinic in

25  Rochester, Minnesota.

**October 17, 2008**

## Hyma - Direct

1  Q.   What position did you have at the Mayo Clinic during your

2  residency, doctor?

3  A.   I was a resident physician at the Mayo Clinic.   My last

4  year I was a chief resident and for three years I also

5  concurrently was the Deputy Coroner for Olmsted County,

6  Rochester being the county seat for Olmsted County, Minnesota.

7  Q.   And in your role as Deputy Coroner, what did you

8  investigate or determine?

9  A.   As Deputy Coroner in the state of Minnesota, I assisted the

10  coroner in investigating any violent death, deaths that

11  occurred in Olmsted County.

12          Also that charge included accidents, suicides, any

13  deaths that occurred under unusual or suspicious circumstances,

14  any deaths that occurred to healthy individuals who were

15  otherwise, who died suddenly and who were otherwise healthy,

16  similar to what the statute here in Florida is.

17  Q.   Dr. Hyma, following your residency and the period where you

18  were a Deputy Coroner, did you continue your education in any

19  way?

20  A.   Yes.

21  Q.   How did you do that?

22  A.   I came here to Miami-Dade and completed a one-year

23  fellowship in Forensic pathology at the Miami-Dade County

24  Medical Examiner Department of which I am the director

25  currently.

**October 17, 2008**

## Hyma - Direct

1  Q.   During the fellowship, did you receive any offers of

2  employment?

3  A.   Yes.   I received an offer of employment to join the

4  department as a Medical Examiner on the Pathology Staff during

5  my fellowship year.

6  Q.   Your fellowship was supposed to last for a year?

7  A.   Yes.

8  Q.   How long did it take before you received the offer,

9  Dr. Hyma?

10 A.   I was offered that three months into my fellowship.

11 Q.   Did you complete the year-long fellowship?

12 A.   Yes, I did.

13 Q.   After that, did you begin employment?

14 A.   Yes.   I began my duties as Associate Medical Examiner here

15 in the State of Florida.

16 Q.   Dr. Hyma, would you tell us, please, what, if any, licenses

17 or certifications you hold?

18 A.   I have a medical license to practice medicine in the State

19 of Florida.   I also have a license to practice medicine in the

20 State of Michigan and also a Registered Medical Practitioner in

21 the Cayman Islands.

22           I also have board certification in Anatomic, Clinical

23 and Forensic Pathology.

24 Q.   Doctor, why don't you take a moment and explain what you

25 mean by anatomic, clinical and forensic pathology?

**October 17, 2008**

## Hynn - Direct

1   A.   Anatomic pathology is a specialty of pathology.   I should

2   just explain what pathology is.

3            Pathology is a specialty of medicine just like

4   surgery, just like cardiology, just like obstetrics and so

5   forth.   Pathology is a specialty of medicine.   It's a specialty

6   of medicine that studies human disease with the various

7   laboratory methods.   We study disease through the laboratory

8   and not direct patient contact.

9            That study of medicine or that specialty of medicine

10  then is divided into a couple of different branches.   Anatomic

11  pathology studies the human disease as it's seen in various

12  tissues of the body.   For example, a tissue that's removed by

13  surgeons looking for a diagnosis or the extent of cancer, for

14  example, would be evaluated by a pathologist.

15           Anatomic pathology also includes looking at cell

16  suspensions from the body.   Probably the most common one you're

17  familiar with is a pap smear.   Anatomic pathologists study

18  those kinds of cell suspensions, looking for disease that may

19  be relevant to the treatment of a patient.

20           Clinical pathology is a branch of pathology that

21  studies human disease as it is expressed in different body

22  fluids, such as blood, urine, body fluids that may be

23  collected, that may collect in different body cavities as a

24  result of disease.   Those areas would include microbiology or

25  infectious diseases that I have studied the laboratory.

**October 17, 2008**

## Hymm - Direct

1          Another area would be hematology or the study of blood

2   diseases.   Another area would be transfusion medicine, all the

3   transfusion of blood products that one would get and the

4   preparation of those blood products.

5          A fourth area would be the chemistry of the body that

6   becomes abnormal with various disease processes.   That's all

7   included in clinical pathology.

8          Forensic pathology takes both of those areas and

9   applies that to the death investigation process, how and why

10  people die or how people get injured and the causation of

11  injury and the reaction of the body to injury and all of the

12  medical information that goes into determining a cause and a

13  manner of death of an individual.

14  Q.   And you're certified -- excuse me -- you're board

15  certified, Dr. Hymm, in all three of those areas.   Is that

16  correct?

17  A.   That's correct.

18  Q.   Do you hold any other certifications you can recall at this

19  time?

20  A.   No, I don't.

21  Q.   Dr. Hymm, have you more recently received any appointments

22  in connection with your particular field?

23  A.   Well, I was recently appointed by Governor Crist to the

24  State Medical Examiner Commission, which here in the State of

25  Florida is the, a body that oversees all of the medical

**October 17, 2008**

## Hyma - Direct

1  examiner services in the State of Florida in terms of

2  policy-making, ethics and discipline.

3  Q.   In addition to your duties with the Governor's appointment

4  to the Medical Examiner Commission and your own duties in

5  Miami-Dade County for the Medical Examiner's Office, can you

6  tell us, Dr. Hyma, whether or not you have any teaching

7  experience?

8  A.   As part of our mission statement in our department,

9  education is one of the two functions of our department.   In

10 addition to our service that we provide under the statute, we

11 also are involved in education.   Not only are we involved in

12 education on a graduate mid-level, mainly the fellowship

13 program of which I was a graduate in 1988, but we're also

14 involved in education for the legal profession, for law

15 enforcement, for the dental profession, for photography and

16 other specialty areas such as toxicology, which is the study of

17 human, study of toxins in human body fluids and also there are

18 some other specialty areas we teach as it relates to diving

19 fatalities particularly here in South Florida.

20 Q.   Doctor, where are some of the places where you have taught?

21 A.   Our department has an annual training program that involves

22 regularly scheduled classes, so that's an ongoing educational

23 program curriculum we have in our own department on various

24 levels.   But I also am faculty at the Armed Forces Medical

25 Examiner Pathology course that is offered through the American,

**October 17, 2008**

## Hymn - Direct

1  through the Armed Forces in Washington, D.C. every fall as part

2  of the Armed Forces Institute of Pathology.

3  Q.   Do you, in fact, travel to the Washington, D.C. area to

4  teach the medical examiner courses for the Armed Forces

5  Institute of Pathology?

6  A.   Yes, I do.

7  Q.   Doctor, do you publish?

8  A.   Yes, I do.

9  Q.   Can you tell us how frequently you are able to do that?

10  A.   Well, given all my duties, it doesn't leave a whole lot of

11  time, but I have published in all three areas of anatomic,

12  clinical and forensic pathology.  Plus our department publishes

13  as a department in various areas, so I'm involved in work with

14  tangentially publishing, but my name, of course, may not appear

15  on publications.

16  Q.   Dr. Hymn, apart from anything you offer or anything you

17  review on behalf of your department, do you review publications

18  in the field?

19  A.   Yes.

20  Q.   And do you take steps to stay current with developments in

21  your profession?

22  A.   Yes.  I'm required by statute to have continuing medical

23  education, but as part of our function as a teaching facility,

24  we have ongoing teaching programs that involve review of the

25  current literature, particularly in our forensic pathology

**October 17, 2008**

## Hymn - Direct

1    fellowship.  For example, we have ongoing journal reviews as

2    part of that educational process and those focus on current

3    information on controversial, if you will, information that's

4    currently being discussed in the forensic science.

5    Q.    Dr. Hymn, have you ever testified in a court of law as an

6    expert in the field of forensic medicine or forensic pathology?

7    A.    Yes, hundreds of times.

8    Q.    And how many times have you done that in the State Court

9    system?

10   A.    Over my 21 year career, hundreds, hundreds of times.

11   Q.    And have you testified as an expert in your field as

12   frequently in the Federal Court system?

13   A.    No.

14   Q.    Have you testified as an expert in your field in Federal

15   Court?

16   A.    Yes, I have.

17   Q.    Do you recall on approximately how many occasions you've

18   qualified to testify as an expert in the Federal system?

19   A.    I have probably had the privilege of testifying maybe less

20   than a dozen times in the Federal system.  We're called much

21   more frequently by the State Court.

22            MS. ROCHLIN:   Your Honor, at this time the United

23   States would offer Dr. Hymn as an expert in the field of

24   forensic medicine specifically, but also forensic pathology.

25            MR. CARIDAD:   I don't have an objection.

**October 17, 2008**

## Hymn - Direct

1       THE COURT:   You may proceed.

2  BY MS. ROCHLIN:

3  Q.   Dr. Hymn, are you getting paid for your testimony here

4  today?

5  A.   No, ma'am

6  Q.   Can you explain whether or not your services come for free?

7  A.   No, they don't.   I'm here on Miami-Dade County time, on

8  your taxpayer dollars.   So Miami-Dade County will bill the

9  United States.

10 Q.   And who will get the money for that billing?

11 A.   Miami-Dade County.

12 Q.   Will you see one dime of that money?

13 A.   No.

14 Q.   Dr. Hymn, do you have time to watch television?

15 A.   Yes.

16 Q.   Are you familiar with the T.V. program, CSI?

17 A.   Yes.

18       MR. CARIDAD:   Objection.   Relevance.

19       THE COURT:   Overruled.

20 BY MS. ROCHLIN:

21 Q.   Doctor, would you please take a moment and explain whether

22 you can do the things that the characters on the T.V. show can

23 do?

24 A.   Well, television presents --

25       MR. CARIDAD:   Your Honor, I object.   Lack of notice.

**October 17, 2008**

## Hymn - Direct

1           THE COURT:   Why don't we take our morning recess,

2    ladies and gentlemen.   Please don't discuss the case.   We'll

3    take 10 minutes.

4           [The jury leaves the courtroom at 10:50 a.m.]

5           THE COURT:   We'll take a brief break, doctor, and

6    resume shortly.

7           [The witness was excused at 10:51 a.m.]

8           THE COURT:   Lack of notice regarding the doctor's

9    opinion with respect to CSI.   Is that the objection, it's not

10   in the report?

11          MR. CARIDAD:   Apparently he's going to be asked to

12   compare what he does in real life to what he sees on T.V.   That

13   relies on his expert testimony, in the sense relies on his

14   expertise to give an opinion about television programs and what

15   he sees.

16          I have not been notified he's going to make such

17   comparison or use his expertise to testify to that.

18          MS. ROCHLIN:   Your Honor, I don't think the notice

19   issue is an issue at all.   Mr. Caridad has been on notice for

20   quite some time Dr. Hymn was going to testify.   He has

21   Dr. Hymn's resumé.   He knows what Dr. Hymn does.

22          My question is simply calling for Dr. Hymn to explain

23   in a factual way the boundaries of his profession, what he can.

24   do, what he cannot do.   These are factual questions.   So the

25   notice regarding opinion testimony of an expert would not

**October 17, 2008**

## Hyma - Direct

1  really apply.  It's just a way of explaining what kind of

2  things the doctor can actually do and what other things he may

3  not be capable of doing.

4          MR. CARIDAD:  I understand he can say what he can do

5  and what he can't do, but that doesn't mean he has to refer or

6  make any kind of comparison to what he sees on T.V.  It's two

7  different things.

8          THE COURT:  I think it's fair, you can ask him what it

9  is he can do and what it is he can't do.  I assume in

10  cross-examination the defense will probe what it is he failed

11  to do, but unless there was notice provided that we're going to

12  see an analysis or comparison of some things these folks may

13  see on T.V. and what these folks can and can't do, I don't

14  think is appropriate either.

15          You can go that route, but just don't have him compare

16  what he has seen on CSI shows that experts there have been able

17  to do that he can't do.

18          MS. ROCHLIN:  Fair enough, Your Honor.

19          THE COURT:  We'll take a brief recess.

20           [There was a short recess at 10:53 a.m.]

21          THE COURT:  Bring the jury in.

22          [The jury returns to the courtroom at 11:05 a.m.]

23          THE COURT:  Everyone please be seated.

24  BY MS. ROCHLIN:

25  Q.  Dr. Hyma, let me ask you this:  Would you explain for the

**October 17, 2008**

## Hynn - Direct

1  Court what it is the field of forensic medicine can actually

2  accomplish?

3  A.  Well, forensic medicine is parted of forensic science.

4  Forensic science applies science and medicine to

5  problem solving, but it's not like the classical scientific

6  method that you may be familiar with.

7        Forensic science cannot predict the past.  We gather

8  historical information from various sources.  We look at

9  physical evidence.  We look at medical evidence and we assess

10  the consistency or inconsistency of that physical evidence with

11  the historical record.

12        Classic science looks at a problem, gathers, forms a

13  hypothesis or a concept once they're faced with a problem and

14  then they experiment to test their theory in order to predict

15  future events.  That's classic science.  Forensic science is a

16  little different.  It applies science, but it doesn't, it

17  doesn't predict the past.

18        So with that said, we are very dependent on historical

19  information.  We don't witness injuries.  We don't witness the

20  event.  We rely on historical information that comes through

21  eyewitnesses, that comes through survivors, that comes through

22  law enforcement, that comes by way of some other memorializing

23  media.  Today we have webcams, we have videos, all kinds of

24  ways of memorializing the past, but we rely on that

25  information.

**October 17, 2008**

## Hynn - Direct

1          We then, with our medical knowledge, training and

2   expertise, gather the medical information that's presented to

3   us.   Many times that's a deceased human being or it's parts of

4   a deceased human being or it may be a living person with

5   injuries.

6          We assess that medical information that we're

7   presented with.   We document it when we memorialize it and then

8   with any other physical evidence that may be also provided, we

9   assess the consistency or inconsistency of all of those pieces

10  of information and finally correlate all of that into an

11  opinion.

12          Now, many of our opinions are related to cause of

13  death, why did someone die, and if it's not a natural death,

14  how did that death come about?   Was it an accident, homicide,

15  suicide or can we tell?   Or in living individuals, we'll be

16  asked to evaluate an injury, either a fresh injury or a healing

17  injury or a healed injury or a deformity, and given that

18  historical information, any medical information sometimes that

19  comes from medical records that have documented the progress of

20  an injury as it heals and as the person recuperates and,

21  finally, we're asked to form an opinion, is that deformity or

22  is that injury consistent with the account of how it actually

23  happened?

24          Sometimes we can say "Yes, it's consistent."

25  Sometimes we can say "No, that's completely inconsistent" and

**October 17, 2008**

## Hynn - Direct

1    sometimes we can say "I don't know.   I can't tell.   Not enough

2        information."

3              So, that's forensic science.   Much different, much

4    different than, perhaps, one's understanding of it that you may

5    get through other sources.

6    Q.   Doctor, let me ask you this:   In evaluating injuries to a

7    living human being, can you walk us through the types of steps

8    you would take in an effort to form an opinion or a conclusion

9    related to these injuries?

10   A.   Well, the first step, as you are all familiar with when you

11   go see your doctor, is to find out what happened, to gather a

12   history, get a history from the individual.

13             Now, with living individuals, it's fairly easy because

14   they can speak to you and we can dialogue about what happened.

15   We can gather a lot of information about what, when, where, how

16   things happened.

17             That's the first critical step of documenting that

18   information and of, perhaps, defining further questions as the

19   information is shared in terms of details that may help

20   interpret a permanent disability or a permanent injury.   So,

21   that's the first step.

22   Q.   Doctor, let me clarify something as well.   When you talk

23   about this first step, interviewing the individual with the

24   injuries, is that something that only you do or is it more

25   common within your field?

**October 17, 2008**

## Flynn - Direct

1   A.   It's not something that I do.   That's the standard practice

2   of medicine.   That's the standard practice of medicine.

3   Whether it's forensic medicine or any other specialty of

4   medicine, that's the first step.

5   Q.   And, so, is this something, is information from the

6   individual in question and statements from the individual in

7   question information that experts in your field, such as

8   yourself, rely upon in an effort to form an opinion?

9   A.   Yes.

10   Q.   Now, do you do more than simply talk to the individual?

11   A.   Yes.

12   Q.   Can you tell us what else you do along the way to correlate

13   information and attempt to form an opinion?

14   A.   Well, as part of this historical data-gathering, medical

15   records are extremely helpful.   Medical records, not only a

16   written record, but photographs, X-rays, any other imaging

17   information, any other medical information that has been

18   documented and preserved in a record is also included in that

19   information-gathering step.

20           Additionally, eyewitnesses, independent accounts of

21   what one observed in our field of forensic medicine that comes

22   through the law enforcement side of the criminal justice

23   system   Law enforcement provides us with witness statements,

24   what did someone see?   What did someone hear?   What did someone

25   observe?   That's critical information.   So those statements, if

**October 17, 2008**

## Hyma - Direct

1   available, would be reviewed.

2           Anything that would memorialize or document the

3   historical record.  If there were videos, still photographs,

4   tape-recordings, anything that would document the historical

5   record, all of that would be reviewed.

6   Q.   And apart from reviewing any available medical records or

7   historical data and apart from obtaining a statement from an

8   individual, is there a further step that you would take on the

9   way to forming an opinion?

10  A.   Yes.

11  Q.   What would that be?

12  A.   Well, in living individuals, the next step would be to

13  examine their body, examine the injury or permanent injuries

14  that have been left on their body, if any.  Also, in an

15  individual where the injury is very, very recent, there will be

16  collection of physical evidence from the body that could help

17  identify and verify the cause of the injury or, in some cases,

18  identify, perhaps, who is responsible.  But that really applies

19  to injuries that are very fresh, where there may be physical

20  evidence that may help in answering that question.

21  Q.   Doctor -- I'm sorry.  I don't mean to interrupt you.

22           Is it possible to get such evidence with respect to

23  injuries that may be years old?

24  A.   No.

25  Q.   Why is that?

**October 17, 2008**

## Hynn - Direct

1   A.   That kind of biological information is gone, is gone with

2   time.   So what's left is, perhaps, a permanent injury or

3   deformity that can be assessed in terms of its configuration,

4   its appearance, the functional abnormality that individual may

5   have.   That could be correlated with the historical record.

6   Q.   Dr. Hynn, tell us what you do when you examine a living

7   individual.

8   A.   Well, living individuals are examined from head to toe,

9   from the top of their head to the bottom of their feet.   Every

10  part of their body is examined externally.   I don't have the

11  privilege, of course, of looking inside.   The imaging

12  techniques we have in medicine do that for us, but everywhere

13  that can be visually observed is observed and any injury

14  evidence or deformity is photographed.

15         Actually, the whole body is photographed and the

16  negative parts of the body are also included in the photograph.

17  So, a photographic record is created to memorialize and verify

18  what I actually observe.

19  Q.   And what do you mean by the "negative parts of the body,"

20  doctor?

21  A.   Well, many times a negative photograph, in other words, a

22  photograph of the absence of something, the absence of injury,

23  may be important, may be important in explaining the historical

24  record.   We always will look for negative features of the body

25  that, perhaps, don't show any injury, but are important in

**October 17, 2008**

## Hynn - Direct

1  their negative quality, as opposed to actually having an

2  injury.

3  Q.  Now, doctor you may have touched on this, but can you

4  explain what you do to document your visual observations of the

5  person you examine?

6  A.  Well, included in the documentation is not only do we

7  measure and use standard measurements of deformities that are

8  left of a permanent injury, but we also use photographs and

9  photographs are taken in such a way as to document the scale or

10 the size of the injury.

11         So many times you will see in photographs actually a

12 scale of reference so that you can assess for yourself how big

13 the injury was and you can verify what is being described to

14 you is, in actual fact, that size.

15 Q.  Who is it that takes the photograph?

16 A.  We have professional photographers on staff that take

17 photographs for us.  Also, as medical examiners, we're also

18 amateur or semi-professional photographers.

19 Q.  And, doctor, once you conducted any interviews, reviewed

20 medical records, reviewed historical information, performed

21 your exam, taken and reviewed any photographs, is that when you

22 begin the process of forming an opinion?

23 A.  Yes.  Once all the information is gathered, then that

24 information is correlated and opinions arise from that

25 correlation.

October 17, 2008

## Hynn - Direct

1           Some of those opinions, like I mentioned before,

2    sometimes we can offer opinions that an injury is consistent

3    with the historical record, an injury is inconsistent with the

4    historical record or we just can't tell.

5    Q.   Doctor, what I would like to do now is direct your

6    attention to September 9th of this year, 2008, and I'd like for

7    you to tell us, if you can, if you do recall meeting a

8    particular individual on that date.

9    A.   Yes.

10   Q.   Are you able to recall the name of that individual?

11   A.   Mr. Rufus Kpadeh.

12   Q.   And, doctor, can you tell us whether you interviewed

13   Mr. Kpadeh and took statements from him?

14   A.   Yes, I did.

15   Q.   When you did that, or actually even before that, when you

16   first met Mr. Kpadeh, who was present?

17   A.   You were present, his personal counsel was present --

18   Q.   His attorney?

19   A.   His attorney, and two, I believe, two agents, U.S.

20   Marshal's agents or Homeland Security agents were present.

21   Q.   And after meeting Mr. Kpadeh, did a time come when you were

22   able to question him and take statements from him?

23   A.   Yes.

24   Q.   Now, who was present when you were taking any statements

25   from Mr. Kpadeh?

**October 17, 2008**

## Hymn - Direct

1    A.   Myself and our photographer.

2    Q.   Was I in the room when you were taking those statements?

3    A.   No.

4    Q.   What about the Federal agents you referred to?

5    A.   No.

6    Q.   What about Mr. Kpadeh's own attorney?

7    A.   No.

8    Q.   Doctor, did you do anything to document or make a record of

9    the statements Mr. Kpadeh made to you?

10   A.   Yes.

11   Q.   What was that?

12   A.   I drafted a report of my examination, including his

13   statements, my examination and my opinion.

14   Q.   Now, in your report, did it reflect all of the things

15   Mr. Kpadeh related to you?

16   A.   Yes.

17   Q.   Dr. Hymn, can you explain, even though you documented

18   everything Mr. Kpadeh related to you, were all of the things he

19   told you relevant or useful in reaching any opinion relating to

20   Mr. Kpadeh?

21   A.   No.

22   Q.   What I would like for you to do, Dr. Hymn, if you can, is

23   describe to us the statements which Mr. Kpadeh made to you that

24   you have determined were relevant for any analysis of

25   Mr. Kpadeh that you conducted.

**October 17, 2008**

## Hynn - Direct

1  A.   Well, Mr. Kpadeh relayed to me that, I believe, back on

2  August 23 of 1999, he was arrested by a man he identified as

3  Chuckie Taylor.   He said he was taken and he was bound by his

4  elbows behind his back and a knife was used to cut his penis,

5  the underside of his penis.

6         He also described hot molten plastic dripped and

7  burned on his arms and his right hand.   He also described being

8  stabbed with an object, a metal object that he described that

9  was used to clean a rifle, in his left hand and in his back.

10        He also said that he was sodomized by another prisoner

11 in front of Mr. Taylor, "sodomized," meaning -- it's a medical

12 term I use.   Actually what it is is a male having anal

13 intercourse with his penis.

14        Mr. Kpadeh describes his rectum as bleeding for at

15 least a day after that incident.

16        He goes on to tell me that he was forced to drink his

17 own urine on multiple occasions, and then he was imprisoned in

18 a water, in a pit, in a water pit that he described contained

19 foul water and the pit was covered with some iron bars and

20 barbed wire.

21        This lasted a number of weeks in that period of time

22 in 1999, in August, and by about October, I believe, he was, he

23 was either escaped or released -- I don't recall -- and then

24 was seen by medical staff for some complaints he had with

25 breathing and urination.

**October 17, 2008**

## Hyma - Direct

1             That's what I recall him telling me.

2  Q.   Dr. Hyma, when you were obtaining statements from Rufus

3  Kpadeh, do you recall whether he made any statements relating

4  to his shoulder?

5  A.   Yes, I do.

6  Q.   What were those statements, if they were relevant to your

7  analysis?

8  A.   In addition to what he also relayed to me was his captives

9  or his captors put a large wooden beam on his shoulder, on his

10  right shoulder, and they repeatedly beat him with an iron rod

11  on top of that beam, injuring the top of his right shoulder.

12  Q.   Dr. Hyma, do you recall if Rufus Kpadeh made any statements

13  to you with respect to his feet?

14  A.   He -- yes.   He also described that he was forced to kick

15  large rocks --   he used the analogy, the size of rugby

16  footballs -- with his bare feet, causing injury, causing injury

17  to his feet.

18  Q.   Doctor, do you recall whether or not you were provided with

19  any medical records for Rufus Kpadeh?

20  A.   Yes, I was.

21  Q.   Were these extensive records, if you remember?

22  A.   No, it was one or two pages.

23  Q.   And, Dr. Hyma, before I address the records that you

24  received, can you tell us how often in your professional

25  practice you have occasion to review medical records?

**October 17, 2008**

## Hynn - Direct

1  A.  Daily.

2  Q.  Are you familiar with medical terminology?

3  A.  Yes.

4  Q.  Are you familiar with medical abbreviations?

5  A.  Yes.

6  Q.  Sir, are you familiar with handwriting in the medical

7  profession?

8  A.  Yes.

9  Q.  Are you able to read doctors' handwriting?

10  A.  Most of the time.  Most of the time.

11          MS. ROCHLIN:  If I could have just a moment, Your

12  Honor.

13          May I approach the witness, Your Honor?

14          THE COURT:  You may.

15  BY MS. ROCHLIN:

16  Q.  Doctor, I've handed you, after having shown it to defense

17  counsel, what is already in evidence as Government's Exhibit RK

18  28.

19          MS. ROCHLIN:  I would also request that the exhibit be

20  published on the screen.

21          THE COURT:  You may.

22  BY MS. ROCHLIN:

23  Q.  Have you seen that exhibit before coming to court today,

24  doctor?

25  A.  Yes, I have.

**October 17, 2008**

## Hymn - Direct

1   Q.   What is that exhibit?

2   A.   This is an Out-Patient Department medical record from the

3   John F. Kennedy Medical Center, dated October 25, 1999.

4   Q.   What individual does the document concern?

5   A.   Rufus Kpadeh.

6   Q.   Is this the medical record you reviewed in connection with

7   your examination of Rufus Kpadeh?

8   A.   Yes, it is.

9   Q.   Did you, in fact, keep a copy of that record in your own

10  file?

11  A.   Yes, I did.

12  Q.   Were you able to read and understand the contents of this

13  particular medical record, Dr. Hymn?

14  A.   Yes.

15  Q.   If you would, directing your attention to the left side of

16  the screen under the column that says "Date," do you see the

17  first line there with some handwriting on it?

18  A.   Yes.

19  Q.   Are you able to make out the date?

20  A.   Yes.

21  Q.   And can you tell us what writing appears to the right side

22  of that date and what it means?

23  A.   What's written there is "T 98.6 degrees Fahrenheit," which

24  is Mr. Kpadeh's body temperature.

25  Q.   And moving further to the right in that same column, what

**October 17, 2008**

## Hynn - Direct

1   appears?

2   A.   The term "P 78 B/MN," which means his pulse rate is 78

3   beats per minute.

4   Q.   Moving down to the next line, again, all the way to the

5   left, do you see some writing?

6   A.   Yes.

7   Q.   And can you tell us what you see and what that writing

8   means?

9   A.   That's "C/O," which means complains of.

10  Q.   Is there text to the right of the symbol for "complains

11  of"?

12  A.   Yes.

13  Q.   Are you able to read that text?

14  A.   Yes.

15  Q.   Can you tell us what it says?

16  A.   It says "Difficulty breathe times 2.   Painful urination

17       times 2 months."

18  Q.   Now, with respect to the first "times 2," are you able to

19  tell us what that represents, Dr. Hynn?

20  A.   Yes.   That is an indication of the time, how long he has

21  had difficulty breathing.   It appears the author here of the

22  record just forgot to put the unit of time there.   So I don't

23  know what "times 2," if it's two days, two weeks, two months.

24  I don't know.

25  Q.   But with respect to the line referring to painful urination

**October 17, 2008**

## Hymn - Direct

1  the symbol, times 2, appears again?

2  A.   Yes.

3  Q.   Is that followed by some reference to time?

4  A.   Yes, months.

5  Q.   Again, moving down the column on the far left of the

6  screen, do you see after a blank line where some additional

7  writing appears?

8  A.   Yes.

9  Q.   Can you tell us what is that additional writing?

10  A.   That is the history of present illness, HPI.

11  Q.   Are you able to read the text to the right of the symbol

12  for history of present illness?

13  A.   Yes.

14  Q.   What is that text?

15  A.   The text says "According to patient, he was imprisoned by

16      the Anti-Terrorist Unit for two months and tortured after

17      which he developed his current condition.  He also

18      complained of a productive calf at night."

19  Q.   On the line that begins "two months and tortured after,"

20  what is it that designates the word "after"?

21  A.   It's a small case "p" with a slash over the top of the

22  letter.

23  Q.   And what do you recognize that "p" with the slash over it

24  to mean?

25  A.   That's a standard abbreviation for the word "after."

**October 17, 2008**

## Hynn - Direct

1  Q.   Again moving down the column on the far left of the

2  document, does some additional writing appear?

3  A.   Yes.

4  Q.   And what appears there?

5  A.   What appears there is "P/E," which stands for physical

6  exam

7  Q.   Are you able to tell us the text that follows to the right

8  of the symbol for physical exam?

9  A.   Yes "G/C."  I'm not familiar with that abbreviation, but

10  behind that is the word "good."  I'm not familiar with the

11  "G/C" in terms of what actually that refers to.

12  Q.   What about what appears on the following line?

13  A.   The -- what I can read on the following line is -- the next

14  line, I can't read.  The next line, I can't read, but the third

15  line, I can read.  "Lungs clear" and then the next line says

16      "Abdomen, no acute distress, NAD."

17  Q.   And on the next line, is there additional writing?

18  A.   The next line is "EXT," which refers to extremities, and

19  what follows that is "multiple scars."

20  Q.   And is there a writing at the very bottom of the form you

21  can make out?

22  A.   Yes.

23  Q.   Can you tell us what that is?

24  A.   To the left is the letters "IP," which means "impression"

25  and followed by the letters of "UTI," which stands for urinary

**October 17, 2008**

## Hynn - Direct

1   tract infection.

2   Q.   Dr. Hynn, directing your attention to the right side of the

3   document, again, starting where the date 10/25/99 appears and

4   moving all the way to the right past the line that divides the

5   page into another column under the section that says "History,

6   Physical Examination, Diagnosis, Treatment," do you see that

7   portion of the document?

8   A.   Yes.

9   Q.   Does writing appear there?

10  A.   Yes.

11  Q.   Are you able to make out any of that writing?

12  A.   Yes.   That is "B/P" and "100 over 70.   MMHG," which is

13  blood pressure, "100 over 70 millimeters mercury."

14  Q.   Are you able to tell us what the following text represents

15  on that part of the document?

16  A.   The following text is his -- the following four lines are

17  his treatment, prescribed treatment.   The first line, I can't

18  read.

19  Q.   Are you able to read any of the following lines?

20  A.   The second line is instructions for a something done daily

21  for five days, but, again, I can't read the first line, so I

22  can't make out what that means.

23  Q.   And what about the following line?

24  A.   The following line is "Aspirin, ASA, 600 milligrams orally

25       three times a day."

**October 17, 2008**

## Hyma - Direct

1   Q.   Are you able to make out the line after that?

2   A.   The next line is "Doxycycline, 100 milligrams, twice a day

3   for 10 days."

4   Q.   What is Doxycycline, Dr. Hyma?

5   A.   Doxycycline is an antibiotic which is given for urinary

6   tract infections, a fairly standard antibiotic.

7   Q.   Are you able to read what appears on the very last line in

8   that portion of the document?

9   A.   No, can't read that.

10  Q.   Doctor, can you tell us whether or not this document was

11  able to give you information useful in reaching an opinion with

12  respect to Rufus Kpadeh?

13  A.   Well, the document independently verifies some of the

14  historical records in terms of what had happened to Mr. Kpadeh.

15  It does document an apparent urinary tract infection for which

16  he was treated with an antibiotic.  The actual cause of the

17  urinary tract infection is not clear or apparent.

18           Also, it does document a number of scars, although not

19  very specific, on his extremities, which would be his arms and

20  his legs.

21  Q.   Dr. Hyma, did you conduct a physical examination of Rufus

22  Kpadeh?

23  A.   Yes, I did.

24  Q.   And did you document that examination with photographs in

25  the manner that you've described to us earlier in your

**October 17, 2008**

## Hymn - Direct

1    testimony today?

2    A.   Yes.

3              MS. ROCHLIN:   Your Honor, at this time may I approach

4    the witness?

5              THE COURT:   You may.

6    BY MS. ROCHLIN:

7    Q.   Doctor, I've just handed you what has been previously

8    marked for identification as Government's Exhibit Hymn 1

9    through Hymn 40.

10   [Government Exhibits Hymn 1-40 marked for identification at

11                        11:42 a.m]

12   BY MS. ROCHLIN:

13   Q.   I would ask you to take a look at those exhibits and when

14   you're ready, let us know if you recognize them

15   A.   Yes, I recognize all 40.

16   Q.   And are all 40 of those exhibits photographs?

17   A.   Yes.

18   Q.   Are all 40 of those photographs, photographs of Rufus

19   Kpadeh?

20   A.   Yes.

21   Q.   And were those photographs taken in your presence on

22   September 9th of 2008?

23   A.   Yes.

24   Q.   Were they taken during your examination of Mr. Kpadeh?

25   A.   Yes.

**October 17, 2008**

## Hymn - Direct

1  Q.   Doctor, do those photographs fairly and accurately depict

2  either Mr. Kpadeh or any marks of note on his body which you

3  observed on September 9th of 2008?

4  A.   Yes, they do.

5           MS. ROCHLIN:   Your Honor, at this time the United

6  States would move for the admission of Government's Exhibit

7  Hymn 1 through 40.

8           MR. CARIDAD:   No objection.

9           THE COURT:   Admitted.

10   [Government Exhibits Hymn 1-40 received in evidence at 11:43

11                         a.m]

12  BY MS. ROCHLIN:

13  Q.   Doctor, before coming to court today to testify, did you

14  review all of the photographs taken of Mr. Kpadeh on September

15  9th, 2008?

16  A.   Yes.

17  Q.   Now, Exhibits Hymn 1 through 40, are those all of the

18  photographs that were taken during your examination of

19  Mr. Kpadeh?

20  A.   No.

21  Q.   Did you select certain photographs from among the total

22  number of photographs that were taken?

23  A.   Yes, that's correct.

24  Q.   And when you had selected certain photographs, did you

25  identify photographs that would be relevant or helpful to your

**October 17, 2008**

## Hyma - Direct

1   testimony in court?

2   A.   Yes.

3   Q.   Were some of the photographs duplicative?

4   A.   Yes.

5   Q.   And were other photographs simply not part of any opinion

6   or conclusion you reached concerning Mr. Kpadeh?

7   A.   That's correct.

8            MS. ROCHLIN:   Your Honor, at this time I would ask to

9   publish Government's Exhibit Hyma 1 on the screen.

10           AGENT BAECHTLE:   (Complied.)

11  BY MS. ROCHLIN:

12  Q.   Doctor, do you see the photograph on your screen?

13  A.   Yes.

14  Q.   Is that the individual you examined on September 9th, 2008?

15  A.   Yes, it is.

16           MS. ROCHLIN:   Your Honor, at this time I would ask to

17  publish or have the agent scroll through Exhibits Hyma 2

18  through 7 on the screen.

19           THE COURT:   You may.

20           AGENT BAECHTLE:   (Complied.)

21  BY MS. ROCHLIN:

22  Q.   Dr. Hyma, do you recognize what Exhibits Hyma 2 through 7

23  depict?

24  A.   Yes.

25  Q.   What do they show?

**October 17, 2008**

## Hymn - Direct

1  A.   This is -- first of all, one is an orientation photograph

2  of the right side of his body and the photographs focus in on a

3  scar that is on the top of his right shoulder.

4  Q.   Is there a name for that kind of scar?

5  A.   This scar is what's referred to as a keloid, k-e-l-o-i-d.

6  Q.   In the photograph appearing on the screen right now, which

7  is Exhibit Hymn 7, can you explain what else appears in

8  addition to the scar itself?

9  A.   In the photograph there's also a scale of reference.  It's

10  a standard scale of reference you'll see there that depicts the

11  measurement on the vertical and on the horizontal and

12  millimeters, the metric measurement.

13  Q.   And when you were drafting these reports that you

14  referenced earlier, did you make a note of not only the scar,

15  but its dimensions?

16  A.   Yes.

17  Q.   Dr. Hymn, when you questioned Mr. Kpadeh, did he make any

18  statements to you that you felt of relevance to this particular

19  scar?

20  A.   Yes.

21  Q.   What were those statements?

22  A.   The statement that he made to me about the large long log

23  that was placed on his shoulder and then repeatedly beaten with

24  a metal rod injuring the top of his right shoulder described

25  the injury that he had on top of his right shoulder and the

**October 17, 2008**

## Hymn - Direct

1   resulting scar that you see there in Exhibit Number 7.

2           That is a type of scar that forms as a result of a,

3   either an abrasion or scraping off of the skin, or actually a

4   crushing of skin, and over time would be a fairly typical type

5   of scar that one would expect to see.

6   Q.   Did you form any opinion as to whether or not that scar was

7   consistent or inconsistent with Mr. Kpadeh's account of the log

8   on his shoulder and that he was beaten with other objects?

9   A.   Yes.   The scar is consistent with that historical record.

10          MS. ROCHLIN:   Your Honor, with the Court's permission

11   at this time I would ask Agent Baechtle to scroll through

12   Exhibits Hymn 8 through 12.

13          AGENT BAECHTLE:   (Complied.)

14          MS. ROCHLIN:   And, agent, if you would return to

15   Exhibit Hymn Number 8.

16          AGENT BAECHTLE:   (Complied.)

17   BY MS. ROCHLIN:

18   Q.   Doctor, can you explain what appears in this particular

19   photograph?

20   A.   This photograph is his back, upper back and neck, and in

21   the photograph are multiple scars over the spine that you will

22   see in successive photographs with the ruler.

23          MS. ROCHLIN:   And, agent, if you would highlight --

24   excuse me.   Strike that.

25          If you would attempt to enlarge the area along

**October 17, 2008**

## Hymn - Direct

1   Mr. Kpadeh's spine in the photograph.

2            AGENT BAECHTLE:   (Complied.)

3   BY MS. ROCHLIN:

4   Q.   In the enlarged portion of the photograph, Dr. Hymn, are

5   you able to see the scars that you just referred to?

6   A.   Yes.   I counted 20 of these scars.   They're raised scars.

7   They have the size of about 5 millimeters, which is a little

8   smaller than the standard eraser on a number 2 pencil.

9   Q.   And if you would touch the enlarged portion of your screen

10  and draw a circle or otherwise indicate where you're able to

11  observe some of these 5 million meter scars?

12  A.   (Complied.)

13  Q.   And, doctor, where the red marks now appear on the screen,

14  are those in relation to where you were able to observe the

15  scars that you've just described on Mr. Kpadeh's back?

16  A.   Yes.

17           MS. ROCHLIN:   Agent, if you would take down the

18  enlargement and move to the next photograph.

19           AGENT BAECHTLE:   (Complied.)

20  BY MS. ROCHLIN:

21  Q.   What does this photograph show, Dr. Hymn?

22  A.   Mr. Kpadeh's back with a higher magnification, with

23  different lighting to bring out the raised scars.

24  Q.   Are you able to see in this photograph where the scars

25  appear?

**October 17, 2008**

## Hynn - Direct

1  A.   Yes.

2  Q.   Would you, please, indicate by touching your screen where

3  the scars appear?

4  A.   (Complied.)

5        MS. ROCHLIN:   Agent, if you would move to the next

6  photograph in the series.

7        AGENT BAECHTLE:   (Complied.)

8  BY MS. ROCHLIN:

9  Q.   Doctor, what is happening in this photograph?

10  A.   Now, this is the photograph with the scale of reference in

11  the photograph.   The photograph is -- excuse me -- the scale is

12  vertical.   The top of the photograph is the top of the

13  shoulders.   The scale is over his left shoulder blade.

14        You can see in the scale a reference there, 5

15  millimeters are five of those small little lines on that ruler

16  that is on the right side of the ruler.   The left side of the

17  ruler is English measurements.   That's the inches.   I'm not

18  using that side.   I'm using the right side of the ruler.

19  Q.   You're using what's marked as the metric side of the ruler?

20  A.   Yes.

21        MS. ROCHLIN:   Agent, if you would move to the next

22  photograph, please.

23        AGENT BAECHTLE:   (Complied.)

24  BY MS. ROCHLIN:

25  Q.   What does this photograph identify, doctor, if anything?

**October 17, 2008**

## Hyma - Direct

1  A.   This is the same ruler in the same part of the back at a

2  higher magnification.   You can see the scars here on the screen

3  much easier now and you can appreciate their size next to the

4  ruler.

5          The largest one is about 5 millimeters, which on the

6  ruler is from there, by the 3, to the middle larger hash mark

7  there.   That's 5 millimeters.

8  Q.   And, doctor, the red slash marks that appear on the screen,

9  are those where you were able to observe the scars on

10 Mr. Kpadeh's back?

11 A.   In addition, I also pointed out 5 millimeters on the ruler.

12 Q.   Those would be the two vertical marks on the far left side

13 of the screen at this time?

14 A.   Yes.

15          MS. ROCHLIN:   Agent, if you would scroll to the next

16 photograph.

17          AGENT BAECHTLE:   (Complied.)

18 BY MS. ROCHLIN:

19 Q.   What does this photograph show, Dr. Hyma?

20 A.   This is actually even closer to one of the injuries I

21 pointed to on the screen, and you can see the ruler right

22 alongside of it.   It's about 5 millimeters in size.

23 Q.   Dr. Hyma, do you recall whether or not Rufus Kpadeh made

24 any statements to you that you found relevant to these

25 particular scars on his back?

**October 17, 2008**

## Hyma - Direct

1    A.    Yes.

2    Q.    What were those statements?

3    A.    He said he was stabbed multiple times in his back with a

4    rod that was used to clean rifles.

5    Q.    And what, if any, opinion or conclusion did you form with

6    respect to the injuries shown in Hyma Exhibits 8 through 12?

7    A.    Well, these scars, they're raised, which indicates there

8    has been damage not only to the outer layer of skin, but the

9    second layer of skin, the dermis.   The size is a little smaller

10    than the diameter of a number 2 pencil eraser.

11            These scars would be consistent with a puncture from

12    such an instrument such as Mr. Kpadeh describes.   These are

13    consistent with a puncture from that kind of an instrument.

14    Q.    For the benefit of the court reporter, Dr. Hyma, when you

15    refer to the dermis, is that spelled d-e-r-m-i-s?

16    A.    Yes.

17            MS. ROCHLIN:   If I could ask the agent now to publish

18    on the screen Exhibits Hyma 13 through 16.

19            AGENT BAECHTLE:   (Complied.)

20    BY MS. ROCHLIN:

21    Q.    Dr. Hyma, are you able to tell us what those photographs

22    demonstrate?

23    A.    Yes.   These photographs are the front of his left elbow and

24    his right elbow, respectively.

25            MS. ROCHLIN:   Could we go back to Exhibit Number Hyma

**October 17, 2008**

## Hymn - Direct

1    13.

2              AGENT BAECHTLE:   (Complied.)

3    BY MS. ROCHLIN:

4    Q.   Doctor, what, if anything, do you observe in this

5    photograph on the front of Mr. Kpadeh's elbow?

6    A.   This is the front of his left elbow and he has horizontal

7    scars that are slightly raised, and actually he has parallel

8    scars.   They're not only raised, but they're a little darker

9    pigment than his native skin, and they spanned his elbow.

10             They're separated by a distance of about 1 centimeter,

11   as you can see there from the ruler next to the scar.   1

12   centimeter is 10 millimeters.   So between the number 4 and 3 on

13   the ruler, that is 1 centimeter or 10 millimeters.

14   Q.   If you would, Dr. Hymn, could you, please, circle the area

15   on the photograph where the scars appear.

16   A.   (Complied.)

17             Right in the circle here and also extends over here to

18   the inside of the left arm

19             MS. ROCHLIN:   If we could move now to photograph

20   Exhibit Hymn 14.

21             AGENT BAECHTLE:   (Complied.)

22   BY MS. ROCHLIN:

23   Q.   Is this also a photograph of the left arm, Dr. Hymn?

24   A.   Yes, it is, a little different lighting, but the scar you

25   can still see.   I'll circle it.   It's right in the center of

## Hymn - Direct

1  the photograph.

2          MS. ROCHLIN:   If we could move to the next photograph,

3  please.

4          AGENT BAECHTLE:   (Complied.)

5  BY MS. ROCHLIN:

6  Q.   Is this the left arm or the right arm?

7  A.   This is the right arm   The scar is a little less, a little

8  less distinct, but I can circle it.   It's right in the center

9  of the photograph.   I believe the next photograph is probably

10 clearer.

11         MS. ROCHLIN:   Agent, if you would move to Exhibit Hymn

12 16.

13         AGENT BAECHTLE:   (Complied.)

14 A.   This is clear.   It gives the scale of reference.   This is

15 the scar.

16 Q.   Dr. Hymn, when you took statements from Mr. Kpadeh, were

17 there any statements you felt were relevant with respect to the

18 scars on the front of his elbow?

19 A.   Yes.

20 Q.   What statements were those?

21 A.   His statement is that, was that he was bound with a, with

22 bindings so tight that his elbows were almost touching in the

23 back.

24 Q.   And what, if anything, did you conclude with respect to the

25 scars that appear on the inside of Mr. Kpadeh's elbows, as

**October 17, 2008**

## Hymn - Direct

1  shown in these photographs, Dr. Hymn?

2  A.   The distribution of the scar being horizontal, the size of

3  the scar and the fact that actually you have a scar here

4  indicates that, again, not only is the outer layer of skin

5  damaged by some kind of band or band instrument, but the

6  underlying layer of skin is actually damaged, resulting in the

7  scar.

8         So, something cut through that part of his arm in a

9  band-like fashion on both sides leaving this scar as a

10  permanent deformity.

11         MS. ROCHLIN:   Agent, if you could take down Exhibit

12  Hymn 16 and bring up Exhibit Hymn 17, please.

13         AGENT BAECHTLE:   (Complied.)

14  BY MS. ROCHLIN:

15  Q.   Dr. Hymn, can you tell us what this photograph depicts?

16  A.   This photograph is the back of both his hands and his

17  forearms.

18  Q.   Does this photograph have any particular purpose?

19  A.   Yes.

20  Q.   What is that purpose?

21  A.   The right hand, which I'll circle here, has scars from

22  where he was burned with the hot molten liquid, and the left

23  hand is also injuries that he describes that were from the stab

24  wounds with this same instrument that caused the scars on his

25  back.

**October 17, 2008**

## Hymn - Direct

1          MS. ROCHLIN:   Agent, if you would mind moving to the

2   next photograph.

3          AGENT BAECHTLE:   (Complied.)

4   BY MS. ROCHLIN:

5   Q.   Dr. Hymn, which hand appears in this photograph, can you

6   tell us, referring to Exhibit Hymn 18?

7   A.   This is his right hand.

8   Q.   What can you tell us about what appears in the photograph

9   of the right hand?

10  A.   His right hand has, again, irregular scars.   I mean, you

11  can see them, and I'll circle them right there on the screen.

12  These are slightly raised scars.   Some of them don't have as

13  much pigment as his native skin.   Some of them have more

14  pigment than his native skin, and you can see the size there.

15  They're roughly about 5, 6 millimeters.

16          MS. ROCHLIN:   Agent, let me ask you at this time to

17  move to the next exhibit, Hymn 19.

18          AGENT BAECHTLE:   (Complied.)

19  BY MS. ROCHLIN:

20  Q.   Doctor, what does this photograph depict, if you could tell

21  us?

22  A.   This is the back of his left hand and he has irregular

23  scars here in the circle that are somewhat jagged in appearance

24  and distributed over his knuckles.

25  Q.   And are those scars the same or different from the scars on

**October 17, 2008**

## Hymn - Direct

1    the opposite hand in some way?

2    A.   They have a different appearance.

3              MS. ROCHLIN:   Agent, let me ask you at this time to

4    put up Exhibits Hymn 20 and 21.

5              AGENT BAECHTLE:   (Complied.)

6    BY MS. ROCHLIN:

7    Q.   Doctor, what do these exhibits show?

8    A.   These are scars on his right forearm   In my report I

9    describe them as millimeters, 3 to 5 millimeters.   Actually,

10   they're 3 to 5 centimeters, as you can see from the scale of

11   reference.

12             These are irregular scars and you can see from the

13   photograph, from the lighting, that both of these scars are

14   actually raised.   They're actually raised off the skin and

15   they're very irregular.   In other words, they have no pattern

16   to them

17   Q.   Dr. Hymn, do you recall what you mentioned with respect to

18   these particular scars on page 2, item 9 of your report?

19   A.   Yes.

20   Q.   What did you mention with respect to these specific scars

21   on Mr. Kpadeh's right forearm?

22   A.   These scars are consistent with burns from molten plastic

23   that he describes that was dripped on his right forearm

24   Q.   Doctor, if you would, would you examine page 2, item 9?

25   A.   (Complied.)

**October 17, 2008**

## Hynn - Direct

1          Yes.

2  Q.   Do you recall what, if anything, Mr. Kpadeh said with

3  respect to these particular scars?

4  A.   Item 9 on my report does not refer to these scars.

5  Q.   I apologize, doctor.

6  A.   What it does refer to, however, is this scar and this scar

7  that I'm circling.

8  Q.   Tell you what, doctor, let me ask you to circle the areas

9  that are referenced in item 9 of your report.

10 A.   (Complied.)

11 Q.   What did Mr. Kpadeh say with respect to those areas?

12 A.   He, in his own words, told me they were not related at all

13 to any of the incidents that he relayed to me.

14 Q.   Referring to the incidents that took place between August

15 and October of 1999?

16 A.   Yes, they're injuries unrelated to that.

17 Q.   And now that the screen has cleared, would you, please,

18 circle the remaining injuries you detected on Mr. Kpadeh's

19 right forearm?

20 A.   (Complied.)

21 Q.   And what did Mr. Kpadeh tell you with respect to those

22 injuries?

23 A.   Those injuries he described as the scars from being burned

24 with molten plastic.

25 Q.   And did you reach any conclusions or form any opinions with

## Hynn - Direct

1   respect to the origin of the scars now circled on the screen in

2   Exhibit Hynn 21?

3   A.   Yes.

4   Q.   What opinion or conclusion did you reach?

5   A.   Those scars are very typical of a burn from a liquid.   As

6   liquid drips and burns the body, it will have an irregular

7   pattern.   Where the hot liquid comes in contact with the skin,

8   if it's hot enough, it will burn the dermis and get this very

9   irregular, almost like candle wax appearance of the scar.

10          MS. ROCHLIN:   Agent, if you could take down Hynn 21

11   and bring up Hynn Exhibit 22.

12          AGENT BAECHTLE:   (Complied.)

13   BY MS. ROCHLIN:

14   Q.   What appears in this photograph?

15   A.   This is more of an orientation photograph so you can

16   appreciate where the scars we previously discussed are located.

17   Q.   Does the hand appear in the photograph as well as the

18   forearm?

19   A.   Yes.

20   Q.   Are you able to observe in this photograph any scars on the

21   right hand?

22   A.   Yes.

23   Q.   And as to those scars, did Mr. Kpadeh make any statements

24   that you found to be relevant?

25   A.   Yes.

**October 17, 2008**

## Hynn - Direct

1  Q.   What statements were those?

2  A.   Also from molten plastic or molten liquid that burned him

3  there.

4  Q.   What, if any, opinion did you reach with respect to the

5  scars on Mr. Kpadeh's right hand?

6  A.   Those scars are also consistent, for the same reason as I

7  stated before, from a hot liquid burning the skin.

8         MS. ROCHLIN:   Agent, if you could move to Exhibit Hynn

9  23.

10         AGENT BAECHTLE:   (Complied.)

11 BY MS. ROCHLIN:

12 Q.   Doctor, are you able to tell us what appears in this

13 photograph?

14 A.   There is also the right forearm, but going a little bit

15 around the arm now to the back of the arm and just to

16 memorialize the extension of the scar around his arm

17 Q.   And does this photograph also show one of the scars that

18 are consistent with a burn from liquid plastic or something in

19 a liquid form?

20 A.   Yes.

21 Q.   Would you circle the scar or scars that appear in this

22 photograph you found to be consistent with that account?

23 A.   (Complied.)

24         MS. ROCHLIN:   If we could take down Hynn 23 and put up

25 Exhibit Hynn 24.

**October 17, 2008**

## Hymn - Direct

1            AGENT BAECHTLE:   (Complied.)

2   BY MS. ROCHLIN:

3   Q.   Doctor, what appears in this photograph?

4   A.   This is the right hand, the back of the right hand and the

5   skin has the previous mentioned scars that I'll put in a circle

6   here of what Mr. Kpadeh described as burns or scars from burns

7   from the molten plastic or molten liquid.

8   Q.   Again, did you reach a conclusion about what caused these

9   particular scars to form on Mr. Kpadeh's right hand?

10  A.   Yes.

11  Q.   And --

12  A.   It's consistent with a molten liquid.

13           MS. ROCHLIN:   Agent, if you could also put up at this

14  time Exhibits Hymn 24 through Hymn 26.

15           AGENT BAECHTLE:   (Complied.)

16  A.   Again, these photographs give you scale of reference.  It's

17  the same scale.  You can appreciate the size of these scars.

18  Q.   Doctor, what is it about these scars that you find to be

19  consistent with burns from molten or liquid plastic?

20  A.   Again, one scar here in the circle is a linear scar or in a

21  line that's slightly raised.  The others are circles, which I'm

22  circling on the screen again, from either running or dripping

23  drops of molten liquid.

24           I would just point out this scar that I'm circling

25  here is not related at all to the injuries.

**October 17, 2008**

## Hyman - Direct

1   Q.   What do you base that conclusion on, doctor, that the last

2   scar you circled was not related to the incidents from August

3   through October of 1999?

4   A.   That's part of the grouping in my report of the scars.

5   Q.   And who was it who indicated to you this particular scar

6   was unrelated to the incident or incidents at issue here?

7   A.   Mr. Kpadeh.

8          MS. ROCHLIN:   If we could take down Exhibit Hyman 26

9   and move to Exhibits Hyman 27 and 28.

10          AGENT BAECHTLE:   (Complied.)

11  BY MS. ROCHLIN:

12  Q.   What appears in those two photographs, Dr. Hyman?

13  A.   This is the back of the left hand and all the scars that

14  you see in this photograph -- and I'll circle them all here --

15  are from -- I'll point these all out here -- are from where he

16  indicates he was stabbed with that same instrument that was

17  used to stab his back.

18  Q.   Dr. Hyman, did you form any opinion with respect to the

19  scars that appear in Exhibit Hyman 28?

20  A.   Yes.

21  Q.   What opinion is that?

22  A.   These are, again, consistent with healing injuries from

23  punctures from the instrument that he described that also

24  injured his back.

25  Q.   And can you tell us, Dr. Hyman, what is it about these scars

## Hyma - Direct

1  that you find to be consistent with descriptions of puncture

2  wounds or a puncturing process?

3  A.   Well, the back of the hand has very thin skin and depending

4  on the type of object that could puncture the skin, it may just

5  split the skin, and many of these scars, as you can see here,

6  are very fine lines, again, consistent with being something

7  from a puncture such as he described, as opposed to the back.

8  The back has much thicker skin than the back of your hand.   The

9  back is much thicker and it won't split like this.

10           MS. ROCHLIN:   If we could take down Exhibit Hyma 28

11  and move to Exhibit Hyma 29.

12           AGENT BAECHTLE:   (Complied.)

13  BY MS. ROCHLIN:

14  Q.   Dr. Hyma, are you able to recognize what appears in this

15  photograph?

16  A.   Yes.

17  Q.   What appears in this photograph?

18  A.   This is a single circular scar that he described on his

19  forearm, again, from dripping molten liquid.

20  Q.   And did you reach any opinion with respect to this

21  particular scar and what Mr. Kpadeh related to you about it?

22  A.   Yes.

23  Q.   What was that conclusion?

24  A.   This is consistent with that molten liquid, being burned by

25  molten liquid.

**October 17, 2008**

## Hyma - Direct

1  Q.  Would you circle the area where the scar appears, Dr. Hyma?

2  A.  (Complied.)

3  Q.  Can you tell us what is consistent with respect to this

4  scar about a burn from molten liquid?

5  A.  Again, it's raised and it's about the size -- you could see

6  the size.   It's about 2 to 3 millimeters.

7  Q.  Dr. Hyma, did Mr. Kpadeh describe to you injuries to his

8  genitals?

9  A.  Yes.

10 Q.  And did you also do a visual examination of Mr. Kpadeh's

11 genitalia?

12 A.  Yes.

13 Q.  Did you document your observations with photographs?

14 A.  Yes.

15 Q.  And did you find evidence of any injuries on Mr. Kpadeh's

16 genitalia?

17 A.  Yes.

18         MS. ROCHLIN:   At this time, I would ask the agent to

19 take down Exhibit Hyma 29 and bring up Exhibits Hyma 30 and 31.

20         AGENT BAECHTLE:   (Complied.)

21 BY MS. ROCHLIN:

22 Q.  With respect to the first photograph that appeared, Exhibit

23 Hyma 30, was that an orientation photograph, Dr. Hyma?

24 A.  Yes.

25 Q.  Showing Mr. Kpadeh's genitalia?

**October 17, 2008**

Hyma - Direct

1    A.    That's correct.

2            MS. ROCHLIN:    And moving to Exhibit Hyma 31?

3            AGENT BAECHTLE:    (Complied.)

4    BY MS. ROCHLIN:

5    Q.    Is that a closer photograph of the area where Mr. Kpadeh

6    said he received injury to his genitalia?

7    A.    Yes.

8    Q.    And, specifically, his penis?

9    A.    Yes.    This is the underside of the shaft of his penis.

10   Q.    And where, if anywhere, do you see the results of any

11   injury in this photograph, Dr. Hyma?

12   A.    I'll circle with my finger.    It's a linear scar along that,

13   parallel just to the right of that line I drew on the screen.

14   It's about 7 millimeters.

15   Q.    How visible is the scar itself, doctor?

16   A.    It's -- you have to look closely to see it.    This part of

17   the body, the skin is very thin and the scarring is very thin

18   and you really have to stretch it to really appreciate it, but

19   without a doubt, it's there.    You can also see it in the

20   previous photograph, the orientation photograph.

21            MS. ROCHLIN:    If we could go back to Exhibit Hyma 30.

22            AGENT BAECHTLE:    (Complied.)

23   BY MS. ROCHLIN:

24   Q.    In this photograph, doctor, can you indicate where the scar

25   appears?

October 17, 2008

## Hynn - Direct

1  A.   In the circle.

2  Q.   Did you form any conclusion or opinion about the origin of

3  this scar, Dr. Hynn?

4  A.   Well, this is a linear scar.   It's in a straight line and,

5  yes, I did.

6  Q.   What was your conclusion?

7  A.   This is consistent with an incised wound or a wound from a

8  cutting instrument such as he described as a knife that was

9  applied to the underside of his penis.

10  Q.   What makes this particular scar consistent with what

11  Mr. Kpadeh described?

12  A.   The scar is a fine line and the scar is on the underside of

13  his penis as one would expect from this injury.

14  Q.   Doctor, how quickly would that kind of injury to the area

15  depicted in the exhibit heal?

16  A.   Depending on the depth of the injury, this could heal

17  anywhere from a couple of days to maybe a week.

18  Q.   If you were to assume, Dr. Hynn, that this particular

19  injury was inflicted in August of 1999, approximately

20  mid-August of 1999, can you indicate what the condition of the

21  injury would be by October 26th of 1999?

22          MR. CARIDAD:   Objection, Your Honor.   No notice.

23          THE COURT:   Overruled.

24  A.   This injury, again, can heal, if it doesn't get infected,

25  can heal in a couple of days to a week, and unless you really

**October 17, 2008**

## Hymn - Direct

1  look for it, it would be not noticeable by October.

2  Q.   Thank you, doctor.

3         MS. ROCHLIN:   If we could bring up at this time Hymn

4  32 through 35.

5         AGENT BAECHTLE:   (Complied.)

6  BY MS. ROCHLIN:

7  Q.   Dr. Hymn, can you tell us what appears in the photographs

8  marked as Hymn 32 through 35?

9  A.   Well, these are photographs of Mr., the top of Mr. Kpadeh's

10  feet and his ankles.

11         MS. ROCHLIN:   If we could go back to Exhibit Hymn 32.

12         AGENT BAECHTLE:   (Complied.)

13  BY MS. ROCHLIN:

14  Q.   How many feet are in there photograph, doctor?

15  A.   Two feet.

16  Q.   Is this photograph one for orientation purposes?

17  A.   Yes, it is.

18         MS. ROCHLIN:   Moving to Exhibit Hymn 33.

19         AGENT BAECHTLE:   (Complied.)

20  BY MS. ROCHLIN:

21  Q.   What appears in this photograph?

22  A.   The purpose of this photograph is to document the injury he

23  described to me that he sustained as a result of kicking these

24  large rugby football size rocks.

25         The injury he described is on the inner part of his

**October 17, 2008**

## Hymn - Direct

1   first toe or the great toe.   This injury and only this injury

2   did he describe or ascribe to the incident of the rock-kicking.

3            All of the other scars on his ankles, from his own

4   account, are not related at all to any of the incidents that we

5   have been discussing.

6   Q.   Doctor, with respect to the injury on Exhibit Hymn 33 that

7   you circled roughly below the big toe --

8   A.   Yes.

9   Q.   -- were you able to form any conclusions concerning the

10  origin or the cause of this particular injury?

11  A.   Again, this scar is somewhat irregular, but it's in a

12  linear distribution.   It's certainly a consistent type of scar

13  that you would see from a laceration from a blunt object that

14  the foot would come in contact with or a blunt object hitting

15  the foot like a rock.

16           It doesn't have a lot of specificity, but it's

17  certainly consistent with what he's describing.

18           MS. ROCHLIN:   And if we could move to Hymn 34.

19           AGENT BAECHTLE:   (Complied.)

20  BY MS. ROCHLIN:

21  Q.   Doctor, could you tell us what appears in this exhibit?

22  A.   This is the top of his foot, his left foot.   Again, this is

23  a photograph that shows some other scars that, from his own

24  account, are not related.

25  Q.   And, doctor, in the course of your examination of

**October 17, 2008**

## Hymn - Direct

1  Mr. Kpadeh, you chose to document even any marks or scars that

2  were not related to his account of what occurred between August

3  and October of 1999.  Is that correct?

4  A.  Yes, that's correct.

5        MS. ROCHLIN:  If we could move to Exhibit Hymn 35.

6        AGENT BAECHTLE:  (Complied.)

7  BY MS. ROCHLIN:

8  Q.  What appears in this exhibit, Dr. Hymn?

9  A.  This is the top of his right foot.

10 Q.  And with respect to the top of Mr. Kpadeh's right foot, did

11 you observe anything noteworthy or not?

12 A.  Again, he had multiple scars on his right foot, but from

13 his account, these are not related to the incidents of August

14 of 1999.

15       MS. ROCHLIN:  If we could take down Hymn 35 and,

16 agent, if you would bring up Exhibits Hymn 36 through 39.

17       AGENT BAECHTLE:  (Complied.)

18 BY MS. ROCHLIN:

19 Q.  Dr. Hymn, can you explain what appears in Exhibits 36

20 through 39?

21 A.  These are orientation photographs of his legs, both the

22 back of his legs and the sides of his legs, again documenting

23 other scars that by his own account are not related to the

24 incidents.

25       MS. ROCHLIN:  Agent, if you could bring up Exhibit

**October 17, 2008**

## Hymn - Voir Dire

1    Hymn 40.

2            AGENT BAECHTLE:   (Complied.)

3    BY MS. ROCHLIN:

4    Q.   Again, Dr. Hymn, in this photograph, is this similar to

5    photos 36 through 39?

6    A.   That's correct.

7            MS. ROCHLIN:   Your Honor, I would be moving to another

8    area at this time.   I don't know if it's an appropriate moment

9    to break for lunch or I can continue.

10            THE COURT:   We can take our lunch recess now.

11            Ladies and gentlemen, I'll ask that everyone please

12    return by 1:45.   It's almost 12:30.   We'll have you back at

13    1:45.   Please don't discuss the case.

14            [The jury leaves the courtroom at 12:23 p.m]

15            THE COURT:   Did you want to question Dr. Hymn about

16    the portions of the report?

17            MR. CARIDAD:   Yes.

18                    VOIR DIRE EXAMINATION

19    BY MR. CARIDAD:

20    Q.   Hello, doctor.

21    A.   Hi.   Good afternoon.

22    Q.   Doctor, do you remember examining Varmuyan Dulleh?

23    A.   Yes.

24    Q.   And you prepared a consultation report concerning him just

25    like for every other person you examined.   Is that correct?

**October 17, 2008**

## Hymn - Voir Dire

1    A.    Yes.

2    Q.    Now, you're consultation report regarding Mr. Dulleh, do

3    you have that with you?

4    A.    Yes, sir.

5    Q.    It lists "evidence received."  Correct?

6    A.    Yes.

7    Q.    And number 1 lists U.S. Department of State file A94720458.

8    Do you see that?

9    A.    Yes.

10   Q.    Do you remember receiving such a file?

11   A.    Yes.

12   Q.    Do you still have the papers that constitute that file with

13   you?

14   A.    What I have here in my file is the medical records from

15   Heartland Outreach, and I may have copies of that U.S.

16   Department of State file that you're making reference to, but

17   I'd actually have to see that file to see what I've retained.

18   Q.    Do you remember receiving a file that was entitled "U.S.

19   Department of State File"?

20   A.    Yes.

21   Q.    And you say you don't have all those documents you received

22   at that time together with you in court today or you do?

23   A.    I don't have that whole file.  Again, I'd have to see that

24   file and see, perhaps, if I made reference or made copies of

25   parts of that file or none of it at all.

**October 17, 2008**

## Hymn - Voir Dire

1          MS. ROCHLIN:  It's not in the courthouse at this time,

2    Your Honor.

3          MR. CARIDAD:  Judge, I'd like to show it to him and

4    ask him are these the records he received as part of the trial

5    and "Which, if any of those records, did you use or rely upon?"

6          MS. ROCHLIN:  The actual file is in Mr. Graveline's

7    office.

8          THE COURT:  Why don't we gather together five minutes

9    before the jury?

10          MR. CARIDAD:  The other issue concerns Mr. Jusu and

11    Mr. Turay in Dr. Hymn's report as "Evidence received:

12    Investigative data from the Department of Homeland Security."

13    I don't know what that means.

14          THE COURT:  Do you want to ask him?

15    BY MR. CARIDAD:

16    Q.  Dr. Hymn, regarding another person you examined,

17    Mr. Jusu -- do you remember that?

18    A.  Yes.

19    Q.  Do you have your consultation report of Mr. Jusu in front

20    of you?

21    A.  Yes.

22    Q.  It lists under "Evidence received:  Number 3, investigative

23        data U.S. Department of Homeland Security."

24    A.  Yes.

25    Q.  Does that number 3 consist of papers that were given to

**October 17, 2008**

## Hymn - Voir Dire

1   you?

2   A.   Yes.

3   Q.   And do you still have those papers in one file that you

4   received them?

5   A.   It is a written narrative.   It's a written narrative that

6   consists of 10 pages.

7   Q.   Did you read that before you examined Mr. Jusu?

8   A.   I reviewed this somewhere in the process of evaluating all

9   the data.   I don't recall the exact sequence of when I read it,

10  but it's all part of my review.

11  Q.   And is that something you relied upon in formulating your

12  opinion?

13  A.   Yes.

14  Q.   Did you do the same thing with Mr. Turay?   Were you given

15  something you labeled "Investigative data, U.S. Department of

16  Homeland Security" as to Mr. Turay?

17  A.   It's the same document.

18  Q.   The exact same document?

19  A.   Yes.

20  Q.   Did you also read it and rely upon it in reaching your

21  conclusion as to Mr. Turay?

22  A.   Yes.

23  Q.   The only thing we're missing then is the A-file concerning

24  Mr. Dulleh?

25  A.   Yes.   I don't have that file.   I may have made some copies

**October 17, 2008**

## Hymn - Voir Dire

1  of select parts of it, but, again, I can't answer your question

2  without actually seeing it.

3            MR. CARIDAD:   That's all I have, Judge.

4            MS. ROCHLIN:   May I, Your Honor?

5            THE COURT:   Yes.

6                     VOIR DIRE EXAMINATION

7  BY MS. ROCHLIN:

8  Q.   Doctor, the documents you referred to concerning Mr. Jusu

9  and Mr. Turay, that particular document is an investigative

10 report.   Correct?

11 A.   Yes.

12 Q.   And what it does is record an account provided by Mr. Jusu

13 and Mr. Turay, respectively.   Is that correct?

14 A.   Yes.   It's another, an independent account of the incident.

15 Q.   Coming from either Mr. Jusu or Mr. Turay.   Is that right?

16 A.   Through another person, yes.

17 Q.   Through a Federal agent?

18 A.   Through a Federal agent.   Again, another historical

19 document I relied upon.

20 Q.   Doctor, you also received an account from Mr. Jusu and from

21 Mr. Turay directly prior to your examination of each of these

22 individuals.   Correct?

23 A.   That's correct.

24 Q.   Doctor, can you tell us if you never had the agent's

25 investigative report, would any of your opinions or conclusions

**October 17, 2008**

## Hymn - Voir Dire

1  concerning Mr. Jusu or Mr. Turay be different?

2  A.   No.

3          MS. ROCHLIN:   I have nothing further, Your Honor.

4          THE COURT:   Very well.   You all have a good lunch.

5          MS. ROCHLIN:   Thank you.

6              [Luncheon recess at 12:32 p.m]

7          THE COURT:   Dr. Hymn, if you could return to the

8  witness stand.

9          Ms. Rochlin.

10          MS. ROCHLIN:   Your Honor, if I may approach I'll

11  provide Dr. Hymn with the file.

12          THE COURT:   Thank you.

13          We have a juror, just like last Friday, who would like

14  to leave again at 3:30 because of a class.   I think we can

15  accommodate that.   The Government didn't think it would go very

16  late today.

17          MS. ROCHLIN:   We were concerned we might not be able

18  to fill up the day.   We would not object to a 3:30 recess.

19          THE COURT:   I will let the parties know on Monday, I

20  need to stop at 3:00 on Monday.   I'm sure the defense will use

21  the afternoon to prepare those witnesses for Tuesday and

22  Wednesday and so forth.   I don't know if the Government will

23  finish by Monday.   We'll see.

24          All right.

25                  VOIR DIRE EXAMINATION

**October 17, 2008**

## Hymn - Voir Dire

1  BY MR. CARIDAD:

2  Q.  Doctor, you received a file folder just now?

3  A.  That's correct.

4  Q.  Do those contain the documents you received as part of the

5  package that was delivered to you before your examination of

6  Mr. Dulleh?

7  A.  I received this file and reviewed this file in the process

8  of evaluation of Mr. Dulleh.

9  Q.  Right.

10  A.  I have tabbed on the left-hand side with yellow Post-it

11  notes the parts of the file that I have copied and have

12  retained in my file.  So I only have part of the file in my

13  file, to answer your original question.

14  Q.  Are the pages you've tabbed the pages you've relied upon in

15  making your opinion about Mr. Dulleh?

16  A.  It was part of the historical information, yes, that I

17  relied upon in my evaluation of Mr. Dulleh.

18  Q.  Did you rely on any other page which you did not tab?

19  A.  No.

20  Q.  But you read those other pages?

21  A.  I reviewed the entire file.

22  Q.  I mean, you've read those other pages in examining

23  Mr. Dulleh?

24  A.  In the process of evaluating Mr. Dulleh.  I don't recall I

25  had this file available to me on the day he was in my

**October 17, 2008**

## Hynn - Voir Dire

1   department to be examined.

2   Q.   But they were given to you at one point or another?

3   A.   That's correct.

4   Q.   Before you made your final opinion?

5   A.   The final report, that's correct.

6   Q.   You've tabbed the ones you have copies of in your own file?

7   A.   Yes, on the left-hand side.

8   Q.   The ones you did not tab, did you read those also in

9   preparing your opinion about Mr. Dulleh?

10  A.   Yes, I read this whole file, reviewed the whole file in

11  preparing my opinion.

12  Q.   Is it fair to say you relied on the whole file in preparing

13  your opinion?

14  A.   Parts of it are not relevant to my opinion.

15  Q.   Which parts are relevant?

16  A.   Again, the parts I have tabbed.

17          MR. CARIDAD:   I would ask for the production of those.

18          THE COURT:   What is the objection of showing that

19  portion the doctor just marked to defense counsel?

20          MS. ROCHLIN:   Your Honor, I believe the portions the

21  doctor has marked have already been provided to Mr. Caridad.

22          THE COURT:   Why don't you compare them so we can move

23  it along?

24          MS. ROCHLIN:   If I could?

25          THE COURT:   Sure.

**October 17, 2008**

## Hynn - Voir Dire

1          MS. ROCHLIN:   Your Honor, Mr. Graveline is examining

2    the file.

3          Your Honor, Mr. Graveline provided all of the

4    statements from the A-file to defense counsel already.   If

5    nothing else, defense counsel has already received the material

6    Dr. Hynn had as Jencks material.   So, in the Government's view,

7    the A-file issue is a moot issue.

8          THE COURT:   All right.

9          You can all cross-check that as we continue then.

10          MR. CARIDAD:   Thank you.

11          THE COURT:   Let's bring the jury in, please.

12          [The jury returns to the courtroom at 1:48 p.m.]

13          THE COURT:   Everyone please be seated.

14          For your planning purposes, ladies and gentlemen, we

15    will stop today at 3:30 to accommodate the juror who has a

16    Friday class and because of my scheduling issues, on Monday we

17    will stop at 3:00.

18          Please proceed.

19          A JUROR:   What time?

20          THE COURT:   At 3:00.

21    BY MS. ROCHLIN:

22    Q.   Dr. Hynn, before moving to a different topic, let me ask

23    you if you would to go back to Exhibits Hynn 13 through 16.

24          MS. ROCHLIN:   And I'd ask to have those brought up on

25    the screen.

**October 17, 2008**

## Hymn - Voir Dire

1              AGENT NAPLES:   (Complied.)

2    BY MS. ROCHLIN:

3    Q.   Before the break, doctor, at some point I believe you

4    testified that these exhibits showed marks on the arms of Rufus

5    Kpadeh.   Is that correct?

6    A.   Yes, that's correct.

7    Q.   Just to make sure that I did not overlook this particular

8    area, can you tell us whether or not you formed any opinion or

9    conclusion concerning the origin of the marks that are shown in

10   Exhibits Hymn 13 through 16?

11   A.   Yes, I did.

12   Q.   What opinion or conclusion did you form?

13   A.   These scars are consistent with healed injuries from the

14   banding that Mr. Kpadeh described.

15   Q.   And did you refer to that description in your prior

16   testimony as when his arms were tied and pulled back so that

17   his elbows touched?

18   A.   Yes.

19   Q.   Doctor, can you explain why it is that you reached the

20   particular conclusion that you did?

21   A.   Well, in order to get these, in order to injure the skin

22   and leave scars such as this, some type of banding device would

23   have to be horizontal across the arm, actually cutting into the

24   outer surface of the skin into the underlayer of the skin, the

25   dermis, to leave a scar.   Otherwise, a scar would not be

**October 17, 2008**

## Hymn - Voir Dire

 1  produced.

 2          The distribution, the appearance, the character of the

 3  scars are consistent with that description of that injury as he

 4  described.

 5  Q.   And, doctor, what I'd like to do now is move to a different

 6  topic.

 7          Directing your attention to June 29th of the year

 8  2007.   Do you recall whether or not you examined any

 9  individuals on that date?

10  A.   Yes, I did.

11  Q.   Specifically directing your attention to June 29th, 2007 at

12  approximately 11:30 in the morning, do you recall whether you

13  examined anybody at that time?

14  A.   Yes, I did.

15  Q.   Who was the individual you examined?

16  A.   Mr. Monoh Turay.

17  Q.   Who requested you examine Mr. Turay?

18  A.   You did at your office.

19  Q.   Do you recall where the examination took place of

20  Mr. Turay?

21  A.   In one of the conference rooms in my office, not actually

22  in my office.

23  Q.   Initially, do you recall who was present when you first met

24  Mr. Turay?

25  A.   Yes.   A Federal officer, Mr. Matt Baechtle --

**October 17, 2008**

## Hymn - Voir Dire

1  Q.   Would that be Matt Baechtle, Dr. Hymn, B-a-e-c-h-t-l-e?

2  A.   Beckel?

3  Q.   I believe it's pronounced Baechtle.

4  A.   Okay.

5          -- and Ms. Caroline Miller of the U.S. Attorney's

6  Office.

7  Q.   Do you recall whether Mr. Turay's attorney was with him or

8  not?

9  A.   (No response.)

10  Q.   Do you remember one way or another, Dr. Hymn?

11  A.   No, I don't recall his attorney being present.

12  Q.   In any event, did you follow the same procedures with

13  respect to Mr. Turay that you described in connection with your

14  examination of Mr. Rufus Kpadeh?

15  A.   Yes.

16  Q.   And did those include reviewing available medical records

17  for Mr. Turay at some point during the course of your analysis?

18  A.   Yes, that's correct.

19  Q.   Do you recall, Dr. Hymn, what country Mr. Turay's medical

20  record came from?

21  A.   From Sweden.

22  Q.   In connection with your analysis relating to Mr. Turay, did

23  you also take a statement from Mr. Turay or question him?

24  A.   Yes, I interviewed Mr. Turay.

25  Q.   When you interviewed Mr. Turay, who was present for the

**October 17, 2008**

**Hymn - Voir Dire**

1  interview?

2  A.   Myself, Mr. Turay and our photographer.

3  Q.   Was Ms. Miller present?

4  A.   No.

5  Q.   Were any Federal agents present?

6  A.   No.

7  Q.   Was anybody present in your interview with Mr. Turay other

8  than yourself and the photographer working with you?

9  A.   No one else was present other than myself and the

10  photographer.

11  Q.   In the course of your discussions with Mr. Turay, Dr. Hymn,

12  did Mr. Turay make any statements which you believe were

13  relevant to reaching any opinions or conclusions concerning

14  what you observed on his body?

15  A.   Yes.

16  Q.   If you would, Dr. Hymn, please indicate which statements of

17  Mr. Turay you found to be relevant to your examination.

18  A.   Mr. Turay relayed to me in 1999 he was arrested by what he

19  called a Liberian Anti-Terrorist Unit under the command of a

20  Charles or Chuckie Taylor.   He was accused of being a rebel.

21  That was the charge.

22         He was blindfolded and he also describes his elbows

23  being tied behind his back with plastic bindings so tight that

24  he said, in his own words, he thought his chest was going to

25  open up.

**October 17, 2008**

## Hymn - Voir Dire

1          He said he was beaten with sticks.   He was kicked with

2    boots and he was imprisoned in a water-filled hole that he

3    described that was covered by barbed wire and an iron grate.

4          He was forced to drink the foul water in the hole.

5    His hands were tied to the grate and the right wrist, the right

6    wrist was actually burned with a cigarette, a lit cigarette.

7          At some point, he was also stabbed in the right thigh

8    with a bayonet and also stabbed in the forehead with a bayonet.

9          Subsequently, he was able to escape, and he didn't

10   describe any other injuries that were relevant to my

11   examination.

12   Q.   Do you recall, Dr. Hymn, whether or not Mr. Turay mentioned

13   hot liquid plastic?

14   A.   Yes, he did.   He did.   He also mentioned hot liquid plastic

15   was poured on his skin, although he couldn't recall, couldn't

16   tell me exactly what parts of his body were burned.

17   Q.   Now, Dr. Hymn, I asked you to describe the statements made

18   by Mr. Turay that were relevant to any opinion that you formed,

19   but can you tell us simply "Yes" or "No" whether or not

20   Mr. Turay also made additional statements in the course of your

21   discussions with him?

22   A.   Yes, he did.

23   Q.   Following your interview of Mr. Turay did you examine him?

24   A.   Yes, I did.

25   Q.   And how much of him did you examine, Dr. Hymn?

**October 17, 2008**

## Hynn - Voir Dire

1    A.    Again, I examined him from head to toe.

2    Q.    I believe you've already mentioned the presence of the

3    photographer, but tell us what, if anything, was done to

4    document your visual observations during the examination of

5    Mr. Turay.

6    A.    The permanent injuries that I could observe were

7    documented, described and measured, as well as photographed.

8    Q.    And -- I'm sorry.   I didn't mean to cut you off?

9    A.    Excuse me.   I'm finished.

10    Q.    Dr. Hynn, also with respect to your interview, the records

11    you reviewed and your examination of Mr. Turay, did you,

12    personally, take any steps to record or document your

13    observations?

14    A.    Yes, I did.

15    Q.    What was that?

16    A.    When I was finished evaluating him complete with all of the

17    data, I offered a report.

18          MS. ROCHLIN:   Your Honor, at this time I would ask to

19    approach the witness.

20          THE COURT:   You may.

21    BY MS. ROCHLIN:

22    Q.    Doctor, I've just handed you what has been marked for

23    identification as Government's Exhibits Hynn 41 through 88.

24    [Government Exhibit Hynn 41 - 88 marked for identification at

25                         1:58 p.m]

**October 17, 2008**

# Hymn - Voir Dire

1    BY MS. ROCHLIN:

2    Q.  If you would, I would ask you to examine those exhibits.

3    When you're ready, let us know if you recognize them.

4    A.  (Complied.)

5              THE COURT:  9:00 on Monday.  Is that all right for

6    everyone?  We'll go from 9:00 to 3:00.

7    A.  I recognize all of the Exhibits 41 through 88.

8    Q.  Doctor, are those exhibits all photographs?

9    A.  Yes, they are.

10   Q.  Are those photographs of Mr. Turay?

11   A.  Yes.

12   Q.  Were those photographs all taken during your physical

13   examination of Mr. Turay?

14   A.  Yes, they were.

15   Q.  Can you tell us, doctor, whether or not the photographs

16   fairly and accurately show what you observed during your

17   examination of Mr. Turay on June 29th, 2007?

18   A.  Yes, they do.

19             MS. ROCHLIN:  Your Honor, at this time the United

20   States would move for the admission of Government's Exhibits

21   Hymn 41 through 88.

22             MR. CARIDAD:  No objection.

23             THE COURT:  Admitted.

24   [Government Exhibits Hymn 41-88 received in evidence at 2:02

25                          p.m]

## October 17, 2008

## Hymn - Voir Dire

1           MS. ROCHLIN:   I would ask at this time if Government's

2    Exhibit Hymn 41 could be published on the screen.

3           AGENT BAECHTLE:   (Complied.)

4           THE COURT:   You may.

5    BY MS. ROCHLIN:

6    Q.   Doctor, do you recognize the individual in the photograph

7    who is now on your screen?

8    A.   Yes, I do.

9    Q.   Who is that?

10   A.   That's Mr. Turay.

11          MS. ROCHLIN:   And at this time if I could ask Agent

12   Baechtle to scroll through Exhibits Hymn 42 through 44.

13          AGENT BAECHTLE:   (Complied.)

14   BY MS. ROCHLIN:

15   Q.   Doctor, can you explain briefly what those three

16   photographs reflect?

17   A.   Those are the face, front, right and left sides of

18   Mr. Turay.

19          MS. ROCHLIN:   Agent Baechtle, if you would now bring

20   up Exhibit Number Hymn 45.

21          AGENT BAECHTLE:   (Complied.)

22   BY MS. ROCHLIN:

23   Q.   Doctor, what can you tell us about what this photograph

24   shows?

25   A.   This is the top of Mr. Turay's scalp --

**October 17, 2008**

## Hymn - Voir Dire

1   Q.   I'm sorry.   Go ahead.

2   A.   -- to orient the position of the scar that is in the front

3   of his hair line in the middle of the scalp.

4           MS. ROCHLIN:   Agent Baechtle, if you would now bring

5   up Exhibits Hymn 46 and 47.

6           AGENT BAECHTLE:   (Complied.)

7           MS. ROCHLIN:   If you would go back to Exhibit Hymn 46.

8           AGENT BAECHTLE:   (Complied.)

9   BY MS. ROCHLIN:

10  Q.   Doctor, can you tell us what appears in this photograph,

11  Number Hymn 46?

12  A.   This is the top of Mr. Turay's scalp and I can circle the

13  scar.   It's a depressed scar just inside his hair line in the

14  middle of his scalp.

15          MS. ROCHLIN:   Now moving on to Exhibit Hymn 47, agent,

16  if you would.

17          AGENT BAECHTLE:   (Complied.)

18  BY MS. ROCHLIN:

19  Q.   Doctor, what do you see in this photograph?

20  A.   This is a closer photograph of the scar that is in his

21  scalp, just inside his hair line.

22  Q.   Can you tell us, Dr. Hymn, whether or not Mr. Turay made

23  any statements during your discussions with him that you found

24  to be relevant with respect to this particular scar?

25  A.   Yes.

**October 17, 2008**

## Hymn - Voir Dire

1    Q.    What statements were those?

2    A.    He stated to me that he was stabbed with the point of a

3    bayonet in this part of his scalp.

4    Q.    Based on your examination and your review of any record,

5    were you able to form an opinion or reach a conclusion

6    concerning this scar?

7    A.    Yes.

8    Q.    Can you tell us what your opinion or conclusion was?

9    A.    This scar is consistent with that type of wound,

10   particularly the type of wound which was not sutured, which was

11   allowed to heal by itself, leaving the scar that you see now in

12   Exhibit 47.

13   Q.    And what, in particular, is it about the scar that led you

14   to that opinion, Dr. Hymn?

15   A.    Well, the scar is 2 centimeters long, which is about, short

16   of about 3/8ths of an inch.   It's elliptical and somewhat flat

17   and depressed, which would be the type of scar which would form

18   from a stab or cut to the scalp that was never stitched.

19              MS. ROCHLIN:   I would ask Agent Baechtle at this time

20   to bring up Exhibit Hymn 48.

21              AGENT BAECHTLE:   (Complied.)

22   BY MS. ROCHLIN:

23   Q.    Doctor, are you able to explain what appears in this

24   photograph?

25   A.    This photograph is THE left eyebrow of Mr. Turay.   The

**October 17, 2008**

# Hyma - Voir Dire

1   right side of the photograph is the bridge of his nose, for

2   your orientation.

3   Q.   The right side of the photograph?

4   A.   Is the bridge of his nose.

5   Q.   As you're looking --

6   A.   Excuse me.   The left side of the photograph, as you're

7   looking at the photograph, is the bridge of his nose.

8           What you have in the photograph is the left eyebrow

9   and the top of his left eyelid.

10  Q.   What, if anything, caused you to obtain a photograph of

11  Mr. Turay's eyebrow?

12  A.   He has a scar through his eyebrow that goes, expands from

13  about the middle of the eyebrow toward the outer part of his

14  eyebrow.

15  Q.   Did you make any determination, Dr. Hyma, whether or not

16  the scar on the eyebrow was related in any way to the incidents

17  Mr. Turay described to you?

18  A.   This is a scar unrelated to the incidents he described to

19  me.

20          MS. ROCHLIN:   Agent Baechtle, if you would at this

21  time bring up Hyma Exhibits 49 and 50.

22          AGENT BAECHTLE:   (Complied.)

23          MS. ROCHLIN:   And going back to Exhibit 49, if you

24  would, Agent Baechtle.

25          AGENT BAECHTLE:   (Complied.)

**October 17, 2008**

## Hyma - Voir Dire

1  BY MS. ROCHLIN:

2  Q.   Dr. Hyma, can you tell us what appears in Exhibit Hyma 49?

3  A.   This is the right side of Mr. Turay with his arm, upper

4  arm, chest and right side of his face.

5           MS. ROCHLIN:   Moving to Exhibit Number Hyma 50.

6           AGENT BAECHTLE:   (Complied.)

7  BY MS. ROCHLIN:

8  Q.   What appears in this photograph?

9  A.   This is the right arm and the back of the right forearm and

10  the right hand.

11  Q.   In Exhibit Hyma 50, with this view of Mr. Turay's arm, is

12  his wrist also visible or not?

13  A.   Yes, it is.

14  Q.   Did you observe anything or do you observe anything in

15  particular in this photograph with respect to the wrist area?

16  A.   Yes.

17  Q.   What is it that you observed, Dr. Hyma?

18  A.   He had a circular depressed scar over the back side of his

19  wrist, just over the bump on your wrist that's below your

20  little finger.   It's a dark area in the photograph.   I can

21  circle it on my screen.

22           MS. ROCHLIN:   I'm going to ask Agent Baechtle if he

23  can enlarge the general area of what Dr. Hyma has circled.

24           AGENT BAECHTLE:   (Complied.)

25  BY MS. ROCHLIN:

**October 17, 2008**

## Hyma - Voir Dire

1  Q.   Do you see now in the enlarged portion of the photograph

2  where the scar appears?

3  A.   Yes.   I'll circle it again.

4  Q.   Dr. Hyma, did Mr. Turay make any statements that you felt

5  were relevant with respect to this particular scar?

6  A.   Yes.

7  Q.   What were those statements?

8  A.   He described this as a healed injury from a cigarette that

9  was burned into his skin.

10          MS. ROCHLIN:   Agent, if you could take down the

11  enlarged photo.

12          I would ask you to move to Hyma Exhibit Numbers 51 and

13  52.

14          AGENT BAECHTLE:   (Complied.)

15  BY MS. ROCHLIN:

16  Q.   What appears in those two photographs, Dr. Hyma?

17  A.   This is the left side of Mr. Turay, the upper arm, his

18  chest and the left side of his neck and part of his, the left

19  side of his face, as well as in 52 is the lower part of his

20  left arm and the back of his left hand.

21          MS. ROCHLIN:   Going back for a minute to Exhibit Hyma

22  51.

23          AGENT BAECHTLE:   (Complied.)

24  BY MS. ROCHLIN:

25  Q.   Was there anything noteworthy with respect to the upper

**October 17, 2008**

## Hyma - Voir Dire

1  portion of Mr. Turay's arm, Dr. Hyma?

2  A.   He has a scar on the outer aspect of his upper arm

3  Q.   In your opinion, was that particular scar relevant or not

4  relevant to the conclusion you reached during your examination

5  of Mr. Turay?

6  A.   This was not a relevant scar to the incident in question.

7  Q.   How were you able to determine that?

8  A.   From Mr. Turay's account.

9           MS. ROCHLIN:   If we could proceed to Exhibits Hyma 53

10  and 54.

11           AGENT BAECHTLE:   (Complied.)

12  BY MS. ROCHLIN:

13  Q.   Dr. Hyma, can you tell us what appears in those

14  photographs?

15  A.   This is the umbilicus or otherwise known as the belly

16  button.

17  Q.   And in these photographs, are you able to detect the

18  presence or absence of any scars or marks?

19  A.   Yes.   Both these photographs demonstrate a linear scar,

20  horizontal scar beneath the umbilicus.

21  Q.   And are you able to tell us, Dr. Hyma, whether or not the

22  scars in Exhibits Hyma 53 and 54 are relevant to the incidents

23  Mr. Turay described?

24  A.   They're not related to the incidents he described.

25  Q.   Again, how do you know that?

**October 17, 2008**

## Hymn - Voir Dire

1  A.    From his account.

2              MS. ROCHLIN:   Agent, if we could proceed to Exhibits

3  Hymn 55 through 57.

4              AGENT BAECHTLE:   (Complied.)

5  BY MS. ROCHLIN:

6  Q.   Dr. Hymn, these three photographs, Hymn 55 through 57.   Can

7  you explain what appears?

8  A.   This is the back of Mr. Turay, the upper back and the back

9  of his neck, and 56 is a closer photograph of two parallel

10  scars, vertical scars that are on the left side of his back.

11  Q.   Can you explain, Dr. Hymn, whether or not the scars

12  appearing on Mr. Turay's back in Exhibits Hymn 55 through 57

13  are relevant or not relevant to the incidents he described to

14  you?

15  A.   They are not related to the incidents he described.

16  Q.   How do you know that?

17  A.   From his own account.

18              MS. ROCHLIN:   Agent, if you could bring up Hymn 58 and

19  59.

20              AGENT BAECHTLE:   (Complied.)

21  BY MS. ROCHLIN:

22  Q.   Dr. Hymn, when you're ready, if you could tell us what

23  appears in Exhibits Hymn 58 and 59.

24  A.   These are photographs of the back and front of both arms

25  and both hands.

**October 17, 2008**

## Hyma - Voir Dire

1  Q.   What, if anything, is the purpose of these particular two

2  photographs?

3  A.   This, again, is for orientation of the injury that he had

4  on his right wrist, which you can see in Exhibit 58.

5  Q.   Can you indicate where on --

6  A.   (Complied.)

7  Q.   Thank you, Dr. Hyma.

8       What is inside the circle you just drew?

9  A.   That is the circular scar I previously discussed related to

10  a healed cigarette burn.

11  Q.   And, doctor, in this photograph, Exhibit Hyma 58, if you

12  would also direct your attention to the inside or front part of

13  Mr. Turay's elbows.

14       In this photograph, in that particular area, is

15  anything visible to you or not?

16  A.   On his right, on his right elbow, the front of his right

17  elbow, and in 59 on the front of his left elbow, one can see

18  scarring in the circle that I just placed, inside the circle

19  here that I just placed on the left elbow, and on Exhibit

20  Number 59 the scarring, again, the front of the elbow and more

21  visible on the left elbow.

22       MS. ROCHLIN:   If we could clear the screen and I would

23  ask Agent Baechtle to bring up Exhibits Hyma 60, 61, 62 and 63.

24       AGENT BAECHTLE:   (Complied.)

25       MS. ROCHLIN:   Agent, if you would now return to

**October 17, 2008**

## Hynn - Voir Dire

1    Exhibit Hynn number 60.

2               AGENT BAECHTLE:   (Complied.)

3    BY MS. ROCHLIN:

4    Q.   Doctor, can you explain what appears in this photograph?

5    A.   This is the front of the left -- I believe it's the left

6    elbow.  Give me a moment, please.  Yes, it's the left elbow and

7    this is a photograph of a scar that actually you can see is

8    parallel horizontal scars, very similar to the scars you've

9    seen before in this area.

10               They're slightly darker than the native skin and you

11    can actually see there's a change in the texture of the skin.

12               I'll circle that part of the scar right there.  It's a

13    little bit more broad, indicating there was a break in the skin

14    there.

15               MS. ROCHLIN:  If you would, Agent Baechtle, bring up

16    Exhibit Hynn 61.

17               AGENT BAECHTLE:   (Complied.)

18               MS. ROCHLIN:  And if we could clear the screen.

19    A.   This is the right elbow and the scar in here you can see is

20    a darker and parallel horizontal scar across the front of the

21    elbow.

22               MS. ROCHLIN:  If we could clear the screen and go back

23    to Exhibit Hynn 62.

24               AGENT BAECHTLE:   (Complied.)

25    BY MS. ROCHLIN:

**October 17, 2008**

## Hymn - Voir Dire

1   Q.   What appears here doctor?

2   A.   This is the same, the right elbow, but now the scar is much

3   clearer.   You can clearly see the horizontal dark scar across

4   the elbow and there's actually a parallel pattern, one there

5   and one there where I've marked with my finger.

6            MS. ROCHLIN:   If we could clear the screen and move

7   forward to Exhibit Hymn 63.

8            AGENT BAECHTLE:   (Complied.)

9   BY MS. ROCHLIN:

10  Q.   What do you observe there, Dr. Hymn?

11  A.   This is, again, the left side.   Again, the scar -- this

12  photograph has a little better lighting on the other side of

13  the elbow.   You can actually see the scar here on the outer

14  aspect of the arm, as well as what you actually observed

15  before, parallel scars running across the inside of the elbow

16  joint.

17           MS. ROCHLIN:   If we could clear the screen.

18           I'd ask Agent Baechtle to scroll through Exhibits Hymn

19  64 through 68.

20           AGENT BAECHTLE:   (Complied.)

21  BY MS. ROCHLIN:

22  Q.   Dr. Hymn, can you tell us what these photographs are doing?

23  A.   These photographs, again, are for reference, for a scale of

24  reference.   You see the scale in the photographs and they have

25  similar dimensions as we've seen before in terms of the how far

**October 17, 2008**

## Hymn - Voir Dire

1    the scars are actually separated and the actual length of the

2    scars.

3    Q.   Dr. Hymn, with respect to Exhibits Hymn 60 through 63 and

4    64 through 68 among others, did Mr. Turay make any statements

5    you found to be relevant with respect to the scars shown in the

6    photographs?

7    A.   Yes.

8    Q.   Can you tell us what statements those were?

9    A.   When he described the binding by plastic bindings to his

10   elbows, so tight to the point he felt his chest was going to

11   split open, these kinds of scars are consistent with an injury

12   that would be left by such bindings, particularly if the

13   bindings cut into the skin in the process.

14   Q.   What is it about the scars, if you can provide any further

15   detail, that indicates to you they're consistent with

16   Mr. Turay's statements?

17   A.   The location of the scars, the position of the scars, the

18   texture of part of the scar on the left elbow indicating the

19   skin actually had split and healed without being stitched, just

20   like the one you saw on the scalp.

21          So all those features are consistent with a binding of

22   this type that would injure the skin when it was applied so

23   tightly, as he described it.

24          MS. ROCHLIN:   Agent Baechtle, at this time if you

25   would bring up Exhibits Hymn 69 and 70.

**October 17, 2008**

## Hymn - Voir Dire

1           AGENT BAECHTLE:   (Complied.)

2    BY MS. ROCHLIN:

3    Q.   Dr. Hymn, if you could tell us if these two photographs

4    have any particular purpose.

5    A.   Again, these are photographs of the front and back of his

6    hands, again, the orientation for the injury on the right wrist

7    that we described before.

8           MS. ROCHLIN:   Agent, if we could return to Exhibit

9    Hymn 69.

10           AGENT BAECHTLE:   (Complied.)

11   BY MS. ROCHLIN:

12   Q.   In this photograph, Dr. Hymn, do you see the injury that

13   you described previously?

14   A.   Yes.   I'll circle it.

15   Q.   And the injury you've just circled, what injury is that?

16   A.   That's the healed injury Mr. Turay described as a cigarette

17   burn.

18           MS. ROCHLIN:   If we could proceed at this time to

19   Exhibits Hymn 71 through 74.

20           AGENT BAECHTLE:   (Complied.)

21   BY MS. ROCHLIN:

22   Q.   Dr. Hymn, what appears in these photographs?

23   A.   71 is a photograph of the previously discussed scar with a

24   scale of reference for size purposes.

25   Q.   And could you circle the area where the scar appears?

**October 17, 2008**

## Hymn - Voir Dire

1   A.   (Complied.)

2   Q.   And this is the scar you've discussed previously on the

3   wrist of Mr. Turay?

4   A.   Yes.

5        MS. ROCHLIN:   And if we could move to Exhibit 72.

6        AGENT BAECHTLE:   (Complied.)

7   A.   These are other scars on the other wrist and they are

8   somewhat nonspecific.   They don't have a real pattern, but they

9   are various scars that he has on his wrist from being tied to

10   the wire cage in the water pit.

11        MS. ROCHLIN:   Moving to Exhibit Hymn 73.

12        AGENT BAECHTLE:   (Complied.)

13   BY MS. ROCHLIN:

14   Q.   What appears here, Dr. Hymn?

15   A.   Again, a somewhat irregular scar.   This is very close to

16   the scar that I previously described, that I circled.   Also,

17   there's some irregular flat scars I put in another circle here

18   that have no pattern, but correspond to his account of being

19   tied to the wire grate in the water pit.

20   Q.   And, Dr. Hymn, just so I'm clear -- I may have misheard

21   you -- can you explain whether the circular scar appearing in

22   the circle further to the left as you're looking in the

23   photograph, is that the same or is that different from what you

24   have indicated Mr. Turay described as the scar from a cigarette

25   burn?

**October 17, 2008**

## Hymn - Voir Dire

1  A.   That's the same scar from the cigarette burn.

2         MS. ROCHLIN:   If we could also move forward to Exhibit

3  Hymn 74.

4         AGENT BAECHTLE:   (Complied.)

5  BY MS. ROCHLIN:

6  Q.   What appears here, Dr. Hymn?

7  A.   These are flat scars.   Again, injuries that he indicated

8  were from being tied to the wire grate that covered the water

9  pit.

10         MS. ROCHLIN:   Agent, if you could back up to Hymn

11  Exhibit Number 73.

12         AGENT BAECHTLE:   (Complied.)

13  BY MS. ROCHLIN:

14  Q.   Doctor, directing your attention to the circular scar in

15  this photograph, the one that you said was the same one

16  Mr. Turay described resulting from a cigarette burn.   Please

17  tell us whether you formed any opinion or conclusion with

18  respect to the circular scar.

19  A.   This circular scar is the same scar we've discussed before

20  that was consistent or that is consistent with a healed

21  cigarette burn.

22  Q.   And can you explain what it is about the scar that leads to

23  your opinion of its being consistent with a healed injury from

24  a cigarette burn?

25  A.   When a hot object like a cigarette is applied right to the

**October 17, 2008**

## Hymn - Voir Dire

1    skin, it actually destroys the skin, and depending how long it

2    actually stays in contact, it many destroy the dermis.   It will

3    destroy underlying fat and a cavity or crater will be created

4    different from what you saw earlier with the hot liquid that

5    just runs over the skin like a candle wax, but this kind of

6    injury when actually a hot object is put right into the skin,

7    you end up with a shallow crater because of the actual

8    destruction of the tissue.

9            When it scars, you're left with a scooped out

10   depressed scar that has a similar pattern as the burning object

11   or as the hot object.

12   Q.   With respect to the scar to the right of the circular scar

13   that appears in this photograph, Hymn 73, tell us, Dr. Hymn,

14   were you able to form an opinion or conclusion concerning the

15   additional scar?

16   A.   Yes.

17   Q.   What opinion or conclusion was that?

18   A.   This scar that I have put in the circle here is a flat

19   scar.   You can actually see the skin ridge lines preserved, but

20   you have a scar from increased pigments in the skin.   This kind

21   of injury or this kind of scar would result from some --

22   certainly it's consistent with a binding that was applied to

23   this area, but didn't actually injure the skin, but caused

24   enough damage to the skin that you have a change in coloration

25   at the time.   Again, this is consistent with his description of

**October 17, 2008**

## Hyma - Voir Dire

1  being tied to that wire grate that covered the water pit.

2          MS. ROCHLIN:   And if you could return briefly to

3  Exhibits Hyma 72 and 74, Agent Baechtle.

4          AGENT BAECHTLE:   (Complied.)

5  BY MS. ROCHLIN:

6  Q.   Dr. Hyma, were you able to form any opinion or conclusion

7  with respect to the scars in those photographs of the wrist

8  area of Mr. Turay?

9  A.   Again, these have a similar character to the previous flat

10 scar and, yes, these are consistent also with him being tied in

11 the fashion as he described.

12 Q.   Referring to his being tied to the iron grate?

13 A.   Yes.

14          MS. ROCHLIN:   Agent Baechtle, if you could, would you

15 bring up Exhibits Hyma 75 and 76.

16          AGENT BAECHTLE:   (Complied.)

17 BY MS. ROCHLIN:

18 Q.   Dr. Hyma, can you explain what appears in those

19 photographs?

20 A.   This is the back of his left hand and both these

21 photographs demonstrate some irregular flat scars close to the

22 knuckles of his fingers.

23 Q.   Can you tell us, Dr. Hyma, whether Mr. Turay said anything

24 you found to be relevant with respect to the scars in these

25 photographs?

**October 17, 2008**

## Hymn - Voir Dire

1  A.   His hand and wrist scars, with the exception of the one he

2  pointed out to me that was from a burn with a cigarette, he

3  relayed these scars, these injuries to him being bound and tied

4  to that wire grate covering the water pit.

5  Q.   And were you able to form any opinion or conclusion with

6  respect to the scars on the back of Mr. Turay's left hand?

7  A.   Yes.

8  Q.   And can you tell us what that was?

9  A.   These scars are consistent with an injury left by such

10  things as he described in the binding and also the barbed wire

11  cutting his hand.

12  Q.   And what is it about these particular scars that are

13  consistent with barbed wire touching his hands?

14  A.   Well, these scars are from injuries that have not been,

15  that have not been sutured, have not been closed at all.

16          Now, they're very irregular.  They certainly are

17  consistent with something having cut his hand, namely, like

18  barbwire or some other sharp object that his hand came in

19  contact with.

20          MS. ROCHLIN:   Agent Baechtle, if I could ask you at

21  this time to bring up Exhibits Hymn 77 and 78.

22          AGENT BAECHTLE:   (Complied.)

23  BY MS. ROCHLIN:

24  Q.   Dr. Hymn, can you tell us whether these two photographs,

25  Hymn 77 and 78, also give you orientation?

**October 17, 2008**

## Hymn - Voir Dire

1    A.   Yes, they do.

2    Q.   What area?

3    A.   The area of the right thigh that I have circled.

4    Q.   Explain to us, please, why you circled an area of

5    Mr. Turay's right thigh in this photograph?

6    A.   Mr. Turay indicated to me he was stabbed with the point of

7    a bayonet into his right thigh.

8         MS. ROCHLIN:   Agent Baechtle, if you would at this

9    time bring up Hymn Exhibit 79.

10        AGENT BAECHTLE:   (Complied.)

11   BY MS. ROCHLIN:

12   Q.   What appears in this photograph, Dr. Hymn?

13   A.   This is the right side of Mr. Turay's right leg and also

14   orientation to the scar Mr. Turay relayed to me was from the

15   stab wounds of a bayonet.

16   Q.   Have you just circled the area where the scar appeared?

17   A.   Yes.

18        MS. ROCHLIN:   Agent, if you would, please, bring up

19   Hymn Exhibits 80 through 83.

20        AGENT BAECHTLE:   (Complied.)

21   BY MS. ROCHLIN:

22   Q.   Doctor, when you're ready, would you, please, explain what

23   appears in these photographs?

24   A.   These photographs depict a circular scar.  The scar, as you

25   can see, is about a centimeter in greatest dimension.  Here is

**October 17, 2008**

## Hymn - Voir Dire

1   a centimeter pointed out on the ruler.  This is a flat scar.

2   It's circular now.

3           Some of the scar has a rather sharp edge, which you

4   can see over on this side, particularly right here.

5   Q.   And I believe you have indicated, Dr. Hymn, Mr. Turay

6   stated this scar resulted from a stab by a bayonet.  Is that

7   correct?

8   A.   Yes, that's correct.

9   Q.   With respect to your own examination of this scar, were you

10  able to form any opinions or conclusions?

11  A.   Yes.

12  Q.   And can you, please, tell us what it was that you concluded

13  or formed an opinion of?

14  A.   This scar is consistent with a healed injury from a sharp

15  instrument like a bayonet, a point of a bayonet, particularly

16  an injury where it was not closed with sutures.

17  Q.   Can you tell us what it is about the scar that led you to

18  reach that particular opinion?

19  A.   Well, in this part of the body, a puncture like that from a

20  point of a bayonet would leave a gaping wound which would then

21  fill in with scar tissue and have this appearance over time.

22  Q.   Why are the edges of the scar significant to you, if at

23  all?

24  A.   Well, part of it, the edge is quite sharp, indicating the

25  injury to that part of the skin was a fairly clean cut in the

**October 17, 2008**

## Hyma - Voir Dire

1    skin.

2           MS. ROCHLIN:   What I would like to do now is clear the

3    screen and ask Agent Baechtle to bring up Hyma Exhibit 84.

4           AGENT BAECHTLE:   (Complied.)

5    BY MS. ROCHLIN:

6    Q.   Dr. Hyma, can you explain what appears in this photograph?

7    A.   This is the left side of Mr. Turay's leg -- excuse me --

8    the outer aspect of his left leg.

9    Q.   All right.   Including the area of the left thigh?

10   A.   Yes.

11   Q.   Is there a scar that appears in this photograph?

12   A.   Yes.

13   Q.   Can you tell us, Dr. Hyma, whether or not the scar was

14   relevant to the incident Mr. Turay described to you on June

15   29th of 2007?

16   A.   This scar is unrelated to the incident that he described.

17   Q.   How is it that you reached the determination the scar was

18   unrelated?

19   A.   From his account.

20          MS. ROCHLIN:   Agent Baechtle, if you could bring up

21   Hyma Exhibit Number 85.

22          AGENT BAECHTLE:   (Complied.)

23   BY MS. ROCHLIN:

24   Q.   And, doctor, can you tell us is this photo one that

25   provides orientation of Mr. Turay's lower leg?

**October 17, 2008**

## Hyma - Voir Dire

1    A.   Yes.

2              MS. ROCHLIN:   Agent Baechtle, if you would at this

3    time bring up Hyma Exhibit 86.

4              AGENT BAECHTLE:   (Complied.)

5    BY MS. ROCHLIN:

6    Q.   What appears in this photograph, Dr. Hyma?

7    A.   This photograph is the back of Mr. Turay's lower, his calf

8    area of both of his legs.

9    Q.   Directing your attention to the left leg as you're looking

10   at the photograph, what appears on the left leg?

11   A.   On the left calf is a depressed scar that is toward the

12   inside of the calf which I circled here and then even a larger

13   depressed scar on the outer calf.

14   Q.   And were you able to determine, Dr. Hyma, the cause of this

15   particular scar or each of those scars, I should say?

16   A.   Yes.

17   Q.   What caused the scars appearing on the left calf in Exhibit

18   Hyma 86?

19   A.   This is from a remote gunshot wound that is unrelated to

20   the incident in question.

21   Q.   What do you mean by "a remote gunshot wound," Dr. Hyma?

22   A.   An old, healed gunshot wound.

23   Q.   How is it that you are able to determine the gunshot wound

24   is unrelated to the incidents Mr. Turay was relating to you?

25   A.   From his own account.

**October 17, 2008**

## Hymn - Voir Dire

1          MS. ROCHLIN:  Agent Baechtle, if you could bring up

2   Hymn Exhibits 87 and 8 8.

3          AGENT BAECHTLE:  (Complied.)

4          MS. ROCHLIN:  If you would go back to Exhibit Hymn 87.

5          AGENT BAECHTLE:  (Complied.)

6   BY MS. ROCHLIN:

7   Q.  What appears in Exhibit Hymn 87?

8   A.  This is the outer aspect of the left calf.

9   Q.  Now, of the two injuries to the left calf, were both of

10  those from the unrelated gunshot wounds, Dr. Hymn?

11  A.  Yes.

12  Q.  Why is it that each of those scars is from the gunshot

13  wounds you referred to?

14  A.  Well, from a gunshot wound such as what he described, it

15  resulted in quite a bit of damage to the muscle in the back of

16  his leg.   It wasn't treated at all and what happened, what

17  results is a big depressed scar from the cavity that resulted

18  from the gunshot wound, and over time the body would fill that

19  in, but because he lost a lot of muscle back there, it becomes

20  contracted and depressed in its appearance.

21          MS. ROCHLIN:  If we could go back for a moment to

22  Exhibit Hymn 86.

23          AGENT BAECHTLE:  (Complied.)

24  BY MS. ROCHLIN:

25  Q.  Doctor, from your observation of the wound, are you able to

**October 17, 2008**

## Hynn - Voir Dire

1  tell us whether or not one of the scars on the left calf

2  represents an entrance wound?

3  A.  I wouldn't have enough information to really be certain

4  which was entrance and which was exit.  I could only speculate

5  which is entrance and which is exit.

6  Q.  Would it be a reasonable assumption that one was an

7  entrance wound and one was an exit wound?

8  A.  Yes, that's correct.

9  Q.  Dr. Hynn, can you explain what, if any, relevance the

10  unrelated gunshot wound on Mr. Turay's calf had with respect to

11  the opinions you reached about the other injuries you describe

12  as related?

13  A.  Well, Mr. Turay has a lot of scars, including this pretty

14  horrific scar on the back of his left leg.  I can only assess

15  the scars based on historical information.

16          He was very clear about which scars were related to

17  the incident that he was sharing with me and unrelated

18  incidents.

19          He could have told me all these scars were related to

20  what happened to him, but he didn't.  In particular, this

21  pretty horrific scar was from an unrelated gunshot wound.

22          MS. ROCHLIN:  And if we could return to Exhibit Hynn

23  88.

24          AGENT BAECHTLE:  (Complied.)

25  BY MS. ROCHLIN:

**October 17, 2008**

## Hymn - Voir Dire

1    Q.   What appears in this exhibit, Dr. Hymn?

2    A.   This is a photograph of the soles, the bottoms of his feet.

3    Q.   Do any scars appear on the bottom of Mr. Turay's feet?

4    A.   No.

5    Q.   Dr. Hymn, I'd like to ask you to assume as part of a

6    hypothetical that someone had been burned on the soles of his

7    or her feet with a lit candle, and I would ask you to explain

8    whether or not that type of injury would or would not leave

9    scars.

10        MR. CARIDAD:   Objection, Your Honor.   Beyond the scope

11   of notice I was given.

12        THE COURT:   Why don't you approach?

13

14

15

16

17

18

19

20

21

22

23

24

25

**October 17, 2008**

## Hymn - Voir Dire

1          [Proceedings at sidebar follow]:

2          THE COURT:   Is it beyond the scope of the notice?   I

3   haven't seen the notice.

4          MS. ROCHLIN:   Mr. Turay did not specifically mention

5   whether his feet were burned when he was examined by Dr. Hymn.

6   He did mention that in his testimony to this Court.

7          Regardless, Mr. Jusu did mention to Dr. Hymn that his

8   feet were burned and in that report, and with respect to

9   Mr. Jusu, the testimony I intend to elicit from Dr. Hymn is

10  that he was able to conclude that Mr. Jusu's account was

11  consistent because burning the soles of feet with a lit candle

12  will not necessarily leave a permanent or long-lasting scar in

13  that area.

14         So it may not be addressed specifically in the report

15  for Turay, but the same principle is coming out when we get to

16  Jusu.   If you like, I can wait until then.

17         THE COURT:   Wait until then.

18         MR. CARIDAD:   I wasn't even given notice as to Jusu.

19         THE COURT:   We'll address it when we get there.

20

21

22

23

24

25

**October 17, 2008**

## Hymn - Voir Dire

1           [Proceedings in open court follow]:

2           MS. ROCHLIN:   Your Honor, at this time I would ask to

3   approach the witness.

4           THE COURT:   You may.

5   BY MS. ROCHLIN:

6   Q.   Dr. Hymn, at this time I have handed you what has been

7   marked for identification as Government's Exhibits Hymn 89

8   through Hymn 143.   I would ask if you would, please, examine

9   those exhibits and when you're ready, let us know if you

10  recognize them

11  A.   (Complied.)

12           I recognize all of the exhibits, 89 to 143.

13  Q.   Dr. Hymn, directing your attention to June 29th, 2007 at

14  10:00, was there an individual you met on that date at that

15  time?

16  A.   Yes.

17  Q.   Who was that individual?

18  A.   A Mr. Jusu Sulaiman.

19  Q.   And the exhibits that you've just reviewed, that you said

20  you recognized, are all of those exhibits photographs?

21  A.   Yes.

22  Q.   And who do those photographs depict?

23  A.   Mr. Sulaiman.

24  Q.   The individual that you examined on June 29th, 2007?

25  A.   Yes, at 10:00 a.m

**October 17, 2008**

## Hyma - Voir Dire

1  Q.   The name that you documented in your report at the top of

2  the page, could you read the name that appears on your report,

3  Dr. Hyma?

4  A.   It's Sulaiman Solo Jusu.

5  Q.   Do you recall at this time which is the first name and

6  which is the last name of the individual you examined?

7  A.   As I read through some of the other references, his first

8  name is Sulaiman, middle name, Solo, last name, Jusu.

9  Q.   When you first met Mr. Jusu on June 29, 2007, where did

10  that meeting occur?

11  A.   In my department.

12  Q.   And who was present for the initial part of the meeting?

13  A.   You were present, Agent Baechtle was present and Ms. Miller

14  was present.

15  Q.   And do you recall at this time -- and if you don't, let us

16  know, Dr. Hyma -- do you recall at this time whether any

17  attorney or counsel was present for Mr. Jusu?

18  A.   I don't recall any counsel being present.

19  Q.   Dr. Hyma, did you follow the same steps with respect to

20  Mr. Jusu that you followed with respect to Mr. Kpadeh and

21  Mr. Turay?

22  A.   Yes.

23  Q.   Did you conduct an interview with Mr. Jusu?

24  A.   Yes, I did.

25  Q.   And can you explain for the interview itself who was

**October 17, 2008**

## Hymm - Voir Dire

1  present?

2  A.   Myself, Mr. Jusu and a photographer.

3  Q.   Was anybody else present other than yourself, Mr. Jusu and

4  the photographer?

5  A.   No.

6  Q.   During the course of your interview with Mr. Jusu, did you

7  obtain any statements that were relevant to your examination of

8  Mr. Jusu and any resulting opinions or conclusions?

9  A.   Yes.

10  Q.   Would you tell us, please, Dr. Hymm, what, if any, relevant

11  statements you heard from Mr. Jusu on June 29th, 2007?

12  A.   Mr. Jusu recounted that he was arrested in 1999 by what he

13  described as a Liberian Anti-Terrorist Unit under the command

14  of a Charles or Chuckie Taylor.

15       He was accused of being a rebel and he described how

16  he was struck in his head with the butt of a rifle.  He was cut

17  with a knife on his left leg.  He was cut with a bayonet on his

18  chest and he was burned with cigarettes on his legs, on his

19  abdomen, on his penis, his anus, and the soles of his feet were

20  burned with liquid plastic.

21       His elbows were tied behind his back so tight that

22  they would touch in the back and he said he was carried like a

23  basket for four days.  He described the elbow bindings as

24  cutting into his flesh.

25       He goes on to describe his head actually being stomped

**October 17, 2008**

## Hymn - Voir Dire

1 with a boot of Mr. Charles Taylor.  He was taken then to a

2 swampy area where he was put into a pit containing foul

3 smelling water and decomposing corpses.  He was forced to drink

4 the water and hot food was forced on him and burned his mouth.

5           He said he was held prisoner about three weeks before

6 he was released.

7 Q.   Did Mr. Jusu provide you with any statements relating to an

8 escape?

9 A.   Yes.

10          MR. CARIDAD:   Objection.   Beyond the scope of 803(4).

11          MS. ROCHLIN:   These are not offered pursuant to

12 803(4,) but pursuant to 703, Your Honor.

13          MR. CARIDAD:   Objection.   Hearsay.

14          THE COURT:   Overruled.

15 BY MS. ROCHLIN:

16 Q.   Dr. Hymn, did Mr. Jusu tell you whether or not following

17 his escape he was recaptured?

18 A.   Yes.

19 Q.   And did he indicate anything about the physical conditions

20 of where he was placed after his recapture in his statement?

21 A.   Yes.

22 Q.   What physical conditions did he describe to you after his

23 recapture?

24 A.   He described the water-filled pit that he was placed in and

25 it was covered with barbwire.

**October 17, 2008**

## Hymn - Voir Dire

1  Q.   In addition to these statements you obtained from Mr. Jusu,

2  were you able to review any medical records concerning

3  Mr. Jusu?

4  A.   Yes.

5  Q.   And were you able -- do you recall what country those

6  medical records came from, Dr. Hymn?

7  A.   Sweden.

8  Q.   Were you able to conduct a physical examination of

9  Mr. Jusu?

10 A.   Yes.

11 Q.   And how much of Mr. Jusu did that examination cover?

12 A.   From his head to his feet.

13 Q.   And as with Mr. Kpadeh and Mr. Turay, was a photographer

14 present during the examination documenting your visual

15 observations?

16 A.   Yes,

17 Q.   Dr. Hymn, the photographs you've just reviewed, Exhibits

18 Hymn 89 through Hymn 143, are those photographs the result of

19 the physical examination of Mr. Jusu on June 29th of 2007?

20 A.   Yes, they are.

21 Q.   And do they fairly represent Mr. Jusu's appearance and your

22 visual observations during that examination?

23 A.   Yes, they do.

24        MS. ROCHLIN:   Your Honor, at this time the United

25 States would move for the admission of Government's Exhibits 89

**October 17, 2008**

## Hyma - Voir Dire

1   through 143.

2          MR. CARIDAD:   No objection, Your Honor.

3          THE COURT:   Admitted.

4   [Government Exhibits  Hyma 89-143 received in evidence at 2:57

5                        p.m]

6          MS. ROCHLIN:   I would ask to publish the exhibits on

7   the screen, starting with Government's Exhibit 89.

8          THE COURT:   You may.

9          AGENT BAECHTLE:   (Complied.)

10  BY MS. ROCHLIN:

11  Q.   Dr. Hyma, is the person now appearing in the photograph on

12  the screen the individual you knew as Sulaiman Solo Jusu?

13  A.   Yes, it is.

14          MS. ROCHLIN:   If I could ask at this time for Agent

15  Baechtle to bring up and scroll through Hyma Exhibits 90

16  through 96.

17          AGENT BAECHTLE:   (Complied.)

18  BY MS. ROCHLIN:

19  Q.   And when you're ready, Dr. Hyma, can you explain what is

20  being depicted in Exhibits 90 through 96?

21  A.   These are photographs of the right side, the left side of

22  Mr. Jusu's face, as well as some macro photographs of his left

23  cheek and right cheek.   They're all macro photographs of the

24  right and left cheek.

25  Q.   When you say "macro photographs," can you explain what you

**October 17, 2008**

## Hymn - Voir Dire

1  mean?

2  A.   Macro is higher magnification.

3  Q.   Dr. Hymn, are there any scars or other marks that appear in

4  this series of photographs, Hymn 90 through 96?

5  A.   Yes.   Both the left and right cheek have scars.   Some are

6  scars from skin blemishes, otherwise known as acne, but there

7  are some other scars from injuries.

8  Q.   And were you able to determine whether or not the scars

9  resulting from injuries were relevant to the or related to what

10  Mr. Jusu described to you on June 29th of 2007 or not?

11  A.   No, I was not.   These are small scars which I couldn't

12  correlate with the incidents that he described.

13        MS. ROCHLIN:   Agent Baechtle, if you would now bring

14  up Exhibits Hymn 97 and 98.

15        AGENT BAECHTLE:   (Complied.)

16  BY MS. ROCHLIN:

17  Q.   Can you explain what appears in Exhibits 97 and 98,

18  Dr. Hymn?

19  A.   These are photographs of his chin.   The photograph on the

20  screen, the top of the photograph is his lower lip, for

21  orientation.

22  Q.   And, Dr. Hymn, again, were you able to determine whether or

23  not what appears in these two photographs was related or

24  unrelated to the incidents Mr. Jusu described to you on June

25  29th of 2007?

**October 17, 2008**

## Hyma - Voir Dire

1    A.   I could not correlate this scar with any of the incidents

2    he described.   In spite of him being burned in the mouth with

3    hot food, this scar he could not relate to me as a scar related

4    to that incident.

5             MS. ROCHLIN:   Agent Baechtle, if you would bring up

6    Exhibit Hyma 99 and Hyma 100.

7             AGENT BAECHTLE:   (Complied.)

8    BY MS. ROCHLIN:

9    Q.   What do you see in these photographs, Dr. Hyma?

10   A.   These photographs are the back of Mr. Jusu and the back of

11   the neck of Mr. Jusu.

12   Q.   And can you tell us whether in these photographs taken from

13   the back of Mr. Jusu do scars appear?

14   A.   Yes.

15   Q.   Are you able to tell us, Dr. Hyma, at this time whether or

16   not these scars were related or unrelated to the incidents

17   described to you by Mr. Jusu?

18   A.   These are unrelated scars.

19   Q.   How do you know that?

20   A.   From his account.

21            MS. ROCHLIN:   Agent Baechtle, if you would bring up

22   Exhibit Hyma 101.

23            AGENT BAECHTLE:   (Complied.)

24   BY MS. ROCHLIN:

25   Q.   What appears in this photograph, Dr. Hyma?

**October 17, 2008**

## Hymn - Voir Dire

1    A.   This is the chest of Mr. Jusu.

2    Q.   And directing your attention to the center area of the

3    photograph below Mr. Jusu's neck.  Can you tell us what, if

4    anything, appears in?

5    A.   I'll circle this area here.  It's a horizontal scar.

6    Q.   Did Mr. Jusu make any statements which you felt were

7    relevant with respect to this scar?

8    A.   Yes, he did.

9    Q.   What statements were those?

10   A.   He states that he was cut with a bayonet on the chest in

11   this area where I've circled.

12           MS. ROCHLIN:   Agent Baechtle, I'm going to ask you to

13   skip to Exhibit Hymn 104.

14           AGENT BAECHTLE:   (Complied.)

15   BY MS. ROCHLIN:

16   Q.   Dr. Hymn, could you explain what appears in this exhibit,

17   Number 104?

18   A.   This is a photograph of his chest with the scar in question

19   here and a ruler for reference, for size reference.

20   Q.   And the scar that is circled in this photograph, that is

21   the same scar that you connected to the statements about the

22   bayonet in the previous photograph?

23   A.   Yes.

24   Q.   Were you able to form any opinion or conclusion concerning

25   the scar now circled in Exhibit Hymn 104?

**October 17, 2008**

## Hyma - Voir Dire

1  A.   Yes.

2  Q.   What opinion or conclusion were you able to form?

3  A.   This is a scar, again consistent with a healed cut from a

4  sharp instrument such as a bayonet.

5  Q.   What is it about the scar that leads you to that particular

6  conclusion, Dr. Hyma?

7  A.   It has a linear or a straight line configuration.  The scar

8  is raised, indicating that this probably was not sutured, as

9  per Mr. Jusu's statement it was never attended to medically

10  and, as a result, it would form a raised linear scar such as

11  you see here.

12         MS. ROCHLIN:   Agent Baechtle, let me ask you to bring

13  up Exhibit Hyma 102.

14         AGENT BAECHTLE:   (Complied.)

15  BY MS. ROCHLIN:

16  Q.   Dr. Hyma, looking at Exhibit Hyma 102, can you tell us

17  whether or not it correlates in any way to Exhibit Hyma 101?

18  A.   Yes.   This is the front of the right shoulder.

19  Q.   And in Exhibit Hyma 102 showing the front of the right

20  shoulder, are there any scars or marks that appear in this

21  photograph?

22  A.   Yes.

23  Q.   And were you able to determine whether or not the

24  particular scars or marks were related or unrelated to what

25  Mr. Jusu recounted to you on June 29th, 2007?

**October 17, 2008**

## Hymm - Voir Dire

1    A.   According to his account, this scar is not related to the

2    incident that occurred in 1999.

3              MS. ROCHLIN:   At this time I would ask Agent Baechtle

4    to scroll through Hymn Exhibits 105 through 109.

5              AGENT BAECHTLE:   (Complied.)

6              MS. ROCHLIN:   If you would return, Agent Baechtle, to

7    Hymn Exhibit 105.

8              AGENT BAECHTLE:   (Complied.)

9    BY MS. ROCHLIN:

10   Q.   Dr. Hymn, what, if anything, appears noteworthy to you in

11   this photograph?

12   A.   This is the left side of Mr. Jusu.   His left arm, his left

13   elbow and his chest and left side of his neck.

14             In particular, this photograph demonstrates the scar

15   that he has over the front of his left elbow.

16   Q.   Would you please circle the scar on the front of the left

17   elbow?

18   A.   (Complied.)

19   Q.   Did Mr. Jusu make any statements during your interview

20   which you determined were relevant for purposes of the any

21   opinion or conclusion you reached?

22   A.   Yes.

23   Q.   And what statements were those?

24   A.   The description he provided to me of the binding that he

25   experienced where he was bound so tightly that the bindings

**October 17, 2008**

## Hymn - Voir Dire

1   around his arms actually cut into his flesh and he was carried

2   like a basket for four days with these bindings on.

3              MS. ROCHLIN:  For a moment I'd like to move to Hymn

4   Exhibit Number 110.

5              AGENT BAECHTLE:  (Complied.)

6   BY MS. ROCHLIN:

7   Q.   What appears in this photograph, Dr. Hymn?

8   A.   This is the right side of the abdomen of Mr. Jusu.

9   Q.   Are there any marks or scars appearing in this photograph?

10  A.   Yes.

11             MS. ROCHLIN:  Agent Baechtle, if you would, I would

12  ask you to scroll through Hymn Exhibits 111 through 117.

13             AGENT BAECHTLE:  (Complied.)

14  BY MS. ROCHLIN:

15  Q.   Dr. Hymn, my first question with respect to these

16  photographs is whether they have any relationship or not with

17  Exhibit Hymn 110.

18  A.   Yes, they do.

19  Q.   Could you explain what that is?

20  A.   These are all close-up photographs of the scars in Exhibit

21  110.

22  Q.   Were you able to determine whether or not the scars in

23  Exhibit  107, as more closely shown in Hymn Exhibits 111

24  through 117, were related or not related to the events Mr. Jusu

25  informed you of during his infer?

**October 17, 2008**

## Hymn - Voir Dire

1  A.   These scars are related.   He describes being burned with

2  hot wax or hot liquid plastic on his abdomen in multiple

3  places.

4  Q.   What is it about the scars -- strike that.

5          Did you reach your own opinion or conclusion about the

6  cause or origin about the scars that are reflected in Hymn 110

7  through Hymn 117?

8  A.   These scars have various shapes and sizes.   Some are very

9  irregular.   Some are oval.   Some are more rectangular or more

10  linear.   They are all consistent with what would be the result

11  of a healing burn from a liquid that was dripped or sloshed or

12  poured on the abdomen in various places.

13          MS. ROCHLIN:   Agent Baechtle, if you would now bring

14  up Hymn Exhibit Number 118.

15          AGENT BAECHTLE:   (Complied.)

16          MS. ROCHLIN:   If you would scroll through 118 through

17  124, please.

18          AGENT BAECHTLE:   (Complied.)

19  BY MS. ROCHLIN:

20  Q.   Dr. Hymn, can you explain what appears in Hymn Exhibits 118

21  through 124?

22  A.   These photographs are the front of the elbows of Mr. Jusu.

23  Q.   And can you explain what, if any, marks appear in these

24  photographs?

25  A.   What appears in these photographs and what he has on his

**October 17, 2008**

## Hymn - Voir Dire

1  elbows are fairly conspicuous horizontal scars.  Some of them

2  are actually overlapping.  Some of them are criss-crossing.

3  Some of the scarring actually indicates that the skin actually

4  had separated at some point in time and had just closed

5  naturally.

6  These are scars, again, these are scars consistent

7  with the binding that he described to me and the length of time

8  that these bindings were applied, namely, four days.

9  MS. ROCHLIN:  Agent Baechtle, if you would go back to

10  Hymn Exhibit 123 for a moment and Hymn Exhibit 122.

11  AGENT BAECHTLE:  (Complied.)

12  MS. ROCHLIN:  121.

13  AGENT BAECHTLE:  (Complied.)

14  BY MS. ROCHLIN:

15  Q.  Dr. Hymn, what, if anything, appears in Hymn Exhibit 121?

16  A.  121 is a scar that has resulted in an injury where the skin

17  was actually separated and the scar tissue covered the skin.

18  In other words, at some point in time, this injury was open and

19  the flesh was open and it scared by what we refer to in

20  medicine as secondary intention.  Instead of actually closing

21  the skin edges, the skin fills in over time because it's not

22  sutured.

23  Q.  Dr. Hymn, with respect to the injury depicted in Hymn

24  Exhibits 118 through 124 and also with respect to those

25  depicted in Hymn Exhibits 105 through 109, were you able to

**October 17, 2008**

## Hymn - Voir Dire

1  reach any opinion or conclusion relating to the origin of these

2  scars?

3  A.   Yes.

4  Q.   And what opinion or conclusion did you reach?

5  A.   These scars are consistent with the bindings that Mr. Jusu

6  described where his elbows were bound so tightly behind his

7  back and that he was carried like a basket for four days.

8        MS. ROCHLIN:   Agent Baechtle, if you would bring up

9  Hymn Exhibits 125 through 127.

10        AGENT BAECHTLE:   (Complied.)

11 BY MS. ROCHLIN:

12 Q.   And when you're ready, Dr. Hymn, if you could explain what

13 appears in Exhibits 125 through 127.

14 A.   125 through 127 are photographs of the right arm, the inner

15 right arm and some close-up photographs of injuries appearing

16 on the inner right arm and the right wrist.

17 Q.   And were you able to determine, Dr. Hymn, whether the

18 injuries depicted on the inner right arm or right wrist were

19 related or unrelated to the incidents described by Mr. Jusu

20 during your examination?

21 A.   These are unrelated injuries.

22 Q.   How were you able to determine that?

23 A.   By his account.

24        MS. ROCHLIN:   I would ask now for Agent Baechtle to

25 bring up Hymn Exhibits 128 through 121.

**October 17, 2008**

## Hymn - Voir Dire

1        AGENT BAECHTLE:   (Complied.)

2            MS. ROCHLIN:   I'm sorry.   128 through 131.

3        AGENT BAECHTLE:   (Complied.)

4            MS. ROCHLIN:   Thank you, Agent Baechtle.

5  BY MS. ROCHLIN:

6  Q.   Dr. Hymn, do these exhibits, 128 through 131, show

7  Mr. Jusu's hands?

8  A.   Yes, they do.

9  Q.   Both of his hands?

10  A.   Yes.

11  Q.   Front and back?

12  A.   Front and back.

13  Q.   Can you tell us whether or not anything is striking to you

14  about these photographs of Mr. Jusu's hands, Dr. Hymn?

15  A.   His -- the distal end of his right index finger has been

16  amputated.

17  Q.   For starters, let me ask you to spell distal for the court

18  reporter.

19  A.   D-i-s-t-a-l.

20  Q.   What do you mean by the distal end of his finger?

21  A.   Just the end, the finger tip, the last two joints.

22  Q.   Was there anything with respect to the amputation of

23  Mr. Jusu's finger tip that was relevant to any conclusions you

24  reached about the origins of Mr. Jusu's injuries?

25  A.   No, it's unrelated to the injuries he described to me.

**October 17, 2008**

## Hymn - Voir Dire

1    Q.   And did the unrelated nature of the particular injury have

2    any significance to you, Dr. Hymn, with respect to your

3    assessment of any of Mr. Jusu's other injuries?

4    A.   Well, this is clearly a deformity.  By looking at the

5    amputation, without any historical information, I can't tell

6    how it happened, but he was very clear that this was not

7    related.  Certainly, it was an injury that one could possibly

8    make into an injury that was related, but he clearly stated to

9    me this was not related to the incident that he described to me

10   in 1999.

11   Q.   The fact Mr. Jusu stated this particular injury was not

12   related, did that also factor into your assessment of the

13   injuries that he said were, in fact, related?

14   A.   Yes.  I mean, it certainly went to his credibility.

15           MR. CARIDAD:   Objection, Your Honor.  Move to strike.

16   He's not here to judge anyone's credibility.

17           THE COURT:   Sustained.

18   BY MS. ROCHLIN:

19   Q.   Dr. Hymn, did you examine Mr. Jusu's legs and genital area?

20   A.   Yes.

21   Q.   Did Mr. Jusu describe to you any injuries to his legs and

22   genital area?

23   A.   Yes.

24   Q.   And did you document that portion of your examination

25   through photographs as well?

**October 17, 2008**

## Hyma - Voir Dire

1  A.   Yes.

2        MS. ROCHLIN:   At this time I would ask Agent Baechtle

3  to scroll through Hyma Exhibits 132 through 135.

4        AGENT BAECHTLE:   (Complied.)

5  BY MS. ROCHLIN:

6  Q.   Dr. Hyma, can you explain what appears in Exhibits 132

7  through 135?

8  A.   132 is the right side of his hip.   133 is the front of his

9  pelvis with his genitalia.   134 is also his genitalia with his

10  penis retracted, and 135 is the left side of his hip.

11  Q.   And did you identify any related scars or marks in this

12  series of photographs or not, Dr. Hyma?

13  A.   Yes.

14  Q.   And where were the areas, if anywhere, you found related

15  scars or marks?

16  A.   On Exhibit Number 133, the right thigh.   I'll circle it be

17  my finger.

18  Q.   And what have you circled?

19  A.   And also the left thigh and injuries to his penis.

20  Q.   Starting with the first two circles on what would be

21  Mr. Jusu's right thigh or the left thigh, as you're looking

22  directly at the photograph, what have you circled there,

23  Dr. Hyma?

24  A.   These are depressed circular scars that are about a

25  centimeter in greatest dimension, similar to the ones we've

**October 17, 2008**

## Hymn - Voir Dire

1  seen before from a cigarette burn.

2  Q.  And what, if any, statements did Mr. Jusu make to you that

3  were relevant with respect to those two scars that you circled?

4  A.  That he was burned in his right thigh with a lit cigarette.

5  Q.  Directing your attention to the opposite side and the area

6  you've circled what appears there, Dr. Hymn.

7  A.  It's part of a scar on his left thigh.

8  Q.  Directing your attention to the photograph where it shows

9  Mr. Jusu's penis.  In this photograph -- in this area in this

10  photograph, were you able to observe any marks or injuries?

11  A.  Yes.

12  Q.  Can you indicate where those are?

13  A.  The scar is there --  I'm drawing a line to it -- and a

14  scar is there on the shaft of his penis just below the glans or

15  the head of the penis.

16  Q.  Where those scars appear that you have just marked, did

17  Mr. Jusu make any statements to you that you found to have been

18  relevant to those scars?

19  A.  Yes.

20  Q.  What were those statements?

21  A.  That he was burned with a hot liquid on his penis.

22  Q.  Dr. Hymn, with respect to the two circular scars on the

23  right side -- excuse me -- on the left side as you're looking

24  at this photograph, did you reach any opinions or conclusions?

25  A.  Yes.

**October 17, 2008**

## Hyma - Voir Dire

1   Q.   What were those?

2   A.   Those scars are consistent with a lit cigarette burn, as he

3   describes.

4   Q.   With respect to the scars appearing on Mr. Jusu's penis,

5   did you reach any conclusions or opinions?

6   A.   Those scars are also consistent with a burn from a hot

7   liquid, as he described.

8   Q.   And are there additional photographs in the series, 132

9   through 135, which would be helpful, Dr. Hyma, in identifying

10   related injuries of Mr. Jusu?

11   A.   No, not related injuries.

12        MS. ROCHLIN:   Agent Baechtle, at this time I would ask

13   you to bring up Hyma Exhibit Number 136.

14        AGENT BAECHTLE:   (Complied.)

15   BY MS. ROCHLIN:

16   Q.   Dr. Hyma, in this photograph, what does it show?

17   A.   This is the front of Mr. Jusu's legs.

18   Q.   Does this photograph provide orientation with respect to

19   his legs?

20   A.   Yes.

21   Q.   Do you see any relevant or related marks in this

22   photograph?

23   A.   Yes, the same marks we just discussed over here, which I

24   have circled, and part of a scar on his left thigh, which I

25   have also circled.

**October 17, 2008**

## Hymn - Voir Dire

1          MS. ROCHLIN:  I'd like to proceed now to Hymn Exhibit

2    137.

3          AGENT BAECHTLE:  (Complied.)

4    BY MS. ROCHLIN:

5    Q.   In this photograph what appears, Dr. Hymn?

6    A.   The soles of his feet.

7    Q.   Did Mr. Jusu make any statements to you which were relevant

8    with respect to the soles of his feet?

9    A.   He stated that the soles of his feet were burned with hot

10   liquid.

11   Q.   Now, were you able to reach any opinions or conclusions

12   with respect to the soles of Mr. Jusu's feet and his statements

13   relating to them?

14   A.   Yes.

15         MR. CARIDAD:  Objection.  Beyond the scope of notice

16   given to us, Judge.

17         MS. ROCHLIN:  Your Honor, the United States submits

18   it's within the scope of any notice.

19         THE COURT:  I don't know.  I don't know what the

20   notice says.  I'm unable to rule.

21         MS. ROCHLIN:  May we have a sidebar, Your Honor?

22         THE COURT:  You may.

23

24

25

**October 17, 2008**

## Hyma - Voir Dire

1          [Proceedings at sidebar follow]:

2          MR. CARIDAD:   Judge, this is the notice I have.

3          THE COURT:   Show me verification of this portion of

4    the opinion to defense counsel.

5          MS. ROCHLIN:   Your Honor, Dr. Hyma's reports provided

6    to defense counsel references statements "He was burned in

7       various areas, including the soles of his feet, with hot

8       liquid plastic."

9          The "Opinion" section also contains references to

10   various injuries and states "Many of his other scars are

11      nonspecific in configuration and location, but consistent

12      with other healed injuries described by Mr. "Jusu."

13          In addition to that, Your Honor, the defense has had

14   absolutely unrestricted access to Dr. Hyma.   They have

15   questioned him about his report line by line.   They have been

16   able to freely interview him and examine all aspects of his

17   report.

18          THE COURT:   Overruled.

19          MR. CARIDAD:   If they haven't given me notice about

20   something, how am I supposed to ask him?

21          THE COURT:   I think what she read covers that area and

22   I think you certainly have the opportunity to talk to him

23   because we're stopping at 3:30.

24          MR. CARIDAD:   Now he's going to say why there are no

25   marks.   He said the man told him his feet were burned.   It

**October 17, 2008**

**Hymn - Voir Dire**

1    hasn't been disclosed why there are no marks.

2              THE COURT:   I think it's within the scope of what was

3    read.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**October 17, 2008**

## Hyma - Voir Dire

1            [Proceedings in open court follow]:

2    BY MS. ROCHLIN:

3    Q.   Dr. Hyma, can you tell us whether or not you were able to

4    reach any opinions or conclusions regarding Mr. Jusu's

5    statements about the burning of the soles of his feet?

6    A.   I can't confirm or refute his statement about his burns on

7    his feet.   The feet are heavily calloused, different from just

8    about any other skin of our body, and heat applied to the soles

9    of the feet may not burn or leave a permanent scar, as opposed

10   to the same temperature fluid being applied to another part of

11   the body.   I can't confirm or refute whether he had burns on

12   his feet.

13            MS. ROCHLIN:   Agent Baechtle, if you would bring up

14   Hyma Exhibit 138.

15            AGENT BAECHTLE:   (Complied.)

16   BY MS. ROCHLIN:

17   Q.   Dr. Hyma, could you explain what appears in Hyma Exhibit

18   138?

19   A.   138 is the right side of his, the outer side of his right

20   leg.

21   Q.   Do any related scars or marks appear, if you can tell us,

22   in Hyma exhibit 138?

23   A.   Yes.   Again, the two scars that we previously discussed,

24   which I circled.

25            MS. ROCHLIN:   Agent Baechtle, at this time if you

**October 17, 2008**

## Hymn - Voir Dire

1  could bring up Hymn Exhibit Number 140 and then Hymn Exhibit

2  Number 143.

3              AGENT BAECHTLE:   (Complied.)

4  BY MS. ROCHLIN:

5  Q.   Dr. Hymn, are you able to tell us what appears in Exhibits

6  140 and 143?

7  A.   143 is, again, the circular or oval scar on his right

8  thigh.

9  Q.   One of the scars appearing in Exhibit 138 or not?

10  A.   Correct.   That's correct.

11  Q.   And with respect to Exhibit 140?

12              AGENT BAECHTLE:   (Complied.)

13  A.   This is an orientation, again, of the two scars in

14  question.

15  Q.   And you may have already told us, Dr. Hymn, but did you

16  reach a conclusion with respect to these particular scars shown

17  in Exhibit 138, 140 and 143?

18  A.   Again, these scars are consistent with healed cigarette

19  burns.

20              MS. ROCHLIN:   Agent Baechtle, if I could ask you to

21  bring up Hymn Exhibit Number 139.

22              AGENT BAECHTLE:   (Complied.)

23  BY MS. ROCHLIN:

24  Q.   Which leg appears in Hymn Exhibit 139, doctor?

25  A.   This is the left leg, the outer part of the left leg.

**October 17, 2008**

## Hyma - Voir Dire

1  Q.   Does this photograph also provide orientation?

2  A.   Yes.

3  Q.   And are you able to detect any related scars or marks in

4  this photograph?

5  A.   Yes.

6  Q.   Where do you see a related scar or mark?

7  A.   (Indicating.)

8       I circled it on the photograph.

9  Q.   And what appears in the area that you circled, Dr. Hyma?

10 A.   This is an elliptical scar on his left thigh.

11      MS. ROCHLIN:   At this time I would ask Agent Baechtle

12 to bring up Hyma Exhibit 141.

13      AGENT BAECHTLE:   (Complied.)

14 BY MS. ROCHLIN:

15 Q.   Dr. Hyma, can you tell us whether there is any correlation

16 between Hyma Exhibit 139 and Exhibit 141?

17 A.   Yes.   This is the scar that I circled on Exhibit 139, the

18 upper left high.   This is a closer photograph of the same scar.

19      MS. ROCHLIN:   Agent Baechtle, if you would bring up

20 Exhibit Hyma 142.

21      AGENT BAECHTLE:   (Complied.)

22 BY MS. ROCHLIN:

23 Q.   What appears in Exhibit 142, doctor?

24 A.   This is a close-up of what was in Exhibit 141, but now with

25 a scale of reference.

**October 17, 2008**

## Hyma - Voir Dire

1  Q.   Dr. Hyma, did Mr. Jusu make any statements to you which

2  were relevant to the scar that appears in Exhibits Hyma 139,

3  141 and 142?

4  A.   Yes.

5  Q.   What statements were those?

6  A.   He was cut with a bayonet on his left thigh.

7  Q.   And were you able to reach an opinion or a conclusion

8  relating to the scar that appears in Exhibits 139, 141 and 142?

9  A.   Yes.

10 Q.   What opinion or conclusion were you able to reach?

11 A.   This scar is very, very classic of a sharp injury that has

12 not been sewn together and the body has healed and bridges the

13 gap with new skin, which we refer to in medicine as secondary

14 intention.   In other words, this was never sutured.

15         The top of the scar, you can actually see a nice sharp

16 line where the native skin ends and the scar tissue begins and

17 you can actually see the radiating lines in the scar pattern as

18 the body pulls this scar together in order to close the gap.

19         It's a very typical type of scar that you would see

20 from a clean cut that was never sutured.

21 Q.   And, Dr. Hyma, with respect to Mr. Jusu's statements and

22 the nature of this injury or the nature of the scar, what, if

23 anything, did you conclude?

24 A.   This is consistent with an incised wound or a cut that he

25 described from a bayonet.

**October 17, 2008**

# Hyma - Voir Dire

1      MS. ROCHLIN:   Agent Baechtle, I would ask you briefly

2  to bring up Hyma Exhibits 79 through 83.

3          AGENT BAECHTLE:   (Complied.)

4  BY MS. ROCHLIN:

5  Q.   Dr. Hyma, I believe you testified briefly that what appears

6  in these exhibits include a bayonet injury for Monoh Turay.   Is

7  that correct?

8  A.   Yes.   This is a stab, a stab wound from the tip of a

9  bayonet, as opposed to a slicing.

10         MS. ROCHLIN:   If we could return to Hyma Exhibit 142.

11         AGENT BAECHTLE:   (Complied.)

12  BY MS. ROCHLIN:

13  Q.   Would you agree, Dr. Hyma, those injuries do not appear to

14  look alike?

15  A.   That's correct.

16  Q.   Can you explain why it is that you found each account of an

17  injury from a bayonet to be consistent with the remaining

18  physical evidence, even though these injuries appear visually

19  different?

20  A.   This wound he describes as a slicing or a cutting, so that

21  the length of the wound is longer than the depth of the wound.

22         A puncture wound from a tip of a knife would result in

23  maybe a deeper wound than it is long.

24         Also, it's located on a different part of the body

25  where the lines of tension in the skin are oriented

**October 17, 2008**

## Hymn - Voir Dire

1    differently.   Here this was actually oriented perpendicular to

2    the lines of tension which run this way, which cause the wound

3    to gape the larger it is.

4           So without any medical intervention, the scar that you

5    see here results from that gaping wound and the body's attempt

6    to close that so you see these radiating lines here in the scar

7    that forms as the body tries to close that together.

8           The other one is much smaller and it's in a different

9    part of the thigh with different tension lines so it will gape

10   a little differently.   Because of the size and the orientation

11   on the body, they may, in fact, appear differently.   This is

12   consistent with a stab wound from a tip and the other one is

13   consistent with a slice from the blade.

14          MS. ROCHLIN:   Your Honor, would this be a good time to

15   break?

16          THE COURT:   I think we need to get one of our jurors

17   to a class this evening.

18          Ladies and gentlemen, we'll stop at this time.   We'll

19   ask you to return Monday morning 9:00 a.m   We'll go from 9:00

20   to 3:00.

21          Have a good weekend.   Don't do any reading regarding

22   this case.

23          [The jury leaves the courtroom at 3:35 p.m ]

24          THE COURT:   Doctor, we'll see you Monday morning.

25          THE WITNESS:   Okay.

**October 17, 2008**

## Hynn - Voir Dire

1          THE COURT:   Have a good weekend.

2          THE WITNESS:   Thanks.

3          THE COURT:   Is there anything we need to address

4  before we resume Monday morning?

5          MS. HECK-MILLER:   Yes, Your Honor.

6          Since we're nearing the end of our case, we're trying

7  to do exhibit clean-up.   There were two sets of exhibits as to

8  which the Court asked the Government and defense to consult

9  with regard to possible redactions.   One was concerning emails

10 that were sent by the defendant to Lieutenant Colonel McMullen.

11         I have consulted with the defense and we have agreed

12 on a redaction and, accordingly, once defense and I confirm the

13 actual document, we will submit that.   Sorry I don't have the

14 exhibit number at hand.

15         THE COURT:   Very well.

16         MS. HECK-MILLER:   The other documents that were, that

17 the Court asked that we try to reach agreement on --

18         THE COURT:   The newspapers.

19         MS. HECK-MILLER:   The newspapers of Mr. Torh.   I

20 talked to Mr. Caridad.   He says simply he thinks everything

21 should be redacted.   Respectfully, I think that is inconsistent

22 with the Court's prior ruling.

23         Having gotten no specificity from the defense as to

24 what they wish redacted, we're really in the same posture as

25 earlier.

**October 17, 2008**

## Hynn - Voir Dire

1          THE COURT:  Why don't you show me the redactions you

2   made to the proposed exhibits?  I know the defense maintains

3   its objection, newspaper articles are hearsay and certainly

4   they are, but I think with the redactions, it will satisfy the

5   Government's purposes as well not putting before the jury any

6   out-of-court statement sought to be admitted for their truth.

7          That was not the purpose of the article, but it was to

8   show the closing of Gbatala Base and the publicity surrounding

9   that which prompted those events to corroborate the particular

10   witness' testimony and the timeline.

11          Why don't you give me those?  I'll look at them

12          MS. HECK-MILLER:  All right.  Actually, even though

13   the defense -- I believe Mr. Caridad has his copy.  I don't

14   have my unmarked copy with me.

15          Can the Court look at your copy?

16          MR. CARIDAD:  Yes, Your Honor.

17          What I have done, I have identified and highlighted

18   things that I think right now are unfairly prejudicial, but my

19   point was I don't know what the following evidence is going to

20   show, either the Government's evidence or ours.  There may be

21   something that is said between now and the end of the trial

22   that makes something said in these papers more prejudicial.  I

23   just don't know.

24          THE COURT:  But the Government would necessarily want

25   to have those admitted before it rests, so it needs to know

**October 17, 2008**

## Hymn - Voir Dire

1    that by Monday or Tuesday.   Right?

2              MR. CARIDAD:   Well, I guess we'll know by the time the

3    Government rests a little more about the case.   They might have

4    rebuttal.   That's the problem I'm having.   Right now there are

5    things in here that seem innocuous to me, but I just don't

6    know.

7              For example, there is an article about Taylor scolding

8    his cabinet, threatens dismissal.   There's an article about the

9    management of the port authority which was under President

10   Taylor.   It mentions Benjamin Yeaten has ordered the immediate

11   detention of two SSU officers.

12             Every headline has something about a scandal.

13   "Scandal is like bread, there's never any shortage."   That's

14   the kind of thing I believe is prejudicial.

15             MS. HECK-MILLER:   Mr. Caridad has not given me

16   anything specific.   I'd like to cut the Gordian knot that goes

17   even farther.

18             Our point is we want to make the point there was an

19   article in the newspaper.   I have prepared a version that

20   actually redacts all of the contents of all of the stories

21   except indicating where the story was and having the banner and

22   some advertising material that appears on all of them.   I think

23   it eliminates all of the defense's objections and I suggest

24   that's how we resolve the matter.

25             If I may hand it up to the Court.

**October 17, 2008**

## Hynn - Voir Dire

1    THE COURT:   Any objection, Mr. Caridad?

2    MR. CARIDAD:   I haven't seen that.

3    THE COURT:   Why don't you show it to defense counsel?

4    MR. CARIDAD:   My only remaining objection is a

5    reference to an article of the Liberian Constitution having to

6    do with security of a person and the other part that has to do

7    with a scandal.

8    MS. HECK-MILLER:   Your Honor, that is part of the

9    masthead of the newspaper.   It does not have the kind of

10   specificity and prejudicial content that counsel suggests.

11   The whole point of the exhibit is to make it clear

12   that there is a newspaper and it had these stories.   We submit

13   the Government has gone far beyond what is necessary, and if I

14   may hand these up to the Court.

15   MR. CARIDAD:   The question is why is a newspaper that

16   they have every day in Liberia, a message in one that talks

17   about scandal being like bread, there's never any shortage, and

18   an article from the Liberian Constitution that has to do --

19   THE COURT:   Let me ask you, Mr. Caridad, you're the

20   one who requested I allow you to play that DVD, images of

21   Monrovia, over Government objection.   I allowed it.   You are

22   the one who has been telling this jury these folks, these

23   alleged witnesses, have tremendous motives to lie.   They really

24   don't want to go back to Liberia.   It's an awful place.

25   Doesn't this support that?   It's a scandal-plagued country

**October 17, 2008**

## Hynn - Voir Dire

1  where, apparently, this news publication speaks of the scandal

2  of the week.   Apparently, it's a newspaper that likes to print

3  articles regarding scandalous events and continues to recite

4  one article of the Constitution sort of to show the

5  Constitution guaranties you these rights.   "Look at all the

6      scandals that are plaguing this country."   That is

7  meaningless.   Doesn't that tie into your theory this is a

8  horrible place, these alleged victims don't want to go back to?

9          MR. CARIDAD:   This newspaper is saying it's a horrible

10  place because of Charles Taylor, who is a co-conspirator in

11  this case.   It's his government.

12          THE COURT:   It just says "Article about Gbatala Base."

13          MR. CARIDAD:   No, Judge.   I mean, the two sections I'm

14  talking about, they're talking about scandal.   I think it's

15  reasonable to conclude they're talking about government scandal

16  probably.   Then they're talking about an article of the

17  Constitution.   I don't know how many articles are in this

18  Constitution, but the one this newspaper has chosen to print

19  has to do with security of person.   This whole case, according

20  to the Government --

21          THE COURT:   Let's take out the "Quotations of the

22  Week" and "Know Your Constitution."   I guess it would be no

23  different than having the front page of the National Inquirer

24  or some other tabloid that has something about --

25          MR. CARIDAD:   It's probably as accurate.

**October 17, 2008**

## Hymn - Voir Dire

1        THE COURT:   I think the Government can get its point

2   across without these two portions that seem to be the thrust of

3   this publication that I'm not familiar with and let the jury

4   know that which you wanted them to know, which was this

5   corroborates there was a great deal of pressure put upon folks

6   to close this base.

7        MR. CARIDAD:   Thank you, Your Honor.

8        THE COURT:   All right.

9        MR. CARIDAD:   Judge, we're starting at 9:00 on Monday?

10        THE COURT:   Yes.

11        You all have a good weekend.

12        MS. ROCHLIN:   You, too, Your Honor.

13        MR. CARIDAD:   Thank you, Your Honor.

**October 17, 2008**

1          C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3   transcription of proceedings in the above-entitled matter.

4

5   ___11/14/08_____          _____
        DATE                      BARBARA MEDINA

6                                 Official United States Court Reporter
                                  400 North Miami Avenue, Suite 12-2
7                                 Miami, FL   33128 -  305.523.5518
                                             (Fax) 305.523.5519
8                                 Email:   barbmedina@aol.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Quality Assurance by Proximity Linguibase Technologies**
**October 17, 2008**

**A**

**abbreviation** 64:25 65:9
**abbreviations** 61:4
**abdomen** 65:16 138:19 147:8
148:2,12
**able** 23:21 24:10 30:18 32:6,12
45:9 49:16 57:10,22 61:9
62:12,19 63:13,18 64:11 65:7
66:11,14,19 67:1,7,11 73:5,10
73:14,24 75:9 76:21 83:20
84:12 87:14 92:9 99:17 107:9
112:5,23 116:7,17,21 125:14
126:6 127:5 129:10 131:14,23
132:25 135:10 140:2,5,8 142:8
142:22 143:15 144:24 145:2
145:23 147:22 149:25 150:17
150:22 154:10 156:11 157:16
159:3 160:5 161:3 162:7,10
**abnormal** 43:6
**abnormality** 55:4
**above-entitled** 171:3
**abrasion** 72:3
**absence** 55:22,22 116:18
**absolutely** 157:14
**abuses** 20:18,20,22 21:2 35:20
35:21,24 36:3,5
**access** 1:25 26:19 157:14
**accident** 37:9 51:14
**accidents** 40:12
**accommodate** 99:15 102:15
**accompanies** 38:25
**accomplish** 50:2
**account** 51:22 72:7 84:22 92:4
92:24 93:2,13,23 98:12,14,20
116:8 117:1,17 123:18 130:19
131:25 135:10 143:20 146:1
150:23 163:16
**accounts** 53:20
**accurate** 25:12 26:11,17 169:25
171:2
**accurately** 69:1 109:16
**accused** 106:20 138:15
**acknowledge** 36:5
**acknowledged** 36:7
**acne** 142:6
**actual** 56:14 67:16 96:6 121:1
125:7 165:13
**acute** 65:16
**addition** 4:23 44:3,10 60:8 71:8
75:11 140:1 157:13
**additional** 64:6,9 65:2,17 107:20
125:15 155:8
**Additionally** 53:20
**address** 3:23 4:3 38:8,9,11,12
60:23 135:19 165:3
**addressed** 135:14
**addresses** 38:9
**ADMINISTRATIVE** 3:21
**admission** 69:6 109:20 140:25
**admitted** 8:10 11:13 13:17 69:9
109:23 141:3 166:6,25
**advertising** 167:22
**advise** 16:21 17:12
**Africa** 19:15,16
**African** 15:8
**afternoon** 94:21 99:21
**agency** 22:7,12 26:2,4,5,9 27:3
29:2
**agent** 5:22 6:3,6,10,22 7:11,16
8:5,14,16,22 9:1,16,18,20 10:4
11:12,15 12:4,6,20 13:1,21,23
14:2,12 15:12 16:2,12,13
17:15,16 21:22 23:3,4,6,9,10
23:11,12,15,25 24:1,7,8,18,19
24:19,20,21,21 27:1 29:19
30:11,12 32:20 34:16,18,20
70:10,17,20 72:11,13,14,16,23

73:2,17,19 74:5,7,21,23 75:15
75:17 76:17,19 77:2,21 78:4
78:11,13 79:11,13 80:1,3,16
80:18 81:3,5 83:10,12 84:8,10
85:1,13,15 86:10 87:12 88:18
88:20 89:3,22 91:5,12,19
92:19 93:6,16,17,25 94:2
98:17,18 103:1 110:3,11,13,19
110:21 111:4,6,8,15,17 112:19
112:21 113:20,22,24,25 114:6
114:22,24 115:10,14,23
116:11 117:2,4,18,20 118:23
118:24,25 119:2,15,17,24
120:8,18,20 121:24 122:1,8,10
122:20 123:6,12 124:4,10,12
126:3,4,14,16 127:20,22 128:8
128:10,18,20 130:3,4,20,22
131:2,4 132:1,3,5,23 133:24
137:13 141:9,14,17 142:13,15
143:5,7,21,23 144:12,14
145:12,14 146:3,5,6,8 147:5
147:11,13 148:13,15,18 149:9
149:11,13 150:8,10,24 151:1,3
151:4 153:2,4 155:12,14 156:3
159:13,15,25 160:3,12,20,22
161:1,11,13,19,21 163:1,3,11
**agents** 22:8 24:13,17 25:2,8,10
25:21 57:19,20,20 58:4 106:5
**agent's** 98:24
**agree** 22:2 24:9 25:9,25 26:11
30:21 32:23,24,25 163:13
**agreed** 165:11
**agreement** 165:17
**ahead** 25:14 111:1
**airport** 16:4
**alike** 30:25 163:14
**alleged** 38:19 168:23 169:8
**Allen** 36:20
**allow** 168:20
**allowed** 112:11 168:21
**alongside** 75:22
**ALTONAGA** 1:13
**amateur** 56:18
**AMERICA** 1:4
**American** 44:25
**amputated** 151:16
**amputation** 151:22 152:5
**anal** 59:12
**analogy** 60:15
**analysis** 49:12 58:24 60:7
105:17,22
**anatomic** 39:24 41:22,25 42:1
42:10,15,17 45:11
**Anders** 10:20 12:19
**ankles** 91:10 92:3
**annual** 44:21
**answer** 16:9 17:5 21:1 22:22
33:8 98:1 100:13
**answering** 54:20
**answers** 23:4
**antibiotic** 67:5,6,16
**Anti-Terrorist** 64:16 106:19
138:13
**anus** 138:19
**anybody** 8:2 9:23 11:6 12:18
29:13 30:5 104:13 106:7 138:3
**anymore** 18:23
**anyone's** 152:16
**apart** 45:16 54:6,7
**apologize** 32:10 82:5
**apparent** 67:15,17
**apparently** 48:11 169:1,2
**appear** 45:14 65:2 66:9 73:13,25
74:3 75:8 77:15 78:25 83:17
84:21 86:19 134:3 142:3
143:13 145:20 148:23 154:16
159:21 163:13,18 164:11
**appearance** 29:9 55:4 80:23

81:2 83:9 104:2 129:21 132:20
140:21
**APPEARANCES** 1:16
**appeared** 88:22 128:16
**appearing** 71:6 117:12 123:21
131:17 141:11 147:9 150:15
159:4 160:9
**appears** 62:21 63:1,21 64:1,7
65:4,5,12 66:3 67:7 71:7 72:18
80:5,8 83:14 84:12 85:3 86:12
87:14,17 88:1 89:25 91:7,21
92:21 93:8,19 111:10 112:23
114:2,8 115:2,16 116:13 117:7
117:23 119:4 120:1 122:22,25
123:14 124:6 125:13 126:18
128:12,23 130:6,11 131:6,10
132:7 134:1 137:2 142:17,23
143:25 144:4,16 146:10 147:7
148:20,25 149:15 150:13
153:6 154:6 156:5 159:17
160:5,24 161:9,23 162:2,8
163:5 167:22
**applied** 90:9 121:22 124:25
125:22 149:8 159:8,10
**applies** 43:9 50:4,16 54:18
**apply** 49:1
**appointed** 43:23
**appointment** 44:3
**appointments** 43:21
**appreciate** 75:3 83:16 85:17
89:18
**approach** 61:13 68:3 99:10
108:19 134:12 136:3
**appropriate** 4:13 49:14 94:8
**approving** 37:13
**approximately** 46:17 90:19
104:12
**April** 23:20
**area** 43:1,2,5 45:3 72:25 77:14
88:1 89:5 90:14 94:8 103:8
114:15,20,23 118:14 119:9
122:25 125:23 126:8 128:2,3,4
128:16 130:9 131:8 135:13
139:2 144:2,5,11 152:19,22
154:5,9 157:21 161:9
**areas** 42:24 43:8,15 44:16,18
45:11,13 82:8,11 153:14 157:7
**arm** 77:18,23 78:6,6,7 79:8 84:15
84:15,16 103:23 114:3,4,9,11
115:17,20 116:1,2 120:14
146:12 150:14,15,16,18
**Armed** 44:24 45:1,2,4
**arms** 59:7 67:19 103:4,16 117:24
147:1
**arrest** 9:12
**arrested** 52:9 106:18 138:12
**arrived** 19:7
**article** 166:7 167:7,8,19 168:5,18
169:4,12,16
**ASA** 66:24
**ascribe** 92:2
**asked** 7:1 17:20,22 18:25 20:23
20:25 21:8,8 30:6 35:19 48:11
51:16,21 107:17 165:8,17
**asking** 18:13 22:19,20 23:3,4
25:7
**aspect** 116:2 120:14 130:8 132:8
**aspects** 157:16
**Aspirin** 66:24
**assess** 50:9 51:6,9 56:12 133:14
**assessed** 55:3
**assessment** 28:11,13 152:3,12
**assessments** 28:4
**assigned** 21:20
**assist** 37:17
**assistance** 9:25 10:3 14:2,4
**assisted** 40:9

**Associate** 39:7 41:14
**assume** 27:15 49:9 90:18 134:5
**assuming** 27:14
**assumption** 133:6
**attempt** 53:13 72:25 164:5
**attended** 145:9
**attention** 57:6 62:15 66:2 104:7
104:11 118:12 124:14 131:9
133:13 144:2 154:5,8
**attorney** 1:18,22 10:19 57:18,19
58:6 105:7,11 137:17
**Attorney's** 105:5
**ATU** 20:2,13,16,19,20,22 21:4,13
21:14,20 35:21
**audio** 25:23 27:4
**audiotape** 22:5 27:7,20 28:15
**audiotaped** 27:17,23 28:1
**audiotaping** 27:22
**August** 59:2,22 82:14 86:2 90:19
93:2,13
**author** 63:21
**authority** 167:9
**available** 54:1,6 100:25 105:16
**Avenue** 1:23 2:9 171:6
**awful** 168:24
**A-file** 4:7,14,20,23 5:3,5,10
97:23 102:4,7
**A-l-l-e-n** 36:21
**A.F.P.D** 2:2,3
**a.m** 5:13,17 7:15 8:11 12:23
13:18 15:25 34:15 36:16 48:4
48:7 49:20,22 68:11 69:11
136:25 164:19
**A.U.S.A** 1:17,18
**a/k/a** 1:8
**A94720458** 95:7

**B**

**Bachelor** 39:11
**back** 15:11 19:9 34:17 59:1,4,9
72:20,20 73:15,22 75:1,10,25
76:3,25 78:23 79:16,25 80:22
84:15 85:4 86:13,17,24 87:3,7
87:8,8,9 89:21 91:11 93:22
94:12 102:23 103:16 106:23
111:7 113:23 114:9,18 115:20
115:21 117:8,8,8,10,12,24
119:22 122:5 124:10 126:20
127:6 131:7 132:4,15,19,21
133:14 138:21,22 143:10,10
143:13 149:9 150:7 151:11,12
168:24 169:8
**background** 39:10
**backup** 24:13,16
**Baechtle** 2:14 5:15,22 6:10,22
8:16 14:2,12 16:2 34:20 70:10
70:20 72:11,13,16 73:2,19
74:7,23 75:17 76:19 77:2,21
78:4,13 79:13 80:3,18 81:5
83:12 84:10 85:1,15 86:10
87:12 88:20 89:3,22 91:5,12
91:19 92:19 93:6,17 94:2
104:25 105:1,3 110:3,12,13,19
110:21 111:4,6,8,17 112:19,21
113:20,22,24,25 114:6,22,24
115:14,23 116:11 117:4,20
118:23,24 119:2,15,17,24
120:8,18,20 121:24 122:1,10
122:20 123:6,12 124:4,12
126:3,4,14,16 127:20,22 128:8
128:10,20 130:3,20,22 131:2
131:4 132:1,3,5,23 133:24
137:13 141:9,17 142:13,15
143:5,7,21,24 144:12,14
145:12,14 146:3,5,6,8 147:5
147:11,13 148:13,15,18 149:9
149:11,13 150:8,10,24 151:1,3

151:4 153:2,4 155:12,14 156:3
159:13,15,25 160:3,12,20,22
161:11,13,19,21 163:1,3,11
**band** 79:5,5
**banding** 103:14,22
**band-like** 79:9
**banner** 167:21
**BARBARA** 2:8 171:5
**barbed** 59:20 107:3 127:10,13
barbmedina@aol.com 2:10
171:8
**barbwire** 127:18 139:25
**bare** 60:16
**bars** 59:19
**base** 33:16,18,19 34:2 86:1
166:8 169:12 170:6
**based** 18:25 22:10 24:1,12,24
26:23 27:14 28:13 29:2 33:9
33:17 34:9 38:25 112:4 133:15
**basis** 38:23
**basket** 138:23 147:2 150:7
**battery** 38:20,20
**bayonet** 107:8,8 112:3 128:7,15
129:6,15,15,20 138:17 144:10
144:22 145:4 162:6,25 163:6,9
163:17
**beam** 60:9,11
**beat** 60:10
**beaten** 71:23 72:8 107:1
**beats** 63:3
**Beckel** 105:2
**began** 18:15 39:22 41:14
**Beginning** 5:17 15:25 34:15
36:16
**begins** 3:17,19 64:19 162:16
**behalf** 45:17
**BELFAST** 1:8
**believe** 4:12 18:18 21:6 29:17
30:11 36:7 57:19 59:1,22 78:9
101:20 103:3 105:3 106:12
108:2 119:5 129:5 163:5
166:13 167:14
**believed** 20:23 21:3 29:7,8
**belly** 116:15
**beneath** 116:20
**benefit** 76:14
**Benjamin** 20:6 167:10
**better** 28:3,6 120:12
**beyond** 134:10 135:2 139:10
156:15 168:13
**big** 56:12 92:7 132:17
**bill** 47:8
**billing** 47:10
**binding** 121:9,21 125:22 127:10
146:24 149:7
**bindings** 78:22 106:23 121:9,12
121:13 138:23 146:25 147:2
149:8 150:5
**biological** 55:1
**biology** 39:11
**bit** 37:2 84:14 119:13 132:15
**black** 31:17
**blade** 74:13 164:13
**blank** 11:10 29:23 30:1 64:6
**bleeding** 59:14
**blemishes** 142:6
**blindfolded** 106:22
**blood** 42:22 43:1,3,4 66:13
**blunt** 92:13,14
**board** 41:22 43:14
**body** 37:13 38:3 39:1 42:12,16
42:21,22,23 43:5,11,25 44:17
54:13,14,16 55:10,15,16,19,24
62:24 69:2 71:2 83:6 89:17
106:14 107:16 129:19 132:18
159:8,11 162:12,18 163:24
164:7,11
**bodyguards** 21:13,15,20

**body's** 164:5
**boot** 139:1
**boots** 107:2
**born** 19:6
**bottom** 9:15 28:15 30:5 55:9
65:20 134:3
**bottoms** 134:2
**bound** 59:3 78:21 127:3 146:25
150:6
**boundaries** 48:23
**branch** 42:20
**branches** 42:10
**bread** 167:13 168:17
**break** 48:5 94:9 103:3 119:13
164:15
**breathe** 63:16
**breathing** 59:25 63:21
**bridge** 113:1,4,7
**bridges** 162:12
**brief** 48:5 49:19
**briefly** 110:15 126:2 163:1,5
**bring** 5:11 49:21 73:23 79:12
83:11 88:19 91:3 93:16,25
102:11 110:19 111:4 112:20
113:21 117:18 118:23 119:15
121:25 126:15 127:21 128:9
128:18 130:3,20 131:3 132:1
141:15 142:13 143:5,21
145:12 148:13 150:8,25
155:13 159:13 160:1,21
161:12,19 163:2
**broad** 119:13
**broke** 5:23 6:20
**brought** 26:21 38:19,23 102:24
**Bruce** 2:18 36:13,14,20
**building** 10:15,16
**bump** 114:19
**buried** 37:14
**burn** 83:5,8 84:18 88:4 118:10
122:17 123:25 124:1,16,21,24
127:2 148:11 154:1 155:2,6
159:9
**burned** 59:7 79:22 82:23 84:2
87:24 107:6,16 115:9 134:6
135:5,8 138:18,20 139:4 143:2
148:1 154:4,21 156:9 157:6,25
**burning** 84:7 125:10 135:11
159:5
**burns** 81:22 83:6 85:6,6,19
159:6,11 160:19
**business** 23:19
**butt** 138:16
**button** 116:16
**B-a-e-c-h-t-l-e** 105:1
**B-r-u-c-e** 36:20
**B/MIN** 63:2
**B/P** 66:12

---

**C**

**C** 171:1,1
**cabinet** 167:8
**cage** 123:10
**calf** 64:18 131:7,11,12,13,17
132:8,9 133:1,10
**call** 35:1
**called** 16:23 35:3 46:20 106:19
**calling** 48:22
**calloused** 159:7
**calls** 36:12
**Calvin** 39:12
**camouflage** 6:16 31:14
**cancer** 42:13
**candle** 83:9 125:5 134:7 135:11
**cap** 32:16
**capable** 28:10 49:3
**capacity** 38:18
**captives** 60:8

**captors** 60:9
**card** 16:16,19
**cardiology** 42:4
**career** 38:22 46:10
**Caridad** 2:3,16,20,22 4:2,5,25
5:8 8:9 13:16 16:1,11,14 17:14
17:17 29:16,20 30:10,13 32:10
32:11,18,21 34:11 46:25 47:18
47:25 48:11,19 49:4 69:8
90:22 94:17,19 96:3,10,15
98:3 100:1 101:17,21 102:10
109:22 134:10 135:18 139:10
139:13 141:2 152:15 156:15
157:2,19,24 165:20 166:13,16
167:2,15 168:1,2,4,15,19
169:9,13,25 170:7,9,13
**Caroline** 1:18 105:5
caroline.miller@usdoj.gov 1:21
**carried** 18:22 147:1 150:7
**carry** 16:17
**case** 1:3 10:10 13:13 16:17
25:15 48:2 64:21 94:13 164:22
165:6 167:3 169:11,19
**cases** 38:7 54:17
**causation** 43:10
**cause** 38:1,3,6 43:12 51:12
54:17 67:16 92:10 131:14
148:6 164:2
**caused** 37:12 38:24 79:24 85:8
113:10 125:23 131:17
**causing** 60:16,16
**cavities** 42:23
**cavity** 125:3 132:17
**Cayman** 41:21
**CE** 6:5 11:13 12:5 16:12,16
17:14 30:11,21,23 32:12,15
34:16 35:1
**CECILIA** 1:13
**cell** 42:15,18
**center** 38:16 62:3 77:25 78:8
144:2
**centimeter** 77:10,12,13 128:25
129:1 153:25
**centimeters** 81:10 112:15
**certain** 24:23 26:10 69:21,24
133:3
**certainly** 26:19 92:12,17 125:22
127:16 152:7,14 157:22 166:3
**Certificate** 2:23
**certification** 41:22
**certifications** 41:17 43:18
**certified** 43:14,15
**certify** 171:2
**chance** 28:19
**change** 119:11 125:24
**character** 104:2 126:9
**characters** 47:22
**charge** 37:13 40:12 106:21
**charged** 37:4 38:10
**Charles** 1:8,9,9 6:12 7:8 8:21,22
8:24,24 9:1 31:9 106:20
138:14 139:1 169:10
**cheek** 141:23,23,24 142:5
**chemistry** 43:9
**chest** 106:24 114:4 115:18
121:10 138:18 144:1,10,18
146:13
**chevrons** 3:25
**chief** 37:22 38:15 39:4 40:4
**chin** 142:19
**choose** 36:2
**chose** 93:1
**chosen** 169:18
**Chris** 23:9
**CHRISTOPHER** 1:22
christopher.graveline@usdoj...
1:24
**Chuckie** 1:8 6:14,17 7:9 9:6,7

11:24 12:3,12 13:25 30:19
32:13 59:3 106:20 138:14
**cigarette** 107:6,6 115:8 118:10
122:16 123:24 124:1,16,21,24
124:25 127:2 154:1,4 155:2
160:18
**cigarettes** 138:18
**circle** 8:17 12:11 73:10 77:14,17
77:25 78:8 79:21 80:11,23
82:8,18 84:21 85:5,20 86:14
88:1 89:12 90:1 111:12 114:21
115:3 118:8,18,18 119:12
122:14,25 123:17,22 125:18
144:5 146:16 153:16
**circled** 13:3,23 83:1 86:2 92:7
114:23 122:15 123:16 128:3,4
128:16 131:12 144:11,20,25
153:18,22 154:3,6 155:24,25
159:24 161:8,9,17
**circles** 85:21 153:20
**circling** 82:7 85:22,24
**Circuit** 37:23
**circular** 87:18 114:18 118:9
123:21 124:14,18,19 125:12
128:24 129:2 153:24 154:22
160:7
**circumstances** 4:14 37:11 40:13
**CITATION** 3:12
**clarify** 52:22
**class** 99:14 102:16 164:17
**classes** 44:22
**classic** 50:12,15 162:11
**classical** 50:5
**clean** 59:9 76:4 129:25 162:20
**clean-up** 165:7
**clear** 65:15 67:17 78:14 118:22
119:18,22 120:6,17 123:20
130:2 133:16 152:6 168:11
**cleared** 82:17
**clearer** 78:10 120:3
**clearly** 37:16 120:3 152:4,8
**client** 17:18 21:9,23 28:19
**Clinic** 39:24 40:1,3
**clinical** 39:24 41:22,25 42:20
43:7 45:12
**close** 123:15 126:21 162:18
164:6,7 170:6
**closed** 127:15 129:16 149:4
**closely** 89:16 147:23
**closer** 75:20 89:5 111:20 117:9
161:18
**close-up** 147:20 150:15 161:24
**closing** 149:20 166:8
**collect** 42:23
**collected** 42:23
**collection** 54:2
**college** 39:10,12
**Colonel** 165:10
**color** 7:4
**coloration** 125:24
**column** 62:16,25 64:5 65:1 66:5
**come** 47:6 51:14 57:21 92:14
**comes** 28:8 50:20,21,21,22
51:19 53:21 83:7
**coming** 20:12 61:23 69:13 98:15
135:15
**command** 106:19 138:13
**comments** 9:24
**Commission** 37:25 43:24 44:4
**Commissioner** 37:24
**committed** 20:20,22
**common** 42:16 52:25
**compare** 26:16 48:12 49:15
101:22
**comparison** 48:17 49:6,12
**compiled** 24:24
**complained** 64:18
**complains** 63:9,10

**complaints** 59:24
**complete** 25:19 41:11 108:16
**completed** 39:18,23 40:22
**completely** 51:25
**Complied** 6:6 7:16 8:14 9:20
   11:15 12:6 13:1,21 14:1 15:12
   16:13 17:16 29:19 30:12 32:20
   34:18 70:10,20 72:13,16 73:2
   73:12,19 74:4,7,23 75:17
   76:19 77:2,16,21 78:4,13
   79:13 80:3,18 81:5,25 82:10
   82:20 83:12 84:10,23 85:1,15
   86:10 87:12 88:2,20 89:3,22
   91:5,12,19 92:19 93:6,17 94:2
   103:1 109:4 110:3,13,21 111:6
   111:8,17 112:21 113:22,25
   114:6,24 115:14,23 116:11
   117:4,20 118:6,24 119:2,17,24
   120:8,20 122:1,10,20 123:1,6
   123:12 124:4,12 126:4,16
   127:22 128:10,20 130:4,22
   131:4 132:3,5,23 133:24
   136:11 141:9,17 142:15 143:7
   143:23 144:14 145:14 146:5,8
   146:18 147:5,13 148:15,18
   149:11,13 150:10 151:1,3
   153:4 155:14 156:3 159:15
   160:3,12,22 161:13,21 163:3
   163:11
**concept** 50:13
**concern** 62:4
**concerned** 19:9 99:17
**concerning** 5:23 7:22 14:5 35:9
   70:6 92:9 94:24 97:23 98:8
   99:1 103:9 106:13 112:6
   125:14 140:2 144:24 165:9
**concerns** 96:10
**conclude** 78:24 135:10 162:23
   169:15
**concluded** 18:19,20 129:12
**conclusion** 52:8 70:6 76:5 83:4
   85:8 86:1 87:23 90:2,6 97:21
   103:9,12,20 112:5,8 116:4
   124:17 125:14,17 126:6 127:5
   144:24 145:2,6 146:21 148:5
   150:1,4 160:16 162:7,10
**conclusions** 82:25 92:9 98:25
   106:13 129:10 138:8 151:23
   154:24 155:5 156:11 159:4
**concurrent** 38:17
**concurrently** 40:5
**condition** 64:17 90:20
**conditions** 139:19,22
**conduct** 22:7,8,8 26:25 28:8
   67:21 137:23 140:8
**conducted** 22:12 26:3 56:19
   58:25
**conference** 3:15,17,19,23
   104:21
**configuration** 55:3 145:7 157:11
**confirm** 159:6,11 165:12
**connected** 10:9 144:21
**connection** 43:22 62:6 105:13
   105:22
**consist** 96:25
**consistency** 50:10 51:9
**consistent** 51:22,24 57:2 72:7,9
   76:11,13 81:22 84:6,18,22
   85:12,19 86:22 87:1,6,24 88:3
   90:7,10 92:12,17 103:13 104:3
   112:9 121:11,15,21 124:20,20
   124:23 125:22,25 126:10
   127:9,13,17 129:14 135:11
   145:3 148:10 149:6 150:5
   155:2,6 157:11 160:18 162:24
   163:17 164:12,13
**consists** 97:6
**conspicuous** 149:1

**constitute** 95:12
**Constitution** 168:5,18 169:4,5
   169:17,18,22
**consult** 165:8
**consultation** 94:24 95:2 96:19
**consulted** 165:11
**contact** 42:8 83:7 92:14 125:2
   127:19
**contain** 24:7 100:4
**contained** 5:2 59:18
**containing** 139:2
**contains** 157:9
**content** 168:10
**contents** 2:12 62:12 167:20
**continue** 39:13 40:18 94:9 102:9
**continued** 21:9
**continues** 169:3
**continuing** 45:22
**contracted** 132:20
**controversial** 46:3
**cont'd** 5:16
**convention** 15:17
**CONVENTIONS** 3:21
**copied** 100:11
**copies** 95:15,24 97:25 101:6
**copy** 6:23 7:2,3,4,4,6,19 11:17
   13:5,8 29:23 62:9 166:13,14
   166:15
**coroner** 40:5,7,9,10,18
**corpses** 139:3
**correct** 6:9 15:1 16:7,9,10,23
   17:7,10,11 18:1,2,4,7,20 19:5
   19:24 20:4,16 21:5,18 22:3,24
   23:24 25:2,4,8,23 29:4,11 30:9
   30:20,25 31:6,8,18 32:5 34:21
   34:24,25 43:16,17 69:23 70:7
   89:1 93:3,4 94:6,25 95:5 98:10
   98:13,22,23 100:3 101:3,5
   103:5,6 105:18 129:7,8 133:8
   160:10,10 163:7,15
**corrections** 28:20
**correctly** 9:23
**correlate** 51:10 53:12 142:12
   143:1
**correlated** 55:5 56:24
**correlates** 145:17
**correlation** 56:25 161:15
**correspond** 123:18
**corresponds** 37:23
**corroborate** 166:9
**corroborates** 170:5
**Couch** 23:12 24:19,22
**Couch's** 24:1
**counsel** 3:22 4:15,16 57:17
   61:17 101:19 102:4,5 137:17
   137:18 157:4,6 168:3,10
**counted** 73:6
**country** 105:19 140:5 168:25
   169:6
**county** 36:23,24 37:3,5,16 38:14
   40:5,6,6,11,23 44:5 47:7,8,11
**couple** 23:18 31:2 42:10 90:17
   90:25
**course** 24:17 33:6,8 44:25 45:14
   55:11 92:25 105:17 106:11
   107:20 138:6
**courses** 45:4
**court** 1:1 2:8 3:18,20,23 4:1,3
   5:4,11,14,18 8:10,13 13:17
   14:10 18:4 34:13 36:9,11,19
   46:5,8,12,15,21 47:1,19 48:1,5
   48:8 49:8,19,21,23 50:1 61:14
   61:21,23 68:5 69:9,13 70:1,19
   76:14 90:23 94:10,15 95:22
   96:8,14 98:5 99:4,7,12,19
   101:18,22,25 108:20,23 111:3
   108:20 109:5,23 110:4 134:12
   135:2,6,17,19 136:1,4 139:14

   141:3,8 151:17 152:17 156:19
   156:22 157:3,18,21 158:2
   159:1 164:16,24 165:1,3,8,15
   165:17,18 166:1,15,24 167:25
   168:1,3,14,19 169:12,21 170:1
   170:8,10 171:6
**courthouse** 96:1
**courtroom** 1:25 5:13 48:4 49:22
   94:14 102:12 164:23
**Court's** 72:10 165:22
**cover** 140:11
**covered** 59:19 107:3 124:8
   126:1 139:25 149:17
**covering** 127:4
**covers** 157:21
**co-conspirator** 169:10
**crater** 125:3,7
**create** 21:5
**created** 28:21 29:6 55:17 125:3
**credibility** 152:14,16
**cremated** 37:14
**criminal** 37:6 53:22
**criss-crossing** 149:2
**Crist** 43:23
**critical** 52:17 53:25
**cross** 4:17 15:24
**cross-check** 102:9
**cross-examination** 2:16 35:8,19
   35:22 49:10
**crushing** 72:4
**CSI** 47:16 48:9 49:16
**current** 39:2 45:20,25 46:2 64:17
**currently** 40:25 46:4
**curriculum** 44:23
**cut** 59:4 79:8 108:8 112:18
   121:13 127:17 129:25 138:16
   138:17 144:10 145:3 147:1
   162:6,20,24 167:16
**cutting** 90:8 103:23 127:11
   138:24 163:20
**C/O** 63:9

**D**

**daily** 61:1 66:20
**damage** 39:1 76:8 125:24 132:15
**damaged** 79:5,6
**dark** 114:20 120:3
**darker** 77:8 119:10,20
**data** 54:7 96:12,23 97:9,15
   108:17
**data-gathering** 53:14
**date** 12:13 14:22 15:3,6,14 57:8
   62:16,19,22 66:3 104:9 136:14
   171:5
**dated** 8:1,6 13:4 62:3
**day** 7:20 10:16,18 15:9 16:19
   19:6 22:12 59:15 66:25 67:2
   99:18 100:25 168:16
**days** 63:23 66:21 67:3 90:17,25
   138:23 147:2 149:8 150:7
**deal** 170:5
**death** 35:6,7,8,8,10,11 38:2,6
   40:10 43:9,13 51:13,13,14
**deaths** 37:15 40:10,13,14
**deceased** 38:10 51:3,4
**deceived** 38:10
**decide** 16:17
**decided** 17:9
**decision** 18:25 21:4 22:6 28:13
**decisions** 27:11
**decline** 17:4
**decomposing** 139:3
**deeper** 163:23
**defendant** 1:11 2:1 17:6 19:11
   20:9,21 21:8 23:19 24:3,21,25
   30:4 35:20,25 36:1 165:10
**Defender's** 2:3

**defense** 4:22 49:10 61:16 99:20
   101:19 102:4,5 157:4,6,13
   165:8,11,12,23 166:2,13 168:3
**defense's** 167:23
**defining** 52:18
**deformities** 56:7
**deformity** 51:17,21 55:3,14
   79:10 152:4
**degree** 39:10,11,16
**degrees** 62:23
**delivered** 100:5
**Demons** 6:17
**demonstrate** 76:22 116:19
   126:21
**demonstrates** 146:14
**dental** 44:15
**department** 1:22 37:20,21 38:9
   38:22 39:8 40:24 41:4 44:8,9
   44:21,23 45:12,13,17 62:2
   95:7,16,19 96:12,23 97:15
   101:1 137:11
**dependent** 50:18
**depending** 87:3 90:16 125:1
**depict** 69:1 70:23 80:20 128:24
   136:22
**depicted** 90:15 141:20 149:23
   149:25 150:18
**depicts** 71:10 79:15
**depressed** 111:13 112:17
   114:18 125:10 131:11,13
   132:17,20 153:24
**depth** 90:16 163:21
**Deputy** 40:5,7,9,18
**dermis** 76:9,15 83:8 103:25
   125:2
**describe** 58:23 81:9 88:7 92:2
   107:10,17 133:11 138:25
   139:22 152:21
**described** 26:13,24 56:13 59:6,7
   59:8,18 60:14 67:25 71:24
   73:15 82:23 85:6 86:23 87:7
   87:18 90:8,11 91:23,25 103:14
   104:4 105:13 107:3 108:7
   113:17,18 115:8 116:23,24
   117:13,15 121:9,23 122:7,13
   122:16 123:16,24 124:16
   126:11 127:10 130:14,16
   132:14 138:13,15,23 139:24
   142:10,12,24 143:2,17 149:7
   150:6,19 151:25 152:9 155:7
   157:12 162:25
**describes** 59:14 76:12 79:23
   81:23 106:22 148:1 155:3
   163:20
**describing** 92:17
**description** 3:3 103:15 104:3
   125:25 146:24
**descriptions** 3:16 87:1
**designates** 64:20
**Despite** 17:8
**destroy** 125:2,3
**destroys** 125:1
**destruction** 125:8
**detail** 21:9 121:15
**details** 52:19
**detect** 116:17 161:3
**detected** 82:18
**detention** 167:11
**determination** 113:15 130:17
**determine** 38:2,24 40:8 116:7
   131:14,23 142:8,22 145:23
   147:22 150:17,22
**determined** 58:24 146:20
**determining** 43:12
**Detroit** 39:15,20
**developed** 64:17
**developments** 45:20
**device** 103:22

**diagnosis** 42:13 66:6
**dialogue** 52:14
**diameter** 76:10
**diamond** 23:19
**die** 43:10 51:13
**died** 38:7 40:15
**dies** 37:8
**different** 15:3,17 24:20 31:4
    42:10,21,23 49:7 50:16 52:3,4
    73:23 77:24 80:25 81:2 99:1
    102:22 104:5 123:23 125:4
    159:7 163:19,24 164:8,9
    169:23
**differently** 28:25 164:1,10,11
**difficult** 22:20,21,22
**difficulty** 63:16,21
**dime** 47:12
**dimension** 128:25 153:25
**dimensions** 71:15 120:25
**Dire** 2:20,21,22 94:18 98:6 99:25
**direct** 2:15,19 5:16 36:15 42:8
    57:5 118:12
**directing** 62:15 66:2 104:7,11
    124:14 131:9 136:13 144:2
    154:5,8
**directly** 98:21 153:22
**director** 37:20 40:24
**disability** 52:20
**disagreement** 20:1,11
**disagreements** 19:23
**discipline** 44:2
**disclosed** 158:1
**discuss** 48:2 94:13
**discussed** 23:16 46:4 83:16
    118:9 122:23 123:2 124:19
    155:23 159:23
**discussing** 23:19 92:5
**discussions** 106:11 107:21
    111:23
**disease** 38:5 42:6,7,11,18,21,24
    43:6
**diseases** 42:25 43:2
**dismissal** 167:8
**dissected** 37:14
**distal** 151:15,17,20
**distance** 77:10
**distinct** 78:8
**distress** 65:16
**distributed** 80:24
**distribution** 79:2 92:12 104:2
**District** 1:1,1,14 37:22
**divided** 42:10
**divides** 66:4
**diving** 44:18
**DIVISION** 1:2
**doctor** 39:21 40:2 41:24 44:20
    45:7 47:21 48:5 49:2 52:6,11
    52:22 54:21 55:20 56:3,19
    57:5,12 58:8 60:18 61:16,24
    67:10 68:7 69:1,13 70:12
    72:18 73:13 74:9,25 75:8 77:4
    80:20 81:7,24 82:5,8 84:12
    85:3,18 86:1 89:15,24 90:14
    91:2,14 92:6,21,25 94:20,22
    98:8,20,24 100:2 101:19,21
    103:3,19 104:5 108:22 109:8
    109:15 110:6,15,23 111:10,19
    112:23 118:11 119:4 120:1
    124:14 128:22 130:24 132:25
    160:24 161:23 164:24
**Doctorate** 39:14
**doctors** 61:9
**doctor's** 48:8
**document** 12:16,18 13:8 17:25
    51:7 54:2,4 56:4,9 58:8 62:4
    65:2 66:3,7,15 67:8,10,13,15
    67:18,24 88:13 91:22 93:1
    97:17,18 98:9,19 108:4,12

152:24 165:13
**documentation** 56:6
**documented** 51:19 53:18 58:17
    108:7 137:1
**documenting** 52:17 93:22
    140:14
**documents** 4:25 95:21 98:8
    100:4 165:16
**doing** 49:3 120:22
**dollars** 47:8
**doubt** 89:19
**Doxycycline** 67:2,4,5
**dozen** 46:20
**Dr** 4:6,7,9,13,21 5:2,4 36:13
    37:19 38:7 39:16 40:17 41:9
    41:16 43:15,21 44:6 45:16
    46:5,23 47:3,14 48:20,21,21
    48:22 49:25 55:6 58:17,22
    60:2,12,23 62:13 63:19 66:2
    67:4,21 70:22 71:17 73:4,21
    75:19,23 76:14,21 77:14,23
    78:16 79:1,15 80:5 81:17
    86:12,18,25 87:14 88:1,7,23
    89:11 90:3,18 91:7 93:8,19
    94:4,15 96:11,16 99:7,11
    102:6,22 105:1,10,19 106:11
    106:16 107:12,17,25 108:10
    111:22 112:14 113:15 114:2
    114:17,23 115:4,16 116:1,13
    116:21 117:6,11,22 118:7
    120:10,22 121:3 122:3,12,22
    123:14,20 124:6 125:13 126:6
    126:18,23 127:24 128:12
    129:5 130:6,13 131:6,14,21
    132:10 133:9 134:1,5 135:5,7
    135:9 136:6,13 137:3,16,19
    138:10 139:16 140:6,17
    141:11,19 142:3,18,22 143:9
    143:15,25 144:16 145:6,16
    146:10 147:7,15 148:20
    149:15,23 150:12,17 151:6,14
    152:2,19 153:6,12,23 154:6,22
    155:9,16 156:5 157:5,14 159:3
    159:17 160:5,15 161:9,15
    162:1,21 163:5,13
**drafted** 24:11 58:12
**drafting** 71:13
**draw** 73:10
**drawing** 154:13
**dressed** 6:11 31:11,13,17 32:1
**drew** 89:13 118:8
**drink** 59:16 107:4 139:3
**dripped** 59:6 81:23 148:11
**dripping** 85:22 87:19
**drips** 83:6
**drops** 85:23
**Dulleh** 4:5,8,17 5:1 94:22 95:2
    97:24 100:6,8,15,17,23,24
    101:9
**duplicate** 13:9,10,11
**duplicative** 70:3
**duties** 37:15,18 38:15,17 41:14
    44:3,4 45:10
**DVD** 168:20
**d-e-r-m-i-s** 76:15
**D-i-s-t-a-l** 151:19
**D.C** 1:23 45:1,3

**E**

**E** 171:1,1
**earlier** 19:5 26:24 67:25 71:14
    125:4 165:25
**easier** 75:3
**easy** 52:13
**edge** 129:3,24
**edges** 129:22 149:21
**education** 39:13 40:18 44:9,11

44:12,14 45:23
**educational** 39:9 44:22 46:2
**effort** 52:8 53:8
**either** 18:18 28:20 49:14 51:16
    59:23 69:2 72:3 85:22 98:15
    166:20
**elbow** 76:23,24 77:5,6,9 78:18
    118:16,17,17,19,20,21 119:6,6
    119:19,21 120:2,4,13,15
    121:18 138:23 146:13,15,17
**elbows** 59:4 78:22,25 103:17
    106:22 118:13 121:10 138:21
    148:22 149:1 150:6
**elicit** 135:9
**eliminates** 167:23
**elliptical** 112:16 161:10
**Email** 1:20 2:5,10 171:8
**emails** 165:9
**embodies** 17:3
**Emmanuel** 1:9 16:4 18:6,8 19:24
    27:25 29:8,10,14
**employment** 41:2,3,13
**EMSSU** 20:2,8,12,16
**ended** 24:6
**ends** 162:16
**enforcement** 44:15 50:22 53:22
    53:23
**English** 74:17
**enlarge** 72:25 114:23
**enlarged** 73:4,9 115:1,11
**enlargement** 73:18
**entire** 100:21
**entirely** 25:9
**entitled** 95:18
**entrance** 133:2,4,5,7
**eraser** 73:8 76:10
**escape** 107:9 139:8,17
**escaped** 59:23
**establish** 35:16
**ethics** 44:2
**evaluate** 38:11 51:16
**evaluated** 38:18 42:14
**evaluating** 52:6 97:8 100:24
    108:16
**evaluation** 38:5,23 100:8,17
**evening** 18:17 164:17
**event** 50:20 105:12
**events** 5:23 19:4,6,19 50:15
    147:24 166:9 169:3
**evidence** 3:2 6:5 8:8,11 11:13
    13:15,18 38:25 50:9,9,10 51:8
    54:16,20,22 55:14 61:17 69:10
    88:15 95:5 96:11,22 109:24
    141:4 163:18 166:19,20
**exact** 9:11 97:9,18
**exactly** 17:21 23:17,21 26:8,25
    107:16
**exam** 56:21 65:6,8
**examination** 2:15,17,19,20,21
    2:22 5:16 15:24 34:14 36:15
    58:12,13 62:7 66:6 67:21,24
    68:24 69:18 88:10 92:25 94:18
    98:6,21 99:25 100:5 104:19
    105:14 106:17 107:11 108:4
    108:11 109:13,17 112:4 116:4
    129:9 138:7 140:8,11,14,19,22
    150:20 152:24
**examinations** 38:1,2
**examine** 4:17 5:4,4 54:13,13
    55:6 56:5 81:24 104:17 107:23
    107:25 109:2 136:8 152:19
    157:16
**examined** 4:8 55:8,10 70:14
    94:25 96:16 97:7 101:1 104:8
    104:13,15 108:1 135:5 136:24
    137:6
**examiner** 36:23,25 37:3,21,22
    37:23,25 38:14,15,16,18 39:4

39:7 40:24 41:4,14 43:24 44:1
    44:4,25 45:4
**examiners** 56:17
**Examiner's** 44:5
**examining** 37:25 94:22 100:22
    102:1
**example** 4:16 42:12,14 46:1
    167:7
**examples** 38:12
**exception** 127:1
**exclusive** 22:25
**excuse** 8:22 43:14 72:24 74:11
    108:9 113:6 130:7 154:23
**excused** 48:7
**exhibit** 3:4,5,7 7:14 8:11 12:22
    13:12,18 30:21 61:17,19,23
    62:1 68:8 69:6 70:9 71:7 72:1
    72:15 76:25 77:20 78:11 79:11
    79:12 80:6,17 83:2,11 84:8,25
    86:8,19 87:10,11 88:19,22
    89:2,21 90:15 91:11,18 92:6
    92:21 93:5,8,25 108:24 110:2
    110:20 111:7,15 112:12,20
    113:23 114:2,5,11 115:12,21
    118:4,11,19 119:1,16,23 120:7
    122:8 123:5,11 124:2,11 128:9
    130:3,21 131:3,17 132:4,7,22
    133:22 134:1 141:7 143:6,22
    144:13,16,25 145:13,16,17,19
    146:7 147:4,17,20,23 148:14
    149:10,10,15 153:16 155:13
    156:1 159:14,17,22 160:1,1,9
    160:11,17,21,24 161:1,12,16,16
    161:17,20,23,24 163:10 165:7
    165:14 168:11
**exhibits** 2:25 3:1,6,9,10 68:10,13
    68:16 69:10,17 70:17,22 72:12
    76:6,18 81:4,7 85:14 86:9
    88:19 93:16,19 102:23 103:4
    103:10 108:23 109:2,7,8,20,24
    110:12 111:5 113:21 116:9,22
    117:2,12,23 118:23 120:18
    121:3,25 122:19 126:3,15
    127:21 128:19 132:2 136:7,9
    136:12,19,20 140:17,25 141:4
    141:6,15,20 142:14,17 146:4
    147:12,23 148:20 149:24,25
    150:9,13,25 151:6 153:3,6
    160:5 162:2,8 163:2,6 165:7
    166:2
**exit** 133:4,5,7
**expands** 113:12
**expect** 72:5 90:13
**experience** 44:7
**experienced** 146:25
**experiment** 50:14
**expert** 46:6,11,14,18,23 48:13
    48:25
**expertise** 48:14,17 51:2
**experts** 49:16 53:7
**explain** 8:16 9:3 37:2 41:24 42:2
    47:6,21 48:22 49:25 56:4
    58:17 71:7 72:18 93:19 103:19
    110:15 112:23 117:7,11 119:4
    123:21 124:22 126:18 128:4
    128:22 130:6 133:9 134:7
    137:25 141:19,25 142:17
    144:16 147:19 148:20,23
    150:12 153:6 159:17 163:16
**explained** 30:5
**explaining** 49:1 55:23
**expressed** 42:21
**EXT** 65:18
**extends** 77:17
**extension** 84:16
**extensive** 60:21
**extent** 4:9,9,13 42:13
**externally** 55:10

extremely 53:15
extremities 65:18 67:19
eyebrow 112:25 113:8,11,12,13
  113:14,16
eyelid 113:9
eyes 12:2
eyewitnesses 50:21 53:20

**F**

F 5:8 62:3 171:1
face 30:25 110:17 114:4 115:19
  141:22
faced 50:13
facility 45:23
fact 17:8 27:14 45:3 56:14 62:9
  79:3 152:11,13 164:11
factor 152:12
factual 48:23,24
faculty 44:24
Fahrenheit 62:23
failed 49:10
fair 33:12 49:8,18 101:12
fairly 52:13 67:6 69:1 72:4
  109:16 129:25 140:21 149:1
fall 45:1
familiar 29:12 30:6 42:17 47:16
  50:6 52:10 61:2,4,6 65:9,10
  170:3
far 64:5 65:1 75:12 120:25
  168:13
farther 167:17
fashion 79:9 126:11
fat 125:3
fatalities 44:19
father 19:24 20:15
father's 21:4
Fax 1:20 2:5,10 171:7
features 55:24 121:21
February 5:23 15:20,21 30:17
  34:21
Federal 2:3 46:12,14,18,20 58:4
  98:17,18 104:25 106:5
feet 55:9 60:13,16,17 91:10,14
  91:15 134:2,3,7 135:5,8,11
  138:19 140:12 156:6,8,9,12
  157:7,25 159:5,7,7,9,12
fellowship 40:23 41:1,5,6,10,11
  44:12 46:1
felt 71:18 78:17 115:4 121:10
  144:6
field 43:22 45:18 46:6,11,14,23
  50:1 52:25 53:7,21
file 4:5 62:10 95:7,10,12,14,16
  95:17,18,19,23,24,25 96:6
  97:3,25 99:11 100:2,7,7,11,12
  100:12,13,21,25 101:6,10,10
  101:12 102:2
fill 99:18 129:21 132:18
fills 149:21
final 24:6,15 25:3 101:4,5
finally 51:10,21
find 52:11 85:18 87:1 88:15
fine 87:6 90:12
finger 89:12 114:20 120:5
  151:15,20,21,23 153:17
fingers 126:22
finish 99:23
finished 108:9,16
first 8:20 10:5,8 11:23 15:8
  16:25 17:24 19:11 52:10,17,21
  52:23 53:4 57:16 62:17 63:18
  66:17,21 71:1 88:22 92:1
  104:23 137:5,7,9 147:15
  153:20
five 66:21 74:15 96:8
FL 1:19 2:4,9 171:7
Flagler 2:4

flat 112:16 123:17 124:7 125:18
  126:9,21 129:1
flesh 138:24 147:1 149:19
Florida 1:1,6 37:4,24 40:16
  41:15,19 43:25 44:1,19
fluid 159:10
fluids 42:22,22 44:17
focus 32:18 46:2 71:2
Fogelberg 10:20 12:19
folder 100:2
folks 49:12,13 168:22 170:5
follow 105:12 135:1 136:1
  137:19 157:1 159:1
followed 64:3 65:25 137:20
following 39:21,23 40:17 65:12
  65:13 64:14,16,16,19,23,24
  107:23 139:16 166:19
follows 65:7,19
food 139:4 143:3
foot 92:14,15,22,22 93:9,10,12
football 91:24
footballs 60:16
force 16:8 17:20 21:5
forced 59:16 60:14 107:4 139:3
  139:4
forces 21:4 44:24 45:1,2,4
forearm 81:8,21,23 82:19 83:18
  84:14 87:19 114:9
forearms 79:17
foregoing 171:2
forehead 107:8
forensic 38:4 39:5,6 40:23 41:23
  41:25 43:8 45:12,25 46:4,6,6
  46:24,24 50:1,3,3,4,7,15 52:3
  53:3,21
forgot 63:22
form 16:11 17:13,18 38:20 51:21
  52:8 53:8,13 65:20 72:6 76:5
  82:25 84:19 85:9 86:18 90:2
  92:9 103:12 112:5,17 125:14
  126:6 127:5 129:10 144:24
  145:2,10
formed 103:8 107:18 124:17
  129:13
forming 54:9 56:22
forms 50:12 72:2 164:7
formulate 22:21
formulating 97:11
forth 42:5 99:22
forward 120:7 124:2
foul 59:19 107:4 139:2
found 75:24 83:24 84:22 106:17
  111:23 121:5 126:24 153:14
  154:17 163:16
four 33:1 39:23 66:16 138:23
  147:2 149:8 150:7
fourth 43:5
frame 35:24
free 47:6
freely 157:16
frequently 45:9 46:12,21
fresh 51:16 54:19
Friday 99:13 102:16
front 5:9 59:11 76:23 77:5,6
  78:18 96:19 110:17 111:2
  117:24 118:12,16,17,20 119:5
  119:20 122:5 145:18,19
  146:15,16 148:22 151:11,12
  153:8 155:17 169:23
function 45:23
functional 55:4
functions 44:9
further 9:3 15:22 34:12 36:8
  52:18 54:8 62:25 99:3 121:14
  123:22
future 50:15

**G**

gap 162:13,18
gape 164:3,9
gaping 129:20 164:5
gather 50:7 51:2 52:11,15 96:8
gathered 56:23
gathers 50:12
Gbatala 166:8 169:12
general 114:23
genital 152:19,22
genitalia 88:11,16,25 89:6 153:9
  153:9
genitals 88:8
gentleman 8:20
gentlemen 48:2 94:11 102:14
  164:18
gesture 31:10
gestures 31:7
getting 47:3
give 11:1 12:8 27:16 33:8 38:12
  48:14 67:11 85:16 119:6
  127:25 166:11
given 9:25 10:3 14:3,4 28:19
  45:10 51:17 67:5 96:25 97:14
  101:2 134:11 135:18 156:16
  157:19 167:15
gives 78:14
giving 19:4
glans 154:14
go 8:22 25:14,24 26:21 33:18 49:15
  52:11 76:25 89:21 91:11 99:15
  102:23 109:6 111:1,7 119:22
  132:4,21 149:9 164:19 168:24
  169:8
goes 28:3 43:12 59:16 113:12
  138:25 167:16
going 10:21,24 11:2 16:20 19:1
  19:9 22:7 37:13 48:11,16,20
  49:11 84:14 106:24 113:23
  114:22 115:21 121:10 144:12
  157:24 166:19
good 4:1,2 5:19,19 16:2,3 37:7
  65:10 94:21 99:4 164:14,21
  165:1 170:11
Gordian 167:16
gotten 165:23
government 1:17 3:4,5,6,7,9,10
  4:8,22 5:8 7:14 8:7,11 12:22
  13:14,18 68:10 69:10 99:15,22
  108:24 109:24 144:4 165:8
  166:24 167:3 168:13,21
  169:11,15,20 170:1
Government's 5:15 36:11,14
  61:17 68:8 69:6 70:9 102:6
  108:23 109:20 110:1 136:7
  140:25 141:7 166:5,20
Governor 43:23
Governor's 44:3
graduate 44:12,13
Grand 39:12
grate 107:3,5 123:19 124:8
  126:1,12 127:4
Graveline 1:22 102:1,3
Graveline's 96:6
great 92:1 170:5
greatest 128:25 153:25
Greg 8:5
ground 33:2,22
group 20:10 30:9
grouping 86:4
guaranties 169:5
guess 17:24 25:25 26:23 167:2
  169:22
gunshot 131:19,21,22,23 132:10
  132:12,14,18 133:10,21
guy 8:21
G/C 65:9,11

hair 12:2 111:3,13,21
hand 31:10 59:7,9 79:21,23 80:5
  80:7,9,10,22 81:1 83:17,21
  84:5 85:4,4,9 86:13 87:3,8
  114:10 115:20 126:20 127:1,6
  127:11,17,18 165:14 167:25
  168:14
handed 61:16 68:7 108:22 136:6
hands 79:16 107:5 117:25 122:6
  127:13 151:7,9,14
handwriting 61:6,9 62:17
happen 27:24 28:20
happened 19:14,19 24:2 51:23
  52:11,14,16 67:14 132:16
  133:20 152:6
happening 74:9
hard 7:2,3
Harri 10:19
hash 75:6
head 9:7 32:18,19 55:8,9 108:1
  138:16,25 140:12 154:15
headed 20:6,8,10
headline 167:12
heal 90:15,16,24,25 112:11
healed 51:17 103:13 115:8
  118:10 121:19 122:16 124:20
  124:23 129:14 131:22 145:3
  157:12 160:18 162:12
healing 51:16 86:22 148:11
heals 51:20
health 37:7,12
healthy 40:14,15
hear 53:24
heard 24:8,11 138:11
hearing 13:12
hearsay 139:13 166:3
Heartland 95:15
heat 159:8
heavily 159:7
Heck-Miller 1:18 2:14,17 5:19,21
  6:3,7 7:17 8:7,12,15 9:18,21
  11:12,16 12:4,7,24 13:14,19
  13:22 14:9,11 15:11,13,22
  32:8 34:16,19 36:8 165:5,16
  165:19 166:12 167:15 168:8
held 139:5
Hello 94:20
help 52:19 54:16,20
helpful 53:15 69:25 155:9
hematology 43:1
Hi 94:21
high 161:18
higher 26:9 27:11 73:22 75:2
  142:2
highlight 72:23
highlighted 166:17
hip 153:8,10
historical 50:8,11,18,20 51:18
  53:14 54:3,4,7 55:5,23 56:20
  57:3,4 67:14 72:9 98:18
  100:16 133:15 152:5
history 52:12,12 64:10,12 66:5
hitting 92:14
hold 41:17 43:18
hole 107:2,4
Homeland 57:20 96:12,23 97:16
homicide 37:9 51:14
Honor 4:2,12 5:19 14:9 15:22
  32:8 34:12 36:8,12 46:22
  47:25 48:18 49:18 61:12,13
  68:3 69:5 70:8,16 72:10 90:22
  94:7 96:2 98:4 99:3,10 101:20
  102:1,3 108:18 109:19 134:10
  136:2 139:12 140:24 141:2
  152:15 156:17,21 157:5,13
  164:14 165:5 166:16 168:8

170:7,12,13
**horizontal** 33:4,5 71:11 77:6
79:2 103:23 116:20 119:8,20
120:3 144:5 149:1
**horrible** 169:8,9
**horrific** 133:14,21
**Hospital** 38:17 39:19
**hot** 59:6 79:22 83:7,8 84:7
107:13,14 124:25 125:4,6,11
139:4 143:3 148:2,2 154:21
155:6 156:9 157:7
**hours** 18:10,11
**HPI** 64:10
**human** 20:18,20,21 21:1 35:20
35:21,24 36:3,5 38:3,5,5 42:6
42:11,21 44:17,17 51:3,4 52:7
**hundreds** 46:7,10,10
**Hyma** 2:18 3:6,7,9,10 4:6,7,9,21
5:2,4 36:13,14,20 37:19 38:7
39:16 40:17 41:9,16 43:15,21
44:6 45:16 46:5,23 47:3,14
48:20,21,22 49:25 55:6 58:17
58:22 60:2,12,23 62:13 63:19
66:2 67:4,21 68:8,9,10 69:7,10
69:17 70:9,17,22,22 71:7,17
72:12,15 73:4,21 75:19,23
76:6,14,18,21,25 77:14,20,23
78:11,16 79:1,12,12,15 80:5,6
80:17 81:4,17 83:2,10,11 84:8
84:24,25 85:14,14 86:8,9,12
86:18,19,25 87:10,11,14 88:1
88:7,19,19,23,23 89:2,11,21
90:3,18 91:3,7,8,11,18 92:6,18
93:5,8,15,16,19 94:1,4,15
96:16 99:7,11 102:6,22,23
103:10 105:1,10,19 106:11,16
107:12,17,25 108:10,23,24
109:21,24 110:2,12,20 111:5,7
111:11,15,22 112:14,20
113:15,21 114:2,2,5,11,17,23
115:4,12,16,21 116:1,9,13,21
116:22 117:3,6,6,11,12,18,22
117:23 118:7,11,23 119:1,16
119:23 120:7,10,18,22 121:3,3
121:25 122:3,9,12,19,22
123:11,14,20 124:3,6,10
125:13,13 126:3,6,15,18,23
127:21,24,25 128:9,12,19
129:5 130:3,6,13,21 131:3,6
131:14,18,21 132:2,4,7,10,22
133:9,22 134:1,5 135:5,7,9
136:6,7,8,13 137:3,16,19
138:10 139:16 140:6,17,18,18
141:4,11,15,19 142:3,4,14,18
142:22 143:6,6,9,15,22,25
144:13,16,25 145:6,13,16,16
145:17,19 146:4,7,10 147:3,7
147:12,15,17,23 148:6,7,14,20
148:20 149:10,10,15,15,23,23
149:25 150:9,12,17,25 151:6
151:14 152:2,19 153:3,6,12,23
154:6,22 155:9,13,16 156:1,5
157:14 159:3,14,17,17,22
160:1,1,5,15,21,24 161:9,12
161:15,16,20 162:1,2,21 163:2
163:5,10,13
**Hyma's** 4:13 48:21 96:11 157:5
**hypothesis** 50:13
**hypothetical** 134:6
**H-y-m-a** 36:21

**I**

**identification** 3:2,24 7:12,14
12:21,22 14:3 68:8,10 108:23
108:24 136:7
**identified** 6:16 7:8,9 8:20,21 9:5
9:23 12:12 13:24 31:9 59:2

166:17
**identify** 3:22 29:10,14 30:18
32:6,12 54:17,18 69:25 74:25
153:11
**identifying** 10:1 155:9
**III** 1:10
**illness** 64:10,12
**image** 7:4 13:6 31:16
**images** 168:20
**imaging** 53:16 55:11
**immediate** 32:4 167:10
**important** 55:23,23,25
**impression** 65:24
**imprisoned** 59:17 64:15 107:2
**inch** 112:16
**inches** 74:17
**incident** 59:15 86:6 92:2 98:14
116:6 130:14,16 131:20
133:17 143:4 146:2 152:9
**incidents** 82:13,14 86:2,6 92:4
93:13,24 113:16,18 116:22,24
117:13,15 131:24 133:18
142:12,24 143:1,16 150:19
**incised** 90:7 162:24
**include** 4:16 42:24 105:16 163:8
**included** 38:21 40:12 43:7 53:18
55:16 56:6
**includes** 42:15
**including** 38:20 58:12 130:9
133:13 157:7
**inconsistency** 50:18
**inconsistent** 51:25 57:3 72:7
165:21
**increased** 125:20
**independent** 53:20 98:14
**independently** 67:13
**index** 2:25 3:12,15 151:15
**indicate** 73:10 74:2 89:24 90:20
106:16 118:5 139:19 154:12
**indicated** 3:24 12:2 20:21 86:5
123:24 124:7 128:6 129:5
**indicates** 76:7 79:4 86:16 121:15
149:3
**indicating** 119:13 121:18 129:24
145:8 161:7 167:21
**indication** 63:20
**individual** 7:7,9,21 8:20,25 9:5,6
9:11,12 11:23 12:2,11 43:13
52:12,23 53:6,6,10 54:8,15
55:4,7 57:8,10 62:4 70:14
104:15 110:6 136:14,17,24
167:6 141:12
**individuals** 10:1,18 24:12 38:10
38:23 40:14 51:15 52:13 54:12
55:8 98:22 104:9
**individual's** 9:7
**industry-standard** 3:24
**infected** 90:24
**infection** 66:1 67:15,17
**infections** 67:6
**infectious** 42:25
**infer** 147:25
**inflicted** 90:19
**information** 17:23 19:4 22:10
43:12 46:3,3 50:8,19,20,25
51:2,6,10,18,18 52:2,15,18,19
53:5,7,13,17,17,25 55:1 56:20
56:23,24 67:11 100:16 133:3
133:15 152:5
**information-gathering** 53:19
**informed** 17:9 147:25
**initial** 137:12
**initially** 24:20 104:23
**injure** 103:21 121:22 125:23
**injured** 43:10 86:24
**injuries** 38:3,8,9,9,11,11,12,21
38:24 50:19 51:5 52:6,9,24
54:13,19,23 75:20 76:6 79:23

82:16,18,22,23 85:25 86:22
88:7,15 103:13 107:10 108:6
124:7 127:3,14 132:9 133:11
142:7,9 150:15,18,21 151:24
151:25 152:3,13,21 153:19
154:10 155:10,11 157:10,12
163:13,18
**injuring** 60:11 71:24
**injury** 38:5,24,25 43:11,11 51:16
51:16,17,17,20,22 52:20 54:13
54:15,17 55:2,13,22,25 56:8
56:10,13 57:2,3 60:16,16
71:25 89:6,11 90:13,14,16,19
90:21,24 91:22,25 92:1,1,6,10
104:3 115:8 118:3 121:11
122:6,12,15,15,16 124:23
125:6,21 127:9 129:14,16,25
134:8 149:16,18,23 152:1,7,8
152:11 162:11,22 163:6,17
**inner** 91:25 150:14,16,18
**innocuous** 167:5
**Inquirer** 169:23
**inside** 55:11 77:18 78:25 111:13
111:21 118:8,12,18 120:15
132:11
**Institute** 45:2,5
**instruct** 12:10
**instruction** 11:1 12:8
**instructions** 66:20
**instrument** 76:12,13 79:5,24
86:16,23 90:8 129:15 145:4
**intend** 135:9
**intention** 149:20 162:14
**intercourse** 59:13
**internship** 39:19,21,23
**interpret** 52:20
**interrogating** 16:8
**interrogation** 21:23
**interrupt** 54:21
**intervention** 164:4
**interview** 18:21 19:1,8 22:7,8,8
22:9,11 23:1,8,14,15 24:2,3,4
24:10,17 25:1,13,18 26:15
27:2 106:1,7 107:23 108:10
137:23,25 138:6 146:19
157:16
**interviewed** 17:4 57:12 105:24
105:25
**interviewing** 24:21 52:23
**interviews** 26:3,4,20 8:9 56:19
**investigate** 37:4 40:8
**investigating** 40:10
**investigation** 43:9
**investigative** 96:12,22 97:15
98:9,25
**investigator** 10:20 12:19
**involve** 38:7 45:24
**involved** 44:11,11,14 45:13
**involves** 38:5 44:21
**IP** 65:24
**iron** 59:19 60:10 107:3 126:12
**irregular** 80:12,22 81:12,15 83:6
83:9 92:11 123:15,17 126:21
127:16 148:9
**Islands** 41:21
**issue** 4:5,6,23 48:19,19 86:6
96:10 102:7,7
**issues** 102:10
**item** 81:18,24 82:4,9
**i.e** 3:25

**J**

**Jackson** 38:16
**jagged** 80:23
**Jan** 4:18
**Jencks** 4:15 5:1,9 102:6
**job** 37:15

**job-related** 37:12
**John** 2:2 39:19 62:3
**john_wylie@fd.org** 2:6
**join** 41:3
**joint** 120:16
**joints** 151:21
**journal** 46:1
**JR** 1:8,9
**judge** 1:14 4:25 96:3 98:3 152:16
156:16 157:2 169:13 170:9
**Judicial** 37:23
**July** 19:21
**June** 104:7,11 109:17 130:14
136:13,24 137:9 138:11
140:19 142:10,24 145:25
**juror** 99:13 102:15,19
**jurors** 164:16
**jury** 5:11,13 6:5 13:20 48:4
49:21,22 94:14 96:9 102:11,12
164:23 166:5 168:22 170:3
**justice** 1:22 53:22
**Jusu** 6:10,22 7:21 8:17 9:3,16,22
9:25 10:18 15:14 29:4,6,10,18
29:21 32:6,12 34:21 35:4
96:10,17,19 97:7 98:8,12,15
98:20 99:1 135:7,9,16,18
136:18 137:4,8,9,17,20,23
138:2,3,6,8,11,12 139:7,16
140:1,3,9,11,19 141:12 142:10
142:24 143:10,11,13,17 144:1
144:6 145:25 146:12,19 147:8
147:24 148:22 150:5,19
152:11,21 154:2,17 155:10
156:7 157:12 162:1
**Jusu's** 135:10 140:21 141:22
144:3 145:9 151:7,14,23,24
152:3,19 153:21 154:9 155:4
155:17 156:12 159:4 162:21

**K**

**KAREN** 1:17
**karen.rochlin@usdoj.gov** 1:20
**keep** 62:9
**keloid** 71:5
**Kennedy** 62:3
**kick** 60:14
**kicked** 107:1
**kicking** 91:23
**kind** 4:20 49:1,6 55:1 71:4 76:13
79:5 90:14 125:5,20,21 167:14
168:9
**kinds** 42:18 50:23 121:11
**knew** 141:12
**knife** 59:4 90:8 138:17 163:22
**knot** 167:16
**know** 4:8 5:1 9:11 11:6 20:25
22:25 26:8,16,16 27:12,12
28:22,24 29:17 31:23 33:14
52:1 63:23,24 68:14 94:8
96:13 99:19,22 109:3 116:25
117:16 136:9 137:16 143:19
156:19,19 166:2,19,23,25
167:2,6 169:17,22 170:4,4
**knowledge** 51:1
**known** 116:15 142:6
**knows** 48:21
**knuckles** 80:24 126:22
**Kpadeh** 33:18,21 34:2 57:11,13
57:16,21,25 58:9,15,18,20,23
58:25 59:1,14 60:3,12,19 62:5
62:7 67:12,14,22 68:19,24
69:2,14,19 70:6 71:17 75:23
76:12 78:16 82:2,11,21 83:23
85:6 86:7 87:21 88:7 89:5
90:11 93:1 103:5,14 105:14
137:20 140:13
**Kpadeh's** 58:6 62:24 72:7 73:1

73:15,22 75:10 77:5 78:25
81:21 82:18 84:5 85:9 88:10
88:15,25 91:9 93:10
k-e-l-o-i-d 71:5

**L**

labeled 97:15
laboratory 42:7,7,25
laceration 92:13
Lack 47:25 48:8
ladies 48:2 94:11 102:14 164:18
large 60:9,15 71:22 91:24
larger 21:5 31:5 75:6 131:12
164:3
largest 75:5
lasted 59:21
late 99:16
law 44:14 46:5 50:22 53:22,23
layer 76:8,9 79:4,6
leads 124:22 145:5
leave 9:1 45:10 99:14 103:22,25
129:20 134:8 135:12 159:9
leaves 48:4 94:14 164:23
leaving 79:9 112:11
led 112:13 129:17
left 6:13 9:15 15:15 19:21 54:14
55:2 56:8 59:9 62:15 63:5 64:5
65:1,24 74:13,16 75:12 76:23
77:6,18,23 78:6 79:22 80:22
86:13 92:22 110:17 112:25
113:6,8,9 115:17,18,18,20,20
117:10 118:17,19,21 119:5,5,6
120:11 121:12,18 123:22
125:9 126:20 127:6,9 130:7,8
130:9 131:9,10,11,17 132:8,9
133:1,14 138:17 141:21,22,24
142:5 146:12,12,12,13,15,16
153:10,19,21 154:7,23 155:24
160:25,25 161:10,18 162:6
left-hand 100:10 101:7
leg 128:13 130:7,8,25 131:9,10
132:16 133:14 138:17 159:20
160:24,25,25
legal 4:24 44:14
legs 67:20 93:21,22,22 131:8
138:18 152:19,21 155:17,19
length 121:1 149:7 163:21
letter 64:22
letters 65:24,25
Let's 5:11 102:11 169:21
level 27:11
levels 44:24
Liberia 8:25 19:9,11 32:1 168:16
168:24
Liberian 106:19 138:13 168:5,18
Liberians 35:11,15
license 41:18,19
licenses 41:16
lie 168:23
Lieutenant 165:10
life 48:12
lighting 73:23 77:24 81:13
120:12
likes 169:2
limit 18:12
line 3:3,3 28:15 62:17 63:4,25
64:6,19 65:12,13,14,14,15,15
65:17,18 66:4,17,20,21,23,24
67:1,2,7 85:21 89:13 90:4,12
111:3,13,21 145:7 154:13
157:15,15 162:16
linear 85:20 89:12 90:4 92:12
116:19 145:7,10 148:10
lines 66:16,19 74:15 87:6 125:19
162:17 163:25 164:2,6,9
lip 142:20
liquid 79:22 83:5,6,7 84:2,7,18

84:19 85:7,12,19,23 87:19,24
87:25 88:4 107:13,14 125:4
138:20 148:2,11 154:21 155:7
156:10 157:8
listed 16:25
listening 25:7
lists 95:5,7 96:22
lit 107:6 134:7 135:11 154:4
155:2
literature 45:25
little 37:2 50:16 73:7 74:15 76:9
77:8,24 78:7,7 84:14 114:20
119:13 120:12 164:10 167:3
living 36:22 38:8,11,13 51:4,15
52:7,13 54:12 55:6,8
located 11:8,9 83:16 163:24
location 121:17 157:11
log 71:22 72:7
logs 32:25
long 21:22 36:24 39:2,5 41:8
63:20 71:22 112:15 125:1
163:23
longer 163:21
long-lasting 135:12
look 6:13 11:5 15:10 25:8 30:25
31:3,4,5,16 33:11 34:7 50:8,9
55:24 68:13 89:16 91:1 163:14
166:11,15 169:5
looked 11:21 29:8,12 30:6
looking 23:22 42:13,15,18 55:11
113:5,7 123:22 131:9 145:16
152:4 153:21 154:23
looks 31:17 32:22,25 33:6 50:12
lost 132:19
lot 45:10 52:15 92:16 132:19
133:13
lower 15:14 115:19 130:25 131:7
142:20
lunch 94:9,10 99:4
Luncheon 99:6
Lungs 65:15

**M**

M 1:8,13
machine 25:23
macro 141:22,23,25 142:2
magnification 73:22 75:2 142:2
maintains 166:2
majority 23:2,8
making 14:3 25:3 28:10 31:7,10
31:20 95:16 100:15
male 59:12
Malone 23:9,10,11,15 24:7,21
Malone's 23:25
man 59:2 157:25
management 167:9
manner 43:13 67:25
March 16:5 19:2,20 28:16
mark 75:6 161:6
marked 3:1 7:7,8,11,14 9:5
12:20,22 68:8,10 74:19 91:8
101:19,21 108:22,24 120:5
136:7 154:16
marking 9:4
marks 7:21 8:16 29:24 69:2
73:13 75:8,12 93:1 103:4,9
116:18 142:3 145:20,24 147:9
148:23 153:11,15 154:10
155:21,23 157:25 158:1
159:21 161:3
Marshal's 57:20
masthead 168:9
material 4:15,20,21,24 102:5,6
167:22
Matt 104:25 105:1
matter 167:24 171:3
Matthew 2:14 5:15 23:12

Mayo 39:24 40:1,3
ma'am 47:5
McARTHUR 1:9
McMullen 165:10
mean 7:3 23:15 41:25 49:5 54:21
55:19 64:24 80:10 100:22
108:8 131:21 142:1 151:20
152:14 169:13
meaning 59:11
meaningless 169:7
means 62:22 63:2,8,9 65:24
66:22 96:13
measure 56:7
measured 108:7
measurement 71:11,12
measurements 56:7 74:17
media 50:23
medical 36:23,24 37:3,21,22,22
37:25,25 38:14,15,18 39:4,7
39:14,16 40:24 41:4,14,18,20
43:12,24,25 44:5 45:4,22
50:9 51:1,2,6,18,19 53:14,15
53:17 54:6 56:17,20 59:11,24
60:19,25 61:2,4,6 62:2,3,6,13
95:14 105:16,19 140:2,6 164:4
medically 145:9
medicine 39:6,19 41:18,19 42:3
42:5,6,9,9 43:2 46:6,24 50:1,3
50:4 53:2,2,3,4,21 55:12
149:20 162:13
MEDINA 2:8 171:5
meet 10:14
meeting 10:9,17 57:7,21 137:10
137:12
memo 24:3,6,6
Memorial 38:17
memorialize 7:1 51:7 54:2 55:17
84:16
memorializing 50:22,24
mention 81:20 135:4,6,7
mentioned 57:1 81:17 85:5
107:12,14 108:2
mentioning 23:20
mentions 167:10
mercury 66:13
merge 20:15 21:4
merging 20:1,12
message 168:16
met 10:13,15 57:16 104:23
136:14 137:9
metal 59:8 71:24
meter 73:11
method 50:6
methods 42:7
metric 71:12 74:19
Miami 1:2,6,19 2:4,9,9 171:6,7
Miami-Dade 36:23,24 37:3,5,16
37:21 38:14 40:22,23 44:5
47:7,8,11
Michigan 39:12,15,20 41:20
microbiology 42:24
middle 32:1 36:20 75:6 111:3,14
113:13 137:8
mid-August 90:20
mid-level 44:12
MIGUEL 2:3
miguel_caridad@fd.org 2:5
military 33:7
Miller 105:5 106:3 137:13
milligrams 66:24 67:2
millimeters 66:13 71:12 73:7
74:15 75:5,7,11,22 77:12,13
80:15 81:9,9 88:6 89:14
million 73:11
mind 80:1
Minnesota 39:25 40:6,9
minus 10:18
minute 63:3 115:21

minutes 48:3 96:8
Miranda 16:11,21,23,24
misheard 123:20
missed 25:6,7,15
missing 97:23
mission 44:8
MMHG 66:12
molten 59:6 79:22 81:22 82:24
84:2,2 85:7,7,12,19,23 87:19
87:24,25 88:4
moment 14:9 34:11 41:24 47:21
61:11 94:8 119:6 132:21 147:3
149:10
Momoh 10:13,14 104:16 163:6
Monday 99:19,20,23 102:16
109:5 164:19,24 165:4 167:1
170:9
money 47:10,12
Monrovia 168:21
month 15:9
months 34:23 41:10 63:17,23
64:4,16,19
moot 4:23 102:7
morning 4:1,2 5:19,20 16:2,3
48:1 104:12 164:19,24 165:4
motives 168:23
mouth 139:4 143:2
move 69:6 73:18 74:5,21 77:19
78:2,11 80:17 84:8 86:9 87:11
92:18 93:5 101:22 104:5
109:20 115:12 120:6 123:5
124:2 140:25 147:3 152:15
moving 62:25 63:4 64:5 65:1
66:4 80:1 89:2 91:18 94:7
102:22 111:15 114:5 123:11
multiple 59:17 65:19 72:21 76:3
93:12 148:2
muscle 132:15,19
mustache 12:1
mysterious 37:10

**N**

NAD 65:16
name 8:1 12:12 13:4 14:14 30:1
36:18,20,20,21 45:14 57:10
71:4 137:1,2,5,6,8,8,8
named 30:19 32:7,13
names 7:10
Naples 6:3,6 7:16 8:5,14 9:18,20
11:12,15 12:6 13:1,21 15:12
16:13 17:16 29:19 30:12 32:20
34:16,18 103:1
Naples's 9:16
narrative 97:5,5
National 169:23
native 77:9 80:13,14 119:10
162:16
natural 51:13
naturally 149:5
nature 9:24 152:1 162:22,22
nearing 165:6
necessarily 25:19 135:12
166:24
necessary 168:13
neck 72:20 115:18 117:9 143:11
144:3 146:13
need 4:3 25:22 99:20 164:16
165:3
needs 166:25
negative 55:16,19,21,24 56:1
never 26:14 27:9 28:12,13 33:7
35:3 98:24 112:18 145:9
162:14,20 167:13 168:17
nevertheless 17:10
new 162:13
news 169:1
newspaper 166:3 167:19 168:9

168:12,15 169:2,9,18
**newspapers** 165:18,19
**nice** 162:15
**night** 64:18
**nonspecific** 123:8 157:11
**North** 2:9 171:6
**nose** 113:1,4,7
**notate** 23:2
**notated** 24:22
**notates** 27:1
**notations** 23:5 24:23
**note** 22:9 69:2 71:14
**notes** 22:13,15,16,17 23:7,10,22
23:23,23,25,25 24:1,12,14,14
24:24 25:3,8,11,18,20,22
26:12 28:5 100:11
**noteworthy** 93:11 115:25 146:10
**notice** 47:25 48:8,18,19,25 49:11
90:22 134:11 135:2,3,18
156:15,18,20 157:2,19
**noticeable** 91:1
**notified** 48:16
**number** 11:24 13:3 30:11 59:21
67:18 69:22 72:1,15 73:8
76:10,25 77:12 95:7 96:22,25
110:20 111:11 114:5 118:20
119:1 124:11 130:21 144:17
147:4 148:14 153:16 155:13
160:1,2,21 165:14
**numbers** 14:19,21,23 15:18
115:12
**N.E** 1:19
**N.W** 1:23

---

**O**

**object** 47:25 59:8,8 87:4 92:13
92:14 99:18 124:25 125:6,10
125:11 127:18
**objection** 8:9 13:16 27:25 32:8
46:25 47:18 48:9 69:8 90:22
101:18 109:22 134:10 139:10
139:13 141:2 152:15 156:15
166:3 168:1,4,21
**objections** 167:23
**objects** 72:8
**observation** 132:25
**observations** 7:1 56:4 88:13
108:4,13 140:15,22
**observe** 53:25 55:18 73:11,14
75:9 77:4 83:20 93:11 108:6
114:14,14 120:10 154:10
**observed** 53:21 55:13,13 69:3
106:14 109:16 114:17 120:14
**obstacle** 33:6,8
**obstetrics** 42:4
**obtain** 113:10 138:7
**obtained** 140:1
**obtaining** 54:7 60:2
**occasion** 60:25
**occasions** 46:17 59:17
**occur** 27:6 137:10
**occurred** 14:25 19:4,13 27:8
35:25 36:6 38:25 40:11,13,14
93:2 146:2
**occurs** 37:5,7,8,9,10
**October** 1:7 59:22 62:3 82:15
86:3 90:21 91:1 93:3
**offer** 41:3,8 45:16 46:23 57:2
**offered** 41:10 44:25 108:17
139:11
**offers** 8:7 13:14 41:1
**office** 1:18 2:3 23:12 44:5 96:7
104:18,21,22 105:6
**officer** 10:20 104:25
**officers** 167:11
**Official** 2:8 171:6
**Okay** 9:1,2 16:15 19:22 24:5

---

31:25 33:10 105:4 164:25
**old** 54:23 131:22
**Olmsted** 40:5,6,11
**once** 22:21 28:23 50:13 56:19,23
165:12
**ones** 28:12 33:2,4,4 101:6,8
153:25
**one's** 52:4
**one-year** 39:18 40:22
**ongoing** 44:22 45:24 46:1
**open** 13:20 106:25 121:11
136:1 149:18,19 159:1
**opinion** 21:1 30:23 48:9,14,25
51:11,21 52:8 53:8,13 54:9
56:22 58:13,19 67:11 70:5
72:6 76:5 83:4 84:4 86:18,21
87:20 90:2 97:12 100:15 101:4
101:9,11,13,14 103:8,12
107:18 112:5,8,14 116:3
124:17,23 125:14,17 126:6
127:5 129:13,18 144:24 145:2
146:21 148:5 150:1,4 157:4,9
162:10
**opinions** 51:12 56:24 57:1,2
82:25 98:25 106:13 129:10
133:11 138:8 154:24 155:5
156:11 159:4
**opportunity** 157:22
**opposed** 56:1 87:7 159:9 163:9
**opposite** 81:1 154:5
**orally** 66:24
**order** 15:17 50:14 103:21,21
162:18
**ordered** 167:10
**orient** 111:2
**orientation** 71:1 83:15 88:23
89:20 91:16 93:21 113:2 118:3
122:6 127:25 128:14 130:25
142:21 155:18 160:13 161:1
164:10
**oriented** 163:25 164:1
**origin** 83:1 90:2 92:10 103:9
148:6 150:1
**original** 13:8,11,12 100:13
**origins** 151:24
**outer** 76:8 79:4 103:24 113:13
116:2 120:13 130:8 131:13
132:8 159:19 160:25
**Outreach** 95:15
**out-of-court** 166:6
**Out-Patient** 62:2
**oval** 149:8 160:7
**overlapping** 149:2
**overlook** 103:7
**Overruled** 47:19 90:23 139:14
157:18
**oversees** 43:25

---

**P**

**p** 63:2 64:21,23
**package** 100:5
**page** 2:13 3:3,3,13,16 66:5 81:18
81:24 100:18 137:2 169:23
**pages** 60:22 97:6 100:14,14,20
100:22
**paid** 47:3
**painful** 63:16,25
**pap** 42:17
**paper** 7:4,6,7,8 8:1 10:24 13:5,8
**papers** 95:12 96:25 97:3 166:22
**parallel** 77:7 89:13 117:9 119:8
119:20 120:4,15
**part** 5:9 13:24 33:6 44:8 45:1,23
46:2 53:14 55:10 66:15 70:5
75:1 79:8 86:4 89:16 91:25
96:4 97:10 100:4,12,16 112:3
113:13 115:18,19 118:12

---

119:12 121:18 129:19,24,25
134:5 137:12 154:7 155:24
159:10 160:25 163:24 164:9
168:6,8
**parted** 50:3
**particular** 43:22 57:8 62:13
71:18 72:18 75:25 79:18 81:18
82:3 85:9 86:5 87:21 90:10,18
92:10 98:9 103:7,20 111:24
112:13 114:15 115:5 116:3
118:1,14 122:4 127:12 129:18
131:15 133:20 145:5,24
146:14 152:1,11 160:16 166:9
**particularly** 44:19 45:25 112:10
121:12 129:4,15
**parties** 99:19
**parts** 51:3 55:16,19 95:25 98:1
100:11 101:14,15,16 107:16
**pathologist** 42:14
**pathologists** 42:17
**pathology** 38:4 39:6,24 40:23
41:4,23,25 42:1,1,2,3,5,11,15
42:20,20 43:7,8 44:25 45:2,5
45:12,25 46:6,24
**patient** 42:8,19 64:15
**patients** 38:19
**pattern** 81:15 83:7 120:4 123:8
123:18 125:10 162:17
**pelvis** 153:9
**pencil** 73:8 76:10
**penis** 59:4,5,13 89:8,9 90:9,13
138:19 153:10,19 154:9,14,15
154:21 155:4
**Pennsylvania** 1:23
**people** 27:7,16,20 29:12 30:25
31:4,4,5,7 33:9 37:17 38:7,8
38:11,13 43:10,10
**performed** 56:20
**period** 19:10,13,18 21:7,9,12
23:13 24:19 36:2,4 40:17
59:21
**periods** 24:22
**permanent** 39:1 52:20,20 54:13
55:2 56:8 79:10 108:6 135:12
159:9
**permission** 72:10
**perpendicular** 164:1
**person** 6:11,12,16 9:8 10:9
13:24 27:22 31:9,11,13,16,17
37:7 51:4,20 56:5 94:25 96:16
98:16 141:11 168:6 169:19
**personal** 57:17
**personally** 108:12
**persons** 29:7
**Peterson** 4:18
**photo** 6:11,12,13 7:19 35:1
115:11 130:24
**photograph** 6:2,8,23 7:2,22,23
8:2,17 9:4,19,23 10:2 13:24
14:6,8 31:11 32:12 34:20
35:11,15 55:16,21,22 56:15
70:12 71:1,6,9 72:19,20,21
73:1,4,18,21,24 74:6,9,10,11
74:11,12,22,25 75:16,19 77:5
77:15,19,23 78:1,2,9,9 79:15
79:16,18 80:2,5,8,20 81:13
83:14,15,17,20 84:13,17,22
85:3 86:14 87:15,17 88:22,23
89:5,11,20,20,24 91:14,16,21
91:22 92:23 94:4 110:6,23
111:10,19,20 112:24,25 113:1
113:3,6,7,8,10 114:8,15,20
115:1 117:9 118:11,14 119:4,7
120:12 122:12,23 123:23
124:15 125:13 128:5,12 130:6
130:11 131:6,7,10 134:2
141:11 142:19,20 143:25
144:3,18,20,22 145:21 146:11

---

146:14 147:7,9 153:22 154:8,9
154:10,24 155:16,18,22 156:5
161:1,4,8,18
**photographed** 55:14,15 108:7
**photographer** 58:1 106:2,8,10
108:3 138:2,4 140:13
**photographers** 56:16,18
**photographic** 55:17
**photographs** 10:25 11:6 53:16
54:3 56:8,9,11,17,21 67:24
68:16,18,18,21 69:1,14,18,21
69:22,24,25 70:3,5 71:2 72:22
76:21,23 79:1 85:16 86:12
88:13 91:7,9 93:21 109:8,10
109:12,15 110:16 115:16
116:14,17,19 117:6,24 118:2
120:22,23,24 121:6 122:3,5,22
126:7,19,21,25 127:24 128:23
128:24 136:20,22 140:17,18
141:21,22,23,25 142:4,19,23
143:9,10,12 147:16,20 148:22
148:24,25 150:14,15 151:14
152:25 153:12 155:8
**photography** 44:15
**photos** 11:5 94:5
**photospread** 11:10,17,20 13:2
29:6,11,14,16 30:3,22,23,24
31:19,20,21,21 32:6,9 34:23
35:2,3,4,6,9,13,17
**photospreads** 29:3
**physical** 29:9,9 38:25 39:1 50:9
50:10 51:8 54:16,19 65:5,8
66:6 67:21 109:12 139:19,22
140:8,19 163:18
**physically** 11:8,9
**physician** 38:16 40:3
**picked** 14:6,7
**picture** 30:9,9,14,16,18 33:14,16
34:2,8
**pictures** 30:25
**piece** 10:24
**pieces** 51:9
**pigment** 77:9 80:13,14
**pigments** 125:20
**pit** 59:18,18,19 123:10,19 124:9
126:1 127:4 139:2,24
**place** 25:13 82:14 104:19 168:24
169:8,10
**placed** 11:17 71:23 118:18,19
139:20,24
**places** 44:20 148:3,12
**plaguing** 169:6
**Plaintiff** 1:5
**planning** 102:14
**plastic** 59:6 81:22 82:24 84:2,18
85:7,19 106:23 107:13,14
121:9 138:20 148:2 157:8
**play** 168:20
**player** 25:24
**please** 5:11,14,18 6:4 8:12,16
9:14 12:5 13:19 14:23 15:10
16:12 29:17 36:18,22 41:16
47:21 48:2 49:23 74:2,22
77:14 78:3 79:12 82:17 94:11
94:13 102:11,13,18 106:16
119:6 124:16 128:4,18,22
129:12 136:8 138:10 146:16
148:17
**Plus** 45:12
**point** 4:6 19:1 21:7 23:17 28:21
33:25 85:24 86:15 101:2 103:3
105:17 107:7 112:2 121:10
128:6 129:15,20 149:4,18
166:19 167:18,18 168:11
170:1
**pointed** 33:21 75:11,21 127:2
129:1
**poison** 37:12

**pole** 32:25 33:22,24,24 34:3,3,5 34:7
**poles** 33:11
**police** 10:16,19 12:19
**policies** 27:12
**policy** 26:5,7,8
**policy-making** 44:2
**port** 167:9
**portion** 19:8 23:14 66:7 67:8 73:4,9 101:19 115:1 116:1 152:24 157:3
**portions** 4:14 94:16 101:20 170:2
**position** 28:4 39:3 40:1 111:2 121:17
**possible** 26:23 27:16 54:22 165:9
**possibly** 152:7
**posts** 33:1,1
**posture** 165:24
**Post-it** 100:10
**poured** 107:15 148:12
**practice** 22:6,11 26:2,7,13,24 27:3 28:7,23 41:18,19 53:1,2 60:25
**practices** 27:13
**practicing** 39:5
**Practitioner** 41:20
**precluding** 4:24
**predict** 50:7,14,17
**prejudicial** 166:18,22 167:14 168:10
**preparation** 43:4
**prepare** 99:21
**prepared** 4:18 23:24 24:14 94:24 167:19
**preparing** 101:9,11,12
**prescribed** 66:17
**presence** 19:14,16 35:15 68:21 108:2 116:18
**present** 10:17 22:9 23:3 24:9,17 24:20,23 25:21 27:1 57:16,17 57:17,20,24 64:10,12 104:23 105:11,25 106:3,5,7,9 137:12 137:13,13,14,17,18 138:1,3 140:14
**presented** 7:5,19 13:12 51:2,7
**presents** 47:24
**preserved** 53:18 125:19
**President** 6:13 8:24 32:1,15 167:9
**pressure** 66:13 170:5
**pretty** 133:13,21
**previous** 10:16 85:5 89:20 126:9 144:22
**previously** 68:7 83:16 118:9 122:13,23 123:2,16 159:23
**primarily** 23:5
**primary** 19:18
**principle** 135:15
**print** 169:2,18
**prior** 13:12 38:14 39:5,7,18 98:21 103:15 165:22
**prison** 37:8
**prisoner** 59:10 139:5
**privilege** 46:19 55:11
**probably** 18:24 23:18 26:8 42:16 46:19 78:9 145:8 169:16,25
**probe** 49:10
**problem** 50:12,13 167:4
**problems** 20:23 21:3
**problem-solving** 50:5
**procedures** 105:12
**proceed** 5:18 47:1 102:18 116:9 117:2 122:18 156:1
**proceedings** 1:13 3:18,20 18:4 135:1 136:1 157:1 159:1 171:3
**process** 22:25 43:9 46:2 56:22

87:2 97:8 100:7,24 121:13
**processes** 43:6
**produced** 24:3 104:1
**production** 4:24 101:17
**productive** 64:18
**products** 43:3,4
**profession** 44:14,15 45:21 48:23 61:7
**professional** 56:16 60:24
**program** 44:13,21,23 47:16
**programs** 45:24 48:14
**progress** 51:19
**projected** 34:20
**projector** 6:1
**prominent** 35:11,15
**prompted** 166:9
**pronounced** 105:3
**proposed** 166:2
**provide** 44:10 99:11 121:14 139:7 155:18 161:1
**provided** 4:15,22 22:10 49:11 51:8 60:18 98:12 101:21 102:3 146:24 157:5
**provides** 53:23 130:25
**public** 2:3 37:11
**publication** 6:4 11:14 169:1 170:3
**publications** 45:15,17
**publicity** 166:8
**publish** 8:12 13:19 45:7 70:9,17 76:17 141:6
**published** 45:11 61:20 110:2
**publishes** 45:12
**publishing** 45:14
**pulled** 103:16
**pulls** 162:18
**pulse** 63:2
**puncture** 76:11,13 87:1,4,7 129:19 163:22
**punctures** 86:23
**puncturing** 87:2
**purpose** 25:10 79:18,20 91:22 118:1 122:4 166:7
**purposes** 7:12 12:21 91:16 102:14 122:24 146:20 166:5
**pursuant** 139:11,12
**put** 6:4 7:10,12 8:17 11:12 15:8 15:11 17:14 18:12 31:21 34:16 35:24 60:9 63:22 81:4 84:24 85:5,13 123:17 125:6,18 139:2 170:5
**putting** 31:20 166:5
**p.m** 94:14 99:6 102:12 108:25 109:25 141:5 164:23
**P/E** 65:5

---
**Q**

**qualified** 46:18
**quality** 56:1
**question** 16:18,21 20:25 22:21 23:1 27:3 48:22 53:6,7 54:20 57:22 94:15 98:1 100:13 105:23 116:6 131:20 144:18 147:15 160:14 168:15
**questioned** 71:17 157:15
**questioning** 18:15
**questions** 15:22 16:9 17:5 18:13 18:23,24 22:19,20 23:3,5 25:7 34:12 35:20 36:8 48:24 52:18
**quickly** 90:14
**quite** 24:16 33:7 48:20 129:24 132:15
**Quotations** 169:21

---
**R**

**R** 171:1
**radiating** 162:17 164:6

**raised** 73:6,23 76:7 77:7,8 80:12 81:14,14 85:21 88:5 145:8,10
**Rape** 38:16
**Rapids** 39:12
**rate** 63:2
**reach** 82:25 83:4 84:4 85:8 87:20 112:5 129:18 148:5 150:1,4 154:24 155:5 156:11 159:4 160:16 162:7,10 165:17
**reached** 70:6 103:19 116:4 130:17 133:11 146:21 151:24
**reaching** 58:19 67:11 97:20 106:13
**reaction** 43:11
**read** 14:22,23 18:8 25:2 28:19 61:9 62:12 63:13 64:11 65:13 65:14,14,15 66:18,19,21 67:7 67:9 97:7,9,20 100:20,22 101:8,10 137:2,7 157:21 158:3
**reading** 17:22 164:21
**ready** 68:14 109:3 117:22 128:22 136:9 141:19 150:12
**real** 48:12 123:8
**really** 49:1 54:18 89:18,18 90:25 133:3 165:24 168:23
**REALTIME** 1:25
**reason** 27:16,19 30:24 84:6
**reasonable** 133:6 169:15
**reasons** 4:24
**rebel** 106:20 138:15
**rebuttal** 167:4
**recall** 5:22 6:10 35:8,19,21 43:18 46:17 57:7,10 59:23 60:1,3,12 60:18 75:23 81:17 82:2 97:9 100:24 104:8,12,19,23 105:7 105:11,19 107:12,15 137:5,15 137:16,18 140:5
**recalling** 19:19
**recapture** 139:20,23
**recaptured** 139:17
**receive** 42:6 41:1
**received** 3:1 4:7 8:11 13:18 39:11,14,16 41:3,8 43:21 60:24 69:10 89:6 95:5,21 96:4 96:11,22 97:4 98:20 100:2,4,7 102:5 109:24 141:4
**receiving** 95:10,18
**recess** 48:1 49:19,20 94:10 99:6 99:18
**recite** 169:3
**recognize** 30:3,5 64:23 68:14,15 70:22 87:14 109:3,7 110:6 136:10,12
**recognized** 6:11,12,16 11:7,25 12:1 136:20
**recollection** 24:1,25
**record** 23:3 25:17 26:18 50:11 53:16,18 54:3,5 55:15,17,24 57:3,4 58:8 62:2,6,9,13 63:22 72:9 98:12 105:20 108:12 112:4
**recorded** 25:22
**recording** 28:8
**records** 51:19 53:15,15 54:6 56:20 60:19,21,23,25 67:14 95:14 96:4,5 105:16 108:10 140:2,6
**recounted** 138:12 145:25
**rectangular** 148:9
**rectum** 59:14
**recuperates** 51:20
**red** 73:13 75:8
**redacted** 165:21,24
**redaction** 165:12
**redactions** 165:9 166:1,4
**redacts** 167:20
**Redirect** 2:17 34:13,14
**refer** 49:5 76:15 82:4,6 103:15

**reference** 20:9 56:12 64:3 71:9 71:10 74:10,14 78:14 81:11 85:16 95:16,24 120:23,24 122:24 144:19,19 161:25 168:5
**referenced** 71:14 82:9
**references** 137:7 157:6,9
**referred** 58:4 71:5 73:5 98:8 132:13
**referring** 63:25 80:6 82:14 126:12
**refers** 65:11,18
**reflect** 58:14 110:16
**reflected** 148:6
**refute** 159:6,11
**regard** 6:23 7:6 10:1 11:2,8,20 165:9
**regarding** 4:7 5:1 19:14,16 21:7 48:8,25 95:2 96:16 159:4 164:21 169:3
**Regardless** 135:7
**Registered** 41:20
**regular** 38:23
**regularly** 44:22
**relate** 143:3
**related** 51:12 52:9 58:15,18 82:12 85:25 86:2 87:21 92:4 92:24 93:2,13,23 113:16 116:24 117:15 118:9 133:12 133:16,19 142:9,23 143:3,16 145:24 146:1 147:24,24 148:1 150:19 152:7,8,9,12,13 153:11 153:14 155:10,11,21 159:21 161:3,6
**relates** 38:6 44:18
**relating** 4:6 38:1 58:19 60:3 105:22 131:24 139:7 150:1 156:13 162:8
**relation** 73:14
**relationship** 147:16
**relayed** 59:1 60:8 82:13 106:18 127:3 128:14
**released** 59:23 139:6
**relevance** 47:18 71:18 133:9
**relevant** 4:14 42:19 58:19,24 60:6 69:25 75:24 78:17 83:24 101:14,15 106:13,17 107:10 107:18 111:24 115:5 116:3,4,6 116:22 117:13,13 121:5 126:24 130:14 138:7,10 142:9 144:7 146:20 151:23 154:3,18 155:21 156:7 162:2
**reliance** 4:13
**relied** 4:9,21 5:2,5,5 25:3 97:11 98:19 100:14,17 101:12
**relies** 48:13,13
**reluctant** 27:17
**rely** 50:20,24 53:8 96:5 97:20 100:18
**remain** 17:1,8,25
**remaining** 82:18 163:17 168:4
**remember** 20:2 21:10 23:14,16 23:17 60:21 94:22 95:10,18 96:17 105:10
**remote** 131:19,21
**removed** 42:12
**repeatedly** 60:10 71:23
**report** 4:10 22:10 23:24 24:3,10 24:11,15,24 25:4,12 27:2 28:5 48:10 58:12,14 81:8,18 82:4,9 86:4 94:16,24 95:2 96:11,19 98:10,25 101:5 108:17 135:8 135:14 137:1,2 157:15,17
**REPORTED** 2:7
**reporter** 2:8 36:19 76:14 151:18 171:6
**Reporter's** 2:23

**reports** 71:13 157:5
**represent** 140:21
**represents** 63:19 66:14 133:2
**request** 21:19 61:19
**requested** 21:16,21 104:17
  168:20
**requests** 11:1
**require** 38:2
**required** 45:22
**residency** 39:17,22,23 40:2,17
**resident** 40:3,4
**resolve** 167:24
**respect** 38:1 48:9 54:22 60:13
  63:18,25 67:12 76:6 78:17,24
  81:17,20 82:3,11,21 83:1 84:4
  86:18 87:20 88:3,22 92:6
  93:10 105:13 108:10 111:24
  114:15 115:5,25 121:3,5
  124:18 125:12 126:7,24 127:6
  129:9 133:10 135:8 137:19,20
  144:7 147:15 149:23,24
  151:22 152:2 154:3,22 155:4
  155:18 156:8,12 160:11,16
  162:21
**Respectfully** 165:21
**respectively** 76:24 98:13
**response** 4:23 105:9
**responsible** 9:12 54:18
**rests** 166:25 167:3
**result** 37:5,9,10 42:24 72:2
  91:23 125:21 140:18 145:10
  148:10 163:22
**resulted** 20:24 21:2,3 129:6
  132:15,17 149:16
**resulting** 72:1 79:6 124:16 138:8
  142:9
**results** 89:10 132:17 164:5
**resume** 3:18,20 48:6 165:4
**RESUMED** 5:15
**resumé** 48:21
**retained** 95:17 100:12
**retracted** 153:10
**return** 10:4 72:14 94:12 99:7
  118:25 122:8 126:2 133:22
  146:6 163:10 164:19
**returns** 5:13 49:22 102:12
**review** 45:17,17,24 60:25 69:14
  97:10 112:4 140:2
**reviewed** 11:21 24:14 54:1,5
  56:19,20,21 62:6 97:8 100:7
  100:21 101:10 108:11 136:19
  140:17
**reviewing** 25:10 54:6 105:16
**reviews** 46:1
**ridge** 125:19
**rifle** 59:9 138:16
**rifles** 76:4
**right** 14:6,8,15 16:6,25 17:1,8,9
  17:12,24,25 18:8 20:24 21:17
  22:13 24:15 25:14,15 27:17,17
  28:17 29:15 31:1,2,12,13,16
  32:3,4,13,18 33:6 59:7 60:10
  60:11 62:21,25 63:10 64:11
  65:7 66:2,4 71:2,3,6,24,25
  74:16,18 75:21 76:24 77:17,25
  78:6,7,8 79:21 80:7,9,10,11
  81:8,21,23 82:19 83:21 84:5
  84:14 85:4,4,9 89:13 93:9,10
  93:12 98:15 99:24 100:9 102:8
  107:5,5,7 109:5 110:17 113:1
  113:3 114:3,4,9,9,10 118:4,16
  118:16,16 119:12,19 120:2
  122:6 124:25 125:6,12 128:3,5
  128:7,13,13 129:4 130:9
  141:21,23,24 142:5 145:18,19
  147:8 150:14,15,16,16,18,18
  151:15 153:8,16,21 154:4,23
  159:19,19 160:7 166:12,18

**Respectfully** (continued)
**rights** 16:22 18:6,8 20:18,20,21
  21:2 35:20,21,24 36:3,5 169:5
**RK** 61:17
**Rochester** 39:25 40:6
**Rochlin** 1:17 2:19,21 4:12 36:12
  36:17 46:22 47:2,20 48:18
  49:18,24 61:11,15,19,22 68:3
  68:6,12 69:5,12 70:8,11,16,21
  72:10,14,17,23 73:3,17,20
  74:5,8,21,24 75:15,18 76:17
  76:20,25 77:3,19,22 78:2,5,11
  79:11,14 80:1,4,16,19 81:3,6
  83:10,13 84:8,11,24 85:2,13
  86:8,11 87:10,13 88:18,21
  89:2,4,21,23 91:3,6,11,13,18
  91:20 92:18,20 93:5,7,15,18
  93:25 94:3,7 96:1,6 98:4,7
  99:3,5,9,10,17 101:20,24
  102:1,21,24 103:2 108:18,21
  109:1,19 110:1,5,11,14,19,22
  111:4,7,9,15,18 112:19,22
  113:20,23 114:1,5,7,22,25
  115:10,15,21,24 116:9,12
  117:2,5,18,21 118:22,25 119:3
  119:15,18,22,25 120:6,9,17,21
  121:24 122:2,8,11,18,21 123:5
  123:11,13 124:2,5,10,13 126:2
  126:5,14,17 127:20,23 128:8
  128:11,18,21 130:2,5,20,23
  131:2,5 132:1,4,6,21,24
  133:22,25 135:4 136:2,5
  139:11,15 140:24 141:6,10,14
  141:18 142:13,16 143:5,8,21
  143:24 144:12,15 145:12,15
  146:3,6,9 147:3,6,11,14
  148:13,16,19 149:5,9,12,14
  150:8,11,24 151:2,4,5 152:18
  153:2,5 155:12,15 156:1,4,17
  156:21 157:5 159:2,13,16,25
  160:4,20,23 161:11,14,19,22
  163:1,4,10,12 164:14 170:12
**rock** 92:15
**rocks** 60:15 91:24
**rock-kicking** 92:2
**rod** 60:10 71:24 76:4
**role** 40:7
**room** 23:6 58:2
**rooms** 104:21
**roughly** 80:15 92:7
**round** 33:11,24 34:5,6
**route** 49:15
**row** 29:12 30:6,6,7
**ROY** 1:8
**Rufus** 57:11 60:2,12,19 62:5,7
  67:12,21 68:18 75:23 103:4
  105:14
**rugby** 60:15 91:24
**rule** 156:20
**ruler** 72:22 74:15,16,17,18,19
  71:5,1,4,6,11,21 77:11,13 129:1
  144:19
**ruling** 165:22
**run** 164:2
**running** 85:22 120:15
**runs** 125:5

**S**

**satisfy** 166:4
**saw** 34:2,7,9 121:20 125:4
**saying** 169:9
**says** 16:25 62:16 63:15,16 64:15
  65:15 66:5 156:20 165:20
  169:12
**scale** 56:9,12 71:9,10 74:10,11
  74:13,14 78:14 81:10 85:16,17
  120:23,24 122:24 161:25

**scalp** 110:25 111:3,12,14,21
  112:3,18 121:20
**scandal** 167:12,13 168:7,17
  169:1,14,15
**scandalous** 169:3
**scandals** 169:6
**scandal-plagued** 168:25
**scanned** 7:19 13:2,5
**scar** 71:3,4,5,8,14,19 72:1,2,5,6
  72:9 77:11,24 78:7,15 79:2,3,3
  79:7,9 82:6,6 83:9 84:16,21
  85:20,20,24 86:2,5 87:18,21
  88:1,4 89:12,15,24 90:3,4,10
  90:12,12 92:11,12 103:25,25
  111:2,13,13,20,24 112:6,9,11
  112:13,15,17 113:12,16,18
  114:8 115:2,5 116:2,3,6,19
  116:20 118:9 119:7,12,19,20
  120:2,3,11,13 121:18 122:23
  122:25 123:2,15,16,21,24
  124:1,14,18,19,19,22 125:10
  125:12,12,15,18,19,20,21
  126:10 128:14,16,24,24 129:1
  129:3,6,9,14,17,21,22 130:11
  130:13,16,17 131:11,13,15
  132:17 133:14,21 135:12
  143:1,3,3 144:5,7,18,20,21,25
  145:3,5,7,10 146:1,14,16
  149:16,17 154:7,13,14 155:24
  159:9 160:7 161:6,10,17,18
  162:2,8,11,15,16,17,18,19,22
  164:4,6
**scared** 149:19
**scarring** 89:17 118:18,20 149:3
**scars** 65:19 67:18 72:21 73:5,6,6
  73:11,15,23,24 74:3 75:2,9,25
  76:7,11 77:7,8,15 78:18,25
  79:21,24 80:10,12,23,25,25
  81:8,12,13,18,20,22 82:3,4,23
  83:1,5,16,20,23 84:5,6,17,21
  85:5,6,9,17,18 86:4,13,19,25
  87:5 92:3,23 93:1,12,23
  103:13,22 104:3 116:18,22
  117:10,10,11 119:8,8 120:15
  121:1,2,5,11,14,17,17 123:7,9
  123:17 124:7 125:9 126:7,21
  126:24 127:1,3,6,9,12,14
  131:15,17 132:12 133:1,13,15
  133:16,19 134:3,9 142:3,5,6,7
  142:8,11 143:13,16,18 145:20
  145:24 147:9,20,22 148:1,4,6
  148:8 149:1,6,6 150:2,5
  153:11,15,24 154:3,16,18,22
  155:2,4,6 157:10 159:21,23
  160:9,13,16,18 161:3
**scheduled** 44:22
**scheduling** 102:16
**science** 39:11 46:4 50:3,4,7,12
  50:15,15,16 52:3
**scientific** 50:5
**scolding** 167:7
**scooped** 125:9
**scope** 134:10 135:2 139:10
  156:15,18 158:2
**scraping** 72:3
**screen** 6:4 7:13 11:13 14:12
  16:16 17:15 29:17 30:10 34:17
  61:20 62:16 64:6 70:9,12,18
  71:6 73:9,13 74:7 75:2,8,13,21
  76:18 80:11 82:17 83:1 85:22
  89:13 102:25 110:2,7 114:21
  118:22 119:18,22 120:6,17
  130:3 141:7,12 142:20
**scroll** 70:17 72:11 75:15 110:12
  120:18 141:15 146:4 147:12
  148:16 153:3
**sea** 37:14
**seat** 40:6

**seated** 5:14 49:23 102:13
**second** 24:19 66:20 76:9
**secondary** 149:20 162:13
**section** 66:5 157:9
**sections** 169:3
**security** 20:4 21:4,9 57:20 96:12
  96:23 97:16 168:6 169:19
**see** 12:25 14:14,19 15:4,14,18
  32:15 47:12 49:12,13 52:11
  53:24 56:11 62:16 63:5,7 64:6
  66:6 70:12 71:10 72:1,5,22
  73:5,24 74:14 75:2,21 77:11
  77:25 80:11,14 81:10,12 86:14
  87:5 88:5 89:10,16,19 92:13
  95:8,17,17,23,24 99:23 111:19
  112:11 115:1 118:4,17 119:7
  119:11,19 120:3,13,24 122:12
  125:19 128:25 129:4 143:9
  145:11 155:21 161:6 162:15
  162:17,19 164:5,6,24
**seeing** 98:2
**seen** 13:5 42:11 49:16 59:24
  61:23 119:9 120:25 135:3
  154:1 168:2
**sees** 38:22 48:12,15 49:6
**select** 69:21 98:1
**selected** 69:24
**semi-professional** 56:18
**sense** 48:13
**sent** 165:10
**separated** 77:10 121:1 149:4,17
  70:14
**September** 57:6 68:22 69:3,14
  70:14
**sequence** 97:9
**series** 74:6 142:4 153:12 155:8
**service** 20:4 44:10
**services** 44:1 47:6
**sets** 165:7
**seven** 37:1,17 39:4
**sewn** 162:12
**sexual** 38:20
**shaft** 89:9 154:14
**shallow** 125:7
**shapes** 148:8
**shared** 52:19
**sharing** 133:17
**sharp** 127:18 129:3,14,24 145:4
  162:11,15
**short** 23:12 24:18 49:20 112:15
**shortage** 167:13 168:17
**shortly** 48:6
**shoulder** 60:4,9,10,11 71:3,23
  71:24,25 72:8 74:13 145:18,20
**shoulders** 74:13
**show** 7:11 9:14 10:21,24 11:2
  12:20 13:23 30:16 47:22 55:25
  70:25 73:21 75:19 81:7 84:17
  96:3 109:16 151:6 155:16
  157:3 166:1,8,20 168:3 169:4
**showed** 6:1 29:3,6,21,23 30:8,14
  103:4
**showing** 88:25 101:18 145:19
**shown** 6:8 28:18 34:21,23 35:11
  61:16 76:6 79:1 103:9 121:5
  147:23 160:16
**shows** 49:16 92:23 110:24 154:8
**side** 53:22 62:15,21 66:2 71:2
  74:16,16,18,18,19 75:12
  100:10 101:7 113:1,3,6 114:3
  114:4,18 115:17,18,19 117:10
  120:11,12 128:13 129:4 130:7
  141:21,21 146:12,13 147:8
  153:8,10 154:5,23,23 159:19
  159:19
**sidebar** 3:15,17,19 135:1 156:21
  157:1
**sides** 79:9 93:22 110:17
**sign** 8:2 12:12,16,18 17:13,18,20

17:22 28:20 30:7
signal 5:9
signalling 34:2
signature 9:15,16,17
signatures 9:14 29:24
signed 4:19 8:1,5,5 13:2,3,8
  14:16 17:23 18:7,9 29:25
significance 152:2
significant 129:22
signing 7:23
silent 17:1,9 18:1
similar 29:8,9 34:10 40:16 94:4
  119:8 120:25 125:10 126:9
  153:25
similarly 15:10
simply 17:4 48:22 53:10 70:5
  107:19 165:20
single 87:18
sir 36:18 61:6 95:4
sit 16:8
situation 16:20
six 10:25
size 32:25 56:10,14 60:15 73:7
  75:3,22 76:9 79:2 80:14 85:17
  88:5,6 91:24 122:24 144:19
  164:10
sizes 31:4 148:8
skin 72:3,4 76:8,9 77:9 79:4,6
  80:13,14 81:14 83:7 84:7 85:5
  87:3,4,5,8 89:17 103:21,24,24
  107:15 115:9 119:10,11,13
  121:13,19,22 125:1,1,5,6,19
  125:20,23,24 129:25 130:1
  142:6 149:3,16,17,21,21 159:8
  162:13,16 163:25
skip 144:13
SL 3:4,5 7:12,14,18 8:7,11 12:21
  12:22,25 13:2,14,18 14:12
  15:10 29:21
slash 64:21,23 75:8
slice 164:13
slicing 163:9,20
slightly 77:7 80:12 85:21 119:10
sloshed 148:11
small 64:21 74:15 142:11
smaller 31:5 73:8 76:9 164:8
smear 42:17
smelling 139:3
sodomized 59:10,11
soles 134:2,6 135:11 138:19
  156:6,8,9,12 157:7 159:5,8
Solo 137:4,8 141:12
somebody 16:21 26:9,21 27:10
  29:7 30:6
somewhat 80:23 92:11 112:16
  123:8,15
son 32:4
sorry 25:14 32:10 54:21 108:8
  111:1 151:2 165:13
sort 32:22 33:6,21 34:3,3 169:4
sought 166:6
sources 50:8 52:5
South 44:19
SOUTHERN 1:1
spanned 77:9
speak 17:10 52:14
speaker 3:24
speaking 19:2
speaks 169:1
Special 8:5 20:4 23:8,11,11
specialty 38:4,4 42:1,3,5,5,9
  44:16,18 53:3
specific 20:25 67:19 81:20
  167:16
specifically 23:17 46:24 89:8
  104:11 135:4,14
specificity 92:16 165:23 168:10
speculate 133:4

spell 36:18 151:17
spelled 9:7 36:21,21 76:15
spine 72:21 73:1
spite 143:2
split 87:5,9 121:11,19
spoke 18:7,9,10 19:6,11 23:20
SSS 20:1,4,12,15
SSU 167:11
St 39:19
stab 79:23 86:17 112:18 128:15
  129:6 163:8,8 164:12
stabbed 59:8 76:3 86:16 107:7,8
  112:2 128:6
staff 37:17 41:4 56:16 59:24
stand 99:8
standard 4:13 53:1,2 56:7 64:25
  67:6 71:10 73:8
standards 4:10
stands 65:5,25
started 16:20 24:20
starters 151:17
starting 66:3 141:7 153:20 170:9
state 37:24,25 39:14 40:9 41:15
  41:18,20 43:24,24 44:1 46:8
  46:21 95:7,16,19
stated 4:22 6:11 12:1 29:12 84:7
  112:2 129:6 152:8,11 156:9
statement 4:18 22:3,5 25:23
  26:1,12,12 28:18,21 44:8 54:7
  71:22 78:21 105:23 139:20
  145:9 159:6 166:6
statements 4:16 26:6 53:6,23,25
  57:13,22,24 58:2,9,13,23 60:2
  60:3,6,12 71:18,21 75:24 76:2
  78:16,17,20 83:23 84:1 102:4
  106:12,16 107:17,20 111:23
  112:1 115:4,7 121:4,8,16
  138:7,11 139:7 140:1 144:6,9
  144:21 146:19,23 154:2,17,20
  156:7,12 157:6 159:5 162:1,5
  162:21
states 1:1,4,14 2:8 15:4,18 17:4
  36:12 46:23 47:9 69:6 109:20
  140:25 144:10 156:17 157:10
  171:6
statute 37:4 38:10 40:16 44:10
  45:22
stay 45:20
stays 125:2
Ste 2:9
step 36:9 52:10,17,21,23 53:4,19
  54:8,12
stepped 23:11,12,15
steps 45:20 52:7 108:12 137:19
sticks 107:1
stitched 112:18 121:19
Stockholm 10:16
stomped 138:25
stop 19:1 99:20 102:15,17
  164:18
stopping 157:23
stories 167:20 168:12
story 167:21
straight 90:4 145:7
Street 1:19 2:4
stretch 89:18
strike 72:24 148:4 152:15
striking 151:13
struck 138:16
structure 32:19,22
studied 42:25
studies 42:6,11,21
study 42:7,9,17 43:1 44:16,17
style 15:3,6
subject 22:11
submit 4:23 165:13 168:12
submits 156:17
Subsequently 107:9

successive 72:22
sudden 37:6
suddenly 37:8 40:15
suggest 167:23
suggesting 27:19
suggestive 31:22,23
suggests 168:10
suicide 37:9 51:15
suicides 40:12
Suite 171:6
Sulaiman 6:10 7:21 8:17 9:3,16
  9:22,25 136:18,23 137:4,8
  141:12
support 168:25
supposed 41:6 157:20
sure 8:19 9:15 15:7 24:16 25:9
  25:12 28:25 29:13 30:11 33:7
  99:20 101:25 103:7
surface 103:24
surgeons 42:13
surgery 39:19 42:4
surrounding 166:8
survivors 50:21
suspensions 42:16,18
suspicious 40:13
sustained 91:23 152:17
sutured 112:10 127:15 145:8
  149:22 162:14,20
sutures 129:16
swampy 139:2
Sweden 10:5,6,8,16 15:7 105:21
  140:7
Swedish 10:19
SWORN 36:14
symbol 63:10 64:1,11 65:8
system 46:9,12,18,20 53:23

---

T

T 62:23 171:1,1
tab 100:18 101:8
tabbed 100:10,14 101:6,16
table 2:12 11:9
tabloid 169:24
take 5:6 9:19 12:4 15:10 41:8,24
  45:20 47:21 48:1,3,5 49:19
  52:8 54:8 56:16 57:22 68:13
  73:17 79:11 83:10 84:24 86:8
  87:10 88:19 93:15 94:10
  105:23 108:12 115:10 169:21
taken 22:16 33:14,16 56:9,21
  59:3 68:21,24 69:14,18,22
  109:12 139:1 143:12
takes 43:8 56:15
talk 16:6 36:2 52:22 53:10
  157:22
talked 20:18,20,21 29:3 165:20
talking 16:4 19:13,20 33:25,25
  169:14,14,15,16
talks 168:16
tangentially 45:14
tape 25:23 26:1 27:10 28:5
tapes 27:4
tape-record 21:22 26:5
tape-recorded 26:14
tape-recorder 26:18,19,20
tape-recording 26:12
tape-recordings 54:4
taught 26:25 28:23,25 44:20
taxpayer 47:8
Taylor 1:8,9,10 6:12,13,14,17
  7:8,9 8:24 11:24 12:3,12 13:25
  31:9 32:15 59:3,11 106:20
  138:14 139:1 167:7,10 169:10
Taylor's 32:19
teach 44:18 45:4
teaching 44:6 45:23,24
techniques 55:12

telephone 3:23 32:25 33:11 34:3
television 47:14,24 48:14
tell 10:21,23 11:4 23:18,21 26:7
  26:13,17 33:2 36:22 39:2,9
  41:16 44:6 45:9 51:15 52:1
  53:12 55:6 57:4,7,12 59:16
  60:24 62:21 63:7,15,19 64:9
  65:7,23 66:14 67:10 76:21
  79:15 80:6,8,20 82:8,21 84:12
  86:25 88:3 91:7 92:21 98:24
  103:8 107:16,19 108:3 109:15
  110:23 111:10,22 112:8 114:2
  116:13,21 117:22 120:22
  121:8 122:3 124:17 125:13
  126:23 127:8,24 129:12,17
  130:13,24 133:1 138:10
  139:16 143:12,15 144:3
  145:16 151:13 152:5 159:3,21
  160:5 161:15
telling 28:7 29:1 60:1 168:22
temperature 62:24 159:10
tender 15:23
tension 163:25 164:2,9
term 32:8 59:12 63:2
terminology 61:2
terms 9:4 44:1 52:19 55:3 65:11
  67:14 120:25
test 50:14
testified 6:10 19:23 20:11,23
  46:5,11,14 103:4 163:5
testify 46:18 48:17,20 69:13
testifying 4:11 5:23 46:19
testimony 35:9 47:3 48:13,25
  68:1 70:1 103:16 135:6,9
  166:10
text 63:10,13 64:11,14,15 65:7
  66:14,16
texture 119:11 121:18
Thank 9:18 12:4 34:12 36:9,10
  39:21 91:2 99:5,12 102:10
  118:7 151:4 170:7,13
Thanks 165:2
theory 50:14 169:7
thicker 87:8,9
thigh 107:7 128:3,5,7 130:9
  153:16,19,21,21 154:4,7
  155:24 160:8 161:10 162:6
  164:9
thin 87:3 89:17,17
thing 27:24 28:3 34:10 97:14,23
  167:14
things 22:21 24:7,7 25:17,18
  47:22 49:2,2,7,12 52:16 58:14
  58:18 127:10 166:18 167:5
think 4:6,11 7:10 16:12 18:24
  22:25 23:18,20 28:4,10 30:8
  48:18 49:8,14 99:14,15 157:21
  157:22 158:2 164:16 165:21
  166:4,18 167:22 169:14 170:1
thinks 165:20
third 65:14
thought 11:23 25:6 30:6 106:24
thousands 38:19
threat 37:11
threatens 167:8
three 18:10,11 19:19 40:4 41:10
  43:15 45:11 66:25 110:15
  117:6 139:5
three-hour 21:22
thrust 170:2
tie 169:7
tied 103:16 106:23 107:5 123:9
  123:19 124:8 126:1,10,12
  127:3 138:21
tight 78:22 106:23 121:10
  138:21
tightly 121:23 146:25 150:6
time 3:22 5:6 6:1 18:12 19:13,18

20:9 21:10,12,14 22:15 23:2,6
23:13 24:19,22 26:20 35:24
43:19 45:11 46:22 47:7,14
48:20 55:2 57:21 59:21 61:10
61:10 63:20,22 64:3 68:3 69:5
70:8,16 72:4,11 75:13 80:16
81:3 85:14 88:18 91:3 94:8
95:22 96:1 102:19 104:13
108:18 109:19 110:1,11
112:19 113:21 121:24 122:18
125:25 127:21 128:9 129:21
131:3 132:18 136:2,6,15 137:5
137:15,16 140:24 141:14
143:15 146:3 149:4,7,18,21
153:2 155:12 159:25 161:11
164:14,18 167:2
timeline 166:10
times 16:17 22:14,16,19 23:1,11
24:16,23 38:2 46:7,8,10,20
51:3 55:21 56:11 63:16,17,18
63:23 64:1 66:25 76:3
tip 151:21,23 163:8,22 164:12
tissue 42:12 125:8 129:21
149:17 162:16
tissues 42:12
title 37:19
titles 37:20
today 4:6,11 47:4 50:23 61:23
68:1 69:13 95:22 99:16 102:15
toe 55:8 92:1,1,7 108:1
told 10:24 11:5 12:11 14:5,7,25
17:3 19:24 20:15 21:16 29:2
33:9,17 58:19 82:12 133:19
157:25 160:15
top 29:12 30:6,7 55:9 60:11,11
64:21 71:3,24,25 74:12,12
91:9 92:22 93:9,10 110:25
111:12 113:9 137:1 142:20
162:15
topic 23:16 102:22 104:6
topics 23:18
Torh 165:19
torture 9:13
tortured 64:16,19
total 1:25 69:21
touch 73:9 138:22
touched 56:3 103:17
touching 74:2 78:22 127:13
touch-screen 8:18
toxicology 44:16
toxin 37:12
toxins 44:17
tract 66:1 67:6,15,17
trained 26:3,10 27:13 29:1
training 16:20 27:9 44:21 51:1
TRANSCRIPT 1:13
transcription 1:25 171:3
transfusion 43:2,3
translate 37:15
travel 45:3
treated 38:18 67:16 132:16
treatment 38:16 42:19 66:6,17
66:17
tremendous 168:23
trial 1:13,22 96:4 166:21
tries 164:7
trip 10:4,5,8
truth 166:6
try 165:17
trying 165:6
Tuesday 99:21 167:1
Turay 10:13,14,15,19,21,23 11:8
11:9,18,20 12:8 13:3,3,23 14:2
14:5 29:4 96:11 97:14,16,21
98:9,13,15,21 99:1 104:16,17
104:20,24 105:13,17,22,23,24
105:25 106:2,7,11,12,17,18
107:12,18,20,23 108:5,11

109:10,13,17 110:10,18
111:22 112:25 113:17 114:3
115:4,17 116:5,23 117:8 121:4
122:16 123:3,24 124:16 126:8
126:23 128:6,14 129:5 130:14
131:24 133:13 135:4,15
137:21 140:13 163:6
Turay's 14:14 105:7,19 110:25
111:12 113:11 114:11 116:1,8
117:12 118:13 121:16 127:6
128:5,13 130:7,25 131:7
133:10 134:3
twice 67:2
two 24:13,17 25:21 26:16 44:9
49:6 57:19,19 60:22 63:23,23
63:23 64:16,19 75:12 86:12
91:15 115:16 117:9 118:1
122:3 127:24 132:9 142:23
151:21 153:20 154:3,22
159:23 160:13 165:7 167:11
169:13 170:2
type 22:2 72:2,4 87:4 92:12
103:22 112:9,10,17 121:22
134:8 162:19
typed 23:24 25:3
types 52:7
typical 72:4 83:5 162:19
T.V 47:16,22 48:12 49:6,13

U

umbilicus 116:15,20
unable 29:10 156:20
uncomfortable 27:21
underlayer 103:24
underlying 79:6 125:3
underneath 14:19
underside 59:5 89:9 90:9,12
understand 17:7 29:25 49:4
62:12
understanding 16:5 52:4
understood 18:6
unexplained 37:6
unfairly 166:18
uniform 6:17 31:14,17
unit 63:22 64:16 106:19 138:13
United 1:1,4,14 2:8 15:4,18 17:4
36:12 46:22 47:9 69:5 109:19
140:24 156:17 171:6
University 39:15
unmarked 166:14
unrelated 82:16 86:6 113:18
130:16,18 131:19,24 132:10
133:10,17,21 142:24 143:16
143:18 145:24 150:19,21
151:25 152:1
unrestricted 157:14
unusual 37:10 40:13
upper 14:14 72:20 114:3 115:17
115:25 116:2 117:8 161:18
urinary 65:25 67:5,15,17
urination 59:25 63:16,25
urine 42:22 59:17
use 35:16 48:17 56:7,8 59:12
96:5 99:20
useful 58:19 67:11
UTI 65:25
U.S 1:18,22 57:19 95:7,15,18
96:23 97:15 105:5

V

various 42:6,11 43:6 44:23
45:13 50:8 123:9 148:8,12
157:7,10
Varmuzan 4:17 94:22
Vattsjö 10:19
verification 157:3
verifies 67:13

verify 54:17 55:17 56:13
version 13:2 25:19 167:19
versus 28:5,5
vertical 71:11 74:12 75:12
117:10
vice-versa 23:4
victims 169:8
video 28:5
videos 50:23 54:3
videotape 21:25 28:3,16
video-recorded 26:14
view 102:6 114:11
violence 37:6
violent 40:10
visible 89:15 114:12 118:15,21
visual 56:4 88:10 108:4 140:14
140:22
visually 55:13 163:18
Voir 2:20,21,22 94:18 98:6 99:25
voluntarily 17:23
vs 1:7

W

wait 135:16,17
waiver 17:13,18 18:7
walk 52:7
want 8:17 14:22 16:17 27:15,16
27:23 28:12 94:15 96:14
166:24 167:18 168:24 169:8
wanted 20:15 170:4
war 23:20,21
warning 16:25 18:3
warnings 16:23,24
Washington 1:23 45:1,3
wasn't 132:16 135:18
watch 47:14
water 59:18,18,19 107:4 123:10
123:19 124:8 126:1 127:4
139:3,4
water-filled 107:2 139:24
wax 83:9 125:5 148:2
way 14:7 18:25 19:14 25:3 26:10
26:25 27:13,14 28:23,24 29:1
29:1 31:24 40:19 48:23 49:1
50:22 53:12 54:9 56:9 63:4
66:4 81:1 105:10 113:16
145:17 164:2
Wayne 39:14
ways 50:24
wear 6:18
wearing 6:17 32:15
webcams 50:23
Wednesday 99:22
week 90:17,25 169:2,22
weekend 164:21 165:1 170:11
weeks 59:21 63:23 139:1
went 19:11 33:18 152:14
weren't 22:15 28:25 29:23
West 2:4 15:7
we'll 9:1 48:2,5 49:19 51:15
94:12 99:23 109:6 135:19
164:18,18,19,24 167:2
we're 27:13 44:13 46:20 49:11
51:6,21 56:17 97:23 157:23
165:6,6,24 170:9
we've 120:25 124:19 153:25
white 6:11 8:21 31:11 32:2,15
wire 59:20 107:3 123:10,19
124:8 126:1 127:4,10,13
wish 165:24
witness 4:17,18 5:12,15 6:4
15:23 36:10,11,14 48:7 50:19
50:19 53:23 61:13 68:4 99:8
108:19 136:3 164:25 165:2
166:10
witnesses 99:21 168:23
women 31:2,3

wondered 27:9
wooden 32:19,22 60:9
word 64:20,25 65:10
words 9:12 55:21 81:15 82:12
106:24 149:18 162:14
word-for-word 25:20
work 45:13
working 106:8
wouldn't 23:21 25:22 133:3
wound 90:7,7 112:9,10 129:20
131:19,21,22,23 132:14,18,25
133:2,7,7,10,21 162:24 163:8
163:20,21,21,22,23 164:2,5,12
wounds 79:24 87:2 128:15
132:10,13
wrist 107:5,6 114:12,15,19,19
118:4 122:6 123:3,7,9 126:7
127:1 150:16,18
write 22:2,10,22,23 24:10 27:2
writing 15:3,6 62:21 63:5,7 64:7
64:9 65:2,17,20 66:9,11
written 14:14 15:14 25:20 28:5
28:18 29:25 53:16 62:23 97:5
97:5
wrong 14:6,8
wrote 7:10 9:6 24:7,8
WYLIE 2:2

X

X 7:10
X-rays 53:16

Y

year 15:8 33:14 37:15 39:23 40:4
41:5,6 46:10 57:6 104:7
years 19:9,19 27:14 37:1 38:17
39:4,7 40:4 54:23
year-long 41:11
Yeaten 20:6 167:10
yellow 100:10
yesterday 5:22 6:20 20:11 21:8

0

06-20758-CR-ALTONAGA 1:3
07 15:8
07/05/11 14:24
08 35:1

1

1 68:8 69:7,17 70:9 77:10,11,13
95:7
1-40 3:6 68:10 69:10
1:45 94:12,13
1:48 102:12
1:58 108:25
10 38:17 48:3 67:3 77:12,13 97:6
10/17/08 5:17 15:25 34:15
10/25/99 66:3
10:00 15:25 18:17,18,18 136:14
136:25
10:28 34:15
10:31 36:16
10:50 48:4
10:51 48:7
10:53 49:20
100 66:12,13 67:2 143:6
101 143:22 145:17
102 145:13,16,19
104 144:13,17,25
105 146:4,7 149:25
107 147:23
108 3:7
109 3:9 146:4 149:25
11 3:6,6 37:22
11th 10:9,17 14:25 37:23
11,000 37:15
11:05 49:22

**11:30** 104:12
**11:42** 68:11
**11:43** 69:10
**110** 147:4,17,21 148:6
**111** 147:12,23
**117** 147:12,24 148:7
**118** 148:14,16,20 149:24
**12** 3:4,5 16:12,16 72:12 76:6
**12-2** 2:9 171:6
**12:23** 94:14
**12:30** 94:12
**12:32** 99:6
**121** 149:12,15,16 150:25
**122** 149:10
**123** 149:10
**124** 148:17,21 149:24
**125** 150:9,13,14
**127** 150:9,13,14
**128** 150:25 151:2,6
**13** 3:5 76:18 77:1 102:23 103:10
**131** 151:2,6
**132** 153:3,6,8 155:8
**133** 153:8,16
**134** 153:9
**135** 3:17 153:3,7,10 155:9
**136** 3:18 155:13
**137** 156:2
**138** 159:14,18,19,22 160:9,17
**139** 160:21,24 161:16,17 162:2,8
**14** 39:7 77:20
**140** 160:1,6,11,17
**141** 3:10 161:12,16,24 162:3,8
**142** 161:20,23 162:3,8 163:10
**143** 136:8,12 140:18 141:1 160:2
  160:6,7,17
**15** 2:16 3:4
**150** 2:4
**157** 3:19
**159** 3:20
**16** 76:18 78:12 79:12 102:23
  103:10
**17** 1:7 79:12
**171** 2:23
**18** 80:6
**19** 3:5 80:17
**1978** 39:12
**1982** 39:15
**1988** 44:13
**1992** 19:12,14
**1996** 23:20
**1999** 59:2,22 62:3 82:15 86:3
  90:19,20,21 93:3,14 106:18
  138:12 146:2 152:10

**2**

**2** 63:16,17,18,23 64:1 70:17,22
  73:8 76:10 81:18,24 88:6
  112:15
**2:02** 109:24
**2:57** 141:4
**20** 73:6 81:4
**2000** 20:18 21:7 36:4,6
**2003** 19:5,9,14,21 21:7 36:4
**2006** 16:5 19:2,20 28:16
**2007** 10:5,9,17 14:25 29:22
  104:8,11 109:17 130:15
  136:13,24 137:9 138:11
  140:19 142:10,25 145:25
**2008** 1:7 5:24 15:20,21 30:17
  34:21 57:6 68:22 69:3,15
  70:14
**202.514.3270** 1:23
**20530** 1:23
**21** 46:10 81:4 83:2,10
**22** 83:11
**23** 3:5 59:2 84:9,24
**24** 3:7,9 84:25 85:14

**25** 62:3
**26** 85:14 86:8
**26th** 90:21
**27** 86:9
**28** 61:18 86:9,19 87:10
**28th** 5:24 15:20,21
**29** 87:11 88:19 137:9
**29th** 104:7,11 109:17 130:15
  136:13,24 138:11 140:19
  142:10,25 145:25

**3**

**3** 3:4 7:12,14,18 8:7,11 11:24
  13:3 15:10 75:6 77:12 81:9,10
  88:6 96:22,25
**3/8ths** 112:16
**3:00** 99:20 102:17,20 109:6
  164:20
**3:30** 99:14,18 102:15 157:23
**3:35** 164:23
**30** 88:19,23 89:21
**30th** 16:5 28:16
**305.523.5518** 2:9 171:7
**305.523.5519** 2:10 171:7
**305.536.4675** 1:20
**305.961.9234** 1:19
**305/530-7120** 2:5
**305/536-6900** 2:4
**31** 88:19 89:2
**32** 91:4,8,11
**33** 91:18 92:6
**33128** 2:9 171:7
**33130** 2:4
**33132** 1:19
**34** 2:17 92:18
**35** 91:4,8 93:5,15
**36** 2:18,19 12:25 93:16,19 94:5
**39** 93:16,20 94:5

**4**

**4** 3:10 77:12
**4th** 1:19
**40** 68:9,15,16,18 69:7,17 94:1
**400** 2:9 171:6
**406** 37:4
**41** 3:7 108:23,24 109:7,21 110:2
**41-88** 3:9 109:24
**42** 110:12
**44** 110:12
**45** 110:20
**46** 111:5,7,11
**47** 111:5,15 112:12
**48** 112:20
**49** 113:21,23 114:2

**5**

**5** 2:14,15 73:7,11 74:14 75:5,7
  75:11,22 80:15 81:9,10
**50** 113:21 114:5,11
**51** 115:12,22
**52** 115:13,19
**53** 116:9,22
**54** 116:10,22
**55** 117:3,6,12
**56** 117:9
**57** 117:3,6,12
**58** 117:18,23 118:4,11
**59** 117:19,23 118:17,20

**6**

**6** 3:5 12:21,22 13:2,14,18 14:12
  17:14 80:15
**6th** 23:20
**60** 118:23 119:1 121:3
**600** 66:24
**61** 118:23 119:16
**62** 118:23 119:23

**63** 118:23 120:7 121:3
**64** 120:19 121:4
**68** 3:6 120:19 121:4
**69** 3:6 121:25 122:9

**7**

**7** 3:4 70:18,22 71:7 72:1 89:14
**7:00** 18:15,16
**70** 66:12,13 121:25
**703** 139:12
**71** 122:19,23
**72** 123:5 126:3
**73** 123:11 124:11 125:13
**74** 122:19 124:3 126:3
**75** 126:15
**76** 126:15
**77** 127:21,25
**78** 63:2,2 127:21,25
**79** 128:9 163:2

**8**

**8** 3:4 6:5 29:21 30:11,21,23
  32:12,15 34:16 72:12,15 76:6
  132:2,2
**80** 128:19
**803(4** 139:12
**803(4)** 139:10
**83** 128:19 163:2
**84** 130:3
**85** 130:21
**86** 131:3,18 132:22
**87** 132:2,4,7
**88** 3:8 108:23,24 109:7,21
  133:23
**89** 136:7,12 140:18,25 141:7
**89-143** 3:10 141:4

**9**

**9** 11:13 12:5 81:18,24 82:4,9
**9th** 57:6 68:22 69:3,15 70:14
**9:00** 109:5,6 164:19,19 170:9
**9:47** 5:13
**9:48** 5:17
**9:50** 7:14
**9:51** 8:11
**9:56** 12:23
**9:57** 13:18
**90** 141:15,20 142:4
**94** 2:20
**950** 1:23
**96** 141:16,20 142:4
**97** 142:14,17
**98** 2:21 142:14,17
**98.6** 62:23
**99** 1:19 2:22 143:6