UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case 06-20758-CR-ALTONAGA

THE UNITED STATES OF AMERICA,

        Plaintiff,

                            MIAMI, FLORIDA

vs.

                            OCTOBER 20, 2008

ROY M. BELFAST, JR., a/k/a
CHUCKIE TAYLOR, CHARLES
McARTHUR EMMANUEL, CHARLES
TAYLOR, JR. and CHARLES
TAYLOR, III,

        Defendant.
_____

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE CECILIA M. ALTONAGA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

                            KAREN ROCHLIN, A.U.S.A.
                            CAROLINE HECK-MILLER, A.U.S.A.
                            Office of the U.S. Attorney
                            99 N.E. 4th Street
                            Miami, FL  33132 - 305.961.9234
                            (Fax) 305.536.4675
                            Email: karen.rochlin@usdoj.gov
                                     caroline.miller@usdoj.gov

                            CHRISTOPHER GRAVELINE, Trial Attorney
                            U.S. Department of Justice
                            950 Pennsylvania Avenue, N.W.
                            Washington, D.C. 20530 - 202.514.3270
                            christopher.graveline@usdoj.gov

TOTAL ACCESS COURTROOM REALTIME TRANSCRIPTION

October 20, 2008

1   FOR THE DEFENDANT:

2
                              JOHN WYLIE, A.F.P.D.
3                             MIGUEL CARIDAD, A.F.P.D.
                              Federal Public Defender's Office
4                             150 West Flagler Street
                              Miami, FL 33130 - 305/536-6900
5                                   (Fax) 305/530-7120
                              Email:  miguel_caridad@fd.org
6                                     john_wylie@fd.org

7   REPORTED BY:

8                             BARBARA MEDINA
                              Official United States Court Reporter
9                             400 North Miami Avenue, Ste. 12-2
                              Miami, FL 33128 - 305.523.5518
10                                  (Fax) 305.523.5519
                              Email:  barbmedina@aol.com
11
                                   -  -  -  -
12
                            TABLE OF CONTENTS
13

14                                                              Page

Bruce A. Hyma By Ms. Rochlin ............................... 5
15
        Direct Examination ...................................... 5
16
        Cross-Examination By Mr. Caridad ...................... 29
17
        Redirect Examination By Ms. Rochlin ................... 82
18
Aloysius Toe .............................................. 89
19
        Direct Examination By Mr. Graveline ................... 89
20
        Cross-Examination By Mr. Caridad ..................... 100
21
James K. Saybay .......................................... 103
22
        Direct Examination By Ms. Heck-Miller ............... 103
23
Reporter's Certificate ................................... 120
24

25                            INDEX TO EXHIBITS

TOTAL ACCESS COURTROOM REALTIME TRANSCRIPTION
October 20, 2008

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Government Exhibits Hymn ....... 144-175 | 10 | 3 | 10 | 24 |
| Government Exhibit CE 16 ....... | 118 | 6 | 118 | 8 |

CITATION INDEX

Page

SIDEBAR CONFERENCE INDEX

Descriptions                                                  Page

Sidebar Conference Begins ................................. 93

Proceedings In Open Court Resume .......................... 96

Sidebar Conference Begins ................................. 99

Proceedings In Open Court Resume ......................... 100

ADMINISTRATIVE CONVENTIONS:

When counsel does not identify themselves each time they address the Court during a telephone conference, the industry-standard speaker identification is indicated by chevrons, i.e., >>>:

**October 20, 2008**

1          THE COURT:   Can we bring the witness in?

2          MR. CARIDAD:   Judge, there's something I need to bring

3   to the Court's attention.   Over the weekend, we were

4   interviewing our witnesses and quite a few said they had called

5   their families in Liberia.   One way or the other their families

6   had been harassed, threatened because our witnesses had come

7   here to testify at Chuckie's trial.

8          No one has been physically hurt yet, but some people

9   have had to leave their homes.   They are in hiding.   One

10  witness told me a list of our witnesses showed up in the hands

11  of the Liberian National Police.

12         I contacted the Government about this over the weekend

13  and they have given me the name of a Liberian National Police

14  officer they have contacted to help them with any problems they

15  have had and I've given my witnesses that gentleman's name and

16  number.

17         There are things going on in Liberia we have no

18  control over.   I will be updating the Court as I receive more

19  information.

20         THE COURT:   Very well.

21         Let's bring in Dr. Hyma, please.

22         THE COURT SECURITY OFFICER:   They're all here.

23         THE COURT:   Let's bring the jury in please.

24         [The jury returns to the courtroom at 9:00 a.m]

25         THE COURT:   Everyone please be seated.

**October 20, 2008**

## Bruce A. Hyma - Direct

1                    Good morning, ladies and gentlemen.   Welcome back.

2                    Please continue, Ms. Rochlin.

3                    MS. ROCHLIN:   Yes, Your Honor.

4                    BRUCE A. HYMA, GOVERNMENT'S WITNESS, RESUMED

5                          DIRECT EXAMINATION (cont'd)

6    [Beginning at 9:01 a.m., 10/20/08.]

7    BY MS. ROCHLIN:

8    Q.   Good morning, Dr. Hyma.

9    A.   Good morning.

10   Q.   Doctor, do you recall before we recessed for the weekend

11   you were testifying concerning your examination of Sulaiman

12   Solo Jusu?

13   A.   Yes.

14   Q.   And do you recall you testified with respect to an

15   interview you conducted of Mr. Jusu?

16   A.   Yes.

17   Q.   When you addressed Mr. Jusu's statements to you in your

18   testimony, did you tell us about everything Mr. Jusu said to

19   you or not?

20   A.   No, I did not.

21   Q.   Can you explain whether in your testimony about what

22   Mr. Jusu said, you addressed his statements that were relevant

23   to your analysis or not?

24   A.   I addressed the statements that were relevant to my

25   analysis, that's correct.

**October 20, 2008**

## Bruce A. Hymn - Direct

1  Q.   Dr. Hymn, with respect to the photographs that you

2  discussed in your testimony concerning Mr. Jusu, did you

3  address every single photograph taken during your examination

4  or not?

5  A.   No, I did not.

6  Q.   Before coming to court, did you review all of the

7  photographs of Mr. Jusu?

8  A.   Yes.

9  Q.   And did you eliminate any photographs that were either

10 redundant or not helpful to your analysis?

11 A.   That's correct.  I pared it down to what would be helpful

12 and to the point.

13 Q.   What I would like to do now, Dr. Hymn, is ask you to direct

14 your attention to October 11th of 2006, and I'm going to ask

15 whether or not on that date you examined another individual in

16 connection with this case.

17 A.   Yes, I did.

18 Q.   Do you recall the name of that individual?

19 A.   His name is Mr. Varmuyan Dulleh or Dullay (ph.).  I'm not

20 sure how you pronounce it.

21 Q.   Is it spelled D-u-l-l-e-h?

22 A.   Yes.

23 Q.   On October 11th of 2006, where did you first meet

24 Mr. Dulleh?

25 A.   In my office.

**October 20, 2008**

## Bruce A. Hynn - Direct

1  Q.    And do you recall who was present when you first

2  encountered Mr. Dulleh?

3  A.    Yes.    You were present and Ms. Dulleh's attorney, Ms. Lori

4  Lightfoot, was present.

5  Q.    After initially meeting Mr. Dulleh, did you interview him?

6  A.    Yes, I did.

7  Q.    Can you explain for the interview itself who was present

8  for that?

9  A.    Just myself and our photographer.

10  Q.    So no attorneys were present, including Ms. Lightfoot and

11  myself.    Is that accurate, Dr. Hynn?

12  A.    That's correct.

13  Q.    Were any Federal agents present during your interview with

14  Mr. Dulleh or not?

15  A.    No Federal agents were present, no.

16  Q.    During your discussions with Mr. Dulleh, can you tell us

17  whether or not he provided you with information relevant to any

18  analysis of or opinion you formed concerning his condition?

19  A.    Yes, he did.

20  Q.    Can you tell us, please, Dr. Hynn, what were those relevant

21  statements Mr. Dulleh made to you?

22  A.    Well, Mr. Dulleh relayed to me that on July, in July of

23  2002, he was arrested in his home in Monrovia and was taken to

24  the home of the Liberian President, Mr. Charles Taylor, in

25  Congotown.

**October 20, 2008**

# Bruce A. Hynn - Direct

1          There among his accusers was another gentleman named

2  Charles or Chuckie Taylor and --

3          MR. CARIDAD:   Your Honor, I object.   Beyond the scope

4  of 803(4).

5          MS. ROCHLIN:   Again, Your Honor this is offered

6  pursuant to 703.

7          MR. CARIDAD:   Objection.

8          THE COURT:   Overruled.

9  A.   -- and another gentleman he identified as a general.   His

10  name was Yeaten.   They threatened to kill him if he didn't

11  cooperate.

12          In order to attempt to get him to talk, they poured

13  what he described as boiling water over his head.   They also

14  applied electric current to his back and his penis.   They also

15  held weapons to his head and poured boiling water through his

16  hands, the palms of his hands.   They also rubbed table salt

17  into his wounds once the scalding was accomplished.

18          He was gagged and taken to a place he describes as a

19  hole in the ground and he describes his imprisonment lasted for

20  12 months, and then was released in July of '03.

21  Q.   I'm sorry, Dr. Hynn, but in case I may have missed it,

22  apart from what he described as boiling water and electric

23  shock, can you explain whether Mr. Dulleh referenced any burns

24  on his body?

25  A.   In addition to the boiling water, he also stated he was

**October 20, 2008**

## Bruce A. Hyma - Direct

1  burned with a clothes iron on his arms and other parts of his

2  body.

3  Q.   And, doctor, were you provided with my medical records

4  relating to Mr. Dulleh?

5  A.   Yes.

6  Q.   And did you have an opportunity to review those records in

7  connection with any examination of him?

8  A.   Yes, I did.

9  Q.   And apart from your interview of Mr. Dulleh and any records

10  which you reviewed, did you also conduct an examination of

11  Mr. Dulleh?

12  A.   Yes, I did.

13  Q.   Can you tell us what parts of Mr. Dulleh's body the

14  examination covered?

15  A.   Mr. Dulleh was examined from head to toe.

16  Q.   What, if anything, did you do to make a record of your

17  visual observations during that examination?

18  A.   I recorded his permanent deformities as observed and also

19  photographed his body and the injuries, the permanent

20  deformities.

21       MS. ROCHLIN:   Your Honor, at this time I would request

22  to approach the witness.

23       THE COURT:   You may.

24  BY MS. ROCHLIN:

25  Q.   Dr. Hyma, I have handed you what has been previously marked

**October 20, 2008**

## Bruce A. Hyma - Direct

1   for identification as Government's Exhibits Hyma 144 through

2   Hyma 175.

3   [Government Exhibits Hyma 144-175 marked for identification at

4   9:08 a.m]

5   BY MS. ROCHLIN:

6   Q.   I'd ask you to examine those exhibits and when you're

7   ready, let us know whether or not you recognize them

8   A.   (Complied.)

9         Yes, I recognize all of the exhibits numbered from 144

10  to 175.

11  Q.   Dr. Hyma, are all of those exhibits photographs?

12  A.   Yes, they are.

13  Q.   And are all of those exhibits photographs from your

14  examination of Varmuyan Dulleh on October 11 of 2006?

15  A.   Yes, they are.

16  Q.   Do they fairly and accurately show what you visually

17  observed during your examination of Mr. Dulleh?

18  A.   Yes, they do.

19         MS. ROCHLIN:   Your Honor, at this time the United

20  States moves for the admission of Government's Exhibits Hyma

21  144 through 175.

22         MR. CARIDAD:   I have no objection.

23         THE COURT:   Admitted.

24  [Government Exhibits Hyma 144-175 received in evidence at 9:12

25                    a.m]

## October 20, 2008

## Bruce A. Hyma - Direct

1          MS. ROCHLIN:   And I would ask to publish Government's

2     Exhibit Hyma 144 on the screen, Your Honor.

3          THE COURT:   You may.

4          AGENT BAECHTLE:   (Complied.)

5     BY MS. ROCHLIN:

6     Q.   Dr. Hyma, do you recognize the individual in the photograph

7     now appearing on your screen?

8     A.   Yes, I do.

9     Q.   Is that a photograph of Varmuyan Dulleh?

10    A.   Yes, it is.

11         MS. ROCHLIN:   At this time I would ask to publish

12    Government's Exhibit Hyma 145.

13         AGENT BAECHTLE:   (Complied.)

14    BY MS. ROCHLIN:

15    Q.   Dr. Hyma, can you explain briefly the purpose of

16    Government's Exhibit Hyma 145?

17    A.   The photograph is an overall photograph orientation of his

18    back and the back of his arms.

19         MS. ROCHLIN:   At this time I would ask to take down

20    Exhibit Hyma 145 and bring up Government's Exhibit Hyma 146.

21         AGENT BAECHTLE:   (Complied.)

22    BY MS. ROCHLIN:

23    Q.   Dr. Hyma, can you explain the purpose of this photograph?

24    A.   This photograph is an orientation of the right side of his

25    body, the right side of his arm, chest and face.

**October 20, 2008**

## Bruce A. Hyma - Direct

1  Q.   And can you explain, Dr. Hyma, whether there is anything

2  relevant to any opinion you formed concerning Mr. Dulleh that

3  appears in this photograph?

4  A.   Yes, there is.

5  Q.   What is that?

6  A.   I'll circle the two scars that appear in the photograph on

7  the upper outer aspect of his right arm

8  Q.   What type of scars are they, Dr. Hyma, if you can tell us?

9  A.   These are flat, slightly raised.  One is actually a

10 triangular in shape scar and you can seat the size of those.

11 One is about 8 centimeters or roughly two and a half inches or

12 three inches.

13          MS. ROCHLIN:   If we could clear the screen.

14          I would ask Agent Baechtle to scroll through Exhibits

15 Hyma 147, 148 and 149.

16          AGENT BAECHTLE:   (Complied.)

17 BY MS. ROCHLIN:

18 Q.   And, Dr. Hyma, can you explain briefly the purpose of these

19 photographs?

20 A.   147 is an orientation photograph, again, with his arms out

21 stretched to orient the right side of his chest and abdomen.

22          148 is an orientation photograph of the left side of

23 his body, his left arm, left side of his face and neck and

24 chest.

25          149 is an orientation photograph with his arms out

**October 20, 2008**

## Bruce A. Hyma - Direct

1  stretched of the left side of his chest and abdomen.

2          MS. ROCHLIN:   Agent Baechtle, if I could ask you to

3  return to Exhibit Hyma 147.

4          AGENT BAECHTLE:   (Complied.)

5  BY MS. ROCHLIN:

6  Q.   Dr. Hyma, in this photograph is there anything you observed

7  that was relevant to any opinion or conclusion you reached as

8  to Mr. Dulleh?

9  A.   Yes.

10  Q.   Can you tell us what appears that was relevant?

11  A.   I'll circle the scar here right at his waistline on the

12  right side of his abdomen.

13  Q.   Directing your attention to Mr. Dulleh's arm, can you tell

14  us whether there appears anything here relevant to an opinion

15  or conclusion you formed?

16  A.   Yes, the same scars I circled before on the outside of his

17  upper right arm

18  Q.   Dr. Hyma, in your testimony a few moments ago you mentioned

19  Mr. Dulleh making statements to you that referred to boiling

20  water.   Do you recall that testimony?

21  A.   Yes.

22  Q.   Could you explain, please, what a reference to boiling

23  water means to you?

24  A.   Boiling water to me means the water that has a temperature

25  of 212 degrees, 212 degrees Fahrenheit, or 100 degrees

## October 20, 2008

## Bruce A. Hyma - Direct

1  centigrade.

2  Q.   Did you question Mr. Dulleh further in your interview with

3  him with respect to the boiling water?

4  A.   Yes, I did.

5  Q.   Do you recall what it was that you asked Mr. Dulleh with

6  regard to the boiling temperature of the water?

7  A.   Yes.  I asked him to describe the water that he was making

8  reference to.  He described water that had steam rising from

9  the surface.  I specifically asked him if he actually observed

10  the water in a container on a heating element with the water at

11  a rolling boil and he said "No," just he observed steam rising

12  from the water.

13  Q.   Now, Dr. Hyma, was that exchange between yourself and

14  Mr. Dulleh concerning his observations of the water relevant to

15  your opinion or conclusions with respect to Mr. Dulleh?

16  A.   Yes.

17  Q.   Can you, please, explain why that was?

18  A.   In order to get a permanent scar, as we discussed on

19  Friday, one must have actually damage to the underlying surface

20  of the skin, the dermis.  The outer layer of skin may be

21  damaged and sluffed off, but if you don't have damage to the

22  underlayer, the dermis, you won't have a permanent scar.

23          For those of you who have been burned before, a

24  blister from a sunburn will not scar because the dermis isn't

25  damaged.  Just the outer surface is damaged.

**October 20, 2008**

## Bruce A. Hynn - Direct

1          The amount of damage it takes, the amount of heat to

2    cause a blister is less than what does actually cause damage to

3    the dermis.

4          Boiling water, 212 degrees, will, if applied to the

5    skin for a period of time, will actually damage the dermis and

6    you will get scars.

7          It was important I have a pretty good idea how hot is

8    this water.  Is it hot enough just to peel off the skin or hot

9    enough to actually damage the dermis?

10   Q.   Based on Mr. Dulleh's description to you of the water, did

11   you form any opinion about whether or not the water he

12   described was boiling or at some temperature less than boiling?

13   A.   From what he shared with me and the appearance of his skin

14   when the water hit his skin -- he shared with me his skin

15   turned white -- and my subsequent observations of his skin,

16   it's my opinion the water was not boiling, was not at 212

17   degrees Fahrenheit, but cooler than that, but still hot enough

18   to cause damage.

19          MS. ROCHLIN:  If we could clear the screen.

20          I would at this time ask Agent Baechtle to bring up

21   Government's Exhibits Hynn 150 through 154 and scroll through

22   them

23          AGENT BAECHTLE:   (Complied.)

24   BY MS. ROCHLIN:

25   Q.   Dr. Hynn, with respect to these series of photographs, what

**October 20, 2008**

## Bruce A. Hyma - Direct

1    area of Mr. Dulleh's body do they present?

2    A.    These photographs are his face and each side of his head

3    and the top of his head.

4    Q.    During your physical examination of Mr. Dulleh, can you

5    tell us whether or not you observed any scars on his face or

6    any side of his head or the top of his head?

7    A.    Or the back of his head.

8              153 is the back of his head.   No, I did not.   I didn't

9    see any scars that I could recognize as possible deformities

10   from a hot liquid.

11   Q.    Dr. Hyma, based on your observations and what Mr. Dulleh

12   stated to you during your discussions, were you able to form

13   any opinions or conclusions with respect to the part of his

14   account concerning boiling water and his head?

15   A.    Well, with the absence of evidence of permanent damage, I

16   can't exclude that he did, in fact, have hot water poured over

17   his head.   From his description, my opinion is that that water

18   was not boiling.   Otherwise, it would have left some scars on

19   his face and scalp, but he has no scars.

20   Q.    And can you explain, Dr. Hyma, whether the absence of scars

21   is inconsistent with what Mr. Dulleh described to you?

22   A.    No, the absence of scars is not evidence of absence of the

23   actual event.   It certainly is consistent with the event as he

24   described it to me.

25              MS. ROCHLIN:   At this time I would ask Agent Baechtle

## October 20, 2008

## Bruce A. Hyma - Direct

1  to bring up Hyma Exhibit Number 155.

2           AGENT BAECHTLE:   (Complied.)

3  BY MS. ROCHLIN:

4  Q.   Dr. Hyma, can you explain what appears in this photograph?

5  A.   This is the right side of his abdomen, a closer photograph

6  of the scar on his abdomen.  I'll circle it here in the

7  photograph.

8           MS. ROCHLIN:   If we could clear the screen and bring

9  up Hyma Exhibit Number 156.

10           AGENT BAECHTLE:   (Complied.)

11 BY MS. ROCHLIN:

12 Q.   Dr. Hyma, tell us what this photograph shows.

13 A.   This is the same scar now with a scale of reference in the

14 photograph.

15 Q.   Doctor, did Mr. Dulleh make any statements to you that were

16 relevant to this particular scar shown in Exhibit Hyma 156?

17 A.   Yes.

18 Q.   What were those statements?

19 A.   This scar was the result of a healed burn from a clothes

20 iron.

21 Q.   And were you able to reach any opinions or conclusions

22 concerning this particular scar?

23 A.   Yes.

24 Q.   What were they?

25 A.   This scar has the configuration and appearance that you

**October 20, 2008**

# Bruce A. Hyma - Direct

1  would see with a burn such as from an iron that would actually

2  damage the dermis.

3           The scar results in a fairly irregular shape and the

4  scar tissue actually has raised off the skin and has this

5  somewhat textured appearance.

6           Clothes irons, as a rule, can get to 400, 450 degrees

7  Fahrenheit, the surface temperature, clearly enough heat to

8  cause damage to the dermis when applied to the skin.

9  Q.  Tell us, Dr. Hyma, whether you found your examination of

10 this scar to be consistent or inconsistent of Mr. Dulleh's

11 account.

12 A.  This is consistent with his account of a clothes iron

13 burning the skin.

14           MS. ROCHLIN:  Agent Baechtle, at this time I would ask

15 you to bring up Hyma Exhibit Numbers 157 and 158.

16           AGENT BAECHTLE:  (Complied.)

17 BY MS. ROCHLIN:

18 Q.  Dr. Hyma, can you tell us what these photographs show?

19 A.  157 is a photograph of the right side of his upper part of

20 his right arm and 158 is a photograph with a scale of reference

21 on the same injury, the same deformity.

22 Q.  And can you tell us whether any of Mr. Dulleh's statements

23 to you were relevant with respect to the scar that appears in

24 these two photographs?

25 A.  Yes, it is.  Yes, the statements are relevant.

**October 20, 2008**

## Bruce A. Hynn - Direct

1  Q.   What statements were those?

2  A.   He stated to me that he was burned with a clothes iron on

3  his upper right arm

4  Q.   What, if any, opinions or conclusions were you able to

5  form, Dr. Hynn, with respect to the scar or scars appearing in

6  Hynn Exhibits 157 and 158?

7  A.   As, again, you can see from these scars, they are raised.

8  They have a texture to them  You can see a triangular type of

9  shape here and the overall size by the ruler.

10        This scar is, as I mentioned, almost 8 centimeters,

11  which is about 3 inches at the greatest dimension.  The rough

12  character of the scar indicates that this was damaged dermis

13  that has healed by the natural body's healing mechanism just to

14  grow skin back over it without a skin graft.

15        So this was an injury that actually burned through the

16  outer layer of the skin and burned into the dermis.  You may be

17  familiar with this kind of injury.  It's a brand.  It's the

18  same kind of a scar that's left when you brand cattle on the

19  skin.  This is a brand, a typical branding scar.

20  Q.   And were you able to make a determination, Dr. Hynn,

21  whether these scars were consistent or not consistent with

22  Mr. Dulleh's account to you?

23  A.   Yes, they are consistent with his account to me.

24        MS. ROCHLIN:   At this time I would ask Agent Baechtle

25  to bring up Hynn Exhibit Numbers 159 and 160.

**October 20, 2008**

## Bruce A. Hyma - Direct

1          AGENT BAECHTLE:   (Complied.)

2  BY MS. ROCHLIN:

3  Q.   What appears in these photographs, Dr. Hyma?

4  A.   159 and 160 are photographs of his back, upper shoulders

5  and lower back.

6  Q.   Can you tell us whether or not anything in these

7  photographs was relevant to any opinion or conclusion you

8  reached with respect to Mr. Dulleh?

9  A.   Yes.

10  Q.   And tell us what was relevant to your analysis, doctor.

11  A.   In photograph 159, he has two flat scars on his upper right

12  shoulder.   He also has other scars you see on his back, but the

13  two that I have circled are the relevant ones.

14  Q.   And what did you find to be relevant with respect to those

15  particular scars?

16  A.   Again, these scars are consistent with a heating element

17  being applied to the skin and subsequent healing.

18  Q.   Dr. Hyma, with respect to these particular scars, did

19  Mr. Dulleh make any statements that you found relevant to your

20  analysis?

21  A.   Yes.

22  Q.   What were those statements?

23  A.   That he was -- that a clothes iron was applied to his right

24  shoulder and resulted in injuries that eventually resulted in

25  these scars.

## October 20, 2008

## Bruce A. Hyma - Direct

1   Q.   Did you reach a conclusion as to whether Mr. Dulleh's

2   account was consistent or inconsistent with what you observed

3   on his body and in any other records you reviewed?

4   A.   These scars are consistent with his account of being burned

5   with a clothes iron.

6           MS. ROCHLIN:   At this time I would ask to clear the

7   screen and to bring up Hyma Exhibit Numbers 161 and 162.

8           AGENT BAECHTLE:   (Complied.)

9   BY MS. ROCHLIN:

10  Q.   Doctor, are you able to tell us what appears in these

11  photographs?

12  A.   161 is an orientation photograph of the back of his left

13  arm and the back of his left shoulder and 162 is a photograph

14  with a scale of reference of the scar on the upper part of his

15  left arm, the back of his upper left arm

16  Q.   And is the scar shown in Exhibit Hyma 162 something that

17  was relevant or not relevant to your analysis with respect to

18  Mr. Dulleh?

19  A.   Yes, it was relevant.

20  Q.   Why was it relevant?

21  A.   This scar, again, has the appearance of what he described

22  was a clothes iron applied to the back of his left arm

23  Q.   And what is it about the appearance of this particular scar

24  that you found to be consistent with application of a clothes

25  iron?

**October 20, 2008**

## Bruce A. Hyma - Direct

1    A.   Again, this scar, as you can see, is rather raised and has

2    a rough texture, similar to the others.

3         The configuration of the scar is somewhat triangular,

4    but smaller.  You can see that by the scale of reference, but

5    it has the same appearance and texture as the other scars,

6    again consistent with something that has damaged the underlying

7    dermis and the skin has grown over without any skin graft.

8    Q.   Did you find the scar shown in this photograph to be

9    consistent or not consistent with Mr. Dulleh's account,

10   Dr. Hyma?

11   A.   I found the scar to be consistent with his account of a

12   clothes iron applied to this part of the body.

13        MS. ROCHLIN:   At this time I would ask to take down

14   Hyma Exhibit 162 and I'd ask Agent Baechtle to bring up and

15   scroll through Hyma Exhibits 163 through 166.

16        AGENT BAECHTLE:   (Complied.)

17   BY MS. ROCHLIN:

18   Q.   Doctor, can you explain what Exhibits 163 through 166 show?

19   A.   163 through 166 are photographs of his hands, the front of

20   his hands, the back of his hands and the sides of his hands.

21   Q.   Can you tell us, Dr. Hyma, whether you were able to observe

22   any scars when you examined Mr. Dulleh's hands?

23   A.   No, I did not see any scars.

24   Q.   And did Mr. Dulleh make any statements to you during your

25   discussions that were relevant to anything that had happened to

**October 20, 2008**

## Bruce A. Hyma - Direct

1  his hands?

2  A.   Yes.

3  Q.   What were those statements?

4  A.   He said he was forced to hold his hands out with his hands

5  cupped and boiling water was poured through his hands.

6  Q.   Based on all of your discussions with Mr. Dulleh, are you

7  able to explain whether the absence of scars on his hands is

8  inconsistent with the statements that he gave you?

9  A.   Again, going back do my previous discussion about the

10  temperature of the water, what he describes as boiling water

11  may, in fact, have not been boiling in terms of it being 212

12  degrees, but he describes his hands as the skin turning white,

13  which is what you would expect with a dark-skinned person when

14  the outer part of their skin slips off because the dark pigment

15  is in the outer surface of the skin.  But if the heat in the

16  liquid is not hot enough to actually damage the dermis, you may

17  not have any scar once the skin heals.

18         So the absence of scars here on his hand is not

19  inconsistent with his account as he described it to me.

20  Q.   Now, Dr. Hyma, in your discussions with Mr. Dulleh, did he

21  tell you of any injuries to his genital area?

22  A.   Yes.

23  Q.   Did you also take photographs to document your observations

24  of that area of his body?

25  A.   Yes, I did.

**October 20, 2008**

## Bruce A. Hymn - Direct

1   Q.   What did Mr. Dulleh tell you occurred with respect to any

2   injuries to his genitals?

3   A.   He said electric current was applied to his penis.

4   Q.   During your visual examination of Mr. Dulleh's penis, did

5   you observe anything relevant to those statements?

6   A.   Yes.

7           MS. ROCHLIN:   At this time I would ask Agent Baechtle

8   to take down Exhibit Hymn 166 and bring up Hymn Exhibits 167

9   and 168.

10          AGENT BAECHTLE:   (Complied.)

11  BY MS. ROCHLIN:

12  Q.   Dr. Hymn, is Exhibit 167 an orientation photograph?

13  A.   Yes.

14  Q.   And with respect to 168, can you explain whether or not you

15  observe anything relevant in that photo?

16  A.   Yes.

17  Q.   What is it that you observe of relevance?

18  A.   This is the underside of the penis and in the photograph --

19  actually I'll circle it -- are scars here on the mid-shaft of

20  the underside of his penis.

21  Q.   And what, if any, conclusions did you reach with respect to

22  those particular scars?

23  A.   These scars in 168 and also the scars in photograph 167,

24  again, are, by themself, nonspecific, but an electric current,

25  depending how much wattage is in the current, an electric

**October 20, 2008**

## Bruce A. Hynn - Direct

1  current will generate heat in the skin where the conductor is

2  applied to the skin and can burn the skin.

3          Again, if there's enough energy there, it can burn the

4  skin, damage the dermis and leave scars.

5          MS. ROCHLIN:  If we could clear the screen and return

6  to Exhibit 167 for a moment.

7          AGENT BAECHTLE:  (Complied.)

8  BY MS. ROCHLIN:

9  Q.  Dr. Hynn, if you can explain here in this photograph, did

10  you observe scars?

11  A.  Scars on the glans of the penis and the shaft of the penis.

12  Q.  Again, did you reach any conclusions with respect to these

13  scars?

14  A.  Again, the scars are nonspecific by themselves, but it

15  indicates an injury that has occurred to the actual dermis of

16  the penis.

17          Electric current, if given enough wattage, will

18  generate enough heat to burn the skin where the conductor comes

19  in contact.  These are certainly consistent with his account of

20  electricity being applied to his penis.

21          MS. ROCHLIN:  I would ask for the screen to be cleared

22  and I would ask Agent Baechtle to bring up Exhibits Hynn 169

23  through 175.

24          AGENT BAECHTLE:  (Complied.)

25  BY MS. ROCHLIN:

## October 20, 2008

## Bruce A. Hynn - Direct

1  Q.   Dr. Hynn, can you explain what these photographs are

2  showing?

3  A.   169 is an orientation of a photograph of his legs from his

4  thighs to his feet.

5         170 is an orientation photograph of the right side of

6  his right leg, and 171 is a photograph of the back of his legs

7  from his thighs down and -- did you say 172?

8  Q.   Yes.

9  A.   -- is an orientation photograph of the left side of his

10  left leg.

11         MS. ROCHLIN:   And if we could bring up Exhibit 173.

12         AGENT BAECHTLE:   (Complied.)

13  A.   173 is an orientation photograph of his right shin or the

14  back of his right calf.

15  Q.   Dr. Hynn, when you observed Mr. Dulleh's leg, can you tell

16  us whether any scars or marks were present there?

17  A.   Yes.

18  Q.   And can you tell us whether all of the scars or marks that

19  you observed were relevant to any opinions or conclusions you

20  reached relating to this case?

21  A.   The scar on one that's depicted in 173 is relevant to his

22  account of the incident.

23  Q.   Were there other scars you found to be not relevant to his

24  account?

25  A.   Yes.

**October 20, 2008**

## Bruce A. Hyma - Direct

1  Q.   What led you to determine that the scars were not relevant?

2  A.   His account of the incidents.

3  Q.   Dr. Hyma can you explain what appears in Hyma Exhibit 173?

4  A.   173 is the back of his calf and the scar, again, you see

5  here is somewhat triangular in shape, similar to the other

6  scars that you've seen.

7       This part of his body has a little more hair so

8  there's a little more hair obscuring the scar, but it has the

9  same texture and configuration as the others.

10  Q.   What, if any, statements did Mr. Dulleh make to you that

11  you found relevant to this particular scar?

12  A.   This particular scar, according to his account, was the

13  result of a healed burn from a clothes iron.

14  Q.   What, if anything, did you conclude with respect to this

15  particular scar and Mr. Dulleh's account?

16  A.   Again, this is a consistent scar from a healed burn from a

17  clothes iron, as I discussed before.

18       MS. ROCHLIN:   If we could clear the screen and bring

19  up Exhibit Hyma 174.

20       AGENT BAECHTLE:   (Complied.)

21  BY MS. ROCHLIN:

22  Q.   What appears in this photograph?

23  A.   This is a photograph with a scale of reference of the same

24  scar that I previously discussed.

25  Q.   If you would, Dr. Hyma, can you circle the area where the

**October 20, 2008**

## Bruce A. Hyma - Direct

1  scar itself appears?

2  A.   (Complied.)

3       MS. ROCHLIN:   If we could clear the screen and move to

4  Hyma Exhibit 175.

5       AGENT BAECHTLE:   (Complied.)

6  BY MS. ROCHLIN:

7  Q.   What appears in this exhibit, doctor?

8  A.   This is a photograph of the outer part of his left shin or

9  left calf.

10 Q.   And do any scars or marks appear in this photograph?

11 A.   Yes.

12 Q.   And did the scar appearing in this photograph amount to one

13 that you found relevant or not relevant to your analysis for

14 purposes of this case?

15 A.   This was not relevant.

16 Q.   And what led you to determine that this particular scar was

17 not relevant?

18 A.   His account, Mr. Dulleh's account of the incidents.

19      MS. ROCHLIN:   Agent, if you would take down Exhibit

20 175.

21      AGENT BAECHTLE:   (Complied.)

22      MS. ROCHLIN:   If I could have just a moment, Your

23 Honor.

24      Your Honor, the United States would request that

25 Dr. Hyma remain subject to recall, but at this time we would

## October 20, 2008

## Hymn - Cross

1    tender him for cross-examination.

2              THE COURT:   Very well.

3              Cross-examination.

4                        CROSS EXAMINATION

5    [Beginning at 9:40 a.m., 10/20/08.]

6    BY MR. CARIDAD:

7    Q.   Good morning, doctor.

8    A.   Good morning.

9    Q.   Doctor, you described your field as forensic science.   Is

10   that a correct way to describe it?

11   A.   Yes, it's part of forensic science.

12   Q.   And a lot of your work has to do with cadavers, dead

13   bodies?

14   A.   Yes, a majority of my work is with the nonliving.

15   Q.   But you also examine persons who are still living, of

16   course?

17   A.   Yes, I have, a number of, quite a number of patients.

18             As I mentioned, I was also a physician at the Rape

19   Treatment Center in Jackson Memorial Hospital for 10 years and

20   saw quite a few patients under that.

21   Q.   What percentage of the injuries to bodies you've examined

22   would you say are from persons who have passed away, as opposed

23   to persons who are still living?

24   A.   I don't know if I understand your question.

25   Q.   Well, you examine cadavers and you examine live persons who

**October 20, 2008**

## Hymn - Cross

1  have injuries to their bodies.  You've done both?

2  A.   Yes.

3  Q.   What percentage of each would you say you examined more of,

4  cadavers or more live bodies?

5  A.   More cadavers.

6  Q.   By what percentage, would you say?

7  A.   Oh, I would say, by and large, 95 percent or more of the

8  bodies that I have examined are deceased.

9  Q.   About 5 percent of the ones you've examined are live

10  bodies?

11  A.   Well, if you consider all of the patients I've seen over

12  the years also at Jackson Memorial Hospital, it probably comes

13  closer to 20 percent because I have probably examined close to

14  2,000 patients there.  Those are all living individuals.

15  Q.   But -- I'm sorry.

16  A.   I'm just doing the math in my head here.  I have done close

17  to probably 4,500 autopsies in my career and the other

18  patients, put that along with maybe 2,000 patients I've seen at

19  Jackson, it comes probably closer to 20, 30 percent.

20  Q.   I'm referring to living persons you've examined, not

21  because they have some sort of illness, but because they have

22  marks on their body.

23  A.   Well, a number of patients I've seen at Jackson did have

24  marks on their body because they were assault survivors, but I

25  can't give you an exact number.

**October 20, 2008**

## Hynn - Cross

1          To be fair, I would say the majority of the cases I

2    have examined are deceased individuals.   15, 20 percent,

3    perhaps, are actually living people with injuries or healed

4    injuries.

5    Q.   Now, I assume you've done work for defense attorneys?

6    A.   Yes.

7    Q.   What percentage of the work you've done of all the work

8    you've done examining either cadavers or live bodies would you

9    say has been for defense attorneys?

10   A.   Most of those cases are criminal cases.   So a lot of the

11   work would be for either, would be for the, involved with the

12   State, although I don't work for the State Attorney's Office.

13          I have worked with defense attorneys on some criminal

14   matters, not many, by nature of the criminal justice system

15   But I've also worked with defense attorneys in civil matters,

16   equally with plaintiffs' attorneys.

17   Q.   But as far as criminal defense attorneys as opposed to

18   working for the prosecution, if I can put it that way, what

19   percentage of your work has been for criminal defense

20   attorneys?

21   A.   Oh, probably less than 5 percent or even less than that

22   just by the nature of the criminal justice system

23   Q.   And you said that by the nature of your profession, you

24   don't witness any of these injuries yourself.   Correct?

25   A.   I have on rare occasion witnessed a fatal injury, but, no,

**October 20, 2008**

## Hynn - Cross

1  I have never witnessed any of these injuries.

2  Q.  So the injuries you've testified about today and you've

3  testified about on Friday, you, of course, didn't see any of

4  these things happen to Mr. Kpadeh, Mr. Jusu, Mr. Turay and

5  Mr. Dulleh?

6  A.  That's correct.

7  Q.  In the case of Mr. Jusu and Mr. Turay, these incidents

8  allegedly happened in 1999?

9  A.  That's correct.

10  Q.  And you examined them within the last two years?

11  A.  Yes, that's correct.

12  Q.  So let's say 2006.  That would make the injuries to

13  Mr. Jusu and Mr. Turay and Mr. Kpadeh, as well, seven years old

14  by the time you examined them?

15  A.  Yes, that's correct.

16  Q.  And as more time passes, the more difficult it is to you to

17  make an assessment of the cause of these injuries.  Is that a

18  fair statement?

19  A.  Not really.

20         Once a permanent deformity has developed, that

21  permanent deformity will be with you for the rest of your life.

22  So by the time I saw them, whatever permanent deformities they

23  have, they're going to have for their life.

24  Q.  But it would have been more advantageous to you, would you

25  agree, to have seen these injuries a few months after they

**October 20, 2008**

## Hynn - Cross

1  occurred?

2  A.   Sure, it would be advantageous to see them the day they

3  occurred, but I didn't have that advantage.

4  Q.   And it would be even better if you could see them a year

5  after they occurred.   Right?

6  A.   It would be helpful to see the progression of the injury,

7  yes, or the healing process.

8  Q.   And you described your profession, you used the word

9  "Assessment."   Is that correct?

10  A.   I used the word "assessment," yes.

11  Q.   Basically, what you're doing is you're speaking to somebody

12  and looking at any evidence provided by them, in this case the

13  prosecution, but, primarily, you're speaking to these people.

14  Correct?

15  A.   That's one of the primary sources of information is they

16  are recounting to me what they experienced, yes.

17  Q.   And then you look at their body to see if there are any

18  marks on their body that are consistent with what they say

19  happened to them   Correct?

20  A.   If I can, yes.

21  Q.   So, for example, if somebody says "I was burned by an iron,

22       a clothing iron," what you do is you look at his body

23  first to see if there is a burn mark on the body.   Right?

24  A.   Again, depending on where the injury occurred, you will

25  have a different appearance, depending on the stage of healing.

## Hynn - Cross

1  But once I have established through the individual the age of

2  the injury or the date of the injury, then I could correlate

3  the appearance of the deformity or the scar or the healed

4  injury with what actually is described as producing that

5  injury.

6  Q.  So you can tell us if a mark on the body is a burn mark.

7  Right?

8  A.  It's consistent with a burn mark, yes.

9  Q.  Consistent with a burn mark?

10  A.  Yes.

11  Q.  Does that mean it could be a burn mark?

12  A.  That's what I'm saying, it's consistent with a burn mark.

13  Q.  Could it be something else?

14  A.  It could be something else.

15  Q.  So it could be a burn mark, but it could be caused by

16  something else all together?

17  A.  With a similar application of heat to that part of the

18  body, yes.

19  Q.  Well, what else besides -- let's take the case of a iron.

20  What else besides a hot object could cause the mark you saw on

21  Mr. Dulleh's right arm?

22  A.  A hot object would cause that kind of burn.  Whether it was

23  hot as a result of a heated iron, whether it was hot as a

24  result of a semi-solid liquid or semi-solid substance put on

25  his arm, anything that would generate enough heat in that

**October 20, 2008**

**Hynn - Cross**

1   configuration to damage his outer layer of skin and his dermis

2   to a point where it would scar in that fashion.

3   Q.   Really what you're telling us, you saw what looked like a

4   burn mark to you on Mr. Dulleh's right arm   Correct?

5   A.   It's a scar consistent with a healed burn.

6   Q.   But it didn't necessarily have to be caused by an iron.

7   Correct?

8   A.   That's correct.

9   Q.   It could have been caused by any other hot objects?

10  A.   Yes.

11  Q.   It could have been caused by something that wasn't even a

12  solid object?

13  A.   That's correct, as long as you could transfer that kind of

14  heat to that part of the body.

15  Q.   For example, I'm thinking something hot that's not solid is

16  tar, for example.

17  A.   If you applied hot tar in that area of the body with that

18  configuration, it certainly is possible that could burn the

19  body in that way.

20  Q.   Is there something, for example, that is not, that's

21  caustic, for example, that would cause that kind of mark that's

22  not a solid, not a liquid, but something else?  Something

23  caustic could cause it?

24  A.   If that substance would damage and damage the part of the

25  dermis just as heat would, yes, it's possible to get that kind

**October 20, 2008**

## Hymn - Cross

1 of scarring as well.

2 Q.   Are there some plants that are caustic in that way or that

3 are caustic enough that you're aware of?

4 A.   No.

5 Q.   Could you give me an example of something that would be

6 caustic that's not a solid object, that's not tar, something

7 else that's caustic that could leave that kind of mark?

8 A.   Oh, I could speculate about all kinds of different caustic

9 things.   A strong acid could do it, like sulfuric acid or

10 hydrochloric acid, or a very strong lye, a very strong lye

11 substance, potassium hydroxide, sodium hydroxide, any of those

12 that are caustic lye substances.   The list could go on and on.

13 Q.   So if he had told you, for example, "I spilled some tar on

14     my right arm and that's what happened," that would be

15 consistent with what you saw?

16 A.   If it's applied in that configuration, yes.   It depends how

17 the tar was applied.   Tar is a, somewhat, is a liquid, so you

18 would anticipate more of a dripping kind of injury or what

19 would look like a dripping, running kind of injury.

20         This is a triangular scar, which, again, he describes

21 as a clothes iron and that's certainly consistent with a

22 clothes iron.

23 Q.   And all the other caustic substances that you said were too

24 many to mention, if he had said it had been caused by one of

25 those, you might have said "Yeah, that's consistent with that

## Hynn - Cross

1          other caustic substance."   Right?

2   A.    Again, it depends how the caustic substance is applied.   If

3   it's a liquid, you would have more of an immersion pattern

4   where it appears to run over the arm as it appears to localize

5   in one particular area.

6               Given the right circumstances and the right factual

7   information, that's possible.

8   Q.    So when you were talking to these gentlemen, Mr. Dulleh,

9   Mr. Turay, Mr. Jusu and Mr. Kpadeh, quite a bit depended on

10  what they told you happened to them?

11  A.    Yes.   As I previously discussed, it was dependent on that

12  historical information.

13  Q.    I'm going to boil it down.   You tell me if it's correct.

14  Mr. Dulleh told you his arm was burned.   You found that

15  consistent with a burn?

16  A.    My opinion is it's consistent with a burn.

17  Q.    He told you it was with an iron?

18  A.    That's correct.

19  Q.    Your opinion is it could have been caused by an iron?

20  A.    My opinion is it's consistent with a healed burn from an

21  iron.

22  Q.    Is it fair to describe your opinion, "Yes, it could have

23        been caused by an iron"?

24               Are you saying any more than that?

25  A.    I'm saying it's consistent with his account of the

**October 20, 2008**

## Hynn - Cross

1  incident.

2  Q.   And in your field, there really are three ways to describe

3  something.  One is consistent, one is inconsistent and the

4  other is "I don't know."  Is that fair to say?

5  A.   Well, in a broad sense, yes.

6          Our opinions whether something is consistent or not

7  have certain degrees of certainty.  When we see injuries that

8  are not healed and are fresh, our degree of certainty is 100

9  percent sometimes, as opposed to seeing a healed injury.

10 Q.   In this case, you had seen injuries that had healed, by

11 their account, as long ago as 1999?

12 A.   That's correct.

13 Q.   These gentlemen who talked to you, did they ever tell you

14 throughout their experiences they ever received any broken

15 bones because of this?

16 A.   I don't recall any of them describing broken bones.

17 Q.   Not a single broken bone on the hands, the ribs or the

18 feet?

19 A.   No, they never described any broken bones to me.

20 Q.   I want to talk to you a little about Mr. Kpadeh.  He is the

21 first person you testified about.  You said his attorney came

22 with him to his exam?

23 A.   Yes, sir.

24 Q.   And he described that he had been tied behind his back so

25 that his elbows touched each other, and you noticed some marks

**October 20, 2008**

## Hynn - Cross

1    on his elbows.   Correct?

2    A.   Yes.

3    Q.   Consistent with being tied that way by a rope or something

4    similar to it?

5    A.   Yes, that's correct.

6    Q.   You can't say whether that happened in '99 or it happened

7    five years before '99 or five years after '99.   Right?

8    A.   That's correct.   By looking at the scar alone, no, I can't

9    do that.

10   Q.   He also said his penis had been cut with a knife.   Correct?

11   A.   Yes.

12   Q.   And you noticed a scar that seemed to you -- how did you

13   describe it?

14   A.   It's consistent with a healed injury from a sharp object.

15   Q.   Now, you're not saying you can tell that was a knife, can

16   you?

17   A.   No.

18   Q.   All you're saying is something, in your opinion, is

19   consistent with a cut to the penis in that area.   Correct?

20   A.   That scar is consistent with a healed injury that he

21   described was a knife cut to his penis, yes.

22   Q.   Could it have been caused by something that wasn't sharp?

23   A.   Not necessarily, no.   It could be a sharp object, a cutting

24   object of some sort.

25   Q.   And you can't tell whether he received that cut as a child

**October 20, 2008**

## Hynn - Cross

1  or as an adult?

2  A.   From looking at the scar alone, no, I can't.

3  Q.   So he could have received this cut somehow as a young boy?

4  A.   Again, it's possible, but I can't tell from looking at the

5  scar alone.

6  Q.   And a cut like that, any cut to the human body has the

7  potential of getting infected.  Correct?

8  A.   That's correct.

9  Q.   And would you agree that the likelihood of a cut getting

10  infected increases if someone is placed where there is dirty,

11  foul water?

12  A.   Yes.

13  Q.   Now, did Mr. Kpadeh ever tell you that the cut to his penis

14  had been infected?

15  A.   Yes.

16  Q.   He did tell you that?

17  A.   Yes.

18  Q.   Is that in your report?  Are you looking in your report?

19  A.   Yes, I am

20       Maybe I should just clarify that.  He received no

21  medical care and was kept in this water prison for three months

22  until he was released.

23       To correct my answer, he received no medical care.

24  Q.   But he never told you the cut to his penis had been

25  infected?

**October 20, 2008**

## Hynn - Cross

1   A.   No.

2   Q.   Now, you were shown one medical record concerning

3   Mr. Kpadeh.   Correct?

4   A.   Yes, I saw one medical record.

5   Q.   And that was from the John F. Kennedy Medical Center in

6   Liberia?

7   A.   Yes, in Monrovia, Liberia.

8        MR. CARIDAD:   If I could ask the agent to please bring

9   that record up.   I'm going to find the number for you.

10       AGENT BAECHTLE:   (Complied.)

11   BY MR. CARIDAD:

12   Q.   On your screen you can see this medical record -- is that

13   right, doctor -- concerning Mr. Kpadeh?

14   A.   Yes.

15   Q.   The date of this medical record is October 25th, 1999?

16   A.   That's correct.

17   Q.   His temperature seems to be normal by that time?

18   A.   This is a normal temperature, yes.

19   Q.   And does he mention anything in here about a cut to his

20   penis?

21   A.   No.

22   Q.   Does he mention anything here about hot plastic being

23   dripped on him?

24   A.   No.

25   Q.   Does he mention anything in here about being stabbed in the

**October 20, 2008**

## Hynn - Cross

1  back and in his left hand?

2  A.   No, not specifically.

3  Q.   Well, all he mentions are multiple scars to the

4  extremities.   Right?

5  A.   And under the "History of Present Illness," it describes

6  him being tortured for two months.

7  Q.   Correct, but it doesn't say anything about a cut to his

8  penis or hot plastic poured on him

9  A.   The author doesn't say what the torture consisted of.

10  Q.   It doesn't say he was sodomized?

11  A.   Again, there's no specific description of what was done

12  under the word of "Torture."

13  Q.   Or that his rectum was bleeding?

14  A.   No.

15  Q.   This is a medical record, isn't it?

16  A.   This is an out-patient department medical record, yes.

17  Q.   And it doesn't say that he was forced to kick large rocks

18  or anything like that?

19  A.   No, it doesn't go into that detail.

20  Q.   And halfway down the page where it says "PE," you

21  interpreted that to mean "physical exam"?

22  A.   Yes.

23  Q.   To the right of that you said it seemed to be like a G/C to

24  you?

25  A.   Yes.

**October 20, 2008**

## Hynn - Cross

1   Q.   Followed by the word "Good"?

2   A.   Yes.

3   Q.   Could that "G/C" mean "general condition"?

4   A.   It's possible.  I would have to ask the author of the

5   record.  It's not a standard medical abbreviation.

6   Q.   Let me use your own words.  It's consistent with meaning

7   "general condition"?

8   A.   One may interpret that, but, again, I would have to ask the

9   author of the record what he or she meant by that designation.

10  Q.   Can you think of anything else it might mean?

11  A.   I would have to think about it for a while.  It's not a

12  standard medical abbreviation.  Offhand, I don't know what it

13  means.  It could mean "general condition."  Again, I'd have to

14  ask the author.

15  Q.   Then you told us on the right-hand side were the

16  prescriptions given to Mr. Kpadeh?

17  A.   That's correct.

18  Q.   The only thing you were able to make out there is he was

19  given some aspirin?

20  A.   And Doxycycline.

21  Q.   What is that?

22  A.   An antibiotic for urinary tract infections.

23  Q.   Infection of the urinary system inside the body?

24  A.   Yes.

25          MR. CARIDAD:   Okay, agent.  If you would take that

**October 20, 2008**

## Hynn - Cross

1    down.

2              AGENT BAECHTLE:    (Complied.)

3    BY MR. CARIDAD:

4    Q.    Now, Mr. Kpadeh told you that he had been forced to carry

5    some sort of log on top of his right shoulder?

6    A.    Yes.

7    Q.    And you determined that there was, of course, some sort of

8    mark on his right shoulder.  That's pretty clear.   Right?

9    A.    Yes, he has a pretty clear keloid scar there.

10   Q.    What is a keloid scar?

11   A.    Keloid is what occurs very commonly in Afro-Americans.   The

12   body is somewhat overzealous in how it heals the injury and it

13   grows a lot of additional scar tissue and it can be -- it

14   actually can grow quite a large scar, but it has this

15   appearance.   It's thick and raised and glistening, as you saw

16   in the photograph, typical of a keloid.

17   Q.    Not everybody heals with a keloid.   Correct?

18   A.    Not everybody will develop keloids, no.

19   Q.    Is it correct to say someone who develops a keloid scar has

20   a scar that looks bigger?

21   A.    Sometimes the scar can actually grow to a larger size from

22   the injured base of skin.   In other words, the injured base,

23   the base of the scar is the same or, essentially, is the area

24   where the injury occurred, but the scar can be heaped up or

25   piled up on top of itself and grow large.

**October 20, 2008**

## Hymn - Cross

1  Q.   This kind of scar results from, you said, abrasion or

2  scraping?

3  A.   It's consistent with that kind of an injury, an abrasion or

4  laceration of the skin.

5  Q.   And someone who didn't have a keloid scar, the scar would

6  be much flatter?

7  A.   Maybe much flatter, yes.

8  Q.   Maybe not as dark as the scar you saw on Mr. Kpadeh's

9  shoulder?  Would it be a different color?

10  A.   Depending on their skin pigment, it may be lighter or

11  darker.

12  Q.   The words you used were "abrasion, scraping or crushing" to

13  describe what might have caused that?

14  A.   Those kind of injuries could cause a scar like that on his

15  shoulder.

16  Q.   You're not saying a log must have caused that injury.

17  Right?

18  A.   Not a log, with the exclusion of all other logs.

19          Again, it's consistent with his account of the

20  incident.

21  Q.   It's consistent with something being on his shoulder and

22  scraping his shoulder.  Right?

23  A.   That's correct.

24  Q.   It could be anything that he had on his shoulder that

25  caused a scrape, that scraped it or crushed it.  Right?

**October 20, 2008**

## Hynn - Cross

1    A.   That's correct.

2           It's whatever caused the injury to the skin.   It's

3    consistent with a scraping motion or a crushing motion in which

4    the skin would actually split.

5    Q.   If someone is carrying something on his shoulder as part of

6    his daily activities, for whatever reason, it could cause that?

7    A.   Well, it all depends.   If one carries something on one's

8    shoulder as a daily activity, the skin will end up actually

9    becoming calloused and will adapt to it as a wear-and-tear

10   mechanism and you probably wouldn't develop a keloid scar such

11   as that.

12          This is consistent with an injury to that top of his

13   right shoulder from the incident as he described it to me.

14   Q.   If something had fallen on his shoulder at some point in

15   his life and crushed his right shoulder or scraped it, would

16   you see that kind of injury?

17   A.   It's possible, yes.

18   Q.   Again, what you're telling us is he told you it was from

19   carrying a log and you're saying it could have been caused by

20   that.

21   A.   He told me he had a log on his shoulder and the log was

22   beaten with an iron bar.   So something would force the log into

23   his shoulder injuring his shoulder.

24   Q.   The weight of the log itself might cause it or the weight

25   of whatever was on his shoulder might cause it.   Right?

## Hymn - Cross

1  A.   It's possible, but the further energy driving the log into

2  his shoulder or into his skin would definitely, you know, have

3  potential damage to his skin causing this kind of injury.

4  Q.   If he's carrying a bunch of branches or heavy branches

5  because he works on a farm, might he get that injury?

6  A.   It's possible he could get that injury from carrying

7  branches that cut into his skin, yes.

8  Q.   You said you saw some scars on his back.

9       MR. CARIDAD:   If I could have up H 8.

10      AGENT BAECHTLE:   (Complied.)

11 BY MR. CARIDAD:

12 Q.   You said you saw 20 marks on his back?

13 A.   Yes.

14 Q.   And they were arranged in a pattern, you said?

15 A.   They appeared to be in pairs.

16 Q.   So right next to each other going up and down his back?

17 A.   Over his spine, yes, on the upper back.

18 Q.   Did they seem to you that those were purposely put in that

19 pattern or did they seem random to you?

20 A.   I don't know.   They appeared in pairs.   In other words,

21 there were two scars that seemed to be the same distance apart

22 and they seemed to be in pairs.

23      That's the way they looked to me.   I don't know.

24 Again, from his account, the only thing I can say is that he

25 described them as being stabbed with some kind of metal rod

**October 20, 2008**

## Hynn - Cross

1   they used to clean rifles in his back.

2   Q.   Well, I'm sorry.

3              You described them as being 20 of them and next to

4   each other in a pattern.

5   A.   Well, they appear to be in pairs by just looking at them

6   overall.   They have -- that may just be coincidental.   When I

7   look at the photograph and when I looked at him, they appeared

8   to be in pairs.

9   Q.   Did they seem to you like they had been put there for a

10  purpose like some sort of ritual scarring or anything like

11  that?

12  A.   All I can say is what he told me was he was stabbed in the

13  back with this metal rod and I can only assess the scars based

14  on that historical information.

15  Q.   But those could have been caused by anything that broke the

16  skin.   Is that fair to say?

17  A.   That small that broke the skin in that way, yes.

18  Q.   If someone took a knife and made little marks on his back,

19  would that be consistent with that?

20  A.   Small injuries.   Again, these are about the size of a

21  number 2 pencil eraser.   By the time I'd seen them, they're

22  scars now.   Clearly, it was something that damaged the outer

23  surface of the skin and the dermis and left these small raised

24  scars.

25              MR. CARIDAD:   Can we see number 9?

**October 20, 2008**

## Hynn - Cross

1              AGENT BAECHTLE:   (Complied.)

2   BY MR. CARIDAD:

3   Q.   These are the marks you're talking about?

4   A.   Yes.

5              MR. CARIDAD:   How about number 10?

6              AGENT BAECHTLE:   (Complied.)

7   BY MR. CARIDAD:

8   Q.   Same marks?

9   A.   Yes.

10              MR. CARIDAD:   Number 11.

11              AGENT BAECHTLE:   (Complied.)

12   A.   Yes.

13              MR. CARIDAD:   Number 12.

14              AGENT BAECHTLE:   (Complied.)

15   A.   Yes.

16   Q.   These on number 12 seem to be right next to each other.

17   A.   Again, they seem to have -- they seem to be paired, but

18   that -- again, all I can describe is the appearance.

19   Q.   And -- I'm sorry.

20   A.   I only can describe the appearance.

21              Whether they are really in pairs or whether it's just

22   coincidental, again, I have to defer to how they happened and

23   how they got there.

24   Q.   And he's saying these resulted from being jabbed in the

25   skin with some sort of metal object?

**October 20, 2008**

## Hynn - Cross

1    A.   Yes, he described it as a metal rod that's used to clean

2    rifles.

3    Q.   It would seem quite a coincidence the metal rod hit at

4    these places right next to each other.   They seem to be almost

5    the same distance apart, up and down and left and right.

6    A.   That's why they appear to be in pairs.   I would have to

7    actually see the metal rod he was referring to.

8    Q.   I mean, if somebody was just stabbing somebody with a metal

9    rod, it would be quite a coincidence to have these marks in

10   that configuration, wouldn't you say?

11   A.   I don't know.   It's certainly possible.

12          MR. CARIDAD:   Now, if we could look at H 17, agent,

13   please.

14          AGENT BAECHTLE:   (Complied.)

15   BY MR. CARIDAD:

16   Q.   Now, here are pictures of his hand -- correct -- his arms

17   rather?

18   A.   His arms and his hands.

19          MR. CARIDAD:   Could we look at H 20, please?

20          AGENT BAECHTLE:   (Complied.)

21   BY MR. CARIDAD:

22   Q.   This is his right forearm   It seems to be right close to

23   the wrist.

24   A.   Yes.

25   Q.   He told you he had been burned by hot plastic being dripped

**October 20, 2008**

## Hynn - Cross

1  on his arm?

2  A.   Yes.

3  Q.   Okay.

4        And you said that's consistent with a burn.   Right?

5  A.   Yes.   Again, you can see these are the same kind of scars

6  we've seen before related to burns.

7  Q.   You circled two burns there, but you didn't circle the one

8  on the top left of the first mark.   Why is that?

9  A.   That's not part of the scar I'm referring to here.   That's

10  another scar.   That's unrelated.   These are the two scars he

11  was describing as the burns.

12  Q.   You used this word "unrelated" a lot during your testimony.

13  It seems to me it means if he told you that a mark was

14  unrelated, you assumed he was saying that "It didn't happen to

15     me during this event."   Right?

16  A.   Yes.   I would ask him "How did this injury occur?"

17        He would say "Oh, that's something that's not

18     related."

19        We all get injured and get scars on our body.   These

20  are the ones he pointed out to me were from the healed burns

21  from the hot liquid.

22  Q.   So you had no choice but to depend on him to tell you what

23  was related and what was unrelated.   Right?

24  A.   Correct.   I didn't see these things happen, so I'm relying

25  on him

## Hynn - Cross

1  Q.   That mark on H 20 you did not circle to the left of the

2  first mark you made.   What do you think that was?

3  A.   I don't know.   Without any historical information, I can't

4  tell.

5          It's a scar.   It's about 8 millimeters.   You can see

6  it has got a glistening surface.   It was something that had

7  injured the dermis and the skin just folded in or grew back

8  over it.   I don't know.

9  Q.   Can you tell if it's a burn mark?

10  A.   Well, again, if one were to relate that this was from

11  either a liquid applied to that area or if it's -- again, we

12  talked about cigarette burns before -- or is it just an injury

13  that's from something else, I don't know.

14          Again, I don't have any historical context or any

15  information that explains this scar.   The only ones that I have

16  is the two that I circled here.

17  Q.   So without historical information, you cannot tell us if

18  that mark that is not circled is either a burn mark or from

19  something else?

20  A.   That's correct.   I can't tell you the origin of that scar.

21  Q.   Could it be an abrasion?

22  A.   It's kind of small for an abrasion, circular for an

23  abrasion.   Abrasions are usually broader.   It could have been a

24  puncture wound.

25  Q.   It -- I'm sorry.

**October 20, 2008**

## Hynn - Cross

1  A.   Again, without the historical context, I really can't offer

2  an opinion what the scar came from

3  Q.   By "historical context," you mean him telling you?

4  A.   Yeah, because I wasn't there to witness that injury.

5  Q.   These marks that you did circle, you say are burn marks

6  and, I believe, is consistent with liquid.   Right?

7  A.   These scars are consistent with a healed burn from a

8  liquid, as he describes, dripping on his wrist.

9  Q.   Could it be a burn mark from something that was not caused

10  by liquid?

11  A.   Well, it's possible, but, again, you can see they're

12  somewhat irregular and some have even the configuration of a

13  liquid actually running down the arm like these two scars here.

14          This one has a more triangular configuration.   I

15  suppose it possible it could be from something other than

16  liquid.   The two have the same appearance and they're together.

17  From his description, it's from a hot liquid.

18  Q.   Could it be caused by an abrasion, by something that wasn't

19  hot?

20  A.   An abrasion, again, would give you another configuration of

21  a scar.   It could give you more broad, flat scars.

22  Q.   You are not saying it could not have been caused by an

23  abrasion.   You're not saying that?

24  A.   Again, the texture of this scar is such that it's the

25  typical texture you see from heat and thermal injury applied to

**October 20, 2008**

## Hynn - Cross

1    the skin and the skin healing without any skin graft.

2                An abrasion results in a more broad, flat scar.   You

3    don't get a raised texture like that with abrasions.

4    Q.    You can't rule out an abrasion, can you?

5    A.    I can't rule it out, but it's less likely.

6    Q.    And you're not saying this was hot wax or anything.   Right?

7    A.    I can't tell what liquid it is.   All I can say is it's

8    consistent with a healed burn.

9    Q.    And it might have been something that was caustic like some

10   acid or something else like that?

11   A.    Again, that's a possibility.   I could speculate about some

12   caustic substances.   I'm only going on the historical context

13   which I was provided.

14   Q.    If this man worked with something hot and caustic like acid

15   and spilled it on his arm, you would get this kind of mark?

16   A.    It's possible, yes.

17   Q.    Again, you mentioned you had noticed what you thought were

18   marks consistent with a cigarette burn.   Is that right?

19   A.    Where he described a cigarette burn, yes.

20   Q.    And all you're saying is this could be a burn.   Right?

21   A.    Again, it's a typical kind of configuration that you would

22   get from a hot object, a burn into the skin.

23                MR. CARIDAD:   If we could look at H 24, agent.

24                AGENT BAECHTLE:   (Complied.)

25   BY MR. CARIDAD:

**October 20, 2008**

## Hynn - Cross

1  Q.   You said on this image there was a mark consistent with a

2  cigarette burn, some sort of burn.   Is that right?

3  A.   I don't believe this is the correct image, no.

4  Q.   No?

5  A.   No.   He has it on his right --

6  Q.   Did you say this was related to anything?

7  A.   He describes, again, this is hot liquid on his right hand.

8  Q.   Could you circle that, too?

9  A.   (Complied.)

10         These irregular areas are from dripping hot liquid on

11  his hands.

12  Q.   The mark to the very left, you say that was from hot

13  liquid?

14  A.   That's what he described it as, yes.

15  Q.   That doesn't look like it's running at all, does it?

16  A.   No, but drops of liquid on the hand, it's certainly

17  consistent with that kind of pattern.

18         The cigarette burn is a little further up on the arm,

19  as I recall.   There's a scar.

20  Q.   You said it was consistent with a liquid because it was

21  running -- it seemed like it was in a running pattern.   This

22  one on the left doesn't seem to be running at all.   Right?

23  A.   If it's liquid, it's more of a dripping or drops of liquid

24  that are hot and burning.   That's certainly consistent with

25  that.

**October 20, 2008**

## Hymn - Cross

1  Q.   A drop that just stays there and didn't run?

2  A.   It burned and once it burned and cooled, the area that it

3  initially burned would be left with the scar.  Once it runs off

4  the hand, it's not going to injure the hand.

5  Q.   Again, these are burn marks the man had on his body?

6  A.   These are scars from what he describes as hot liquid

7  dripping on his hand.

8  Q.   Again, would it be fair to say it could have been caused by

9  something that was not hot liquid?

10  A.   Again, we talked about acid or lye dripping on the body.

11  That's possible.

12  Q.   Would an abrasion -- could it have caused these marks on

13  Exhibit 24?

14  A.   Again, abrasions are more broad.  They're usually not

15  circular like you see here and individual like you see here and

16  here.  Abrasions are more of a broad scar.

17  Q.   It depends on what caused the abrasion.  If it's something

18  narrow, it would leave a narrow mark.  If it was broad, it

19  would leave a broader mark?

20  A.   But these are circular complete scars.  An abrasion is

21  something more of a broad injury that scrapes the skin off.

22  Q.   What if something just punctured the skin without any heat

23  at all?  Would it leave a mark like this?

24  A.   It's possible.

25  Q.   It's possible these were caused by something that didn't

**October 20, 2008**

## Hynn - Cross

1  have any heat associated with it at all?

2  A.   That's correct.   As long as the dermis was damaged in that

3  small area, you would get a scar like this.

4  Q.   Now, you noticed quite a few marks on this man's body,

5  Mr. Kpadeh's body, that were unrelated to what he told you

6  happened to him   Right?

7  A.   Yes, that's correct.

8  Q.   I mean, all over his body you noticed marks that were

9  unrelated?

10  A.   Yes, he had a lot of scars unrelated to the incidents he

11  described to me.

12  Q.   On his feet he had a lot of scars that were unrelated?

13  A.   Yes.

14  Q.   On his legs and arms?

15  A.   Yes.

16  Q.   If he told you it was unrelated, you didn't bother to

17  examine it?

18  A.   I photographed it, but if he tells me they're unrelated,

19  again, I can't interpret a nondescript or nonspecific scar

20  pattern.

21         MR. CARIDAD:   If we could look at H 33, please.

22         AGENT BAECHTLE:   (Complied.)

23  BY MR. CARIDAD:

24  Q.   These are his feet.   Correct?

25  A.   That's correct.

**October 20, 2008**

## Hymn - Cross

1  Q.   You see on the ankle in the front, there seems to be a scar

2  there in the front of his ankle.   You know what I'm talking

3  about?

4  A.   Yes, this one here.   Is that correct?

5  Q.   Yes.   Did he say that was related to this?

6  A.   No, he did not.

7  Q.   What could cause something like that?

8  A.   It could be just about -- it's an injury that has somewhat

9  of a triangular appearance to it.   Again, I couldn't really say

10  what it is.   If there's some historical context, I certainly

11  could provide an opinion, whether it's consistent or not

12  consistent with it.

13  Q.   But you never asked him what caused that?

14  A.   He said it's not related, so I didn't get into the origin

15  of that scar.

16  Q.   Now, the feet, especially for people who may not be wearing

17  protection on their feet, is an area you might find a lot of

18  scarring.   Is that correct?

19  A.   Yeah.

20  Q.   It's the one part of the body that comes into contact with

21  the ground every day?

22  A.   That's correct.

23  Q.   Not just the underside, the top of it with someone who is

24  just wearing sandals, you would expect a lot of scarring on

25  feet?

**October 20, 2008**

## Hynn - Cross

1  A.   Yes.

2  Q.   Especially with someone living in a rural environment?

3  A.   Yes.

4  Q.   And wears sandals?

5  A.   You certainly would expect it.

6  Q.   When you said you found some lacerations on his foot that

7  were consistent with a blunt object like a rock, you're not

8  saying that any mark on this man night have been caused by him

9  hitting a rock, are you?

10  A.   I didn't describe any laceration on his feet.   All I

11  described was what he pointed out to me here on his toe was a

12  scar that he relates to a healed injury from him kicking one of

13  these large rocks.

14  Q.   But you're not telling us that the only way he could have

15  gotten this laceration is from kicking a hard rock.   Right?

16  A.   Well, no.   But according to his account, this scar is a

17  result of that injury.

18  Q.   Again, we have to go back to his account.

19  A.   That's correct.

20  Q.   Now, he told you he had been kicking a rock.   Is that

21  right?

22  A.   Yes.

23  Q.   He didn't tell you he had been pushing a rock?

24  A.   No, he said he was kicking them like rugby football.

25  Q.   If he had been pushing it, would it be the same mark?

**October 20, 2008**

## Hynn - Cross

1    A.   It's possible.   It depends on the configuration of the

2    rock, how jagged the rock is.

3              MR. CARIDAD:   I don't know if the Court wants to take

4    a break.

5              THE COURT:   Is this a good point for you?

6              MR. CARIDAD:   Yes.

7              THE COURT:   Ladies and gentlemen, we'll take our

8    morning recess.   Please do not discuss the case.

9              [The jury leaves the courtroom at 10:25 a.m]

10             THE COURT:   We need Dr. Hynn?

11             MR. GRAVELINE:   Your Honor, before we bring in the

12   jury, there's one issue we would like to bring up.

13             The Government has two more witnesses, but they'll be

14   short.   Then we have an issue with the last victim in the case,

15   Mulbah Kamara.   He is the one in the car accident.

16             We worked all weekend to get him down here.   We

17   finally got his doctor's approval to let him fly on an air

18   ambulance from Kentucky.   He won't take off until this

19   afternoon or maybe this evening.   The earliest we could get him

20   down is tonight.

21             We wanted to know if we could start tomorrow at noon.

22   We wanted to get the Court's okay.   We would have to put him on

23   first and then have three short witnesses after him  We wanted

24   to get the defense's reaction before we put him on an air

25   ambulance.

**October 20, 2008**

## Hymn - Cross

1          THE COURT:   Why can he start at our regular start

2   time?

3          MR. GRAVELINE:   If he doesn't get down until 8:00 or

4   9:00 this evening, I would have to speak to him to get him

5   ready to testify.   I have no problem working until late.   If he

6   doesn't get down until 9:00, 10:00, 11:00, I might not be able

7   to sit down to talk to him before putting him on the witness

8   stand before 9:00 a.m.

9          THE COURT:   You've had months to talk to him, I'm

10   sure.

11          MR. GRAVELINE:   I talked to him before.   The problem

12   is this car accident happened two or three months ago.   He was

13   in Liberia incommunicado for a month at that point.   His family

14   only owns one cell phone.   It has been incredibly difficult to

15   talk with him.

16          When he got here, we sent an agent to talk to him.

17   This was in September.   It was, essentially, yeses and nos at

18   that point.   He was on oxygen.   We have had a very difficult

19   time to get in touch with him, especially since we have been in

20   trial since mid-September.

21          With that schedule, we believe we will rest our case

22   Wednesday morning.

23          THE COURT:   We'll start tomorrow at 10:00.   I'm not

24   going to push it until the noon hour.   You can talk to him this

25   evening and tomorrow morning.   I'm sure you talked to him

**October 20, 2008**

## Hynn - Cross

1  already.   He's going to tell us what occurred.   That should not

2  change.

3           Let's bring the jury in, please.

4           [The jury returns to the courtroom at 10:44 a.m.]

5           THE COURT:   Everyone please be seated.

6  BY MR. CARIDAD:

7  Q.   Dr. Hynn, you also examined Mr. Turay?

8  A.   Yes.

9           MR. CARIDAD:   Can we have H 46, please?

10          AGENT BAECHTLE:   (Complied.)

11  BY MR. CARIDAD:

12  Q.   Can you see that, doctor?

13  A.   Yes.

14  Q.   Can you circle there the mark that you examined?

15  A.   (Complied.)

16  Q.   Now, he told you that was caused by a bayonet?

17  A.   Yes, that's correct.

18  Q.   Now, you're not saying that it was caused by a bayonet.

19  Right?

20  A.   No.   My testimony is that that is a scar that is consistent

21  with a healed bayonet injury, as he described.

22  Q.   It could have been caused by something that was not a

23  bayonet?

24  A.   Any object that could puncture the skin and leave the same

25  size dimension of an injury could be any pointed object.

**October 20, 2008**

## Hynn - Cross

1  Q.   It doesn't have to be a weapon?

2  A.   It doesn't have to be necessarily a weapon, but he

3  described a bayonet that caused that injury which healed to

4  that scar.

5  Q.   It doesn't have to be a metal object that caused that?

6  A.   Not necessarily, no.

7  Q.   It could be a wooden object that penetrated the skin?

8  A.   That's possible.

9  Q.   You could get that on the head by bumping your head into a

10  sharp twig or sharp branch?

11  A.   You could injure your scalp in multiple different ways that

12  could leave a similar scar, but he described it was a bayonet

13  injury to me.

14          MR. CARIDAD:   If we could have H 53.

15          AGENT BAECHTLE:   (Complied.)

16  BY MR. CARIDAD:

17  Q.   This was a picture of his belly button.   There seems to be

18  a scar there, too?

19  A.   Right below his belly button.

20  Q.   He told you that was unrelated?

21  A.   That's correct.

22  Q.   Do you know what that could have been caused by?

23  A.   No.   Just looking at it, I wouldn't know what caused that

24  injury.   It has got a linear configuration, so, certainly, it's

25  possible this could be a sharp injury that has healed, but from

**October 20, 2008**

## Hynn - Cross

1  what source and for what reason, I wouldn't have any opinion.

2  Q.  Without him telling you the source, you really can't give

3  any opinion at all?

4  A.  No, other than it's a linear configuration-type of scar.

5  It looks somewhat interrupted, the scar directly beneath the

6  belly button, so I really have no opinion what caused this

7  scar.

8  Q.  Like Mr. Kpadeh, this gentleman, Mr. Turay, seemed to have

9  a lot of scars or marks on his body, apparently, that he says

10  were unrelated to what happened?

11  A.  That's correct.

12  Q.  If I used the words "a lot," would you agree with that?

13  A.  His body is scared, but he was clear which scars were

14  related to the incidents he described to me and which were not.

15        MR. CARIDAD:  And then, again, H 55, if we could see

16  that, please.

17        AGENT BAECHTLE:  (Complied.)

18  BY MR. CARIDAD:

19  Q.  Are these marks similar to the marks we saw on Mr. Kpadeh's

20  back?

21  A.  Yes.  I mean, they're similar size and similar character,

22  similar distribution.

23  Q.  Mr. Turay told you these were unrelated to this incident.

24  Right?

25  A.  That's correct.

**October 20, 2008**

## Hynn - Cross

1            MR. CARIDAD:  H 71, please.

2            AGENT BAECHTLE:  (Complied.)

3            MR. CARIDAD:  Maybe H 72.

4            AGENT BAECHTLE:  (Complied.)

5    BY MR. CARIDAD:

6    Q.   You said these were nonspecific scars?

7    A.   Yes.

8    Q.   What do you mean by "nonspecific"?

9    A.   In other words, I'm looking at the scar, just looking at

10   the scar.  I can't tell what caused the scar without some

11   historical context or framework.

12   Q.   Isn't that true for every single mark on this man's body?

13   Without him telling you what caused it, you can't give any

14   opinion.  Right?

15   A.   Well, in a general sense, that's true.  Again, some scars,

16   depending on their degree of individual and specific

17   characteristics, you may be able to form an opinion about how

18   the scar occurred.

19            This kind of scarring, it doesn't have any specific

20   character to it.  Without knowing some historical context, I

21   wouldn't be able to provide an opinion.

22            MR. CARIDAD:  Let's look at H 74.

23            AGENT BAECHTLE:  (Complied.)

24   BY MR. CARIDAD:

25   Q.   Did you say that was consistent with a cigarette burn?

**October 20, 2008**

Hynn - Cross

1    A.   I don't believe that's the burn scar.

2              MR. CARIDAD:   How about H 75?

3              AGENT BAECHTLE:   (Complied.)

4              MR. CARIDAD:   H 76.

5              AGENT BAECHTLE:   (Complied.)

6    BY MR. CARIDAD:

7    Q.   Do you see anything you might think is consistent with a

8    cigarette burn on any of these pictures?

9    A.   No, these were not described as injuries from a burning

10   cigarette.

11             MR. CARIDAD:   Let's look at H 73 then.   Maybe that's

12   it.

13             AGENT BAECHTLE:   (Complied.)

14   BY MR. CARIDAD:

15   Q.   Did you describe any scar on this picture, H 73, as

16   consistent with a cigarette burn?

17   A.   The one here in the center is what he described as a healed

18   injury from a cigarette burn.

19   Q.   Now, could that be from something not even hot applied to

20   the skin, a laceration or abrasion?

21   A.   It's circular and it's depressed.

22   Q.   I'm sorry to interrupt you.

23   A.   Whatever caused this damaged the dermis enough below the

24   outer layer of skin.   When it scared, it scared as a depression

25   and it's circular, about a centimeter.   It's about a centimeter

October 20, 2008

## Hynn - Cross

1  in width and in length.

2  Q.   Could that have been caused by something other than a burn?

3  A.   Again, it's possible, but this is the typical type of scar

4  that comes from a burning cigarette applied to the skin.

5  Q.   It could be something that was not hot that caused this.

6  You say that's not possible?

7  A.   Again, if you're talking about a caustic substance that

8  just drips on the skin in that size and shape and burns the

9  skin in that location, that's possible.   But, again, this is

10  the type of scar that you would normally or you would commonly

11  see with cigarette burns or healed cigarette burns.

12  Q.   The most you could possibly say about this, if you believe

13  it's a burn, is that it was something hot applied to the skin?

14  A.   It's consistent with a hot circular cylindrical object

15  applied to the skin, burning not only the outer layer, but the

16  dermis below it.

17  Q.   So something hot with that shape might have caused that.

18  Correct?

19  A.   Consistent with that injury that's healed.   As a result of

20  a injury or consistent, a scar consistent with an injury from

21  that mechanism

22  Q.   Well, hot cooking oil, could that have caused that?

23  A.   Consistent with a drop, consistent heat, yes, that could

24  have burned him there.

25          MR. CARIDAD:   H 85.

**October 20, 2008**

## Hymn - Cross

1              AGENT BAECHTLE:   (Complied.)

2    BY MR. CARIDAD:

3    Q.   You said you noticed what was a gunshot wound in one of his

4    legs.   Is that right?

5    A.   Yes.   85 is the front of his legs.   You can actually see it

6    better in the photograph of the back of his legs.

7              MR. CARIDAD:   Maybe 86.

8              AGENT BAECHTLE:   (Complied.)

9    A.   Yes.

10   Q.   That seems to you to be a wound from a gun, a bullet?

11   A.   He described it as a gunshot wound through his calf.   That

12   is definitely a consistent scarring pattern you would see from

13   a perforating-type of projectile injury where you have a loss

14   of muscle and a depressed contracted scar.

15   Q.   You can't say how old this is?

16   A.   No, I can't, other than it's not recent.   It's not, you

17   know, a day or a week old.   It's months to years, and probably

18   closer to years old.

19   Q.   It could have happened in '99?

20   A.   Yes.   Again, he described it as a remote gunshot wound to

21   his left leg.

22   Q.   Now, I want to ask you a little bit about Mr. Jusu now.

23   Did he ever tell you that his mouth had been burned with hot

24   food?

25   A.   Yes, he did.

**October 20, 2008**

## Hynn - Cross

1  Q.   Did you check his mouth?

2  A.   Yes.

3  Q.   You didn't find any scars in there?

4  A.   I didn't see anything, any scarring or permanent deformity,

5  no.

6  Q.   Okay.

7       The mouth, however, is a place that heals pretty

8  quickly.   Right?

9  A.   It can heal, yes.   It heals very quickly.   It's difficult

10  to know exactly what he meant by "hot food" also.   It's

11  different for different people.

12  Q.   Now, Mr. Jusu, I believe, said he had been cut with a

13  bayonet on his chest.

14  A.   Yes.

15       MR. CARIDAD:   H 101, please.

16       AGENT BAECHTLE:   (Complied.)

17  BY MR. CARIDAD:

18  Q.   Could you circle the mark he told you was caused by a

19  bayonet?

20  A.   (Complied.)

21  Q.   Now, could that have been caused by something other than a

22  sharp object?

23  A.   Well, again, it's a fairly discrete linear scar.   The scar

24  is raised, so this would come from an object that would have

25  broken the skin in a straight line and then not sutured or not

**October 20, 2008**

## Hymn - Cross

1   stitched.

2           So other objects that could do that, yes, that could

3   leave a similar type of scar.   But this is certainly a

4   consistent scar that you would see from, with an injury like he

5   described, healed.

6   Q.   Could it be from a sharp branch from a tree?

7   A.   It's possible.

8   Q.   A sharp thorn?

9   A.   If it could cut his skin in a linear fashion like this,

10  yes.

11  Q.   Now, Mr. Jusu also told you he had been burned on his penis

12  with a hot liquid?

13  A.   Yes.

14          MR. CARIDAD:   That's image H 133, please.

15          AGENT BAECHTLE:   (Complied.)

16  BY MR. CARIDAD:

17  Q.   Are you able to see the mark you're talking about there,

18  doctor, or do you need another image?

19  A.   I can see the mark.

20  Q.   Is there a better image that would allow you --

21          MR. CARIDAD:   Could we try the next one maybe, H 134?

22          AGENT BAECHTLE:   (Complied.)

23  BY MR. CARIDAD:

24  Q.   Is that one better or the previous one for the mark on his

25  penis?

## October 20, 2008

## Hynn - Cross

1    A.   The previous one is better.

2            AGENT BAECHTLE:   (Complied.)

3    BY MR. CARIDAD:

4    Q.   Where is that mark?

5    A.   He actually has two scars here.   There's one here and one

6    here.

7    Q.   Okay.

8            And he said those were caused by hot wax being poured

9    on his penis?

10   A.   Yes.

11   Q.   Could something other than liquid have caused these marks?

12   A.   Well, sure, anything that would have damaged the skin of

13   the penis and the underlying dermis.

14   Q.   So a scraping by an object?

15   A.   If he had a scrape or a split in the skin of his penis

16   there, that could have caused that kind of damage, although the

17   scar you can see is -- actually it's quite -- it's a fairly

18   thick scar and it's somewhat raised, so something damaged his

19   penis there in two places in a linear or horizontal

20   distribution and left these scars.

21   Q.   I'm sorry?

22   A.   And, again, certainly something that damaged the underlying

23   dermis that caused the scarring to occur.

24   Q.   But not necessarily a hot liquid?

25   A.   It doesn't necessarily have to be a hot liquid, but it's

**October 20, 2008**

## Hynn - Cross

1  consistent with a healed burn from a hot liquid.

2  Q.   This could have happened, again, when Mr. Jusu was a child?

3  A.   Again, I can't tell the age of this injury from just

4  looking at the scar alone.

5          MR. CARIDAD:   H 141.

6          AGENT BAECHTLE:   (Complied.)

7  BY MR. CARIDAD:

8  Q.   You examined his left leg.   Correct?

9  A.   Yes, this is his left leg.

10 Q.   He told you that was because he was cut with a bayonet?

11 A.   Yes, he was cut with a bayonet.

12 Q.   You said this was a sharp injury.   Right?

13 A.   This is the kind of scar you would get from a sharp injury

14 that has not been sutured where it's healed by what's referred

15 to as secondary intention.

16          Primary intention is where you actually bring the skin

17 edges together with sutures to help the healing process.   This

18 is healed by secondary intention.   In other words, the wound is

19 just allowed to gape and over time the skin will fill in and

20 the body will attempt to pull the edges of the injury together.

21 Q.   Apparently, he was injured and he didn't go to a doctor for

22 care?

23 A.   That's consistent with his account, yes.   This would be a

24 wound that was not sutured.

25 Q.   Did this man tell you he was from Sierra Leone?

**October 20, 2008**

Hynn - Cross

1  A.   I don't recall his country of origin.

2  Q.   Did you ask him what kind of medical attention he had

3  received during his life?

4  A.   Other than if he received any medical attention for his

5  injuries, I didn't get into what other medical attention he

6  received.

7  Q.   You didn't ask him "When you were growing up in Sierra

8       Leone or when you were living there, did you ever receive

9       medical attention for any wounds on your body?"

10          You didn't go into that?

11 A.   No, I didn't.

12 Q.   This is, essentially, a cut to the skin that not

13 necessarily must have been caused by a knife?

14 A.   That's the most likely kind of instrument.   Anything that

15 is sharpened and the cut leaves nice straight edges here like

16 you see here, because of the location on the leg, it will gape

17 because of the skin tension line.

18 Q.   More than likely, it seems it was a piece of metal?

19 A.   It's a sharp instrument, a cutting instrument as opposed to

20 a crushing instrument.

21 Q.   Correct.   A piece of metal could be sharp and not be a

22 knife?

23 A.   That's correct.

24 Q.   Could it be caused by something that wasn't a piece of

25 metal?

October 20, 2008

## Hynn - Cross

1  A.   Anything that could cut, anything with a sharp cutting

2  edge.

3  Q.   Could that be caused by a burn also?

4  A.   This is not the appearance of what you would see with a

5  burn because of its sharp clean edges and it's elliptical

6  configuration.   This is very consistent with what you would see

7  from a sharp object.

8  Q.   Again, you're not saying it was a bayonet.   Right?

9  A.   I can't tell you it was a bayonet as opposed to any other

10  type of cutting instrument, no.

11  Q.   You certainly can't tell us if this was a wound that

12  somebody intentionally inflicted on this man?

13  A.   No.   From looking at this scar, no, I can't.   I can't form

14  that opinion.

15  Q.   Now, regarding Mr. Dulleh, if we could talk about him for

16  just a moment.

17       You said Mr. Dulleh described the water that had been

18  poured on him as boiling water.   Right?

19  A.   That's how he described it.

20  Q.   Poured on his head?

21  A.   And through his hands.

22  Q.   And you didn't find any marks on his head?

23  A.   No.

24  Q.   Okay.

25       And you said that probably maybe the water wasn't hot

**October 20, 2008**

Hynn - Cross

1    enough --

2    A.    Maybe --

3    Q.    -- or as hot as he thought, maybe?

4    A.    When he used the word "boiling," we're talking about two

5    different things, and it may have not been boiling in the sense

6    of 212 degrees.

7    Q.    But he used the word "boiling"?

8    A.    Yes.

9    Q.    So the absence of the scars on his head is, in fact,

10   inconsistent with his statement that it was boiling?

11   A.    The absence of scars is not evidence it didn't happen the

12   way he described it.

13   Q.    Right.   But the absence of scars on his head is

14   inconsistent with his statement that it was boiling water.

15   A.    That he meant 212 degrees, yes.

16   Q.    He might have been wrong how hot the water was, but if he

17   said "boiling," that's certainly inconsistent with what you

18   saw.   Right?

19   A.    If he meant 212 degrees, yes.

20   Q.    Now, we saw some images of the back of Mr. Dulleh.

21             MR. CARIDAD:   Image 161.

22             AGENT BAECHTLE:   (Complied.)

23   BY MR. CARIDAD:

24   Q.    You said these images were consistent with a burn from the

25   clothes iron.

October 20, 2008

## Hynn - Cross

1  A.   The two scars I circled here he described as a clothes iron

2  being applied to that part of the body.

3  Q.   You took notes of your conversation with Mr. Dulleh.

4  Right?

5  A.   Yes.

6  Q.   He didn't mention he had been burned with an iron to the

7  back of his left arm, did he?

8  A.   I believe he did, yes.

9  Q.   Could you look at your report and see if that's correct?

10  A.   (Complied.)

11       Yes, he said he was burned with a clothes iron to his

12  body and these injuries he pointed out as burns.  As a matter

13  of fact, in my opinion I stated all of these permanent

14  deformities are consistent with the documented factual evidence

15  and these injuries or these scars are included in a list in my

16  report.

17  Q.   I understand.

18       But in the "Opinion" section of your report when

19  you're talking about a burn from a clothes iron, you list right

20  upper arm, which you have shown us.  Right?

21  A.   Yes.

22  Q.   You list right flank.  What is the flank of the body?

23  A.   On the side of his abdomen.

24  Q.   In this case, the right side of his abdomen?

25  A.   Yes.

**October 20, 2008**

## Hymn - Cross

1  Q.   And his legs.

2  A.   And number 3, the left posterior arm

3  Q.   All you say about the left posterior arm, it has two raised

4  4.1 centimeter scars.

5  A.   Correct.

6  Q.   When you're giving your opinion, you don't mention these

7  scars we're looking at in image 161, do you?

8  A.   Yes, those are included.

9  Q.   You describe, again, permanent scar similar to those on his

10  right upper arm   This is not his right upper arm we're looking

11  at, is it, doctor?

12  A.   No.

13  Q.   The right flank, this is not his right flank?

14  A.   No.

15  Q.   And his legs, these certainly aren't his legs.

16  A.   No.

17  Q.   So when you're describing the parts of his body that in

18  your opinion are consistent with a burn from an iron, you did

19  not include the image we see on 161 on the screen.   Right?

20  A.   In that sentence, no, I didn't include those, but the

21  summary paragraph at the bottom, I have included those.   That

22  may have been just an oversight on my part.

23  Q.   You are telling us now you remember he told you these were

24  also marks from an iron.   Right?

25  A.   That's what he included where he had been burned with an

## October 20, 2008

## Hynn - Cross

1  iron, yes.

2  Q.   These marks don't have any particular shape to them, do

3  they?

4  A.   Some have.   One is somewhat -- one has a somewhat

5  triangular shape to it, the one up at the top, but the other

6  side of it is somewhat irregular.   But the scars are, again,

7  the similar texture and they're raised like you would see from

8  a thermal injury.

9  Q.   Now, on this image we see a lot of marks on Mr. Dulleh's

10  body.   Is that correct?

11  A.   Yes.

12  Q.   The one on his shoulder blade -- do you know what I'm

13  talking about on his shoulder blade?

14  A.   Are you referring to this one here?

15  Q.   Yes.   What did he tell you that was from?

16  A.   He didn't relate that to any injury he received from this

17  whole ordeal.

18  Q.   This looks a lot like the other two you circled.

19  A.   It's pigmented like that, but it's not raised.

20  Q.   You can tell from the photograph it's not raised?

21  A.   Yes.

22  Q.   Do you remember examining that one?

23  A.   I have other pictures of it.   He didn't describe this as

24  one of the areas that he was burned.

25  Q.   He didn't tell you he was burned there?

**October 20, 2008**

## Hynn - Cross

1  A.   He described the areas he was burned and the other scars

2  were not related.

3  Q.   Now, he told you he was electrocuted on his neck.   Right?

4  A.   He had an electric current applied to his neck.

5  Q.   Did you find any evidence of that in his examination?

6  A.   Again, he had some very small scars.   Again, they're

7  nonspecific, unless they can be interpreted in the context of

8  how they occurred.

9  Q.   I'm sorry.

10         He said they applied an electrical current to his

11  neck?

12  A.   Yes.

13  Q.   You are not able to tell us if a mark on his neck is

14  consistent with that or not?

15  A.   He had some scars on his neck.   They're small.   Again, it

16  depends on how much wattage it generated in the passage of the

17  electrical current which would generate heat, which would

18  generate potentially a permanent scar.

19         He does have small scars on the back of his neck.

20  They certainly would be, are consistent with a healed injury

21  from an electric current.   By themselves, I can't tell what

22  they came from

23  Q.   They could be from almost anything?

24  A.   That's correct.

25         MR. CARIDAD:   If we could look at 167.

**October 20, 2008**

## Hynn - Cross

1            AGENT BAECHTLE:   (Complied.)

2   BY MR. CARIDAD:

3   Q.   Did that show the marks he testified about that he said

4   resulted from electrical current?

5   A.   Yes.

6   Q.   Could you circle those?

7   A.   (Complied.)

8   Q.   You're not telling us those must have been caused by

9   electrical current, are you?

10   A.   No, that's not my testimony.

11   Q.   Could they have been caused by something that wasn't even

12   hot?

13   A.   Yes.

14   Q.   And they could have been caused when he was a young man?

15   A.   Again, these are injuries that -- as long as the injury

16   damages the underlying dermis in the fashion you see in that

17   very circular one on the tip of the penis and the really broad

18   irregular area on the shaft of the penis, this could be from

19   temperature from a burn from an electrical current.   It could

20   be from other injuries that would damage the underlying dermis

21   of the penis.

22   Q.   Some object that came into contact with his penis that

23   caused some sort of damage to it?

24   A.   Yes, anything that could damage the dermis.   It could be an

25   object or anything, again, that would cause damage to the

**October 20, 2008**

## Hynn - Cross

1  dermis.

2           MR. CARIDAD:   If I could have one moment, Judge?

3           THE COURT:   Yes.

4  BY MR. CARIDAD:

5  Q.   Doctor, were you asked to do any kind of psychological exam

6  of these people?

7  A.   No, sir.

8  Q.   Have you heard of such a thing being done, a psychological

9  exam being done of people who claim they were the victims of

10  torture?

11  A.   I am aware of that, but that's outside of my area of

12  expertise.

13  Q.   And there are professionals who do that kind of

14  examination.   Are you aware of it?

15  A.   Yes.

16  Q.   Are you aware of something called the Istanbul Protocol?

17  A.   I'm not familiar with that.   I'm not a psychiatrist or

18  psychologist.

19  Q.   The theory is if --

20           MS. ROCHLIN:   Objection to any question that assumes

21  facts not in evidence, especially when it's outside of the

22  witness' expertise.

23           THE COURT:   Sustained.

24  BY MR. CARIDAD:

25  Q.   In summary, you examined these men for marks on their body?

**October 20, 2008**

## Hyma - Redirect

1   A.   I assessed scars, permanent deformities they had on their

2   bodies with the historical account of how they occurred.

3   Q.   And you weren't asked to determine if they had any marks

4   left in their mind because of what happened to them?

5   A.   No.

6            MR. CARIDAD:   Thank you, Judge.

7            That's all I have.

8            THE COURT:   Redirect.

9                    REDIRECT EXAMINATION

10  [Beginning at 11:13 a.m., 10/20/08.]

11  BY MS. ROCHLIN:

12  Q.   Dr. Hyma, do you recall on cross-examination when you were

13  asked questions by Mr. Caridad about who you work for?

14  A.   No.

15  Q.   Do you recall --

16  A.   No, I don't.

17  Q.   Do you recall whether or not you were asked if you ever

18  worked for defense attorneys?

19  A.   Oh, in a general sense, yes.   I thought you were talking

20  about my employer.   Yes, I recall those questions.

21  Q.   And that was in the context of your work determining either

22  cause of death or cause of injury.   Was that your

23  understanding?

24  A.   Yes.

25  Q.   And, Dr. Hyma, when you analyze the cause of a death or an

**October 20, 2008**

## Hymn - Redirect

1  injury, does that analysis always lead to the filing of a case

2  or not?

3  A.   No.

4  Q.   And when you gave Mr. Caridad the breakdown of who you

5  worked for, did that breakdown include those times when there

6  are no cases based on your analysis?

7  A.   Yes.

8  Q.   Dr. Hymn, when you met with and questioned Rufus Kpadeh,

9  what, if any, medical terminology did he use?

10  A.   He didn't use any medical terminology.

11  Q.   What, if anything, did you observe that suggested

12  Mr. Kpadeh had any kind of medical background?

13  A.   I didn't sense that he had any medical background at all in

14  our conversation.

15  Q.   What about Mr. Turay, Mr. Jusu or Mr. Dulleh?  Did you

16  observe anything indicating that either of these other

17  individuals had any kind of medical background?

18  A.   No, I didn't observe that they had any kind of medical

19  background by the vocabulary they used or their knowledge.

20  Q.   Can you explain, Dr. Hymn, whether or not you can form an

21  opinion or reach a conclusion about an injury in a vacuum with

22  no other information beyond the appearance of the injury

23  itself?

24  A.   At times, yes, if the injury is very fresh, opinions about

25  causation of injury can be 100 percent, certainty.

**October 20, 2008**

## Hymn - Redirect

1          With the passage of time and healing, it becomes more

2   and more obscure and there we have to rely on the historical

3   context in which the injury occurred to form any opinion how

4   the injury occurred or what actually caused the injury.

5   Q.   How does it affect your conclusion or opinion when the

6   appearance of the injury itself does not match the historical

7   account or the statements that you've been given?

8   A.   If I understand your question, I guess then my opinion

9   would be what I'm seeing is inconsistent with the historical

10  account.

11  Q.   Now, did you observe anything on Mr. Kpadeh's body that was

12  inconsistent with the historical account he gave you?

13  A.   No.

14  Q.   Did you observe anything on Mr. Turay's body that was

15  inconsistent with the historical account he gave you?

16  A.   No.

17  Q.   Did you observe anything on Mr. Jusu's body that was

18  inconsistent with the historical account that he gave you?

19  A.   No.

20  Q.   Can you tell us if you observed anything on Mr. Dulleh's

21  body that was inconsistent with the historical account he gave

22  you?

23  A.   No.

24  Q.   Dr. Hymn, do you recall Mr. Caridad's questions about the

25  boiling water in Mr. Dulleh's account?

**October 20, 2008**

## Hyma - Redirect

1  A.   Yes.

2  Q.   What description did Mr. Dulleh provide about his

3  recollection of the water in his account?

4  A.   He just described a container with water from which steam

5  was rising.   He didn't see the container on a heating element

6  and the water actually in a rolling kind of boil.

7  Q.   Dr. Hyma, do you also recall questions from defense counsel

8  about various possibilities for injuries to each of the men you

9  examined?

10  A.   Yes.

11  Q.   Do you recall his question you about the possibility of

12  scars resulting on a shoulder from carrying branches?

13  A.   Yes.

14  Q.   Dr. Hyma, for someone who worked on a farm regularly

15  clearing and carrying branches on a regular basis, would such

16  activity cause the raised keloid scar you observed on Rufus

17  Kpadeh?

18  A.   Again, if he had an incident where he actually tore his

19  skin or damaged his skin from some kind of an object that was

20  placed or came in contact with that part of the body, it's

21  possible.   But he clearly related to me that this came from the

22  incident of them placing this log on his shoulder and then

23  beating it with a metal bar.

24  Q.   In your testimony on cross-examination you referred to

25  habitual wear and tear, I believe, or habitual activity.   Do

**October 20, 2008**

## Hyma - Redirect

1    you recall that reference in one of your answers?

2    A.    Yes.

3    Q.    How would habitual wear and tear affect the human body?

4    A.    Well, the human body will adapt to parts of the skin that

5    comes in contact with surfaces all the time.

6             Think of the calluses on the soles of your feet, the

7    calluses on your hands.  If you work with your hands, over time

8    the body will adapt and the skin will thicken if there's a

9    physical stress applied to that area of the skin.

10   Q.    And in areas which become calloused or thickened because of

11   habitual activity, what is the likelihood of a raised keloid

12   scar such as the one on Mr. Kpadeh's shoulder resulting simply

13   from that habitual activity?

14   A.    Usually you wouldn't see that kind of scar.  Since the skin

15   would thicken and it would protect one from injury, you

16   wouldn't see that kind of a scar form unless the skin was and

17   the underlying dermis was actually injured.

18             MS. ROCHLIN:  If I could ask Agent Baechtle to bring

19   up Hyma Exhibits 49, 50, 69 and 71 through 74.

20             All right.  49.

21             AGENT BAECHTLE:  (Complied.)

22             MS. ROCHLIN:  50.

23             AGENT BAECHTLE:  (Complied.)

24             MS. ROCHLIN:  69.

25             AGENT BAECHTLE:  (Complied.)

**October 20, 2008**

## Hymn - Redirect

1        MS. ROCHLIN:   And 71 through 74.

2        AGENT BAECHTLE:   (Complied.)

3   BY MS. ROCHLIN:

4   Q.   Dr. Hymn, the photographs that just appeared on the screen,

5   do you recognize those as ones that show orientation or

6   actually show the scar Mr. Turay described as coming from a

7   cigarette burn?

8   A.   Yes.   On his right wrist, yes.   It's not the one on the

9   screen currently, though, not 74.

10        MS. ROCHLIN:   Agent, let's take down 74 and return to

11   73.

12        AGENT BAECHTLE:   (Complied.)

13   BY MS. ROCHLIN:

14   Q.   Doctor, do you recall Mr. Caridad's questions about whether

15   such scars could possibly result from some kind of caustic

16   agent?

17   A.   Yes.

18   Q.   By "caustic agent," is that a reference to something like

19   acid?

20   A.   Yes, or a strong base on both ends of the acid base scale.

21   Q.   What is the likelihood a scar of this configuration and

22   shape and characteristic would result from the application of a

23   caustic agent such as acid?

24   A.   Well, again, in order to get that kind of scar, one would

25   have to have the acid applied in a very specific area in a

**October 20, 2008**

## Hynn - Redirect

1   circular distribution and one would have to have their body

2   still and quiet while it burned into the skin because it would

3   take a little time to burn through the skin.

4          So, you know, I could speculate about, perhaps, a

5   factual scenario or a scenario where you could, perhaps,

6   accomplish that, but it would require some cooperation on the

7   part of the individual and the very specific application of

8   that caustic agent to that particular part of the body.

9   Q.   Dr. Hynn, do acids usually take a solid or liquid form, in

10  your experience?

11  A.   Most acids are liquid.

12  Q.   Would you expect in an acid burn to see evidence of

13  dripping or movement or flow of the liquid?

14  A.   Yes, if it was a very, very small amount and applied very,

15  very direct and discretely.

16  Q.   And do you see any evidence of liquid movement in the

17  photographs of the scar on Mr. Turay's wrist?

18  A.   No.   This is a discrete circular almost punched-out-type of

19  scar.

20  Q.   And with respect to the question of acid versus cigarette,

21  is the scar on Mr. Turay's wrist more consistent or less

22  consistent with a burn from a cigarette, as opposed to an acid

23  burn?

24  A.   This is more consistent with a cigarette burn than an acid

25  burn.

**October 20, 2008**

# Toe - Direct

1          MS. ROCHLIN:  If I could have a moment, Your Honor?

2  BY MS. ROCHLIN:

3  Q.  Dr. Hyma, just to clarify and make sure the way I phrased

4  my questions were not ambiguous, was there anything

5  inconsistent in Mr. Turay's account with the marks you observed

6  on his body?

7  A.   No.

8  Q.   Was there anything inconsistent in Mr. Jusu's account with

9  the marks you observed on his body?

10 A.   No.

11 Q.   Was there anything inconsistent with Mr. Dulleh's account

12 with the marks you observed on his body?

13 A.   No.

14          MS. ROCHLIN:  I have no further questions, Your Honor.

15          THE COURT:  Thank you, doctor.  You are excused.

16          THE WITNESS:  Thank you.

17          THE COURT:  Government's next witness.

18          MR. GRAVELINE:  Government calls Aloysius Toe to the

19 stand.

20          [The witness was excused at 11:25 a.m.]

21          ALOYSIUS TOE, GOVERNMENT'S WITNESS, SWORN.

22                     DIRECT EXAMINATION

23 [Beginning at 11:25 a.m.]

24 BY MR. GRAVELINE:

25 Q.   Can you please state your name and spell it for the record?

**October 20, 2008**

## Toe - Direct

1  A.    My name is Aloysius Toe.   Aloysius is spelled

2  A-l-o-y-s-i-u-s, and my surname is spelled T-o-e.

3  Q.   Mr. Toe, where were you born?

4  A.   I was born in Barclayville, Grand Kru County, in

5  southeastern Liberia.

6  Q.   How old, are you?

7  A.   31-years-old.

8  Q.   Where do you currently live?

9  A.   I live in Monrovia, Liberia.

10  Q.   Did you live in Liberia during the Charles Taylor

11  government?

12  A.   Yes.

13  Q.   And did that government begin in 1997?

14  A.   Yes.

15  Q.   I'd like to focus your attention, though, beginning about

16  the year 2000 and going forward from there.

17         Were you involved in any organizations within Liberia?

18  A.   Yes.

19  Q.   What organizations were you involved with?

20  A.   The Movement for the Defense of Human Rights, MDHR, and the

21  Amnesty International Special Program on Africa based at the

22  National Human Rights Center of Liberia.

23  Q.   And what causes would these two organizations champion

24  within Liberia?

25         MR. CARIDAD:   Objection, Your Honor.   Relevance.

**October 20, 2008**

## Toe - Direct

1    Hearsay.   403.

2              THE COURT:   Overruled.

3    BY MR. GRAVELINE:

4    Q.   Go ahead.

5    A.   They were monitoring human rights violations and advocating

6    for human rights in Liberia.

7    Q.   What were some of the human rights activities that your

8    group was monitoring in Liberia after the year 2000?

9              MR. CARIDAD:   Objection, Your Honor.   Relevance.

10   Hearsay.

11             THE COURT:   Sustained.

12   BY MR. GRAVELINE:

13   Q.   What were some of the ways that your two organizations

14   would advocate on behalf of the Liberian people after the year

15   2000?

16             MR. CARIDAD:   Same objection, Your Honor.

17             THE COURT:   Overruled.

18   BY MR. GRAVELINE:

19   Q.   You can go ahead.

20   A.   Well, publicize the names of victims.   We would launch

21   protests and we would institute court actions.

22   Q.   When you mentioned court actions, what type of court

23   actions would you launch?

24             MR. CARIDAD:   Objection, Your Honor.   Relevance.

25             THE COURT:   Sustained.

**October 20, 2008**

**Toe - Direct**

1  BY MR. GRAVELINE:

2  Q.   You mentioned public protests.   What types of protests did

3  you organize?

4        MR. CARIDAD:   Same objection, Your Honor.

5        THE COURT:   Overruled.

6  A.   Peaceful protest march in the streets of Monrovia to

7  protest the detention of those detained unlawfully.

8  Q.   Towards the end of 2002, do you remember some of the names

9  of the people you were advocating the release of?

10        MR. CARIDAD:   Objection, Your Honor.   Hearsay.

11  Request a sidebar

12        THE COURT:   You may approach.

13

14

15

16

17

18

19

20

21

22

23

24

25

**October 20, 2008**

## Toe - Direct

1          [Proceedings at sidebar follow]:

2          MR. CARIDAD:  This has be hearsay.  If he's going to

3    say he received information somebody was detained, that's

4    hearsay.  The person detained was named, whatever, that's

5    hearsay.  How can I confront this?

6          MR. GRAVELINE:  I asked if he remembered what names he

7    was advocating the release of.  It's not hearsay.  It's what he

8    did, the actions he took and the people he was advocating on

9    behalf of.

10          Now, if the defense wants to ask him on

11    cross-examination "How do you know these people were detained?"

12    that might go to the basis of knowledge.  This is what he was

13    doing.  He was publicizing certain people's names, I believe.

14          THE COURT:  That's all inferential hearsay.  How does

15    he know they were detained?  Did he see them detained?

16          MR. GRAVELINE:  He didn't see the actual arrest.

17          THE COURT:  He didn't see any of the folks he's

18    advocating for in a detention situation.  He knows it.  It's

19    all inferential hearsay.

20          MR. GRAVELINE:  It's not being offered for the truth

21    of the matter asserted.  Basically, who he would mention would

22    be Hassan Bility and Varmuyan Dulleh.

23          What it's being offered for is to show the actions of

24    his group.  This is very similar to the testimony of Mr. James

25    Torh.  How did these people get released from jail?  There was

**October 20, 2008**

## Toe - Direct

1  pressure being put on the Liberian government by certain

2  organizations.    He will also testify pressure was being put on

3  them by the U.S. Embassy and local Catholic church.    That's the

4  type of pressure that gained the release of these men in 2002.

5  That's the exact same testimony we elicited from Mr. Torh in

6  the '99 time frame.

7          THE COURT:    Which of the alleged victims is he going

8  to provide this cooperation for?

9          MR. GRAVELINE:    Varmuyan Dulleh and, basically, Bility

10  was the one they were very much advocating for because he was

11  best known.

12          MR. CARIDAD:    Judge, I can't think of anything that is

13  not hearsay.    Not a single word of that is nonhearsay.    If it's

14  not offered for the truth, it's irrelevant.    Of course, it's

15  being offered for the truth.    Everything he is saying has to

16  come from hearsay.

17          THE COURT:    He's going to testify of his efforts in

18  getting these folks out and, in fact, they were released.

19          MR. GRAVELINE:    Yes.

20          THE COURT:    How does he know they were released?

21          MR. GRAVELINE:    He knows that -- as far as him seeing

22  them, I don't know.    I mean, he'll say that he has seen them

23  subsequently and, you know, basically -- I mean, he can testify

24  that he saw them because he was arrested for some of the things

25  he had done and he was held longer than any of these people.    I

**October 20, 2008**

## Toe - Direct

1  wasn't planning on eliciting that.

2          THE COURT:   He's going to say he advocated for these

3  two men, Dulleh and Bility.   He doesn't know they were, in

4  fact, detained, but his organization advocated to free them and

5  since then he knows they are free.   He doesn't know they were

6  detained other than hearsay.

7          MR. GRAVELINE:   That's correct.

8          THE COURT:   With that understanding, and you can

9  certainly probe, Mr. Caridad, that he doesn't even know whether

10  they were detained.   These are just names he advocated for.

11          Overruled.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**October 20, 2008**

## Toe - Direct

1          [Proceedings in open court follow]:

2   BY MR. GRAVELINE:

3   Q.   Mr. Toe, before we stopped, can you name the two

4   organizations you were part of once again in the 2002 time

5   frame?

6   A.   Movement for the Defense of Human Rights, MDHR, and the

7   Amnesty International Special Program on Africa based at the

8   National Human Rights Center of Liberia.

9   Q.   Now, your first organization, the Movement for the Defense

10  of Human Rights, that's not MODEL as in the warring faction of

11  the 1990s, is it?

12  A.   It is not.

13  Q.   And at any point had any of your organizations taken up

14  arms in Liberia?

15  A.   Never.

16  Q.   Now, in 2002, did those two organizations fall underneath

17  of a larger umbrella organization that had developed in

18  Liberia?

19  A.   Yes, it was the Coalition of Human Rights Defenders in

20  Liberia.

21  Q.   And what was your role in that organization?

22  A.   Secretary general.

23  Q.   Now, in 2002, did this Coalition of Human Rights groups

24  advocate for the release of any persons in detention?

25  A.   Yes.

**October 20, 2008**

## Toe - Direct

1  Q.   Do you remember the names of any of the people you were

2  advocating for?

3  A.   I remember some of the names, yes.

4  Q.   And what were some of the names of the people you were

5  advocating the release for?

6  A.   Hassan Bility, Sheikh Sackor, Varmuyan Dulleh, Varsay

7  Kamara and a lot of Kamaras.

8  Q.   Was yours the only organization that was advocating for

9  their release?

10  A.   No.

11  Q.   What were some of the other organizations advocating for

12  these men?

13            MR. CARIDAD:   Objection.   Hearsay.

14            THE COURT:   Overruled.

15  A.   The Catholic church of Liberia, especially Bishop Michael

16  K. Francis.

17  Q.   Were there any other organizations who were advocating for

18  these men?

19  A.   The Coalition of Human Rights Defenders in Liberia, the

20  President of Liberia, of course.

21  Q.   How would you characterize the amount of pressure being

22  applied to the Charles Taylor government in 2002?

23            MR. CARIDAD:   Objection, Your Honor.   Relevance.

24  Speculation.

25            THE COURT:   Overruled.

October 20, 2008

## Toe - Direct

1  A.   The pressure that was being applied by the human rights

2  community, you mean?

3  Q.   Yes.   I'm sorry.

4  A.   Very massive.

5  Q.   In October of 2002, what, if anything, did you organize to

6  advocate for the release of these men you have named?

7  A.   There was a peaceful, there was a peaceful solidarity

8  prayer that was organized first and following that prayer was a

9  march, a peaceful march.   But before that march, there was a

10  habeas corpus which was handled in Liberian Court and later the

11  African Commission of U.N. People's Rights.

12  Q.   What, if anything, happened to you because of that march?

13          MR. CARIDAD:   Objection.   Relevance.

14          THE COURT:   Overruled.

15  A.   I was in an assassination attempt and my wife kidnapped.

16          MR. CARIDAD:   Judge, can I have a sidebar?

17

18

19

20

21

22

23

24

25

**October 20, 2008**

## Toe - Direct

1          [Proceedings at sidebar follow]:

2          MR. CARIDAD:  This the first time I'm hearing any of

3   this, that somebody tried to kill him  This man has just told

4   this jury that somebody tried to kill him, kill his wife or

5   something.  This has nothing to do with this case at all.

6          Now we're dealing with an allegation I have never

7   heard before from this man whom I have never met before that

8   someone tried to kill him  What is the relevance of that.

9          MR. GRAVELINE:  What I was seeking to elicit is he was

10  arrested.  When I talked to him during prep sessions, he was

11  going to say "I was arrested in November and was held" --

12         THE COURT:  I'll go ahead and strike the answer.

13         MR. CARIDAD:  This has absolutely nothing to do with

14  my client.

15         THE COURT:  I'll strike the testimony, strike the

16  answer.

17

18

19

20

21

22

23

24

25

**October 20, 2008**

## Toe - Cross

1           [Proceedings in open court follow]:

2               THE COURT:   Ladies and gentlemen, you are to disregard

3    the witness' last answer.   That is stricken.

4    BY MR. GRAVELINE:

5    Q.   Mr. Toe, after the march in October of 2002, were you

6    yourself detained?

7    A.   Yes, I was detained.

8    Q.   When did the Charles Taylor government come to an end in

9    Liberia?

10   A.   August, 2003.

11              MR. GRAVELINE:   Thank you.

12              No further questions, Your Honor.

13              MR. CARIDAD:   If I could have a moment, Your Honor.

14              THE COURT:   Yes.

15                           CROSS EXAMINATION

16   [Beginning at 11:39 a.m., 10/20/08.]

17   BY MR. CARIDAD:

18   Q.   Mr. Toe, you said the Charles Taylor government came to an

19   end in August 2003?

20   A.   Yes.

21   Q.   That was before President Taylor's term in office was

22   supposed to expire?

23   A.   Yes.

24   Q.   Basically, from what you saw he was forced from office?

25   A.   I wouldn't say that.

**October 20, 2008**

**Toe - Cross**

1  Q.  He left voluntarily?

2  A.  He resigned.

3  Q.  He resigned because of pressure from groups like yours and

4  the international community.  Is that fair to say?

5  A.  No, I wouldn't say that.

6  Q.  Okay.

7           He gave up the presidency of the country.  Correct?

8  A.  He gave up the presidency of the country in compliance with

9  the Accra Peace Accord.

10  Q.  The Peace Accord was because of the fighting going on in

11  Monrovia?

12  A.  Because of the conflict in Liberia.

13  Q.  Which extended into 2003?

14  A.  Yes.

15  Q.  There was conflict in 2002.  Would that be fair to say?

16  A.  Yes.

17  Q.  Even before that, there was conflict in 2001?

18  A.  I wouldn't say.

19  Q.  In 2002, there was conflict that was approaching Monrovia.

20  Would you say that's correct?

21  A.  There was conflict in parts of the country.

22  Q.  In 2003, the conflict got more severe and closer to

23  Monrovia.  Would you say that's correct?

24  A.  Yes.

25  Q.  Because of that, there was a peace agreement that was

**October 20, 2008**

## Toe - Cross

1  signed?

2  A.   Yes.

3  Q.   As a consequence of that peace agreement, Charles Taylor

4  left the country?

5  A.   Yes.

6  Q.   And went to another country?

7  A.   Pardon?

8  Q.   He went to another country.   He left Liberia?

9  A.   Yes.

10  Q.   Was the United States part of that pressure that was

11  applied on Mr. Taylor, would you say?

12  A.   I couldn't say, but the United States was part of the

13  negotiations with Accra.

14  Q.   The United States was part of the negotiations?

15  A.   In Accra.

16  Q.   And they wanted Mr. Taylor to leave?

17  A.   I wouldn't say that.

18  Q.   The United States didn't care whether he stayed or left?

19  A.   I wouldn't say that.

20  Q.   What was the United States' role?

21  A.   As I read from the paper, the U.S. Government was seeking

22  an end to the conflict in Liberia.   There was a cease fire.

23          MR. CARIDAD:   Thank you.   That's all I have.

24          MR. GRAVELINE:   One moment, Your Honor.

25          No further questions, Your Honor.

**October 20, 2008**

## Saybay - Direct

1    THE COURT:   Thank you.

2    The witness is excused.

3    [The witness was excused at 11:41 a.m]

4    MS. HECK-MILLER:   The United States calls James

5  Saybay.

6    JAMES K. SAYBAY, GOVERNMENT'S WITNESS, SWORN

7    DIRECT EXAMINATION

8  [Beginning at 11:41 a.m]

9  BY MS. HECK-MILLER:

10  Q.   Sir, please tell us your name and spell your last name.

11  A.   My full name is James K. Saybay AND my last name is spelled

12  S-a-y-b-a-y.

13  Q.   Mr. Saybay, when were you born?

14  A.   (Redacted.)

15  Q.   Where were you born?

16  A.   Gbarnga City, Bong County, Liberia.

17  Q.   Where do you currently live?

18  A.   I currently live in Gbarnga City, Bong County, Liberia.

19  Q.   Mr. Saybay, what is your profession?

20  A.   I am an attorney at law.

21  Q.   Where do you practice your profession?

22  A.   I practice in Liberia.   Specifically, in Bong County right

23  now.

24  Q.   Are you associated or affiliated with any law firm?

25  A.   Yes.

**October 20, 2008**

## Saybay - Direct

1  Q.   What is the name of the law firm?

2  A.   Wright Jangaba & Associates, and that Wright is spelled

3  Wr-i-g-h-t J-a-n-g-a-b-a & Associates law firm

4  Q.   Is Wright Jangaba & Associates a local law firm of Gbarnga

5  or is it a national law firm?

6  A.   A national law firm and I control the branch in Gbarnga.

7  Q.   Where is the main headquarters?

8  A.   It's in Monrovia.

9  Q.   Mr. Saybay, do you have a college degree?

10  A.   Yes, I do.

11  Q.   When did you receive that?

12  A.   1987.

13  Q.   And in what area is your degree?

14  A.   Political science and international humanitarian relations.

15  Q.   What did you receive your degree from?

16  A.   At the Cuttington University, Suakoko, Bong County.

17  Q.   Could you spell Cuttington University, please?

18  A.   C-u-t-t-i-n-g-t-o-n.

19  Q.   Could you spell Suakoko, please?

20  A.   S-u-a-k-o-k-o.

21  Q.   Mr. Saybay, in addition to receiving a college degree, did

22  you also have occasion to study law?

23  A.   Yes, with Garlawola & Associates Law Offices and admitted

24  in 1987.

25  Q.   And could you spell the name of the law office, please,

**October 20, 2008**

## Saybay - Direct

1  Garlawola?

2  A.   Capital G-a-r-l-a-w-o-l-a and some would say u.

3  Q.   Mr. Saybay, in Liberia, is it an accepted practice that

4  persons may receive training in law by working at a law firm?

5  A.   Yes.

6  Q.   And following that stint with the Garlawola law firm, did

7  you receive any certification or licensure with regard to the

8  practice of law?

9  A.   Yes.

10  Q.   And what type of certification or license did you receive?

11  A.   Certificate of admission and I that yearly practicing

12  license.

13  Q.   And have you been continuously licensed to practice law in

14  Liberia since then?

15  A.   Yes.

16  Q.   Mr. Saybay, did you undertake any additional educational

17  activity after you got your law license?

18  A.   Yes.

19  Q.   And, specifically, did you study in 2004 someplace?

20  A.   Yes.

21  Q.   Where did you study in 2004?

22  A.   In the Hague, the Netherlands.

23  Q.   And what educational institution did you attend in the

24  Netherlands?

25  A.   International Criminal Investigation Institute, University

**October 20, 2008**

## Saybay - Direct

1   of Leiden.

2   Q.   And that's the University of Leiden, did you say?

3   A.   Yes.

4   Q.   Did you receive a certificate in those fields?

5   A.   Yes.

6   Q.   What were the fields, again, please in which you received a

7   certificate?

8   A.   Say that again.

9   Q.   What were the fields in which you received a certificate

10  from the University of Leiden?

11  A.   International humanitarian law, criminal investigation.

12  Q.   Did you also recently do some education further at

13  Cuttington University?

14  A.   Yes.

15  Q.   And what education was that?

16  A.   Peace study and conflict resolution.

17  Q.   When did you undertake those studies at Cuttington

18  University?

19  A.   2007, 2008.

20  Q.   And did you have any graduation or receive any

21  certification in connection with that education?

22  A.   Yes.

23  Q.   And what graduation or certification did you obtain?

24  A.   Received certificate in peace study and conflict resolution

25  during the last graduation in 2008, June.

**October 20, 2008**

## Saybay - Direct

1   Q.   Mr. Saybay, I'd like to ask you a bit about your job

2   experience.   Could you, please, describe to us your present

3   legal practice?

4   A.   Presently I have a contract with the American Refugee

5   Committee as routine legal officer for SGBV cases.   That is

6   sexual gender base, which include rape, sexual harassment, et

7   cetera, and in doing that, I associate with the Ministry of

8   Justice in prosecuting perpetrators.

9   Q.   In that regard, Mr. Saybay, are you then a private attorney

10  or a public attorney or is it a combination?

11  A.   A combination.   I'm private, but I usually associate with

12  the state in doing those special jobs.

13  Q.   And when you say you associate with the state, are you, in

14  fact, prosecuting criminal cases for the Government of Liberia?

15  A.   Yes.

16  Q.   And what types of criminal cases do you prosecute?

17  A.   Like I said, specifically gender-based violence and

18  sometimes murder cases, but those that I do for the ARC are

19  specifically gender-based violent cases.

20  Q.   And in the course of your work -- withdrawn.

21        Do you also do criminal defense work, Mr. Saybay?

22  A.   Yes.

23  Q.   Is that in Liberia?

24  A.   In Liberia yes.

25  Q.   Mr. Saybay, then could you describe, please, the extent of

**October 20, 2008**

## Saybay - Direct

1  your experience in the criminal sanctions of Liberia?

2  A.   Say that again, ma'am?

3  Q.   Could you, please, describe the extent of your professional

4  experience in working with and knowing the criminal sanctions

5  of Liberia?

6  A.   Yes.

7  Q.   Can you describe that for us, please?

8  A.   I do know that I help, like I said, the Ministry of

9  Justice.   If cases are referred to me by the agency just named,

10  the ARC, I associate with the administration of justice in

11  their framework to help prosecute those perpetrators.

12  Q.   Mr. Saybay, have you, yourself, ever been a member of any

13  military organization?

14  A.   No.

15  Q.   Have you been a member of any militia?

16  A.   No.

17  Q.   Have you ever engaged in any armed conflict?

18  A.   No.

19  Q.   Mr. Saybay, are you familiar with the lawful sanctions that

20  may be imposed by the Liberian criminal justice system with

21  regard to detainees?

22  A.   Yes.

23  Q.   And, Mr. Saybay, I'd like to ask you with regard to --

24  withdrawn.   Let me ask you some further preliminary questions.

25           Mr. Saybay, during 1999 through 2003, were the courts

**October 20, 2008**

## Saybay - Direct

1  operating in the country of Liberia?

2  A.   Yes.

3  Q.   During the period 1999 to 2003, was the Liberian

4  Constitution in effect?

5  A.   Yes.

6  Q.   During the period 1999 through 2003, was the writ of habeas

7  corpus in effect?

8  A.   Yes.

9  Q.   Mr. Saybay, I would now like to present to you --

10 withdrawn.

11        Are you then familiar, Mr. Saybay, with what sanctions

12 and punishments may be imposed within the Liberian law

13 incidental to lawful sanctions?

14 A.   Yes.

15 Q.   I would like to now present to you some propositions and I

16 would like you to tell us whether these propositions may be

17 imposed incidental to lawful sanctions within Liberia.

18        Do you understand my question?

19 A.   Yes.

20        MR. CARIDAD:   Judge, I object.  Now, he's giving an

21 opinion.

22        THE COURT:   Why don't we take our lunch recess?

23        Ladies and gentlemen, I'll remind you again not to

24 discuss this case.  I'll ask that everyone please return by

25 1:15.  We'll have you back at 1:15.  Have a good lunch.

**October 20, 2008**

## Saybay - Direct

1          [The jury leaves the courtroom at 11:52 a.m]

2          THE COURT:   Mr. Saybay, you are excused.   We'll see

3    you back at 1:15.

4          THE WITNESS:   Thank you.

5          [The witness was excused at 11:53 a.m].

6          THE COURT:   Let me just say, and I know we're on a

7    defense objection, but the last witness and this witness have

8    both mentioned the writ of habeas corpus and no explanation has

9    been given.   There's an assumption that the jury understands

10   that.   That is just an aside.

11          Let's address the objection from Mr. Caridad.   The

12   objection is opinion testimony.

13          MR. CARIDAD:   He's giving an opinion, I assume, an

14   expert opinion, although he has not been qualified yet as an

15   expert, and I know he's going to give an opinion about whether

16   these actions that we've heard in trial are incidental to

17   lawful sanctions.

18          That term, "incidental to lawful sanctions," Your

19   Honor, is a term that is found in the Convention Against

20   Torture and it is found in our criminal statutes.   I don't

21   believe it's found in the Liberian Legal Code.   It's strictly

22   something found in the Convention Against Torture and in our

23   statutes.

24          I don't see this man is capable of interpreting what

25   "incidental lawful sanctions" means under American law.   If

**October 20, 2008**

## Saybay - Direct

1   they want to bring somebody in who is familiar with Title 18,

2   United States Code, § 2340, maybe, but this gentleman is not

3   familiar with that.

4           THE COURT:   I'll hear from the Government.

5           MS. HECK-MILLER:   First of all, Your Honor, we don't

6   agree that we're about to elicit opinions.   We are about to

7   elicit facts about what sanctions fit within the Liberian

8   sanctions.

9           Second of all, Your Honor, if the Court were to

10  disagree and consider this testimony as only opinion testimony,

11  Mr. Saybay could be qualified as an expert.

12          I did not go into all of the details of his background

13  because I did not propose to qualify him as an expert because I

14  don't believe his testimony will be opinion.   However, I

15  believe he is qualified as an expert and further information in

16  his background would suggest that.

17          I think that counsel's objection that the only

18  testimony that could be relevant here is with regard to

19  incidental to lawful sanctions within the United States is not

20  correct and is not pertinent.

21          The statute that we deal with and that the jury must

22  ultimately assess defines "torture" as the intentional

23  infliction of severe physical pain or suffering or severe

24  mental pain or suffering, and then there's the parenthetical,

25  "other than pain or suffering incidental to lawful sanctions."

**October 20, 2008**

## Saybay - Direct

1           Counsel already has injected into this trial the

2     notion that there are practices in Liberia such as Sassywood

3     and Trial by Ordeal that at least by fair implication from the

4     cross-examination can provide some explanation or rationale for

5     the conduct here.

6           I believe that the Government is entitled to meet that

7     defense and to meet that suggestion by eliciting from this

8     witness, who is qualified by dint of his special knowledge of

9     the system, even without dealing with opinion, that practices

10    such as have been outlined here are not incidental to lawful

11    sanctions.

12          My plan was simply to go through the conduct in the

13    bare terms in which it is stated in the Indictment and to ask

14    Mr. Saybay if that conduct, to his knowledge, is incidental

15    to lawful sanctions, such as dripping molten plastic on

16    skin.  Is that the sort of conduct that is subsumed and

17    incidental to lawful sanctions in the Liberian law, and I

18    suspect all his answers will be "No," as we go through that

19    process.

20          THE COURT:  Can he even define for us what is

21    incidental to lawful sanctions?

22          MS. HECK-MILLER:  He could.

23          I wasn't going to go into it, but he could say

24    detention may be imposed incidental to lawful sanctions, that

25    handcuffing, regular handcuffing, but not tabie is incidental

**October 20, 2008**

## Saybay - Direct

1   to lawful sanctions in circumstances when it's done by an

2   authorized person with a hostile defendant.

3            As I said, I did not intend to go into the positive.

4   I intended only to address what I think is really the minimum

5   that is necessary here, which is to negate any defense that

6   Sassywood, Trial by Ordeal or other Liberian practices would

7   bring this conduct within the exception that's stated in the

8   statute

9            MR. CARIDAD:  Judge, this man might be able to say

10  whether it's legal under Liberian law to do certain things, and

11  if that's what he's going to say, which I think is all he can

12  say, then it's irrelevant.

13           "Incidental to lawful sanctions" is a legal term just

14  like "torture" is.  He wouldn't be allowed to testify that

15  these things we heard here are torture.  He'd never be allowed

16  to do that.  Why should he be allowed to testify to another

17  legal term that is another element of the offense, "incidental

18  to lawful sanctions"?  He doesn't know what it means under

19  Title 28, United States Code 2340.

20           All he can say is "Under Liberian law, it's not legal

21      to burn somebody," and that's all he can say, and if that's

22  all he can say, then it's irrelevant, what's illegal under

23  Liberian law.

24           THE COURT:  I will allow the testimony so long as you

25  first establish with the witness how he defines "incidental to

**October 20, 2008**

## Saybay - Direct

1   lawful sanctions," but let's get his definition, his parameters

2   up front so we know how it is he's defining it.

3            That it's a legal term of art, it very well may be,

4   but he can give his testimony regarding what matters are

5   incidental to lawful sanctions without using that terminology

6   necessarily or having something that's synonymous with that.

7            MS. HECK-MILLER:   I'm sorry.   Without using that

8   terminology?

9            THE COURT:   He doesn't have to use it.   He can respond

10  to your questions using it after we've established how he

11  defines it so we know what his benchmark is.

12            The objection is overruled.

13            I will see everyone at 1:15.   Have a good lunch.

14            [Luncheon recess at 11:59 a.m.].

15            THE COURT:   Do you have the witness.

16            THE WITNESS:   [Entered the courtroom at 1:16 p.m.]

17            THE COURT:   Bring the jury in, please.

18            [The jury returns to the courtroom at 1:16 p.m.]

19            THE COURT:   Everyone please be seated.

20            MS. HECK-MILLER:   Thank you, Your Honor.

21  BY MS. HECK-MILLER:

22  Q.  Mr. Saybay, before lunch we had just turned our attention

23  to the topic of lawful sanctions in Liberia.

24            Do you recall that?

25  A.  Yes.

**October 20, 2008**

## Saybay - Direct

1  Q.   Mr. Saybay, do you have an understanding of the range of

2  lawful sanctions that may be imposed on persons who are

3  arrested, detained or convicted in Liberia?

4  A.   Yes,

5  Q.   And what do you mean by that concept of lawful sanctions

6  which may be imposed on persons arrested, detained or

7  convicted?  Could you explain that, please?

8  A.   Well, for example, someone who is arrested, depending on

9  the case, could be handcuffed and then they can be detained,

10  but there are some different conditions as well.

11  Q.   Mr. Saybay, are you familiar with the term "tabie"?

12  A.   Yes.

13  Q.   Does the kind of handcuffing that is included within the

14  lawful sanctions that may be imposed on an arrestee, does that

15  include tabie?

16  A.   No.

17  Q.   Does that range of lawful sanctions include selecting

18  persons say from a checkpoint and summarily shooting them?

19  A.   No.

20  Q.   Does that range of lawful sanctions include beating an

21  arrestee, detainee or convict with instruments, physical

22  instruments including firearms?

23  A.   No.

24  Q.   Does it include dripping molten plastic on the skin of an

25  arrestee, detainee or convict?

## Saybay - Direct

1  A.   No.

2  Q.   Does it include burning such persons with a lit cigarette?

3  A.   No.

4  Q.   Does it include summarily ordering the execution of such a

5  person by beheading?

6  A.   No.

7  Q.   Does it include beating such a person by striking that

8  person with a weapon about his body and stabbing the person

9  with a bayonet?

10  A.   No.

11  Q.   Does it include burning such a person, that is, an

12  arrestee, detainee or convict on any part of the body using

13  molten candle wax or molten plastic or a lit cigarette?

14  A.   No.

15  Q.   Does it include ordering such a person to be tortured?

16  A.   No.

17  Q.   Does it include having such a person's genitals cut?

18  A.   No.

19  Q.   Does it include requiring such a person to run while

20  carrying a long log as the log is struck with another object?

21  A.   No.

22  Q.   Does it include jabbing or striking or the term juking such

23  a person while the person is confined in a pit with a sharp

24  metal rod?

25  A.   No.

**October 20, 2008**

## Saybay - Direct

1    Q.   Does it include shoveling stinging ants on to a person

2    while the person is confined and naked?

3    A.   No.

4    Q.   Does it include threatening such a person at gunpoint into

5    holding scalding water in his hands?

6    A.   No.

7    Q.   Does it include splashing such a person with scalding

8    water?

9    A.   No.

10   Q.   Does it include applying a hot iron to such a person?

11   A.   No.

12   Q.   Does it include shocking such a person in any part of the

13   human body with an electrical device?

14   A.   No.

15   Q.   Does it include rubbing salt into such a person's wounds?

16   A.   No.

17            MS. HECK-MILLER:   Could I have a moment, Your Honor?

18            THE COURT:   You may.

19            MS. HECK-MILLER:   Thank you, Your Honor.

20            We tender the witness.

21            MR. CARIDAD:   We have no questions.

22            THE COURT:   Thank you.

23            You are excused.

24               [The witness was excused at 1:21 p.m]

25            MS. ROCHLIN:   Your Honor, at this time the United

**October 20, 2008**

## Saybay - Direct

1  States would seek to move for the introduction of what has been

2  marked as Government's Exhibit CE 16 as a self-authenticating

3  certified public record consisting of a warrant for arrest as

4  it relates to venue under 18 USC § 3238.

5           THE COURT:   Hearing no objection.   Admitted.

6      [Government Exhibit CE 16 marked for identification at

7  1:22 p.m]

8   [Government Exhibit CE 16 received in evidence at 1:22 p.m]

9           MS. ROCHLIN:   For the record, I would identify that

10  document as the executed warrant for the arrest of Roy M

11  Belfast, Jr., executed in the Southern District of Florida on

12  November 13th of 2007 in case number 06-20758-CR-Altonaga-SS.

13          MS. HECK-MILLER:   Your Honor, that brings us to the

14  point of the matter we discussed this morning as implicating

15  our schedule.

16          THE COURT:   Ladies and gentlemen, it appears there are

17  no additional witnesses for today.   I will ask that you all

18  return tomorrow morning at 10:00.   We will start a little bit

19  later also to accommodate a witness who is in route as we

20  speak.

21          So, we will begin at 10:00 and probably go the full

22  day, until 4:30 as usual.

23          Please remember my instructions not to discuss this

24  case and not to do any independent reading regarding the case

25  or matters that you have been hearing about.

October 20, 2008

## Saybay - Direct

1          You have a good afternoon.

2          [The jury leaves the courtroom at 1:23 p.m]

3          THE COURT:   All right.   Is there anything else we need

4   to address?

5          MR. GRAVELINE:   No, Your Honor.

6          MR. CARIDAD:   No.   Thank you.

7          THE COURT:   Have a good afternoon.

**October 20, 2008**

1

## C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3  transcription of proceedings in the above-entitled matter.

4

5   ___11/14/08___            _____
         DATE                 BARBARA MEDINA
6                             Official United States Court Reporter
                              400 North Miami Avenue, Suite 12-2
7                             Miami, FL   33128 - 305.523.5518
                                          (Fax) 305.523.5519
8                             Email:  barbmedina@aol.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Quality Assurance by Proximity Linguibase Technologies
October 20, 2008**

## A

abbreviation 43:5,12
abdomen 12:21 13:1,12 17:5,6
    76:23,24
able 16:12 17:21 19:4,20 21:10
    22:21 23:7 43:18 61:6 65:17
    65:21 70:17 79:13 113:9
above-entitled 120:3
abrasion 45:1,3,12 52:21,22,23
    53:18,20,23 54:2,4 56:12,17
    56:20 66:20
abrasions 52:23 54:3 56:14,16
absence 16:15,20,22,22 23:7,18
    75:9,11,13
absolutely 99:13
accepted 105:3
ACCESS 1:25
accident 60:15 61:12
accommodate 118:19
accomplish 88:6
accomplished 8:17
Accord 101:9,10
account 16:14 18:11,12 19:22
    19:23 21:2,4 22:9,11 23:19
    25:19 26:22,24 27:2,12,15
    28:18,18 37:25 38:11 45:19
    47:24 59:16,18 72:23 82:2
    84:7,10,12,15,18,21,25 85:3
    89:5,8,11
Accra 101:9 102:13,15
accurate 7:11 120:2
accurately 10:16
accusers 8:1
acid 36:9,9,10 54:10,14 56:10
    87:19,20,23,25 88:12,20,22,24
acids 88:9,11
actions 91:21,22,23 93:8,23
    110:16
activities 46:6 91:7
activity 46:8 85:16,25 86:11,13
    105:17
actual 16:23 25:15 93:16
adapt 46:9 86:4,8
addition 8:25 104:21
additional 44:13 105:16 118:17
address 3:19 6:3 110:11 113:4
    119:4
addressed 5:17,22,24
administration 108:10
ADMINISTRATIVE 3:17
admission 10:20 105:11
admitted 10:23 104:23 118:5
adult 40:1
advantage 33:3
advantageous 32:24 33:2
advocate 91:14 96:24 98:6
advocated 95:2,4,10
advocating 91:5 92:9 93:7,8,18
    94:10 97:2,5,8,11,17
affect 84:5 86:3
affiliated 103:24
Africa 90:21 96:7
African 98:11
Afro-Americans 44:11
afternoon 60:19 119:1,7
age 34:1 72:3
agency 108:9
agent 11:4,13,21 12:14,16 13:2,4
    15:20,23 16:25 17:2,10 18:14
    18:16 19:24 20:1 21:8 22:14
    22:16 24:7,10 25:7,22,24
    26:12 27:20 28:5,19,21 41:8
    41:10 43:25 44:2 47:10 49:1,6
    49:11,14 50:12,14,20 54:23,24
    57:22 61:16 62:10 63:15 64:17
    65:2,4,23 66:3,5,13 68:1,8
    69:16 70:15,22 71:2 72:6

## agents 7:13,15
ago 13:18 38:11 61:12
agree 32:25 40:9 64:12 111:6
agreement 101:25 102:3
ahead 91:4,19 99:12
air 60:17,24
allegation 99:6
alleged 94:7
allegedly 32:8
allow 70:20 113:24
allowed 72:19 113:14,15,16
Aloysius 2:18 89:18,21 90:1,1
ALTONAGA 1:13
ambiguous 89:4
ambulance 60:18,25
AMERICA 1:4
American 107:4 110:25
Amnesty 90:21 96:7
amount 15:1,1 28:12 88:14
    97:21
analysis 5:23,25 6:10 7:18 20:10
    20:20 21:17 28:13 83:1,6
analyze 82:25
ankle 58:1,2
answer 40:23 99:12,16 100:3
answers 86:1 112:18
antibiotic 43:22
anticipate 36:18
ants 117:1
apart 82:9 9:49 47:21 50:5
apparently 64:9 72:21
appear 12:6 28:10 48:5 50:6
appearance 15:13 17:25 18:5
    21:21,23 22:5 33:25 34:3
    44:15 49:18,20 53:16 58:9
    74:4 83:22 84:6
APPEARANCES 1:16
appeared 47:15,20 48:7 87:4
appearing 11:7 19:5 28:12
appears 12:3 13:10,14 17:4
    18:23 20:3 21:10 27:3,22 28:1
    28:7 37:4,4 118:16
application 21:24 34:17 87:22
    88:7
applied 8:14 15:4 18:8 20:17,23
    21:22 22:12 24:3 25:2,20
    35:17 36:16,17 37:2 52:11
    53:25 66:19 67:4,13,15 76:2
    79:4,10 86:9 87:25 88:14
    97:22 98:1 102:11
applying 117:10
approach 9:22 92:12
approaching 101:19
approval 60:17
ARC 107:18 108:10
area 16:1 23:21,24 27:25 35:17
    37:5 39:19 44:23 52:11 56:2
    57:3 58:17 80:18 81:11 86:9
    87:25 104:13
areas 55:10 78:24 79:1 86:10
arm 11:25 12:7,23 13:13,17
    18:20 19:3 21:13,15,15,22
    34:21,25 35:4 36:14 37:4,14
    51:1 53:13 54:15 55:18 76:7
    76:20 77:2,3,10,10
armed 108:17
arms 9:1 11:18 12:20,25 50:16
    50:18 57:14 96:14
arranged 47:14
arrest 93:16 118:3,10
arrested 7:23 94:24 99:10,11
    115:3,6,8
arrestee 115:14,21,25 116:12
art 114:3
aside 110:10
asked 14:5,7,9 58:13 81:5 82:3

## 75:22 80:1 86:18,21,23,25
    87:2,10,12,16,18,23 88:8
    82:13,17 93:6
aspect 12:7
aspirin 43:19
assassination 98:15
assault 30:24
asserted 93:21
assess 48:13 111:22
assessed 82:1
assessment 32:17 33:9,10
associate 107:7,11,13 108:10
associated 57:1 103:24
Associates 104:2,3,4,23
assume 31:5 110:13
assumed 51:14
assumes 81:20
assumption 110:9
attempt 8:12 72:20 98:15
attend 105:23
attention 4:3 6:14 13:13 73:2,4,5
    73:9 90:15 114:22
attorney 1:18,22 7:3 38:21
    103:20 107:9,10
attorneys 7:10 31:5,9,13,15,16
    31:17,20 82:18
Attorney's 31:12
August 100:10,19
author 42:9 43:4,9,14
authorized 113:2
autopsies 30:17
Avenue 1:23 2:9 120:6
aware 36:3 81:11,14,16
A-l-o-y-s-i-u-s 90:2
A.F.P.D 2:2,3
a.m 4:24 5:6 10:4,25 29:5 60:9
    61:8 62:4,2 82:10 89:20,23
    100:16 103:3,8 110:1,5 114:14
A.U.S.A 1:17,18
a/k/a 1:8

## B

back 5:1 8:14 11:18,18 16:7,8
    19:14 20:4,5,12 21:12,13,15
    21:22 22:20 23:9 26:6,14 27:4
    38:24 42:1 47:8,12,16,17 48:1
    48:13,18 52:7 59:18 64:20
    68:6 75:20 76:7 79:19 109:25
    110:3
background 83:12,13,17,19
    111:12,16
Baechtle 11:4,13,21 12:14,16
    13:2,4 15:20,23 16:25 17:2,10
    18:14,16 19:24 20:1 21:8
    22:14,16 24:7,10 25:7,22,24
    26:12 27:20 28:5,21 41:10
    44:2 47:10 49:1,6,11,14 50:14
    50:20 54:24 57:22 62:10 63:15
    64:17 65:2,4,23 66:3,5,13 68:1
    68:8 69:16 70:15,22 71:2 72:6
    75:22 80:1 86:18,21,23,25
    87:2,12
bar 46:22 85:23
BARBARA 2:8 120:5
barbmedina@aol.com 2:10
    120:8
Barclayville 90:4
bare 112:13
base 44:22,22,23 87:20,20 107:6
based 15:10 16:11 23:6 48:13
    83:6 90:21 96:7
basically 33:11 93:21 94:9,23
    100:24
basis 85:15 93:12
bayonet 62:16,18,21,23 63:3,12
    69:13,19 72:10,11 74:8,9
    116:9
beaten 46:22
beating 85:23 115:20 116:7

## becoming 46:9
beginning 5:6 29:5 82:10 89:23
    90:15 100:16 103:8
Begins 3:13,15
behalf 91:14 93:9
beheading 116:5
Belfast 1:8 118:11
believe 53:6 55:3 61:21 66:1
    67:12 69:12 76:8 85:25 93:13
    110:21 111:14,15 112:6
belly 63:17,19 64:6
benchmark 114:11
beneath 64:5
best 94:11
better 33:4 68:6 70:20,24 71:1
beyond 8:3 83:22
bigger 44:20
Bility 93:22 94:9 95:3 97:6
Bishop 97:15
bit 37:9 68:22 107:1 118:18
blade 78:12,13
bleeding 42:13
blister 14:24 15:2
blunt 59:7
bodies 29:13,21 30:1,4,8,10 31:8
    82:2
body 8:24 9:2,13,19 11:25 12:23
    16:1 21:3 22:12 23:24 27:7
    30:22,24 33:17,18,22,23 34:6
    34:18 35:14,17,19 40:6 43:23
    44:12 51:19 56:5,10 57:4,5,8
    58:20 64:9,13 65:12 72:20
    73:9 76:2,12,22 77:17 78:10
    81:25 84:11,14,17,21 85:20
    86:3,4,8 88:1,8 89:6,9,12
    116:8,12 117:13
body's 19:13
boil 14:11 37:13 85:6
boiling 8:13,15,22,25 13:19,22
    13:24 14:3,6 15:4,12,12,16
    16:14,18 23:5,10,11 74:18
    75:4,5,7,10,14,17 84:25
bone 38:17
bones 38:15,16,19
Bong 103:16,18,22 104:16
born 90:3,4 103:13,15
bother 57:16
bottom 77:21
boy 40:3
branch 63:10 70:6 104:6
branches 47:4,4,7 85:12,15
brand 19:17,18,19
branding 19:19
break 60:4
breakdown 83:4,5
briefly 11:15 12:18
bring 4:1,2,21,23 11:20 15:20
    17:1,8 18:15 19:25 21:7 22:14
    24:8 25:22 26:11 27:18 41:8
    60:11,12 62:3 72:16 86:18
    111:1 113:7 114:17
brings 118:13
broad 38:5 53:21 54:2 56:14,16
    56:18,21 80:17
broader 52:23 56:19
broke 48:15,17
broken 38:14,16,17,19 69:25
Bruce 2:14 5:4
bullet 68:10
bumping 63:5
bunch 47:4
burn 17:19 18:1 25:2,3,18 27:13
    27:16 33:23 34:6,8,9,11,12,15
    34:22 35:4,5,18 37:15,16,20
    51:4 52:9,18 53:5,7,9 54:8,18
    54:19,20,22 55:2,2,18 56:5
    65:25 66:1,8,16,18 67:2,13
    72:1 74:3,5 75:24 76:19 77:18

80:19 87:7 88:3,12,22,23,24
88:25 113:21
**burned** 9:1 14:23 19:2,15,16
21:4 33:21 37:14 50:25 56:2,2
56:3 67:24 68:23 70:11 76:6
76:11 77:25 78:24,25 79:1
88:2
**burning** 18:13 55:24 66:9 67:4
67:15 116:2,11
**burns** 8:23 51:6,7,11,20 52:12
67:8,11,11 76:12
**button** 63:17,19 64:6

---

**C**

**C** 120:1,1
**cadavers** 29:12,25 30:4,5 31:8
**calf** 26:14 27:4 28:9 68:11
**called** 4:4 81:16
**calloused** 46:9 86:10
**calls** 89:18 103:4
**calluses** 86:6,7
**candle** 116:13
**capable** 110:24
**Capital** 105:2
**car** 60:15 61:12
**care** 40:21,23 72:22 102:18
**career** 30:17
**Caridad** 2:3,16,20 4:2 8:3,7
10:22 29:6 41:8,11 43:25 44:3
47:9,11 48:25 49:2,5,7,10,13
50:12,15,19,21 54:23,25 57:21
57:23 60:3,6 62:6,9,11 63:14
63:16 64:15,18 65:1,3,5,22,24
66:2,4,6,11,14 67:25 68:2,7
69:15,17 70:14,16,21,23 71:3
72:5,7 75:21,23 79:25 80:2
81:2,4,24 82:6,13 83:4 90:25
91:9,16,24 92:4,10 93:2 94:12
95:9 97:13,23 98:13,16 99:2
99:13 100:13,17 102:23
109:20 110:11,13 113:9
117:21 119:6
**Caridad's** 84:24 87:14
**CAROLINE** 1:18
caroline.miller@usdoj.gov 1:21
**carries** 46:7
**carry** 44:4
**carrying** 46:5,19 47:4,6 85:12,15
116:20
**case** 1:3 6:16 8:21 26:20 28:14
32:7 33:12 34:19 38:10 60:8
60:14 61:21 76:24 83:1 99:5
109:24 115:9 118:12,24,24
**cases** 31:1,10,10 83:6 107:5,14
107:16,18,19 108:9
**Catholic** 94:3 97:15
**cattle** 19:18
**causation** 83:25
**cause** 15:2,2,18 18:8 32:17
34:20,22 35:21,23 45:14 46:6
46:24,25 58:7 80:25 82:22,22
82:25 85:16
**caused** 34:15 35:6,9,11 36:24
37:19,23 39:22 45:13,16,25
46:2,19 48:15 53:9,18,22 56:8
56:12,17,25 58:13 59:8 62:16
62:18,22 63:3,5,22,23 64:6
65:10,13 66:23 67:2,5,17,22
69:18,21 71:8,11,16,23 73:13
73:24 74:3 80:8,11,14,23 84:4
**causes** 90:23
**causing** 47:3
**caustic** 35:21,23 36:2,3,6,7,8,12
36:23 37:1,2 54:9,12,14 67:7
87:15,18,23 88:8
**CE** 3:5 118:2,6,8
**cease** 102:22

**CECILIA** 1:13
**cell** 61:14
**center** 29:19 41:5 66:17 90:22
96:8
**centigrade** 14:1
**centimeter** 66:25,25 77:4
**centimeters** 12:11 19:10
**certain** 38:7 93:13 94:1 113:10
**certainly** 16:23 25:19 35:18
36:21 50:11 55:16,24 58:10
59:5 63:24 70:3 71:22 74:11
75:17 77:15 79:20 95:9
**certainty** 38:7,8 83:25
**certificate** 2:23 105:11 106:4,7,9
106:24
**certification** 105:7,10 106:21,23
**certified** 118:3
**certify** 120:2
**cetera** 107:7
**champion** 90:23
**change** 62:2
**character** 19:12 64:21 65:20
**characteristic** 87:22
**characteristics** 65:17
**characterize** 97:21
**Charles** 1:8,9,9 7:24 8:2 90:10
97:22 100:8,18 102:3
**check** 69:1
**checkpoint** 115:18
**chest** 11:25 12:21,24 13:1 69:13
**chevrons** 3:21
**child** 39:25 72:2
**choice** 51:22
**CHRISTOPHER** 1:22
christopher.graveline@usdoj...
1:24
**Chuckie** 1:8 8:2
**Chuckie's** 4:7
**church** 94:3 97:15
**cigarette** 52:12 54:18,19 55:2,18
65:25 66:8,10,16,18 67:4,11
67:11 87:7 88:20,22,24 116:2
116:13
**circle** 12:6 13:11 17:6 24:19
27:25 51:7 52:1 53:5 55:8
62:14 69:18 80:6
**circled** 13:16 20:13 51:7 52:16
52:18 76:1 78:18
**circular** 52:22 56:15,20 66:21,25
67:14 80:17 88:1,18
**circumstances** 37:6 113:1
**CITATION** 3:7
**City** 103:16,18
**civil** 31:15
**claim** 81:9
**clarify** 44:20 89:3
**clean** 48:1 50:1 74:5
**clear** 12:13 15:19 17:8 21:6 25:5
27:18 28:3 44:8,9 64:13
**cleared** 25:21
**clearing** 85:15
**clearly** 18:7 48:22 85:21
**client** 99:14
**close** 30:13,16 50:22
**closer** 17:5 30:13,19 68:18
101:22
**clothes** 9:1 17:19 18:6,12 19:2
20:23 21:5,22,24 22:12 27:13
27:17 36:21,22 75:25 76:1,11
76:19
**clothing** 33:22
**Coalition** 96:19,23 97:19
**Code** 110:21 111:2 113:19
**coincidence** 50:3,9
**coincidental** 48:6 49:22
**college** 104:9,21
**color** 45:9
**combination** 107:10,11

**come** 4:6 69:24 94:16 100:8
**comes** 25:18 30:12,19 58:20
67:4 86:5
**coming** 6:6 87:6
**Commission** 98:11
**Committee** 107:5
**commonly** 44:11 67:10
**community** 98:2 101:4
**complete** 56:20
**compliance** 101:8
**Complied** 10:8 11:4,13,21 12:16
13:4 15:23 17:2,10 18:16 20:1
21:8 22:16 24:10 25:7,24
26:12 27:20 28:2,5,21 41:10
44:2 47:10 49:1,6,11,14 50:14
50:20 54:24 55:9 57:22 62:10
62:15 63:15 64:17 65:2,4,23
66:3,5,13 68:1 8 69:16,20
70:15,22 71:2 72:6 75:22
76:10 80:1,7 86:21,23,25 87:2
87:12
**concept** 115:5
**concerning** 5:11 6:2 7:18 12:2
14:14 16:14 17:22 41:2,13
**conclude** 27:14
**conclusion** 13:7,15 20:7 21:1
83:21 84:5
**conclusions** 14:15 16:13 17:21
19:4 24:21 25:12 26:19
**condition** 7:18 43:3,7,13
**conditions** 11:10
**conduct** 9:10 112:5,12,14,16
113:7
**conducted** 5:15
**conductor** 25:1,18
**conference** 3:11,13,15,19
**configuration** 17:25 22:3 27:9
35:1,18 36:16 50:10 53:12,14
53:20 54:21 60:1 63:24 74:6
87:21
**configuration-type** 64:4
**confined** 116:23 117:2
**conflict** 110:12,15,17,19,21,22
102:22 106:16,24 108:17
**confront** 93:5
**Congotown** 7:25
**connection** 6:16 9:7 106:21
**consequence** 102:3
**consider** 30:11 111:10
**consisted** 42:9
**consistent** 16:23 18:10,12 19:21
19:21,23 20:16 21:2,4,24 22:6
22:9,9,11 25:19 27:16 33:18
34:8,9,12 35:5 36:15,21,25
37:15,16,20,25 38:3,6 39:3,14
39:19,20 43:6 45:3,19,21 46:3
46:12 48:19 51:4 53:6,7 54:8
54:18 55:1,17,20,24 58:11,12
59:7 62:20 65:25 66:7,16
67:14,19,20,20,23,23 68:12
70:4 72:1,23 74:6 75:24 76:14
77:18 79:14,20 88:21,22,24
**consisting** 118:3
**Constitution** 109:4
**contact** 25:19 58:20 80:22 85:20
86:5
**contacted** 4:12,14
**container** 14:10 85:4,5
**CONTENTS** 2:12
**context** 52:14 53:1,3 54:12
58:10 65:11,20 79:7 82:21
84:3
**continue** 5:2
**continuously** 105:13
**contract** 107:4
**contracted** 68:14
**control** 4:18 104:6
**cont'd** 5:5

**Convention** 110:19,22
**CONVENTIONS** 3:17
**conversation** 76:3 83:14
**convict** 115:21,25 116:12
**convicted** 115:3,7
**cooking** 67:22
**cooled** 56:2
**cooler** 15:17
**cooperate** 8:11
**cooperation** 88:6 94:8
**corpus** 98:10 109:7 110:8
**correct** 5:25 6:11 7:12 29:10
31:24 32:6,9,11,15 33:9,14,19
35:4,7,8,13 37:13,18 38:12
39:1,5,8,10,19 40:7,8,23 41:3
41:16 42:7 43:17 44:17,19
45:23 46:1 50:16 51:24 52:20
55:3 57:2,7,24,25 58:4,18,22
59:19 62:17 63:21 64:11,25
67:18 72:8 73:21,23 76:9 77:5
78:10 79:24 95:7 101:7,20,23
111:20
**correlate** 34:2
**counsel** 3:18 85:7 112:1
**counsel's** 111:17
**country** 73:1 101:7,8,21 102:4,6
102:8 109:1
**County** 90:4 103:16,18,22
104:16
**course** 29:16 32:3 44:7 94:14
97:20 107:20
**court** 1:1 2:8 3:14,16,19 4:1,18
4:20,22,23,25 6:6 8:8 9:23
10:23 11:3 29:2 60:3,5,7,10
61:1,9,23 62:5,23 82:3 82:8
89:15,17 91:2,11,17,21,22,22
91:25 92:5,12 93:14,17 94:7
94:17,20 95:2,8 96:1 97:14,25
98:10,14 99:12,15 100:1,2,14
103:1 109:22 110:2,6 111:4,9
112:20 113:24 114:9,15,17,19
117:18,22 118:5,16 119:3,7
120:6
**courtroom** 1:25 4:24 60:9 62:4
110:1 114:16,18 119:2
**courts** 108:25
**Court's** 4:3 60:22
**covered** 9:14
**criminal** 31:10,13,14,17,19,22
105:25 106:11 107:14,16,21
108:1,4,20 110:20
**CROSS** 29:4 100:15
**cross-examination** 2:16,20 29:1
29:3 82:12 85:24 93:11 112:4
**crushed** 45:25 46:15
**crushing** 45:12 46:3 73:20
**cupped** 23:5
**current** 8:14 24:3,24,25 25:1,17
79:4,10,17,21 80:4,9,19
**currently** 87:9 90:8 103:17,18
**cut** 39:10,19,21,25 40:3,6,6,9,13
40:24 41:19 42:7 47:7 69:12
70:9 72:10,11 73:12,15 74:1
116:17
**cutting** 39:23 73:19 74:1,10
**Cuttington** 104:16,17 106:13,17
**cylindrical** 67:14
**C-u-t-t-i-n-g-t-o-n** 104:18

---

**D**

**daily** 46:6,8
**damage** 14:19,21 15:1,2,5,9,18
16:15 18:2,8 23:16 25:4 35:1
35:24,24 47:3 71:16 80:20,23
80:24,25
**damaged** 14:21,25,25 19:12
22:6 48:22 57:2 66:23 71:12

71:18,22 85:19
**damages** 80:16
**dark** 23:14 45:8
**darker** 45:11
**dark-skinned** 23:13
**date** 6:15 34:2 41:15 120:5
**day** 33:2 58:21 68:17 118:22
**dead** 29:12
**deal** 111:21
**dealing** 99:6 112:9
**death** 82:22,25
**deceased** 30:8 31:2
**defendant** 1:11 2:1 113:2
**Defenders** 96:19 97:19
**Defender's** 2:3
**defense** 31:5,9,13,15,17,19
82:18 85:7 90:20 93:10 96:6,9
107:21 110:7 112:7 113:5
**defense's** 60:24
**defer** 49:22
**define** 112:20
**defines** 111:22 113:25 114:11
**defining** 114:2
**definitely** 47:2 68:12
**definition** 114:1
**deformities** 9:18,20 16:9 32:22
76:14 82:1
**deformity** 18:21 32:20,21 34:3
69:4
**degree** 38:8 65:16 104:9,13,15
104:21
**degrees** 13:25,25,25 15:4,17
18:6 23:12 38:7 75:6,15,19
**department** 1:22 42:16
**depend** 51:22
**depended** 37:9
**dependent** 37:11
**depending** 24:25 33:24,25 45:10
65:16 115:8
**depends** 36:16 37:2 46:7 56:17
60:1 79:16
**depicted** 26:21
**depressed** 66:21 68:14
**depression** 66:24
**dermis** 14:20,22,24 15:3,5,9
18:2,8 19:12,16 22:7 23:16
25:4,15 35:1,25 48:23 52:7
57:2 66:23 67:16 71:13,23
80:16,20,24 81:1 86:17
**describe** 14:7 29:10 37:22 38:2
39:13 45:13 49:18,20 59:10
66:15 77:9 78:23 107:2,25
108:3,7
**described** 8:13,22 14:8 15:12
16:21,24 21:21 23:19 29:9
33:8 34:4 38:19,24 39:21
46:13 47:25 48:3 50:1 54:19
55:14 57:11 59:11 62:21 63:3
63:12 64:14 66:9,17 68:11,20
70:5 74:17,19 75:12 76:1 79:1
85:4 87:6
**describes** 8:18,19 23:10,12
36:20 42:5 53:8 55:7 56:6
**describing** 38:16 51:11 77:17
**description** 3:3 15:10 16:17
42:11 53:17 85:2
**Descriptions** 3:12
**designation** 43:9
**detail** 42:19
**details** 111:12
**detained** 92:7 93:3,4,11,15,15
95:4,6,10 100:6,7 115:3,6,9
**detainee** 115:21,25 116:12
**detainees** 108:21
**detention** 92:7 93:18 96:24
112:24
**determination** 19:20
**determine** 27:1 28:16 82:3
**determined** 44:7
**determining** 82:21
**develop** 44:18 46:10
**developed** 32:20 96:17
**develops** 44:19
**device** 117:13
**different** 33:25 36:8 45:9 63:11
69:11,11 75:5 115:10
**difficult** 32:16 61:14,18 69:9
**dimension** 19:11 62:25
**dint** 112:8
**direct** 2:15,19,22 5:5 6:13 88:15
89:22 103:7
**Directing** 13:13
**directly** 64:5
**dirty** 40:10
**disagree** 111:10
**discrete** 69:23 88:18
**discretely** 88:15
**discuss** 60:8 109:24 118:23
**discussed** 6:2 14:18 27:17,24
37:11 118:14
**discussion** 23:9
**discussions** 7:16 16:12 22:25
23:6,20
**disregard** 100:2
**distance** 47:21 50:5
**distribution** 64:22 71:20 88:1
**District** 1:1,1,14 118:11
**DIVISION** 1:2
**doctor** 5:10 9:3 17:15 20:10
21:10 22:18 28:7 29:7,9 41:13
62:12 70:18 72:21 77:11 81:5
87:14 89:15
**doctor's** 60:17
**document** 23:23 118:10
**documented** 76:14
**doing** 30:16 33:11 93:13 107:7
107:12
**Doxycycline** 43:20
**Dr** 4:21 5:8 6:1,13 7:11,20 8:21
9:25 10:11 11:6,15,23 12:1,8
12:18 13:6,18 14:13 15:25
16:11,20 17:4,12 18:9,18 19:5
19:20 20:3,18 22:10,21 23:20
24:12 25:9 26:1,15 27:3,25
28:25 60:10 62:7 82:12,25
83:8,20 84:24 85:7,14 87:4
88:9 89:3
**dripped** 41:23 50:25
**dripping** 36:18,19 53:8 55:10,23
56:7,10 88:13 112:15 115:24
**drips** 67:8
**driving** 47:1
**drop** 56:1 67:23
**drops** 55:16,23
**Dullay** 6:19
**Dulleh** 6:19,24 7:2,5,14,16,21,22
8:23 9:4,9,11,15 10:14,17 11:9
11:12 13:8,19 14:2,5,14,16 15:4
16:11,21 17:15 20:8,19 21:18
22:24 23:6,20 24:1 27:10 32:5
37:8,14 74:15,17 75:20 76:3
83:15 85:2 93:22 94:9 95:3
97:6
**Dulleh's** 7:3 9:13 13:13 15:10
16:1 18:10,22 19:22 21:1 22:9
22:22 24:4 26:15 27:15 28:18
34:21 35:4 78:9 84:20,25
89:11
**D-u-l-l-e-h** 6:21
**D.C** 1:23

**E**

**E** 120:1,1
**earliest** 60:19
**edge** 74:2
**edges** 72:17,20 73:15 74:5
**education** 106:12,15,21
**educational** 105:16,23
**effect** 109:4,7
**efforts** 94:17
**either** 6:9 31:8,11 52:11,18
82:21 83:16
**elbows** 38:25 39:1
**electric** 8:14,22 24:3,24,25 25:17
79:4,21
**electrical** 79:10,17 80:4,9,19
117:13
**electricity** 25:20
**electrocuted** 79:3
**element** 14:10 20:16 85:5 113:17
**elicit** 99:9 111:6,7
**elicited** 94:5
**eliciting** 95:1 112:7
**eliminate** 6:9
**elliptical** 74:5
**Email** 1:20 2:5,10 120:8
**Embassy** 94:3
**EMMANUEL** 1:9
**employer** 82:20
**encountered** 7:2
**ends** 87:20
**energy** 25:3 47:1
**engaged** 108:17
**Entered** 114:16
**entitled** 112:6
**environment** 59:2
**equally** 31:16
**eraser** 48:21
**especially** 58:16 59:2 61:19
81:21 97:15
**essentially** 44:23 61:17 73:12
**establish** 113:25
**established** 34:1 114:10
**et** 100:6
**evening** 60:19 61:4,25
**event** 16:23,23 51:15
**eventually** 20:24
**everybody** 44:17,18
**evidence** 3:2 10:24 16:15,22
33:12 75:11 76:14 79:5 81:21
88:12,16 118:8
**exact** 30:25 94:5
**exactly** 69:10
**exam** 38:22 42:21 81:5,9
**examination** 2:15,17,19,22 5:5
5:11 6:3 9:7,10,14,17 10:14,17
16:4 18:9 24:4 29:4 79:5 81:14
82:9 89:22 100:15 103:7
**examine** 10:6 29:15,25,25 57:17
**examined** 6:15 9:15 22:22 29:21
30:3,8,9,13,20 31:2 32:10,14
62:7,14 72:8 81:25 85:9
**examining** 31:8 78:22
**example** 33:21 35:15,16,20,21
36:5,13 115:8
**exception** 113:7
**exchange** 14:13
**exclude** 16:16
**exclusion** 45:18
**excused** 89:15,20 103:2,3 110:2
110:5 117:23,24
**executed** 118:10,11
**execution** 116:4
**exhibit** 3:5 11:2,12,16,20,20 13:3
17:1,9,16 18:15 19:25 21:7,16
22:14 24:8,12 25:6 26:11 27:3
27:19 28:4,7,19 56:13 118:2,6
118:8
**exhibits** 2:25 3:1,4 10:1,3,6,9,11
10:13,20,24 12:14 15:21 19:6
22:15,18 24:8 25:22 86:19
**expect** 23:13 58:24 59:5 88:12
**experience** 88:10 107:2 108:1,4

**experienced** 33:16
**experiences** 38:14
**expert** 110:14,15 111:11,13,15
**expertise** 81:12,22
**expire** 100:22
**explain** 5:21 7:7 8:23 11:15,23
12:1,18 13:22 14:17 16:20
17:4 22:18 23:7 24:14 25:9
26:1 27:3 83:20 115:7
**explains** 52:15
**explanation** 110:8 112:4
**extended** 101:13
**extent** 107:25 108:3
**extremities** 42:4

**F**

**F** 41:5 120:1
**face** 11:25 12:23 16:2,5,19
**fact** 16:16 23:11 75:9 76:13
94:18 95:4 107:14
**faction** 96:10
**facts** 81:21 111:7
**factual** 37:6 76:14 88:5
**Fahrenheit** 13:25 15:17 18:7
**fair** 31:1 32:18 37:22 38:4 48:16
56:8 101:4,15 112:3
**fairly** 10:16 18:3 69:23 71:17
**fall** 96:16
**fallen** 46:14
**familiar** 19:17 81:17 108:19
109:11 111:1,3 115:11
**families** 4:5,5
**family** 61:13
**far** 31:17 94:21
**farm** 47:5 85:14
**fashion** 35:2 70:9 80:16
**fatal** 31:25
**Fax** 1:20 2:5,10 120:7
**Federal** 2:3 7:13,15
**feet** 26:4 38:18 57:12,24 58:16
58:17,25 59:10 86:6
**field** 29:9 38:2
**fields** 106:4,6,9
**fighting** 101:10
**filing** 83:1
**fill** 72:19
**finally** 60:17
**find** 20:14 22:8 41:9 58:17 69:3
74:22 79:5
**fire** 102:22
**firearms** 115:22
**firm** 103:24 104:1,3,4,5,6 105:4
105:6
**first** 6:23 7:1 33:23 38:21 51:8
52:2 60:23 96:9 98:8 99:2
111:5 113:25
**fit** 111:7
**five** 39:7,7
**FL** 1:19 2:4,9 120:7
**Flagler** 2:4
**flank** 76:22,22 77:13,13
**flat** 12:9 20:11 53:21 54:2
**flatter** 45:6,7
**Florida** 1:1,6 118:11
**flow** 88:13
**fly** 60:17
**focus** 90:15
**folded** 52:7
**folks** 93:17 94:18
**follow** 93:1 96:1 99:1 100:1
**Followed** 43:1
**following** 98:8 105:6
**food** 68:24 69:10
**foot** 59:6
**football** 59:24
**force** 46:22
**forced** 23:4 42:17 44:4 100:24

forearm 50:22
foregoing 120:2
forensic 29:9,11
form 15:11 16:12 19:5 65:17
 74:13 83:20 84:3 86:16 88:9
formed 7:18 12:2 13:15
forward 90:16
foul 40:11
found 18:9 20:19 21:24 22:11
 26:23 27:11 28:13 37:14 59:6
 110:19,20,21,22
frame 94:6 96:5
framework 65:11 108:11
Francis 97:16
free 95:4,5
fresh 38:8 83:24
Friday 14:19 32:3
front 22:19 58:1,2 68:5 114:2
full 103:11 118:21
further 14:2 47:1 55:18 89:14
 100:12 102:25 106:12 108:24
 111:15

**G**

gagged 8:18
gained 94:4
gape 72:19 73:16
Garlawola 104:23 105:1,6
Gbarnga 103:16,18 104:4,6
gender 107:6
gender-based 107:17,19
general 8:9 43:3,7,13 65:15
 82:19 96:22
generate 25:1,18 34:25 79:17,18
generated 79:16
genital 23:21
genitals 24:2 116:17
gentleman 8:1,9 64:8 111:2
gentleman's 4:15
gentlemen 5:1 37:8 38:13 60:7
 100:2 109:23 118:16
getting 40:7,9 94:18
give 30:25 36:5 53:20,21 64:2
 65:13 110:15 114:4
given 4:13,15 25:17 37:6 43:16
 43:19 84:7 110:9
giving 77:6 109:20 110:13
glans 25:11
glistening 44:15 52:6
go 36:12 42:19 59:18 72:21
 73:10 91:4,19 93:12 99:12
 111:12 112:12,18,23 113:8
 118:21
going 4:17 6:14 23:9 32:23
 37:13 41:9 47:16 54:12 56:4
 61:24 62:1 90:16 93:2 94:7,17
 95:2 99:11 101:10 110:15
 112:23 113:11
good 5:1,8,9 15:7 29:7,8 43:1
 60:5 109:25 114:13 119:1,7
gotten 59:15
government 1:17 3:4,5 4:12
 10:3,24 60:13 89:18 90:11,13
 94:1 97:22 100:8,18 102:21
 107:14 111:4 112:6 118:6,8
Government's 5:4 10:1,20 11:1
 11:12,16,20 15:21 89:17,21
 103:6 118:2
graduation 106:20,23,25
graft 19:14 22:7 54:1
Grand 90:4
Graveline 1:22 2:19 60:11 61:3
 61:11 89:18,24 91:3,12,18
 92:1 93:6,16,20 94:9,19,21
 95:7 96:2 99:9 100:4,11
 102:24 119:5
greatest 19:11

grew 52:7
ground 8:19 58:21
group 91:8 93:24
groups 96:23 101:3
grow 19:14 44:14,21,25
growing 73:7
grown 22:7
grows 44:13
guess 84:8
gun 68:10
gunpoint 117:4
gunshot 68:3,11,20
G-a-r-l-a-w-o-l-a 105:2
G/C 42:23 43:3

**H**

H 47:9 50:12,19 52:1 54:23 57:21
 62:9 63:14 64:15 65:1,3,22
 66:2,4,11,15 67:25 69:15
 70:14,21 72:5
habeas 98:10 109:6 110:8
habitual 85:25,25 86:3,11,13
Hague 105:22
hair 27:7,8
half 12:11
halfway 42:20
hand 23:18 42:1 50:16 55:7,16
 56:4,4,7
handcuffed 115:9
handcuffing 112:25,25 115:13
handed 9:25
handled 98:10
hands 4:10 8:16,16 22:19,20,20
 22:20,22 23:1,4,4,5,7,12 38:17
 50:18 55:11 74:21 86:7,7
 117:5
happen 32:4 51:14,24 75:11
happened 22:25 32:8 33:19
 36:14 37:10 39:6,6 49:22 57:6
 61:12 64:10 68:19 72:2 82:4
 98:12
harassed 4:6
harassment 107:6
hard 59:15
Hassan 93:22 97:6
head 8:13,15 9:15 16:2,3,6,6,7,8
 16:14,17 30:16 63:9,9 74:20
 74:22 75:9,13
headquarters 104:7
heal 69:9
healed 17:19 19:13 27:13,16
 31:3 34:3 35:5 37:20 38:8,9,10
 39:14,20 51:20 53:7 54:8
 59:12 62:21 63:3,25 66:17
 67:11,19 70:5 72:1,14,18
 79:20
healing 19:13 20:17 33:7,25 54:1
 72:17 84:1
heals 23:17 44:12,17 69:7,9
heaped 44:24
hear 111:4
heard 81:8 99:7 110:16 113:15
hearing 99:2 118:5,25
hearsay 91:1,10 92:10 93:2,4,5
 93:7,14,19 94:13,16 95:6
 97:3
heat 15:1 18:7 23:15 25:1,18
 34:17,25 35:14,25 53:25 56:22
 57:1 67:23 79:17
heated 34:23
heating 14:10 20:16 85:5
heavy 47:4
Heck-Miller 1:18 2:22 103:4,9
 111:5 112:22 114:7,20,21
 117:17,19 118:13
held 8:15 94:25 99:11
help 4:14 72:17 108:8,11

helpful 6:10,11 33:6
he'll 94:22
hiding 4:9
historical 37:12 48:14 52:3,14
 52:17 53:1,3 54:12 58:10
 65:11,20 82:2 84:2,6,9,12,15
 84:18,21
History 42:5
hit 15:14 50:3
hitting 59:9
hold 23:4
holding 117:5
hole 8:19
home 7:23,24
homes 4:9
Honor 5:3 8:3,5 9:21 10:19 11:2
 28:23,24 60:11 89:1,14 90:25
 91:9,16,24 92:4,10 97:23
 100:12,13 102:24,25 110:19
 111:5,9 114:20 117:17,19,25
 118:13 119:5
horizontal 71:19
Hospital 29:19 30:12
hostile 113:2
hot 15:7,8,8,17 16:10,16 23:16
 34:20,22,23 35:9,15,17
 41:22 42:8 50:25 51:21 53:17
 53:19 54:6,14,22 55:7,10,12
 55:24 56:6,9 66:19 67:5,13,14
 67:17,22 68:23 69:10 70:12
 71:8,24,25 72:1 74:25 75:3,16
 80:12 117:10
hour 61:24
human 40:6 86:3,4 90:20,22
 91:5,6,7 96:6,8,10,19,23 97:19
 98:1 117:13
humanitarian 104:14 106:11
hurt 4:8
hydrochloric 36:10
hydroxide 36:11,11
Hyma 2:14 3:4 4:21 5:4,8 6:1,13
 7:11,20 8:21 9:25 10:1,2,3,11
 10:20,24 11:2,6,12,15,16,20
 11:20,23 12:1,8,15,18 13:3,6
 13:18 14:13 15:21,25 16:11,20
 17:1,4,9,12,16 18:9,15,18 19:5
 19:6,20,25 20:3,18 21:7,16
 22:10,14,15,21 23:20 24:8,8
 24:12 25:9,22 26:1,15 27:3,3
 27:19,25 28:4,25 60:10 62:7
 82:12,25 83:8,20 84:24 85:7
 85:14 86:19 87:4 88:9 89:3

**I**

idea 15:7
identification 3:2,20 10:1,3
 118:6
identified 8:9
identify 3:18 118:9
III 110:3
illegal 113:22
illness 30:21 42:5
image 55:1,3 70:14,18,20 75:21
 77:7,19 78:9
images 75:20,24
immersion 37:3
implicating 118:14
implication 112:3
important 15:7
imposed 108:20 109:12,17
 112:24 115:2,6,14
imprisonment 8:19
inches 12:11,12 19:11
incident 26:22 38:1 45:20 46:13
 64:23 85:18,22
incidental 109:13,17 110:16,18
 110:25 111:15,25 112:10,14

112:17,21,24,25 113:13,17,25
 114:5
incidents 27:2 28:18 32:7 57:10
 64:14
include 77:19,20 83:5 107:6
 115:15,17,20,24 116:2,4,7,11
 116:15,17,19,22 117:1,4,7,10
 117:12,15
included 76:15 77:8,21,25
 115:13
including 7:10 115:22
incommunicado 61:13
inconsistent 16:21 18:10 21:2
 23:8,19 38:3 75:10,14,17 84:9
 84:12,15,18,21 89:5,8,11
increases 40:10
incredibly 61:14
independent 118:24
INDEX 2:25 3:7,11
indicated 3:20
indicates 10:12 25:15
indicating 83:16
Indictment 112:13
individual 6:15,18 11:6 34:1
 56:15 65:16 88:7
individuals 30:14 31:2 83:17
industry-standard 64:2
infected 40:7,10,14,25
Infection 43:23
infections 43:22
inferential 93:14,19
inflicted 74:12
infliction 111:23
information 4:19 7:17 33:15
 37:7,12 48:14 52:3,15,17
 83:22 93:3 111:15
initially 7:5 56:3
injected 112:1
injure 56:4 63:11
injured 44:22,22 51:19 52:7
 72:21 86:17
injuries 9:19 20:24 23:21 24:2
 29:21 30:1 31:3,4,24 32:1,2,12
 32:17,25 38:7,10 45:14 48:20
 66:9 73:5 76:12,15 80:15,20
 85:8
injuring 46:23
injury 18:21 19:15,17 25:15
 31:25 33:6,24 34:2,2,4,5 36:18
 36:19 38:9 39:14,20 44:12,24
 45:3,16 46:2,12,16 47:3,5,6
 51:16 52:12 53:4,25 56:21
 58:8 59:12,17 62:21,25 63:3
 63:13,24,25 66:18 67:19,20,20
 68:13 70:4 72:3,12,13,20 78:8
 78:16 79:20 80:15 82:22 83:1
 83:21,22,24,25 84:3,4,4,6
 86:15
inside 43:23
institute 91:21 105:25
institution 105:23
instructions 118:23
instrument 73:14,19,19,20
 74:10
instruments 115:21,22
intend 113:3
intended 113:4
intention 72:15,16,18
intentional 111:22
intentionally 74:12
international 90:21 96:7 101:4
 104:14 105:25 106:11
interpret 43:8 57:19
interpreted 42:21 79:7
interpreting 110:24
interrupt 66:22
interrupted 64:5
interview 5:15 7:5,7,13 9:9 14:2

125

interviewing 4:4
introduction 118:1
investigation 105:25 106:11
involved 31:11 90:17,19
iron 9:1 17:20 18:1,12 19:2
20:23 21:5,22,25 22:12 27:13
27:17 33:21,22 34:19,23 35:6
36:21,22 37:17,19,21,23 46:22
75:25 76:1,6,11,19 77:18,24
78:1 117:10
irons 18:6
irregular 18:3 53:12 55:10 78:6
80:18
irrelevant 94:14 113:12,22
issue 60:12,14
Istanbul 81:16
i.e 3:21

**J**

jabbed 49:24
jabbing 116:22
Jackson 29:19 30:12,19,23
jagged 60:2
jail 93:25
James 2:21 93:24 103:4,6,11
Jangaba 104:2,4
job 107:1
jobs 107:12
John 2:2 41:5
john_wylie@fd.org 2:6
Jr 1:8,9 118:11
Judge 1:14 4:2 81:2 82:6 94:12
98:16 109:20 113:9
juking 116:22
July 7:22,22 8:20
June 106:25
jury 4:23,24 60:9,12 62:3,4 99:4
110:1,9 111:21 114:17,18
119:2
justice 1:22 31:14,22 107:8
108:9,10,20
Jusu 5:12,15,18,22 6:2,7 32:4,7
32:13 37:9 68:22 69:12 70:11
72:2 83:15
Jusu's 5:17 84:17 89:8
J-a-n-g-a-b-a 104:3

**K**

K 2:21 97:16 103:6,11
Kamara 60:15 97:7
Kamaras 97:7
KAREN 1:17
karen.rochlin@usdoj.gov 1:10
keloid 44:9,10,11,16,17,19 45:5
46:10 85:16 86:11
keloids 44:18
Kennedy 41:5
Kentucky 60:18
kept 40:21
kick 42:17
kicking 59:12,15,20,24
kidnapped 98:15
kill 8:10 99:3,4,4,8
kind 19:17,18 34:22 35:13,21,25
36:7,18,19 45:1,3,14 46:16
47:3,25 51:5 52:22 54:15,21
55:17 65:19 71:16 72:13 73:2
73:14 81:5,13 83:12,17,18
85:6,19 86:14,16 87:15,24
115:13
kinds 36:8
knife 39:10,15,21 48:18 73:13,22
know 10:7 29:24 38:4 43:12 47:2
47:20,23 50:11 52:3,8,13 58:2
60:3,21 63:22,23 68:17 69:10
78:12 88:4 93:11,15 94:20,22
94:23 95:3,5,9 108:8 110:6,15

113:18 114:2,11
knowing 65:20 108:4
knowledge 83:19 93:12 112:8,14
known 94:11
knows 93:18 94:21 95:5
Kpadeh 32:4,13 37:9 38:20
40:13 41:3,13 43:16 44:4 64:8
83:8,12 85:17
Kpadeh's 45:8 57:5 64:19 84:11
86:12
Kru 90:4

**L**

laceration 45:4 59:10,15 66:20
lacerations 59:6
ladies 5:1 60:7 100:2 109:23
118:16
large 30:7 42:17 44:14,25 59:13
larger 44:21 96:17
lasted 8:19
late 61:5
launch 91:20,23
law 103:20,24 104:1,3,4,5,6,22
104:23,25 105:4,4,6,8,13,17
106:11 109:12 110:25 112:17
113:10,20,23
lawful 108:19 109:13,17 110:17
110:18,25 111:19,25 112:10
112:15,17,21,24 113:1,13,18
114:1,5,23 115:2,5,14,17,20
layer 14:20 19:16 35:1 66:24
67:15
lead 83:1
leave 4:9 25:4 36:7 56:18,19,23
62:24 63:12 70:3 102:16
leaves 60:9 73:15 110:1 119:2
led 27:1 28:16
left 12:22,23,23 13:1 16:18 19:18
21:12,13,15,15,22 26:9,10
28:8,9 42:1 48:23 50:5 51:8
52:1 55:12,22 56:3 68:21
71:20 72:8,9 76:7 77:2,3 82:4
101:1 102:4,8,18
leg 26:6,10,15 68:21 72:8,9
73:16
legal 107:3,5 110:21 113:10,13
113:17,20 114:3
legs 26:3,6 57:14 68:4,5,6 77:1
77:15,15
Leiden 106:1,2,10
length 67:1
Leone 72:25 73:8
let's 4:21,23 32:12 34:19 62:3
65:22 66:11 87:10 110:11
114:1
Liberia 4:5,17 41:6,7 61:13 90:5
90:9,10,17,22,24 91:6,8 96:8
96:14,18,20 97:15,19,20 100:9
101:12 102:8,22 103:16,18,22
105:3,14 107:14,23,24 108:1,5
109:1,17 112:2 114:23 115:3
Liberian 4:11,13 7:24 91:14 94:1
98:10 108:20 109:3,12 110:21
112:1,17 113:6,10,20,23
license 105:10,12,17
licensed 105:13
licensure 105:7
life 32:21,23 46:15 73:3
lighter 45:10
Lightfoot 7:4,10
likelihood 4:9 86:11 87:21
line 3:3,3 69:25 73:17
linear 63:24 64:4 69:23 70:9
71:19
liquid 10:23:16 34:24 35:22
36:17 37:3 51:21 52:11 53:6,8
53:10,13,16,17 54:7 55:7,10

513:16,20,23,23 56:6,9
70:12 71:11,24,25 72:1 88:9
88:11,13,16
list 4:10 36:12 76:15,19,22
lit 116:2,13
little 27:7,8 38:20 48:18 55:18
68:22 88:3 118:18
live 29:25 30:4,9 31:8 90:8,9,10
103:17,18
living 29:15,23 30:14,20 31:3
59:2 73:8
local 94:3 104:4
localize 37:4
location 67:9 73:16
log 44:5 45:16,18 46:19,21,22,22
46:24 47:1 85:22 116:20,20
logs 45:18
long 35:13 38:11 57:2 80:15
113:24 116:20
longer 94:25
look 33:17,22 36:19 48:7 50:12
50:19 54:23 55:15 57:21 65:22
66:11 76:9 79:25
looked 35:3 47:23 48:7
looking 33:12 39:8 40:2,4,18
48:5 63:23 65:9,9 72:4 74:13
77:7,10
looks 44:20 64:5 78:18
Lori 7:3
loss 68:13
lot 29:12 31:10 44:13 51:12
57:10,12 58:17,24 64:9,12
78:9,18 97:7
lower 20:5
lunch 109:22,25 114:13,22
Luncheon 114:14
lye 36:10,10,12 56:10

**M**

M 1:8,13 118:10
main 104:7
majority 29:14 31:1
making 13:19 14:7
man 54:14 56:5 59:8 72:25 74:12
80:14 99:3,7 110:24 113:9
man's 57:4 65:12
march 92:6 98:9,9,9,12 100:5
mark 33:23 34:6,6,8,9,11,12,15
34:20 35:4,21 36:7 44:8 51:8
51:13 52:1,2,9,18,18 53:9
54:15 55:1,12 56:18,19,23
59:8,25 62:14 65:1 69:18
70:17,19,24 71:4 79:13
marked 3:1 9:25 10:3 118:2,9
marks 26:16,18 28:10 30:22,24
33:18 38:25 47:12 48:18 49:3
49:8 50:9 53:5,5 54:18 56:5,12
57:4,8 64:9,19,19 71:11 74:22
77:24 78:2,9 80:3 81:25 82:3
89:5,9,12
massive 98:4
match 84:6
math 30:16
matter 76:12 93:21 118:14 120:3
matters 31:14,15 114:4 118:25
ma'am 108:2
McARTHUR 1:9
MDHR 90:20 96:6
mean 34:11 42:21 43:3,10,13
50:8 53:3 57:8 64:21 65:8
94:22,23 98:2 115:5
meaning 43:6
means 13:23,24 43:13 51:13
110:25 113:18
meant 43:9 69:10 75:15,19
mechanism 19:13 46:10 67:21
medical 9:3 40:21,23 41:2,4,5,12

41:15 42:15,16 43:5,12 73:2,4
73:5,9 83:9,10,12,13,17,18
MEDINA 2:8 120:5
meet 6:23 112:6,7
meeting 7:5
member 108:12,15
Memorial 29:19 30:12
men 81:25 85:8 94:4 95:3 97:12
97:18 98:6
mental 111:24
mention 36:24 41:19,22,25 76:6
77:6 93:21
mentioned 13:18 19:10 29:18
54:17 91:22 92:2 110:8
mentions 42:3
met 83:8 99:7
metal 47:25 48:13 49:25 50:1,3,7
50:8 63:5 73:18,21,25 85:23
116:24
Miami 1:2,6,19 2:4,9,9 120:6,7
Michael 97:15
mid-September 61:20
mid-shaft 24:19
MIGUEL 2:3
miguel_caridad@fd.org 2:5
military 108:13
militia 108:15
millimeters 52:5
mind 82:4
minimum 113:4
Ministry 107:7 108:8
missed 8:21
MODEL 96:10
molten 112:15 115:24 116:13,13
moment 25:6 28:22 74:16 81:2
89:1 100:13 102:24 117:17
moments 13:18
monitoring 91:5,8
Monrovia 7:23 41:7 90:9 92:6
101:11,19,23 104:8
month 61:13
months 8:20 32:25 40:21 42:6
61:9,12 68:17
morning 5:1,8,9 29:7,8 60:8
61:22,25 118:14,18
motion 46:3,3
mouth 68:23 69:1,7
move 28:3 118:1
movement 88:13,16 90:20 96:6
96:9
moves 10:20
Mulbah 60:15
multiple 42:3 63:11
murder 107:18
muscle 68:14

**N**

naked 117:2
name 4:13,15 6:18,19 8:10 89:25
90:1 96:3 103:10,10,11,11
104:1,25
named 8:1 93:4 98:6 108:9
names 91:20 92:8 93:6,13 95:10
97:1,3,4
narrow 56:18,18
national 4:11,13 90:22 96:8
104:5,6
natural 19:13
nature 31:14,22,23
necessarily 35:6 39:23 63:2,6
71:24,25 73:13 114:6
necessary 113:5
neck 12:23 79:3,4,11,13,15,19
need 4:2 60:10 70:18 119:3
negate 113:5
negotiations 102:13,14
Netherlands 105:22,24

never 32:1 38:19 40:24 58:13
  96:15 99:6,7 113:15
nice 73:15
nondescript 57:19
nonhearsay 94:13
nonliving 29:14
nonspecific 24:24 25:14 57:19
  65:6,8 79:7
noon 60:21 61:24
normal 41:17,18
normally 67:10
North 2:9 120:6
nos 61:17
notes 76:3
noticed 38:25 39:12 54:17 57:4
  57:8 68:3
notion 112:2
November 99:11 118:12
number 4:16 17:1,9 29:17,17
  30:23,25 41:9 48:21,25 49:5
  49:10,13,16 77:2 118:12
numbered 10:9
Numbers 18:15 19:25 21:7
N.E 1:19
N.W 1:23

**O**

object 8:3 34:20,22 35:12 36:6
  39:14,23,24 49:25 54:22 59:7
  62:24,25 63:5,7 67:14 69:22
  69:24 71:14 74:7 80:22,25
  85:19 109:20 116:20
objection 8:7 10:22 81:20 90:25
  91:9,16,24 92:4,10 97:13,23
  98:13 110:7,11,12 111:17
  114:12 118:5
objects 35:9 70:2
obscure 84:2
obscuring 27:8
observations 9:17 14:14 15:15
  16:11 23:23
observe 22:21 24:5,15,17 25:10
  83:11,16,18 84:11,14,17
observed 9:18 10:17 13:6 14:9
  14:11 16:5 21:2 26:15,19
  84:20 85:16 89:5,9,12
obtain 106:23
occasion 31:25 104:22
occur 51:16 71:23
occurred 24:1 25:15 33:1,3,5,24
  44:24 62:1 65:18 79:8 82:2
  84:3,4
occurs 44:11
October 1:7 6:14,23 10:14 41:15
  98:5 100:5
offense 113:17
offer 53:1
offered 8:5 93:20,23 94:14,15
Offhand 43:12
office 1:18 2:3 6:25 31:12 100:21
  100:24 104:25
officer 4:14,22 107:5
Offices 104:23
Official 2:8 120:6
Oh 30:7 31:21 36:8 51:17 82:19
oil 67:22
okay 43:25 51:3 60:22 69:6 71:7
  74:24 101:6
old 32:13 68:15,17,18 90:6
once 8:17 23:17 32:20 34:1 56:2
  56:3 96:4
ones 20:13 30:9 51:20 52:15
  87:5
one's 46:7
open 3:14,16 96:1 100:1
operating 109:1
opinion 7:18 12:2 13:7,14 14:15

15:11,16 16:17 20:7 37:16,19
  37:20,22 39:18 53:2 58:11
  64:1,3,6 65:14,17,21 74:14
  76:13,18 77:6,18 83:21 84:3,5
  84:8 109:21 110:12,13,14,15
  111:10,14 112:9
opinions 16:13 17:21 19:4 26:19
  38:6 83:24 111:6
opportunity 9:6
opposed 29:22 31:17 38:9 73:19
  74:9 88:22
ordeal 78:17 112:3 113:6
order 8:12 14:18 87:24
ordering 116:4,15
organization 95:4 96:9,17,21
  97:8 108:13
organizations 90:17,19,23 91:13
  94:2 96:4,13,16 97:11,17
organize 92:3 98:5
organized 98:8
orient 12:21
orientation 11:17,24 12:20,22
  12:25 21:12 24:12 26:3,5,9,13
  87:5
origin 52:20 58:14 73:1
outer 12:7 14:20,25 19:16 23:14
  23:15 28:8 35:1 48:22 66:24
  67:15
outlined 112:10
outside 13:16 81:11,21
out-patient 42:16
overall 11:17 19:9 48:6
overruled 8:8 91:2,17 92:5 95:11
  97:14,25 98:14 114:12
oversight 77:22
overzealous 44:12
owns 61:14
oxygen 61:18

**P**

page 2:13 3:3,3,8,12 42:20
pain 111:23,24,25
paired 49:17
pairs 47:15,20,22 48:5,8 49:21
  50:6
palms 8:16
paper 102:21
paragraph 77:21
parameters 114:1
Pardon 6:11
pared 6:11
parenthetical 111:24
part 16:13 18:19 21:14 22:12
  23:14 27:7 28:8 29:11 34:17
  35:14,24 46:5 51:9 58:20 76:2
  77:22 85:20 88:7,8 96:4
  102:10,12,14 116:12 117:12
particular 17:16,22 20:15,18
  21:23 24:22 27:11,12,15 28:16
  37:5 78:22 88:8
parts 9:1,13 77:17 86:4 101:21
passage 79:16 84:1
passed 29:22
passes 32:16
patients 29:17,20 30:11,14,18
  30:18,23
pattern 37:3 47:14,19 48:4 55:17
  55:21 57:20 68:12
PE 42:20
peace 101:9,10,25 102:3 106:16
  106:24
peaceful 92:6 98:7,7,9
peel 15:8
pencil 48:21
penetrated 63:7
penis 8:14 24:3,4,18,20 25:11,11
  25:16,20 39:10,19,21 40:13,24

41:20 42:8 70:11,25 71:9,13
  71:15,19 80:17,18,21,22
Pennsylvania 1:23
people 4:8 31:3 33:13 58:16
  69:11 81:6,9 91:14 92:8 93:8
  93:11,25 94:25 97:1,4
people's 93:13 98:11
percent 30:7,9,13,19 31:2,21
  38:9 83:25
percentage 29:21 30:3,6 31:7,19
perforating-type 68:13
period 15:5 109:3,6
permanent 9:18 14:18,22
  16:15 32:20,21,22 69:4 76:13
  77:9 79:18 82:1
perpetrators 107:8 108:11
person 23:13 38:21 93:4 113:2
  116:5,7,8,8,11,15,19,23,23
  117:1,2,4,7,10,12
persons 29:15,22,23,25 30:20
  96:24 105:4 115:2,6,18 116:2
person's 116:17 117:15
pertinent 111:20
ph 6:19
phone 61:14
photo 24:15
photograph 6:3 11:6,9,17,17,23
  11:24 12:3,6,20,22,25 13:6
  17:4,5,7,12,14 18:19,20 20:11
  21:12,13 22:8 24:12,18,23
  25:9 26:3,5,6,9,13 27:22,23
  28:8,10,12 44:16 48:7 68:6
  78:20
photographed 9:19 57:18
photographer 7:9
photographs 6:1,7,9 10:11,13
  12:19 15:25 16:2 18:18,24
  20:3,4,7 21:11 22:19 23:23
  26:1 87:4 88:17
phrased 89:3
physical 16:4 42:21 86:9 111:23
  115:21
physically 4:8
physician 29:18
picture 63:17 66:15
pictures 50:16 66:8 78:23
piece 73:18,21,24
pigment 23:14 45:10
pigmented 78:19
piled 44:25
pit 116:23
place 8:18 69:7
placed 40:10 85:20
places 50:4 71:19
placing 85:22
Plaintiff 1:5
plaintiffs 31:16
plan 112:12
planning 95:1
plants 36:2
plastic 41:22 42:8 50:25 112:15
  115:24 116:13
please 4:21,23,25 5:2 7:20 13:22
  14:17 41:8 50:13,19 57:21
  60:8 62:3,5,9 64:16 65:1 69:15
  70:14 89:25 103:10 104:17,19
  104:25 106:6 107:2,25 108:3,7
  109:24 114:17,19 115:7
  118:23
point 6:12 35:2 46:14 60:5 61:13
  61:18 96:13 118:14
pointed 51:20 59:11 62:25 76:12
Police 4:11,13
Political 104:14
positive 113:3
possibilities 85:8
possibility 54:11 85:11
possible 16:9 35:18,25 37:7 40:4

43:4 46:17 47:1,6 50:11 53:11
  53:15 54:16 56:11,24,25 60:1
  63:8,25 67:3,6,9 70:7 85:21
possibly 67:12 87:15
posterior 77:2,3
potassium 36:11
potential 40:7 47:3
potentially 79:18
poured 8:12,15 16:16 23:5 42:8
  71:8 74:18,20
practice 103:21,22 105:3,8,13
  107:3
practices 112:2,9 113:6
practicing 105:11
prayer 98:8,8
preliminary 108:24
prep 99:10
prescriptions 43:16
present 7:1,3,4,7,10,13,15 16:1
  26:16 42:5 107:2 109:9,15
Presently 107:4
presidency 101:7,8
President 7:24 97:20 100:21
pressure 94:1,2,4 97:21 98:1
  101:3 102:10
pretty 15:7 44:8,9 69:7
previous 23:9 70:24 71:1
previously 9:25 27:24 37:11
primarily 33:13
primary 33:15 72:16
prison 40:21
private 107:9,11
probably 30:12,13,17,19 31:21
  46:10 68:17 74:25 118:21
probe 65:9
problem 61:5,11
problems 4:14
proceedings 1:13 3:14,16 93:1
  96:1 99:1 100:1 120:3
process 33:7 72:17 112:19
producing 34:4
profession 31:23 33:8 103:19,21
professional 108:3
professionals 81:13
Program 90:21 96:7
progression 33:6
projectile 68:13
pronounce 6:20
propose 111:13
propositions 109:15,16
prosecute 107:16 108:11
prosecuting 107:8,14
prosecution 31:18 33:13
protect 86:15
protection 58:17
protest 92:6,7
protests 91:21 92:2,2
Protocol 81:16
provide 58:11 65:21 85:2 94:8
  112:4
provided 7:17 9:3 33:12 54:13
psychiatrist 81:17
psychological 81:5,8
psychologist 81:18
public 2:3 92:2 107:10 118:3
publicize 91:20
publicizing 93:13
publish 11:1,11
pull 72:20
punched-out-type 88:18
puncture 52:24 62:24
punctured 56:22
punishments 109:12
purpose 11:15,23 12:18 48:10
purposely 47:18
purposes 28:14
pursuant 8:6
push 61:24

**pushing** 59:23,25
**put** 30:18 31:18 34:24 47:18 48:9 60:22,24 94:1,2
**putting** 61:7
**p.m** 114:16,18 117:24 118:7,8 119:2

**Q**

**qualified** 110:14 111:11,15 112:8
**qualify** 111:13
**question** 14:2 29:24 81:20 84:8 85:11 88:20 109:18
**questioned** 83:8
**questions** 82:13,20 84:24 85:7 87:14 89:4,14 100:12 102:25 108:24 114:10 117:21
**quickly** 69:8,9
**quiet** 88:2
**quite** 4:4 29:17,20 37:9 44:14 50:3,9 57:4 71:17

**R**

**R** 120:1
**raised** 12:9 18:4 19:7 22:1 44:15 48:23 54:3 69:24 71:18 77:3 78:7,19,20 85:16 86:11
**random** 47:19
**range** 115:1,17,20
**rape** 29:18 107:6
**rare** 31:25
**rationale** 112:4
**reach** 17:21 21:1 24:21 25:12 83:21
**reached** 13:7 20:8 26:20
**reaction** 60:24
**read** 102:21
**reading** 118:24
**ready** 10:7 61:5
**really** 32:19 35:3 38:2 49:21 53:1 58:9 64:2,6 80:17 113:4
**REALTIME** 1:25
**reason** 46:6 64:1
**recall** 5:10,14 6:18 7:1 13:20 14:5 28:25 38:16 55:19 73:1 82:12,15,17,20 84:24 85:7,11 86:1 87:14 114:24
**receive** 4:18 73:8 104:11,15 105:4,7,10 106:4,20
**received** 3:1 10:24 38:14 39:25 40:3,20,23 73:3,4,6 78:16 93:3 106:6,9,24 118:8
**receiving** 104:21
**recess** 60:8 109:22 114:14
**recessed** 5:10
**recognize** 10:7,9 11:6 16:9 87:5
**recollection** 85:3
**record** 9:16 41:2,4,9,12,15 42:15 42:16 43:5,9 89:25 118:3,9
**recorded** 9:18
**records** 9:3,6,9 21:3
**recounting** 33:16
**rectum** 42:13
**Redacted** 103:14
**Redirect** 2:17 82:8,9
**redundant** 6:10
**reference** 13:22 14:8 17:13 18:20 21:14 22:4 27:23 86:1 87:18
**referenced** 8:23
**referred** 13:19 72:14 85:24 108:9
**referring** 30:20 50:7 51:9 78:14
**Refugee** 107:4
**regard** 14:6 105:7 107:9 108:21 108:23 111:18
**regarding** 74:15 114:4 118:24

**regular** 61:1 85:15 112:25
**regularly** 85:14
**relate** 52:10 78:16
**related** 51:6,18,23 55:6 58:5,14 64:14 79:2 85:21
**relates** 59:12 118:4
**relating** 9:4 26:20
**relayed** 7:22
**release** 92:9 93:7 94:4 96:24 97:5,9 98:6
**released** 8:20 40:22 93:25 94:18 94:20
**relevance** 24:17 90:25 91:9,24 97:23 98:13 99:8
**relevant** 5:22,24 7:17,20 12:2 13:7,10,14 14:14 17:16 18:23 18:25 20:7,10,13,14,19 21:17 21:17,19,20 22:25 24:5,15 26:19,21,23 27:1,11 28:13,13 28:15,17 111:18
**rely** 84:2
**relying** 51:24
**remain** 28:25
**remember** 77:23 78:22 92:8 97:1 97:3 118:23
**remembered** 93:6
**remind** 109:23
**remote** 68:20
**report** 40:18,18 76:9,16,18
**REPORTED** 2:7
**Reporter** 2:8 120:6
**Reporter's** 2:23
**request** 9:21 28:24 92:11
**require** 88:6
**requiring** 116:19
**resigned** 101:2,3
**resolution** 106:16,24
**respect** 5:14 6:1 14:3,15 15:25 16:13 18:23 19:5 20:8,14,18 21:17 24:1,14,21 25:12 27:14 88:20
**respond** 114:9
**rest** 32:21 61:21
**result** 17:19 27:13 34:23,24 59:17 67:19 87:15,22
**resulted** 20:24,24 49:24 80:4
**resulting** 85:12 86:12
**results** 18:3 45:1 54:2
**Resume** 3:14,16
**RESUMED** 5:4
**return** 13:3 25:5 87:10 109:24 118:18
**returns** 4:24 62:4 114:18
**review** 6:6 9:6
**reviewed** 9:10 21:3
**ribs** 38:17
**rifles** 48:1 50:2
**right** 11:24,25 12:7,21 13:11,12 13:17 17:5 18:19,20 19:3 20:11,23 26:5,6,13,14 33:5,23 34:7,21 35:4 36:14 37:1,6,6 39:7 41:13 42:4,23 44:5,8,8 45:17,22,25 46:13,15,25 47:16 49:16 50:4,5,22,22 51:4,15,23 53:6 54:6,18,20 55:2,5,7,22 57:6 59:15,21 62:19 63:19 64:24 65:14 68:4 69:8 72:12 74:8,18 75:13,18 76:4,19,20 76:22,24 77:10,10,13,13,19,24 79:3 86:20 87:8 103:22 119:3
**rights** 90:20,22 91:5,6,7 96:6,8 96:10,19,23 97:19 98:1,11
**right-hand** 43:15
**rising** 14:8,11 85:5
**ritual** 48:10
**Rochlin** 1:17 2:14,17 5:2,3,7 8:5 9:21,24 10:5,19 11:1,5,11,14

**R-1**1:19,22 12:13,17 13:2,5 15:19,24 16:25 17:3,8,11 18:14,17 19:24 20:2 21:6,9 22:13,17 24:7,11 25:5,8,21,25 26:11 27:18,21 28:3,6,19,22 81:20 82:11 86:18,22,24 87:1 87:3,10,13 89:1,2,14 117:25 118:9
**rock** 59:7,9,15,20,23 60:2,2
**rocks** 42:17 59:13
**rod** 47:25 48:13 50:1,3,7,9 116:24
**role** 96:21 102:20
**rolling** 14:11 85:6
**rope** 39:3
**rough** 19:11 22:2
**roughly** 12:11
**route** 118:19
**routine** 107:5
**Roy** 1:8 118:10
**rubbed** 8:16
**rubbing** 117:15
**Rufus** 83:8 85:16
**rugby** 59:24
**rule** 18:6 54:4,5
**ruler** 19:9
**run** 37:4 56:1 116:19
**running** 36:19 53:13 55:15,21,21 55:22
**runs** 56:3
**rural** 59:2

**S**

**Sackor** 97:6
**salt** 8:16 117:15
**sanctions** 108:1,4,19 109:11,13 109:17 110:17,18,25 111:7,8 111:19,25 112:1,11,15,17,21,24 113:1,13,18 114:1,5,23 115:2 115:5,14,17,20
**sandals** 58:24 59:4
**Sassywood** 112:2 113:6
**saw** 29:20 32:22 34:20 35:3 36:15 41:4 44:15 45:8 47:8,12 64:19 75:18,20 94:24 100:24
**Saybay** 2:21 103:5,6,11,13,19 104:9,21 105:3,16 107:1,9,21 107:25 108:12,19,23,25 109:9 109:11 110:2 111:11 112:14 114:22 115:1,11
**saying** 34:12 37:24,25 39:15,18 45:16 46:19 49:24 51:14 53:22 53:23 54:6,20 59:8 62:18 74:8 94:15
**says** 33:21 42:20 64:9
**scalding** 8:17 117:5,7
**scale** 17:13 18:20 21:14 22:4 27:23 87:20
**scalp** 16:19 63:11
**scar** 12:10 13:11 14:18,22,24 17:6,13,16,19,22,25 18:3,4,10 18:23 19:5,10,12,18,19 21:14 21:16,21,23 22:1,3,8,11 23:17 26:21 27:4,8,11,12,15,16,24 28:1,12,16 34:3 35:2,5 36:20 39:8,12,20 40:2,5 44:9,10,13 44:14,19,20,21,23,24 45:1,5,5 45:8,14 46:10 51:9,10 52:5,15 52:20 53:2,21,24 54:2 55:19 56:3,16 57:3,19 58:1,15 59:11 59:16 62:20 63:4,12,18 64:4,5 64:7 65:9,10,10,18 66:1,15 67:3,10,20 68:14 69:23,23 70:3,4 71:17,18 72:4,13 74:13 77:9 79:18 85:16 86:12,14,16 87:6,21,24 88:17,19,21 **scared** 64:13 66:24,24

**scarring** 36:1 48:10 58:18,24 65:19 68:12 69:4 71:23
**scars** 12:6,8 13:16 15:6 16:5,9 16:18,19,20,22 19:5,7,21 20:11,12,15,16,18,25 21:4 22:5,22,23 23:7,18 24:19,22 24:23,23 25:4,10,11,13,14 26:16,18,23 27:1,6 28:10 42:3 47:8,21 48:13,22,24 51:5,10 51:19 53:7,13,21 56:6,20 57:10,12 64:9,13 65:6,15 69:3 71:5,20 75:9,11,13 76:1,15 77:4,7 78:6 79:1,6,15,19 82:1 85:12 87:15
**scenario** 88:5,5
**schedule** 61:21 118:15
**science** 29:9,11 104:14
**scope** 8:3
**scrape** 45:25 71:15
**scraped** 45:25 46:15
**scrapes** 56:21
**scraping** 45:2,12,22 46:3 71:14
**screen** 11:2,7 12:13 15:19 17:8 21:7 25:5,21 27:18 28:3 41:12 77:19 87:4,9
**scroll** 12:14 15:21 22:15
**seat** 12:10
**seated** 4:25 62:5 114:19
**Second** 111:9
**secondary** 72:15,18
**Secretary** 96:22
**section** 76:18
**SECURITY** 4:22
**see** 16:9 18:1 19:7,8 20:12 22:1 22:4,23 27:4 32:3 33:2,4,6,17 33:23 38:7 41:12 46:16 48:25 50:7 51:5,24 52:5 53:11,25 56:15,15 58:1 62:12 64:15 66:7 67:11 68:5,12 69:4 70:4 70:17,19 71:17 73:16 74:4,6 76:9 77:19 78:7,9 80:16 85:5 86:14,16 88:12,16 93:15,16,17 110:2,24 114:13
**seeing** 38:9 84:9 94:21
**seek** 118:1
**seeking** 99:9 102:21
**seen** 27:6 30:11,18,23 32:25 38:10 48:21 51:6 94:22
**selecting** 115:17
**self-authenticating** 118:2
**semi-solid** 34:24,24
**sense** 38:5 65:15 75:5 82:19 83:13
**sent** 61:16
**sentence** 77:20
**September** 61:17
**series** 15:25
**sessions** 99:10
**seven** 32:13
**severe** 101:22 111:23,23
**sexual** 107:6,6
**SGBV** 107:5
**shaft** 25:11 80:18
**shape** 12:10 18:3 19:9 27:5 67:8 67:17 78:2,5 87:22
**shared** 15:13,14
**sharp** 39:14,22,23 63:10,10,25 69:22 70:6,8 72:12,13 73:19 73:21 74:1,5,7 116:23
**sharpened** 73:15
**Sheikh** 97:6
**shin** 26:13 28:8
**shock** 8:23
**shocking** 117:12
**shooting** 115:18
**short** 60:14,23
**shoulder** 20:12,24 21:13 44:5,8 45:9,15,21,22,24 46:5,8,13,14

46:15,21,23,23,25 47:2 78:12
78:13 85:12,22 86:12
**shoulders** 20:4
**shoveling** 117:1
**show** 10:16 18:18 22:18 80:3
87:5,6 93:23
**showed** 4:10
**showing** 26:2
**shown** 17:16 21:16 22:8 41:2
76:20
**shows** 17:12
**side** 11:24,25 12:21,22,23 13:1
13:12 16:2,6 17:5 18:19 26:5,9
43:15 76:23,24 78:6
**sidebar** 3:11,13,15 92:11 93:1
98:16 99:1
**sides** 22:20
**Sierra** 72:25 73:7
**signed** 102:1
**similar** 22:2 27:5 34:17 39:4
63:12 64:19,21,21,22 70:3
77:9 78:7 93:24
**simply** 86:12 112:12
**single** 6:3 38:17 65:12 94:13
**sir** 38:23 81:7 103:10
**sit** 61:7
**situation** 93:18
**size** 12:10 19:9 44:21 48:20
62:25 64:21 67:8
**skin** 14:20,20 15:5,8,13,14,14,15
18:4,8,13 19:14,14,16,19
20:17 22:7,7 23:12,14,15,17
25:1,2,2,4,18 35:1 44:22 45:4
45:10 46:2,4,8 47:2,3,7 48:16
48:17,23 49:25 52:7 54:1,1,1
54:22 56:21,22 62:24 63:7
66:20,24 67:4,8,9,13,15 69:25
70:9 71:12,15 72:16,19 73:12
73:17 85:19,19 86:4,8,9,14,16
88:2,3 112:16 115:24
**slightly** 12:9
**slips** 23:14
**sluffed** 14:21
**small** 48:17,20,23 52:22 57:3
79:6,15,19 88:14
**smaller** 22:4
**sodium** 36:11
**sodomized** 42:10
**soles** 86:6
**solid** 35:12,15,22 36:6 88:9
**solidarity** 98:7
**Solo** 5:12
**somebody** 33:11,21 50:8,8
74:12 93:3 99:3,4 111:1
113:21
**someplace** 105:19
**somewhat** 18:5 22:3 27:5 36:17
44:12 53:12 58:8 64:5 71:18
78:4,4,6
**sorry** 8:21 30:15 48:2 49:19
52:25 66:22 71:21 79:9 98:3
114:7
**sort** 30:21 39:24 44:5,7 48:10
49:25 55:2 80:23 112:16
**source** 64:1,2
**sources** 33:15
**southeastern** 90:5
**Southern** 1:1 118:11
**speak** 61:4 118:20
**speaker** 3:20
**speaking** 33:11,13
**special** 90:21 96:7 107:12 112:9
**specific** 42:11 65:16,19 87:25
88:7
**specifically** 14:9 42:2 103:22
105:19 107:17,19
**speculate** 36:8 54:11 88:4
**Speculation** 97:24

**spell** 89:25 103:10 104:17,19,25
**spelled** 6:21 90:1,2 103:11 104:2
**spilled** 36:13 54:15
**spine** 47:17
**splashing** 117:4
**split** 46:4 71:15
**stabbed** 41:25 47:25 48:12
**stabbing** 50:8 116:8
**stage** 33:25
**stand** 61:8 89:19
**standard** 43:5,12
**start** 60:21 61:1,1,23 118:18
**state** 31:12,12 89:25 107:12,13
**stated** 8:25 16:12 19:2 76:13
112:13 113:7
**statement** 32:18 75:10,14
**statements** 5:17,22,24 7:21
13:19 17:15,18 18:22,25 19:1
20:19,22 22:24 23:3,8 24:5
27:10 84:7
**States** 1:1,4,14 2:8 10:20 28:24
102:10,12,14,18,20 103:4
111:2,19 113:19 118:1 120:6
**statute** 111:21 113:8
**statutes** 110:20,23
**stayed** 102:18
**stays** 56:1
**Ste** 2:9
**steam** 14:8,11 85:4
**stinging** 117:1
**stint** 105:6
**stitched** 70:1
**stopped** 96:3
**straight** 69:25 73:15
**Street** 1:19 2:4
**streets** 92:6
**stress** 86:9
**stretched** 12:21 13:1
**stricken** 100:3
**strictly** 110:21
**strike** 99:12,15,15
**striking** 116:7,22
**strong** 36:9,10,10 87:20
**struck** 116:20
**studies** 106:17
**study** 104:22 105:19,21 106:16
106:24
**Suakoko** 104:16,19
**subject** 28:25
**subsequent** 15:15 20:17
**subsequently** 94:23
**substance** 34:24 35:24 36:11
37:1,2 67:7
**substances** 36:12,23 54:12
**subsumed** 112:16
**suffering** 111:23,24,25
**suggest** 111:16
**suggested** 83:11
**suggestion** 112:7
**Suite** 120:6
**Sulaiman** 5:11
**sulfuric** 36:9
**summarily** 115:18 116:4
**summary** 77:21 81:25
**sunburn** 14:24
**suppose** 53:15
**supposed** 100:22
**sure** 6:20 33:2 61:10,25 71:12
89:3
**surface** 14:9,19,25 18:7 23:15
48:23 52:6
**surfaces** 86:5
**surname** 90:2
**survivors** 30:24
**suspect** 112:18
**Sustained** 81:23 91:11,25
**sutured** 69:25 72:14,24
**sutures** 72:17

**SWORN** 89:21 103:6
**synonymous** 114:6
**system** 31:14,22 43:23 108:20
112:9
**S-a-y-b-a-y** 103:12
**S-u-a-k-o-k-o** 104:20

---

**T**

**T** 120:1,1
**tabie** 112:25 115:11,15
**table** 2:12 8:16
**take** 11:19 22:13 23:23 24:8
28:19 34:19 43:25 60:3,7,18
87:10 88:3,9 109:22
**taken** 6:3 7:23 8:18 96:13
**takes** 15:1
**talk** 8:12 38:20 61:7,9,15,16,24
74:15
**talked** 38:13 52:12 56:10 61:11
61:25 99:10
**talking** 37:8 49:3 58:2 67:7 70:17
75:4 76:19 78:13 82:19
**tar** 35:16,17 36:6,13,17,17
**Taylor** 1:8,9,10 7:24 8:2 90:10
97:22 100:8,18 102:3,11,16
**Taylor's** 100:21
**tear** 85:25 86:3
**telephone** 3:19
**tell** 5:18 7:16,20 9:13 12:8 13:10
13:13 16:5 17:12 18:9,18,22
20:6,10 21:10 22:21 23:21
24:1 26:15,18 34:6 37:13
38:13 39:15,25 40:4,13,16
51:22 52:4,9,17,20 54:7 59:23
62:1 65:10 68:23 72:3,25 74:9
74:11 78:15,20,25 79:13,21
84:20 103:10 109:16
**telling** 35:3 46:18 53:3 59:14
64:2 65:13 77:23 80:8
**tells** 57:18
**temperature** 13:24 14:6 15:12
18:7 23:10 41:17,18 80:19
**tender** 29:1 117:20
**tension** 73:17
**term** 100:21 110:18,19 113:13
113:17 114:3 115:11 116:22
**terminology** 83:9,10 114:5,8
**terms** 23:11 112:13
**testified** 5:14 32:2,3 38:21 80:3
**testify** 4:7 61:5 94:2,17,23
113:14,16
**testifying** 5:11
**testimony** 5:18,21 6:2 13:18,20
51:12 62:20 80:10 85:24 93:24
94:5 99:15 110:12 111:10,10
111:14,18 113:24 114:4
**texture** 19:8 22:2,5 27:9 53:24
53:25 54:3 78:7
**textured** 18:5
**Thank** 82:6 89:15,16 100:11
102:23 103:1 110:4 114:20
117:19,22 119:6
**theme** 38:16
**themself** 24:24
**theory** 81:19
**thermal** 53:25 78:8
**thick** 44:15 71:18
**thicken** 86:8,15
**thickened** 86:10
**thighs** 26:4,7
**thing** 43:18 47:24 81:8
**things** 4:17 32:4 36:9 51:24 75:5
94:24 113:10,15
**think** 43:10,11 52:2 66:7 86:6
94:12 111:17 113:4,11
**thinking** 35:15
**thorn** 70:8

**thought** 54:17 75:3 82:19
**threatened** 4:6 8:10
**threatening** 117:4
**three** 12:12 38:2 40:21 60:23
61:12
**tied** 38:24 39:3
**time** 3:18 9:21 10:19 11:11,19
15:5,20 16:25 18:14 19:24
21:6 22:13 24:7 28:25 32:14
32:16,22 41:17 48:21 61:2,19
72:19 84:1 86:5,7 88:3 94:6
96:4 99:2 117:25
**times** 83:5,24
**tip** 80:17
**tissue** 18:4 44:13
**Title** 111:1 113:19
**today** 32:2 118:17
**toe** 2:18 9:15 59:11 89:18,21
90:1,3 96:3 100:5,18
**told** 4:10 36:13 37:10,14,17
40:24 43:15 44:4 46:18,21
48:12 50:25 51:13 57:5,16
59:20 62:16 63:20 64:23 69:18
70:11 72:10 77:23 79:3 99:3
**tomorrow** 60:21 61:23,25
118:18
**tonight** 60:20
**top** 16:3,6 44:5,25 46:12 51:8
58:23 78:5
**topic** 114:23
**tore** 85:18
**Torh** 93:25 94:5
**torture** 42:9,12 81:10 110:20,22
111:22 113:14,15
**tortured** 42:6 116:15
**TOTAL** 1:25
**touch** 61:19
**touched** 38:25
**tract** 43:22
**training** 105:4
**TRANSCRIPT** 1:13
**transcription** 1:25 120:3
**transfer** 35:13
**Treatment** 29:19
**tree** 70:6
**trial** 1:13,22 4:7 61:20 110:16
112:1,3 113:6
**triangular** 12:10 19:8 22:3 27:5
36:20 53:14 58:9 78:5
**tried** 99:3,4,8
**true** 65:12,15
**truth** 93:20 94:14,15
**try** 70:21
**Turay** 32:4,7,13 37:9 62:7 64:8
64:23 83:15 87:6
**Turay's** 84:14 88:17,21 89:5
**turned** 15:15 114:22
**turning** 23:12
**twig** 63:10
**two** 12:6,11 18:24 20:11,13
32:10 42:6 47:21 51:7,10
52:16 53:13,16 60:13 61:12
71:5,19 75:4 76:1 77:3 78:18
90:23 91:13 95:3 96:3,14,16
**type** 12:8 19:8 67:3,10 70:3
74:10 91:22 94:4 105:10
**types** 92:2 107:16
**typical** 19:19 44:16 53:25 54:21
67:3
**T-o-e** 90:2

---

**U**

**u** 105:2
**ultimately** 111:22
**umbrella** 96:17
**underlayer** 14:22
**underlying** 14:19 22:6 71:13,22

80:16,20 86:17
**underneath** 96:16
**underside** 24:18,20 58:23
**understand** 29:24 76:17 84:8
  109:18
**understanding** 82:23 95:8 115:1
**understands** 110:9
**undertake** 105:16 106:17
**United** 1:1,4,14 2:8 10:19 28:24
  102:10,12,14,18,20 103:4
  111:2,19 113:19 117:25 120:6
**University** 104:16,17 105:25
  106:2,10,13,18
**unlawfully** 92:7
**unrelated** 51:10,12,14,23 57:5,9
  57:10,12,16,18 63:20 64:10,23
**updating** 4:18
**upper** 12:7 13:17 18:19 19:3
  20:4,11 21:14,15 47:17 76:20
  77:10,10
**urinary** 43:22,23
**USC** 118:4
**use** 43:6 83:9,10 114:9
**usual** 118:22
**usually** 52:23 56:14 86:14 88:9
  107:11
**U.N** 98:11
**U.S** 1:18,22 94:3 102:21

**V**

**vacuum** 83:21
**various** 85:8
**Varmuyan** 6:19 10:14 11:9 93:22
  94:9 97:6
**Varsay** 97:6
**venue** 118:4
**versus** 88:20
**victim** 60:14
**victims** 81:9 91:20 94:7
**violations** 91:5
**violence** 107:17
**violent** 107:19
**visual** 9:17 24:4
**visually** 10:16
**vocabulary** 83:19
**voluntarily** 101:1
**vs** 1:7

**W**

**waistline** 13:11
**want** 38:20 68:22 111:1
**wanted** 60:21,22,23 102:16
**wants** 60:3 93:10
**warrant** 118:3,10
**warring** 96:10
**Washington** 1:23
**wasn't** 35:11 39:22 53:4,18
  73:24 74:25 80:11 95:1 112:23
**water** 8:13,15,22,25 13:20,23,24
  13:24 14:3,6,7,8,10,10,12,14
  15:4,8,10,11,14,16 16:14,16
  16:17 23:5,10,10 40:11,21
  74:17,18,25 75:14,16 84:25
  85:3,4,6 117:5,8
**wattage** 24:25 25:17 79:16
**wax** 54:6 71:8 116:13
**way** 4:5 29:10 31:18 35:19 36:2
  39:3 47:23 48:17 59:14 75:12
  89:3
**ways** 38:2 63:11 91:13
**weapon** 63:1,2 116:8
**weapons** 8:15
**wear** 85:25 86:3
**wearing** 58:16,24
**wears** 59:4
**wear-and-tear** 46:9
**Wednesday** 61:22

**week** 68:12
**weekend** 4:3,12 5:10 60:16
**weight** 46:24,24
**Welcome** 5:1
**went** 102:6,8
**weren't** 82:3
**West** 2:4
**we'll** 60:7 61:23 109:25 110:2
**we're** 75:4 77:7,10 99:6 110:6
  111:6
**we've** 51:6 110:16 114:10
**white** 15:15 23:12
**width** 67:1
**wife** 98:15 99:4
**withdrawn** 107:20 108:24
  109:10
**witness** 4:1,10 5:4 9:22 31:24
  53:4 61:7 81:22 89:16,17,20
  89:21 100:3 103:2,3,6 110:4,5
  110:7,7 112:8 113:25 114:15
  114:16 117:20,24 118:19
**witnessed** 31:25 32:1
**witnesses** 4:4,6,10,15 60:13,23
  118:17
**wooden** 63:7
**word** 33:8,10 42:12 43:1 51:12
  75:4,7 94:13
**words** 43:6 44:22 45:12 47:20
  64:12 65:9 72:18
**work** 29:12,14 31:5,7,7,11,12,19
  82:13,21 86:7 107:20,21
**worked** 31:13,15 54:14 60:16
  82:18 83:5 85:14
**working** 31:18 61:5 105:4 108:4
**works** 47:5
**wouldn't** 46:10 50:10 63:23 64:1
  65:21 86:14,16 100:25 101:5
  101:18 102:17,19 113:14
**wound** 52:24 68:3,10,11,20
  72:18,24 74:11
**wounds** 8:17 73:9 117:15
**Wright** 104:2,2,4
**wrist** 50:23 53:8 87:8 88:17,21
**writ** 109:6 110:8
**wrong** 75:16
**WYLIE** 2:2
**W-r-i-g-h-t** 104:3

**Y**

**Yeah** 36:25 53:4 58:19
**year** 33:4 90:16 91:8,14
**yearly** 105:11
**years** 29:19 30:12 32:10,13 39:7
  39:7 68:17,18
**Yeaten** 8:10
**yeses** 61:17
**young** 40:3 80:14

**0**

**03** 8:20
**06-20758-CR-ALTONAGA** 1:3
**06-20758-CR-Altonaga-SS**
  118:12

**1**

**1:15** 109:25,25 110:3 114:13
**1:16** 114:16,18
**1:21** 117:24
**1:22** 118:7,8
**1:23** 119:2
**10** 3:4,4 29:19 49:5
**10/20/08** 5:6 29:5 82:10 100:16
**10:00** 61:6,23 118:18,21
**10:25** 60:9
**10:44** 62:4
**100** 2:20 3:16 13:25 38:8 83:25
**101** 69:15

**103** 2:21,22
**11** 10:14 49:10
**11th** 6:14,23
**11:00** 61:6
**11:13** 82:10
**11:25** 89:20,23
**11:39** 100:16
**11:41** 103:3,8
**11:52** 110:1
**11:53** 110:5
**11:59** 114:14
**118** 3:5,5
**12** 8:20 49:13,16
**12-2** 2:9 120:6
**120** 2:23
**13th** 118:12
**133** 70:14
**134** 70:21
**141** 72:5
**144** 10:1,9,21 11:2
**144-175** 3:4 10:3,24
**145** 11:12,16,20
**146** 11:20
**147** 12:15,20 13:3
**148** 12:15,22
**149** 12:15,25
**15** 31:2
**150** 2:4 15:21
**153** 16:8
**154** 15:21
**155** 17:1
**156** 17:9,16
**157** 18:15,19 19:6
**158** 18:15,20 19:6
**159** 19:25 20:4,11
**16** 3:5 118:2,6,8
**160** 19:25 20:4
**161** 21:7,12 75:21 77:7,19
**162** 21:7,13,16 22:14
**163** 22:15,18,19
**166** 22:15,18,19 24:8
**167** 24:8,12,23 25:6 79:25
**168** 24:9,14,23
**169** 25:22 26:3
**17** 50:12
**170** 26:5
**171** 26:6
**172** 26:7
**173** 26:11,13,21 27:3,4
**174** 27:19
**175** 10:2,10,21 25:23 28:4,20
**18** 111:1 118:4
**1987** 104:12,24
**1990s** 96:11
**1997** 90:13
**1999** 32:8 38:11 41:15 108:25
  109:3,6

**2**

**2** 48:21
**2,000** 30:14,18
**20** 1:7 30:13,19 31:2 47:12 48:3
  50:19 52:1
**2000** 90:16 91:8,15
**2001** 101:17
**2002** 7:23 92:8 94:4 96:4,16,23
  97:22 98:5 100:5 101:15,19
**2003** 100:10,19 101:13,22
  108:25 109:3,6
**2004** 105:19,21
**2006** 6:14,23 10:14 32:12
**2007** 106:19 118:12
**2008** 1:7 106:19,25
**202.514.3270** 1:23
**20530** 1:23
**212** 13:25,25 15:4,16 23:11 75:6
  75:15,19

**2340** 111:2 113:19
**24** 3:4 54:23 56:13
**25th** 41:15
**28** 113:19
**29** 2:16

**3**

**3** 3:4 19:11 77:2
**30** 30:19
**305.523.5518** 2:9 120:7
**305.523.5519** 2:10 120:7
**305.536.4675** 1:20
**305.961.9234** 1:19
**305/530-7120** 2:5
**305/536-6900** 2:4
**31-years-old** 90:7
**3238** 118:4
**33** 57:21
**33128** 2:9 120:7
**33130** 2:4
**33132** 1:19

**4**

**4** 87:1
**4th** 1:19
**4,500** 30:17
**4.1** 77:4
**4:30** 118:22
**400** 2:9 18:6 120:6
**403** 91:1
**450** 18:6
**46** 62:9
**49** 86:19,20

**5**

**5** 2:14,15 30:9 31:21
**50** 86:19,22
**53** 63:14
**55** 64:15

**6**

**6** 3:5
**69** 86:19,24

**7**

**7** 87:1
**703** 8:6
**71** 65:1 86:19 87:1
**72** 65:3
**73** 66:11,15 87:11
**74** 65:22 86:19 87:9,10
**75** 66:2
**76** 66:4

**8**

**8** 3:5 12:11 19:10 47:9 52:5
**8:00** 61:3
**803(4)** 8:4
**82** 2:17
**85** 67:25 68:5
**86** 68:7
**89** 2:18,19

**9**

**9** 48:25
**9:00** 4:24 61:4,6,8
**9:01** 5:6
**9:08** 10:4
**9:12** 10:24
**9:40** 29:5
**93** 3:13
**95** 30:7
**950** 1:23
**96** 3:14
**99** 1:19 3:15 39:6,7,7 68:19 94:6