# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### Case 06-20758-CR-ALTONAGA

THE UNITED STATES OF AMERICA,

        Plaintiff,

                            MIAMI, FLORIDA

    vs.

                            OCTOBER 27, 2008

ROY M. BELFAST, JR., a/k/a
CHUCKIE TAYLOR, CHARLES
McARTHUR EMMANUEL, CHARLES
TAYLOR, JR. and CHARLES
TAYLOR, III,

        Defendant.

_____

### TRANSCRIPT OF TRIAL PROCEEDINGS
### BEFORE THE CECILIA M. ALTONAGA,
### UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

                KAREN ROCHLIN, A.U.S.A.
                CAROLINE HECK-MILLER, A.U.S.A.
                Office of the U.S. Attorney
                99 N.E. 4th Street
                Miami, FL  33132 - 305.961.9234
                (Fax) 305.536.4675
                Email:  karen.rochlin@usdoj.gov
                        caroline.miller@usdoj.gov

                CHRISTOPHER GRAVELINE, Trial Attorney
                U.S. Department of Justice
                950 Pennsylvania Avenue, N.W.
                Washington, D.C. 20530 - 202.514.3270
                christopher.graveline@usdoj.gov

        TOTAL ACCESS COURTROOM REALTIME TRANSCRIPTION

**October 27, 2008**

1  FOR THE DEFENDANT:
2
3                         JOHN WYLIE, A.F.P.D.
                          MIGUEL CARIDAD, A.F.P.D.
                          Federal Public Defender's Office
4                         150 West Flagler Street
                          Miami, FL  33130 - 305/536-6900
5                                    (Fax) 305/530-7120
                          Email:  miguel_caridad@fd.org
6                                  john_wylie@fd.org
7  REPORTED BY:
8                         BARBARA MEDINA
                          Official United States Court Reporter
9                         400 North Miami Avenue, Ste. 12-2
                          Miami, FL  33128 - 305.523.5518
10                                   (Fax) 305.523.5519
                          Email:  barbmedina@aol.com
11
                                   - - - -
12
                          TABLE OF CONTENTS
13
                                                            Page
14
Randy Weinstein .............................................  5
15
        Direct Examination By Mr. Caridad .....................  5
16
        Cross-Examination By Ms. Heck-Miller .................. 16
17
        Redirect Examination By Mr. Caridad .................. 21
18
Murphy Smith ............................................... 21
19
        Direct Examination By Mr. Caridad ..................... 21
20
        Cross-Examination By Ms. Rochlin ...................... 27
21
        Redirect Examination By Mr. Caridad .................. 35
22
Ronald Hady ............................................... 36
23
        Direct Examination By Mr. Caridad ..................... 36
24
        Cross-Examination By Ms. Rochlin ...................... 40
25
Amos Nuarpa ............................................... 41

**TOTAL ACCESS COURTROOM REALTIME TRANSCRIPTION**
**October 27, 2008**

1         Direct Examination By Mr. Caridad ..................... 41

2         Cross-Examination By Ms. Rochlin ..................... 46

3         Redirect Examination By Mr. Caridad ................... 49

4    Agustine Gayetay ......................................... 50

5         Direct Examination By Mr. Wylie ...................... 50

6         Cross-Examination By Ms. Rochlin ..................... 62

7         Redirect Examination By Mr. Wylie ................... 68

8    Gregory Naples ........................................... 70

9         Direct Examination By Mr. Caridad ..................... 70

10        Cross-Examination By Mr. Graveline ................... 75

11        Redirect Examination By Mr. Caridad ................... 76

12   William Barnett .......................................... 78

13        Direct Examination By Mr. Wylie ...................... 78

14        Cross-Examination By Ms. Heck-Miller ................. 85

15   Reporter's Certificate ................................... 135

16
17
                          INDEX TO EXHIBITS
18
Exhibits                          Marked for           Received
19                                Identification     in Evidence
20   Description                   Page     Line     Page     Line
21   Defense Exhibit 15 .............. 7       13        8        5
22
23                          CITATION INDEX
24                                                           Page
     Pierre versus Attorney General of the United States ....... 110
25
     Zubeta (ph.) versus Ashcroft ............................. 107

1

2

3                      SIDEBAR CONFERENCE INDEX

4   Descriptions                                          Page

5   Sidebar Conference Begins .................................. 86

6   Proceedings In Open Court Resume .......................... 87

7                   ADMINISTRATIVE CONVENTIONS:

8         When counsel does not identify themselves each time they

9   address the Court during a telephone conference, the

10  industry-standard speaker identification is indicated by

11  chevrons, i.e., >>>:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**October 27, 2008**

## Weinstein - Direct

1    THE COURT:   Good morning.   I apologize for starting
2  late.
3         Do you have your next witness?
4         MR. CARIDAD:   Yes, Your Honor.
5         THE COURT:   Bring the jury in.
6         [The jury returns to the courtroom at 9:17 a.m.]
7         THE COURT:   Everyone please be seated.
8         Good morning, ladies and gentlemen.
9         RANDY WEINSTEIN, DEFENDANT'S WITNESS, SWORN
10                   DIRECT EXAMINATION
11  [Beginning at 9:19 a.m.]
12  BY MR. CARIDAD:
13  Q.   Good morning.
14         Could you, please, state your name, sir?
15  A.   My name is Randy Weinstein.
16  Q.   Mr. Weinstein, how are you employed, sir?
17  A.   I am an investigator with the Federal Public Defender's
18  Office.
19  Q.   How long have you been an investigator with the Federal
20  Public Defender's Office?
21  A.   I have been with the Federal Defender's Office for seven
22  years.
23  Q.   And what are your duties as an investigator with the
24  Federal Public Defender's Office?
25  A.   As an investigator, it's my position to review discovery in

## Weinstein - Direct

1  these cases, to locate witnesses, review crime scenes and

2  documentation.

3  Q.   Before you became an investigator for the Federal Public

4  Defender's Office, how were you employed?

5  A.   I was a Special Agent for the FBI.

6  Q.   How long were you a Special Agent for the FBI?

7  A.   Five and a half years.

8  Q.   And were you assigned to any particular group within the

9  FBI?

10  A.   I was.   As an agent for the FBI, I was assigned to the

11  Organized Crime/Drug Program responsible for dismantling and

12  investigating national and international drug trafficking

13  organizations.

14  Q.   Before you were an agent with the FBI, how were you

15  employed?

16  A.   I was a police officer for the City of Sunrise Police

17  Department, which is located in Broward County.

18  Q.   Mr. Weinstein, were you assigned to work on this case,

19  United States versus Charles Emmanuel, by our office?

20  A.   I was, yes.

21  Q.   In the course of that investigation, did you travel to the

22  country of Liberia?

23  A.   Yes, I did.

24  Q.   Could you tell us which years you traveled to the country

25  of Liberia?

**October 27, 2008**

## Weinstein - Direct

1  A.   I traveled to the country of Liberia four times myself,

2  personally, one time in 2007 and three times in 2008.

3  Q.   Now, when you traveled to the country of Liberia, did you

4  or someone with you take videos of certain areas of the

5  country?

6  A.   Yes, I did, as well as you, Assistant Federal Public

7  Defender Miguel Caridad.

8  Q.   Now, have you reviewed the videos that were taken by either

9  yourself or me of parts of Liberia?

10  A.   Yes, I did.

11         MR. CARIDAD:   Judge, if I could hand Mr. Weinstein

12  Defense Exhibit 15.

13    [Defense Exhibit 15 marked for identification at 9:21 a.m.]

14         THE COURT:   You may.

15  BY MR. CARIDAD:

16  Q.   Mr. Weinstein, what is that?

17  A.   This DVD is entitled "Bridge, Monrovia, Police Station" and

18  it's a series of video clips that I had taken and you had taken

19  during our investigation in Liberia.

20  Q.   Now, did you review that video before coming to court

21  today, that DVD in your hands?

22  A.   Yes, I did.

23  Q.   Does that DVD fairly and accurately depict the St. Paul

24  River Bridge, the Gbarnga Police Station and areas of Monrovia?

25  A.   Yes, it does.

**October 27, 2008**

# Weinstein - Direct

1          MR. CARIDAD:   Judge, I move Defendant's Exhibit 15

2   into evidence now.

3          MS. HECK-MILLER:   No objection.

4          THE COURT:   Admitted.

5     [Defense Exhibit 15 received in evidence at 9:22 a.m.]

6          MR. CARIDAD:   Judge, I would like to publish Defense

7   Exhibit 15 to the jury now, if I might.

8   BY MR. CARIDAD:

9   Q.   If we could see the video of the bridge, please?

10                      [ DVD played. ]

11  BY MR. CARIDAD:

12  Q.   Mr. Weinstein, do you recognize what we're looking at now?

13  A.   Yes.

14  Q.   What is that?

15  A.   The town of Waterside at the St. Paul River Bridge in Bong

16  County.

17         MR. CARIDAD:   Could you pause the video there, please.

18  BY MR. CARIDAD:

19  Q.   I see a road here.   In which direction is the camera

20  pointing at this moment?

21  A.   Can you play it a little more.   My screen is blurry.

22  Q.   Okay.

23                      [ DVD played. ]

24  A.   That is away from the bridge in Bong County.

25         MR. CARIDAD:   If you could pause there.

## October 27, 2008

## Weinstein - Direct

1  BY MR. CARIDAD:

2  Q.  In which direction are we looking now?

3  A.  That's the checkpoint.  We're looking towards Lofa County,

4  the St. Paul River Bridge.

5  Q.  Where is the bridge in relation to that checkpoint?

6  A.  It's about maybe 200 yards past that checkpoint.

7        MR. CARIDAD:  Continue, please.  Play Bridge 2, please

8                     [ DVD played. ]

9  BY MR. CARIDAD:

10 Q.  In which direction, Mr. Weinstein, is the camera walking?

11 A.  You're walking towards the bridge again.  Here you are also

12 walking towards the bridge.

13 Q.  Is that the St. Paul River Bridge?

14 A.  Yes, sir.

15        MR. CARIDAD:  Could we have the next clip, please.

16                     [DVD played. ]

17 BY MR. CARIDAD:

18 Q.  What is that, Mr. Weinstein, we're looking at?

19 A.  You are looking at the checkpoint.  This time you are

20 facing Bong County.  My back was toward the bridge.

21        MR. CARIDAD:  Could we have the next clip of the

22 bridge, please.

23                     [DVD played. ]

24 BY MR. CARIDAD:

25 Q.  What are we looking at here, Mr. Weinstein?

**October 27, 2008**

## Weinstein - Direct

1  A.   The is it St. Paul River Bridge.  We are on the Bong County

2  side and across the bridge is Lofa County.

3            MR. CARIDAD:   Could we have the next clip of the

4  bridge, please.

5                       [DVD played.]

6  BY MR. CARIDAD:

7  Q.   Now, what are we looking at there?

8  A.   You are looking at a town across the St. Paul River Bridge.

9  It's in Lofa County.

10  Q.   Now, in which direction is the camera facing,

11  Mr. Weinstein?

12  A.   It's facing Bong County and just up the hill is the

13  checkpoint at the St. Paul River Bridge.

14            MR. CARIDAD:   If we could have the next clip.

15                       [DVD played.]

16  BY MR. CARIDAD:

17  Q.   What are we looking at here?

18  A.   This is the town of Waterside that's located at the

19  checkpoint.

20            MR. CARIDAD:   Next please.

21                       [DVD played.]

22  BY MR. CARIDAD:

23  Q.   What are we looking at here, Mr. Weinstein?

24  A.   This is a building by the checkpoint that through my

25  investigation was where the security forces lived during the

**October 27, 2008**

## Weinstein - Direct

1  time in question.

2                                   [DVD played.]

3  BY MR. CARIDAD:

4  Q.   Without telling us what your investigation revealed, what

5  are we looking at here?

6  A.   It looks like a water tower.

7  Q.   What building is the camera panning to now?

8  A.   The red-roofed building.

9           MR. CARIDAD:   If we could have the next, please.

10                                  [DVD played.]

11  BY MR. CARIDAD:

12  Q.   This building?

13  A.   The same, the same building.

14  Q.   Is that the red-roofed building that's next to the

15  checkpoint?

16  A.   Yes.

17  Q.   Is this the front or back of the building?

18  A.   That's the rear of the building.

19           MR. CARIDAD:   If we could have the next clip, please.

20                                  [DVD played.]

21  BY MR. CARIDAD:

22  Q.   What are we looking at here?

23  A.   That's the checkpoint.   You are actually in front of the

24  red-roofed building right now.

25  Q.   In which direction is the camera looking at now?

**October 27, 2008**

## Weinstein - Direct

1   A.   At the bridge, the St. Paul River Bridge.

2   Q.   Is that the bridge that the camera is focusing on now?

3   A.   Yes, sir.

4         MR. CARIDAD:   The next clip, please.

5                    [DVD played.]

6   BY MR. CARIDAD:

7   Q.   Now, what is that building there, Mr. Weinstein?

8         MR. CARIDAD:   If you could back up.

9   BY MR. CARIDAD:

10  Q.   What is that building, Mr. Weinstein?

11  A.   That's the Immigration checkpoint building.

12  Q.   Where is that building in relation to the building with the

13  red roof?

14  A.   Right across the street, directly across the road.

15        MR. CARIDAD:   I believe we have one more clip of the

16  bridge area.

17                   [DVD played.]

18  BY MR. CARIDAD:

19  Q.   Which direction are we looking at, Mr. Weinstein?

20  A.   That is Bong County.   That is away from the checkpoint,

21  away from the bridge.

22        That's the checkpoint right there.

23  BY MR. CARIDAD:

24  Q.   Thank you.   I want to show you next a clip of Gbarnga.

25                   [DVD played.]

**October 27, 2008**

## Weinstein - Direct

1  BY MR. CARIDAD:

2  Q.  Tell me if you recognize that, Mr. Weinstein.

3  A.  I do.   That is the Liberian National Police station located

4  in Gbarnga, a town in Liberia.

5  Q.  Where is Gbarnga in relation to the bridge?  Is it south or

6  north?

7  A.  It's south of the bridge.   It's about an hour and 40

8  minutes, an hour and a half south of the bridge.

9  Q.  We're looking at a road.   Do you know which direction we're

10  looking now?

11  A.  North.

12  Q.  Is that the direction where the bridge is?

13  A.  Correct, it is.

14          MR. CARIDAD:   If you could continue.

15                  [DVD played.]

16          MR. CARIDAD:   If you could stop there, please.

17  BY MR. CARIDAD:

18  Q.  That road, in what direction are we looking?

19  A.  That road heads back to Monrovia, the capital.

20          MR. CARIDAD:   If you could continue.

21                  [DVD played.]

22          MR. CARIDAD:   Thank you.

23          If we could have the next series of clips.

24  BY MR. CARIDAD:

25  Q.  Before we begin, Mr. Weinstein, the next series of clips

**October 27, 2008**

## Weinstein - Direct

1  are of what part of the country?

2  A.   The next part is going to be the capital, the actual city

3  of Monrovia.

4          MR. CARIDAD:   If we could please continue playing

5  that.

6                  [DVD played.]

7          MR. CARIDAD:   The next clip, please.

8                  [DVD played.]

9  BY MR. CARIDAD:

10  Q.   Mr. Weinstein, which parts of Monrovia were filmed?

11  A.   I filmed the streets of Monrovia, the highway going in and

12  out of Monrovia, and some of the market places in Monrovia like

13  the shopping districts.

14  Q.   Any particular day of the week this was filmed?

15  A.   I filmed one day during the week and one day on the

16  weekend.

17  Q.   Now, is this in the center of Monrovia or the outskirts, if

18  you know?

19  A.   This is the outskirts of Monrovia.

20          MR. CARIDAD:   If we can see the next clip.

21                  [DVD played.]

22  BY MR. CARIDAD:

23  Q.   This scene we're looking at, Mr. Weinstein, is that still

24  in the outskirts of Monrovia or the city?

25  A.   It's not in the center of town.   It's on the outskirts.

**October 27, 2008**

## Weinstein - Direct

1      MR. CARIDAD:   If we could look at the next one,
2  please.
3                    [DVD played.]
4  BY MR. CARIDAD:
5  Q.   Still on the outskirts of Monrovia?
6  A.   Yes.   This is actually on one of the highways leading out
7  of Monrovia.
8                    [DVD played.]
9      MR. CARIDAD:   Perhaps if we could select the video of
10  the center of Monrovia.   11.   Let's see, maybe 12.
11                    [DVD played.]
12  BY MR. CARIDAD:
13  Q.   Do you recognize these scenes, Mr. Weinstein?
14  A.   Yes.   This is the center of Monrovia.   Actually on the
15  right-hand side is the University of Liberia.
16  Q.   Now, these images, again, were taken in what years,
17  Mr. Weinstein?
18  A.   2007, 2008.
19                    [DVD played.]
20      MR. CARIDAD:   Can we see the next clip, 13.
21                    [DVD played.]
22  BY MR. CARIDAD:
23  Q.   What are we looking at here?
24  A.   This is downtown Monrovia.
25                    [DVD played.]

**October 27, 2008**

## Weinstein - Cross

1          MR. CARIDAD:   Perhaps one more, the following one,

2     please, Monrovia 14.

3                          [DVD played.]

4     BY MR. CARIDAD:

5     Q.   Is this also downtown Monrovia?

6     A.   Yes, sir.

7                          [DVD played.]

8          MR. CARIDAD:   Thank you.   If you could stop it.

9          MR. CARIDAD:   Thank you, Judge.

10         I have no further questions of Mr. Weinstein.

11                    CROSS EXAMINATION

12    [Beginning at 9:43 a.m., 10/27/08.]

13    BY MS. HECK-MILLER:

14    Q.   Good morning, Mr. Weinstein.

15    A.   Good morning.

16    Q.   Your photos included some photos that were of locales that

17    were specific to this case and some photos of locales that were

18    not specific to this case?

19    A.   You mean the video?

20    Q.   The video.

21    A.   Yes, ma'am that's correct.

22    Q.   For instance, the bridge and the Gbarnga Police Station,

23    those were locales that were specific to this case.

24    A.   That's correct.

25    Q.   In Monrovia, there were many shots that were not specific

**October 27, 2008**

## Weinstein - Cross

1  to this case, but were general pictures of and about Monrovia?

2  A.   That is correct.

3  Q.   With regard to the shots of Monrovia, for instance, the

4  ones that are general to the case, obviously these are the

5  shots that you or Mr. Caridad chose to take.  Is that correct?

6  A.   That's correct.

7  Q.   This is not meant to be a comprehensive travel log or

8  panorama of all of Monrovia, is it?

9  A.   By no means, no.

10  Q.   And with regard to the shots of Monrovia, there were

11  locales that are specific to this case that are not included in

12  the video.  Is that true?

13  A.   (No response.)

14  Q.   Let me ask you specifically.

15  A.   Sure.  That would be good.  Thank you.

16  Q.   For instance, you didn't take shots of the Executive

17  Mansion as part of the video.

18  A.   I have taken video of the Executive Mansion, yes.

19  Q.   As part of the video we just saw?

20  A.   No, not on the video.

21  Q.   And the video we just saw that was put in evidence did not

22  include shots of the defendant's home?

23  A.   That is correct.

24  Q.   Nor of Whiteflower?

25  A.   That is correct.

**October 27, 2008**

## Weinstein - Cross

1  Q.   Now, with regard to the shots of Waterside and the bridge

2  area, you were there on a day or days in 2007 and 2008.   True?

3  A.   Correct, yes.

4  Q.   And the days that you were there, of course, are far

5  removed from the days -- well, withdrawn.

6          The days you were there were not the days of the

7  events in this case.   Is that true?

8  A.   That's correct.

9  Q.   On the days you were there, Waterside was peaceful, was it

10  not?

11  A.   It was.

12  Q.   It was fairly empty, was it not?

13  A.   That's a relative term   I mean, people were there in the

14  village.   It's not a very big place, but people were there.

15  Q.   The days you were there, there were no throngs of IDPs?

16  A.   Absolutely not.

17  Q.   There were no throngs of refugees?

18  A.   No.

19  Q.   Although you were there on days that were peaceful, you

20  could see physical signs in that village, could you not, of

21  days that were not peaceful and had been violent?

22  A.   (No response.)

23  Q.   Let me ask you specifically, did you see any physical signs

24  of fighting having taken place in that area?

25  A.   You mean, buildings demolished?   Yes.

**October 27, 2008**

## Weinstein - Cross

1  Q.  Or bullet ridden?

2  A.  Yes.

3  Q.  For instance, the bridge going over the St. Paul River

4  area, it's full of bullet holes, isn't it?

5  A.  Yes.

6       MS. HECK-MILLER:  Agent, can we take a look at ER 16

7  in evidence.

8       AGENT NAPLES:  (Complied.)

9  BY MS. HECK-MILLER:

10 Q.  Sir, this is the bridge, the St. Paul River Bridge?

11 A.  Yes.

12 Q.  This sign was on one of your videos?

13 A.  Yes.

14 Q.  You saw these holes?

15 A.  Yes.

16 Q.  Did they appear, based on your knowledge and experience,

17 did they appear to be bullet holes?

18 A.  Yes.

19 Q.  Similarly, some of the buildings showed what appeared to be

20 damage by weapons?

21 A.  Yes, ma'am, they did.

22       MS. HECK-MILLER:  Could we take a look at ER 7.

23       AGENT NAPLES:  (Complied.)

24 BY MS. HECK-MILLER:

25 Q.  Mr. Weinstein, do you recognize this as part of the

## October 27, 2008

## Weinstein - Cross

1  red-roofed building?

2  A.   Yes, ma'am

3  Q.   Does it appear to have bullet hole damage to you?

4  A.   Yes, ma'am

5        MS. HECK-MILLER:   Thank you, agent.   You can take it

6  down.

7        AGENT NAPLES:   (Complied.)

8  BY MS. HECK-MILLER:

9  Q.   When you observed that building -- it was a one-story

10  building?

11  A.   Yes.

12  Q.   It had two corridors running through it?

13  A.   Yes.

14  Q.   Are you familiar with the term "shotgun building"?

15  A.   Yes.

16  Q.   Is that, basically, what it was?   It had two corridors

17  running through it?

18  A.   Yes.

19  Q.   Now, your photographs of Monrovia, they did not include,

20  for instance, Mulbah Kamara's communications stores, did they?

21  A.   No.

22  Q.   Or his four houses?

23  A.   No.

24  Q.   You did not take any footage of Rufus Kpadeh's farm acreage

25  up in Lofa County, did you?

## October 27, 2008

## Smith - Direct

1   A.   No.

2            MS. HECK-MILLER:   Thank you.

3            No further questions.

4                    REDIRECT EXAMINATION

5   [Beginning at 9:48 a.m, 10/27/08.]

6   BY MR. CARIDAD:

7   Q.   Agent Weinstein, did you know where Milbah Kamara's

8   businesses were?

9   A.   No, I did not.

10  Q.   Did you know where Mr. Kpadeh's farms were?

11  A.   No, I did not.

12  Q.   Did you even know if Mr. Kpadeh had a farm?

13  A.   I did not.

14            MR. CARIDAD:   Thank you, Judge.

15            That's all I have.

16            THE COURT:   Thank you.   You're excused.

17            [The witness was excused at 9:48 a.m]

18            THE COURT:   Your next witness.

19            MR. CARIDAD:   Your Honor, the defense calls Murphy

20  Smith.

21            MURPHY SMITH, DEFENDANT'S WITNESS, SWORN

22                    DIRECT EXAMINATION

23  [Beginning at 9:49 a.m]

24            THE COURT:   Do you solemnly swear to tell the truth?

25            THE WITNESS:   Yes.

**October 27, 2008**

## Smith - Direct

1  BY MR. CARIDAD:

2  Q.   Sir, could you, please, tell us your name?

3  A.   Murphy Smith.

4          THE COURT:   I'm sorry.   Could you move closer to the

5  microphone?

6  BY MR. CARIDAD:

7  Q.   Is that Murphy Smith?

8  A.   I'm Murphy Smith.

9  Q.   How old are you, Mr. Smith?

10  A.   I'm 36 years of age.

11  Q.   And where do you presently live?

12  A.   I live Waterside.

13  Q.   Is that in Liberia?

14  A.   Yes.

15  Q.   Is that near the St. Paul River Bridge?

16  A.   Yes.

17  Q.   What do you do for a living in Waterside today?

18  A.   Farming and fishing.

19  Q.   Did you say "farming and fishing"?

20  A.   Yes.

21          THE INTERPRETER:   "I make farm and fishing."

22  BY MR. CARIDAD:

23  Q.   Do you have a family today in Waterside?

24  A.   Yes.

25  Q.   What is your family?  Do you have a wife?

**October 27, 2008**

## Smith - Direct

1   A.   (Through the Interpreter)  I have a wife.

2   Q.   How many children do you have?

3   A.   I have three.

4   Q.   Mr. Smith, in 1999 were you living in Waterside?

5   A.   Yes.

6   Q.   Were you married in 1999?

7   A.   Yes.

8   Q.   How many children did you have in 1999?

9   A.   (Through Interpreter) I had two.

10  Q.   In 1999, how were you making a living in Waterside?

11  A.   (Through Interpreter) I made farm and fishing.

12  Q.   What did you farm?

13  A.   I farmed pretty close to the real side, the other side.

14  Q.   What kind of rice did you grow?

15  A.   I grow rice, edo and plantain.

16  Q.   What is that, Mr. Smith?

17  A.   Edo is what you eat.

18  Q.   Is it something green?

19  A.   It can be green and then it becomes ripe.

20  Q.   Are you familiar with the checkpoint at Waterside?

21  A.   Yes.

22  Q.   How far from the checkpoint was your house in 1999?

23  A.   (Through Interpreter)  It's about six seconds from the

24  checkpoint to my house.

25  Q.   It took you about six seconds to walk from your house to

**October 27, 2008**

## Smith - Direct

1  the checkpoint in '99?

2  A.   Yes.

3  Q.   How far is your farm--

4  A.   My farm--

5  Q.   Excuse me.   Let me finish the question.

6         How far was your farm in 1999 from your house?

7  A.   (Through Interpreter)   It was 20 minutes.

8  Q.   Now, did you farm the land yourself or did you have people

9  who worked for you in 1999?

10  A.   (Through Interpreter)   Sometimes I paid people.   I have

11  people.   I pay them money to go and work.

12  Q.   Now, how many times a week would you visit your farm?

13  A.   (Through Interpreter)   In a week, roughly, it's about two

14  times in a week.

15  Q.   Whenever you went to your farm, how long would you stay

16  there?

17  A.   It is two hours.

18  Q.   Now, when you were not on your farm, what did you do during

19  the rest of the time?

20  A.   (Through Interpreter)   I work in the town and sometimes the

21  day of working, we working and then we clean the town.

22  Q.   You said you work and clean the town?

23  A.   Yes.

24  Q.   What does that mean?   Describe that for us, please.

25  A.   (Through Interpreter)   The town can get dirty and I was a

**October 27, 2008**

## Smith - Direct

1  youth leader, so I put the boys and girls together and we

2  cleaned the town.

3  Q.   What do you mean by being a youth leader?

4  A.   (Through Interpreter)   The younger people, I was the

5  chairman and the head of them

6  Q.   How did you obtain that position as youth leader?

7  A.   (Through Interpreter)   The citizens who are there gave me

8  that position.   The young people and those who were there gave

9  me that position.

10  Q.   Did you know the people in Waterside personally?

11  A.   (Through Interpreter)   I know them

12  Q.   Did you socialize with them frequently?

13  A.   Pardon me?

14  Q.   Did you talk with them every day and visit with them?

15  A.   (Through Interpreter)   I visit them every day and we talk

16  together.

17  Q.   How often were you near the checkpoint each day?

18  A.   (Through Interpreter)   Every day I visit the checkpoint,

19  day and night.

20  Q.   Did you also visit a building that has a red roof on it?

21  A.   Yes.

22  Q.   Was that building there in 1999?

23  A.   Yes.

24  Q.   And what was that building used for, from what you could

25  see?

**October 27, 2008**

## Smith - Direct

1   A.   (Through Interpreter)   That building was used for any

2   officer assigned there to lodge in there with their family.

3   Q.   By "lodge," what do you mean by "lodge"?

4   A.   (Through Interpreter)   Where they sleep.

5   Q.   Mr. Smith, in 1999, did you ever see human heads displayed

6   at the checkpoint?

7   A.   No.

8   Q.   Did anyone ever tell you that they had seen human heads

9   displayed at the checkpoint?

10   A.   No.

11   Q.   Did anyone ever tell you that Chuckie, the President's son,

12   had detained a man, tied him and interrogated him?

13          MS. ROCHLIN:   Objection.   Calls for hearsay.

14          THE COURT:   Overruled.

15   BY MR. CARIDAD:

16   Q.   Did anyone ever tell you that Chuckie, the President's son,

17   had tied a man and interrogated him?

18   A.   No.

19   Q.   Did you ever see Chuckie do such a thing in 1999?

20   A.   No.

21   Q.   Now, Mr. Smith, tell us when is the rainy season in

22   Liberia?

23   A.   (Through Interpreter)   The rainy season starts from May.

24   May, July, August, September, October.   October the 15th it

25   ends.

**October 27, 2008**

## Smith - Cross

1   Q.   And then when does the dry season start?

2   A.   (Through Interpreter)   The dry season starts from October

3   the 15th to May.   May, it ends.

4   Q.   Now, in 1999, was there fighting between government troops

5   and rebel forces in Waterside in 1999?

6   A.   (Through Interpreter)   It was in Lofa County, but I live in

7   Bong County.

8   Q.   So there was no fighting in Waterside?

9   A.   No.

10   Q.   Now, in 1999, did you see IDPs coming through Waterside?

11   A.   Yes.

12   Q.   Did it seem to you that there were more IDPs in '99 than

13   '98?

14   A.   In 1999, I saw refugees coming in '99.

15   Q.   In 1999, did you ever spend a long period of time away from

16   Waterside?

17   A.   No.

18           MR. CARIDAD:   If I could have a moment, Judge?

19           THE COURT:   You may.

20           MR. CARIDAD:   Thank you, Judge.   We have no further

21   questions of Mr. Smith.

22                          CROSS EXAMINATION

23   [Beginning at 9:59 a.m., 10/27/08.]

24   BY MS. ROCHLIN:

25   Q.   Good morning, Mr. Smith.

**October 27, 2008**

## Smith - Cross

1   A.   Good morning.

2   Q.   How are you today?

3   A.   Fine.

4   Q.   There were refugees coming through Waterside in 1999?

5   A.   Yes.

6   Q.   There were refugees coming into Bong County and Lofa County

7   in 1999?

8   A.   Yes.

9   Q.   And there were refugees coming through Waterside after

10  1999?

11  A.   I do not know about that.

12  Q.   Were you living in Waterside in 2000?

13  A.   Yes.

14  Q.   Were you living in Waterside in 2001?

15  A.   Yes.

16  Q.   Were you living in Waterside in 2002?

17  A.   Yes.

18  Q.   Do you remember refugees coming from Lofa across the

19  bridge --

20  A.   (Through Interpreter)  I don't know about that.

21  Q.   You didn't see 6,000 refugees coming across the bridge in

22  2001?

23  A.   (Through Interpreter) I do not know about that.

24  Q.   You did not see several more thousand refugees coming

25  across the bridge in 2002?

**October 27, 2008**

**Smith - Cross**

1    A.    No.

2    Q.    Did you know after 1999 the Charles Taylor government put a

3    travel ban around the St. Paul River Bridge and Bong County?

4              MR. CARIDAD:   Objection, Your Honor.   Assumes facts

5    not in evidence.

6              MS. ROCHLIN:   I'm asking if he knows, Your Honor.

7              THE COURT:   Overruled.

8    BY MS. ROCHLIN:

9    Q.    Did you know that?

10   A.    Pardon me?

11   Q.    Did you know after 1999 the Charles Taylor government put a

12   travel ban on Bong County --

13   A.    I don't know.

14   Q.    You didn't know that?

15   A.    I don't know.

16   Q.    You didn't know that NGOs were not allowed to travel to the

17   bridge?

18   A.    No.

19             MR. CARIDAD:   Your Honor, it assumes facts not in

20   evidence.

21             THE COURT:   Overruled.

22   BY MS. ROCHLIN:

23   Q.    Mr. Smith, do you know when that travel ban was lifted?

24   A.    (Through Interpreter)   No, I do not know.

25   Q.    Do you know when the NGOs came back?

**October 27, 2008**

Smith - Cross

1  A.  No.

2  Q.  So the only year you remember IDPs and refugees coming

3  across the bridge from Lofa was 1999?

4  A.  Yes.

5  Q.  Did you know about any fighting in Lofa after '99?

6  A.  (Through Interpreter)   I don't know.

7  Q.  Did you know about fighting in Lofa in 2002?

8  A.  (Through Interpreter)  I do not know.

9         MS. ROCHLIN:   Your Honor, if I could ask Agent Naples

10  to bring up ER 3.

11         AGENT NAPLES:   (Complied.)

12  BY MS. ROCHLIN:

13  Q.  Mr. Smith, do you see a picture of the bridge in front of

14  you?

15  A.  Yes.

16  Q.  Is that a picture of the building you talked about where

17  the securities would have their building?

18  A.  I don't know that.

19  Q.  What is the picture of the building on the screen?

20  A.  This building?  The building that I see right on it?

21  Q.  What was that building used for?

22  A.  (Through Interpreter)  This building was used for security

23  lodging, to sleep.

24  Q.  Did you ever go inside that building?

25  A.  Yes.

October 27, 2008

**Smith - Cross**

1  Q.   And what was that building used for before 1999?

2  A.   (Through Interpreter)  For security to sleep.

3  Q.   What about before 1999?

4  A.   Pardon me?

5  Q.   What about before 1999?

6  A.   (Through Interpreter)  It was for security in 1999, before

7  1999.

8  Q.   And wasn't there a time when that building was a school?

9  A.   Pardon me?

10  Q.   Wasn't there a time before 1999 when that building was a

11  school?

12  A.   (Through Interpreter)  I'm not getting that.

13  Q.   Wasn't there a time before 1999 when that building was a

14  mission school?

15  A.   (Through Interpreter)  It is not still clear.  I'm not

16  getting that.

17  Q.   You don't understand my question?

18  A.   (Through Interpreter) I do not understand that question.

19  Q.   Security didn't always sleep in that building, Mr. Smith?

20  A.   Pardon me?

21  Q.   Security did not always sleep in that building.  Right?

22  A.   (Through Interpreter) I'm not understanding that English,

23  actually.

24         MS. ROCHLIN:   May I ask the interpreter to translate

25  the question, Your Honor.

**October 27, 2008**

## Smith - Cross

1  BY MS. ROCHLIN:

2  Q.   Security did not always sleep in that building, did they,

3  sir?

4  A.   (Through Interpreter)  If other security can sleep there?

5  Q.   My question is many years ago the building was used for

6  something else besides letting security sleep there.

7  A.   (Through Interpreter)  No, for security.

8  Q.   Mr. Smith, you said you were 36-years-old?

9  A.   (Through Interpreter) I'm 36 now.

10  Q.   So you were born sometime in the 1970s.  Is that right?

11  A.   (Through Interpreter) 1972, August 3rd.

12  Q.   And when you were a small boy, there was no fighting in

13  Bong County, was there?

14  A.   (Through Interpreter)  Small?

15  Q.   When you were a small boy, there was no fighting and no war

16  in Bong County, was there?

17  A.   No.

18  Q.   There was no fighting in Lofa, was there, when you were a

19  small boy?

20  A.   (Through Interpreter)  Yes, when I was small, there was no

21  fighting in Lofa and Bong.  That was when I was small.

22  Q.   And when you were small, what was the building with the red

23  roof used for?

24  A.   (Through Interpreter)  This building was used for security

25  to sleep.

**October 27, 2008**

**Smith - Cross**

1            MS. ROCHLIN:   Your Honor, I seek leave to publish ER

2    16 at this time.

3            THE COURT:   You may.

4            AGENT NAPLES:   (Complied.)

5    BY MS. ROCHLIN:

6    Q.   Mr. Smith, do you see the picture on your screen right now?

7    A.   Yes.

8    Q.   What is that a picture of?

9    A.   (Through Interpreter)   That's the bridge.

10   Q.   That's the bridge over the St. Paul River?

11   A.   Yes.

12   Q.   That's the bridge near where you live?

13   A.   Yes.

14   Q.   Looking at this photograph, do you see any holes in the

15   bridge?

16   A.   Yes, there is a hole down the bridge.

17   Q.   And the holes in the bridge, do you know what they came

18   from?

19   A.   (Through Interpreter)   I do not know.

20   Q.   You don't know what caused the holes in the bridge, sir?

21   A.   (Through Interpreter)   I do not know.

22   Q.   When did the holes get there?

23   A.   (Through Interpreter)   I do not know.

24           MS. ROCHLIN:   Could we bring up ER 17, please.

25           AGENT NAPLES:   (Complied.)

**October 27, 2008**

Smith - Cross

1   BY MS. ROCHLIN:

2   Q.   Mr. Smith, do you see a different picture on your screen?

3   A.   Yes.

4   Q.   Is that also a picture of the bridge?

5   A.   Yes.

6   Q.   Does this picture also show some holes in the bridge?

7   A.   Pardon me?

8   Q.   In this picture, do you see some holes in the bridge?

9   A.   Yes, yes.

10  Q.   What put those holes in the bridge?

11  A.   (Through Interpreter)  I do not know.

12  Q.   When did those holes get put on the bridge?

13  A.   (Through Interpreter)  I do not know.

14  Q.   Mr. Smith, in 1999, who was the President of Liberia?

15  A.   1999?

16  Q.   In 1999, who was the President of Liberia?

17  A.   (Through Interpreter)  It was Charles Taylor.

18  Q.   What was the year when Charles Taylor got elected?

19  A.   (Through Interpreter)  Nothing I heard.  I don't know.

20  Q.   What was the year when Charles Taylor stopped being

21  President?

22  A.   Pardon me?

23  Q.   What was the year when Charles Taylor stopped being

24  President?

25  A.   (Through Interpreter)  I do not listen to radio because I

October 27, 2008

## Smith - Redirect

1   do not have it.

2   Q.   You don't listen to radio?

3   A.   Pardon me?

4   Q.   You don't listen to radio?

5   A.   Yes, because I do not have it.

6   Q.   Do you read newspapers?

7   A.   (Interpreters)  I don't even read.

8   Q.   Do you watch T.V.?

9   A.   I do not have T.V.

10   Q.   Do you have a calendar?

11   A.   No.

12           MS. ROCHLIN:  If I could have a moment?

13           No further questions, Your Honor.

14           THE COURT:   Redirect.

15                   REDIRECT EXAMINATION

16   [Beginning at 10:10 a.m., 10/27/08.]

17   BY MR. CARIDAD:

18   Q.   Mr. Smith, where have you lived all of your life, sir?

19   A.   (Through Interpreter)  All my life I have lived in

20   Waterside.

21   Q.   Did there come a time after '99 when there was fighting in

22   Lofa County?

23   A.   Pardon me?

24   Q.   Was there fighting in Lofa County after '99?

25   A.   I do not know.

**October 27, 2008**

## Hady - Direct

1  Q.   How about in 2000?   Was there fighting in Lofa County after

2  '99?

3  A.   I do not know.

4  Q.   Did you ever have to leave Waterside?

5  A.   (Through Interpreter)   I never left Waterside.

6  Q.   In 1998, did you ever hear someone tell you that there had

7  been heads placed on the checkpoint?

8  A.   No.

9  Q.   In '99, did you ever hear somebody tell you that there had

10 been heads placed at the checkpoint?

11 A.   No.

12 Q.   In 2000, did you ever hear anybody tell you there were

13 heads placed at the checkpoint?

14 A.   No.

15        MR. CARIDAD:   Thank you, Judge.   That's all I have.

16        THE COURT:   Thank you.

17        The witness is excused.   Next witness please.

18        [The witness was excused at 10:11 a.m]

19

20        RONALD HADY, DEFENDANT'S WITNESS, SWORN

21            DIRECT EXAMINATION

22 [Beginning at 10:12 a.m]

23 BY MR. CARIDAD:

24 Q.   Good morning, Mr. Hady.

25        Please give us your full name.

**October 27, 2008**

## Hady - Direct

1   A.   Ronald Hady.

2        THE COURT:   You need to move the microphone closer to

3   the witness and the chair forward.

4   BY MR. CARIDAD:

5   Q.   Mr. Hady, how are you employed, sir?

6   A.   I'm employed with the United States Marshal's Service.

7   Q.   How long have you been employed with the United States

8   Marshal's Service?

9   A.   Just under 13 years.

10  Q.   What is your current position with the United States

11  Marshal's Service?

12  A.   One of my jobs is working with fact witnesses.

13  Q.   You said "fact witnesses"?

14  A.   Correct.

15  Q.   Okay.

16        How long have you been doing that, sir?

17  A.   Just under 13 years.

18  Q.   And can you describe what you mean by working with fact

19  witnesses?

20  A.   I'm involved with the payment of fact witnesses for both

21  the Government and the defense witnesses.   I also handle the

22  airline ticketing or bus fees, the witness fees and hotels and

23  other expenses for the defense.

24  Q.   Now, the United States Marshal's Service is under what

25  department of our Government?

**October 27, 2008**

## Hady - Direct

1  A.    Department of Justice.

2  Q.    Now, what kind of expenses do you pay for witnesses who are

3  brought to court?

4  A.    Witnesses are paid a daily witness fee of $40 a day.

5  They're also entitled to mileage expenses, traveling expenses,

6  meals and incidentals.  If they spend the night, hotel

7  expenses.

8  Q.    So that also includes travel expenses.  Correct?

9  A.    Correct.

10  Q.    For example, travel from a place outside of the United

11  States into the United States.  Is that correct?

12  A.    That's correct.

13  Q.    Now, how is it you are able to cover such expenses for a

14  defendant?

15  A.    The rules are governed under the guiding principles of

16  obtaining witness services under the fees and expenses of

17  appropriations.  § 7 tells me for defense witnesses when I

18  receive a Court Order referencing rule 17(b) that I'm eligible

19  to make such payments.

20  Q.    Now, is that for all defense witnesses, for private

21  attorneys or just for Federal Public Defenders?

22  A.    No, that's for all attorneys, CJAs as well.

23  Q.    You mentioned CJAs.  What does that mean?

24  A.    Court-appointed attorneys.

25  Q.    Do you have the ability to pay for fees, for travel

**October 27, 2008**

## Hady - Direct

1  expenses for witnesses who are represented by private

2  attorneys?

3  A.   If it's a private attorney, the people pay for it

4  themselves.   It's taken care of by them   It's for

5  Court-appointed.

6  Q.   You also pay for Government witnesses who are brought in

7  from outside of the Country.   Correct?

8  A.   Yes.

9  Q.   What kind of expenses do you pay for government witnesses

10  who are brought in from outside the country?

11  A.   I pay the witness fees, travel expenses, meals and

12  incidentals, and if they pay their own hotel fees, I reimburse

13  them for that.

14  Q.   Is there any difference between the fees paid to defense

15  witnesses and Government witnesses?

16  A.   No, it's exactly the same.

17  Q.   In this case, did you receive a Court Order directing you

18  to pay for the travel and subsistence expenses of defense

19  witnesses?

20  A.   Yes, sir, I did.

21  Q.   And do you remember if one of those witnesses included a

22  gentleman by the name of G.G. Lawrence?

23  A.   Yes, sir.

24  Q.   Now, does the money that is used to pay for the travel

25  expenses, hotel and meals of Federal Public Defender witnesses

**October 27, 2008**

## Hady - Cross

1   come from the same pool of money that is used to pay for the

2   same expenses for Government witnesses?

3   A.   Yes, sir, it does.

4            MR. CARIDAD:   If I could have a moment, Judge?

5            Thank you, Your Honor.   That's all I have.

6                      CROSS EXAMINATION

7   [Beginning at 10:17 a.m., 10/27/08.]

8   BY MS. ROCHLIN:

9   Q.   Good morning, Mr. Hady.

10  A.   Good morning.

11  Q.   How are you?

12  A.   Okay.

13  Q.   Do me a favor, sir.   I'm not sure if it was asked

14  originally.   For the record, do you mind spelling your last

15  name so we have it correctly in the transcript?

16  A.   H-a-d-y.

17  Q.   Sir, are you the individual who has been dealing with

18  witness expenses in this case?

19  A.   Yes, ma'am

20  Q.   Is it fair to say both Government witnesses and defense

21  witnesses get reimbursed for their travel expenses in this

22  case?

23  A.   Yes, ma'am

24           MS. ROCHLIN:   No further questions, Your Honor.

25           MR. CARIDAD:   Thank you, Your Honor.

**October 27, 2008**

## Nuarpa - Direct

1          THE COURT:   Your next witness, please.

2                [The witness was excused at 10:18 a.m.]

3          MR. CARIDAD:   The defense calls Amos Nuarpa.

4

5          AMOS NUARPA, DEFENDANT'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7    [Beginning at 10:19 a.m.]

8          MR. CARIDAD:   You have to answer "Yes" or "No,"

9    Mr. Nuarpa.

10   BY MR. CARIDAD:

11   Q.   Mr. Nuarpa, your last name is spelled N-u-a-r-p-a.   Is that

12   correct?

13   A.   Yes.

14   Q.   Your first name is Amos, A-m-o-s?

15   A.   Yes.

16   Q.   Mr. Nuarpa, how old are you, sir?

17   A.   48 years.

18   Q.   And where were you born?

19   A.   (Through Interpreter) Gbalatuah, Waterside.

20   Q.   What year were you born, sir?

21   A.   (No response.)

22   Q.   Do you know what year you were born?

23   A.   (Through Interpreter)   Yes '68.

24   Q.   Where do you live today?

25   A.   (Through Interpreter)   I live in Waterside.

**October 27, 2008**

## Nuarpa - Direct

1   Q.   What family do you have in Waterside today?

2   A.   (Through Interpreter)  I have my wife and my children.

3   Q.   How many children do you have?

4   A.   (Through Interpreter)  Five children.

5   Q.   What do you do for a living today in Waterside?

6   A.   (Through Interpreter)  A farmer.

7   Q.   What do you farm?  What do you grow?

8   A.   (Through Interpreter).  I grow rice, cassava, edos.

9   Q.   You mentioned a word I don't understand.

10  A.   (Through Interpreter)  Edo.

11  Q.   What is that, sir?

12  A.   (Through Interpreter)  It is a fruit that you plan to eat.

13  Q.   In 1999, were you living in Waterside, Mr. Nuarpa?

14  A.   Yes.

15  Q.   What were you doing to make a living in 1999 in Waterside?

16  A.   (Through Interpreter)  I was making a farm

17  Q.   Are you familiar with the checkpoint at Waterside?

18  A.   (Through Interpreter)  The checkpoint is right in

19  Waterside.

20  Q.   How far is your home from the checkpoint in Waterside?

21  A.   (Through Interpreter)  It's there where the checkpoint is,

22  my home.

23  Q.   How long does it take you to walk from your home to

24  Waterside?

25  A.   (Through Interpreter)  About two or three minutes' walk.

**October 27, 2008**

## Nuarpa - Direct

1   Q.   How far was your farm in 1999 from your home?

2   A.   (Through Interpreter)   About one hour 30 minutes' walk.

3   Q.   How often would you go to your farm in 1999?

4   A.   (Through Interpreter)   Sometimes two, three, four days in a

5   week.

6   Q.   How long would you stay at your farm?

7   A.   (Through Interpreter)   From 8:00 a.m. to 4:00 p.m.

8   Q.   When you were not at your farm, what did you do?

9   A.   (Through Interpreter)   Oh, when I'm there, I work very hard

10   to get food.

11   Q.   Did you know the people in Waterside personally?

12   A.   (Through Interpreter)   Yes, they are relatives to me,

13   family.

14   Q.   Do you also have friends in Waterside who are not family?

15   A.   (Through Interpreter)   I have friends there with me.

16   Q.   In 1999, did you have any position in the town of

17   Waterside?

18   A.   (Through Interpreter)   Yes, I was serving as the town

19   administrator.

20   Q.   And how did you obtain that position?

21   A.   (Through Interpreter)   It was to serve my people.

22   Q.   Were you elected?

23   A.   (Through Interpreter)   I like them and they like me.

24   Q.   What are some of your responsibilities as town

25   administrator?

**October 27, 2008**

## Nuarpa - Direct

1   A.    (Through Interpreter)   To give advice to my civilians.

2   Q.    Would you say that you stayed in close contact with the

3   people in Waterside in 1999?

4   A.    (Through Interpreter)   They move with me freely and I move

5   with them freely.

6   Q.    Mr. Nuarpa, in 1999, did you leave Waterside for any long

7   period of time?

8   A.    (Through Interpreter)   Yes, I will travel out and would

9   come back.

10  Q.    In 1999, how many times did you leave Waterside?

11  A.    (Through Interpreter)   Three times.

12  Q.    How long were you away from Waterside each time that you

13  left?

14  A.    (Through Interpreter)   Sometimes it would take me over a

15  week.

16  Q.    In 1999, were there refugees coming across the bridge?

17  A.    Yes.

18  Q.    Do you know why they were coming across the bridge?

19  A.    (Through Interpreter)   Yes, because there was a war

20  fighting to Lofa, so the displaced started coming in.

21  Q.    Were there more displaced people in '99 or '98?

22  A.    (Through Interpreter)   Well, there was just a few coming

23  in, just a few.

24  Q.    When were there just a few coming in?  What year?

25  A.    (Through Interpreter)   From July, August, downward.

**October 27, 2008**

## Nuarpa - Direct

1   Q.   Were there more IDPs in '99 than in '98?

2   A.   (Through Interpreter)   '98, I do not know.   I do not know.

3   Q.   Do you know if eventually there was fighting between the

4   military and rebels near Waterside?

5   A.   No.

6   Q.   After '99, was there fighting in Lofa County?

7   A.   Yes.

8   Q.   Mr. Nuarpa, when you were living in Waterside in 1999, did

9   you ever see any human heads displayed at the checkpoint?

10  A.   No.

11  Q.   Did anyone ever tell you that they had seen human heads

12  displayed at the checkpoint?

13  A.   (Through Interpreter)  It was not my concern at that time.

14  Q.   Did you hear anybody tell you that they had seen such a

15  thing?

16  A.   No.

17  Q.   Did you ever see in 1999 Chuckie Taylor, the President's

18  son, shoot anyone at the bridge?

19  A.   No.

20  Q.   Did you ever hear in 1999 that Chuckie Taylor, the

21  President's son, had shot somebody at the bridge?

22  A.   No.

23  Q.   Did anybody tell you in 1999 Chuckie Taylor, the

24  President's son, had detained a man, tied him and taken him

25  away?

**October 27, 2008**

## Nuarpa - Cross

1    A.    No.

2    Q.    How often would you speak to the people in Waterside,

3    Mr. Nuarpa, in 1999?

4    A.    Pardon me?

5    Q.    How often would you speak to the people who elected you as

6    town administrator in 1999?

7    A.    (Through Interpreter)  Well, every day.

8              MR. CARIDAD:   If I can have a moment, Judge.

9              THE COURT:   You may.

10             MR. CARIDAD:   No further questions, Judge.

11             THE COURT:   Cross-examination.

12                       CROSS EXAMINATION

13   [Beginning at 10:28 a.m., 10/27/08.]

14   BY MS. ROCHLIN:

15   Q.    Good morning, Mr. Nuarpa.

16   A.    Good morning.

17   Q.    How are you?

18   A.    Fine.

19   Q.    So, Mr. Nuarpa, there were IDPs and refugees coming from

20   Lofa in 1999.   Is that right?

21   A.    Yes.

22   Q.    And they were leaving the fighting that was in Lofa County.

23   Correct?

24   A.    Yes.

25   Q.    And there was fighting in Lofa County after '99, wasn't

**October 27, 2008**

**Nuarpa - Cross**

1  there, sir?

2  A.   Yes.

3  Q.   And the refugees kept coming, didn't they?

4  A.   Yes.

5  Q.   Even after '99.  Is that right?

6  A.   Yes.

7  Q.   Do you remember what years the refugees were coming after

8  1999?

9  A.   2001 upward.

10 Q.   So there were refugees coming in 2001.  Is that right?

11 A.   Yes.

12 Q.   And 2002?

13 A.   Yes.

14 Q.   Were the refugees still coming in 2003?

15 A.   Yes.

16 Q.   And in 2001, there were many, many refugees that would

17 come.  Isn't that right?

18 A.   Yes.

19 Q.   In 2002, there were many --

20 A.   (Through Interpreter)  Many was coming.

21 Q.   And they were coming from Lofa County.  Right?

22 A.   Yes.

23 Q.   And they would come from Lofa County --

24 A.   Yes.

25 Q.   -- and cross the bridge over the St. Paul River into Bong

**October 27, 2008**

**Nuarpa - Cross**

1  County.   Is that right?

2  A.   Yes.

3  Q.   And sometimes there were thousands of refugees, weren't

4  there?

5  A.   Yes.

6  Q.   And you saw these refugees with your own eyes.   Right?

7  A.   (Through Interpreter)   With my own eyes.

8  Q.   Because you lived in Waterside.   Correct?

9  A.   Yeah.

10  Q.   And you were right there, weren't you?

11  A.   Pardon me?

12  Q.   You were right there when the refugees were coming?

13  A.   (Through Interpreter)   Yes, I was there.

14  Q.   You were right there in 2001?

15  A.   Yes.

16  Q.   And 2002?

17  A.   I left.

18  Q.   You left in 2002?

19  A.   (Through Interpreter)   I left in 2002.

20  Q.   But in 2001, you saw the refugees coming?

21  A.   (Through Interpreter)   Yes, that was the time they were

22  coming in.

23  Q.   Couldn't miss them, could you?

24  A.   Pardon me?

25  Q.   It was impossible not to see all of those refugees coming

**October 27, 2008**

## Nuarpa - Redirect

1    from Lofa County?

2    A.    (Through Interpreter)  Oh, yes.  There was a group.  I

3    wouldn't see everybody, but I saw them coming.

4    Q.    Because if you were right there, it was impossible not to

5    see them  Right?

6    A.    (Through Interpreter)  Oh, yes, but it is a checkpoint, so

7    anybody that passes there, you would see them

8              MS. ROCHLIN:  If I could have a moment?

9              No further questions, Your Honor.

10                           REDIRECT EXAMINATION

11   [Beginning at 10:32 a.m., 10/27/08.]

12   BY MR. CARIDAD:

13   Q.    Mr. Nuarpa, you said you left Waterside in 2002?

14   A.    Yes.

15   Q.    Why did you leave in 2002?

16   A.    (Through Interpreter)  Because of the tension.  It was not

17   easy for me to sit there.

18   Q.    Was there fighting going on?

19   A.    (Through Interpreter)  Yes, seriously.

20   Q.    And was the fighting coming close to Waterside?

21   A.    (Through Interpreter)  Almost there.

22              MR. CARIDAD:  Thank you, Judge.  That's all I have.

23              THE COURT:  Thank you.  You are excused.

24              MR. CARIDAD:  Mr. Nuarpa, please come this way.

25              THE COURT:  You're next witness.

**October 27, 2008**

## Gayetay - Direct

1          [The witness was excused at 10:32 a.m]

2          MR. WYLIE:   We next call Agustine Gayetay.

3

4          AGUSTINE GAYETAY, DEFENDANT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6   [Beginning at 10:34 a.m]

7   BY MR. WYLIE:

8   Q.   Good morning, Mr. Gayetay?

9   A.   Good morning.

10  Q.   We have an interpreter here.   If you don't understand any

11  of my questions, let me know.   Okay?

12  A.   Okay.

13  Q.   Just so everybody understands every word you say, we may

14  use the interpreter as well.

15  A.   Okay.

16  Q.   What is your name, sir?

17  A.   My name is Augustine Gayetay.

18  Q.   How do you spell that, sir?

19  A.   G-a-y-e-t-a-y.

20  Q.   Sir, when were you born?

21  A.   I was born (redacted.)

22  Q.   Where were you born?

23  A.   (Through Interpreter)   I was born in Gre, Ninba County.

24  Q.   Where is Ninba country, what country?

25  A.   Ninba County is Liberia.

**October 27, 2008**

## Gayetay - Direct

1  Q.  Do you have a family back home in Liberia?

2  A.  Pardon me?

3  Q.  Do you have a family in Liberia?

4  A.  Yes, I have my father and my mother.

5  Q.  Are you married?

6  A.  Yes.

7  Q.  Do you have any children?

8  A.  Yes, I have 10 living children.

9  Q.  Sir, where do you currently live?

10 A.  I live in Gbarnga, Bong County.

11 Q.  Is that in Liberia?

12 A.  Yes.

13 Q.  In 1999, where were you living?

14 A.  (Through Interpreter)  I was living in Gbarnga, Bong

15 County.

16 Q.  When did you move from Nimba County to Bong County?

17 A.  I left Nimba County September the 8th, 1985.

18 Q.  Now, in 1999, what was your job?

19 A.  (Through Interpreter)  I was working with the Liberian

20 National Police.

21 Q.  When did you first start working with the Liberian National

22 Police?

23 A.  I started my job November 17th, 1977.

24 Q.  And in 1999, what police station were you stationed at?

25 A.  (Through Interpreter)  The police station was at Gbarnga,

**October 27, 2008**

## Gayetay - Direct

1  Bong County.

2  Q.   How far did you live from the police station in Gbarnga?

3  A.   (Through Interpreter)  I lived, I mean, almost a mile from

4  the station.

5  Q.   How long did it take you to walk to work?

6  A.   (Through Interpreter)  Roughly it takes me about 30

7  minutes.

8  Q.   Now, in 1999, did you live the entire year in Gbarnga?

9  A.   Yes.

10  Q.   And in 1999, did you work the entire year at the Gbarnga

11  Police Station?

12  A.   Yes.

13  Q.   What was your work schedule at the police station?

14  A.   (Through Interpreter)  Roughly we changed shifts, first and

15  second.

16  Q.   What was the first shift?

17  A.   (Through Interpreter)  The first shift, from 8:00 in the

18  morning to 8:00 in the night.

19  Q.   What was the second shift?

20  A.   (Through Interpreter)  The second shift, from 8:00 p.m to

21  8:00 a.m

22  Q.   And which shift did you work in 1999?

23  A.   (Through Interpreter)  I worked on both shifts.  We usually

24  change shifts.

25  Q.   How often would you change shifts?

**October 27, 2008**

## Gayetay - Direct

1  A.  (Through Interpreter)  We change shifts biweekly.

2  Q.  How many days a week would you work?

3  A.  (Through Interpreter)  I worked throughout.

4  Q.  Seven days a week?

5  A.  Yes.

6  Q.  Did there come a time in 1999 when you left Gbarnga for any

7  period of time?

8  A.  Pardon me?

9  Q.  In 1999, did you leave Gbarnga during that year?

10 A.  (Through Interpreter)  At times I would go to visit my

11 people and come back.

12 Q.  And where were your people?

13 A.  (Through Interpreter)  My people are in Ninba.

14 Q.  By "people," do you mean family?

15 A.  (Through Interpreter)  My family are in Ninba.

16 Q.  What was the longest period of time in 1999 that you went

17 to Ninba County?

18 A.  (Through Interpreter)  No, a day or two.

19 Q.  So if it was a day or two, that was the longest period of

20 time you were away from the police station?

21 A.  Yes.

22 Q.  When you were working at the Gbarnga Police Station, what

23 was your title?

24 A.  (Through Interpreter)  I was a the deputy commander for

25 CID, the Criminal Investigation Department.

**October 27, 2008**

## Gayetay - Direct

1   Q.   So were you second in command?

2   A.   Yes.

3   Q.   How many other police officers worked at the Gbarnga Police

4   Station in 1999?

5   A.   (Through Interpreter)  They varied.  We have Traffic, we

6   have Patrol Division and we have the Criminal Investigation

7   Division.

8   Q.   How many officers were in the Traffic Division in Gbarnga?

9   A.   (Through Interpreter)  Only one office.

10  Q.   How many officers were in the patrol division in Gbarnga in

11  1999?

12  A.   Only one office.

13  Q.   And then in your department, the CID Department, how many

14  officers?

15  A.   (Through Interpreter)  Only one office.

16  Q.   Was that you or was that somebody that worked below you?

17  A.   (Through Interpreter)  The commander and myself in the

18  office.

19  Q.   Who was the commander?

20  A.   (Through Interpreter)  The commander was Charles P. Sergey.

21  Q.   Charles P. Sergey?

22  A.   Yes.

23  Q.   What is your current job, sir?

24  A.   (Through Interpreter)  Presently, I'm a farmer.

25  Q.   When did you stop being a police officer?

**October 27, 2008**

## Gayetay - Direct

1   A.   (Through Interpreter)   I was deactivated 2006, May 10th.

2   Q.   Why were you deactivated?

3   A.   (Through Interpreter)   Because I worked with the Liberian

4   National Police for 28 years.

5   Q.   And are you required to be deactivated at some time in

6   Liberia?

7   A.   Pardon me?

8   Q.   Why were you deactivated, other than the length of time you

9   worked?

10  A.   (Through Interpreter)   It came from the Government.

11  Myself, I do not know the reason.

12  Q.   Is there a requirement in the Liberian Constitution

13  regarding time of service with the police?

14  A.   (Through Interpreter)   Yes, yes.   If you serve for 15 or

15  over 15 -- I mean, 25 or over 25 years, you need to be retired.

16  Q.   Who was the President of Liberia when you were first hired

17  by the Liberian National Police?

18  A.   (Through Interpreter)   Dr. William R. Tolbert.

19  Q.   Is that "Tolbert," you said?

20  A.   Tolbert.

21          THE COURT:   Could we take a morning recess?

22          Ladies and gentlemen, we'll take 10 minutes.   Please

23  don't the discuss the case.

24          [The jury leaves the courtroom at 10:44 a.m.]

25          THE COURT:   All right.   We're in recess.

**October 27, 2008**

## Gayetay - Direct

1              [There was a short recess at 10:45 a.m.].

2              THE COURT:   Bring the jury in.

3          [The jury returns to the courtroom at 10:59 a.m.]

4              THE COURT:   Continue Mr. Wylie.

5              MR. WYLIE:   Thank you, Your Honor.

6              If may I see what's admitted into evidence as PD 2.

7   BY MR. WYLIE:

8   Q.    Mr. Gayetay, do you have something on your television

9   screen there?

10  A.    Yes.

11  Q.    Do you recognize there?

12  A.    (Through Interpreter)   This is the police headquarters

13  where I was working.

14  Q.    Were you working there in 1999?

15  A.    Yes.

16  Q.    Do you see your office in this picture or the area of the

17  building where your office was?

18  A.    Yes.

19  Q.    Can you put a mark an X on the screen where it was?

20  A.    Yes.

21  Q.    Go ahead.   You can touch the screen and it will put a red

22  mark.

23  A.    With my hand or --

24  Q.    Yes, with your hand.

25  A.    (Through Interpreter)   Here is my office.

**October 27, 2008**

## Gayetay - Direct

1   Q.   Okay.

2        And do you see the cell where the prisoners were kept?

3   A.   Yes.

4   Q.   Where was that?

5   A.   (Through Interpreter)  The cell is here.

6   Q.   Okay.

7        Do you see the spot at the jail where prisoners would

8   be accepted?

9   A.   Yes.

10  Q.   Can you put a mark there?

11  A.   (Through Interpreter)  That's here.

12  Q.   What do you call that area?

13  A.   (Through Interpreter)  We call that charge of quarter.

14  Q.   That's where you would accept the prisoners?

15  A.   Yes.

16  Q.   Would you, yourself, accept the prisoners when they were

17  brought in?

18  A.   (Through Interpreter)  No.  Those who are at the charge of

19  quarter would receive the prisoners.

20  Q.   You call that the charge of quarter?

21  A.   Yes.

22  Q.   When you were on duty, would you see the prisoners?

23  A.   (Through Interpreter)  From my office?

24  Q.   No.  During your shift, would you see the prisoners?

25  A.   (Through Interpreter)  Yes.

## October 27, 2008

## Gayetay - Direct

1  Q.   When would you see the prisoners?

2  A.   (interpreter)  When they bring them from the outside.   This

3  is the only entrance to the charge of quarter.

4  Q.   Was it your responsibility to check on them during your

5  shift?

6  A.   No.

7  Q.   Would you see the prisoners at the cell?

8  A.   (Through Interpreter)  Yes.   When you go through the charge

9  of quarter, then you could see the prisoners in the cell.

10  Q.   How many cells were in the Gbarnga Police Station?

11  A.   (Through Interpreter)  There was two cells, one for male

12  and one for female.

13          MR. WYLIE:   May I see what has been admitted into

14  evidence as Government's Exhibit PD 3.

15  BY MR. WYLIE:

16  Q.   Is this the police station?  Is this also a picture of the

17  police station?

18  A.   Yes.

19  Q.   And the -- when you're looking toward the cells in the

20  police station, which one is the male sell and which one is the

21  female cell?

22  A.   (Interpreted)  The male cell is on the right and the female

23  cell is on the left.

24  Q.   When you're in one cell, can you see the prisoners in the

25  other cell?

**October 27, 2008**

## Gayetay - Direct

1  A.   Pardon me?

2  Q.   Can you see the prisoners in the female cell when you're in

3  the male cell?

4  A.   (Through Interpreter)  Not exactly.

5  Q.   There a wall between the cells?

6  A.   (Through Interpreter)  Yes, there is a little wall on the

7  left.

8  Q.   Do you know who Chuckie Taylor is?

9  A.   Pardon me?

10  Q.   Do you know who Chuckie Taylor is?

11  A.   (Through Interpreter)  I saw Chuckie Taylor, but I was not

12  close to him

13  Q.   Do you know if he's related to the former President of

14  Liberia, Charles Taylor?

15  A.   (Through Interpreter)  Well, I heard it over the air.

16  Q.   What did you hear?

17  A.   (Through Interpreter)  That he is the son of Charles

18  Taylor.

19  Q.   Did you ever see Chuckie in Gbarnga?

20  A.   Yes.

21  Q.   Where did you see him in Gbarnga?

22  A.   (Through Interpreter)  I saw Chuckie Taylor across the

23  road, which is opposite the police station, at a gas station

24  taking out gasoline.

25  Q.   Did he have men with him?

## October 27, 2008

## Gayetay - Direct

1  A.   (Through Interpreter)  Well, he was a little bit farther

2  away from me taking gas and they showed him to me, that this is

3  Chuckie Taylor.

4  Q.   In 1999, did you ever see Chuckie Taylor at the Gbarnga

5  Police Station?

6  A.   No.

7  Q.   In 1999, did you ever hear that Chuckie Taylor had been to

8  the police station in Gbarnga?

9  A.   No.

10  Q.   In 1999, did you ever see Chuckie Taylor drop off any

11  prisoners at the Gbarnga Police Station?

12  A.   No.

13  Q.   In 1999, did you ever hear from Chuckie Taylor had dropped

14  off any prisoners at the Gbarnga Police Station?

15  A.   No.

16  Q.   In 1999, did you ever see Chuckie Taylor beat any prisoners

17  at the Gbarnga Police Station?

18  A.   No.

19  Q.   In 1999, did you ever hear that Chuckie Taylor beat any

20  prisoners at the Gbarnga Police Station?

21  A.   No.

22  Q.   In 1999, did you see Chuckie Taylor order any prisoners

23  beaten?

24  A.   No.

25  Q.   In 1999, did you hear that Chuckie Taylor ordered prisoners

**October 27, 2008**

## Gayetay - Direct

1  beaten?

2  A.   No.

3  Q.   In 1999, did you ever see Chuckie Taylor tie anybody up at

4  the Gbarnga Police Station?

5  A.   No.

6  Q.   In 1999, did you ever hear that Chuckie Taylor tied

7  somebody up at the Gbarnga Police Station?

8  A.   No.

9  Q.   Did you ever see Chuckie beat anyone anywhere in Gbarnga

10  ever?

11  A.   No.

12  Q.   Did you ever see Chuckie Taylor at the Gbarnga Police

13  Station?

14  A.   (Through Interpreter)  I said "No."

15  Q.   How many times did you see him across the street getting

16  gas?

17  A.   (Through Interpreter)  Two different times.

18  Q.   Did the Gbarnga Police Station keep records?

19  A.   Yes.

20  Q.   In 1999, did the Gbarnga Police Station keep records?

21  A.   (Through Interpreter)  Well, there were records, but

22  because of the war, most of the records got damaged.

23  Q.   When a prisoner was admitted to the Gbarnga Police Station,

24  would his information be taken down?

25  A.   (Through Interpreter)  Yes, the information can be taken

**October 27, 2008**

## Gayetay - Cross

1   down by the charge of quarter.

2   Q.   Would the charge of quarter save that information?

3   A.   Pardon me?

4   Q.   Would the charge of quarter write that information on a

5   document?

6   A.   Yes.

7   Q.   And would that document be saved?

8   A.   Pardon?

9   Q.   Would that document be saved somewhere in the police

10  station?

11  A.   (Through Interpreter)  Well that is their own area, so they

12  keep the documents.

13  Q.   Was the police station destroyed during the war?

14  A.   (Through Interpreter)  Part of it was destroyed.

15  Q.   Was it burned to the ground?

16  A.   (Through interpreter)  No, it was only looted.

17          MR. WYLIE:   One minute, Your Honor.

18          We tender the witness, Your Honor.

19                  CROSS EXAMINATION

20  [Beginning at 11:11 a.m., 10/27/08.]

21  BY MS. ROCHLIN:

22  Q.   Good morning, Mr. Gayetay.

23  A.   Good morning.

24  Q.   How are you today?

25  A.   How you been?

**October 27, 2008**

## Gayetay - Cross

1   Q.   Thank you.   I'm fine.

2            Mr. Gayetay, you said the police station at Gbarnga

3   was looted during the war.  Is that right?

4   A.   Yes.

5   Q.   And you also said that because of the war, most of the

6   records in the police station were damaged?

7   A.   Yes.

8   Q.   And so those records aren't around anymore.  Is that right?

9   A.   Pardon me?

10  Q.   The records that were damaged during the war, you don't

11  have those anymore, do you?

12  A.   (Through Interpreter)  No, I do not keep them to have them

13  Q.   And they were damaged during the war, so the police station

14  doesn't have them anymore.  Is that right?

15  A.   (Through Interpreter)  I said most of the documents.

16  Q.   Not all, but most of the documents were damaged.  Is that

17  right?

18  A.   Yes.

19  Q.   Now, you said when you were working at the Gbarnga Police

20  Station you worked different shifts?

21  A.   (Through Interpreter)  I said we would change shifts.  We

22  used to change shifts.

23  Q.   So sometimes you would work the first shift?

24  A.   Yes.

25  Q.   And sometimes you would work the second shift.  Right?

**October 27, 2008**

## Gayetay - Cross

1   A.   Yes.

2   Q.   And you would change your shifts around every two weeks.

3   Is that correct?

4   A.   Yes.

5   Q.   On April 2nd, 1999, were you working the first shift or the

6   second shift?

7   A.   (Through Interpreter)  Well, I cannot recall now because it

8   has been too long.

9   Q.   On April 20th of 1999, were you working the first shift or

10   the second shift?

11   A.   (Through Interpreter)  This is what I'm saying, that I

12   cannot recall now because it has been too long.

13   Q.   And on April 22nd, 23rd, 24th of 1999, do you remember if

14   you were working the first shift or the second shift?

15   A.   (Through Interpreter)  This is what I'm saying, that it has

16   been so long that I can recall which shift I was on.

17   Q.   And your shift was 12 hours long.  Is that right?

18   A.   Pardon me?

19   Q.   Whichever shift you worked, it was a 12 hour shift?

20   A.   Yes.

21   Q.   And when you finished your shift, would you go home?

22   A.   Yes.

23   Q.   And you would walk to your home?

24   A.   Yes.

25   Q.   And your home was an hour and a half away from the police

**October 27, 2008**

## Gayetay - Cross

1   station.   Is that right?

2   A.   No.

3   Q.   How long would it take you to walk home from the police

4   station?

5   A.   (Through Interpreter)   Approximately 30 minutes.

6   Q.   And you also said sometimes when you were working at the

7   police station, you would go to Nimba County.   Is that right?

8   A.   Yes.

9   Q.   And Nimba county is where you're from   Right?

10  A.   Yes.

11  Q.   Nimba County is where your people are from?

12  A.   Pardon me?

13  Q.   Nimba County is where you're people were from?

14  A.   Yes.

15  Q.   So you would go to Nimba and visit with your people, with

16  your friends?

17  A.   Yes, for a day.

18  Q.   And you would do that in 1999.   Is that right?

19  A.   (Through Interpreter)   I did that often.

20  Q.   And how would you get from Gbarnga to Nimba?

21  A.   (Through Interpreter)   By transportation.

22  Q.   When you say "transportation," what do you mean?

23  A.   (Through Interpreter)   I mean by a vehicle, a motor car.

24  Q.   How long would it take to get by motor car from Gbarnga to

25  your people in Nimba County?

**October 27, 2008**

## Gayetay - Cross

1  A.   (Through Interpreter)   At times, about two hours.   It

2  depends on the vehicle.

3  Q.   Does it also depend on the road?

4  A.   Yes.

5  Q.   And would it depend also sometimes on the weather?

6  A.   No.

7  Q.   Would you go from Gbarnga to Nimba in the rainy season?

8  A.   Yes.

9  Q.   Would it ever take longer to get to Nimba in the rainy

10  season?

11  A.   (Through Interpreter)   From Gbarnga to where I'm going, the

12  road cannot get spoiled totally.

13  Q.   But it gets spoiled in some places?

14  A.   Yes.

15  Q.   And that would slow you down a little bit?

16  A.   Yes.

17  Q.   And would you also go to Nimba during the dry season?

18  A.   Yes.

19  Q.   And you would only spend one day with your family in Nimba?

20  A.   (Through Interpreter)   I spend one day and come back.   At

21  times, I carry foodstuff from them to come back.

22  Q.   You also said when you were in Gbarnga, you saw Chuckie --

23  is that right -- the person you knew as Chuckie Taylor?

24  A.   (Through Interpreter)   I stated I saw him and people stated

25  to me that "This is Chuckie Taylor" because I was not closer to

## October 27, 2008

## Gayetay - Cross

1  him

2  Q.   And you saw that person in the daytime?

3  A.   Chuckie?

4  Q.   Yes.

5  A.   Yes.

6  Q.   And you saw him two times.  Is that right?

7  A.   Yes.

8  Q.   But you did see him in Gbarnga.  Correct?

9  A.   Pardon me?

10  Q.   You did see him while you were in Gbarnga.  Correct?

11  A.   (Through Interpreter)  I saw him in Gbarnga at the gas

12  station opposite the police station.

13  Q.   So you saw him in Gbarnga not far from the police station.

14  Correct?

15  A.   (Through Interpreter)  Yes.

16          MS. ROCHLIN:  If I could have a moment, Your Honor?

17          THE COURT:  You may.

18  BY MS. ROCHLIN:

19  Q.   Mr. Gayetay, what were the years when you worked at the

20  Gbarnga Police Station?

21  A.   What were the year?

22  Q.   Yes.

23  A.   (Through Interpreter)  I stated that I was assigned to

24  Gbarnga in 1985.

25  Q.   And when did you leave the Gbarnga Police Station?

**October 27, 2008**

## Gayetay - Redirect

1   A.   (Through Interpreter)   I did not leave the station until

2   2006, May the 10th.

3   Q.   You were working at the Gbarnga Police Station from 1985

4   until 2006.   Is that correct?

5   A.   Yes.

6   Q.   And you were working at the Gbarnga Police Station when

7   Charles Taylor had his farm in Gbarnga.   Right?

8   A.   (Through Interpreter)   No, when Charles Taylor came with

9   the war, all of us fled and after the police station --

10   Q.   Have you finished your answer, sir?

11   A.   I finished.

12          MS. ROCHLIN:   May I have a moment, Your Honor?

13   BY MS. ROCHLIN:

14   Q.   Sir, can you repeat your answer to the interpreter, please?

15   A.   (Through Interpreter)   I said when the war came, we fled

16   the police station completely.   But when things returned to

17   normal, we were reassigned to Gbarnga Police Station.

18   Q.   And what were the years when you were away from the Gbarnga

19   Police Station?

20   A.   (Through Interpreter)   I was away from that time up to

21   1997.

22          MS. ROCHLIN:   Your Honor, no further questions.

23          THE COURT:   Redirect.

24                  REDIRECT EXAMINATION

25   [Beginning at 11:21 a.m., 10/27/08.]

**October 27, 2008**

## Gayetay - Redirect

1  BY MR. WYLIE:

2  Q.   Mr. Gayetay, when did you flee Liberia because of the war?

3  What years?

4  A.   Pardon me?

5  Q.   What years did you leave Liberia because of the war?

6  A.   (Through Interpreter)  I did not leave Liberia.  I was in

7  Liberia throughout, but we fled into the bushes.

8  Q.   And what year was that that you left Gbarnga and went into

9  the bushes?

10  A.   (Through Interpreter)  I left Gbarnga 1989.

11  Q.   And when did you return to Gbarnga?

12  A.   (Through Interpreter)  I returned to Gbarnga 1997.

13  Q.   And is that because it became peaceful in Gbarnga in 1997?

14  A.   (Through Interpreter)  Well, when police were reactivated,

15  they assigned me to Gbarnga.

16  Q.   When you would return from your trips to Ninba, did you

17  ever hear that Chuckie Taylor had been to the police station?

18  A.   No.

19  Q.   When you would return from your trip in Ninba County, had

20  you heard that Chuckie Taylor had beaten anybody in Gbarnga?

21  A.   No.

22          MR. WYLIE:   No further questions, Your Honor.

23          MR. CARIDAD:   Mr. Gayetay, you may come down, please,

24  sir.

25          [The witness was excused at 11:23 a.m.]

**October 27, 2008**

## Naples - Direct

1          MR. CARIDAD:   The defense calls Agent Greg Naples,

2     Your Honor.

3

4          GREGORY NAPLES, DEFENDANT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6     BY MR. CARIDAD:

7     Q.   Agent Naples, you are an FBI agent assigned to this case?

8     A.   Yes.

9     Q.   When were you assigned to this case?

10    A.   In approximately April, 2006.

11    Q.   Now, you're familiar with one of the witnesses who

12    testified named Milbah Kamara.   Is that right?

13    A.   Yes.

14    Q.   Now, did you have an opportunity to interview Mr. Kamara

15    throughout the course of this investigation?

16    A.   Yes.

17    Q.   Can you tell me how the process is of interviewing such a

18    witness?   What do you do?

19    A.   Well, in the case of Mr. Kamara, we had a lead that

20    Mr. Kamara would be a good person to talk to.   So we sent

21    out --

22    Q.   Excuse me.   I didn't make my question very clear.   I'm just

23    talking about the simple process of sitting down with him and

24    talking to him.  How does that work?

25    A.   We would sit down in an office and speak with him and try

**October 27, 2008**

## Naples - Direct

1 to earn his trust and build rapport with him

2 Q.   Would you take notes of what he said to you?

3 A.   Yes, we would.

4 Q.   And when you interview somebody like that, do you do it

5 just by yourself or is someone else present?

6 A.   We have other people present.

7 Q.   Are the other persons also agents with the FBI?

8 A.   Other agents, yes.

9 Q.   And do you take down notes as you are speaking to

10 Mr. Kamara?  Did you do that?

11 A.   Normally, we have one person who would speak to Mr. Kamara

12 or anyone, ask a question, and the other person will take the

13 notes.

14 Q.   And eventually you use those notes, or somebody does, to

15 make a report, a typed report?

16 A.   Yes.

17 Q.   And then you review those reports to make sure they're

18 accurate.   Is that right?

19 A.   Yes.

20 Q.   Now, how many times did you interview Mr. Kamara between

21 2006 and 2008?

22 A.   Four times.

23 Q.   Did you interview Mr. Kamara in August of 2006?

24 A.   Yes, we did.

25 Q.   And where was that first, that interview of August, 2006?

**October 27, 2008**

## Naples - Direct

1   A.   That was in Bedford, New Hampshire.

2   Q.   And was it at his home?

3   A.   No, it was not.

4   Q.   Where was it?

5   A.   At the FBI Bedford office.

6   Q.   And how long did you spend with Mr. Kamara in August of

7   2006 during that interview?

8   A.   I don't remember exactly, but I would say approximately two

9   or three hours.

10  Q.   Was there any reason to rush through that interview?

11  A.   No, no.

12  Q.   Now, did you speak to Mr. Kamara again in May of 2006?

13  A.   We spoke to him in May, 2007.

14  Q.   Where was that interview?

15  A.   That interview was also, I believe, at the FBI Bedford

16  office.

17  Q.   How long did that interview take?

18  A.   Again, approximately two or three hours.

19  Q.   Was there any hurry to get through that interview?

20  A.   I don't recall there was, no.

21  Q.   Did you speak to Mr. Kamara again in October of 2008, just

22  this month?

23  A.   Yes, we did.

24  Q.   And where did you speak to Mr. Kamara in October, 2008?

25  A.   At the U.S. Attorney's Office here in Miami.   Excuse me.

**October 27, 2008**

## Naples - Direct

1   Actually, it was at the hotel where Mr. Kamara was staying.

2   Q.   Was there any rush to get through that interview?

3   A.   No.

4   Q.   In each of these three interviews, did you take notes or

5   did someone take notes of what Mr. Kamara was saying?

6   A.   Yes.

7   Q.   In each of these three interviews, were those notes made

8   into a final typewritten report?

9   A.   The October interview was not made into a typewritten

10  report.

11  Q.   It has not been made into a report yet?

12  A.   Correct.

13  Q.   At each one of these interviews, did you review the reports

14  for accuracy?

15  A.   Yes.

16  Q.   Were they accurate so far as you could tell?

17  A.   Yes.

18  Q.   Now, I want to ask you about the August, 2006 interview of

19  Mr. Kamara.   Did Mr. Kamara tell you that after leaving

20  Benjamin Yeaten's house, he was taken to different places in

21  Monrovia before arriving at Klay?

22  A.   Yes, he did.

23  Q.   In May of 2007, during your interview of Mr. Kamara on that

24  day, did he tell you that he had been taken directly from

25  Benjamin Yeaten's house to Klay?

**October 27, 2008**

## Naples - Direct

1  A.   Yes, he did.

2  Q.   Now, during your August, 2006 interview of Mr. Kamara, did

3  he tell you that when he was taken from the police station to

4  Whiteflower, his head had been covered?

5  A.   Yes, he did.

6  Q.   But did he tell you on May 7th when you spoke to him that

7  he did not have a cover over his head?

8  A.   In May of 2007, yes, he did not have a cover.

9  Q.   May of 2007.  Is that right?

10 A.   Yes.

11 Q.   Again, in October of 2008, he told you that when he was

12 taken to Whiteflower, he did not remember having any cover on

13 his head.  Is that right?

14 A.   Yes, that's correct.

15 Q.   Now, in August of 2006, during that interview with

16 Mr. Kamara, did he mention to you at all that he had been taken

17 from the police station to a beach near Congotown Road where he

18 had seen dead bodies on the beach and then had heard a radio

19 call to bring him to Whiteflower?  Did he mention that to you

20 at all in August of 2006?

21 A.   No, he did not.

22 Q.   Now, when you interviewed him in August of 2006, did you

23 ask him to tell you what had happened to him that night?

24 A.   Yes.  It was like I said, we just wanted to build a trust

25 and rapport with him and we just asked him to tell us his

## Naples - Cross

1    story.

2    Q.   And during that interview of August, 2006, he did not tell

3    you about being taken to a beach, seeing dead bodies or hearing

4    a radio call to take him back to Whiteflower.  Is that correct?

5    A.   That's correct.

6    Q.   And then, again, in May of 2007 when you interviewed

7    Mr. Kamara, did he tell you then about this incident where he

8    was taken to a beach, seeing dead bodies and then heard a radio

9    call to bring him to Whiteflower?

10   A.   No, he didn't mention it.

11   Q.   Then, again, in May of 2007, did you simply ask him to tell

12   you what had happened to him?

13   A.   Yes.  We were going over in more detail based on the

14   previous interview.

15   Q.   And while going over those details, he never mentioned to

16   you in May of 2007 this incident at the beach.  Correct?

17   A.   Correct.

18            MR. CARIDAD:  If I could have a moment, Your Honor?

19            Thank you, Your Honor.  I have no further questions of

20   Agent Naples.

21                        CROSS EXAMINATION

22   [Beginning at 11:32 a.m., 10/27/08.]

23   BY MR. GRAVELINE:

24   Q.   Agent Naples, you spoke to Mr. Kamara in August of 2006.

25   Is that correct?

**October 27, 2008**

## Naples - Redirect

1    A.    Yes.

2    Q.    That was at the FBI station in Bedford, New Hampshire?

3    A.    Yes.

4    Q.    Can you describe Mr. Kamara's appearance or attitude at

5    that first meeting?

6    A.    Yes.   He was very, very nervous, didn't know why he was

7    needed to speak to the FBI and ICE agents.   The last time he

8    voluntarily went to a police station, he was detained.

9    Q.    When Mr. Kamara started relating what had happened to him

10   in Liberia in August, 2006, what was his emotional condition

11   during that first interview?

12   A.    The first interview he broke down frequently.   We didn't

13   want to press him too hard.

14   Q.    Did you ask him for any follow-up details while he was

15   breaking down during that first interview?

16   A.    No.

17          MR. GRAVELINE:   No further questions, Your Honor.

18                      REDIRECT EXAMINATION

19   [Beginning at 11:34 a.m., 10/27/08.]

20   BY MR. CARIDAD:

21   Q.    Agent Naples, during that August, 2002 meeting, you noticed

22   that Mr. Kamara appeared very nervous to you?

23   A.    In August, 2006?

24   Q.    2006.   I'm sorry.

25          Did you give him an opportunity to relax, if he could.

**October 27, 2008**

## Naples - Redirect

1    A.    Any time he wanted it, yes.

2    Q.    You weren't pressing him with questions, were you?

3    A.    No.

4    Q.    You've interviewed a lot of people over your career,

5    wouldn't you say?

6    A.    Yes.

7    Q.    So you know how to deal with people who might be nervous.

8    Is that right?

9    A.    Yes.

10   Q.    And you try to give them some room and some space.   Would

11   you say that's right?

12   A.    Yes.

13   Q.    You say there was no hurry in your conversation with

14   Mr. Kamara in August of 2006.   Right?

15   A.    Correct.

16   Q.    So when you say he broke down frequently, I imagine you

17   took a rest and let him compose himself?

18   A.    Yes, we did.

19   Q.    And you gave him as much time as he wanted to tell you what

20   had happened to him?

21   A.    Yes.

22              MR. CARIDAD:   Thank you, Your Honor.

23              I have no further questions.

24              MR. WYLIE:   Your Honor, the defense calls Special

25   Agent Bill Barnett.

**October 27, 2008**

## Barnett - Direct

1

2            WILLIAM BARNETT, DEFENDANT'S WITNESS, SWORN

3                        DIRECT EXAMINATION

4  [Beginning at 11:36 a.m]

5  BY MR. WYLIE:

6  Q.    Agent, good morning.

7  A.    Good morning.

8  Q.    Are you familiar with the first person involved, Rufus

9  Kpadeh?

10  A.    Yes, I am

11  Q.    You have interviewed Mr. Kpadeh in your investigation in

12  this case.   Right?

13  A.    Yes, I have.

14  Q.    How many times?

15  A.    There were two occasions, February, 2007 -- pardon me,

16  sir -- three occasions, February of 2007, in May, 2007 and in

17  November of 2007.

18  Q.    Do you know if he was also interviewed by other agents on

19  occasions when you were not present?

20  A.    Yes.

21  Q.    How many other interviews when you were not present?

22  A.    I believe in May of 2007 there were additional interviews

23  when I was not present.

24  Q.    When you interview somebody in your line of work, do you

25  take notes?

**October 27, 2008**

## Barnett - Direct

1  A.   Yes, I do.

2  Q.   Do you have other agents present as well?

3  A.   That is standard procedure, to have at least two agents,

4  although on occasions in different cases, sometimes it doesn't

5  allow for two agents.

6  Q.   But in this case when you interviewed Mr. Kpadeh, you had

7  another agent there.  Is that right?

8  A.   That's correct.

9  Q.   And in February of 2007, where did you interview

10  Mr. Kpadeh?

11  A.   I interviewed Mr. Kpadeh at the United States Embassy in

12  Monrovia, Liberia.

13  Q.   And were you rushed during that interview at all?

14  A.   No, sir, I wouldn't say I was rushed.

15  Q.   Did you take a complete statement of Mr. Kpadeh that day?

16  A.   I believe we took a fairly thorough statement of

17  Mr. Kpadeh.

18  Q.   When he was asked a question, he was given as much time as

19  he needed to answer the question?

20  A.   That's correct.

21  Q.   And you didn't put any pressure on Mr. Kpadeh when you were

22  interviewing him, did you?

23  A.   No, sir.

24  Q.   You tried to make him as comfortable as he could possibly

25  be.  Right?

**October 27, 2008**

## Barnett - Direct

1  A.   Yes.

2  Q.   And in May of 2007, where did you interview Mr. Kpadeh?

3  A.   That was also at the United States Embassy in Monrovia,

4  Liberia.

5  Q.   And in November of 2007, where did you interview

6  Mr. Kpadeh?

7  A.   That was at the United States Embassy in Monrovia, Liberia.

8  Q.   And during either of those interviews, were you rushed in

9  any way?

10  A.   No, sir.

11  Q.   You were able to complete the interview as much as you

12  needed or wanted to that day?

13  A.   As I recall, yes.

14  Q.   The same thing -- I guess I asked you for May and in

15  November, but in November of 2007, was the interview rushed in

16  any way?

17  A.   Not that I recall, sir.

18  Q.   In May of 2007, Mr. Kpadeh said he was on a truck heading

19  toward the St. Paul River checkpoint.  Is that correct?

20  A.   If he stated that, sir, I believe that was in one of the

21  interviews at which I was not present.

22  Q.   In May you did not talk about his leaving Voinjama toward

23  the St. Paul checkpoint?

24  A.   No.

25  Q.   Now, in November of 2007, did you speak with Mr. Kpadeh

**October 27, 2008**

## Barnett - Direct

1  about leaving Voinjama towards the St. Paul River checkpoint?

2  A.   Yes.

3  Q.   And Mr. Kpadeh -- what kind of vehicle did Mr. Kpadeh say

4  he was riding in?

5  A.   The description, as I recall, the exact vehicle description

6  was a Daf truck, which is a form of a flatbed, a large open

7  flatbed truck.

8  Q.   And on that truck Mr. Kpadeh, in November of 2007, told you

9  that he was traveling with himself, his wife, two children and

10  his mom  Is that correct?

11  A.   I believe that is correct, sir.

12  Q.   And he had other relatives traveling separately on a

13  different truck?

14  A.   Yes.

15  Q.   So in November of 2007, he said that his wife and two

16  children were on his truck?

17  A.   That's my recollection, sir.

18  Q.   In February of 2007, you interviewed Mr. Kpadeh.  Is that

19  correct?

20  A.   Yes.

21  Q.   And during that interview, Mr. Kpadeh told you that all men

22  were ordered down from the truck at the St. Paul River

23  checkpoint?

24  A.   That's correct, sir.

25  Q.   And during your interview with Mr. Kpadeh in May of 2007,

**October 27, 2008**

## Barnett - Direct

1  Mr. Kpadeh told you that everyone was ordered down from the

2  truck at the checkpoint near the St. Paul River Bridge.   Is

3  that right?

4  A.   That may have occurred during an interview in which I did

5  not participate, sir.

6  Q.   There were other May interviews at which you were not

7  present with Mr. Kpadeh?

8  A.   That's correct.   There were interviews conducted with

9  Mr. Kpadeh by Special Agent Baechtle and Doyle of Immigration &

10 Customs Enforcement at which I was not present.

11 Q.   During the February 20th, 2007 meeting with Mr. Kpadeh, he

12 told you that his head was dunked in some water four times?

13 A.   Correct.

14 Q.   And in that February 13, 2007 -- or excuse me -- February

15 20th, 2007 meeting, he said it was dunked four times and then

16 his genitals were cut?

17 A.   Correct.

18 Q.   Now, you interviewed him again, Mr. Kpadeh again, November

19 6th, 2007.   Is that correct?

20 A.   That's correct, sir.

21 Q.   During that meeting he stated his head was dunked in water

22 three times.   Then his genitals were cut and then he was dunked

23 a fourth time.   Is that accurate?

24 A.   That is accurate, sir.

25 Q.   Now, during your February, 2007 interview with Mr. Kpadeh,

**October 27, 2008**

## Barnett - Direct

1  you spoke to him about stone football games?

2  A.   Yes.

3  Q.   Mr. Kpadeh told you in February of 2007 that Chuckie was

4  present for only one stone football game.   Is that right?

5  A.   At that time he could only recall one instance in which

6  Chuckie Taylor was present for the stone football game.

7  Q.   And then in November, 2007 Mr. Kpadeh remembered more times

8  that Chuckie was present for a stone football game?

9  A.   I would actually characterize it, sir, that he was open to

10  the possibility there could have been other occasions, but he

11  did not specifically know of them at the time.   He just said

12  it's possible that he could have been there for more.

13  Q.   And this November 7th -- excuse me -- this November, 2007

14  meeting with Mr. Kpadeh was after your previous meeting in

15  February of 2007.   Is that right?

16  A.   That is correct, sir.

17  Q.   During your February, 2007 meeting, Mr. Kpadeh told you

18  that Chuckie Taylor ordered soldiers to torture him until he

19  told the truth.   Is that right?

20  A.   In February of 2007, yes, that statement was made.

21  Q.   And then Mr. Kpadeh said based on that order, soldiers then

22  melted plastic on Mr. Kpadeh?

23  A.   Yes, correct.

24  Q.   But in November of 2007, Mr. Kpadeh told you that Chuckie

25  was not present when plastic was melted on him   Is that

## October 27, 2008

## Barnett - Cross

1   correct?

2   A.   That is correct, sir.

3   Q.   Now, during the February 20th, 2007 meeting with

4   Mr. Kpadeh, Mr. Kpadeh told you that when he arrived at the St.

5   Paul River Bridge checkpoint, he already had knowledge of who

6   Chuckie Taylor and the ATU were?

7   A.   In February of 2000, sir?

8   Q.   Yes.

9   A.   Yes, correct.

10  Q.   In November of 2000, Mr. Kpadeh told you when he arrived at

11  the checkpoint he had never heard of Chuckie Taylor or the ATU,

12  but later found out about them at Gbatala Base?

13  A.   To clarify that point, sir, he advised that he had not

14  heard of Chuckie Taylor, Jr., but that he had heard of the ATU.

15  Q.   All right.

16        So to be clear, February 20th, 2007 Mr. Kpadeh said

17  that he knew of Chuckie when he got to the checkpoint?

18  A.   Yes, he had heard of Chuckie Taylor, Jr.

19  Q.   But in November of 2007, Mr. Kpadeh stated that he did not

20  learn of Chuckie's identity until he later got to Gbatala Base?

21  A.   Correct.

22        MR. WYLIE:   May I have a moment, Your Honor?

23        THE COURT:   You may.

24        I tender the witness, Your Honor.

25                CROSS EXAMINATION

**October 27, 2008**

## Barnett - Cross

1  [Beginning at 11:47 a.m., 10/27/08.]

2  BY MS. HECK-MILLER:

3  Q.   Agent Barnett, in either February of '07 or November of

4  '07, did Rufus Kpadeh ever say that he had seen Chuckie Taylor

5  before the St. Paul River Bridge?

6  A.   In both instances, ma'am, he indicated that he had never

7  seen nor had he seen pictures of Chuckie Taylor, Jr.

8  Q.   And he said that at both times?

9  A.   Yes.

10  Q.   Thank you.

11          MS. HECK-MILLER:   I have no other questions.

12          MR. WYLIE:   No more questions, Your Honor.

13          THE COURT:   You are excused.

14          Your next witness.

15          MR. CARIDAD:   May we have a sidebar?

16

17

18

19

20

21

22

23

24

25

**October 27, 2008**

## Barnett - Cross

1    [Proceedings at sidebar follow]:

2    MR. CARIDAD:  Your Honor, the next two witnesses who

3    we intended to call cannot be found by our investigators.  We

4    planned to call them for an hour, hour and a half, maybe not

5    that much.  After that we were going to speak to our client to

6    determine if we were going to call any witnesses after that.

7    What I'm asking the Court to do is give us this

8    afternoon to try to locate these two witnesses and try to have

9    them here tomorrow morning.

10    THE COURT:  You've had the weekend.

11    I'll give you the lunch hour to try to reach them

12    We're not going to put the trial on hold while you search for

13    them

14    MR. CARIDAD:  The Government twice, Your Honor, said

15    they had run out of witnesses and twice the Court indulged them

16    and recessed early.

17    THE COURT:  We can bring them in out of turn if they

18    should resurface and put them on.  We're not going to have this

19    afternoon break.

20    MR. CARIDAD:  So --

21    THE COURT:  We can take an early lunch.  I don't know

22    if the Government has a rebuttal case.  If not, right before

23    you close, if they should surface, you can put them on.

24    All right.

25

**October 27, 2008**

## Barnett - Cross

1              [Proceedings in open court follow]:

2              THE COURT:  Ladies and gentlemen, we are going to take

3    our lunch recess.  I'll ask everyone return by 1:00.  Please do

4    not discuss the case.

5              [The jury leaves the courtroom at 11:50 a.m.]

6              THE COURT:  Be seated.

7              If by 1:00 you don't locate these witnesses, what are

8    we doing at that point?

9              MR. CARIDAD:  I would like to have the lunch hour to

10   speak to my client.

11             THE COURT:  Any rebuttal case for the Government.  You

12   will have a rebuttal if those two show up?

13             MS. ROCHLIN:  We may discuss it more over the

14   lunchbreak, but from our perspective now, we won't have a

15   rebuttal case.

16             THE COURT:  In which case, we will do closing

17   arguments tomorrow.

18             MS. ROCHLIN:  Yes, Your Honor.

19             THE COURT:  All right.

20             We'll see everyone at 1:00.  You are all excused.

21             MR. CARIDAD:  Thank you, Your Honor.

22                  [Luncheon recess at 11:52 a.m.]

23             THE COURT:  Please be seated.

24             MR. CARIDAD:  Good afternoon, Your Honor.

25             Judge, we have not been able to locate the two

**October 27, 2008**

## Barnett - Cross

1    witnesses.   I would like to put on the record a request.   The

2    two gentlemen are Alexander Zinnah and Jacob Madave.

3             We interviewed both these men in Liberia.   They gave

4    us relevant exculpatory evidence concerning our client.   We

5    brought them over here along with other witnesses.   Shortly

6    after our witnesses arrived, some of them -- not these two

7    gentlemen, in particular -- began receiving information from

8    Liberia that some of the witnesses' families have been

9    threatened, harassed because they had come to testify in

10   Chuckie's trial.

11            These two gentlemen, Madave and Zinnah, were in our

12   office late last week.   We interviewed them   We got them ready

13   to testify.   They did not tell us if there was any problem with

14   them testifying.   They said they would be here on Monday

15   morning and we cannot find them

16            The alternative we have proposed is to allow our

17   investigator, Randy Weinstein, to testify to the substance of

18   the testimony being given by Mr. Madave and Mr. Zinnah.

19   Mr. Zinnah was a member of the Armed Forces of Liberia in 1999

20   and slept at the building that has been commonly referred to as

21   the red-roofed building.   In fact, he lived there 24 hours a

22   day in 1999.   He would testify that that building was used for

23   the security persons to sleep, that he, himself, slept in the

24   very room where Mr. Kpadeh said he was questioned by our

25   client.

**October 27, 2008**

## Barnett - Cross

1          Mr. Zinnah would also testify that he saw Chuckie

2    twice in the area in 1999 and saw him deliver supplies to the

3    refugees and to the soldiers.

4          Mr. Zinnah would have testified at no time during

5    those visits did Chuckie shoot anybody, decapitate anyone.   At

6    no time did he arrest somebody named Mr. Kpadeh or anyone,

7    detain and take them to that room for an interview.   Likewise,

8    he never heard such a thing happened, never heard it from the

9    soldiers or civilians at Waterside.

10          Mr. Madave would testify he was a refugee living in

11   Voinjama and he never heard of any businessman in Voinjama

12   during 1999 named Sulaiman Jusu.   I showed him the picture of

13   Sulaiman Jusu.   He does not recognize Mr. Jusu as being a

14   businessman in Voinjama.   Mr. Madave, himself, was a

15   businessman in Voinjama.

16          He would testify he left Voinjama after the first

17   attack in April, came south across the bridge, was not harassed

18   by anyone, proceeded on to Gbalatuah, which was about 15, 20

19   minutes south of Waterside, and stayed with his family at the

20   refugee camp.

21          He frequently walked to the bridge, which was about a

22   15, 20 minute walk, two or three times a week.   While at

23   Waterside, he would speak to the people there.   He never heard

24   from anyone there at Waterside or the people staying at

25   Gbalatuah Refugee Camp, who also visited Waterside, the

**October 27, 2008**

## Barnett - Cross

1  defendant had ever shot anyone, decapitated anyone, arrested

2  anyone or harmed anyone at all.

3          Those are the two witnesses we intended to present

4  today.  We cannot find them  We would ask the Court allow

5  Mr. Weinstein to testify to the substance of what they would

6  say.

7          We would also ask the Court to issue an arrest warrant

8  for these two gentlemen and bring them to court pursuant to 18

9  USC 3144 which governs the release or detention of a material

10  witness.

11          That section states "If it appears from an affidavit

12      filed by a party that the testimony of person is material

13      in a criminal proceeding, and if it is shown that it may

14      become impracticable to secure the presence of the person

15      by subpoena, a judicial officer may order the arrest of the

16      person and treat the person in accordance with the

17      provisions of § 3142 of this title, the Bail Reform Act."

18          We believe these people have material testimony to

19  offer.  We cannot find them  We cannot secure their presence

20  to testify at this trial, so we ask the Court to order the

21  Marshals to locate, arrest and bring them before the Court to

22  testify.

23          Those are our two requests at this time.  We do not

24  have any further witnesses.  So aside from our request that

25  Mr. Weinstein be allowed to testify, the defense will have to

**October 27, 2008**

## Barnett - Cross

1    rest.

2              THE COURT:   Very well.

3              I'll hear from the Government.

4              MS. ROCHLIN:   Your Honor, it's an unfortunate fact of

5    criminal trials for both sides that sometimes witnesses go

6    missing.   The proposal counsel has suggested, as having an

7    investigator testify to what these witnesses would say, is

8    unprecedented and without any legal support I know of

9    whatsoever.

10             Counsel has certainly provided no case law or other

11   authority to allow an investigator to testify on a hearsay

12   basis to what these witnesses would say.   If the shoe were on

13   the other foot and the Government had lost a witness, the

14   United States would not even consider proposing that one of its

15   case or other agents get on the stand and testify to what the

16   witness would say if that witness were not present and able to

17   take the stand, and we see no reason why, while it might be

18   unfortunate from the defense perspective that their witnesses

19   have gone, that this kind of hearsay, which the Government

20   can't confront directly -- we can't cross examine the

21   investigator in the same way that we can cross examine the live

22   witness -- we see no support and no reason and, frankly, no

23   fairness in allowing the investigator to substitute.

24             So we definitely would oppose allowing Mr. Weinstein

25   to testify to what he had heard, and, frankly, while there may

## October 27, 2008

## Barnett - Cross

1   be many reasons for the absence of these witnesses, that

2   reason, for all we know, could relate in some way to the

3   substance of their testimony and that's another reason why it

4   would be improvident to allow an investigator to simply step in

5   absent some rule of evidence or other authority permitting this

6   kind of substitution.

7            The United States would definitely oppose putting

8   Mr. Weinstein on the stand in place of these witnesses.

9            As for counsel's request for a material witness

10  complaint, in a sense, that's fine as far as it goes, but the

11  standard for a material witness complaint is that compulsory

12  process will not be sufficient to secure the appearance of a

13  witness, and I may have missed it, but I did not hear in

14  Mr. Caridad's remarks to the Court that these witnesses had, in

15  fact, been subpoenaed.

16           Even assuming they were, a material witness warrant

17  would make sense if this Court were inclined to recess the

18  trial to allow the location and apprehension of the witnesses

19  in question.  But if that is not going to be the case and if we

20  are going to proceed to the conclusion of this trial and, in

21  fact, both sides rest their respective cases, then there would

22  be nothing to bring these witnesses back for.

23           If they are under subpoena, there may be a reason to

24  bring them back for contempt of Court or some other sanction,

25  but without knowing more about whether the witnesses were, in

**October 27, 2008**

## Barnett - Cross

1    fact, under subpoena and without the actual presentation of the

2    required affidavit stating probable cause for this Court to

3    determine, I just think we're putting the cart ahead of the

4    horse a little bit and there may yet be too many variables to

5    assess the material witness complaint under 3144 as a remedy.

6            THE COURT:   Thank you.

7            Mr. Caridad.

8            MR. CARIDAD:   One thing final on 3144, I will file an

9    affidavit this afternoon if the Court requires one.   The only

10   thing 3144 requires is if it is shown it may become impractical

11   to secure the presence of the person by subpoena.   It's

12   completely impractical to do that.   I can't even find these

13   people in the first place.

14           THE COURT:   Were they brought here on a visa?

15           MR. CARIDAD:   They were brought here on parole -- the

16   term is parole -- issued by the Department of Justice after we

17   make application to them

18           THE COURT:   Does it expire?

19           MR. CARIDAD:   They have 60 days, I believe.

20           THE COURT:   Upon the 60 days expiring, they would be

21   here unlawfully.

22           MR. CARIDAD:   That's my understanding.

23           MS. ROCHLIN:   Your Honor, I'm not sure that's

24   completely correct.   The parole is for the specific purpose of

25   testifying and if these witnesses by absenting themselves are

**October 27, 2008**

## Barnett - Cross

1  not, in fact, going to be testifying, then I think technically

2  they maybe out of status as we speak.  So they could be dealing

3  with or facing Immigration issues unless they immediately

4  return themselves for purposes of testifying.

5          THE COURT:  Would that be another reason for the

6  arrest warrant being issued?  They're here unlawfully as we

7  speak if they're not making themselves available to testify.

8          MS. ROCHLIN:  I believe it would be grounds for

9  Immigration to take action and, perhaps, place them in some

10  kind of administrative custody, Your Honor.  That is certainly

11  an option for getting them off the streets if they can be

12  located.

13          THE COURT:  Well, I will request that the defense

14  prepare those warrants.  You have the names and information

15  with respect to these people.  Their appearance, their height,

16  their weight and so forth I assume would have to be in the

17  warrant.  If you want to prepare those, I will sign them today.

18          MR. CARIDAD:  Yes, Your Honor.

19          THE COURT:  The other request is denied.  There is no

20  basis for your investigator to give testimony about what these

21  men said outside of court and I think your own request to the

22  Court acknowledged that by the absence of any citation to any

23  authority.  I'm unaware of any.  I don't believe anyone here is

24  aware of such authority.

25          That being the case, I will colloquy the defendant.

**October 27, 2008**

## Barnett - Cross

1  Is he ready to be colloquied?

2       MR. CARIDAD:  Your Honor, I know it's the Court's

3  practice to do that, but I ask the Court not to do it with

4  Mr. Emmanuel.

5       He will not testify.  He has chosen not to testify and

6  we simply rest.

7       THE COURT:  Well, it is my practice to make that

8  request and to have the defendant answer those questions under

9  oath so there's no question later.  I don't know why I would

10  vary from that with this defendant.

11       MR. CARIDAD:  My only concern, Your Honor, is the

12  defendant, obviously, has a right to remain silent about

13  anything.

14       THE COURT:  Correct.

15       MR. CARIDAD:  I can ask Mr. Emmanuel.

16       THE COURT:  If you would rather ask him the questions,

17  that's fair.

18       Raise your right hand, please, Mr. Emmanuel.

19       MR. CARIDAD:  Judge, he chooses not to testify about

20  this issue.

21       THE COURT:  He needs to state that on the record.

22       [The defendant was sworn at 1:19 p.m]

23       THE COURT:  You may inquire, Mr. Caridad.

24       MR. CARIDAD:  I'm sorry?

25       THE COURT:  You may inquiry.

**October 27, 2008**

## Barnett - Cross

1          MR. CARIDAD:   Your Honor, my client does not want to

2     testify about anything.   He does not want to answer any

3     questions.

4          That's the situation we're in.   I understand what the

5     Court is doing.   It may -- the Court is thinking ahead,

6     obviously, but I don't think there's any authority that can

7     compel Mr. Emmanuel to answer any questions at all if he

8     chooses not to.

9          THE COURT:   Then I will advise him of those rights so

10    it's clear on the record and by his silence, he will indicate

11    his refusal to answer any question I ask.

12          Mr. Emmanuel, as the accused in this case, you enjoy

13    the Constitutional right to remain silent.   You do not have to

14    give testimony and when you exercise that right, it cannot be

15    held against you in any way.

16          Similarly, as the accused in this case, you have the

17    right to give testimony and testify before this jury and be

18    examined and be cross-examined.

19          The choice of whether or not to give testimony is a

20    choice only you can make.   In other words, notwithstanding the

21    advice that your attorneys may give you, it is your right to

22    overrule that advice and to indicate to your lawyers that you

23    would like to give testimony or would not like to give

24    testimony contrary to the advice they may give you.

25          Do you understand this right of yours?

**October 27, 2008**

## Barnett - Cross

1          THE DEFENDANT:   (Nodded.)

2          THE COURT:   And have you made your decision as to

3    whether or not you will testify?

4          THE DEFENDANT:   (Nodded.)

5          THE COURT:   And it is your decision, sir, not to give

6    testimony.   Is that correct?

7          THE DEFENDANT:   (Nodded.)

8          THE COURT:   All right.

9          I will advise this jury to return tomorrow morning.

10   The defense will rest when the jury comes in.   There's no

11   rebuttal case?

12         MS. ROCHLIN:   No, Your Honor.

13         THE COURT:   All right.

14         If these witnesses should surface, as I indicated,

15   before the jury begins its deliberations, they can be heard out

16   of turn and you will have the opportunity to do any rebuttal --

17   "you," being the Government -- and any additional follow-up

18   closing argument if that's when these two persons are found.

19         Shall I tell the jury 9:30?

20         MR. CARIDAD:   Yes, Your Honor.

21         MS. ROCHLIN:   That's fine, Judge.

22         THE COURT:   Let's bring the jury in, please.

23         We have to address the instructions still.

24         MR. CARIDAD:   Yes.

25      [The jury returns to the courtroom at 1:23 p.m]

## October 27, 2008

## Barnett - Cross

1          THE COURT:   Everyone please be seated.

2          Mr. Caridad.

3          MR. CARIDAD:   Your Honor, the defense rests.

4          THE COURT:   Ladies and gentlemen, all of the testimony

5    and evidence have been presented for your consideration.   What

6    remains is the attorneys' closing arguments and my instructions

7    to you on the applicable law before you begin your

8    deliberations.

9          The attorneys and I have to address those instructions

10   which I need to give you this afternoon.   I need to give them

11   some time to prepare their closing arguments.   So as not to

12   take up your time, we will adjourn for the day and I will ask

13   that you all return tomorrow morning at 9:30.

14         The schedule, as I see it, is that we will begin with

15   those arguments, I will instruct you and you will begin your

16   deliberations tomorrow.

17         Please remember not to discuss this case and not to do

18   any reading about this case or the matters that you have been

19   hearing about, and we'll see you at 9:30.

20         Have a good afternoon.

21         [The jury leaves the courtroom at 1:24 p.m]

22         THE COURT:   You may be seated.

23         Let's address the jury instructions.

24         MS. ROCHLIN:   Your Honor, with the Court's permission,

25   Mr. Graveline will address that for the United States.

**October 27, 2008**

## Barnett - Cross

1          MR. GRAVELINE:   Your Honor, we submitted proposed jury

2    instructions at the beginning of the case.   We stand on those

3    instructions that we submitted with the following additions --

4    well, corrections, more likely.

5          Proposed instruction number 12, Your Honor, the

6    conspiracy to commit torture for Count I.   Upon doing research

7    over the last week or two, the section that deals with

8    conspiracy, 2348, subsection C was enacted in 2001,

9    specifically October 26th of 2001.   Because of the enactment of

10   the conspiracy at that point, we don't believe that we have any

11   ex post facto issues concerning acts in furtherance of the

12   conspiracy before that, but since what the Government charged

13   the death resulting happened before that time, we do not

14   believe the sentence enhancement of life continues to go with

15   that, and, so, we don't believe we need a special jury verdict

16   form where the jury would have to find the death resulted from

17   those acts.

18         With that, we would be not asking for the last

19   paragraph of the proposed instruction and we would not be

20   needing the proposed special verdict form that is contained in

21   footnote number 1.

22         THE COURT:   So your request is to delete the last

23   paragraph of proposed instruction 12.

24         MR. GRAVELINE:   That's correct.

25         THE COURT:   Any objection from the defense?

**October 27, 2008**

## Barnett - Cross

1          MR. CARIDAD:   No, Your Honor.

2          So my understanding is correct, the maximum possible

3   penalty of this count, if convicted, is 20 years?

4          MR. GRAVELINE:   That's correct.

5          MR. CARIDAD:   Thank you.

6          MR. GRAVELINE:   The only other addition that we need

7   to take care of concerns carrying and possessing a firearm

8   during the furtherance of a crime of violence.   This goes

9   towards Count VIII, proposed instruction number 17.

10          As charged in the Indictment this, Count VIII is

11  charged happening on or about July 24th, 2002, but then also

12  charges as set forth in Counts III through VII being the actual

13  crime of violence.   July 24th, 2002 only pertains to Count VI,

14  not Counts III through VII, so in the first paragraph of the

15  elements where it says that the defendant committed at least

16  one of the crimes of violence charged in Count I or Counts III

17  through VII, it should read "as charged in Count I and

18      paragraph 24 through 34 and/or Count VI of the Indictment."

19          It only applies to the crime as charged with

20  Mr. Dulleh, victim number 6.

21          THE COURT:   All right.

22          So you want to change the language in the first

23  element of instruction 17 to read "that the defendant committed

24      at least one of the crimes of violence charged in" --

25          MR. GRAVELINE:   1, paragraphs 24 through 34.

**October 27, 2008**

## Barnett - Cross

1          THE COURT:   Paragraph.

2          MR. GRAVELINE:   Yes.

3          THE COURT:   24 through 34.

4          MR. GRAVELINE:   Yes, and/or Count VI of the

5    Indictment.

6          THE COURT:   Any objection from the defense?

7          MR. CARIDAD:   Your Honor, it seems then that part of

8    Count VIII should be stricken, the part dealing with "as set

9        forth in Counts III through VII."

10          MR. GRAVELINE:   It should be stricken and should read

11        "Count VI in the Indictment."

12          THE COURT:   Where are you reading from?  I'm still on

13    instruction 17.   The question is is there any objection to that

14    language?

15          MR. CARIDAD:   No, Your Honor.

16          THE COURT:   Next.

17          MR. CARIDAD:   My concern is that Count VIII alleges

18    Counts III through VII of the Indictment at the end and,

19    apparently, that's no loner the case.   It should only read

20    Count VI of the Indictment.

21          I'm not sure if this Indictment can be amended at this

22    point.   It alleges Counts III through VII.   Counts III through

23    VII deal with -- Count III is Mr. Jusu.   Count IV is Mr. Turay.

24    Count V is Mr. Kpadeh.   Count VI is Mr. Dulleh.   Count VII is

25    Mr. Kamara.   It seems the thing to do is to -- well, I have to

**October 27, 2008**

**Barnett - Cross**

1    think through this, Your Honor.  The Government is saying this

2    count only applies to Count VI.

3          THE COURT:  I'm only looking at the instruction as

4    modified.  You're going back to the Indictment and asking

5    whether the Government is seeking to dismiss part of a count.

6    Is that what you're asking?

7          MR. CARIDAD:  I don't know what to do about the

8    situation is what I'm asking.

9          THE COURT:  Those are separate issues.  First of all,

10   is the proposed instruction correctly worded.  The next issue

11   is does the Government have the ability now to amend the

12   Indictment to make one particular count less inclusive.

13         We can answer the one question first, is the

14   instruction correctly worded, and then deal with the separate

15   legal issues that you're addressing with respect to the

16   Government's ability to amend.

17         Why don't we did deal first with proposed instruction

18   number 17.  Assuming Count VIII stays, is it appropriately

19   worded?

20         MR. CARIDAD:  Yes.  If the amendment to the

21   instruction is that the paragraphs in the Indictment that deal

22   with Count VIII are 24 --

23         MR. GRAVELINE:  Through 34.

24         THE COURT:  Count I, paragraph 24 through 34, and/or

25   Count VI, and it's not the Indictment, it's the Superseding --

**October 27, 2008**

## Barnett - Cross

1          MR. GRAVELINE:   The Second.

2          MR. CARIDAD:   Second Superseding Indictment.   Yes, I

3     think that wording is correct.

4          THE COURT:   So let's deal with the other issue you're

5     addressing.   Can the Government amend in this way?

6          MR. GRAVELINE:   Ms. Rochlin would like to address

7     that, Your Honor.

8          MS. ROCHLIN:   Your Honor, the short answer is the

9     Government can.   We believe, especially based on our review of

10    earlier drafts of this Indictment, that the additional

11    underlying counts referenced in Count VIII crept in as a

12    scrivener's error and there is authority from this circuit

13    addressing leave to amend an Indictment.

14          If the Court wishes -- I don't know that this need

15    take up time with the charge conference.   I would be happy to

16    return either later this afternoon or tomorrow with citations

17    that I will also provide to opposing counsel.

18          THE COURT:   Mr. Caridad?

19          MR. CARIDAD:   I do need time to think about it.   It

20    has hit me now.   The issue is can the Government amend Count

21    VIII so that it reads instead of "as set forth in Counts III

22       through VII," so it reads "As set forth in Count VI."  Is

23    that the amendment we're talking about?

24          MS. ROCHLIN:   Yes, we seek to limit it to Count VI.

25          THE COURT:   The instruction is that the defendant

**October 27, 2008**

## Barnett - Cross

1  committed at least one of the crimes of violence charged in

2  those counts.  As proposed, the amendment is to make it less

3  inclusive.

4          MS. ROCHLIN:  Correct.

5          THE COURT:  In other words, there are fewer of those

6  crimes of violence that the jury is to consider, not more.  In

7  other words, it's not making it easier for the Government to

8  obtain a guilty verdict.  It's making it harder because it has

9  just deleted how many counts from their consideration?

10          MR. GRAVELINE:  Four.

11          THE COURT:  So now there are fewer avenues for the

12  Government to prove this.

13          So I don't see that it prejudices the defense.  You

14  take a look at the issue.  Ms. Rochlin will share with you that

15  case law and if there is a concern, we can address it tomorrow.

16          MR. CARIDAD:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. GRAVELINE:  Other than that, those are the only

19  changes to our proposed jury instructions, Your Honor.

20          THE COURT:  I'll hear from the defense.

21          MR. CARIDAD:  Your Honor, we had asked the Court to

22  define "torture" in a way consistent with that found at the

23  Bybee memo, which the Court is now certainly familiar with.  We

24  filed a pleading on November 9th, 2008 containing our proposed

25  jury instructions.

**October 27, 2008**

**Barnett - Cross**

1          I think the only real difference between that and the

2    Government's proposed instruction is the definition of the term

3    "torture," and we believe our definition is more consistent

4    with the way that torture was intended to be punished by the

5    Convention Against Torture and the statute.  That is the most

6    extreme form of punishment that the law recognizes short of

7    murder.

8          So we ask the Court to instruct the jury on the

9    definition of "torture" found in our suggestion, which is that

10   in order to constitute torture, severe pain, as used in § 2340,

11   must rise to a high level, a level that would orderly be

12   associated with a sufficiently serious physical condition or

13   injury, such as death, organ failure or serious impairment of

14   body functions, and pain and suffering is a single concept

15   within the definition of 2340.

16         That's our first request.

17         We do have one major objection to the Government's

18   proposed instruction and that is that its instruction number 12

19   on conspiracy does not include the object of the conspiracy

20   which was to maintain, preserve, protect and strengthen the

21   power and authority of Charles McArthur Taylor's presidency and

22   to intimidate, punish, weaken and eliminate actual and

23   perceived opponents of and threats to his administration by

24   means of torture.

25         We believe the Government has charged that as the

**October 27, 2008**

**Barnett - Cross**

1    object of conspiracy and that they must prove that the acts

2    charged in the conspiracy occurred with that purpose in mind.

3              That's our second objection.

4              Government instructions 11 and 14 do not refer to an

5    element of the statute that states that torture that is merely

6    incidental to lawful sanctions is not punishable.   The

7    instruction on 11, 11 and 14, do not contain such language.

8              We also object to jury instruction number 9 concerning

9    person on trial.   That's not found in the 11th Circuit pattern

10   jury instructions, and Government's requested number 20, which

11   has to do with investigative instructions.   That, likewise, is

12   not found in the 11th Circuit pattern jury instructions.

13             THE COURT:   Why don't we take those up one at a time.

14             The first concerns the definition of "torture."

15             MR. GRAVELINE:   Yes, Your Honor.

16             We believe that our proposed jury instruction contains

17   all of the elements that are necessary to instruct the jury on

18   torture, to include the definition of physical pain and

19   physical suffering.

20             What the defense has done is taken an excerpt of a

21   Department of Justice internal memorandum, the Bybee memo,

22   which has since been rescinded with another Department of

23   Justice memorandum, and the definition contained here and

24   offered here was expressly rejected in that subsequent memo.

25             What the Government has done is gone back to either

**October 27, 2008**

## Barnett - Cross

1    the dictionary definitions or the law, case law in this area to

2    craft what we have proposed and we don't believe there

3    necessarily needs to be a definition for "torture" as proposed

4    by the defense.

5              The concept that this, that the term "torture" should

6    be reserved for more extreme or than just your usual physical

7    abuse is contained in the first paragraph of page 18, I

8    believe, of proposed instruction 14, which states "The term

9         'torture' is usually reserved for extreme, deliberate and

10        unusually cruel practices," and the severity of the

11   intended  pain and suffering is the distinguishing

12   characteristic of torture under 18 USC 2340A.

13             Both of these concepts are found straight from Senate

14   report.  The first sentence comes straight from the Senate

15   report when talking about the Convention Against Torture, the

16   ratification of that.  The second sentence comes from Zubeta

17   (ph.) versus Ashcroft, the 3rd opinion in 2003.

18             We believe that instruction gives the defense exactly

19   what they're looking for here, some type of bar that sets

20   torture above just your usual physical abuse, and it's

21   something more elevated than just your typical beating or

22   physical abuse that might occur in some other case.

23             THE COURT:  Mr. Caridad, what does the Government's

24   proposed language on page 18 not have that you want the

25   definition to include?

**October 27, 2008**

## Barnett - Cross

1            MR. CARIDAD:   Page 18 Your Honor?

2            THE COURT:   Correct.

3            MR. CARIDAD:   The instruction I have from the

4    Government on page 18, I have instruction number 15 on page 18.

5            THE COURT:   Instruction number 14 appears on page 18.

6            MR. CARIDAD:   I must have a different proposed, but it

7    is instruction number 14?

8            THE COURT:   Correct.

9            MR. CARIDAD:   It does not contain our request that

10   distinguishes torture from cruel, inhuman or degrading

11   treatment, and that is found in our requested instruction on

12   page 2 of our pleading, and support for that is at 8 CFR

13   208.818.   Our paragraph reads "Torture is an extreme form of

14       cruel and inhuman treatment and does not include lesser

15       forms of cruel, inhuman or degrading treatment or

16       punishment that do not amount to torture."

17           That serves to distinguish torture from cruel, inhuman

18   or degrading treatment.   That's why we believe our request

19   distinguishes those two is appropriate.

20           The Government's instruction goes a little bit towards

21   that.   It says "The term 'torture' is usually reserved for

22       extreme, deliberate and unusually cruel practices," but we

23   think our statement, which is actually found in the Code of

24   Federal Regulations, that implemented the Convention Against

25   Torture should be given.

**October 27, 2008**

## Barnett - Cross

1          THE COURT:   Well, there are various ways of defining

2     it.   Why isn't the defendant's way an appropriate way of

3     defining it?

4          MR. GRAVELINE:   If the defendant is talking about his

5     definition being "Torture is an extreme form of cruel and

6          inhuman treatment and does not include the lesser forms,"

7     if he's talking about the CFR citation, we have no objection to

8     the CFR.   Our objection goes to the whole Bybee --

9          THE COURT:   I'm sorry.   What's the CFR citation?

10          MR. GRAVELINE:   The CFR citation is very close to what

11     we propose.   It's "Torture is an extreme form of cruel and

12          inhuman treatment and does not include lesser forms of

13          cruel, inhuman and degrading treatment or punishment that

14          do not amount to torture."

15          We think that that's very similar to what we've

16     already drafted, but if the Court prefers to lift that exact

17     language from the CFR and use it as opposed to the way we

18     drafted it, we have no objection.

19          THE COURT:   What's wrong with the paragraph that

20     follows that also cites to the Code of Federal Regulations?

21          MR. GRAVELINE:   I believe that that is very similar to

22     the paragraph we already have up above that talks about

23     specific intent.

24          This is on the first page of the proposed instruction

25     14.   It says "Specific intent to inflict severe physical pain

**October 27, 2008**

## Barnett - Cross

1          and suffering means to act with intent."

2               We took that right from the case law, Pierre versus

3  Attorney General of the United States, which is a 3rd Circuit

4  en banc opinion as of 2008.   This is the latest case law on

5  specific intent to torture, Pierre versus the Attorney General

6  of the United States.

7               THE COURT:   How about the under color of law?

8               MR. GRAVELINE:   We have actually asked for the exact

9  same pattern instruction.   That is pattern instruction 8 of the

10  deprivation of civil rights.   That's found on the second page

11  of proposed instruction 14.   We believe we're actually asking

12  for the same language there.

13               THE COURT:   Oh, I see.   And the "incidental to"?

14               MR. GRAVELINE:   The "incidental to lawful arrest," the

15  way we read that, it's an affirmative defense, not an element

16  of the case, and we would point the Court to United States

17  versus Klose (ph.), which 251 F.3d 941.   It's an 11th Circuit

18  case From 2001 which discusses the statutory interpretation of

19  what is an element, as opposed to an affirmative defense,  and

20  because the language in 2348 uses this as a parenthetical in

21  the actual statute, we believe that that is an affirmative

22  defense in this case, Your Honor, not an element.   It's

23  actually --

24               THE COURT:   You technically don't disagree with the

25  language "incidental to" that the defendant is proposing p.

**October 27, 2008**

## Barnett - Cross

1          MR. GRAVELINE:  What we're suggesting, it's not an

2   element.

3          THE COURT:  Where would you put it?  How would you say

4   it?  You don't disagree with the substance.  You're just saying

5   it's the defendant's burden.

6          MR. GRAVELINE:  We're saying it's not an element we

7   need to meet.

8          THE COURT:  Correct.  Where would it go.

9          MR. GRAVELINE:  We believe it's already in there when

10   we define "torture" up above in the second paragraph.  It says

11          "Torture means an act committed by an person acting

12       under color of law specifically intended to inflict severe

13       physical pain and suffering other than pain and suffering

14       incident to lawful sanctions."

15          So it's in the definition already, but it's just in a

16   parenthetical.  It's just not an element of the crime of

17   torture, proposed instruction 14.  It would not be delineated

18   as an additional element that the Government would have to

19   meet.  It's an affirmative defense.

20          THE COURT:  So you already have it in the definitions.

21   You just don't have it in as complete a way as the defendant

22   would like.

23          MR. GRAVELINE:  Well, the defendant's suggestion is

24   it's an actual element of the offense.  It would be a fifth

25   element of this offense.  We do not believe it's a correct

**October 27, 2008**

## Barnett - Cross

1    statutory interpretation.

2            THE COURT:   I agree with you.   I don't agree that is

3    an element of the offense.   The question is is the

4    parenthetical in your proposed instruction sufficient to convey

5    that meaning.

6            MR. GRAVELINE:   Well, as far as the defendant's

7    suggested language, we think that should be a separate

8    instruction all together and be labeled as "This is an

9        affirmative defense by"  -- I'd have to take a look and

10   rework some language to say "This is an affirmative defense by

11       the defense."

12           THE COURT:   You already have it in your parenthetical.

13   You have incorporated it in your definition of the term  The

14   question is is that incorporation sufficient to convey the

15   meaning of incidental to lawful sanctions.

16           MR. GRAVELINE:   The only thing we would ask in

17   addition to the defense's proposed language is to identify it

18   as being an affirmative defense, as opposed to an element.

19           So, if we're going to add this paragraph in that the

20   defense is asking for out of the CFR, into proposed instruction

21   14, we would ask for an additional sentence that, basically,

22   identifies it, "This is an affirmative defense," and at this

23   point, to be quite honest, there has been no evidence that any

24   of the actions that were taken were incident to lawful

25   sanctions by the Liberian government.

**October 27, 2008**

## Barnett - Cross

1    MR. CARIDAD:  Judge, the Government is the one who

2    presented evidence on this issue in their case in chief.  I

3    assume that they did that because they thought it was an

4    element of the offense.  I assumed it's an element of the

5    offense.  I know the Court disagrees.  I do not want it labeled

6    as an affirmative defense when we have not put it forward as an

7    affirmative defense.

8         THE COURT:  I would like to see a statement added --

9    the Government already has the parenthetical that says "other

10        than pain and suffering incidental to lawful sanctions,"

11    but it doesn't define it, and so I think the second sentence

12    that the defendant proposes in defining "lawful sanctions"

13    should appear right after that statement.

14             If you bothered to put the parenthetical in to say

15             "It's not this," then let's give the jury a definition

16    of what "lawful sanctions" includes and that's in the

17    defendant's proposed.  We don't have to call it an affirmative

18    defense.  It's not one of the elements.

19        MR. GRAVELINE:  Okay.  Understood, Your Honor.

20        THE COURT:  Mr. Caridad, why isn't "under color of

21    law" already dealt with?

22        MR. CARIDAD:  I believe the definitions are identical.

23        THE COURT:  All right.

24             So then what remains is whether to add the additional

25    language with respect to torture and the torture being an

**October 27, 2008**

## Barnett - Cross

1   extreme form of cruel and inhuman treatment.

2            I think if we look to page 18, "The term 'torture' is

3      usually reserved for extreme, deliberate and unusually

4      cruel practices."

5            We can add "The term 'torture' is usually reserved for

6      extreme, deliberate, inhuman and unusually cruel practices"

7   to incorporate the inhuman aspect of the defendant's proposed.

8            MR. CARIDAD:   Judge, I'm sorry.   The point I'm making,

9   Judge, is that there is torture, on the one hand, is an extreme

10  form of cruel and inhuman treatment, and then there are lesser

11  forms, such as cruel, inhuman and degrading punishment.   I

12  think that may be the best way to make that distinction.

13           THE COURT:   "Torture is usually reserved for extreme,

14     deliberate and unusually cruel practices."   That's what the

15  Government has in its proposed.   You want me to do what?

16           MR. CARIDAD:   Add what I proposed --

17           THE COURT:   "Torture does not include lesser forms of

18     acts that do not amount to torture"?

19           MR. CARIDAD:   No, "lesser forms of cruel, inhuman or

20     degrading treatment or punishment do not amount to

21     torture."

22           THE COURT:   It makes no sense.   "Torture does not

23     include A, B and C that doesn't amount to torture."

24           MR. CARIDAD:   Well, it's the CFR, Judge.

25           THE COURT:   Well, I'm not saying they are the -- if

**October 27, 2008**

**Barnett - Cross**

1    I'm instructing the jury in a way that's meant to assist them,

2    how can I say "Torture is not A, B and C that doesn't amount to

3        torture"?

4            MR. CARIDAD:   "Torture is an extreme form of cruel and

5        inhuman treatment and does not include lesser forms of

6        cruel and inhuman or degrading treatment."

7            I mean, the jury is going to have to make a

8    distinction and what this tells them is that it's an extreme,

9    which is in the Government's proposed instruction, but that's

10   all it says about it.   It doesn't distinguish it from anything

11   else, and the CFRs, and, actually, the Convention Against

12   Torture itself, makes the distinction.   You have torture on the

13   one hand and lesser forms of punishment which the CAT and CFR

14   itself calls cruel, inhuman or degrading treatment.   It just

15   serves to emphasize how torture must be such an extreme thing.

16           THE COURT:   Why don't I take the Government's first

17   sentence and modify it as follows:   "The term 'torture' is

18       usually reserved for extreme, deliberate and unusually

19       cruel practices, rather than lesser forms of cruel, inhuman

20       or degrading treatment or punishment."

21           MR. CARIDAD:   That did not amount to torture.

22           THE COURT:   That makes no sense.   "Torture is A, B and

23       C that doesn't amount to torture."   I don't think we speak

24   that way.   I don't.

25           MR. CARIDAD:   The Court's suggestion is fine.

**October 27, 2008**

**Barnett - Cross**

1        THE COURT:   "Rather than lesser forms of cruel,

2     inhuman or degrading treatment or punishment."

3          Any objection from the Government?

4        MR. GRAVELINE:   No, Your Honor.

5        THE COURT:   The next sentence proposed by the

6  defendant, "In order to constitute torture, an act must be

7     specifically intended to inflict severe physical pain and

8     suffering."  I think that's already there in the

9  Government's proposed.

10       MR. GRAVELINE:   We believe it is.

11       THE COURT:   It's the very next sentence.

12       MR. CARIDAD:   The only addition we have is "An act

13    that resulted in an unanticipated or unintended severity of

14    pain and suffering is not torture."

15       THE COURT:   Isn't that already -- where was it you

16  read that?

17       MR. GRAVELINE:   The first paragraph after the

18  elements.

19       THE COURT:   Right.  "Specific intent to inflict means

20    to have the intent."  So the intent is there.

21       MR. CARIDAD:   What my sentence does, it distinguishes

22  that in certain circumstances you may have a result that is not

23  anticipated.

24       THE COURT:   We could add to the sentence on page 17,

25       "An act that results in unanticipated or unintended pain

**October 27, 2008**

## Barnett - Cross

1    and suffering is not torture."  That seems to go

2  hand-in-hand with the concept of intent.

3          MR. GRAVELINE:  Yes, Your Honor.

4          THE COURT:  What else is missing?  I think we've

5  addressed everything else in your proposed, Mr. Caridad.

6          MR. CARIDAD:  I believe that does address my requested

7  instructions, Your Honor.

8          THE COURT:  Now, you had other requests.  Let me go

9  back to those.  What were they?

10          Instruction number 12 on conspiracy does not include

11  the object of the conspiracy.

12          I'll hear from the Government.

13          MR. GRAVELINE:  Your Honor, instruction number 12 lays

14  out the elements of conspiracy.  No where in the pattern

15  instructions of the 11th Circuit or any case law does it

16  require that the Government prove the motive for the

17  conspiracy.  That's, essentially, what defense is asking, is

18  that motive be inserted as one of the elements of the acts of

19  the conspiracy.

20          By putting in what has been put forth in the speaking

21  Indictment to assist the defense in preparing for a defense in

22  this case, what they're looking to do is just insert motive as

23  an element of the crime of conspiracy.  So we would object to

24  that.

25          MR. CARIDAD:  Judge, I didn't insert anything.  This

**October 27, 2008**

## Barnett - Cross

1  is paragraph 3, the object of the conspiracy, and that's the

2  way I tried the case.  If something was not intended to

3  preserve or protect or --

4          THE COURT:  Why couldn't we have it as part of the

5  interrogatory to the jury?  "Do you find that the object -- if

6          your answer is 'Yes' or 'Guilty,' do you find the object

7      of the conspiracy was," and then have them answer "Yes" or

8  "No."

9          MR. CARIDAD:  Our position is if they answer "No,"

10 they find my client not guilty of the conspiracy.

11         THE COURT:  If they answer "No," we can take up the

12 issue afterwards, but we know what the jury's decision is.

13         The Government saying there is no authority you cite

14 for the proposition that the object of the conspiracy is part

15 of what the Government must prove and that I must charge the

16 jury.

17         You're saying it is.  "Otherwise, why did they put it

18     in the Indictment?"

19         MR. CARIDAD:  Yes, I have cited numerous cases that

20 say if the Government charges one thing, they've got to prove

21 it.  If they don't, then they have amended the Indictment.

22         THE COURT:  Why isn't that addressed by having the

23 jury answer "Yes, I had find the object of the conspiracy" --

24 we had the issue as to the alleged victim the Government put

25 on, whether the acts that he testified about were related to

**October 27, 2008**

## Barnett - Cross

1    the object of the conspiracy.

2            Right, Ms. Rochlin?

3            MS. ROCHLIN:   Your Honor, we did address that in part

4    of the defendant's rule 29 as a factual matter, but that was

5    without conceding --

6            THE COURT:   I'm not saying you are conceding it, but

7    clearly there was a question whether that last witness, if the

8    jury believed he was tortured, whether that torture was related

9    to the object of this conspiracy as charged.   Right?

10           MS. ROCHLIN:   The --

11           THE COURT:   The Government argued "Look at the

12           circumstantial evidence.   He didn't know why he was being

13           held."

14           MS. ROCHLIN:   The Government argued in the

15    alternative, Your Honor.   Our first point was that we disagreed

16    with Mr. Caridad's legal proposition and then as an additional

17    factual matter, we noted for the Court an additional way to

18    resolve the issue.   It is our view circumstantial evidence

19    exists to show that what happened to Mr. Kamara, victim number

20    7, is consistent with what happened to all of the other victims

21    in this case.

22            Having said that, the Indictment alleges all sorts of

23    things that are not, in fact, elements of the offense, and

24    that's just as true for the acts in furtherance of the

25    conspiracy which need not be made elements of the offense.   In

## October 27, 2008

## Barnett - Cross

1   fact, the law with respect to acts in furtherance of the

2   conspiracy is quite the contrary of what Mr. Caridad proposes.

3          We could fail to prove a single one of the acts in

4   furtherance of the conspiracy.  The jury could still convict on

5   the conspiracy we have charged, and it's the position of the

6   United States just as we need not prove any one of the acts in

7   furtherance of the conspiracy, we need not prove the object of

8   the conspiracy which goes to motive, and there is abundant law

9   that motive is not an element of a criminal offense.

10  Therefore, we continue to object to what Mr. Caridad is

11  proposing.

12         MR. CARIDAD:   Judge, the problem is the Government,

13  and even the Court at one time ruled, that evidence was

14  admissible because of this very object alleged in the

15  conspiracy, that it was a broad conspiracy to keep Charles

16  Taylor in power so they tortured their soldiers so the soldiers

17  will be tough enough to torture other people.

18         That is a broad reading of what the case is about and

19  it even guided the Court in admitting evidence.  It guided me

20  in questioning people.

21         They cannot put this in there now so they can get in a

22  lot of evidence they normally would not have gotten and then

23  shrink back to say "No, it was never an element of the

24     offense."

25         Why was it there?  It didn't help me to do anything.

**October 27, 2008**

## Barnett - Cross

1  It made it difficult for me to defend the case.  This is an

2  element of the offense they charged and it has to be proved

3  beyond a reasonable doubt, we believe.

4          MS. ROCHLIN:  Your Honor, with all due respect I think

5  Mr. Caridad is mixing apples and oranges.  What may be properly

6  included in an Indictment and what may be properly admissible

7  during the course of a trial as relevant evidence is different

8  from an element of the offense.

9          All of these things may be properly proved.  They may

10 or may not be included in the Indictment.

11         Again, we submit it's analogous to the acts in

12 furtherance of the conspiracy, not one of which we need prove,

13 not one of which is an element of the offense, although they

14 remain in the Indictment.

15         So the defense's attempt to suggest that just because

16 it's in the Indictment, it somehow becomes an element of the

17 offense is incorrect.

18         THE COURT:  I think the Government is right,

19 Mr. Caridad.  I don't think the object of the conspiracy is an

20 element the Government has to prove.

21         I'm looking at the law right now and I'm not finding

22 anything that would say that.  If you find something that does,

23 let me know this afternoon, if you would, but I'm not aware and

24 I think the Government is correct, particularly -- I mean,

25 we're looking at the standard instruction and it's not there.

**October 27, 2008**

## Barnett - Cross

1        The next point you had.

2            MR. CARIDAD:  Your Honor, I objected to Government

3    instruction number 9 having to do with persons not on trial.

4            THE COURT:  Oh, that's right.

5            MR. GRAVELINE:  It is correct, Your Honor, that this

6    is not found in the 11th Circuit pattern jury instructions.

7    This came from the 2nd Circuit.  We believe it's good law and

8    also addresses any concerns that the jury might have about "Why

9        aren't other co-conspirators on trial here with the

10       defendant in this case?"

11           MR. CARIDAD:  Judge, I think it's dangerous to tell

12   the jury what they might or might not speculate about.  So I

13   would object to this.  It's not in the pattern.  The 11th

14   Circuit has not found it fit to authorize this instruction.  I

15   don't think the Court should give it.

16           MR. GRAVELINE:  I don't think it's a problem that we

17   tell them not to speculate about something.  They're just told

18       "That's not what your concern."

19       This is exactly what jury instructions are about,

20   telling the jury what is the proper inferences they can take or

21   what they should not be speculating about.

22           THE COURT:  I think it's a fair instruction.  It's not

23   one I customarily give because I don't think the parties ever

24   proposed it and it's not in our standard instructions, but it's

25   a correct statement.  They're not to speculate on who else is

**October 27, 2008**

## Barnett - Cross

1   not here.

2           MR. CARIDAD:  I don't know it is a correct statement

3   of the law.

4           THE COURT:  If you find any law that says it's

5   incorrect, let me know and I won't read it.

6           MR. CARIDAD:  Okay.

7           Judge, my next objection had to do with investigative

8   techniques for the same reason I argued as to the previous

9   instruction.

10          THE COURT:  What's the number?

11          MR. CARIDAD:  21.

12          THE COURT:  21?

13          MR. CARIDAD:  No, 20.  I'm sorry.  20

14          MR. GRAVELINE:  Once again, Your Honor, this is

15  something that isn't found in the 11th Circuit pattern jury

16  instructions.  It is found in some pattern modern Federal jury

17  instructions and has been given in the 4th Circuit in cases.

18          We believe it's a correct statement of law.  Once

19  again, there's no requirement that either side produce some

20  certain type of evidence.  As the Court has already instructed,

21  the --

22          THE COURT:  I'm sorry.  Did we hear testimony and

23  argument that the Government did not use specific investigative

24  techniques?

25          MR. GRAVELINE:  Didn't record the defendant's

**October 27, 2008**

**Barnett - Cross**

1  statement.   They asked some of the FBI witnesses, "You weren't

2      asked to do other investigative techniques other than do

3      measurements."

4          THE COURT:  All right.

5          I'm not sure it's a correct statement to say that "Law

6      enforcement techniques are not your concern."  If law

7  enforcement techniques are not the concern of the jury, then

8  none of that evidence should come in.

9          MR. GRAVELINE:  Your Honor, we would be perfectly fine

10  if we delete that sentence out of the instruction.

11          THE COURT:  I have modified proposed instruction 20.

12  I'll hear from counsel once you've seen it.

13          MR. GRAVELINE:  The Government is fine with the

14  Court's proposed instruction number 20, Your Honor.

15          MR. CARIDAD:  That's fine.

16          THE COURT:  You're next objection, Mr. Caridad.

17          MR. CARIDAD:  I think that was it, Your Honor.

18          The Court did understand I was asking for a different

19  instruction, the definition of "torture," than the Government.

20          THE COURT:  I think I've incorporated most of your

21  definition.

22          MR. CARIDAD:  The definition I was requesting was one

23  from the Bybee memo.

24          THE COURT:  I have added various sections that you

25  requested.

**October 27, 2008**

## Barnett - Cross

1          MR. CARIDAD:   Perhaps I could pass it up to the Court.

2    It's found in my proposed instruction.   It defines "torture" as

3    it must rise to a high level, a level ordinarily associated

4    with serious physical condition or injury, such as death, organ

5    failure or serious impairment of body functions.

6          MR. GRAVELINE:   Your Honor, that was the language we

7    objected to as being rescinded.   That's the language taken from

8    what's called the Bybee memo, the memorandum that was presented

9    out of the office of legal counsel back in 2001.

10          THE COURT:   That was the memorandum that was receded

11    from

12          MR. GRAVELINE:   It was rescinded.   It's no longer the

13    definition used by the Legal Office of the Department of

14    Justice.

15          THE COURT:   The defendant's position is preserved.   I

16    will not give an instruction that relies upon that memorandum

17    as its authority.

18          I'd like to give you all a set of what I have before

19    you leave today so we're in agreement with the instructions.

20    I'm just making a few more changes to them

21          The font is all wrong.   It changes every time we make

22    a change to it.   We will get that straightened out so it looks

23    pleasing to the eye.

24          MR. CARIDAD:   Your Honor, I'm looking at one

25    instruction I overlooked.   If I could bring it up.

**October 27, 2008**

## Barnett - Cross

1          THE COURT:   Go right ahead.

2          MR. CARIDAD:   It has to do with proposed instruction

3    16, the Pinkerton instruction concerning Count VIII.

4          Count VIII is the 924(c) count and this instruction

5    says if he's found guilty of the 924 conspiracy count, he can

6    be also found guilty of Count VIII if the offense was committed

7    by co-conspirators.   But Count VIII, the allegation is

8    Mr. Emmanuel, himself, handled the gun that --

9          THE COURT:   I'm looking at Pinkerton for the

10   conspiracy.   That's not the one you're referring to?

11         MR. CARIDAD:   No, there are two Pinkertons.

12         THE COURT:   All right.   I'm there.

13         MR. CARIDAD:   Proposed instruction 16, Your Honor,

14   states that, the second paragraph, "So in this case with regard

15       to Count VIII, insofar as the defendant is concerned if you

16       have first found the defendant guilty of the conspiracy

17       as charged in Count II," which is the 924(c) conspiracy --

18       924 conspiracy -- "you may also find the defendant guilty

19       of the offense charged in Count VIII," which is the torture

20   of Dulleh, "even though such defendant did not personally

21       participate in such an offense."

22         Here the evidence is and the Government's allegation

23   is my client did personally participate in holding that gun to

24   Dulleh's head.   So I don't think there's any place for this

25   Pinkerton instruction.

**October 27, 2008**

**Barnett - Cross**

1           MR. GRAVELINE:  That's correct, there was evidence

2    that the defendant did hold a gun to Mr. Dulleh's head, but

3    there was also evidence Benjamin Yeaten also held a gun to his

4    head at that time.  That's why we believe the Pinkerton

5    instruction would still be included as toward Count VIII

6    because --

7           THE COURT:  In the event the testimony with respect to

8    the defendant holding the weapon was not believed.

9           MR. GRAVELINE:  Exactly.

10           THE COURT:  I would I asked my courtroom deputy to

11    make copies for you and to clean it up a little bit.  I took

12    out much of the text that will not be read.  I know you're

13    anxious to go and continue preparing your closing.  I would

14    like you to take a look at this so we don't have any last

15    minute problems or to minimize those issues.

16           How long for closing argument?  An hour and a half

17    each side?

18           MS. ROCHLIN:  Would you go for two and a half, Your

19    Honor?

20           THE COURT:  Certainly.

21           Mr. Caridad.

22           MR. CARIDAD:  I won't use that much, but that's fine

23    with me.

24           The only thing I've noticed over the years, Your

25    Honor, sometimes the Government in its first closing does not

## Barnett - Cross

1   speak for a very long time and then its rebuttal is much longer

2   than its initial.

3           I would ask the Court to impose a rule that the

4   rebuttal should not be longer.  It should be much shorter than

5   the initial argument.

6           MS. ROCHLIN:  Your Honor, I'm not aware of any

7   requirement under law that says one portion of the Government's

8   closing should be shorter or longer than any other.  I think

9   it's a matter of our discretion to try to use our time as

10  effectively as possible.  You know, we could blow it by making

11  a bad first impression in our initial closing or choose to do

12  things in a way that might or might not be deemed to be

13  effective or appropriate in terms of what counsel might

14  perceive.

15          Our goal is to be effective in the time the Court

16  provides.  I would ask we be allowed to make our case initially

17  as we see fit and respond accordingly to what defense counsel

18  argues in their closing.

19          Frankly, Your Honor, I'm not entirely sure we're going

20  to use the entire two and a half hours.  I would rather not

21  have us get caught short.

22          I am also inclined to doubt between initial closing

23  and rebuttal closing, while they may not involve equal amounts

24  of time, I seriously doubt there will be a significant

25  imbalance between the two and we see no reason for the Court to

**October 27, 2008**

**Barnett - Cross**

1    police in this fashion.

2          THE COURT:  I don't believe I have ever imposed those

3    kinds of limits on first close and second close.  I won't do

4    that now.  I will give each side two and a half hours.  If the

5    defense wants to divide up your time, you are free to do that

6    as well.

7          Let's take about 10 minutes.  I have replaced the

8    Indictment with the Second Superseding each time since that is

9    what the jury will take back with them  Look at it one last

10   time with the defendant's objections noted.

11         I will give you about 20 minutes or so.

12         [There was a short recess at 2:20 p.m]

13         THE COURT:  Please be seated.

14         Are there any objections?

15         MR. CARIDAD:  Your Honor, at page 15 the Court has

16   inserted an alibi defense.  We didn't --

17         THE COURT:  I didn't insert it.  It was in the

18   Government's proposed.

19         MR. GRAVELINE:  I should have caught that, Your Honor.

20   We should take that out.

21         THE COURT:  All right.  What page is that.

22         MR. CARIDAD:  Page 15.

23         MR. GRAVELINE:  "Evidence has been introduced to

24      establish an alibi."

25         THE COURT:  All right.

**October 27, 2008**

## Barnett - Cross

1          MR. GRAVELINE:   The next two paragraphs.

2          MR. CARIDAD:   Then on page 17, the Court distinguishes

3    intent from motive and I think you might be getting close to

4    the definition of "intentional" in torture and you might be

5    cutting into that.

6          THE COURT:   That was the Government's proposed again.

7          MR. GRAVELINE:   We think that's fine, Your Honor.   We

8    believe the proposed jury instruction on motive is a correct

9    statement of the law.

10         MR. CARIDAD:   I think in this case it should not be

11   given because the definition of "torture," it has to be

12   intentional and unintended consequences are not, may not be

13   torture, and that comes awfully close to motive.   I don't think

14   the Court should give that instruction.

15         THE COURT:   Does the Government need the instruction?

16         MR. GRAVELINE:   We believe it does, Your Honor.   There

17   can be definitely a question between the difference between

18   what the defendant was specifically intending to do and motive

19   in this case.   We believe it is necessary in order to, you

20   know, delineate for the jury, you know, any issue of what the

21   defendant was doing, the reason for why the defendant was doing

22   the actions he was doing.

23         For example, if one of the jurors was, like, "Well, he

24      was just trying to, you know, protect himself" or this

25   would delineate what the person was specifically intending to

## October 27, 2008

## Barnett - Cross

1  do from the motive itself.

2          MR. CARIDAD:   The problem, Judge, that really affects

3  the definition of specific intent.   I just think it comes too

4  close to this definition.

5          THE COURT:   Well, I don't know that there's any law

6  that indicates this instruction is not appropriate when we're

7  dealing with intent.

8          If you want to take a look this evening and show me

9  some law that says to give this instruction when we're dealing

10  with an intent crime, we can look at it further.   I'm not

11  troubled by the giving of it.   I'm not sure it does what you're

12  concerned about.   If you are, just show me something.

13          MR. CARIDAD:   All right.

14          THE COURT:   Anything else?

15          MR. GRAVELINE:   On page 10, the sentence that the

16  Court added to the paragraph, "specific intent to inflict

17      severe physical pain and suffering" that the defense

18  requested, I think it's just an English thing.   "An act that

19      results in unanticipated and unintended severity of" --

20  would it be more correct to say "an act that" --

21          THE COURT:   "that results," I think I forget the

22  article "the."   I will do that.

23          MR. GRAVELINE:   Other than that, I don't see any other

24  additions or corrections, Your Honor.

25          THE COURT:   Mr. Caridad, anything additional?

**October 27, 2008**

## Barnett - Cross

1     MR. CARIDAD:  No, Your Honor.

2     THE COURT:  I'll see everyone at 9:30.

3     MR. CARIDAD:  Judge, I have one final request.  Could

4  we start at 10:00?

5     THE COURT:  I told the jury 9:30.

6     MR. CARIDAD:  The reason I say that, it will give me a

7  half-hour to digest everything that has happened here in the

8  trial.  I'm scared I'm going to be forced to start my closing

9  before lunch and then break and come back.

10    That won't happen, will it?  The Government, they're

11  going to take really two hours?

12    THE COURT:  Keep in mind, they need to leave at 4:30.

13  They need an hour and 15 for lunch.  They need breaks and you

14  all want a total of five hours for closing.  Otherwise, the

15  Government will come back on Wednesday and finish, perhaps, a

16  half-hour of rebuttal close at that time.

17    MR. CARIDAD:  My closing won't be interrupted by lunch

18  is my only concern.

19    THE COURT:  It may be unless you want to work through

20  and give them a late lunch at 1:30.

21    MR. CARIDAD:  I don't want them to be hungry when they

22  listen to me.  I don't want my closing to be interrupted.

23    MR. CARIDAD:  If the Government could go in the

24  morning and we could start when we get back after lunch --

25    THE COURT:  If we get back after lunch around 1:15,

**October 27, 2008**

## Barnett - Cross

1  does that give enough time for you to do your closing and the

2  Government its rebuttal before they leave at 4:40?

3  　　　　　MR. CARIDAD:  I don't know.

4  　　　　　THE COURT:  That's three and a half hours.  Right?

5  　　　　　MR. CARIDAD:  I expect to be talking, at the most, two

6  hours.

7  　　　　　THE COURT:  I could give them an early lunchbreak.  If

8  the Government starts at 9:30 and stops at 11:00, we could take

9  a very early lunchbreak, but the risk of having you all start

10  at 10:00 is that the Government will be giving the jury its

11  rebuttal closing argument, or part of it, Wednesday morning --

12  　　　　　MR. CARIDAD:  I prefer to take an early lunch then.

13  　　　　　THE COURT:  All right.

14  　　　　　MS. HECK-MILLER:  Your Honor, with regard to exhibits,

15  I don't know if the Court wants to go over what all the

16  admitted exhibits are.  We have been keeping careful exhibit

17  lists.  We can rely on our lists.  I don't think Mr. Caridad

18  has a different list.  I want to make sure before the jury gets

19  exhibits that everybody is on the same page as to what exhibits

20  have been admitted.

21  　　　　　THE COURT:  That's a prudent thing.  I think you

22  should look at the list and make sure everything is there that

23  needs to be there and you are all in agreement and you give my

24  courtroom deputy the final exhibit list.

25  　　　　　MS. HECK-MILLER:  We will be looking at that tonight

**October 27, 2008**

**Barnett - Cross**

1    and I'll email it to counsel and have it for the record

2              THE COURT:   Have a good evening.

3              MS. HECK-MILLER:   You, too, Judge.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**October 27, 2008**

1        C E R T I F I C A T E

2           I hereby certify that the foregoing is an accurate

3    transcription of proceedings in the above-entitled matter.

4

5    11/14/08                        _____
          DATE                       BARBARA MEDINA

6                                    Official United States Court Reporter
                                     400 North Miami Avenue, Suite 12-2
7                                    Miami, FL  33128 - 305.523.5518
                                                (Fax) 305.523.5519
8                                    Email:   barbmedina@aol.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

ability 38:25 102:11,16
able 38:13 80:11 87:25 91:16
above-entitled 135:3
absence 92:1 94:22
absent 92:5
absenting 93:25
Absolutely 18:16
abundant 120:8
abuse 107:7,20,22
accept 57:14,16
accepted 57:8
ACCESS 1:25
accuracy 73:14
accurate 71:18 73:16 82:23,24
135:2
accurately 7:23
accused 96:12,16
acknowledged 94:22
acreage 20:24
act 90:17 110:1 111:11 116:6,12
116:25 131:18,20
acting 111:11
action 94:9
actions 112:24 130:22
acts 99:11,17 106:1 114:18
117:18 118:25 119:24 120:1,3
120:6 121:11
actual 14:2 93:1 100:12 105:22
110:21 111:24
add 112:19 113:24 114:5,16
116:24
added 113:8 124:24 131:16
addition 100:6 112:17 116:12
additional 78:22 97:17 103:10
111:18 112:21 113:24 119:16
119:17 131:25
additions 99:3 131:24
address 4:9 97:23 98:9,23,25
103:6 104:15 117:6 119:3
addressed 117:5 118:22
addresses 122:8
addressing 102:15 103:5,13
adjourn 98:12
administration 105:23
administrative 4:7 94:10
administrator 43:19,25 46:6
admissible 120:14 121:6
admitted 8:4 56:6 58:13 61:23
133:16,20
admitting 120:19
advice 44:1 96:21,22,24
advise 96:9 97:9
advised 84:13
affidavit 90:11 93:2,9
affirmative 110:15,19,21 111:19
112:9,10,18,22 113:6,7,17
afternoon 86:8,19 87:24 93:9
98:10,20 103:16 121:23
age 22:10
agent 6:5,6,10,14 19:6,8,23 20:5
20:7 21:7 30:9,11 33:4,25 70:1
70:7,7 75:20,24 76:21 77:25
78:6 79:7 82:9 85:9
agents 71:7,8 76:7 78:18 79:2,3
79:5 91:15
ago 32:5
agree 112:2,2
agreement 125:19 133:23
Agustine 3:4 50:2,4
ahead 56:21 93:3 96:5 126:1
air 59:15
airline 37:22
Alexander 88:2
alibi 129:16,24
allegation 126:7,22
alleged 118:24 120:14

alleges 101:17,22 119:22
allow 79:5 88:16 90:4 91:11 92:4
92:18
allowed 29:16 90:25 128:16
allowing 91:23,24
alternative 88:16 119:15
ALTONAGA 1:13
amend 102:11,16 103:5,13,20
amended 101:21 118:21
amendment 102:20 103:23
104:2
AMERICA 1:4
Amos 2:25 41:3,5,14
amount 108:16 109:14 114:18
114:20,23 115:2,21,23
amounts 128:23
analogous 121:11
and/or 100:18 101:4 102:24
answer 41:8 68:10,14 79:19 95:8
96:2,7,11 102:13 103:8 118:6
118:7,9,11,23
anticipated 116:23
anxious 127:13
anybody 36:12 45:14,23 49:7
61:3 69:20 89:5
anymore 63:8,11,14
apologize 5:1
apparent 101:19
apparently 101:19
appear 19:16,17 20:3 113:13
appearance 76:4 92:12 94:15
APPEARANCES 1:16
appeared 19:19 76:22
appears 90:11 108:5
apples 121:5
applicable 98:7
application 93:17
applies 100:19 102:2
apprehension 92:18
appropriate 108:19 109:2
128:13 131:6
appropriately 102:18
appropriations 38:17
approximately 65:5 70:10 72:8
72:18
April 64:5,9,13 70:10 89:17
area 12:16 18:2,24 19:4 56:16
57:12 62:11 89:2 107:1
areas 7:4,24
argued 119:11,14 123:8
argues 128:18
argument 97:18 123:23 127:16
128:5 133:11
arguments 87:17 98:6,11,15
Armed 88:19
arrest 89:6 90:7,15,21 94:6
110:14
arrested 90:1
arrived 84:4,10 88:6
arriving 73:21
article 131:22
Ashcroft 3:25 107:17
aside 90:24
asked 40:13 74:25 79:18 80:14
104:21 110:8 124:1,2 127:10
asking 29:6 86:7 99:18 102:4,6,8
110:11 112:20 117:17 124:18
aspect 114:7
assess 93:5
assigned 6:8,10,18 26:2 67:23
69:15 70:7,9
assist 115:1 117:21
Assistant 7:6
associated 105:12 125:3
assume 94:16 113:3
assumed 113:4
assumes 29:4,19
assuming 92:16 102:18
attack 89:17

attempt 121:15
attitude 76:4
attorney 1:18,22 3:24 39:3 110:3
110:5
attorneys 38:21,22,24 39:2
96:21 98:6,9
Attorney's 72:25
ATU 84:6,11,14
August 26:24 32:11 44:25 71:23
71:25 72:6 73:18 74:2,15,20
74:22 75:2,24 76:10,21,23
77:14
Augustine 50:17
authority 91:11 92:5 94:23,24
96:6 103:12 105:21 118:13
125:17
authorize 122:14
available 94:7
Avenue 1:23 2:9 135:6
avenues 104:11
aware 94:24 121:23 128:6
awfully 130:13
A-m-o-s 41:14
A.F.P.D 2:2,3
a.m 5:6,11 7:13 8:5 16:12 21:5
21:17,23 27:23 35:16 36:18,22
40:7 41:2,7 43:7 46:13 49:11
50:1,6 52:21 55:24 56:1,3
62:20 68:25 69:25 75:22 76:19
78:4 85:1 87:5,22
A.U.S.A 1:17,18
a/k/a 1:8

**B**

B 114:23 115:2,22
back 9:20 11:17 12:8 13:19
29:25 44:9 51:1 53:11 66:20
66:21 75:4 92:22,24 102:4
106:25 117:9 120:23 125:9
129:9 132:9,15,24,25
bad 128:11
Baechtle 82:9
Bail 90:17
ban 29:3,12,23
banc 110:4
bar 107:19
BARBARA 2:8 135:5
barbmedina@aol.com 2:10
135:8
Barnett 3:12 77:25 78:2 85:3
Base 84:12,20
based 19:16 75:13 83:21 103:9
basically 20:16 112:21
basis 91:12 94:20
beach 74:17,18 75:3,8,16
beat 60:16,19 61:9
beaten 60:23 61:1 69:20
beating 107:21
Bedford 72:1,5,15 76:2
began 88:7
beginning 5:11 16:12 21:5,23
27:23 35:16 36:22 40:7 41:7
46:13 49:11 50:6 62:20 68:25
75:22 76:19 78:4 85:1 99:2
begins 4:5 97:15
BELFAST 1:8
believe 12:15 72:15 78:22 79:16
80:20 81:11 90:18 93:19 94:8
94:23 99:10,14,15 103:9 105:3
105:25 106:16 107:2,8,18
108:18 109:21 110:11,21
111:9,25 113:22 116:10 117:6
121:3 122:7 123:18 127:4
129:2 130:8,16,19
believed 119:8 127:8
Benjamin 73:20,25 127:3
best 114:12

beyond 121:3
big 18:14
Bill 77:25
bit 60:1 66:15 93:4 108:20
127:11
biweekly 53:1
blow 128:10
blurry 8:21
bodies 74:18 75:3,8
body 105:14 125:5
Bong 8:15,24 9:20 10:1,12 12:20
27:7 28:6 29:3,12 32:13,16,21
47:25 51:10,14,16 52:1
born 32:10 41:18,20,22 50:20,21
50:22,23
bothered 113:14
boy 32:12,15,19
boys 25:1
BR 19:6,22 30:10 33:1,24
break 86:19 132:9
breaking 76:15
breaks 132:13
bridge 7:17,24 8:9,15,24 9:4,5,7
9:11,12,13,20,22 10:1,2,4,8,13
12:1,1,2,16,21 13:5,7,8,12
16:22 18:1 19:3,10,10 22:15
28:19,21,25 29:3,17 30:3,13
33:9,10,12,15,16,17,20 34:4,6
34:8,10,12 44:16,18 45:18,21
47:25 82:2 84:5 85:5 89:17,21
bring 5:5 30:10 33:24 56:2 58:2
74:19 75:9 86:17 90:8,21
92:22,24 97:22 125:25
broad 120:15,18
broke 76:12 77:16
brought 38:3 39:6,10 57:17 88:5
93:14,15
Broward 6:17
build 71:1 74:24
building 10:24 11:7,8,12,13,14
11:17,18,24 12:7,10,11,12,12
20:1,9,10,14 25:20,22,24 26:1
30:16,17,19,20,20,21,22,24
31:1,8,10,13,19,21 32:2,5,22
32:24 56:17 88:20,21,22
buildings 18:25 19:19
bullet 19:1,4,17 20:3
burden 111:5
burned 62:15
bus 37:22
bushes 69:7,9
businesses 21:8
businessman 89:11,14,15
Bybee 94:23 106:21 109:8
124:23 125:8

**C**

C 99:8 114:23 115:2,23 135:1,1
calendar 35:10
call 50:2 57:12,13,20 74:19 75:4
75:9 86:3,4,6 113:17
called 125:8
calls 21:19 26:13 41:3 70:1
77:24 115:14
camera 8:19 9:10 10:10 11:7,25
12:2
camp 89:20,25
capital 13:19 14:2
car 65:23,24
care 39:4 100:7
career 77:4
careful 133:16
Caridad 2:3,15,17,19,21,23 3:1,3
3:9,11 5:4,12 7:7,11,15 8:1,6,8
8:11,17,18,25 9:1,7,9,15,17,21
9:24 10:3,6,14,16,20,22 11:3,9
11:11,19,21 12:4,6,8,9,15,18

12:23 13:1,14,16,17,20,22,24
14:4,7,9,20,22 15:1,4,9,12,20
15:22 16:1,4,8,9 17:5 21:6,14
21:19 22:1,6,22 26:15 27:18
27:20 29:4,19 35:17 36:15,23
37:4 40:4,25 41:3,8,10 46:8,10
49:12,22,24 69:23 70:1,6
75:18 76:20 77:22 85:15 86:2
86:14,20 87:9,21,24 93:7,8,15
93:19,22 94:18 95:2,11,15,19
95:23,24 96:1 97:20,24 98:2,3
100:1,5 101:7,15,17 102:7,20
103:2,18,19 104:16,21 107:23
108:1,3,6,9 113:1,20,22 114:8
114:16,19,24 115:4,21,25
116:12,21 117:5,6,25 118:9,19
120:2,10,12 121:5,19 122:2,11
123:2,6,11,13 124:15,16,17,22
125:1,24 126:2,11,13 127:21
127:22 129:15,22 130:2,10
131:2,13,25 132:1,3,6,17,21
132:23 133:3,5,12,17
**Caridad's** 92:14 119:16
**CAROLINE** 1:18
caroline.miller@usdoj.gov 1:21
**carry** 66:21
**carrying** 100:7
**cart** 93:3
**case** 1:3 6:18 16:17,18,23 17:1,4
17:11 18:7 39:17 40:18,22
55:23 70:7,9,19 78:12 79:6
86:22 87:4,11,15,16 91:10,15
92:19 94:25 96:12,16 97:11
98:17,18 99:2 101:19 104:15
107:1,22 110:2,4,16,18,22
113:2 117:15,22 118:2 119:21
120:18 121:1 122:10 126:14
128:16 130:10,19
**cases** 6:1 79:4 92:21 118:19
123:17
**cassava** 42:8
**CAT** 115:13
**caught** 128:21 129:19
**cause** 93:2
**caused** 33:20
**CECILIA** 1:13
**cell** 57:2,5 58:7,9,21,22,23,24,25
59:2,3
**cells** 58:10,11,19 59:5
**center** 14:17,25 15:10,14
**certain** 7:4 116:22 123:20
**certainly** 91:10 94:10 104:23
127:20
**Certificate** 3:15
**certify** 135:2
**CFR** 108:12 109:7,8,9,10,17
112:20 114:24 115:13
**CFRs** 115:11
**chair** 37:3
**chairman** 25:5
**change** 52:24,25 53:1 63:21,22
64:2 100:22 125:22
**changed** 52:14
**changes** 104:19 125:20,21
**characteristic** 107:12
**characterize** 83:9
**charge** 57:13,18,20 58:3,8 62:1
62:2,4 103:15 118:15
**charged** 99:12 100:10,11,16,17
100:19,24 104:1 105:25 106:2
119:9 120:5 121:2 126:17,19
**charges** 100:12 118:20
**Charles** 1:8,9,9 6:19 29:2,11
34:17,18,20,23 54:20,21 59:14
59:17 68:7,8 105:21 120:15
**check** 58:4
**checkpoint** 9:3,5,6,19 10:13,19
10:24 11:15,23 12:11,20,22

**chevrons** 4:11
**chief** 113:2
**children** 23:2,8 42:2,3,4 51:7,8
81:9,16
**choice** 96:19,20
**choose** 128:11
**chooses** 95:19 96:8
**chose** 17:5
**chosen** 95:5
**CHRISTOPHER** 1:22
christopher.graveline@usdoj...
1:24
**Chuckie** 1:8 26:11,16,19 45:17
45:20,23 59:8,10,11,19,22
60:3,4,7,10,13,16,19,22,25
61:3,6,9,12 66:22,23,25 67:3
69:17,20 83:3,6,8,18,24 84:6
84:11,14,17,18 85:4,7 89:1,5
**Chuckie's** 84:20 88:10
**CID** 53:25 54:13
**circuit** 103:12 106:9,12 110:3,17
117:15 122:6,7,14 123:15,17
**circumstances** 116:22
**circumstantial** 119:12,18
**citation** 3:23 94:22 109:7,9,10
**citations** 103:16
**cite** 118:13
**cited** 118:19
**cites** 109:20
**citizens** 25:7
**city** 6:16 14:2,24
**civil** 110:10
**civilians** 44:1 89:9
**CJAs** 38:22,23
**clarify** 84:13
**clean** 24:21,22 127:11
**cleaned** 25:2
**clear** 31:15 70:22 84:16 96:10
**clearly** 119:7
**client** 86:5 87:10 88:4,25 96:1
118:10 126:23
**clip** 9:15,21 10:3,14 11:19 12:4
12:15,24 14:7,20 15:20
**clips** 7:18 13:23,25
**close** 23:13 44:2 49:20 59:12
86:23 109:10 129:3,3 130:3,13
131:4 132:16
**closer** 22:4 37:2 66:25
**closing** 87:16 97:18 98:6,11
127:13,16,25 128:8,11,18,22
128:23 132:8,14,17,22 133:1
133:11
**Code** 108:23 109:20
**colloquied** 95:1
**colloquy** 94:25
**color** 110:7 111:12 113:20
**come** 35:21 40:1 44:9 47:17,23
49:24 53:6,11 66:20,21 69:23
88:9 124:8 132:9,15
**comes** 97:10 107:14,16 130:13
131:3
**comfortable** 79:24
**coming** 7:20 27:10,14 28:4,6,9
28:18,21,24 30:2 44:16,18,20
44:22,24 46:19 47:3,7,10,14
47:20,21 48:12,20,22,25 49:3
49:20
**command** 54:1
**commander** 53:24 54:17,19,20
**commit** 99:6
**committed** 100:15,23 104:1
111:11 126:6
**commonly** 88:20
**communications** 20:20

**compel** 96:7
**complaint** 92:10,11 93:5
**complete** 79:15 80:11 111:21
**completely** 68:16 93:12,24
**Complied** 19:8,23 20:7 30:11
33:4,25
**compose** 77:17
**comprehensive** 17:7
**compulsory** 92:11
**conceding** 119:5,6
**concept** 105:14 107:5 117:2
**concepts** 107:13
**concern** 45:13 95:11 101:17
104:15 122:18 124:6,7 132:18
**concerned** 126:15 131:12
**concerning** 88:4 99:11 106:8
126:3
**concerns** 100:7 106:14 122:8
**conclusion** 92:20
**condition** 76:10 105:12 125:4
**conducted** 82:8
**conference** 4:3,5,9 103:15
**confront** 91:20
**Congotown** 74:17
**consequences** 130:12
**consider** 91:14 104:6
**consideration** 98:5 104:9
**consistent** 104:22 105:3 119:20
**conspiracy** 99:6,8,10,12 105:19
105:19 106:1,2 117:10,11,14
117:17,19,23 118:1,7,13,14,23
119:1,9,25 120:2,4,5,7,8,15,15
121:12,19 126:5,10,16,17,18
**constitute** 105:10 116:6
**Constitution** 55:12
**Constitutional** 96:13
**contact** 44:2
**contain** 106:7 108:9
**contained** 99:20 106:23 107:7
**containing** 104:24
**contains** 106:16
**contempt** 92:24
**CONTENTS** 2:12
**continue** 9:7 13:14,20 14:4 56:4
120:10 127:13
**continues** 99:14
**contrary** 96:24 120:2
**Convention** 105:5 107:15
108:24 115:11
**CONVENTIONS** 4:7
**conversation** 77:13
**convey** 112:4,14
**convict** 120:4
**convicted** 100:3
**copies** 127:11
**correct** 13:13 16:21,24 17:2,5,6
17:23,25 18:3,8 37:14 38:8,9
38:11,12 39:7 41:12 46:23
48:8 64:3 67:8,10,14 68:4
73:12 74:14 75:4,5,16,17,25
77:15 79:8,20 80:19 81:10,11
81:19,24 82:8,13,17,19,20
83:16,23 84:1,2,9,21 93:24
95:14 97:6 99:24 100:2,4
103:3 104:4 108:2,8 111:8,25
121:24 122:5,25 123:2,18
124:5 127:1 130:8 131:20
**corrections** 99:4 131:24
**correctly** 40:15 102:10,14
**corridors** 20:12,16
**counsel** 4:8 91:6,10 103:17
124:12 125:9 128:13,17 134:1
**counsel's** 92:9
**count** 99:6 100:3,9,10,13,16,17
100:18 101:4,8,11,17,20,23,23
101:24,24,24 102:2,2,5,12,18
102:22,24,25 103:11,20,22,24
126:3,4,4,5,6,7,15,17,19 127:5

**country** 6:22,24 7:1,3,5 14:1
39:7,10 50:24,24
**counts** 100:12,14,16 101:9,18
101:22,22 103:11,21 104:2,9
**county** 6:17 8:16,24 9:3,20 10:1
10:2,9,12 12:20 20:25 27:6,7
28:6,6 29:3,12 32:13,16 35:22
35:24 36:1 45:6 46:22,25
47:21,23 48:1 49:1 50:23,25
51:10,15,16,16,17 52:1 53:17
65:7,9,11,13,25 69:19
**course** 6:21 18:4 70:15 121:7
**court** 1:1 2:8 4:6,9 5:1,5,7 7:14
7:20 8:4 21:16,18,24 22:4
26:14 27:19 29:2,21 33:3
35:14 36:16 37:2 38:3,18
39:17 41:1 46:9,11 49:23,25
55:21,25 56:2,4 67:17 68:23
84:23 85:13 86:7,10,15,17,21
87:1,2,6,11,16,19,23 90:4,7,8
90:20,21 91:2 92:14,17,24
93:2,6,9,14,18,20 94:5,13,19
94:21,22 95:3,7,14,16,21,23
95:25 96:5,5,9 97:2,5,8,13,22
98:1,4,22 99:22,25 100:21
101:1,3,6,12,16 102:3,9,24
103:4,14,18,25 104:5,11,17,20
104:21,23 105:8 106:13
107:23 108:2,5,8 109:1,9,16
109:19 110:7,13,16,24 111:3,8
111:20 112:2,12 113:5,8,20,23
114:13,17,22,25 115:16,22
116:1,5,11,15,19,24 117:4,8
118:4,11,22 119:6,11,17
120:13,19 121:18 122:4,15,22
123:4,10,12,20,22 124:4,11,16
124:18,20,24 125:1,10,15
126:1,9,12 127:7,10,20 128:3
128:15,25 129:2,13,15,17,21
129:25 130:2,6,14,15 131:5,14
131:16,21,25 132:2,5,12,19,25
133:4,7,13,15,21 134:2 135:6
**courtroom** 1:25 5:6 55:24 56:3
87:5 97:25 98:21 127:10
133:24
**Court's** 95:2 98:24 115:25
124:14
**Court-appointed** 38:24 39:5
**cover** 38:13 74:7,8,12
**covered** 74:4
**co-conspirators** 122:9 126:7
**craft** 107:2
**crept** 103:11
**crime** 6:1 100:8,13,19 111:16
117:23 131:10
**crimes** 100:16,24 104:1,6
**Crime/Drug** 6:11
**criminal** 53:25 54:6 90:13 91:5
120:9
**cross** 16:11 27:22 40:6 46:12
47:25 62:19 75:21 84:25 91:20
91:21
**Cross-Examination** 2:16,20,24
3:2,6,10,14 46:11
**cross-examined** 96:18
**cruel** 107:10 108:10,14,15,17,22
109:5,11,13 114:1,4,6,10,11
114:14,19 115:4,6,14,19,19
116:1
**current** 37:10 54:23
**currently** 51:9
**custody** 94:10
**customarily** 122:23
**Customs** 82:10
**cut** 82:16,22
**cutting** 130:5

**D**

**Daf** 81:6
**daily** 38:4
**damage** 19:20 20:3
**damaged** 61:22 63:6,10,13,16
**dangerous** 122:11
**DATE** 135:5
**day** 14:14,15,15 18:2 24:21
25:14,15,17,18,19 38:4 46:7
53:18,19 65:17 66:19,20 73:24
79:15 80:12 88:22 98:12
**days** 18:2,4,5,6,6,9,15,19,21
43:4 53:2,4 93:19,20
**daytime** 67:2
**deactivated** 55:1,2,5,8
**dead** 74:18 75:3,8
**deal** 77:7 101:23 102:14,17,21
103:4
**dealing** 40:17 94:2 101:8 131:7,9
**deals** 99:7
**dealt** 113:21
**death** 99:13,16 105:13 125:4
**decapitate** 89:5
**decapitated** 90:1
**decision** 97:2,5 118:12
**deemed** 128:12
**defend** 121:1
**defendant** 1:11 2:1 38:14 90:1
94:25 95:8,10,12,22 97:1,4,7
100:15,23 103:25 109:4
110:25 111:21 113:12 116:6
122:10 126:15,16,18,20 127:2
127:8 130:18,21,21
**defendant's** 5:9 8:1 17:22 21:21
36:20 41:5 50:4 70:4 78:2
109:2 111:5,23 112:6 113:17
114:7 119:4 123:25 125:15
129:10
**Defender** 7:7 39:25
**Defenders** 38:21
**Defender's** 2:3 5:17,20,21,24 6:4
**defense** 3:21 7:12,13 8:5,6 21:19
37:21,23 38:17,20 39:14,18
40:20 41:3 70:1 77:24 90:25
91:18 94:13 97:10 98:3 99:25
101:6 104:13,20 106:20 107:4
107:18 110:15,19,22 111:19
112:9,10,11,18,20,22 113:6,7
113:18 117:17,21,21 128:17
129:5,16 131:17
**defense's** 112:17 121:15
**define** 104:22 111:10 113:11
**defines** 125:2
**defining** 109:1,3 113:12
**definitely** 91:24 92:7 130:17
**definition** 105:2,3,9,15 106:14
106:18,23 107:3,25 109:5
111:15 112:13 113:15 124:19
124:21,22 125:13 130:4,11
131:3,4
**definitions** 107:1 111:20 113:22
**degrading** 108:10,15,18 109:13
114:11,20 115:6,14,20 116:2
**delete** 99:22 124:10
**deleted** 104:9
**deliberate** 107:9 108:22 114:3,6
114:14 115:18
**deliberations** 97:15 98:8,16
**delineate** 130:20,25
**delineated** 111:17
**deliver** 89:2
**demolished** 18:25
**denied** 94:19
**department** 1:22 6:17 37:25
38:1 53:22 54:13,13 93:16
106:21,22 125:13
**depend** 66:3,5

**depends** 66:2
**depict** 7:23
**deprivation** 110:10
**deputy** 53:24 127:10 133:24
**describe** 24:24 37:18 76:4
**description** 3:20 81:5,5
**Descriptions** 4:4
**destroyed** 62:13,14
**detail** 75:13
**details** 75:15 76:14
**detain** 89:7
**detained** 26:12 45:24 76:8
**detention** 90:9
**determine** 86:6 93:3
**dictionary** 107:1
**difference** 39:14 105:1 130:17
**different** 34:2 61:17 63:20 73:20
79:4 81:13 108:6 121:7 124:18
133:18
**difficult** 121:1
**digest** 132:7
**Direct** 2:15,19,23 3:1,5,9,13 5:10
21:22 36:21 41:6 50:5 70:5
78:3
**directing** 39:17
**direction** 8:19 9:2,10 10:10
11:25 12:19 13:9,12,18
**directly** 12:14 73:24 91:20
**dirty** 24:25
**disagree** 110:24 111:4
**disagreed** 119:15
**disagrees** 113:5
**discovery** 5:25
**discretion** 128:9
**discuss** 55:23 87:4,13 98:17
**discusses** 110:18
**dismantling** 6:11
**dismiss** 102:5
**displaced** 44:20,21
**displayed** 26:5,9 45:9,12
**distinction** 114:12 115:8,12
**distinguish** 108:17 115:10
**distinguishes** 108:10,19 116:21
130:2
**distinguishing** 107:11
**DISTRICT** 1:1,1,14
**districts** 14:13
**divide** 129:5
**division** 1:2 54:6,7,8,10
**document** 62:5,7,9
**documentation** 6:2
**documents** 62:12 63:15,16
**doing** 37:16 42:15 87:8 96:5
99:6 130:21,21,22
**doubt** 121:3 128:22,24
**downtown** 15:24 16:5
**downward** 44:25
**Doyle** 82:9
**Dr** 55:18
**drafted** 109:16,18
**drafts** 103:10
**drop** 60:10
**dropped** 60:13
**drug** 6:12
**dry** 27:1,2 66:17
**due** 121:4
**Dulleh** 100:20 101:24 126:20
**Dulleh's** 126:24 127:2
**dunked** 82:12,15,21,22
**duties** 5:23
**duty** 57:22
**DVD** 7:17,21,23 8:10,23 9:8,16
9:23 10:5,15,21 11:2,10,20
12:5,17,25 13:15,21 14:6,8,21
15:3,8,11,19,21,25 16:3,7
**D.C** 1:23

**E** 135:1,1
**earlier** 103:10
**early** 86:16,21 133:7,9,12
**earn** 71:1
**easier** 104:7
**easy** 49:17
**eat** 23:17 42:12
**edo** 23:15,17 42:10
**edos** 42:8
**effective** 128:13,15
**effectively** 128:10
**either** 7:8 80:8 85:3 103:16
106:25 123:19
**elected** 34:18 43:22 46:5
**element** 100:23 106:5 110:15,19
110:22 111:2,6,16,18,24,25
112:3,18 113:4,4 117:23 120:9
120:23 121:2,8,13,16,20
**elements** 100:15 106:17 113:18
116:18 117:14,18 119:23,25
**elevated** 107:21
**eligible** 38:18
**eliminate** 105:22
**email** 1:20 2:5,10 134:1 135:8
**Embassy** 79:11 80:3,7
**Emmanuel** 1:9 6:19 95:4,15,18
96:7,12 126:8
**emotional** 76:10
**emphasize** 115:15
**employed** 5:16 6:4,15 37:5,6,7
**empty** 18:12
**en** 110:4
**enacted** 99:8
**enactment** 99:9
**ends** 26:25 27:3
**enforcement** 82:10 124:6,7
**English** 31:22 131:18
**enhancement** 99:14
**enjoy** 96:12
**entire** 52:8,10 128:20
**entitle** 128:19
**entitled** 7:17 38:5
**entrance** 58:3
**equal** 128:23
**error** 103:12
**especially** 103:9
**essentially** 117:17
**establish** 129:24
**evening** 131:8 134:2
**event** 127:7
**events** 18:7
**eventually** 45:3 71:14
**everybody** 49:3 50:13 133:19
**evidence** 3:19 8:2,5 17:21 19:7
29:5,20 56:6 58:14 88:4 92:5
98:5 112:23 113:2 119:12,18
120:13,19,22 121:7 123:20
124:8 126:22 127:1,3 129:23
**ex** 99:11
**exact** 81:5 109:16 110:8
**exactly** 39:16 59:4 72:8 107:18
122:19 127:9
**Examination** 2:15,17,19,21,23
3:1,3,5,7,9,11,13 5:10 16:11
21:4,22 27:22 35:15 36:21
40:6 41:6 46:12 49:10 50:5
62:19 68:24 70:5 75:21 76:18
78:3 84:25
**examine** 91:20,21
**examined** 96:18
**example** 38:10 130:23
**excerpt** 106:20
**exculpatory** 88:4
**excuse** 24:5 70:22 72:25 82:14
83:13
**excused** 21:16,17 36:17,18 41:2

**E** 

49:23 50:1 69:25 85:13 87:20
**Executive** 17:16,18
**exercise** 96:14
**exhibit** 3:21 7:12,13 8:1,5,7
58:14 133:16,24
**exhibits** 3:17,18 133:14,16,19,19
**exists** 119:19
**expect** 133:5
**expenses** 37:23 38:2,5,5,7,8,13
38:16 39:1,9,11,18,25 40:2,18
40:21
**experience** 19:16
**expire** 93:18
**expiring** 93:20
**expressly** 106:24
**extreme** 105:6 107:6,9 108:13
108:22 109:5,11 114:1,3,6,9
114:13 115:4,8,15,18
**eye** 125:23
**eyes** 48:6,7

**F**

**F** 135:1
**facing** 9:20 10:10,12 94:3
**fact** 37:12,13,18,20 88:21 91:4
92:15,21 93:1 94:1 119:23
120:1
**facto** 99:11
**facts** 29:4,19
**factual** 119:4,17
**fail** 120:3
**failure** 105:13 125:5
**fair** 40:20 95:17 122:22
**fairly** 7:23 18:12 79:16
**fairness** 91:23
**familiar** 20:14 23:20 42:17 70:11
78:8 104:23
**families** 88:8
**family** 22:23,25 26:2 42:1 43:13
43:14 51:1,3 53:14,15 66:19
89:19
**far** 18:4 23:22 24:3,6 42:20 43:1
52:2 67:13 73:16 92:10 112:6
**farm** 20:24 21:12 22:21 23:11,12
24:3,4,6,8,12,15,18 42:7,16
43:1,3,6,8 68:7
**farmed** 23:13
**farmer** 42:6 54:24
**farming** 22:18,19
**farms** 21:10
**farther** 60:1
**fashion** 129:1
**father** 51:4
**favor** 40:13
**Fax** 1:20 2:5,10 135:7
**FBI** 6:5,6,9,10,14 70:7 71:7 72:5
72:15 76:2,7 124:1
**February** 78:15,16 79:9 81:18
82:11,14,14,25 83:3,15,17,20
84:3,7,16 85:3
**Federal** 2:3 5:17,19,21,24 6:3
7:6 38:21 39:25 108:24 109:20
123:16
**fee** 38:4
**fees** 37:22,22 38:16,25 39:11,12
39:14
**female** 58:12,21,22 59:2
**fewer** 104:5,11
**fifth** 111:24
**fighting** 18:24 27:4,8 30:5,7
32:12,15,18,21 35:21,24 36:1
44:20 45:3,6 46:22,25 49:18
49:20
**file** 93:8
**filed** 90:12 104:24
**filmed** 14:10,11,14,15
**final** 73:8 93:8 132:3 133:24

**find** 88:15 90:4,19 93:12 99:16 118:5,6,10,23 121:22 123:4 126:18
**finding** 121:21
**fine** 23:8 46:18 63:1 92:10 97:21 115:25 124:9,13,15 127:22 130:7
**finish** 24:5 132:15
**finished** 64:21 68:10,11
**firearm** 100:7
**first** 41:14 51:21 52:14,16,17 55:16 63:23 64:5,9,14 71:25 76:5,11,12,15 78:8 89:16 93:13 100:14,22 102:9,13,17 105:16 106:14 107:7,14 109:24 115:16 116:17 119:15 126:16 127:25 128:11 129:3
**fishing** 22:18,19,21 23:11
**fit** 122:14 128:17
**five** 6:7 42:4 132:14
**FL** 1:19 2:4,9 135:7
**Flagler** 2:4
**flatbed** 81:6,7
**fled** 68:9,15 69:7
**flee** 69:2
**FLORIDA** 1:1,6
**focusing** 12:2
**follow** 86:1 87:1
**following** 16:1 99:3
**follows** 109:20 115:17
**follow-up** 76:14 97:17
**font** 125:21
**food** 43:10
**foodstuff** 66:21
**foot** 91:13
**footage** 20:24
**football** 83:1,4,6,8
**footnote** 99:21
**forced** 132:8
**forces** 10:25 27:5 88:19
**foregoing** 135:2
**forget** 131:21
**form** 81:6 99:16,20 105:6 108:13 109:5,11 114:1,10 115:4
**former** 59:13
**forms** 108:15 109:6,12 114:11 114:17,19 115:5,13,19 116:1
**forth** 94:16 100:12 101:9 103:21 103:22 117:20
**forward** 37:3 113:6
**found** 84:12 86:3 97:18 104:22 105:9 106:9,12 107:13 108:11 108:23 110:10 122:6,14 123:15,16 125:2 126:5,6,16
**four** 7:1 20:22 43:4 71:22 82:12 82:15 104:10
**fourth** 82:23
**frankly** 91:22,25 128:19
**free** 129:5
**freely** 44:4,5
**frequently** 25:12 76:12 77:16 89:21
**friends** 43:14,15 65:16
**front** 11:17,23 30:13
**fruit** 42:12
**full** 19:4 36:25
**functions** 105:14 125:5
**further** 16:10 21:3 27:20 35:13 40:24 46:10 49:9 68:22 69:22 75:19 76:17 77:23 90:24 131:10
**furtherance** 99:11 100:8 119:24 120:1,4,7 121:12
**F.3d** 110:17

---

**G**

**game** 83:4,6,8
**games** 83:1
**gas** 59:23 60:2 61:16 67:11
**gasoline** 59:24
**Gayetay** 3:4 50:2,4,8,17 56:8 62:22 63:2 67:19 69:2,23
**Gbalatuah** 41:19 89:18,25
**Gbarnga** 7:24 12:24 13:4,5 16:22 51:10,14,25 52:2,8,10 53:6,9,22 54:3,8,10 58:10 59:19,21 60:4,8,11,14,17,20 61:4,7,9,12,18,20,23 63:2,19 65:20,24 66:7,11,22 67:8,10 67:11,13,20,24,25 68:6,7,17 68:18 69:8,10,11,12,13,15,20
**Gbatala** 84:12,20
**general** 3:24 17:1,4 110:3,5
**genitals** 82:16,22
**gentleman** 39:22
**gentlemen** 5:8 55:22 87:2 88:2,7 88:11 90:8 98:4
**getting** 31:12,16 61:15 94:11 130:3
**girls** 25:1
**give** 36:25 44:1 76:25 77:10 86:7 86:11 94:20 96:14,17,19,21,23 96:23,24 97:5 98:10,10 113:15 122:15,23 125:16,18 129:4,11 130:14 131:9 132:6,20 133:1,7 133:23
**given** 79:18 88:18 108:25 123:17 130:11
**gives** 107:18
**giving** 131:11 133:10
**go** 24:11 30:24 43:3 53:10 56:21 58:8 64:21 65:7,15 66:7,17 91:5 99:14 111:8 117:1,8 126:1 127:13,18 132:23 133:15
**goal** 128:15
**goes** 92:10 100:8 108:20 109:8 120:8
**going** 14:2,11 19:3 49:18 66:11 75:13,15 86:5,6,12,18 87:2 92:19,20 94:1 102:4 112:19 115:7 128:19 132:8,11
**good** 5:1,8,13 16:14,15 17:15 27:25 28:1 36:24 40:9,10 46:15,16 50:8,9 62:22,23 70:20 78:6,7 87:24 98:20 122:7 134:2
**gotten** 120:22
**governed** 38:15
**government** 1:17 27:4 29:2,11 37:21,25 39:6,9,15 40:2,20 55:10 86:14,22 87:11 91:3,13 91:19 97:17 99:12 102:1,5,11 103:5,9,20 104:7,12 105:25 106:4,25 108:4 111:18 112:25 113:1,9 114:15 116:3 117:12 117:16 118:13,15,20,24 119:11,14 120:12 121:18,20 121:24 122:2 123:23 124:13 124:19 127:25 130:15 132:10 132:15,23 133:2,8,10
**Government's** 58:14 102:16 105:2,17 106:10 107:23 108:20 115:9,16 116:9 126:22 128:7 129:18 134:6
**governs** 90:9
**Graveline** 1:22 3:10 75:23 76:17 98:25 99:1,24 100:4,6,25 101:2,4,10 102:23 103:1,6 104:10,18 106:15 109:4,10,21 110:8,14 111:1,6,9,23 112:6 112:16 113:19 116:4,10,17 117:3,13 122:5,16 123:14,25 124:9,13 125:6,12 127:1,9 129:19,23 130:1,7,16 131:15

**Gre** 50:23
**green** 23:18,19
**Greg** 70:1
**Gregory** 3:8 70:4
**ground** 62:15
**grounds** 94:8
**group** 6:8 49:2
**grow** 23:14,15 42:7,8
**guess** 80:14
**guided** 120:19,19
**guiding** 38:15
**guilty** 104:8 118:6,10 126:5,6,16 126:18
**gun** 126:8,23 127:2,3
**G-a-y-e-t-a-y** 50:19
**G.G** 39:22

---

**H**

**Hady** 2:22 36:20,24 37:1,5 40:9
**half** 6:7 13:8 64:25 86:4 127:16 127:18 128:20 129:4 133:4
**half-hour** 132:7,16
**Hampshire** 72:1 76:2
**hand** 7:11 56:23,24 95:18 114:9 115:13
**handle** 37:21
**handled** 126:8
**hands** 7:21
**hand-in-hand** 117:2
**happen** 132:10
**happened** 74:23 75:12 76:9 77:20 89:8 99:13 119:19,20 132:7
**happening** 100:11
**happy** 50:15 96:11
**harassed** 88:9 89:17
**hard** 43:9 76:13
**harder** 104:8
**harmed** 90:2
**head** 25:5 74:4,7,13 82:12,21 126:24 127:2,4
**heading** 80:18
**headquarters** 56:12
**heads** 13:19 26:5,8 36:7,10,13 45:9,11
**hear** 36:6,9,12 45:14,20 59:16 60:7,13,19,25 61:6 69:17 91:3 92:13 104:20 117:12 123:22 124:12
**heard** 34:19 59:15 69:20 74:18 75:8 84:11,14,14,18 89:8,8,11 89:23 91:25 97:15
**hearing** 75:3 98:19
**hearsay** 26:13 91:11,19
**Heck-Miller** 1:18 2:16 3:14 8:3 16:13 19:6,9,22,24 20:5,8 21:2 85:2,11 133:14,25 134:3
**height** 94:15
**held** 96:15 119:13 127:3
**help** 120:25
**high** 105:11 125:3
**highway** 14:11
**highways** 15:6
**hill** 10:12
**hired** 55:16
**hit** 103:20
**hold** 86:12 127:2
**holding** 126:23 127:8
**hole** 20:3 33:16
**holes** 19:4,14,17 33:14,17,20,22 34:6,8,10,12
**home** 17:22 42:20,22,23 43:1 51:1 64:21,23,25 65:3 72:2
**honest** 112:23
**Honor** 5:4 21:19 29:4,6,19 30:9 31:25 33:1 35:13 40:5,24,25

**horse** 93:4
**hotel** 38:6 39:12,25 73:1
**hotels** 37:22
**hour** 13:7,8 43:2 64:19,25 86:4,4 86:11 87:9 127:16 132:13
**hours** 24:17 64:17 66:1 72:9,18 88:21 128:20 129:4 132:11,14 133:4,6
**house** 23:22,24,25 24:6 73:20,25
**houses** 20:22
**human** 26:5,8 45:9,11
**hungry** 132:21
**hurry** 72:19 77:13
**H-a-d-y** 40:16

---

**I**

**ICE** 76:7
**identical** 113:22
**identification** 3:19 4:10 7:13
**identifies** 11:22
**identify** 4:8 112:17
**identity** 84:20
**IDPs** 18:15 27:10,12 30:2 45:1 46:19
**II** 126:17
**III** 1:10 100:12,14,16 101:9,18,22 101:22,23 103:21
**images** 15:16
**imagine** 77:16
**imbalance** 128:25
**immediately** 94:3
**Immigration** 12:11 82:9 94:3,9
**impairment** 105:13 125:5
**implemented** 108:24
**impose** 128:3
**imposed** 129:2
**impossible** 48:25 49:4
**impracticable** 90:14
**impractical** 93:10,12
**impression** 128:11
**improvident** 92:4
**incident** 75:7,16 111:14 112:24
**incidental** 106:6 110:13,14,25 112:15 113:10
**incidentals** 38:6 39:12
**inclined** 92:17 128:22
**include** 17:22 20:19 105:19 106:18 107:25 108:14 109:6 109:12 114:17,23 115:5 117:10
**included** 16:16 17:11 39:21 121:6,10 127:5
**includes** 38:8 113:16
**inclusive** 102:12 104:3
**incorporate** 114:7
**incorporated** 112:13 124:20
**incorporation** 112:14
**incorrect** 121:17 123:5
**INDEX** 3:17,23 4:3
**indicate** 96:10,22
**indicated** 4:10 85:6 97:14
**indicates** 131:6
**Indictment** 100:10,18 101:5,11

101:18,20,21 102:4,12,21,25
103:2,10,13 117:21 118:18,21
119:22 121:6,10,14,16 129:8
**individual** 40:17
**indulged** 86:15
**industry-standard** 4:10
**inferences** 122:20
**inflict** 109:25 111:12 116:7,19
131:16
**information** 61:24,25 62:2,4
88:7 94:14
**inhuman** 108:10,14,15,17 109:6
109:12,13 114:1,6,7,10,11,19
115:5,6,14,19 116:2
**initial** 128:2,5,11,22
**initially** 128:16
**injury** 105:13 125:4
**inquire** 95:23
**inquiry** 95:25
**insert** 117:22,25 129:17
**inserted** 117:18 129:16
**inside** 30:24
**insofar** 126:15
**instance** 16:22 17:3,16 19:3
20:20 83:5
**instances** 85:6
**instruct** 98:15 105:8 106:17
**instructed** 123:20
**instructing** 115:1
**instruction** 99:5,19,23 100:9,23
101:13 102:3,10,14,17,21
103:25 105:2,18,18 106:7,8,16
107:8,18 108:3,4,5,7,11,20
109:24 110:9,9,11 111:17
112:4,8,20 115:9 117:10,13
121:25 122:3,14,22 123:9
124:10,11,14,19 125:2,16,25
126:2,3,4,13,25 127:5 130:8
130:14,15 131:6,9
**instructions** 97:23 98:6,9,23
99:2,3 104:19,25 106:4,10,11
106:12 117:7,15 122:6,19,24
123:16,17 125:19
**intended** 86:3 90:3 105:4 107:11
111:12 116:7 118:2
**intending** 130:18,25
**intent** 109:23,25 110:1,5 116:19
116:20,20 117:2 130:3 131:3,7
131:10,16
**intentional** 130:4,12
**internal** 106:21
**international** 6:12
**interpretation** 110:18 112:1
**Interpreted** 58:22
**interpreter** 22:21 23:1,9,11,23
24:7,10,13,20,25 25:4,7,11,15
25:18 26:1,4,23 27:2,6 28:20
28:23 29:24 30:6,8,22 31:2,6,6
31:12,15,18,22,24 32:4,7,9,11
32:14,20,24 33:9,19,21,23
34:11,13,17,19,25 35:19 36:5
41:19,23,25 42:2,4,6,8,10,12
42:16,18,21,25 43:2,4,7,9,12
43:15,18,21,23 44:1,4,8,11,14
44:19,22,25 45:2,13 46:7
47:20 48:7,13,19,21 49:2,6,16
49:19,21 50:10,14,23 51:14,19
51:25 52:3,6,14,17,20,23 53:1
53:3,10,13,15,18,24 54:5,9,15
54:17,20,24 55:1,3,10,14,18
56:12,25 57:5,11,13,18,23,25
58:2,8,11 59:4,6,11,15,17,22
60:1 61:14,17,21,25 62:11,14
62:16 63:12,15,21 64:7,11,15
65:5,19,21,23 66:1,11,20,24
67:11,15,23 68:1,8,14,15,20
69:6,10,12,14
**Interpreters** 35:7

**interrogated** 26:12,17
**interrogatory** 118:5
**interrupted** 132:17,22
**interview** 70:14 71:4,20,23,25
72:7,10,14,15,17,19 73:2,9,18
73:23 74:2,15 75:2,14 76:11
76:12,15 78:24 79:9,13 80:2,5
80:11,15 81:21,25 82:4,25
89:7
**interviewed** 74:22 75:6 77:4
78:11,18 79:6,11 81:18 82:18
88:3,12
**interviewing** 70:17 79:22
**interviews** 73:4,7,13 78:21,22
80:8,21 82:6,8
**intimidate** 105:22
**introduced** 129:23
**investigating** 6:12
**investigation** 6:21 7:19 10:25
11:4 53:25 54:6 70:15 78:11
**investigative** 106:11 123:7,23
124:2
**investigator** 5:17,19,23,25 6:3
88:17 91:7,11,21,23 92:4
94:20
**investigators** 86:3
**involve** 128:23
**involved** 37:20 78:8
**issue** 90:7 95:20 102:10 103:4
103:20 104:14 113:2 118:12
118:24 119:18 130:20
**issued** 93:16 94:6
**issues** 94:3 99:11 102:9,15
127:15
**IV** 101:23
**i.e** 4:11

**J**

**Jacob** 88:2
**jail** 57:7
**job** 51:18,23 54:23
**jobs** 37:12
**JOHN** 2:2
**john_wylie@fd.org** 2:6
**Jr** 1:8,9 84:14,18 85:7
**Judge** 1:14 7:11 8:1,6 16:9 21:14
27:18,20 36:15 40:4 46:8,10
49:22 87:25 95:19 97:21 113:1
114:8,9,24 117:25 120:12
122:11 123:7 131:2 132:3
134:3
**judicial** 90:15
**July** 26:24 44:25 100:11,13
**jurors** 130:23
**jury** 5:5,6 87:7 55:24 56:2,3 87:5
96:17 97:9,10,15,19,22,25
98:21,23 99:1,15,16 104:6,19
104:25 105:8 106:8,10,12,16
106:17 113:15 115:1,7 118:5
118:16,23 119:8 120:4 122:6,8
122:12,19,20 123:15,16 124:7
129:9 130:8,20 132:5 133:10
133:18
**jury's** 118:12
**Justice** 1:22 38:1 93:16 106:21
125:13,15,24
**Jusu** 89:12,13,13 101:23

**K**

**Kamara** 70:12,14,19,20 71:10,11
71:20,23 72:6,12,21,24 73:1,5
73:19,19,23 74:2,16 75:7,24
76:9,22 77:14 101:25 119:19
**Kamara's** 20:20 21:7 76:4
**KAREN** 1:17
**karen.rochlin@usdoj.gov** 1:20
**keep** 61:18,20 62:12 63:12

120:15 132:12
**keeping** 133:16
**kept** 47:3 57:2
**kind** 23:14 38:2 39:9 81:3 91:19
92:6 94:10
**kinds** 129:3
**Klay** 73:21,25
**Klose** 110:17
**knew** 66:23 84:17
**know** 13:9 14:18 21:7,10,12
25:10,11 28:11,20,23 29:2,9
29:11,13,14,15,16,23,24,25
30:5,6,7,8,18 33:17,19,20,21
33:23 34:11,13,19 35:25 36:3
41:22 43:11 44:18 45:2,2,3
50:11 55:11 59:8,10,13 76:6
77:7 78:18 83:11 86:21 91:8
92:2 95:2,9 102:7 103:14
113:5 118:12 119:12 121:23
123:2,5 127:12 128:10 130:20
130:20,24 131:5 133:3,15
**knowing** 92:25
**knowledge** 19:16 84:5
**knows** 29:6
**Kpadeh** 21:12 78:9,11 79:6,10
79:11,15,17,21 80:2,6,18,25
81:3,3,8,18,21,25 82:1,7,9,11
82:18,25 83:3,7,14,17,21,22
83:24 84:4,4,10,16,19 85:4
88:24 89:6 101:24
**Kpadeh's** 20:24 21:10

**L**

**labeled** 112:8 113:5
**ladies** 5:8 55:22 87:2 98:4
**land** 24:8
**language** 100:22 101:14 106:7
107:24 109:17 110:12,20,25
112:7,10,17 113:25 125:6,7
**large** 81:6
**late** 5:2 88:12 132:20
**latest** 110:4
**law** 91:10 98:7 104:15 105:6
107:1,1 110:2,4,7 111:12
113:21 117:15 120:1,8 121:21
122:7 123:3,4,18 124:5,6
128:7 130:9 131:5,9
**lawful** 106:6 110:14 111:14
112:15,24 113:10,12,16
**Lawrence** 39:22
**lawyers** 96:22
**lays** 117:13
**lead** 70:19
**leader** 25:1,3,6
**leading** 15:6
**learn** 84:20
**leave** 33:1 36:4 44:6,10 49:15
53:9 67:25 68:1 69:5,6 103:13
125:19 132:12 133:2
**leaves** 55:24 87:5 98:21
**leaving** 46:22 73:19 80:22 81:1
**left** 36:5 44:13 48:17,18,19 49:13
51:17 53:6 58:23 59:7 69:8,10
89:16
**legal** 91:8 102:15 119:16 125:9
125:13
**length** 55:8
**lesser** 108:14 109:6,12 114:10
114:17,19 115:5,13,19 116:1
**letting** 32:6
**let's** 15:10 97:22 98:23 103:4
113:15 129:7
**level** 105:11,11 125:3,3
**Liberia** 6:22,25 7:1,3,9,19 13:4
15:15 22:13 26:22 34:14,16
50:25 51:1,3,11 55:6,16 59:14
69:2,5,6,7 76:10 79:12 80:4,7

88:3,8,19
**Liberian** 13:3 51:19,21 55:3,12
55:17 112:25
**life** 35:18,19 99:14
**lift** 109:16
**lifted** 29:23
**likewise** 89:7 106:11
**limit** 103:24
**limits** 129:3
**line** 3:20,20 78:24
**list** 133:18,22,24
**listen** 34:25 35:2,4 132:22
**lists** 133:17,17
**little** 8:21 59:6 60:1 66:15 93:4
108:20 127:11
**live** 22:11,12 27:6 33:12 41:24
41:25 51:9,10 52:2,8 91:21
**lived** 10:25 35:18,19 48:8 52:3
88:21
**living** 22:17 23:4,10 28:12,14,16
42:5,13,15 45:8 51:8,13,14
89:10
**locales** 16:16,17,23 17:11
**locate** 6:1 86:8 87:7,25 90:21
**located** 6:17 10:18 13:3 94:12
**location** 92:18
**lodge** 26:2,3,3
**lodging** 30:23
**Lofa** 9:3 10:2,9 20:25 27:6 28:6
28:18 30:3,5,7 32:18,21 35:22
35:24 36:1 44:20 45:6 46:20
46:22,25 47:21,23 49:1
**log** 17:7
**loner** 101:19
**long** 5:19 6:6 24:15 27:15 37:7
37:16 42:23 43:6 44:6,12 52:5
64:8,12,16,17 65:3,24 72:6,17
127:16 128:1
**longer** 66:9 125:12 128:1,4,8
**longest** 53:16,19
**look** 15:1 19:6,22 104:14 112:9
114:2 119:11 127:14 129:9
131:8,10 133:22
**looking** 8:12 9:2,3,18,19,25 10:7
10:8,17,23 11:5,22,25 12:19
13:9,10,18 14:23 15:23 33:14
58:19 102:3 107:19 117:22
121:21,25 125:24 126:9
133:25
**looks** 11:6 125:22
**looted** 62:16 63:3
**lost** 91:13
**lot** 77:4 120:22
**lunch** 86:11,21 87:3,9 132:9,13
132:17,20,24,25 133:12
**lunchbreak** 87:14 133:7,9
**Luncheon** 87:22

**M**

**M** 1:8,13
**Madave** 88:2,11,18 89:10,14
**maintain** 105:20
**major** 105:17
**making** 32:10 42:16 94:7 104:7,8
114:8 125:20 128:10
**male** 58:11,20,22 59:3
**man** 26:12,17 45:24
**Mansion** 17:17,18
**mark** 56:19,22 57:10
**marked** 3:18 7:13
**market** 14:12
**married** 23:6 51:5
**Marshals** 90:21
**Marshal's** 37:6,8,11,24
**material** 90:9,12,18 92:9,11,16
93:5
**matter** 119:4,17 128:9 135:3

matters 98:18
maximum 100:2
ma'am 16:21 19:21 20:2,4 40:19 40:23 85:6
McARTHUR 1:9 105:21
meals 38:6 39:11,25
mean 16:19 18:13,25 24:24 25:3 26:3 37:18 38:23 52:3 53:14 55:15 65:22,23 115:7 121:24
meaning 112:5,15
means 17:9 105:24 110:1 111:11 116:19
meant 17:7 115:1
measurements 124:3
MEDINA 2:8 135:5
meet 111:7,19
meeting 76:5,21 82:11,15,21 83:14,17,17 84:3
melted 83:22,25
member 88:19
memo 104:23 106:21,24 124:23 125:8
memorandum 106:21,23 125:8 125:10,16
men 59:25 81:21 88:3 94:21
mention 74:16,19 75:10
mentioned 38:23 42:9 75:15
merely 106:5
Miami 1:2,6,19 2:4,9,9 72:25 135:6,7
microphone 22:5 37:2
Miguel 2:3 7:7
miguel_caridad@fd.org 2:5
mile 52:3
mileage 38:5
military 45:4
mind 40:14 106:2 132:12
minimize 127:15
minute 62:17 89:22 127:15
minutes 13:8 24:7 42:25 43:2 52:7 55:22 65:5 89:19 129:7 129:11
missed 92:13
missing 91:6 117:4
mission 31:14
mixing 121:5
modern 123:16
modified 102:4 124:11
modify 115:17
mom 81:10
moment 8:20 27:18 35:12 40:4 46:8 49:8 67:16 68:12 75:18 84:22
Monday 88:14
money 24:11 39:24 40:1
Monrovia 7:17,24 13:19 14:3,10 14:11,12,12,17,19,24 15:5,7 15:10,14,24 16:2,5,25 17:1,3,8 17:10 20:19 73:21 79:12 80:3 80:7
month 72:22
morning 5:1,8,13 16:14,15 27:25 28:1 36:24 40:9,10 46:15,16 50:8,9 52:18 55:21 62:22,23 78:6,7 86:9 88:15 97:9 98:13 132:24 133:11
mother 51:4
motive 117:16,18,22 120:8,9 130:3,8,13,18 131:1
motor 65:23,24
move 8:1 22:4 37:2 44:4,4 51:16
Mulbah 20:20 21:7 70:12
murder 105:7
Murphy 2:18 21:19,21 22:3,7,8

N
name 5:14,15 22:2 36:25 39:22

40:15 41:11,14 50:16,17
named 70:12 89:6,12
names 94:14
Naples 3:8 19:8,23 20:7 30:9,11 33:4,25 70:1,4,7 75:20,24 76:21
national 6:12 13:3 51:20,21 55:4 55:17
near 22:15 25:17 33:12 45:4 74:17 82:1
necessarily 107:3
necessary 106:17 130:19
need 37:2 55:15 98:10,10 99:15 100:6 103:14,19 111:7 119:25 120:6,7 121:12 130:15 132:12 132:13,13
needed 76:7 79:19 80:12
needing 99:20
needs 95:21 107:3 133:23
nervous 76:6,22 77:7
never 36:5 75:15 84:11 85:6 89:8,8,11,23 120:23
New 72:1 76:2
newspapers 35:6
NGOs 29:16,25
night 25:19 38:6 52:18 74:23
Nimba 50:23,24,25 51:16,17 53:13,15,17 65:7,9,11,13,15 65:20,25 66:7,9,17,19 69:16 69:19
Nodded 97:1,4,7
normal 68:17
normally 71:11 120:22
north 2:9 13:6,11 135:6
noted 119:17 129:10
notes 71:2,9,13,14 73:4,5,7 78:25
noticed 76:21 127:24
notwithstanding 96:20
November 51:23 78:17 80:5,15 80:15,25 81:8,15 82:18 83:7 83:13,13,24 84:10,19 85:3 104:24
Nuarpa 2:25 41:3,5,9,11,16 42:13 44:6 45:8 46:3,15,19 49:13,24
number 99:5,21 100:9,20 102:18 105:18 106:8,10 108:4,5,7 117:10,13 119:19 122:3 123:10 124:14
numerous 118:19
N-u-a-r-p-a 41:11
N.E 1:19
N.W 1:23

O
oath 95:9
object 105:19 106:1,8 117:11,23 118:1,5,6,14,23 119:1,9 120:7 120:10,14 121:19 122:13
objected 122:2 125:7
objection 8:3 26:13 29:4 99:25 101:6,13 105:17 106:3 109:7,8 109:18 116:3 123:7 124:16
objections 129:10,14
observed 20:9
obtain 25:6 43:20 104:8
obtaining 38:16
obviously 17:4 95:12 96:6
occasions 78:15,16,19 79:4 83:10
occur 107:22
occurred 82:4 106:2
October 1:7 26:24,24 27:2 72:21 72:24 73:9 74:11 99:9
offense 111:24,25 112:3 113:4,5 119:23,25 120:9,24 121:2,8,13

121:17 126:6,19,21
offer 90:19
offered 106:24
office 1:18 2:3 5:18,20,21,24 6:4 6:19 54:9,12,15,18 56:16,17 56:25 57:23 70:25 72:5,16,25 88:12 125:9,13
officer 6:16 26:2 54:25 90:15
officers 54:3,8,10,14
Official 2:8 135:6
Oh 43:9 49:2,6 110:13 122:4
Okay 8:22 37:15 40:12 50:11,12 50:15 57:1,6 113:19 123:6
old 22:9 41:16
once 123:14,18 124:12
ones 17:4
one-story 20:9
open 4:6 81:6 83:9 87:1
opinion 107:17 110:4
opponents 105:23
opportunity 70:14 76:25 97:16
oppose 91:24 92:7
opposed 109:17 110:19 112:18
opposing 103:17
opposite 59:23 67:12
option 94:11
oranges 121:5
order 38:18 39:17 60:22 83:21 90:15,20 105:10 116:6 130:19
ordered 60:25 81:22 82:1 83:18
orderly 105:11
ordinarily 125:3
organ 105:13 125:4
organizations 6:13
Organized 6:11
originally 40:14
outside 38:10 39:7,10 58:2 94:21
outskirts 14:17,19,24,25 15:5
overlooked 125:25
overrule 96:22
Overruled 26:14 29:7,21

P
p 54:20,21 110:25
page 2:13 3:20,20,24 4:4 107:7 107:24 108:1,4,4,5,12 109:24 110:10 114:2 116:24 129:15 129:21,22 130:2 131:15 133:19
paid 24:10 38:4 39:14
pain 105:10,14 106:18 107:11 109:25 111:13,13 113:10 116:7,14,25 131:17
panning 11:7
panorama 17:8
paragraph 99:19,23 100:14,18 101:1 102:24 107:7 108:13 109:19,22 111:10 112:19 116:17 118:1 126:14 131:3
paragraphs 100:25 102:21 130:1
pardon 25:13 29:10 31:4,9,20 34:7,22 35:3,23 46:4 48:11,24 51:2 53:8 55:7 59:1,9 62:3,8 63:9 64:18 65:12 67:9 69:4 78:15
parenthetical 110:20 111:16 112:4,12 113:9,14
parole 93:15,16,24
part 14:1,2 17:17,19 19:25 62:14 101:7,8 102:5 118:4,14 119:3 133:11
participate 82:5 126:21,23
particular 6:8 14:14 88:7 102:12
particularly 121:24
parties 122:23

parts 7:9 14:10
party 90:12
pass 125:1
passes 49:7
patrol 54:6,10
pattern 106:9,12 110:9,9 117:14 122:6,13 123:15,16
Paul 7:23 8:15 9:4,13 10:1,8,13 12:1 19:3,10 22:15 29:3 33:10 47:25 80:19,23 81:1,22 82:7 84:5 85:5
pause 8:17,25
pay 24:11 38:2,25 39:3,6,9,11,12 39:18,24 40:1
payment 37:20
payments 38:19
PD 56:6 58:14
peaceful 18:9,19,21 69:13
penalty 100:3
Pennsylvania 1:23
people 18:13,14 24:8,10,11 25:4 25:8,10 39:3 43:11,21 44:3,21 46:2,5 53:11,12,13,14 65:11 65:13,15,25 66:24 71:6 77:4,7 89:23,24 90:18 93:13 94:15 120:17,20
perceive 128:14
perceived 105:23
perfectly 124:9
period 27:15 44:7 53:7,16,19
permission 98:24
permitting 92:5
person 66:23 67:2 70:20 71:11 71:12 78:8 90:12,14,16,16 93:11 106:9 111:11 120:13
personally 7:2 25:10 43:11 126:20,23
persons 71:7 88:23 97:18 122:3
perspective 87:14 91:18
pertains 100:13
ph 3:25 107:17 110:17
photograph 33:14
photographs 20:19
photos 16:16,16,17
physical 18:20,23 105:12 106:18 106:19 107:6,20,22 109:25 111:13 116:7 125:4 131:17
picture 30:13,16,19 33:6,8 34:2 34:4,6,8 56:16 58:16 89:12
pictures 17:1 85:7
Pierre 3:24 110:2,5
Pinkerton 126:3,9,25 127:4
Pinkertons 126:11
place 18:14,24 38:10 92:8 93:13 94:9 126:24
placed 36:7,10,13
places 14:12 66:13 73:20
Plaintiff 1:5
plan 42:12
planned 86:4
plantain 23:15
plastic 83:22,25
play 8:21 9:7
played 8:10,23 9:8,16,23 10:5,15 10:21 11:2,10,20 12:5,17,25 13:15,21 14:6,8,21 15:3,8,11 15:19,21,25 16:3,7
playing 14:4
pleading 104:24 108:12
please 5:7,14 8:9,17 9:7,7,15,22 10:4,20 11:9,19 12:4 13:16 14:4,7 15:2 16:2 22:2,24 24:24 33:24 36:17,25 41:1 49:24 55:22 68:14 69:23 87:3,23 95:18 97:22 98:1,17 129:13
pleasing 125:23
point 84:13 87:8 99:10 101:22 110:16 112:23 114:8 119:15

122:1
**pointing** 8:20
**police** 6:16,16 7:17,24 13:3
16:22 51:20,22,24,25 52:2,11
52:13 53:20,22 54:3,3,25 55:4
55:13,17 56:12 58:10,16,17,20
59:23 60:5,8,11,14,17,20 61:4
61:7,12,18,20,23 62:9,13 63:2
63:6,13,19 64:25 65:3,7 67:12
67:13,20,25 68:3,6,9,16,17,19
69:14,17 74:3,17 76:8 129:1
**pool** 40:1
**portion** 128:7
**position** 5:25 25:6,8,9 37:10
43:16,20 118:9 120:5 125:15
**possessing** 100:7
**possibility** 83:10
**possible** 83:12 100:2 128:10
**possibly** 79:24
**post** 99:11
**power** 105:21 120:16
**practice** 95:3,7
**practices** 107:10 108:22 114:4,6
114:14 115:19
**prefer** 133:12
**prefers** 109:16
**prejudices** 104:13
**prepare** 94:14,17 98:11
**preparing** 117:21 127:13
**presence** 90:14,19 93:11
**present** 71:5,6 78:19,21,23 79:2
80:21 82:7,10 83:4,6,8,25 90:3
91:16
**presentation** 93:1
**presented** 98:5 113:2 125:8
**presently** 22:11 54:24
**preserve** 105:20 118:3
**preserved** 125:15
**presidency** 105:21
**President** 34:14,16,21,24 55:16
59:13
**President's** 26:11,16 45:17,21
45:24
**press** 76:13
**pressing** 77:2
**pressure** 79:21
**pretty** 23:13
**previous** 75:14 83:14 123:8
**principles** 38:15
**prisoner** 61:23
**prisoners** 57:2,7,14,16,19,22,24
58:1,7,9,24 59:2 60:11,14,16
60:20,22,25
**private** 38:20 39:1,3
**probable** 93:2
**problem** 88:13 120:12 122:16
131:2
**problems** 127:15
**procedure** 79:3
**proceed** 92:20
**proceeded** 89:18
**proceeding** 90:13
**proceedings** 1:13 4:6 86:1 87:1
135:3
**process** 70:17,23 92:12
**produce** 123:19
**Program** 6:11
**proper** 122:20
**properly** 121:5,6,9
**proposal** 91:6
**propose** 109:11
**proposed** 88:16 99:1,5,19,20,23
100:9 102:10,17 104:2,19,24
105:2,18 106:16 107:2,3,8,24
108:6 109:24 110:11 111:17
112:4,17,20 113:17 114:7,15
114:16 115:9 116:5,9 117:5
122:24 124:11,14 125:2 126:2

122:1 129:18 130:6,8
**proposes** 113:12 120:2
**proposing** 91:14 110:25 120:11
**proposition** 118:14 119:16
**protect** 105:20 118:3 130:24
**prove** 104:12 106:1 117:16
118:15,20 120:23,6,7 121:12,20
**proved** 121:2,9
**provide** 103:17
**provided** 91:10
**provides** 128:16
**provisions** 90:17
**prudent** 133:21
**Public** 2:3 5:17,20,24 6:3 7:6
38:21 39:25
**publish** 8:6 33:1
**punish** 105:22
**punishable** 106:6
**punished** 105:4
**punishment** 105:6 108:16
109:13 114:11,20 115:13,20
116:2
**purpose** 93:24 106:2
**purposes** 94:4
**pursuant** 90:8
**put** 17:21 25:1 29:2,11 34:10,12
56:19,21 57:10 79:21 86:12,18
86:23 88:1 111:3 113:6,14
117:20 118:17,24 120:21
**putting** 92:7 93:3 117:20
**p.m** 43:7 52:20 95:22 97:25
98:21 129:12

**Q**

**quarter** 57:13,19,20 58:3,9 62:1
62:2,4
**question** 11:1 24:5 31:17,18,25
32:5 70:22 71:12 79:18,19
92:19 95:9 96:11 101:13
102:13 112:3,14 119:7 130:17
**questioned** 88:24
**questioning** 120:20
**questions** 16:10 21:3 27:21
35:13 40:24 46:10 49:9 50:11
68:22 69:22 75:19 76:17 77:2
77:23 85:11,12 95:8,16 96:3,7
**quite** 112:23 120:2

**R**

**R** 55:18 135:1
**radio** 34:25 35:2,4 74:18 75:4,8
**rainy** 26:21,23 66:7,9
**Raise** 95:18
**Randy** 2:14 5:9,15 88:17
**rapport** 71:1 74:25
**ratification** 107:16
**reach** 86:11
**reactivated** 69:14
**read** 35:6,7 100:17,23 101:10,19
110:15 116:16 123:5 127:12
**reading** 98:18 101:12 120:18
**reads** 103:21,22 108:13
**ready** 88:12 95:1
**real** 23:13 105:1
**really** 131:2 132:11
**REALTIME** 1:25
**rear** 11:18
**reason** 55:11 72:10 91:17,22
92:2,3,23 94:5 123:8 128:25
130:21 132:6
**reasonable** 121:3
**reasons** 92:1
**reassigned** 68:17
**rebel** 27:5
**rebels** 45:4
**rebuttal** 86:22 87:11,12,15 97:11
97:16 128:1,4,23 132:16 133:2

133:11
**recall** 64:7,12,16 72:20 80:13,17
81:5 83:5
**receded** 125:10
**receive** 38:18 39:17 57:19
**received** 3:18 8:5
**receiving** 88:7
**recess** 55:21,25 56:1 87:3,22
92:17 129:12
**recessed** 86:16
**recognize** 8:12 13:2 15:13 19:25
56:11 89:13
**recognizes** 105:6
**recollection** 81:17
**record** 40:14 88:1 95:21 96:10
123:25 134:1
**records** 61:18,20,21,22 63:6,8
63:10
**red** 12:13 25:20 32:22 56:21
**redacted** 50:21
**Redirect** 2:17,21 3:3,7,11 21:4
35:14,15 49:10 68:23,24 76:18
**red-roofed** 11:8,14,24 20:1
88:21
**refer** 106:4
**referenced** 103:11
**referencing** 38:18
**referred** 88:20
**referring** 126:10
**Reform** 90:17
**refugee** 89:10,20,25
**refugees** 18:17 27:14 28:4,6,9
28:18,21,24 30:2 44:16 46:19
47:3,7,10,14,16 48:3,6,12,20
48:25 89:3
**refusal** 96:11
**regard** 17:3,10 18:1 126:14
133:14
**regarding** 55:13
**Regulations** 108:24 109:20
**reimburse** 39:12
**reimbursed** 40:21
**rejected** 106:24
**relate** 92:2
**related** 53:13 118:25 119:8
**relating** 76:9
**relation** 9:5 12:12 13:5
**relative** 18:13
**relatives** 43:12 81:12
**relax** 76:25
**release** 90:9
**relevant** 88:4 121:7
**relies** 125:16
**rely** 133:17
**remain** 95:12 96:13 121:14
**remains** 86:6 113:24
**remarks** 92:14
**remedy** 93:5
**remember** 28:18 30:2 39:21 47:7
64:13 72:8 74:12 98:17
**remembered** 83:7
**removed** 18:5
**repeat** 68:14
**replaced** 129:7
**report** 71:15,15 73:8,10,11
107:14,15
**REPORTED** 2:7
**Reporter** 2:8 135:6
**Reporter's** 3:15
**reports** 71:17 73:13
**represented** 39:1
**request** 88:1 90:24 92:9 94:13
94:19,21 95:8 99:22 105:16
108:9,18 132:2
**requested** 106:10 108:11 117:6
124:25 131:18
**requesting** 124:22
**requests** 90:23 117:8

**require** 117:16
**required** 55:5 93:2
**requirement** 55:12 123:19 128:7
**requires** 93:9,10
**rescinded** 106:22 125:7,12
**research** 99:6
**reserved** 107:6,9 108:21 114:3,5
114:13 115:18
**resolve** 119:18
**respect** 94:15 102:15 113:25
120:1 121:4 127:7
**respective** 92:21
**respond** 128:17
**response** 17:13 18:22 41:21
**responsibilities** 43:24
**responsibility** 58:4
**responsible** 6:11
**rest** 24:19 77:17 91:1 92:21 95:6
97:10
**rests** 98:3
**result** 116:22
**resulted** 99:16 116:13
**resulting** 99:13
**results** 116:25 131:19,21
**Resume** 4:6
**resurface** 86:18
**retired** 55:15
**return** 69:11,16,19 87:3 94:4
97:9 98:13 103:16
**returned** 68:16 69:12
**returns** 5:6 56:3 97:25
**revealed** 11:4
**review** 5:25 6:1 7:20 71:17 73:13
103:9
**reviewed** 7:8
**rework** 112:10
**rice** 23:14,15 42:8
**ridden** 19:1
**riding** 81:4
**right** 11:24 12:14,22 30:20 31:21
32:10 33:6 42:18 46:20 47:5
47:10,17,21 48:1,6,10,12,14
49:4,5 55:25 58:22 63:3,8,14
63:17,25 64:17 65:1,7,9,18
66:23 67:6 68:7 70:12 71:18
74:9,13 77:8,11,14 78:12 79:7
79:25 82:3 83:4,15,19 84:15
86:22,24 87:19 95:12,18 96:13
96:14,17,21,25 97:8,13 100:21
104:17 110:2 113:13,23
116:19 119:2,9 121:18,21
122:4 124:4 126:1,12 129:21
129:25 131:13 133:4,13
**rights** 96:9 110:10
**right-hand** 15:15
**ripe** 23:19
**rise** 105:11 125:3
**risk** 133:9
**River** 7:24 8:15 9:4,13 10:1,8,13
12:1 19:3,10 22:15 29:3 33:10
47:25 80:19 81:1,22 82:2 84:5
85:5
**road** 8:19 12:14 13:9,18,19
59:23 66:3,12 74:17
**Rochlin** 1:17 2:20,24 3:2,6 26:13
27:24 29:6,8,22 30:9,12 31:24
32:1 33:1,5,24 34:1 35:12 40:8
40:24 46:14 49:8 62:21 67:16
67:18 68:12,13,22 87:13,18
91:4 93:23 94:8 97:12,21
98:24 103:6,8,24 104:4,14
119:2,3,10,14 121:4 127:18
128:6
**Ronald** 2:22 36:20 37:1
**roof** 12:13 25:20 32:23
**room** 77:10 88:24 89:7
**roughly** 24:13 52:6,14
**ROY** 1:8

**Rufus** 20:24 78:8 85:4
**rule** 38:18 92:5 119:4 128:3
**ruled** 120:13
**rules** 38:15
**run** 86:15
**running** 20:12,17
**rush** 72:10 73:2
**rushed** 79:13,14 80:8,15

_____

**S**

**sanction** 92:24
**sanctions** 106:6 111:14 112:15
112:25 113:10,12,16
**save** 62:2
**saved** 62:7,9
**saw** 17:19,21 19:14 27:14 48:6
48:20 49:3 59:11,22 66:22,24
67:2,6,11,13 89:1,2
**saying** 64:11,15 73:5 102:1
111:4,6 114:25 118:13,17
119:6
**says** 100:15 108:21 109:25
111:10 113:9 115:10 123:4
126:5 128:7 131:9
**scared** 132:8
**scene** 14:23
**scenes** 6:1 15:13
**schedule** 52:13 98:14
**school** 31:8,11,14
**screen** 8:21 30:19 33:6 34:2 56:9
56:19,21
**scrivener's** 103:12
**search** 86:12
**season** 26:21,23 27:1,2 66:7,10
66:17
**seated** 5:7 87:6,23 98:1,22
129:13
**second** 52:15,19,20 54:1 63:25
64:6,10,14 103:1,2 106:3
107:16 110:10 111:10 113:11
126:14 129:3,8
**seconds** 23:23,25
**section** 90:11 99:7
**sections** 124:24
**secure** 90:14,19 92:12 93:11
**securities** 30:17
**security** 10:25 30:22 31:2,6,19
31:21 32:2,4,6,7,24 88:23
**see** 8:9,19 14:20 15:10,20 18:20
18:23 25:25 26:5,19 27:10
28:21,24 30:13,20 33:6,14
34:2,8 45:9,17 48:25 49:3,5,7
56:6,16 57:2,7,22,24 58:1,7,9
58:13,24 59:2,19,21 60:4,10
60:16,22 61:3,9,12,15 67:8,10
87:20 91:17,22 98:14,19
104:13 110:13 113:8 128:17
128:25 131:23 132:2
**seeing** 75:3,8
**seek** 33:1 103:24
**seeking** 102:5
**seen** 26:8 45:11,14 74:18 85:4,7
85:7 124:12
**select** 15:9
**sell** 58:20
**Senate** 107:13,14
**sense** 92:10,17 114:22 115:22
**sent** 70:20
**sentence** 99:14 107:14,16
112:21 113:11 115:17 116:5
116:11,21,24 124:10 131:15
**separate** 102:9,14 112:7
**separately** 81:12
**September** 26:24 51:17
**Sergey** 54:20,21
**series** 7:18 13:23,25
**serious** 105:12,13 125:4,5

**seriously** 49:19 128:24
**serve** 43:21 55:14
**serves** 108:17 115:15
**service** 37:6,8,11,24 55:13
**services** 38:16
**serving** 43:18
**set** 100:12 101:8 103:21,22
125:18
**sets** 107:19
**seven** 5:21 53:4
**severe** 105:10 109:25 111:12
116:7 131:17
**severity** 107:10 116:13 131:19
**share** 104:14
**shift** 52:16,17,19,20,22 57:24
58:5 63:23,25 64:5,6,9,10,14
64:14,16,17,19,19,21
**shifts** 52:14,23,24,25 53:1 63:20
63:21,22 64:2
**shoe** 91:12
**shoot** 45:18 89:5
**shopping** 14:13
**short** 56:1 103:8 105:6 128:21
129:12
**shorter** 128:4,8
**Shortly** 88:5
**shot** 45:21 90:1
**shotgun** 20:14
**shots** 16:25 17:3,5,10,16,22 18:1
**show** 12:24 34:6 87:12 119:19
131:8,12
**showed** 19:19 60:2 89:12
**shown** 90:13 93:10
**shrink** 120:23
**side** 10:2 15:15 23:13,13 123:19
127:17 129:4
**sidebar** 4:3,5 85:15 86:1
**sides** 91:5 92:21
**sign** 19:12 94:17
**significant** 128:24
**signs** 18:20,23
**silence** 96:10
**silent** 95:12 96:13
**similar** 109:15,21
**Similarly** 19:19 96:16
**simple** 70:23
**simply** 75:11 92:4 95:6
**single** 105:14 120:3
**sir** 5:14,16 9:14 12:3 16:6 19:10
22:2 32:3 33:20 35:18 37:5,16
39:20,23 40:3,13,17 41:16,20
42:11 47:1 50:16,18,20 51:9
54:23 68:10,14 69:24 78:16
79:14,23 80:10,17,20 81:11,17
81:24 82:5,20,24 83:9,16 84:2
84:7,13 97:5
**sit** 49:17 70:25
**sitting** 70:23
**situation** 96:4 102:8
**six** 23:23,25
**sleep** 26:4 30:23 31:2,19,21 32:2
32:4,6,25 88:23
**slept** 88:20,23
**slow** 66:15
**small** 32:12,14,15,19,20,21,22
**Smith** 2:18 21:20,21 22:3,7,8,9
23:4,16 26:5,21 27:21,25
29:23 30:13 31:19 32:8 33:6
34:2,14 35:18
**socialize** 25:12
**soldiers** 83:18,21 89:3,9 120:16
120:16
**solemnly** 21:24
**somebody** 36:9 45:21 54:16
61:7 71:4,14 78:24 89:6
**son** 26:11,16 45:18,21,24 59:17
**sorry** 22:4 76:24 95:24 109:9
114:8 123:13,22

**sorts** 119:22
**south** 13:5,7,8 89:17,19
**SOUTHERN** 1:1
**space** 77:10
**speak** 46:2,5 70:25 71:11 72:12
72:21,24 76:7 80:25 86:5
87:10 89:23 94:2,7 115:23
128:1
**speaker** 4:10
**speaking** 71:9 117:20
**special** 6:5,6 77:24 82:9 99:15
99:20
**specific** 16:17,18,23,25 17:11
93:24 109:23,25 110:5 116:19
123:23 131:3,16
**specifically** 17:14 18:23 83:11
99:9 111:12 116:7 130:18,25
**speculate** 122:12,17,25
**speculating** 122:21
**spell** 50:18
**spelled** 41:11
**spelling** 40:14
**spend** 27:15 38:6 66:19,20 72:6
**spoiled** 66:12,13
**spoke** 72:13 74:6 75:24 83:1
**spot** 57:7
**St** 7:23 8:15 9:4,13 10:1,8,13
12:1 19:3,10 22:15 29:3 33:10
47:25 80:19,23 81:1,22 82:2
84:4 85:5
**stand** 91:15,17 92:8 99:2
**standard** 79:3 92:11 121:25
122:24
**start** 27:1 51:21 132:4,8,24
133:9
**started** 44:20 51:23 76:9
**starting** 5:1
**starts** 26:23 27:2 133:8
**state** 5:14 95:21
**stated** 66:24,24 67:23 80:20
82:21 84:19
**statement** 79:15,16 83:20
108:23 113:8,13 122:25 123:2
123:18 124:1,5 130:9
**states** 1:1,4,14 2:8 3:24 6:19
37:6,7,10,24 38:11,11 79:11
80:3,7 90:11 91:14 92:7 98:25
106:5 107:8 110:3,6,16 120:6
126:14 135:6
**stating** 93:2
**station** 7:17,24 13:3 16:22 51:24
51:25 52:2,4,11,13 53:20,22
54:4 58:10,16,17,20 59:23,23
60:5,8,11,14,17,20 61:4,7,13
61:18,20,23 62:10,13 63:2,6
63:13,20 65:1,4,7 67:12,12,13
67:20,25 68:1,3,6,9,16,17,19
69:17 74:3,17 76:2,8
**stationed** 51:24
**status** 94:2
**statute** 105:5 106:5 110:21
**statutory** 110:18 112:1
**stay** 24:15 43:6
**stayed** 44:2 89:19
**staying** 73:1 89:24
**stays** 102:18
**Ste** 2:9
**step** 92:4
**stone** 83:1,4,6,8
**stop** 13:16 16:8 54:25
**stopped** 34:20,23
**stops** 133:8
**stores** 20:20
**story** 75:1
**straight** 107:13,14
**straightened** 125:22
**street** 1:19 2:4 12:14 61:15
**streets** 14:11 94:11

**strengthen** 105:20
**stricken** 101:8,10
**submit** 121:11
**submitted** 99:1,3
**subpoena** 90:15 92:23 93:1,11
**subpoenaed** 92:15
**subsection** 99:8
**subsequent** 106:24
**subsistence** 39:18
**substance** 88:17 90:5 92:3
111:4
**substitute** 91:23
**substitution** 92:6
**suffering** 105:14 106:19 107:11
110:1 111:13,13 113:10 116:8
116:14 117:1 131:17
**sufficient** 92:12 112:4,14
**sufficiently** 105:12
**suggest** 121:15
**suggested** 91:6 112:7
**suggesting** 111:1
**suggestion** 105:9 111:23 115:25
**Suite** 135:6
**Sulaiman** 89:12,13
**Sunrise** 6:16
**Superseding** 102:25 103:2
129:8
**supplies** 89:2
**support** 91:8,22 108:12
**sure** 17:15 40:13 71:17 93:23
101:21 124:5 128:19 131:11
133:18,22
**surface** 86:23 97:14
**swear** 21:24
**sworn** 5:9 21:21 36:20 41:5 50:4
70:4 78:2 95:22

_____

**T**

**T** 135:1,1
**TABLE** 2:12
**take** 7:4 17:5,16 19:6,22 20:5,24
42:23 44:14 52:5 55:21,22
65:3,24 66:9 71:2,9,12 72:17
73:4,5 75:4 78:25 79:15 86:21
87:2 89:7 91:17 94:9 98:12
100:7 103:15 104:14 106:13
112:9 115:16 118:11 122:20
127:14 129:7,9,20 131:8
132:11 133:8,12
**taken** 7:8,18,18 15:16 17:18
18:24 39:4 45:24 61:24,25
73:20,24 74:3,12,16 75:3,8
106:20 112:24 125:7
**takes** 52:6
**talk** 25:14,15 70:20 80:22
**talked** 30:16
**talking** 70:23,24 103:23 107:15
109:4,7 133:5
**talks** 109:22
**Taylor** 1:8,9,10 29:2,11 34:17,18
34:20,23 45:17,20,23 59:8,10
59:11,14,18,22 60:3,4,7,10,13
60:16,19,22,25 61:3,6,12
66:23,25 68:7,8 69:17,20 83:6
83:18 84:6,11,14,18 85:4,7
120:16
**Taylor's** 105:21
**technically** 94:1 110:24
**techniques** 123:8,24 124:2,6,7
**telephone** 4:9
**television** 56:8
**tell** 6:24 13:2 21:24 22:2 26:8,11
26:16,21 36:6,9,12 45:11,14
45:23 70:17 73:16,19,24 74:3
74:6,23,25 75:2,7,11 77:19
88:13 97:19 122:11,17
**telling** 11:4 122:20

**tells** 38:17 115:8
**tender** 62:18 84:24
**tension** 49:16
**term** 18:13 20:14 93:16 105:2
107:5,8 108:21 112:13 114:2,5
115:17
**terms** 128:13
**testified** 70:12 89:4 118:25
**testify** 88:9,13,17,22 89:1,10,16
90:5,20,22,25 91:7,11,15,25
94:7 95:5,5,19 96:2,17 97:3
**testifying** 88:14 93:25 94:1,4
**testimony** 88:18 90:12,18 92:3
94:20 96:14,17,19,23,24 97:6
98:4 123:22 127:7
**text** 127:12
**Thank** 12:24 13:22 16:8,9 17:15
20:5 21:2,14,16 27:20 36:15
36:16 40:5,25 49:22,23 56:5
63:1 75:19 77:22 85:10 87:21
93:6 100:5
**thing** 26:19 45:15 80:14 89:8
93:8,10 101:25 112:16 115:15
118:20 127:24 131:18 133:21
**things** 68:16 119:23 121:9
128:12
**think** 93:3 94:1,21 96:6 102:1
103:3,19 105:1 108:23 109:15
112:7 113:11 114:2,12 115:23
116:8 117:4 121:4,18,19,24
122:11,15,16,22,23 124:17,20
126:24 128:8 130:3,7,10,13
131:3,18,21 133:17,21
**thinking** 96:5
**thorough** 79:16
**thought** 113:3
**thousand** 28:24
**thousands** 48:3
**threatened** 88:9
**threats** 105:23
**three** 7:2 23:3 42:25 43:4 44:11
72:9,18 73:4,7 78:16 82:22
89:22 133:4
**throngs** 18:15,17
**ticketing** 37:22
**tie** 61:3
**tied** 26:12,17 45:24 61:6
**time** 4:8 7:2 9:19 11:1 24:19
27:15 31:8,10,13 33:2 35:21
44:7,12 45:13 48:21 53:6,7,16
53:20 55:5,8,13 68:20 76:7
77:1,19 79:18 82:23 83:5,11
89:4,6 90:23 98:11,12 99:13
103:15,19 106:13 120:13
125:21 127:4 128:1,9,15,24
129:5,8,10 132:16 133:1
**times** 7:1,2 24:12,14 44:10,11
53:10 61:15,17 66:1,21 67:6
71:20,22 78:14 82:12,15,22
83:7 85:8 89:22
**title** 53:23 90:17
**today** 7:21 12:17,23 28:2 41:24
42:1,5 62:24 90:4 94:17
125:19
**Tolbert** 55:18,19,20
**told** 74:11 81:8,21 82:1,12 83:3
83:17,19,24 84:4,10 122:17
132:5
**tomorrow** 86:9 87:17 97:9 98:13
98:16 103:16 104:15
**tonight** 133:25
**torture** 83:18 99:6 104:22 105:3
105:4,5,9,10,24 106:5,14,18
107:3,5,9,12,15,20 108:10,13
108:16,17,21,25 109:5,11,14
110:5 111:10,11,17 113:25,25
114:2,5,9,13,17,18,21,22,23
115:2,3,4,12,12,15,17,21,22

115:23 116:6,14 117:1 119:8
120:17 124:19 125:2 126:19
130:4,11,13
**tortured** 119:8 120:16
**total** 1:25 132:14
**totally** 66:12
**touch** 56:21
**tough** 120:17
**tower** 11:6
**town** 8:15 10:8,18 13:4 14:25
24:20,21,22,25 25:2 43:16,18
43:24 46:6
**Traffic** 54:5,8
**trafficking** 6:12
**transcript** 1:13 40:15
**transcription** 1:25 135:3
**translate** 31:24
**transportation** 65:21,22
**travel** 6:21 17:7 29:3,12,16,23
38:8,10,25 39:11,18,24 40:21
44:8
**traveled** 6:24 7:1,3
**traveling** 38:5 81:9,12
**treat** 90:16
**treatment** 108:11,14,15,18 109:6
109:12,13 114:1,10,20 115:5,6
115:14,20 116:2
**trial** 1:13,22 86:12 88:10 90:20
92:18,20 106:9 121:7 122:3,9
132:8
**trials** 91:5
**tried** 79:24 118:2
**trip** 69:19
**trips** 69:16
**troops** 27:4
**troubled** 131:11
**truck** 80:18 81:6,7,8,13,16,22
82:2
**true** 17:12 18:2,7 119:24
**trust** 71:1 74:24
**truth** 21:24 83:19
**try** 70:25 77:10 86:8,8,11 128:9
**trying** 130:24
**Turay** 101:23
**turn** 86:17 97:16
**twice** 86:14,15 89:2
**two** 20:12,16 23:9 24:13,17
42:25 43:4 53:18,19 58:11
61:17 64:2 66:1 67:6 72:8,18
78:15 79:3,5 81:9,15 86:2,8
87:12,25 88:2,6,11 89:22 90:3
90:8,23 97:18 99:7 108:19
126:11 127:18 128:20,25
129:4 130:1 132:11 133:5
**type** 107:19 123:20
**typed** 71:15
**typewritten** 73:8,9
**typical** 107:21
**T.V** 35:8,9

**U**

**unanticipated** 116:13,25 131:19
**unaware** 94:23
**underlying** 103:11
**understand** 31:17,18 42:9 50:10
96:4,25 124:18
**understanding** 31:22 93:22
100:2
**understands** 50:13
**Understood** 119:13
**unfortunate** 91:4,18
**unintended** 116:13,25 130:12
131:19
**United** 1:1,4,14 2:8 3:24 6:19
37:6,7,10,24 38:10,11 79:11
80:3,7 91:14 92:7 98:25 110:3
110:6,16 120:6 135:6

**University** 15:15
**unlawfully** 93:21 94:6
**unprecedented** 84:8
**unusually** 107:10 108:22 114:3
114:6,14 115:18
**upward** 47:9
**USC** 90:9 107:12
**use** 50:14 71:14 109:17 123:23
127:22 128:9,20
**uses** 110:20
**usual** 107:6,20
**usually** 52:23 107:9 108:21
114:3,5,13 115:18
**U.S** 1:18,22 72:25

**V**

**V** 101:24
**variables** 93:4
**varied** 54:5
**various** 109:1 124:24
**vary** 95:10
**vehicle** 65:23 66:2 81:3,5
**verdict** 99:15,20 104:8
**versus** 3:24,25 6:19 107:17
110:2,5,17
**VI** 100:13,18 101:4,11,20,24
102:2,25 103:22,24
**victim** 100:20 118:24 119:19
**victims** 119:20
**video** 7:18,20 8:9,17 15:9 16:19
16:20 17:12,17,18,19,20,21
**videos** 7:4,8 19:12
**view** 119:18
**VII** 100:12,14,17 101:9,18,22,23
101:24 103:22
**VIII** 100:9,10 101:8,17 102:18,22
103:11,21 126:3,4,6,7,15,19
127:5
**village** 18:14,20
**violence** 100:8,13,16,24 104:1,6
**violent** 18:21
**visa** 93:14
**visit** 24:12 25:14,15,18,20 53:10
65:15
**visited** 89:25
**visits** 89:5
**Voinjama** 80:22 81:1 89:11,11
89:14,15,16
**voluntarily** 76:8
**vs** 1:7

**W**

**walk** 23:25 42:23,25 43:2 52:5
64:23 65:3 89:22
**walked** 89:21
**walking** 9:10,11,12
**wall** 59:5,6
**want** 12:24 73:18 76:13 94:17
96:1,2 100:22 107:24 113:5
114:15 131:8 132:14,19,21,22
133:18
**wanted** 74:24 77:1,19 80:12
**wants** 129:5 133:15
**war** 32:15 44:19 61:22 62:13
63:3,5,10,13 68:9,15 69:2,5
**warrant** 90:7 92:16 94:6,17
**warrants** 94:14
**Washington** 1:23
**wasn't** 31:8,10,13 46:25
**watch** 35:8
**water** 11:6 82:12,21
**Waterside** 8:15 10:18 18:1,9
22:12,17,23 23:4,10,20 25:10
27:5,8,10,16 28:4,9,12,14,16
35:20 36:4,5 41:19,25 42:1,5
42:13,15,17,19,20,24 43:11,14
43:17 44:3,6,10,12 45:4,8 46:2

48:8 49:13,20 89:9,19,23,24
89:25
**way** 49:24 80:9,16 91:21 92:2
96:15 103:5 104:22 105:4
109:2,2,17 110:15 111:21
114:12 115:1,24 118:2 119:17
128:12
**ways** 109:1
**weaken** 105:22
**weapon** 127:8
**weapons** 19:20
**weather** 66:5
**Wednesday** 132:15 133:11
**week** 14:14,15 24:12,13,14 43:5
44:15 53:2,4 88:12 89:22 99:7
**weekend** 14:16 86:10
**weeks** 64:2
**weight** 94:16
**Weinstein** 2:14 5:9,15,16 6:18
7:11,16 8:12 9:10,18,25 10:11
10:23 12:7,10,19 13:2,2,25
14:10,23 15:13,17 16:10,14
19:25 21:7 88:17 90:5,25
91:24 92:8
**went** 24:15 53:16 69:8 76:8
**weren't** 48:3,10 77:2 124:1
**West** 2:4
**we'll** 55:22 87:20 98:19
**we're** 8:12 9:3,18 13:9,9 14:23
55:25 86:12,18 93:3 96:4
103:23 110:11 111:1,6 112:19
121:25 125:19 128:19 131:6,9
**we've** 109:15 117:4
**whatsoever** 91:9
**Whichever** 64:19
**Whiteflower** 17:24 74:4,12,19
75:4,9
**wife** 22:25 23:1 42:2 81:9,15
**William** 3:12 55:18 78:2
**wishes** 103:14
**withdrawn** 56:3
**witness** 5:3,9 21:17,18,21,25
36:17,17,18,20 37:3,22 38:4
38:16 39:11 40:18 41:1,2,5
49:25 50:1,4 62:18 69:25 70:4
70:18 78:2 84:24 85:14 90:10
91:13,16,16,22 92:9,11,13,16
93:5 119:7
**witnesses** 6:1 37:12,13,19,20,21
38:2,4,17,20 39:1,6,9,15,15,19
39:21,25 40:2,20,21 70:11
86:2,6,8,15 87:7 88:1,5,6,8
90:3,24 91:5,7,12,18 92:1,8,14
92:18,22,25 93:25 97:14 124:1
**word** 42:9 50:13
**worded** 102:10,14,19
**wording** 103:3
**words** 96:20 104:5,7
**work** 6:18 24:11,20,22 43:9 52:5
52:10,13,22 53:2 63:23,25
70:24 78:24 132:19
**worked** 24:9 52:23 53:3 54:3,16
55:3,9 63:20 64:19 67:19
**working** 24:21,21 37:12,18
51:19,21 53:22 56:13,14 63:19
64:5,9,14 65:6 68:3,6
**wouldn't** 49:3 77:5 79:14
**write** 62:4
**wrong** 109:19 125:21
**Wylie** 2:2 3:5,7,13 50:2,7 56:4,5
56:7 58:13,15 62:17 69:1,22
77:24 78:5 84:22 85:12

**X**

**X** 56:19

**Y**

**yards** 9:6
**Yeah** 48:9
**year** 30:2 34:18,20,23 41:20,22
   44:24 52:8,10 53:9 67:21 69:8
**years** 5:22 6:7,24 15:16 22:10
   32:5 37:9,17 41:17 47:7 55:4
   55:15 67:19 68:18 69:3,5
   100:3 127:24
**Yeaten** 127:3
**Yeaten's** 73:20,25
**young** 25:8
**younger** 25:4
**youth** 25:1,3,6

---

**Z**

**Zinnah** 88:2,11,18,19 89:1,4
**Zubeta** 3:25 107:16

---

**$**

**$40** 38:4

---

**0**

**06-20758-CR-ALTONAGA** 1:3
**07** 85:3,4

---

**1**

**1** 99:21 100:25
**1:00** 87:3,7,20
**1:15** 132:25
**1:19** 95:22
**1:23** 97:25
**1:24** 98:21
**1:30** 132:20
**10** 51:8 55:22 129:7 131:15
**10th** 55:1 68:2
**10/27/08** 16:12 21:5 27:23 35:16
   40:7 46:13 49:11 62:20 68:25
   75:22 76:19 85:1
**10:00** 132:4 133:10
**10:10** 35:16
**10:11** 36:18
**10:12** 36:22
**10:17** 40:7
**10:18** 41:2
**10:19** 41:7
**10:28** 46:13
**10:32** 49:11 50:1
**10:34** 50:6
**10:44** 55:24
**10:45** 56:1
**10:59** 56:3
**107** 3:25
**11** 15:10 106:4,7,7
**11th** 106:9,12 110:17 117:15
   122:6,13 123:15
**11:00** 133:8
**11:11** 62:20
**11:21** 68:25
**11:23** 69:25
**11:32** 75:22
**11:34** 76:19
**11:36** 78:4
**11:47** 85:1
**11:50** 87:5
**11:52** 87:22
**110** 3:24
**12** 15:10 64:17,19 99:5,23
   105:18 117:10,13
**12-2** 2:9 135:6
**13** 3:21 15:20 37:9,17 82:14
**135** 3:15
**14** 16:2 106:4,7 107:8 108:5,7
   109:25 110:11 111:17 112:21
**15** 3:21 7:12,13 8:1,5,7 55:14,15
   89:18,22 108:4 129:15,22
   132:13
**15th** 26:24 27:3

---

**150** 2:4
**16** 2:16 19:6 33:2 126:3,13
**17** 33:24 100:9,23 101:13 102:18
   116:24 130:2
**17th** 51:23
**17(b)** 38:18
**18** 90:8 107:7,12,24 108:1,4,4,5
   114:2
**1970s** 32:10
**1972** 32:11
**1977** 51:23
**1985** 51:17 67:24 68:3
**1989** 69:10
**1997** 68:21 69:12,13
**1998** 36:6
**1999** 23:4,6,8,10,22 24:6,9 25:22
   26:5,19 27:4,5,10,14,15 28:4,7
   28:10 29:2,11 30:3 31:1,3,5,6
   31:7,10,13 34:14,15,16 42:13
   42:15 43:1,3,16 44:3,6,10,16
   45:8,17,20,23 46:3,6,20 47:8
   51:13,18,24 52:8,10,22 53:6,9
   53:16 54:4,11 56:14 60:4,7,10
   60:13,16,19,22,25 61:3,6,20
   64:5,9,13 65:18 88:19,22 89:2
   89:12

---

**2**

**2** 9:7 56:6 108:12
**2nd** 64:5 122:7
**2:20** 129:12
**20** 24:7 89:18,22 100:3 106:10
   123:13,13 124:11,14 129:11
**20th** 64:9 82:11,15 84:3,16
**200** 9:6
**2000** 28:12 36:1,12 84:7,10
**2001** 28:14,22 47:9,10,16 48:14
   48:20 99:8,9 110:18 125:9
**2002** 28:16,25 30:7 47:12,19
   48:16,18,19 49:13,15 76:21
   100:11,13
**2003** 47:14 107:17
**2006** 55:1 68:2,4 70:10 71:21,23
   71:25 72:7,12 73:18 74:2,15
   74:20,22 75:2,24 76:10,23,24
   77:14
**2007** 7:2 15:18 18:2 72:13 73:23
   74:8,9 75:6,11,16 78:15,16,16
   78:17,22 79:9 80:2,5,15,18,25
   81:8,15,18,25 82:11,14,15,19
   82:25 83:3,7,13,15,17,20,24
   84:3,16,19
**2008** 1:7 7:2 15:18 18:2 71:21
   72:21,24 74:11 104:24 110:4
**202.514.3270** 1:23
**20530** 1:23
**208.818** 108:13
**21** 2:17,18,19 123:11,12
**22nd** 64:13
**23rd** 64:13
**2340** 105:10,15
**2340A** 107:12
**2348** 99:8 110:20
**24** 88:21 100:18,25 101:3 102:22
   102:24
**24th** 64:13 100:11,13
**25** 55:15,15
**251** 110:17
**26th** 99:9
**27** 1:7 2:20
**28** 55:4
**29** 119:4

---

**3**

**3** 30:10 58:14 118:1
**3rd** 32:11 107:17 110:3
**30** 43:2 52:6 65:5

---

**305.523.5518** 2:9 135:7
**305.523.5519** 2:10 135:7
**305.536.4675** 1:20
**305.961.9234** 1:19
**305/530-7120** 2:5
**305/536-6900** 2:4
**3142** 90:17
**3144** 90:9 93:5,8,10
**33128** 2:9 135:7
**33130** 2:4
**33132** 1:19
**34** 100:18,25 101:3 102:23,24
**35** 2:21
**36** 2:22,23 22:10 32:9
**36-years-old** 32:8

---

**4**

**4th** 1:19 123:17
**4:00** 43:7
**4:30** 132:12
**4:40** 133:2
**40** 2:24 13:7
**400** 2:9 135:6
**41** 2:25 3:1
**46** 3:2
**48** 41:17
**49** 3:3

---

**5**

**5** 2:14,15 3:21
**50** 3:4,5

---

**6**

**6** 100:20
**6th** 82:19
**6,000** 28:21
**60** 93:19,20
**62** 3:6
**68** 3:7 41:23

---

**7**

**7** 3:21 19:22 38:17 119:20
**7th** 74:6 83:13
**70** 3:8,9
**75** 3:10
**76** 3:11
**78** 3:12,13

---

**8**

**8** 3:21 108:12 110:9
**8th** 51:17
**8:00** 43:7 52:17,18,20,21
**85** 3:14
**86** 4:5
**87** 4:6

---

**9**

**9** 106:8 122:3
**9th** 104:24
**9:17** 5:6
**9:19** 5:11
**9:21** 7:13
**9:22** 8:5
**9:30** 97:19 98:13,19 132:2,5
   133:8
**9:43** 16:12
**9:48** 21:5,17
**9:49** 21:23
**9:59** 27:23
**924** 126:5,18
**924(c)** 126:4,17
**941** 110:17
**950** 1:23
**98** 27:13 44:21 45:1,2
**99** 1:19 24:1 27:12,14 30:5 35:21
   35:24 36:2,9 44:21 45:1,6

---

**46:25 47:5**